IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| DEFENSE DISTRIBUTED and | § | Case No. 15-CV-372-RP |
| SECOND AMENDMENT FOUNDATION, INC., | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | |
| | § | |
| U.S. DEPARTMENT OF STATE, et al., | § | |
| | § | |
| Defendants. | § | |
| _____ | § | |

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Come now Plaintiffs, Defense Distributed and Second Amendment Foundation, Inc., by and

through counsel, and submit their Memorandum of Points and Authorities in Support of their

Motion for Preliminary Injunction.

Dated: May 11, 2015                    Respectfully submitted,

GURA & POSSESSKY, PLLC                 FISH & RICHARDSON P.C.

Alan Gura                              */s/ William B. Mateja*
Virginia Bar No. 68842*                William T. "Tommy" Jacks
Gura & Possessky, PLLC                 Texas State Bar No. 10452000
105 Oronoco Street, Suite 305          William B. Mateja
Alexandria, Virginia 22314             Texas State Bar No. 13185350
703.835.9085 / Fax 703.997.7665        David S. Morris
alan@gurapossessky.com                 Texas State Bar No. 24032877
                                       FISH & RICHARDSON P.C.
Matthew Goldstein                      One Congress Plaza, Suite 810
D.C. Bar No. 975000*                   111 Congress Avenue
Matthew A. Goldstein, PLLC             Austin, Texas 78701
1012 14th Street NW, Suite 620         (512) 472-5070 (Telephone)
Washington, DC 20005                   (512) 320-8935 (Facsimile)
202.550.0040/Fax 202.683.6679          jacks@fr.com
matthew@goldsteinpllc.com              dmorris@fr.com
                                       mateja@fr.com

Josh Blackman
Virginia Bar No. 78292*
1303 San Jacinto Street
Houston, Texas 77002
202.294.9003/Fax: 713.646.1766
joshblackman@gmail.com

*Admission pro hac vice pending

# TABLE OF CONTENTS

Preliminary Statement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Statement of Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    1.     Defendants' Regulation of "Technical Data". . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    2.     Defense Distributed's Publication of Technical Data . . . . . . . . . . . . . . . . . . . . . . . 5

    3.     Defendants' Imposition of a Prior Restraint Against Plaintiffs' Speech . . . . . . . . . . 7

          a.     The Published Files . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

          b.     The "Ghost Gunner" Files . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

          c.     The CAD Files . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

          d.     Prior Restraint on Other Files . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

    4.     Great, Irreparable, and Continuing Harm . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Summary of Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

    I.     Plaintiffs Are Likely to Succeed on the Merits . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

          A.     Congress Never Authorized Defendants' Censorship of
               Privately-Generated, Unclassified Speech . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

          B.     Defendants Are Violating Plaintiffs' First Amendment Rights . . . . . . . . . . . 14

               1.     Plaintiffs' Files Constitute Protected Speech . . . . . . . . . . . . . . . . . . 14

               2.     ITAR's Application to All Public, Unclassified Speech
                    Containing Technical Data Is Unconstitutionally Overbroad . . . . . 16

               3.     Defendants Impose an Unconstitutional Prior Restraint
                    Against Plaintiffs' Lawful Speech . . . . . . . . . . . . . . . . . . . . . . . . . . 19

                    a.     Unbridled Discretion to Censor Speech . . . . . . . . . . . . . . . 20

                    b.     Lengthy Delays and the Lack of Procedural Safeguards . . . 21

i

4.    Defendants' Speech Regulation of Plaintiffs' Speech Fails Any Level of First Amendment Scrutiny. . . . . . . . . . . . . . . . . . . . . 23

C.    Defendants' Prior Restraint is Void for Vagueness. . . . . . . . . . . . . . . . . . 24

D.    Defendants Are Violating Plaintiffs' Second Amendment Rights. . . . . . . . 25

1.    The Government Bears the Burden of Proving that Laws Burdening Second Amendment Rights Pass Heightened Scrutiny Review. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

2.    The Second Amendment Secures the Right to Produce Firearms, and to Exchange Technical Data Concerning Firearms. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

3.    Defendants' Regulations Fail Any Level of Second Amendment Scrutiny. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

II.    Defendants' Licensing Scheme Irreparably Harms Plaintiffs. . . . . . . . . . . . . . . . 29

III.    The Balance of Equities Favors Granting Injunctive Relief. . . . . . . . . . . . . . . . . 30

IV.    The Public Interest Warrants Injunctive Relief. . . . . . . . . . . . . . . . . . . . . . . . . . . 30

V.    No Bond or Other Security Is Required as a Condition of Providing Injunctive Relief. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

# TABLE OF AUTHORITIES

Cases

*Alexander* v. *United States*,
    509 U.S. 544 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Ashcroft* v. *Free Speech Coalition*,
    535 U.S. 234 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Awad* v. *Ziriax*,
    670 F.3d 1111 (10th Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Bernstein* v. *DOC*, No. C-95-0582-MHP,
    2004 U.S. Dist. LEXIS 6672 (N.D. Cal. Apr. 19, 2004). . . . . . . . . . . . . . . . 15

*Bernstein* v. *U.S. Dep't of State*,
    192 F.3d 1308 (9th Cir. 1999) (en banc) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Bernstein* v. *U.S. Dep't of State*,
    922 F. Supp. 1426 (N.D. Cal. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 21

*Bernstein* v. *U.S. Dep't of State*,
    945 F. Supp. 1279 (N.D. Cal. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Bernstein* v. *U.S. Dep't of State*,
    974 F. Supp. 1288 (N.D. Cal. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Bernstein* v. *United States Dep't of Justice*,
    176 F.3d 1132 (9th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Bowen* v. *Georgetown Univ. Hospital*,
    488 U.S. 204 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Burson* v. *Freeman*,
    504 U.S. 191 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Carey* v. *Pop. Servs. Int'l*,
    431 U.S. 678 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Catholic Leadership Coalition of Texas* v. *Reisman*,
    764 F.3d 409 (5th Cir. 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 19

*Chesapeake B & M, Inc.* v. *Harford County*,
    58 F.3d 1005 (4th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Chevron, U.S.A., Inc.* v. *Natural Res. Def. Council, Inc.*,
    467 U.S. 837 (1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Christensen* v. *Harris County*,
    529 U.S. 576 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 14

*Citizens United* v. *FEC*,
    558 U.S. 310 (2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*City of Lakewood* v. *Plain Dealer Publ'g Co.*,
    486 U.S. 750 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Connally* v. *General Const. Co.*,
    269 U.S. 385 (1926). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Deerfield Med. Center* v. *City of Deerfield Beach*,
    661 F.2d 328 (5th Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*District of Columbia* v. *Heller*,
    554 U.S. 570 (2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 26, 29

*East Brooks Books, Inc.* v. *Shelby County*,
    588 F.3d 360 (6th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Elrod* v. *Burns*,
    427 U.S. 347 (1976). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Ezell* v. *City of Chicago*,
    651 F.3d 684 (7th Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 29

*Fantasy Ranch, Inc.* v. *City of Arlington*,
    459 F.3d 546 (5th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Forsyth County* v. *Nationalist Movement*,
    505 U.S. 123 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Freedman* v. *Maryland*,
    380 U.S. 51 (1965). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 21, 22

*FW/PBS, Inc.* v. *Dallas*,
    493 U.S. 215 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Gibson* v. *Tex. Dep't of Ins.–Div. of Workers' Comp.*,
    700 F.3d 227 (5th Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Gorin* v. *United States*,
312 U.S. 19 (1941) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 18

*Grayned* v. *City of Rockford*,
408 U.S. 104 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Herceg* v. *Hustler Magazine, Inc.*,
814 F.2d 1017 (5th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Hoechst Diafoil Co.* v. *Nan Ya Plastics Corp.*,
174 F.3d 411 (4th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Holder* v. *Humanitarian Law Project*,
561 U.S. 1 (2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Hynes* v. *Mayor & Council of Oradell*,
425 U.S. 610 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Immigration and Naturalization Service* v. *St. Cyr*,
533 U.S. 289 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Jackson Women's Health Org.* v. *Currier*,
760 F.3d 448 (5th Cir. 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Junger* v. *Daily*,
209 F.3d 481 (6th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Kaepa, Inc.* v. *Achilles Corp.*,
76 F.3d 624 (5th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Louisiana Pub. Serv. Comm'n* v. *FCC*,
476 U.S. 355 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Mance* v. *Holder*, No. 4:14-cv-539-O,
2015 U.S. Dist. LEXIS 16679 (N.D. Tex. Feb. 11, 2015) . . . . . . . . . . . . . . . . . . 27

*Marceaux* v. *Lafayette City-Parish Consol. Gov't*,
731 F.3d 488 (5th Cir. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Martin* v. *Harrington & Richardson, Inc.*,
743 F.2d 1200 (7th Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*McCullen* v. *Coakley*,
134 S. Ct. 2518 (2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Michigan* v. *EPA*,
  268 F.3d 1075 (D.C. Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Miller* v. *California*,
  413 U.S. 15 (1973). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Nat'l Endowment for the Arts* v. *Finley*,
  524 U.S. 569 (1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Nat'l Rifle Ass'n of Am., Inc.* v. *Bureau of Alcohol, Tobacco, Firearms & Explosives*,
  700 F.3d 185 (5th Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 26, 28

*Reliable Consultants, Inc.* v. *Earle*,
  517 F.3d 738 (5th Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Richmond Newspapers* v. *Virginia*,
  448 U.S. 555 (1980). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Riley* v. *Nat'l Fed. of Blind of N.C.*,
  487 U.S. 781 (1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Shuttlesworth* v. *Birmingham*,
  394 U.S. 147 (1969). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Simon & Schuster, Inc.* v. *Members of the N.Y. State Crime Victims Bd.*,
  502 U.S. 105 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Skidmore* v. *Swift & Co.*,
  323 U.S. 134 (1944). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 14

*Speiser* v. *Randall*,
  357 U.S. 513 (1958). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Texas* v. *Seatrain Int'l, S.A.*,
  518 F.2d 175 (5th Cir. 1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*United States* v. *Alvarez*,
  132 S. Ct. 2537 (2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*United States* v. *Brown*,
  218 F.3d 415 (5th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*United States* v. *Edler Industries*,
  579 F.2d 516 (9th Cir. 1978). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17-19

*United States* v. *Featherston*,
    461 F.2d 1119 (5th Cir. 1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*United States* v. *Henry*,
    688 F.3d 637 (9th Cir. 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*United States* v. *Marzzarella*,
    614 F.3d 85 (3d Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*United States* v. *Masciandaro*,
    638 F.3d 458 (4th Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*United States* v. *Mead Corp.*,
    533 U.S. 218 (2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 14

*United States* v. *Playboy Entm't Group*,
    529 U.S. 803 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*United States* v. *Scruggs*,
    714 F.3d 258 (5th Cir. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*United States* v. *Stevens*,
    559 U.S. 460 (2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 23

*Universal City Studios, Inc.* v. *Corley*,
    273 F.3d 429 (2d Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Winter* v. *Natural Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10


Statutes, Rules and Regulations

18 U.S.C. § 2339A(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

18 U.S.C. § 794(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

22 C.F.R. Part 120 et seq.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

22 C.F.R. § 120.10. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

22 C.F.R. § 120.10(a)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

22 C.F.R. § 120.10(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 4, 7

22 C.F.R. § 120.11. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 7

22 C.F.R. § 120.11(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

22 C.F.R. § 120.11(a)(7) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

22 C.F.R. § 120.17(a)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

22 C.F.R. § 120.17(a)(4). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 12

22 C.F.R. § 120.4(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 21

22 C.F.R. § 120.41. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

22 C.F.R. § 120.6 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 21

22 C.F.R. § 121.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 21

22 C.F.R. § 121.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

22 C.F.R. § 125.4(b)(13). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

22 C.F.R. 128.1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

22 U.S.C. § 2778(a)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 12

22 U.S.C. § 2778(c). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

22 U.S.C. § 2778(e). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

22 U.S.C. § 2778(h). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Fed. R. Civ. P. 65(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Other Authorities

49 Fed. Reg. 47,682 (December 6, 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 13

74 Fed. Reg. 63497 (December 3, 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Andy Greenberg, "3D-Printed Guns As Art: London Design Museum Buys
 Two 'Liberator' Printed Pistols," *Forbes*, (Sep. 15, 2013),
 www.forbes.com/sites/andygreenberg/2013/09/15/3d-printed-guns-
 as-art-london-design-museum-buys-two-liberator-printed-pistols
 (last visited May 4, 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Chris Anderson, "The New MakerBot Replicator Might Just Change Your World,"
 *Wired* (Sep. 19, 2012) http://www.wired.com/2012/09/how-makerbots-
 replicator2-will-launch-era-of-desktop-manufacturing/all (last visited
 May 6, 2015).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Eugene Volokh, *Crime-Facilitating Speech*,
 57 Stan. L. Rev. 1095 (2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Geoffrey Fowler, "MakerBot's Bre Pettis: 3-D Printers Are for 'Everyone,'"
 *Wall St. J. Blog* (June 18, 2014) http://blogs.wsj.com/personal-
 technology/2014/06/18/makerbots-bre-pettis-3-d-printers-are-for-
 everyone (last visited May 6, 2015). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Mark Wilson, "Artist Warps 3-D Printed Gun Blueprints, Protests Gun Violence,"
 *Fast Company* (April 15, 2014), http://www.fastcodesign.com/3028300/
 infographic-of-the-day/artist-warps-3-d-printed-gun-blueprints-protests-
 gun-violence (last visited May 5, 2015). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Paola Antonelli, "Design and Violence Debate I: Open Source,"
 *MOMA* (March 27, 2014) http://designandviolence.moma.org/
 design-and-violence-debate-i-open-source (last visited May 4, 2015). . . . . . . . . . . . . . . . . . 6

Peter Jensen-Haxel, *3D Printers, Obsolete Firearm Supply Controls,
 and the Right to Build Self-Defense Weapons Under Heller*,
 42 Golden Gate U. L. Rev. 447 (2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Rachel Donadio, "A History of the Now, Found in Politically Charged Objects,"
 *New York Times* (July 6, 2014) http://www.nytimes.com/2014/07/07/
 arts/design/victoria-and-albert-museum-pushes-boundaries-of-collecting.
 html (last visited May 4, 2015).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

The Writings of Thomas Jefferson
 (T.J. Randolph, ed., 1830). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

"Final Commodity Jurisdiction Determinations,"
 https://www.pmddtc.state.gov/commodity_
 jurisdiction/determination.html (last visited May 8, 2015). . . . . . . . . . . . . . . . . . . . . . 2

PRELIMINARY STATEMENT

Contrary to the Justice Department's advice, and in derogation of rulemaking specifically designed to prevent such conduct, Defendants impose an unconstitutional prior restraint against Plaintiffs' lawful speech. By asserting that Internet postings regarding arms of the kind in common civilian use for traditional lawful purposes constitute "exports" subject to prepublication approval license requirements under the International Traffic in Arms Regulations (22 C.F.R. Part 120 et seq.) ("ITAR"), Defendants plainly violate Plaintiffs' First, Second, and Fifth Amendment rights, and those of their customers, visitors and members. A preliminary injunction is warranted.

STATEMENT OF FACTS

1.      *Defendants' Regulation of "Technical Data"*

The State Department's Directorate of Defense Trade Controls ("DDTC") administers the ITAR regime in order to effectuate the President's limited control over the export of "defense articles" under the Arms Export Control Act of 1976 ("AECA"), 22 U.S.C. § 2778(a)(1). ITAR's "U.S. Munitions List" ("USML"), 22 C.F.R. § 121.1, describes those "defense articles" whose export requires advance government authorization—including "technical data," 22 C.F.R. § 120.6. "Export means," inter alia, "[s]ending or taking a defense article out of the United States in any manner, except by mere travel outside of the United States by a person whose personal knowledge includes technical data," 22 C.F.R. § 120.17(a)(1), and "[d]isclosing (including oral or visual disclosure) or transferring technical data to a foreign person, whether in the United States or abroad," 22 C.F.R. § 120.17(a)(4). Unauthorized exports are punishable by up to twenty years in prison, fines of up to $1,000,000, and civil penalties up to $500,000. 22 U.S.C. § 2778(c), (e).

1

The ITAR's USML purports to cover twenty-one categories of "technical data," broadly defined as information "required for the design, development, production, manufacture, assembly, operation, repair, testing, maintenance or modification of defense articles." 22 C.F.R. § 120.10(a)(1). This includes "information in the form of blueprints, drawings, photographs, plans, instructions or documentation" and "software" "directly related to defense articles," *Id.*, although it excludes, inter alia, "general scientific, mathematical, or engineering principles commonly taught in schools, colleges, and universities, or information in the public domain . . . ." 22 C.F.R. § 120.10(b). When referring to various types of "technical data," the USML utilizes additional vague terms, such as "military application," *see, e.g.,* 22 C.F.R. § 121.1 at USML paragraphs XII(b), XV(c), and XVIII(b), which is undefined; and/or "specially designed," whose definition exceeds 900 words, 22 C.F.R. § 120.41. Moreover, the USML's Category XXI is a catch-all provision, controlling "Articles, Technical Data, and Defense Services Not Otherwise Enumerated." 22 C.F.R. § 121.1 at USML paragraph XXI(a). These problems in interpreting the scope of ITAR control are aggravated by the fact that, since 2011, the ITAR has been the subject of over fifty proposed and final published notices of rulemaking in the Federal Register.

"[I]f doubt exists as to whether an article or service is covered by the U.S. Munitions List," prospective exporters must obtain a "commodity jurisdiction" determination from DDTC. 22 C.F.R. § 120.4(a). DDTC reports that over four thousand commodity jurisdiction requests have been submitted since 2010.[1] Defendants identify the Office of Freedom of Information and Security Review, the predecessor to the Department of Defense Office of Prepublication Review and Security ("DOPSR"), as the government agency from which persons must obtain prior approval before they

---

[1]"Final Commodity Jurisdiction Determinations," https://www.pmddtc.state.gov/ commodity_jurisdiction/determination.html (last visited May 8, 2015).

can publish unclassified technical information subject to ITAR control, regardless of whether the information is privately created. 22 C.F.R. § 125.4(b)(13). However, neither the Code of Federal Regulations nor any other public law establishes a timeline for decision, standard of review, or an appeals process for DOPSR public release determinations. Worsening this situation, DOPSR refuses to review information that it deems is not clearly subject to the ITAR without a formal commodity jurisdiction determination.

Obtaining a commodity jurisdiction determination can take a long time. Reportedly, nonpublic National Security Council ("NSC") guidelines establish a sixty-day deadline for DDTC to render a commodity jurisdiction determination. App. 17. But Government Accountability Office, Office of Inspector General and Defendant DDTC's reports show that the NSC guidelines are routinely disregarded, as commodity jurisdiction requests languish at DDTC awaiting final determinations for well over a year or more. App. 36-41, 84-86.

From 1969 to 1984, Footnote 3 to former ITAR Section 125.11 implied a prepublication approval requirement on privately generated, ITAR-controlled technical data, stating that "[t]he burden for obtaining appropriate U.S. Government approval for the publication of technical data falling within the definition in § 125.01, including such data as may be developed under other than U.S. Government contract, is on the person or company seeking publication." App. 200. Beginning in 1978, the U.S. Department of Justice's Office of Legal Counsel issued a series of publicly-available opinions advising Congress, the White House, and the State Department that the use of ITAR to impose a prior restraint on publications of privately generated unclassified information violates the First Amendment. App. 99-196.

In 1980, Defendant DDTC's predecessor, the Department of State Office of Munitions Control, issued official guidance providing that "[a]pproval is not required for publication of data

within the United States as described in Section 125.11(a)(1). Footnote 3 to Section 125.11 does not establish a prepublication review requirement." App. 205. Thereafter, the State Department removed Footnote 3 from ITAR, expressly stating its intent to address First Amendment concerns. *See* 49 Fed. Reg. 47,682, 47,683 (December 6, 1984) ("Concerns were expressed, for example, on licensing requirements as they relate to the First Amendment to the Constitution. The revision seeks to reflect these concerns . . ."). As such, to the extent ITAR imposed any prepublication approval requirement on public speech containing unclassified technical information, the requirement was ostensibly removed in 1984.

Moreover, as noted *supra*, ITAR now expressly excludes from its scope information found in the public domain. *See* 22 C.F.R. § 120.10(b). A reasonable person reading ITAR's expansive definition of "public domain," 22 C.F.R. § 120.11, would conclude that private speech can thus enter the public domain without U.S. government approval. This is especially so considering that "public release . . . after approval by the cognizant U.S. government department or agency," 22 C.F.R. § 120.11(a)(7) is but one of eight sources of "information which is published and which is generally accessible or available to the public," 22 C.F.R. § 120.11(a). Moreover, anyone reading the ITAR would reason that "cognizant U.S. government department of agency" is only relevant to information generated under government contracts, and not to privately generated information.

The Internet contains a large, ever-expanding array of technical information arguably subject to ITAR control. Simple Google, Amazon, and Yahoo searches reveal all manner of technical data that might well fit within one or another USML designation published in books, journals, and other mediums. Indeed, in 1997, the Department of Justice reported to Congress that

> [i]t is readily apparent from our cursory examination that anyone interested in manufacturing a bomb, dangerous weapon or weapon of mass destruction can easily obtain detailed instructions for fabricating and using such a device. Available sources include not

only publications from the so-called underground press but also manuals written for legitimate purposes, such as military, agricultural, industrial and engineering purposes. Such information is also readily available to anyone with access to a home computer equipped with a modem.

App. 160.

2.      *Defense Distributed's Publication of Technical Data*

First developed in the 1980s, three-dimensional ("3D") printing technology allows a computer to "print" a physical object (as opposed to a two-dimensional image on paper). This technology was not widely available until open source communities such as the RepRap Project (www.reprap.org)[2] developed inexpensive but capable 3D printers.[3] Today, 3D printers are sold at stores such as Home Depot and Best Buy, and the instructions for printing everything from jewelry to toys to car parts are shared and exchanged freely online at sites like GrabCAD.com and Thingiverse.com.

Plaintiff Defense Distributed was organized and is operated for the purpose of defending the civil liberty of popular access to arms guaranteed by the United States Constitution through facilitating global access to, and the collaborative production of, information and knowledge related to the 3D printing of arms; and to publish and distribute, at no cost to the public, such information and knowledge on the Internet in promotion of the public interest. App. 1, ¶ 2. Beginning in 2012, Defense Distributed privately generated, and posted on the Internet for free access by the public,

---

[2]Open source communities are online forums through which individuals freely and collaboratively share their knowledge and discoveries.

[3]Geoffrey Fowler, "MakerBot's Bre Pettis: 3-D Printers Are for 'Everyone,'" *Wall St. J. Blog* (June 18, 2014) http://blogs.wsj.com/personal-technology/2014/06/18/makerbots-bre-pettis-3-d-printers-are-for-everyone (last visited May 6, 2015); Chris Anderson, "The New MakerBot Replicator Might Just Change Your World," *Wired* (Sep. 19, 2012) http://www.wired.com/2012/09/how-makerbots-replicator2-will-launch-era-of-desktop-manufacturing/all (last visited May 6, 2015)

technical information about various gun-related items, including a trigger guard, grips, two receivers, a magazine for AR-15 rifles, and a handgun named "The Liberator" (the "Published Files"). At the time, there were no publicly known DDTC enforcement actions for the posting of files on the Internet. *Id*. ¶ 3.

The Published Files were downloaded hundreds of thousands of times. App. 2, ¶ 4. The Liberator files in particular generated national media attention, with coverage in Forbes, CNN, NBC News, the Wall Street Journal, and even an episode of The Colbert Report. *Id*. Apart from their functional aspects, the Published Files have also proven to have artistic and political utility. For example, one artist has repurposed the Liberator schematics to create a statement protesting gun violence.[4] London's Victoria & Albert Museum purchased two 3D printed Liberators to display during its ongoing Design Festival.[5] And the Liberator prompted the Museum of Modern Art in New York to host a debate concerning the intersection of design and violence.[6]

---

[4]Mark Wilson, "Artist Warps 3-D Printed Gun Blueprints, Protests Gun Violence," *Fast Company* (April 15, 2014), http://www.fastcodesign.com/3028300/infographic-of-the-day/artist-warps-3-d-printed-gun-blueprints-protests-gun-violence (last visited May 5, 2015).

[5]Andy Greenberg, "3D-Printed Guns As Art: London Design Museum Buys Two 'Liberator' Printed Pistols," *Forbes*, (Sep. 15, 2013), www.forbes.com/sites/andygreenberg/2013/09/15/3d-printed-guns-as-art-london-design-museum-buys-two-liberator-printed-pistols (last visited May 4, 2015); Rachel Donadio, "A History of the Now, Found in Politically Charged Objects," *New York Times* (July 6, 2014) http://www.nytimes.com/2014/07/07/arts/design/victoria-and-albert-museum-pushes-boundaries-of-collecting.html (last visited May 4, 2015).

[6]Paola Antonelli, "Design and Violence Debate I: Open Source," *MOMA* (March 27, 2014) http://designandviolence.moma.org/design-and-violence-debate-i-open-source (last visited May 4, 2015).

3.    *Defendants' Imposition of a Prior Restraint Against Plaintiffs' Speech*

     a.    *The Published Files*

On May 8, 2013, Defendant Smith, Chief of Defendant DDTC's Enforcement Division, sent

Defense Distributed a letter that warned:

> DTCC/END is conducting a review of technical data made publicly available by Defense
> Distributed through its 3D printing website, DEFCAD.org, the majority of which appear to
> be related to items in Category I of the USML. Defense Distributed may have released
> ITAR-controlled technical data without the required prior authorization from the Directorate
> of Defense Trade Controls (DDTC), a violation of the ITAR . . . all such data should be
> removed from public access immediately.

App. 2, ¶ 5; App. 13-14.

At the time it posted the Published Files, Defense Distributed did not know that the

Defendants would demand to pre-approve its speech. Defense Distributed believed, and continues to

believe, that the United States Constitution guarantees a right to share truthful speech—especially

speech concerning fundamental constitutional rights—in open forums. App. 2, ¶ 6. Moreover, as

noted *supra*, ITAR specifically excludes from its coverage "technical data" appearing in the "public

domain," 22 C.F.R. § 120.10(b), the latter term appearing to broadly encompass Defense

Distributed's activities, *see* 22 C.F.R. § 120.11. Nevertheless, for fear of criminal and civil

enforcement, Defense Distributed promptly complied with Defendants' demands and removed all of

the Published Files from its servers. App. 2, ¶ 6.

Defendants' letter further directed Defense Distributed to submit the Published Files to

DDTC for review using the "commodity jurisdiction" procedure. App. 2, ¶ 7, App. 14. Defense

Distributed complied with Defendants' request and filed ten (10) commodity jurisdiction requests

covering the Published Files on June 21, 2013. App. 2, ¶ 7; Exh. 13. Nearly two years later,

Defendants have still not responded to the requests. App. 2, ¶ 7.

On September 25, 2014, Defense Distributed requested DOPSR's prepublication approval for public release of files containing technical information on a machine, named the "Ghost Gunner," that can be used to manufacture a variety of items, including gun parts (the "Ghost Gunner Files"). App. 3, ¶ 8; Exh. 14.[7] On October 1, 2014, DOPSR informed Defense Distributed this request for review was refused because DOPSR was unsure whether the Ghost Gunner was subject to ITAR. DOPSR further recommended that Defense Distributed submit another commodity jurisdiction request to the Defendants. App. 3, ¶ 8; Exh. 15.

Defense Distributed submitted another commodity jurisdiction request for the Ghost Gunner to Defendants on January 2, 2015. App. 3, ¶ 9; Exh. 16. On April 15, 2015, Defendant DDTC determined that the Ghost Gunner machine, user manual, and operating software are not subject to ITAR, but that "software, data files, project files, coding, and models for producing a defense article, to include 80% AR-15 lower receivers, are subject to the jurisdiction of the Department of State in accordance with [ITAR]." App. 3, ¶ 9; Exh. 17.

c. *The CAD Files*.

Since September 2, 2014, Defense Distributed has made multiple requests to DOPSR for prepublication review of certain computer-aided design ("CAD") files. App. 3-4, ¶ 10; Exhs. 18-21. On December 31, 2014, nearly four months after the first such review request, DOPSR sent Defense Distributed two letters stating its refusal to review the CAD files. App. 4, ¶ 10; Exh. 22. The letters directed Defense Distributed to the DDTC Compliance and Enforcement Division for further

---

[7]Any milling machine can be modified to mill components that are unlawful to manufacture, just as any saw that may be purchased at a hardware store can be used to unlawfully shorten a shotgun. However, Ghost Gunner does not ship with the jigs and code to manufacture machine guns, and Defense Distributed has no intention of offering such items for sale. *Id.*

questions on public release of the CAD files. *Id.* However, because this is not the DDTC division responsible for issuing licenses or other DDTC authorizations, on January 5, 2015, Defense Distributed requested Defendants' guidance on how to obtain authorization from DDTC Compliance for release of the CAD files. To date, Defendants have not responded to Defense Distributed's request for guidance. App. 4, ¶ 11; Exh. 23.

d.  *Prior Restraint on Other Files*

Defense Distributed has and will continue to create and possess other files that contain technical information, to include design drawings, rendered images, written manufacturing instructions, and other technical information that Defense Distributed intends to post to open forums on the Internet. Many of these files are described in the USML. App. 4, ¶ 13.

Plaintiff Second Amendment Foundation, Inc. ("SAF"), a non-profit membership organization, has over 650,000 members and supporters nationwide, including in Texas. The purposes of SAF include promoting the exercise of the right to keep and bear arms; and education, research, publishing and legal action focusing on the constitutional right to privately own and possess firearms, and the consequences of gun control. App. 6, ¶ 2. SAF's members have a keen interest in accessing, studying, sharing, modifying, and learning from Defense Distributed's various files, as well as similar 3D printing files related to firearm that they or other have created, but have been barred from doing so by Defendants' actions. *Id.* ¶ 3; App. 8, ¶ 4; App. 9, ¶ 5; App. 10, ¶ 4; App. 11, ¶ 5.

4.  *Great, Irreparable, and Continuing Harm*

But for Defendants' impositions upon the distribution of the Published Files, Ghost Gunner Files, CAD Files, and Defense Distributed's other files (collectively, the "Subject Files"), Plaintiffs would freely distribute the Subject Files and other files relating to Second Amendment arms.

Plaintiffs refrain from distributing the Subject Files because they reasonably fear that Defendants would pursue criminal and civil enforcement proceedings against Plaintiffs for doing so. App. 4-5, ¶ 14; App. 7, ¶ 4. Defendants' threats have thus silenced Plaintiffs. Defendants have deprived Plaintiffs' customers, visitors and patrons of access to Plaintiffs' speech; impeded their ability to likewise speak on the same subjects; and infringed their right to keep and bear arms.

SUMMARY OF ARGUMENT

"A plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Winter* v. *Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008) (citations omitted). These factors are measured along a "sliding scale . . . which takes into account the intensity of each [factor] in a given calculus." *Texas* v. *Seatrain Int'l, S.A.*, 518 F.2d 175, 180 (5th Cir. 1975) (citation omitted). Each of these four factors weighs heavily in Plaintiffs' favor.

ARGUMENT

I. PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS

A. CONGRESS NEVER AUTHORIZED DEFENDANTS' CENSORSHIP OF PRIVATELY-GENERATED, UNCLASSIFIED SPEECH.

"It is axiomatic that an administrative agency's power to promulgate legislative regulations is limited to the authority delegated by Congress." *Bowen* v. *Georgetown Univ. Hospital*, 488 U.S. 204, 208 (1988). "[A]n agency literally has no power to act . . . unless and until Congress confers power upon it." *Louisiana Pub. Serv. Comm'n* v. *FCC*, 476 U.S. 355, 374 (1986). Such authority "may not be lightly presumed." *Michigan* v. *EPA*, 268 F.3d 1075, 1082 (D.C. Cir. 2001). And "when a particular interpretation of a statute invokes the outer limits of Congress' power, we expect

10

a clear indication that Congress intended that result." *Immigration and Naturalization Service* v. *St. Cyr*, 533 U.S. 289, 299 (2001) (citation omitted).

Defendants have aggrandized for themselves nothing less than a power to censor privately-generated, unclassified "technical data" on the Internet. Their apparent syllogism holds: (1) the Internet is available worldwide, and is also available to foreign persons within the United States; (2) all speech posted to the Internet is thus deemed "exported;" (3) the export of "technical data" may be licensed and reviewed under ITAR; therefore (4) all "technical data" posted to the Internet is subject to ITAR controls and procedures. Q.E.D. Before addressing the constitutionality of this breathtaking regulatory regime, the Court should ask whether Congress granted Defendants such authority. As the Justice Department and Defendants' predecessors have opined, that question is answered "no."

The only potential source of statutory authority for Defendants' conduct would be found in the AECA, which authorizes the President, "[i]n furtherance of world peace and the security and foreign policy of the United States . . . to control the import and the export of defense articles and defense services and to provide foreign policy guidance to persons of the United States involved in the export and import of such articles and services." 22 U.S.C. § 2778(a)(1). To this end, "[t]he President is authorized to designate those items which shall be considered as defense articles and defense services for the purposes of this section and to promulgate regulations for the import and export of such articles and services." *Id.*

To be sure, Plaintiffs do not suggest that Defendants lack authority under the AECA to construct a narrowly-tailored regime to regulate the export of certain technical data. Nor do Plaintiffs suggest that uploading files to the Internet cannot be viewed, in some sense, as an export. Defendants can bar individuals from emailing classified blueprints for secret weapons systems to a foreign agent or providing technical assistance to a foreign person on designing defense articles. But

11

that is a very far cry from supposing that AECA authorizes the imposition of an indecipherable prior

restraint against sharing *all* public speech containing "technical data" on the Internet. And were the

AECA read to contain such a broad grant of prior restraint authority, there would be no reason to

limit that authority to the Internet. Recall that Defendants have broadly defined "export" to

encompass the act of "[d]isclosing (including oral or visual disclosure) . . . technical data to a

foreign person . . . in the United States." 22 C.F.R. § 120.17(a)(4). Any other publication of

"technical data," such as those appearing in countless scientific and academic publications, as well

as on television and at the movies, would be subject to Defendants' prior restraint. No American

could stand on a street corner or public square of any town visited by foreign tourists and declaim

"technical data" without being subject to Defendants' prior restraint.

This is doubtless not what Congress had in mind when delegating authority to regulate the

export of defense articles "[i]n furtherance of world peace and the security and foreign policy of the

United States." 22 U.S.C. § 2778(a)(1). In 1978, not long after the AECA's enactment, the Justice

Department doubted that the Act authorized a prior restraint against cryptographic speech, and

warned, "It is by no means clear from the language or legislative history of either statute [AECA

and ITAR] that Congress intended that the President regulate noncommercial dissemination of

information, or considered the problems such regulation would engender." App. 102.

> [W]e wish to emphasize our doubts that the executive branch may validly provide for
> licensing or prior approval of exports of cryptographic information without more explicit
> Congressional authorization. The scope of the existing delegation of authority from Congress
> to the President, as we note above, is somewhat unclear. Before imposing a prior restraint on
> exports of public cryptographic information, we believe that a more clear cut indication of
> Congressional judgment concerning the need for such a measure is in order . . . further
> Congressional authorization would obviously be necessary in order to extend governmental
> controls to domestic as well as foreign disclosures of public cryptographic information.

App. 113 (citations omitted); *cf.* App. 115 ("we are uncertain whether the present legislative authority for the technical data provisions of ITAR is adequate.")).

Defendants might claim that Congress's statute is purposefully vague and indeterminate, leaving to them the task of creating regulations governing the export of defense articles—a task clothed with a fair degree of judicial deference under the rule of *Chevron, U.S.A., Inc.* v. *Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842 (1984). But *Chevron* deference applies only "when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority." *United States* v. *Mead Corp.*, 533 U.S. 218, 227-28 (2001). In other words, the agency action entitled to deference must involve the exercise of some delegated process. "[A]djudication or notice-and-comment rulemaking," for example, may carry the force of law. *Id.* at 228. But "[i]nterpretations such as those in opinion letters—like interpretations contained in policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law—do not warrant *Chevron*-style deference." *Christensen* v. *Harris County*, 529 U.S. 576, 587 (2000) (citations omitted).

Defendants' prior restraint scheme is plainly not the product of its duly adopted rules. To the contrary, as noted *supra*, First Amendment concerns prompted the State Department to withdraw the only ITAR provision potentially authorizing a prior restraint regime in 1984, 49 Fed. Reg. 47,682 (December 6, 1984), four years after advising that the offending provision "does not establish a prepublication review requirement." App. 205. The prior restraint scheme has only been hinted at in Defendants' threatening letter to Defense Distributed and, perhaps, in Defendants' internal enforcement guidelines. "[I]nterpretations contained in formats such as opinion letters are 'entitled to respect' under our decision in *Skidmore* v. *Swift & Co.*, 323 U.S. 134, 140 (1944), but only to the

13

extent that those interpretations have the 'power to persuade.'" *Christensen*, 529 U.S. at 587

(parallel and other citations omitted).

> The weight [accorded to an administrative] judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control.

*Mead*, 533 U.S. at 228.

Defendants' prior restraint scheme plainly fails the *Skidmore* test. There is no evidence that

Defendants, unlike their predecessors and the Department of Justice, ever properly considered the

implications of applying a prior restraint to all speech containing technical data that might be

accessed or overheard by a foreigner. The practice is also starkly inconsistent with earlier

pronouncements, wherein the government took steps to clarify that export controls did *not* amount to

a prior restraint on private speech. Nor has this prior restraint been consistently applied. Defense

Distributed appears to be the scheme's *only* target, other websites containing similar computer files

are apparently unimpeded. App. 4, ¶ 12. Defendants' actions in imposing a prior restraint on

unclassified and public speech containing "technical data" lie beyond the authority delegated to

them by Congress—assuming Congress could even restrict constitutional rights so broadly.

B.    DEFENDANTS ARE VIOLATING PLAINTIFFS' FIRST AMENDMENT RIGHTS.

1.    *Plaintiffs' Files Constitute Protected Speech.*

"The First Amendment protects works which, taken as a whole, have serious literary,

artistic, political, or scientific value, regardless of whether the government or a majority of the

people approve of the ideas these works represent." *Miller* v. *California*, 413 U.S. 15, 34 (1973).

"[C]omputer code conveying information is 'speech' within the meaning of the First Amendment . . .

." *Universal City Studios, Inc.* v. *Corley*, 273 F.3d 429, 449-50 (2d Cir. 2001); *see also Junger* v.

*Daily*, 209 F.3d 481, 485 (6th Cir. 2000) ("Because computer source code is an expressive means for the exchange of information and ideas about computer programming, we hold that it is protected by the First Amendment."); *Bernstein* v. *United States Dep't of Justice*, 176 F.3d 1132, 1141 (9th Cir.) ("*Bernstein IV*") ("encryption software . . . must be viewed as expressive for First Amendment purposes, and thus is entitled to the protections of the prior restraint doctrine"), *reh'g in banc granted and opinion withdrawn*, 192 F.3d 1308 (9th Cir. 1999).[8]

To be sure, Plaintiffs' speech might be used to facilitate crime,[9] but that much is true of virtually all protected speech. "The prospect of crime . . . by itself does not justify laws suppressing protected speech." *Ashcroft* v. *Free Speech Coalition*, 535 U.S. 234, 245 (2002).

> The constitutional protection accorded to the freedom of speech and of the press is not based on the naive belief that speech can do no harm but on the confidence that the benefits society reaps from the free flow and exchange of ideas outweigh the costs society endures by receiving reprehensible or dangerous ideas.

*Herceg* v. *Hustler Magazine, Inc.*, 814 F.2d 1017, 1019 (5th Cir. 1987). Thus, while speech may be regulated for its hazardous aspects, "first amendment protection is not eliminated simply because publication of an idea creates a potential hazard." *Id.* at 1020. *See* Eugene Volokh, *Crime-Facilitating Speech*, 57 Stan. L. Rev. 1095, 1103 (2005).

---

[8]In *Bernstein* v. *U.S. Dep't of State*, 922 F. Supp. 1426 (N.D. Cal. 1996) ("*Bernstein I*"), a district court held that the source code for an ITAR-designated cryptographic program constituted protected First Amendment expression. The court subsequently struck down ITAR in *Bernstein* v. *U.S. Dep't of State*, 945 F. Supp. 1279 (N.D. Cal. 1996) ("*Bernstein II*"). When the government shifted control over the code's export from the State Department to the Commerce Department, the plaintiff amended his complaint to challenge the relevant Export Administration Regulations. The court struck down these regulations as well, *Bernstein* v. *U.S. Dep't of State*, 974 F. Supp. 1288 (N.D. Cal. 1997) ("*Bernstein III*"), and the Ninth Circuit affirmed that decision in *Bernstein IV*. Although the Court granted rehearing en banc, the government amended its regulations to exclude plaintiff's code from export controls, mooting the case. *See Bernstein* v. *DOC*, No. C-95-0582-MHP, 2004 U.S. Dist. LEXIS 6672, at *6 & n.2 (N.D. Cal. Apr. 19, 2004).

[9]It is less obvious that Plaintiffs' files would be particularly useful to foreign governments.

Furthermore, Defendants bear the burden of proving that Plaintiffs' speech is somehow unprotected. *See Freedman* v. *Maryland*, 380 U.S. 51, 58 (1965); *Speiser* v. *Randall*, 357 U.S. 513, 526 (1958). This they cannot do. This is not a case where the speech itself is inherently unprotected (e.g., perjury or fraud), or directly and exclusively aids and abets a criminal act. *Cf. United States* v. *Alvarez*, 132 S. Ct. 2537, 2547 (2012). Even were Plaintiffs' files purely functional and devoid of expressive content, Americans enjoy a fundamental right to possess the items described in and that can be created by the operation of Plaintiffs' files, which are legal to possess throughout most of the United States, including Texas.

2.   *ITAR's Application to All Public, Unclassified Speech Containing Technical Data Is Unconstitutionally Overbroad.*

"A statute is overbroad if in banning unprotected speech, a substantial amount of protected speech is prohibited or chilled in the process." *United States* v. *Scruggs*, 714 F.3d 258, 267 (5th Cir. 2013) (quotation omitted). A speech restriction is unconstitutional if "no set of circumstances exists under which [the law] would be valid or . . . the statute lacks any plainly legitimate sweep." *Catholic Leadership Coalition of Texas* v. *Reisman*, 764 F.3d 409, 426 (5th Cir. 2014) (quoting *United States* v. *Stevens*, 559 U.S. 460, 472 (2010)). A restriction is also unconstitutionally overbroad if "a substantial number of [the law's] applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Id.* (quoting *Stevens*, 559 U.S. at 473).

Given Defendants' sweeping views of what constitutes an "export"—virtually all speech in the presence of foreigners, including all Internet speech—and their equally broad definition of "technical data," ITAR cannot withstand constitutional scrutiny.

Federal laws criminalizing speech typically require that the targeted speech be made with intent or knowledge that the information would be used to facilitate criminal conduct, or with

knowledge that a particular recipient of the information intends to use it in the furtherance of

criminal activity. The Espionage Act, for example, only punishes those who seek to communicate

"with intent or reason to believe that [the information] is to be used to the injury of the United States

or to the advantage of a foreign nation." 18 U.S.C. § 794(a); see *Gorin* v. *United States*, 312 U.S.

19, 28 (1941) (upholding constitutionality of Espionage Act owing to scienter requirement). And it

is not a crime to provide material support or resources to terrorists, unless one "know[s] or intend[s]

that they are to be used in preparation for, or in carrying out, a violation" of various law. 18 U.S.C.

§ 2339A(a); *see Holder* v. *Humanitarian Law Project*, 561 U.S. 1 (2010); *see also United States*

v. *Featherston*, 461 F.2d 1119, 1121 (5th Cir. 1972) (upholding convictions for teaching the use or

making of explosives or incendiary devices, as statute "requires those prosecuted to have acted with

intent or knowledge that the information disseminated would be used in the furtherance of a civil

disorder.").

      A scienter requirement should likewise limit ITAR's reach in restricting speech. *United*

*States* v. *Edler Industries*, 579 F.2d 516 (9th Cir. 1978). In *Edler*, the Ninth Circuit overturned a

conviction under the AECA's predecessor act, and the ITAR regulations then in effect, because the

trial court rejected arguments that the technical data had non-military applications. The act and its

> definition of technical data are susceptible of an overbroad interpretation. Their expansive
> language may be construed to restrict not only the export of arms and information directly
> leading to the production of articles on the Munitions List, but also the interchange of
> scientific and technical information that of itself is without any substantial military
> application.

*Edler*, 579 F.2d at 520. To avoid the constitutional problem, the court construed ITAR's reach

narrowly, to "control the conduct of assisting foreign enterprises to obtain military equipment and

related technical expertise. So confined, the statute and regulations are not overbroad [or] an

unconstitutional prior restraint on speech." *Id.* at 521.

> [T]echnical data must relate in a significant fashion to some item on the Munitions List. Moreover, adequate notice to the potential exporter requires that the relationship be clear . . . Presumably, Congress intended that the technical data subject to control would be directly relevant to the production of a specified article on the Munitions List, not simply vaguely useful for the manufacture of arms.

*Id*. at 520-21. "If the information could have both peaceful and military applications, as Edler contends that its technology does, the defendant must know or have reason to know that its information is intended for the prohibited use." *Id*. at 521 (citing *Gorin*, 312 U.S. at 27-28).

Following *Edler*, the Department of Justice Office of Legal Counsel issued a memorandum to the State Department warning of "serious constitutional questions" were ITAR applied to "transactions in which an 'exporter' who is not otherwise connected or concerned with any foreign enterprise transmits technical data knowing, or having reason to know, that the data may be taken abroad and used by someone there in the manufacture or use of arms." App. 121.

> [T[he revised technical data provisions cannot constitutionally be applied to the dissemination of technical data by persons having no direct connection with foreign conduct in settings in which there is no more than belief or a reasonable basis for believing (1) that a foreign national may take the technical data abroad and (2) that the data could be used by someone there in the manufacture or use of items on the Munitions List.

App. 128. "For obvious reasons, the best legal solution for the overbreadth problem is for the Department of State, not the courts, to narrow the regulations." App. 129; see also App. 131 (1981 DOJ Memorandum to Commerce Dep't).

The Department of Justice reiterated these concerns in its 1997 report to Congress, counseling that prior restraints against Internet publication of bomb-making and use information violated the First Amendment, unless the publication was made "(i) with the intent that the information be used to facilitate criminal conduct, or (ii) with the knowledge that a particular recipient of the information intends to use it in furtherance of criminal activity." App. 156.

Defendants' censorship disregards both of these limitations. Plaintiffs are not seeking to help foreigners build controlled weapons of war. Rather, they are merely communicating with their fellow Americans, through a website, information regarding simple arms of the kind in common use for traditional lawful purposes that are themselves constitutionally protected. Had Defense Distributed designed a new type of diesel engine, that engine's possible utility in a tank would not authorize the State Department to prohibit the dissemination of blue prints, CAD files, or even executable 3D printing files on automotive-themed websites. *Cf. Edler*, 579 F.2d at 519. There is simply no telling where Defendants' censorship might end, unless it ends here.

3.      *Defendants Impose an Unconstitutional Prior Restraint Against Plaintiffs' Lawful Speech.*

"The classic prior restraint, of course, is an 'administrative [or] judicial order[] forbidding certain communications when issued in advance of the time that such communications are to occur.'" *Catholic Leadership Coalition*, 764 F.3d at 437 (quoting *Alexander* v. *United States*, 509 U.S. 544, 550 (1993) (other citations omitted). Prior restraints are, "in other words, laws which require a speaker 'to obtain prior approval for any expressive activities.'" *Gibson* v. *Tex. Dep't of Ins.–Div. of Workers' Comp.*, 700 F.3d 227, 235 (5th Cir. 2012) (quoting *Alexander*, 509 U.S. at 550-51). "Prior restraints face a well-established presumption against their constitutionality." *Marceaux* v. *Lafayette City-Parish Consol. Gov't*, 731 F.3d 488, 493 (5th Cir. 2013) (quotation omitted).

> In general, a prior restraint . . . will be upheld only if the government can establish that the activity restrained poses either a clear and present danger or a serious and imminent threat to a protected competing interest. The government must also establish that the order has been narrowly drawn and is the least restrictive means available.

*United States* v. *Brown*, 218 F.3d 415, 425 (5th Cir. 2000) (quotations omitted).

"Constitutional invalidity of prior restraints may result from one or both of 'two evils . . .: (1) the risk of censorship associated with the vesting of unbridled discretion in government officials; and (2) 'the risk of indefinitely suppressing permissible speech' when a licensing law fails to provide for the prompt issuance of a license." *East Brooks Books, Inc.* v. *Shelby County*, 588 F.3d 360, 369 (6th Cir. 2009) (quotation omitted); *FW/PBS, Inc.* v. *Dallas*, 493 U.S. 215, 225-27 (1990) (plurality opinion). Defendants' prior restraint inflicts both evils.

a.      Unbridled Discretion to Censor Speech.

"Statutes or policies" affording government officials "unbridled discretion" to determine "who may speak and who may not . . . are unconstitutional." *City of Lakewood* v. *Plain Dealer Publ'g Co.*, 486 U.S. 750, 763 (1988) (citations omitted). "[E]ven if the government may constitutionally impose content-neutral prohibitions on a particular manner of speech, it may not *condition* that speech on obtaining a license or permit from a government official in that official's boundless discretion." *Id.* at 763-64. Accordingly, standards governing prior restraints must be "narrow, objective and definite." *Shuttlesworth* v. *Birmingham*, 394 U.S. 147, 151 (1969). Standards involving "appraisal of facts, the exercise of judgment, [or] the formation of an opinion" are unacceptable. *Forsyth County* v. *Nationalist Movement*, 505 U.S. 123, 131 (1992) (quotation omitted). "Unbridled discretion naturally exists when a licensing scheme does not impose adequate standards to guide the licensor's discretion." *Chesapeake B & M, Inc.* v. *Harford County*, 58 F.3d 1005, 1009 (4th Cir. 1995) (en banc).

ITAR does not meaningfully limit Defendants' discretion. Reasonable persons must guess at what "specially designed" or "military application" truly mean and there are no limits to what DDTC can claim falls under USML Category XXI. Were Defendants able to readily apply their criteria, perhaps Defense Distributed's ten pending commodity jurisdiction requests would not

remain outstanding for nearly two years. "'Technical data' is perhaps the most confusing category of items regulated by the ITAR since it is defined separately and in relation to defense articles, 22 C.F.R. § 120.10, but is also defined as a defense article when it is covered by the USML. *See* 22 C.F.R. § 120.6." *Bernstein I*, 945 F. Supp. at 1284. Indeed, the regulations explicitly bar publication of a "Not Otherwise Enumerated" class of "technical data." 22 C.F.R. § 121.1 at USML paragraph XXI(b). An unenumerated prior restraint is the very definition of unbridled discretion. Respectfully, "if doubt exists as to whether [speech] is covered by the U.S. Munitions List," the solution should not be found in Defendants' inscrutable and often interminable "commodity jurisdiction" procedures. 22 C.F.R. § 120.4(a). Rather, the solution should be found in a judicial declaration that ITAR's speech controls must conform to First Amendment requirements.

b.      Lengthy Delays and the Lack of Procedural Safeguards.

"[T]he Supreme Court established three procedural safeguards to protect against the suppression of constitutionally protected speech by a censorship board." *Fantasy Ranch, Inc.* v. *City of Arlington*, 459 F.3d 546, 563 (5th Cir. 2006) (citing *Freedman*).

> First, any restraint before judicial review occurs can be imposed only for a specified brief period during which the status quo must be maintained; second, prompt judicial review of that decision must be available; and third, the censor must bear the burden of going to court to suppress the speech and must bear the burden of proof in court.

*Id*. (quotation omitted).

"The ITAR scheme, a paradigm of standardless discretion, fails on every count." *Bernstein I*, 945 F. Supp. at 1289. The DOPSR review process contains no publicly-known timelines in which the agency must complete its review. Aggravating this situation, in cases where DOPSR refuses to perform its review because of uncertain export control jurisdiction, as noted above, the period of time it takes to obtain a commodity jurisdiction request to enable DOPSR review can take months to

a year or more. Defense Distributed's ten commodity jurisdiction requests regarding the previously Published Files have been pending at DDTC for nearly two years—a long time throughout which Defense Distributed has been threatened with criminal enforcement should it republish the files.

And in cases where DOPSR refuses to allow publication and requires that a license be obtained from Defendants, nothing requires DDTC to issue a licensing decision within a specific and reasonable period of time. Relevant here, a "Policy on Review Time for License Applications" established under a 2008 National Security Decision Directive requires that DDTC "complete the review and adjudication of license applications within 60 days of receipt." *See* 74 Fed. Reg. 63497 (December 3, 2009). A two-month delay on the right to speak is per se unreasonable under the First Amendment. But even were a two-month delay constitutional, this policy contains broad "national security exceptions" allowing the government plenary authority to override the timeline. This exception effectively swallows the two month rule, as it applies where "[t]he Department of Defense has not yet completed its review" and "[w]hen a related export policy is under active review and pending final determination by the Department of State." *Id.* A prior restraint that "permits a delay without limits" is unconstitutional. *Riley* v. *Nat'l Fed. of Blind of N.C.*, 487 U.S. 781, 802 (1988).

And although "only a judicial determination in an adversary proceeding ensures the necessary sensitivity to freedom of expression, only a procedure requiring a judicial determination suffices to impose a valid final restraint," *Freedman*, 380 U.S. at 59, judicial review of DDTC or DOPSR actions is non-existent. In fact, ITAR expressly provides that Defendants' licensing determinations are *not* subject to judicial review under the Administrative Procedures Act. 22 C.F.R. § 128.1. And the AECA provides that "[t]he designation . . . of items as defense articles or defense services for purposes of this section shall not be subject to judicial review." 22 U.S.C. § 2778(h).

4.  Defendants' Speech Regulation of Plaintiffs' Speech Fails Any Level of
    First Amendment Scrutiny.

"Premised on mistrust of governmental power, the First Amendment stands against attempts to disfavor certain subjects or viewpoints." *Citizens United* v. *FEC*, 558 U.S. 310, 340 (2010) (citations omitted). "[A]s a general matter, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Stevens*, 559 U.S. at 468 (quotation omitted). A speech restriction is "content based if it require[s] enforcement authorities to examine the content of the message that is conveyed to determine whether a violation has occurred." *McCullen* v. *Coakley*, 134 S. Ct. 2518, 2531 (2014) (quotation omitted). This aptly describes Defendants' prior restraint. Plaintiffs are free to publish whatever they want, on the Internet or anywhere else, unless Defendants deem the content of Plaintiffs' speech to be ITAR-controlled.

It does not matter that Defendants might claim to be indifferent to any views expressed in Plaintiffs' speech. The absence of "illicit legislative intent" or an "improper censorial motive" is irrelevant when considering that Defendants' restriction is content-based. *Simon & Schuster, Inc*. v. *Members of the N.Y. State Crime Victims Bd.*, 502 U.S. 105, 117 (1991) (quotations omitted). Defendants have singled out speech about arms—and "the First Amendment's hostility to content-based regulation extends not only to a restriction on a particular viewpoint, but also to a prohibition of public discussion of an entire topic." *Burson* v. *Freeman*, 504 U.S. 191, 197 (1992) (plurality opinion) (citations omitted).

"Since [Defendants' practice] is a content-based speech restriction, it can stand only if it satisfies strict scrutiny." *United States* v. *Playboy Entm't Group*, 529 U.S. 803, 813 (2000) (citation omitted). This much, it cannot do. While Defendants may have a compelling interest in

controlling the export of sensitive data related to certain defense articles, the restriction is not narrowly tailored, reaching vastly more speech than needed to advance the regulatory interest, and capturing vastly more speech than that intended for a foreign audience.

C.    DEFENDANTS' PRIOR RESTRAINT IS VOID FOR VAGUENESS.

"It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned* v. *City of Rockford*, 408 U.S. 104, 108 (1972). Vagueness doctrine applies with particular force in review of laws dealing with speech. "[S]tricter standards of permissible statutory vagueness may be applied to a statute having a potentially inhibiting effect on speech; a man may the less be required to act at his peril here, because the free dissemination of ideas may be the loser." *Hynes* v. *Mayor & Council of Oradell*, 425 U.S. 610, 620 (1976) (quotations omitted). "Under the First and Fifth Amendments, speakers are protected from arbitrary and discriminatory enforcement of vague standards.'" *Nat'l Endowment for the Arts* v. *Finley*, 524 U.S. 569, 588 (1998) (citation omitted).

Defendants' prepublication approval requirement is by no means self-evident to reasonable people reading the ITAR. If anything, ITAR's exclusion of information in the public domain suggests a variety of avenues by which people might avoid ITAR's strictures by publishing their information. The regulatory regime has even been amended to remove the suggestion of a pre-publication review requirement, the validity of which the Justice Department has repeatedly questioned. The existence of a catch-all provision, and the need to submit to the opaque commodity jurisdiction procedures, confirm that persons of "common intelligence must necessarily guess at [ITAR's] meaning and differ as to its application." *Connally* v. *General Const. Co.*, 269 U.S. 385, 391 (1926) (citations omitted). It thus "violates the first essential of due process of law." *Id.*

D.    DEFENDANTS ARE VIOLATING PLAINTIFFS' SECOND AMENDMENT RIGHTS.

      1.    *The Government Bears the Burden of Proving that Laws Burdening Second Amendment Rights Pass Heightened Scrutiny Review.*

The Second Amendment functions as a normal constitutional right. As the Supreme Court demonstrated, some laws will be struck down for conflicting with the right's core guarantee, without employing any balancing test. *District of Columbia* v. *Heller*, 554 U.S. 570 (2008). In *Heller*, once it was determined that the Second Amendment secures a right to have handguns for self-defense, city ordinances banning handguns and the keeping of functional firearms simply could not survive. "The Court invalidated the laws because they violated the central right that the Second Amendment was intended to protect . . . ." *Nat'l Rifle Ass'n of Am., Inc.* v. *Bureau of Alcohol, Tobacco, Firearms & Explosives*, 700 F.3d 185, 193 (5th Cir. 2012) ("*NRA*"). Other cases lend themselves to different constitutional tests, *e.g.*, gun licensing laws affording unbridled discretion could be viewed as prior restraints, and disarmed individuals may raise as-applied challenges based on their personal circumstances.

But in large part, when Second Amendment claims arise,

> [a] two-step inquiry has emerged as the prevailing approach: the first step is to determine whether the challenged law impinges upon a right protected by the Second Amendment— that is, whether the law regulates conduct that falls within the scope of the Second Amendment's guarantee; the second step is to determine whether to apply intermediate or strict scrutiny to the law, and then to determine whether the law survives the proper level of scrutiny.

*NRA*, 700 F.3d at 194 (citations omitted). The Fifth Circuit follows this approach in appropriate cases, *Id.*, and this case appears to be well-suited to this approach.

"To determine whether a law impinges on the Second Amendment right, we look to whether the law harmonizes with the historical traditions associated with the Second Amendment guarantee." *Id.* (citations omitted). "If the challenged law burdens conduct that falls outside the Second

25

Amendment's scope, then the law passes constitutional muster. If the law burdens conduct that falls within the Second Amendment's scope, we then proceed to apply the appropriate level of means-ends scrutiny." *Id.* at 195 (citations omitted).

"[T]he appropriate level of scrutiny depends on the nature of the conduct being regulated and the degree to which the challenged law burdens the right." *NRA*, 700 F.3d at 195 (citations omitted). But at least in the Fifth Circuit, rational basis review is unavailable. Means-ends scrutiny in Second Amendment cases must always be heightened scrutiny—strict or intermediate. *Id.*

2.    *The Second Amendment Secures the Right to Produce Firearms, and to Exchange Technical Data Concerning Firearms.*

There is no question that the Second Amendment secures a right to possess firearms, including handguns such as the Liberator. *See Heller*. Because individuals have the right to render their firearms operable as such (and not be mere paperweights), *Heller*, 554 U.S. at 630, it follows that constitutional protection extends to any components necessary to the functioning of one's constitutionally-protected firearm.

But there must be more. "[C]ertain unarticulated rights are implicit in enumerated guarantees . . . fundamental rights, even though not expressly guaranteed, have been recognized by the Court as indispensable to the enjoyment of rights explicitly defined." *Richmond Newspapers* v. *Virginia*, 448 U.S. 555, 579-80 (1980). Because there is a right to possess handguns, there is, necessarily, a right to acquire them. And the most basic means of acquiring something, is to make it. Surely, the Second Amendment secures the right to make the arms that might then be kept or carried. *Cf. Martin* v. *Harrington & Richardson, Inc.*, 743 F.2d 1200, 1204 (7th Cir. 1984) (adopting tort doctrines "which would in practice drive [handgun] manufacturers out of business, would produce a handgun ban by judicial fiat in the face of" a constitutional right to handgun

possession."). If "restricting the ability to purchase an item is tantamount to restricting that item's use," *Reliable Consultants, Inc.* v. *Earle*, 517 F.3d 738, 743 (5th Cir. 2008) (footnote omitted), the same must be said of restricting the ability to manufacture that item.[10]

The fact manufactured arms might cross the Nation's borders does not diminish the right to arms. "Our citizens have always been free to make, vend and export arms. It is the constant occupation and livelihood of some of them." 3 THE WRITINGS OF THOMAS JEFFERSON 230 (T.J. Randolph, ed., 1830). "With organized armories inaccessible to the frontier and low barriers to entering the trade in all regions, the [early American] public could reasonably have understood a right to acquire arms through self-production." Peter Jensen-Haxel, *3D Printers, Obsolete Firearm Supply Controls, and the Right to Build Self-Defense Weapons Under Heller*, 42 Golden Gate U. L. Rev. 447, 478 (2012).

In keeping with the familiar rule "vendors and those in like positions . . . have been uniformly permitted to resist efforts at restricting their operations by acting as advocates for the rights of third parties who seek access to their market or function," *Carey* v. *Pop. Servs. Int'l*, 431 U.S. 678, 684 (1977) (quotation omitted); *Reliable Consultants*, 517 F.3d at 743, Plaintiffs are entitled to assert the Second Amendment rights of their customers and website visitors. "[O]perating a business that provides Second Amendment services is generally protected by the Second Amendment." *Mance* v. *Holder*, No. 4:14-cv-539-O, 2015 U.S. Dist. LEXIS 16679, at *25 n.8 (N.D. Tex. Feb. 11, 2015); *Ezell* v. *City of Chicago*, 651 F.3d 684, 696 (7th Cir. 2011) ("Action

_____

[10]In *United States* v. *Henry*, 688 F.3d 637 (9th Cir. 2012), the Ninth Circuit rejected a Second Amendment claim to a homemade machine gun. Notably, the court did not address, let alone deny that the Second Amendment secures the right to make firearms. Rather, the court held that this particular type of firearm lies outside the Second Amendment's scope. Plaintiffs do not claim a right in any arms or arms components that would lack Second Amendment protection.

Target, as a supplier of firing-range facilities, is harmed by the firing-range ban"). And SAF has associational standing to assert its members Second Amendment rights. *Mance*, at *11-*12.

       3.    *Defendants' Regulations Fail Any Level of Second Amendment Scrutiny.*

The prior restraint and prohibition of speech relating to the manufacture of firearms and related components is very much "a salient outlier in the historical landscape of gun control." *NRA*, 700 F.3d at 205. Never mind the Framing Era—nothing like this has existed in the United States until Defendants ordered the Liberator files taken down. As the record shows, ITAR was long ago amended specifically to remove the suggestion of such prior restraints. And while the Government's various opinions over the years have focused on the scheme's First Amendment problems, the fact remains that this type of conduct lies well outside American tradition and accepted legal norms.

"A regulation that threatens a right at the core of the Second Amendment—for example, the right of a law-abiding, responsible adult to possess and use a handgun to defend his or her home and family—triggers strict scrutiny." *NRA*, 700 F.3d at 195; *see also United States* v. *Masciandaro*, 638 F.3d 458, 470 (4th Cir. 2011) ("we assume that any law that would burden the 'fundamental,' core right of self-defense in the home by a law-abiding citizen would be subject to strict scrutiny"). Defendants' restrictions squarely fit this description, though the outcome would be no different under intermediate scrutiny, which "requires the government to demonstrate a 'reasonable fit' between the challenged regulation and an 'important' government objective," *NRA*, 700 F.3d at 195, and "may not burden more [conduct] than is reasonably necessary," *United States* v. *Marzzarella*, 614 F.3d 85, 98 (3d Cir. 2010).

Again, Plaintiffs do not question that the Government has a compelling interest in regulating the exportation of arms. But this interest cannot effectively override the traditional, centuries-old American craft of making arms of the kind to which individuals in this country enjoy a fundamental

right. If allowing Americans to exchange information useful in the manufacture of Second Amendment arms carries some risk that the information might be gleaned by a foreign government, there are nonetheless real limits on the Government's ability to mitigate that (theoretical) harm. The later-enacted Second Amendment acts as a limitation on Congress's authority to regulate foreign commerce, and not the other way around.

* * *

Plaintiffs are substantially likely to prevail on at least some if not all of their claims.

II. DEFENDANTS' LICENSING SCHEME IRREPARABLY HARMS PLAINTIFFS.

A finding that a constitutional right "'is either threatened or in fact being impaired'. . . mandates a finding of irreparable injury." *Deerfield Med. Center* v. *City of Deerfield Beach*, 661 F.2d 328, 338 (5th Cir. 1981) (quoting *Elrod* v. *Burns*, 427 U.S. 347, 373 (1976)). "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod*, 427 U.S. at 373-74 (citations omitted). And no constitutional right is so directly linked to one's immediate physical well-being as is the right to keep and bear arms. The interest in self-defense is the "*central component* of the [Second Amendment] right itself," *Heller*, 554 U.S. at 599 (emphasis original). As the Seventh Circuit explained,

> The loss of a First Amendment right is frequently presumed to cause irreparable harm based on "the intangible nature of the benefits flowing from the exercise of those rights; and the fear that, if those rights are not jealously safeguarded, persons will be deterred, even if imperceptibly, from exercising those rights in the future." The Second Amendment protects similarly intangible and unquantifiable interests. *Heller* held that the Amendment's central component is the right to possess firearms for protection. Infringements of this right cannot be compensated by damages.

*Ezell*, 651 F.3d at 699 (citations and footnote omitted).

29

III.    THE BALANCE OF EQUITIES FAVORS GRANTING INJUNCTIVE RELIEF.

While Plaintiffs suffer irreparable harm when their fundamental rights are violated, an injunction would not harm Defendants at all. First, it appears that Defendants have thus far targeted only Defense Distributed's website with a prior restraint on unclassified technical data. Defendants are not apparently taking action to control all technical data, or even just unclassified technical data relating to arms, present throughout the public domain. And an injunction would not bar Defendants from controlling the export of classified information.

IV.    THE PUBLIC INTEREST WARRANTS INJUNCTIVE RELIEF.

"[I]t is always in the public interest to prevent the violation of a party's constitutional rights." *Jackson Women's Health Org.* v. *Currier*, 760 F.3d 448, 458 n.9 (5th Cir. 2014) (quoting *Awad* v. *Ziriax*, 670 F.3d 1111, 1132 (10th Cir. 2012)); *De Leon* v. *Perry*, 975 F. Supp. 2d 632, 665 (W.D. Tex. 2014).

V.    NO BOND OR OTHER SECURITY IS REQUIRED AS A CONDITION OF INJUNCTIVE RELIEF.

The security requirement of Fed. R. Civ. P. 65(c) may be dispensed with when there is no risk of financial harm to the enjoined party. "In holding that the amount of security required pursuant to Rule 65(c) 'is a matter for the discretion of the trial court,' we have ruled that the court 'may elect to require no security at all.'" *Kaepa, Inc.* v. *Achilles Corp.*, 76 F.3d 624, 628 (5th Cir. 1996) (quotation and citations omitted). Even courts that view Rule 65(c) as mandatory are open to the idea of the mandatory bond being set at zero. *See Hoechst Diafoil Co.* v. *Nan Ya Plastics Corp.*, 174 F.3d 411, 421 n.3 (4th Cir. 1999). As an injunction would not financially harm Defendants, the Court should dispense with the bond requirement.

CONCLUSION

Plaintiffs respectfully request that the motion be granted.

30

Dated: May 11, 2015

Respectfully submitted,

GURA & POSSESSKY, PLLC

FISH & RICHARDSON P.C.

Alan Gura
Virginia Bar No. 68842*
Gura & Possessky, PLLC
105 Oronoco Street, Suite 305
Alexandria, Virginia 22314
703.835.9085 / Fax 703.997.7665
alan@gurapossessky.com

*/s/ William B. Mateja*
William T. "Tommy" Jacks
Texas State Bar No. 10452000
William B. Mateja
Texas State Bar No. 13185350
David S. Morris
Texas State Bar No. 24032877
FISH & RICHARDSON P.C.
One Congress Plaza, Suite 810
111 Congress Avenue
Austin, Texas 78701
(512) 472-5070 (Telephone)
(512) 320-8935 (Facsimile)
jacks@fr.com
dmorris@fr.com
mateja@fr.com

Matthew Goldstein
D.C. Bar No. 975000*
Matthew A. Goldstein, PLLC
1012 14th Street NW, Suite 620
Washington, DC 20005
202.550.0040/Fax 202.683.6679
matthew@goldsteinpllc.com

Josh Blackman
Virginia Bar No. 78292*
1303 San Jacinto Street
Houston, Texas 77002
202.294.9003/Fax: 713.646.1766
joshblackman@gmail.com

*Admission pro hac vice pending