IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| DEFENSE DISTRIBUTED and | § | Case No. 15-CV-372-RP |
| SECOND AMENDMENT FOUNDATION, INC., | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | |
| | § | |
| U.S. DEPARTMENT OF STATE, et al., | § | |
| | § | |
| Defendants. | § | |
| _____ | § | |

APPENDIX IN SUPPORT OF
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Contents

Declaration of Cody Wilson. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . App. 1

Declaration of Alan Gottlieb. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . App. 6

Declaration of Conn Williamson . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . App. 8

Declaration of Peter Versnel. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . App. 10

Exhibit 1 - DDTC Enforcement Division Letter (May 8, 2013) . . . . . . . . . . . . . . . . . . . . . App. 12

Exhibit 2 - Washington Trade & Tariff Letter, Vo. 29, No. 31. . . . . . . . . . . . . . . . . . . . . App. 16

Exhibit 3 - GAO Publication No. GAO-02-996. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . App. 21

Exhibit 4 - Office of Inspector General Memorandum Report 01-FP-M-027. . . . . . . . . . . . . App. 76

Exhibit 5 - DDTC June 3, 2014 Website Notice. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . App. 91

Exhibit 6 - 1978 Department of Justice Opinion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . App. 98

Exhibit 7 - 1981 Department of Justice Opinion (ITAR). . . . . . . . . . . . . . . . . . . . . . . . . . App. 116

Exhibit 8 - 1981 Department of Justice Opinion (EAR). . . . . . . . . . . . . . . . . . . . . . . . . . . . App. 130

Exhibit 9 - 1984 Department of Justice Opinion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . App. 136

Exhibit 10 - 1997 Department of Justice Report. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . App. 152

Exhibit 11 - 22 C.F.R. § 125.11 (1978). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . App. 197

Exhibit 12 - Munitions Control Newsletter No. 80.. . . . . . . . . . . . . . . . . . . . . . . . . . . . App. 204

Exhibit 13 - Defense Distributed Ten Commodity Jurisdiction Requests (June 21, 2013).. App. 207

Exhibit 14 - Defense Distributed DOPSR Request (September 25, 2014). . . . . . . . . . . . . App. 260

Exhibit 15 - DOPSR Refusal to Review Request (October 1, 2014). . . . . . . . . . . . . . . . . App. 263

Exhibit 16 - Ghost Gunner Commodity Jurisdiction Request (January 2, 2015). . . . . . . . App. 266

Exhibit 17 - DDTC Final Determination on Ghost Gunner (April 15, 2015). . . . . . . . . . . App. 279

Exhibit 18 - Defense Distributed DOPSR Request (September 2, 2014). . . . . . . . . . . . . . App. 282

Exhibit 19 - Defense Distributed DOPSR Request (October 9, 2014-C). . . . . . . . . . . . . . App. 286

Exhibit 20 - Defense Distributed DOPSR Request (October 9, 2014-M). . . . . . . . . . . . . . App. 290

Exhibit 21 - Defense Distributed DOPSR Request (October 23, 2014). . . . . . . . . . . . . . . App. 294

Exhibit 22 - DOPSR Refusal to Review Request (December 31, 2014). . . . . . . . . . . . . . . App. 298

Exhibit 23 - Defense Distributed Request for Advisory Opinion (January 5, 2015). . . . . . App. 305

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| DEFENSE DISTRIBUTED and | § | Case No. 15-CV-372 |
| SECOND AMENDMENT FOUNDATION, INC., | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | |
| | § | |
| U.S. DEPARTMENT OF STATE, et al., | § | |
| | § | |
| Defendants. | § | |
| | § | |

DECLARATION OF CODY WILSON

I, Cody Wilson, declare:

1.      I am a citizen of the United States and a resident of Texas.

2.      I co-founded and now lead Defense Distributed, a Texas non-profit corporation. Defense Distributed is organized and operated for the purpose of defending the civil liberty of popular access to arms guaranteed by the United States Constitution through facilitating global access to, and the collaborative production of, information and knowledge related to the 3D printing of arms; and to publish and distribute, at no cost to the public, such information and knowledge on the Internet in promotion of the public interest.

3.      Beginning in 2012, Defense Distributed privately generated, and posted on the Internet for free access by the public, technical information about various gun-related items, including a trigger guard, grips, two receivers, a magazine for AR-15 rifles, and a handgun named "The Liberator" (the "Published Files"). At the time it did so, there were no publicly known DDTC enforcement actions for the posting of files on the Internet.

4.      The Published Files were downloaded hundreds of thousands times. The Liberator files in particular generated national media attention, with coverage in Forbes, CNN, NBC News, the Wall Street Journal, and even an episode of The Colbert Report.

5.      In May 2013, Defense Distributed received a letter dated May 8, 2013, from Glenn Smith, Chief of Defendant DDTC's Enforcement Division. The letter warned:

> DTCC/END is conducting a review of technical data made publicly available by Defense Distributed through its 3D printing website, DEFCAD.org, the majority of which appear to be related to items in Category I of the USML. Defense Distributed may have released ITAR-controlled technical data without the required prior authorization from the Directorate of Defense Trade Controls (DDTC), a violation of the ITAR . . . all such data should be removed from public access immediately.

Exhibit 1 is a true and correct copy of that letter.

6.      At the time it posted the Published Files, Defense Distributed did not know that the government would demand to pre-approve its speech. Defense Distributed believed, and continues to believe, that the United States Constitution guarantees a right to share truthful speech—especially speech concerning fundamental constitutional rights—in open forums. Nevertheless, for fear of criminal and civil enforcement, Defense Distributed promptly complied with Defendants' demands and removed all of the Published Files from its servers.

7.      Defendants' letter further directed Defense Distributed to submit the Published Files to DDTC for review using the "commodity jurisdiction" procedure. Defense Distributed complied with Defendants' request and filed ten (10) commodity jurisdiction requests covering the Published Files on June 21, 2013. Exhibit 13 is a true and correct copy of those requests (without attachments). Nearly two years later, Defendants have still not responded to the requests.

8.      On September 25, 2014, Defense Distributed requested DOPSR's prepublication approval for public release of files containing technical information on a milling machine, named the "Ghost Gunner," that can be used to manufacture a variety of items, including gun parts (the "Ghost Gunner Files").[1] Exhibit 14 is a true and correct copy of that request (without attachments). On October 1, 2014, DOPSR informed Defense Distributed this request for review was refused because DOPSR was unsure whether the Ghost Gunner was subject to ITAR. DOPSR further recommended that Defense Distributed submit another commodity jurisdiction request to the Defendants. Exhibit 15 is a true and correct copy of DOPSR's October 1, 2014 correspondence to Defense Distributed.

9.      Defense Distributed submitted another commodity jurisdiction request for the Ghost Gunner to Defendants on January 2, 2015. Exhibit 16 is a true and correct copy of that request (without attachments). On April 15, 2015, Defendant DDTC determined that the Ghost Gunner machine, user manual, and operating software are not subject to ITAR, but that "software, data files, project files, coding, and models for producing a defense article, to include 80% AR-15 lower receivers, are subject to the jurisdiction of the Department of State in accordance with [ITAR]." Exhibit 17 is a true and correct copy of DOPSR's April 15, 2015 correspondence to Defense Distributed.

10.      Since September 2, 2014, Defense Distributed has made multiple requests to DOPSR for prepublication review of certain computer-aided design ("CAD") files. Exhibits 18 through 21 are true and correct copies of these requests (without attachments). On December 31,

---

[1]Any milling machine can be modified to mill components that are unlawful to manufacture, just as any saw that may be purchased at a hardware store can be used to unlawfully shorten a shotgun. However, Ghost Gunner does not ship with the jigs and code to

2014, nearly four months after the first such review request, DOPSR sent Defense Distributed two letters dated December 22, 2014, stating its refusal to review the CAD files. The letters directed Defense Distributed to the DDTC Compliance and Enforcement Division for further questions on public release of the CAD files. Exhibit 22 is a true and correct copy of DOPSR's December 31, 2014 correspondence to Defense Distributed.

11.     However, because this is not the DDTC division responsible for issuing licenses or other DDTC authorizations, on January 5, 2015, Defense Distributed requested Defendants' guidance on how to obtain authorization from DDTC Compliance for release of the CAD files. Exhibit 23 is a true and correct copy of that request (without attachments). To date, Defendants have not responded to Defense Distributed's request for guidance.

12.     Defense Distributed appears to be the ITAR prior restraint scheme's *only* target. Other websites containing similar firearm-related parts, such as GrabCAD.com, Weaponeer.com, Thingiverse.com, Ak-builder.com, AR15.com, Scribd.com, CNCguns.com, we are apparently unimpeded.

13.     Defense Distributed has and will continue to create and possess other files that contain technical information, to include design drawings, rendered images, written manufacturing instructions, and other technical information that Defense Distributed intends to post to open forums on the Internet. Many of these files are described in the USML.

14.     But for Defendants' impositions upon the distribution of the Published Files, Ghost Gunner Files, CAD Files, and Defense Distributed's other files (collectively, the "Subject Files"), Defense Distributed would freely distribute the Subject Files and other files relating to

---

manufacture machine guns, and Defense Distributed has no intention of offering such items for sale.

Second Amendment arms. Defense Distributed refrains from distributing the Subject Files

because I fear that Defendants would pursue criminal and civil enforcement proceedings against

me and the company for doing so.

I declare under penalty of perjury that the foregoing is true and correct.

This the 8th day of May, 2015.

Cody Wilson

Scanned by CamScanner

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| DEFENSE DISTRIBUTED and | § | Case No. 15-CV-372-RP |
| SECOND AMENDMENT FOUNDATION, INC., | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | |
| | § | |
| U.S. DEPARTMENT OF STATE, et al., | § | |
| | § | |
| Defendants. | § | |
| | § | |

DECLARATION OF ALAN GOTTLIEB

I, Alan Gottlieb, declare:

1.     I am a citizen of the United States and a resident of the state of Washington.

2.     I am the Executive Vice President of the Second Amendment Foundation, Inc.
(SAF). SAF is a non-profit membership organization incorporated under the laws of Washington
with its principal place of business in Bellevue, Washington. SAF has over 650,000 members and
supporters nationwide, including Texas. The purposes of SAF include education, research,
publishing and legal action focusing on the constitutional right to privately own and possess
firearms, and the consequences of gun control.

3.     The issues raised by, and consequences of, Defendants' policies, are of great interest
to SAF's constituency. Conn Williamson and Peter Versnel are members of SAF. Countless other
law-abiding, responsible adult SAF members and supporters would access, study, share, modify, and
learn from Defense Distributed's various files, as well as similar 3D printing files related to firearms
that they or others have created. SAF members would create and share firearm 3-D printing files.

1

4.     In furtherance of SAF's mission, and to serve its members and the public, SAF would publish and promote, on the Internet, the free distribution of Defense Distributed's various files, and allow its members and others to upload their own 3-D printing firearm-related files to SAF's servers for Internet publication. SAF is presently refraining from doing so only owing to the Government's interpretation of ITAR, including threats against Defense Distributed.

5.     SAF is proud to bring this action on behalf of its members.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this the 7th day of May, 2015.

_____
Alan Gottlieb

2

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| DEFENSE DISTRIBUTED and | § | Case No. _____ |
| SECOND AMENDMENT FOUNDATION, INC., | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | |
| | § | |
| U.S. DEPARTMENT OF STATE, et al., | § | |
| | § | |
| Defendants. | § | |
| _____ | § | |

DECLARATION OF CONN WILLIAMSON

I, Conn Williamson, declare:

1.     I am a citizen of the United States and a resident of the state of Washington.

2.     I am over the age of 21, am not under indictment, have never been convicted of a felony or misdemeanor crime of domestic violence, am not a fugitive from justice, am not an unlawful user of or addicted to any controlled substance, have never been adjudicated a mental defective or committed to a mental institution, have never been discharged from the Armed Forces under dishonorable conditions, have never renounced my citizenship, and have never been the subject of a restraining order relating to an intimate partner.

3.     I am a member of the Second Amendment Foundation.

4.     I have a keen interest in accessing, studying, sharing, modifying, and learning from Defense Distributed's various files, including files related to the Liberator handgun, as well as similar 3D printing files related to firearms that Defense Distributed or others have created. I am also interested in creating and sharing with others my own firearm 3-D printing files.

5.      I have sought to download firearm files from Defense Distributed, but could not locate them on Defense Distributed's website. I understand those files were taken down owing to threats issued by government officials. Such threats also dissuade me from publishing any 3-D firearm printing files that I might create. But for the government's threats of arrest and prosecution, I would access and share 3-D printing files related to firearms.

I declare under penalty of perjury that the foregoing is true and correct.

This the 6 day of May, 2015.

Conn Williamson

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| DEFENSE DISTRIBUTED and | § | Case No. _____ |
| SECOND AMENDMENT FOUNDATION, INC., | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | |
| | § | |
| U.S. DEPARTMENT OF STATE, et al., | § | |
| | § | |
| Defendants. | § | |
| _____ | § | |

DECLARATION OF PETER VERSNEL

I, Peter Versnel, declare:

1.      I am a citizen of the United States and a resident of the state of Washington.

2.      I am over the age of 21, am not under indictment, have never been convicted of a felony or misdemeanor crime of domestic violence, am not a fugitive from justice, am not an unlawful user of or addicted to any controlled substance, have never been adjudicated a mental defective or committed to a mental institution, have never been discharged from the Armed Forces under dishonorable conditions, have never renounced my citizenship, and have never been the subject of a restraining order relating to an intimate partner.

3.      I am a member of the Second Amendment Foundation.

4.      I have a keen interest in accessing, studying, sharing, modifying, and learning from Defense Distributed's various files, including files related to the Liberator handgun, as well as similar 3D printing files related to firearms that Defense Distributed or others have created. I am also interested in creating and sharing with others my own firearm 3-D printing files.

5.     I have sought to download firearm files from Defense Distributed, but could not locate them on Defense Distributed's website. I understand those files were taken down owing to threats issued by government officials. Such threats also dissuade me from publishing any 3-D firearm printing files that I might create. But for the government's threats of arrest and prosecution, I would access and share 3-D printing files related to firearms.

I declare under penalty of perjury that the foregoing is true and correct.

This the ⏜ day of May, 2015.


_____
Peter Versnel

# EXHIBIT 1



United States Department of State

*Bureau of Political-Military Affairs*
*Office of Defense Trade Controls Compliance*
*Washington, D.C. 20522-0112*

MAY 0 8 2013

In reply refer to



Mr. Cody Wilson
Defense Distributed

Dear Mr. Wilson:

The Department of State, Bureau of Political Military Affairs, Office of Defense Trade Controls Compliance, Enforcement Division (DTCC/END) is responsible for compliance with and civil enforcement of the Arms Export Control Act (22 U.S.C. 2778) (AECA) and the AECA's implementing regulations, the International Traffic in Arms Regulations (22 C.F.R. Parts 120-130) (ITAR). The AECA and the ITAR impose certain requirements and restrictions on the transfer of, and access to, controlled defense articles and related technical data designated by the United States Munitions List (USML) (22 C.F.R. Part 121).

DTCC/END is conducting a review of technical data made publicly available by Defense Distributed through its 3D printing website, DEFCAD.org, the majority of which appear to be related to items in Category I of the USML. Defense Distributed may have released ITAR-controlled technical data without the required prior authorization from the Directorate of Defense Trade Controls (DDTC), a violation of the ITAR.

Technical data regulated under the ITAR refers to information required for the design, development, production, manufacture, assembly, operation, repair, testing, maintenance or modification of defense articles, including information in the form of blueprints, drawings, photographs, plans, instructions or documentation. For a complete definition of technical data, see § 120.10 of the ITAR. Pursuant to § 127.1 of the ITAR,

- 2 -

it is unlawful to export any defense article or technical data for which a license or
written approval is required without first obtaining the required authorization from the
DDTC. Please note that disclosing (including oral or visual disclosure) or transferring
technical data to a foreign person, whether in the United States or abroad, is considered
an export under § 120.17 of the ITAR.

The Department believes Defense Distributed may not have established the
proper jurisdiction of the subject technical data. To resolve this matter officially, we
request that Defense Distributed submit Commodity Jurisdiction (CJ) determination
requests for the following selection of data files available on DEFCAD.org, and any
other technical data for which Defense Distributed is unable to determine proper
jurisdiction:

1. Defense Distributed Liberator pistol

2. .22 electric

3. 125mm BK-14M high-explosive anti-tank warhead

4. 5.56/.223 muzzle brake

5. Springfield XD-40 tactical slide assembly

6. Sound Moderator – slip on

7. "The Dirty Diane" 1/2-28 to 3/4-16 STP S3600 oil filter silencer adapter

8. 12 gauge to .22 CB sub-caliber insert

9. Voltlock electronic black powder system

10. VZ-58 front sight.

DTCC/END requests that Defense Distributed submit its CJ requests within three
weeks of receipt of this letter and notify this office of the final CJ determinations. All
CJ requests must be submitted electronically through an online application using the
DS-4076 Commodity Jurisdiction Request Form. The form, guidance for submitting CJ
requests, and other relevant information such as a copy of the ITAR can be found on
DDTC's website at http://www.pmddtc.state.gov.

Until the Department provides Defense Distributed with final CJ determinations,
Defense Distributed should treat the above technical data as ITAR-controlled. This
means that all such data should be removed from public access immediately. Defense
Distributed should also review the remainder of the data made public on its website to

determine whether any additional data may be similarly controlled and proceed according to ITAR requirements.

Additionally, DTCC/END requests information about the procedures Defense Distributed follows to determine the classification of its technical data, to include the aforementioned technical data files. We ask that you provide your procedures for determining proper jurisdiction of technical data within 30 days of the date of this letter to Ms. Bridget Van Buren, Compliance Specialist, Enforcement Division, at the address below:

<div align="center">Office of Defense Trade Controls Compliance</div>



We appreciate your full cooperation in this matter. Please note our reference number in any future correspondence.

<div align="center">Sincerely,</div>

Glenn E. Smith
Chief, Enforcement Division

# EXHIBIT 2

ISSN 0276-8275

WTTLonline.com

# Washington Tariff & Trade Letter®

A Weekly Report for Business Executives on
U.S. Trade Policies, Negotiations, Legislation,
Trade Laws and Export Controls

Editor & Publisher: Samuel M. Gilston • P.O. Box 5325, Rockville, MD 20848-5325 • Phone: 301.570.4544 Fax: 301.570.4545

**Vol. 29, No. 31**                                                      **August 3, 2009**

## NSC Issues Guidance to Speed Commodity Jurisdiction Decisions

President Obama's national security adviser, General Jim Jones, has issued new guidance aimed at shortening the deadline for State to issue Commodity Jurisdiction (CJ) decisions and creating an interagency process for resolving differences over CJ rulings. "There is now a new set of CJ procedural guidelines in place that General Jones signed about a month ago that compress the timelines" for CJ decisions, Bureau of Industry and Security (BIS) Acting Assistant Secretary Matthew Borman said July 28. "There is a regular weekly meeting between the agencies at a fairly senior level to look at CJs when there is still disagreement among the agencies," he told the BIS Sensors and Instrumentation Technical Advisory Committee (SITAC).

> The new guidance was issued June 18 to State's Directorate of Defense Trade Controls (DDTC), Defense's Defense Technology Security Administration (DTSA) and BIS. It implements one of the export control reforms President Bush initiated in a National Security Policy Directive (NSPD) in January 2008. It replaces CJ guidance last updated in 1996.

The new procedures cut the deadline for completing a CJ application to 60 days from 90 days. After the application is received by DDTC and sent out to the other agencies for review and comment, BIS and DTSA must give their responses in 20 days. If there is disagreement among the agencies, a meeting of officials from the three agencies will be held within 30 days. Officials at this meeting will be at the office director or deputy assistant secretary (DAS) level. After DDTC takes this advice, it will issue a preliminary decision. If there is still disagreement, the case will be escalated to a meeting of officials at the assistant secretary level. This Interagency Policy Committee (IPC) will be chaired by an official from the White House National Security Council. The final determination will still be up to DDTC.

So far, there have been two weekly meetings of DAS-level officials. The first meeting of the IPC is scheduled for the week of Aug. 3. At the first DAS-level meeting, five pending CJs were considered and 12 were reviewed at the second. In addition to new incoming applications, the process is also working on the backlog of older pending cases. DDTC is expected to roll out the new procedures publicly, along with a new CJ application form, in August.

## U.S.-China Talks Stress Close Economic Ties

That the U.S. and China are locked in an economic bear hug from which neither can let go was underscored by two days of bilateral talks July 27-28 of the newly renamed Strategic and

Copyright © 2009 Gilston-Kalin Communications, LLC.

All rights reserved. Reproduction, copying, electronic retransmission or entry to database without written permission of the publisher is prohibited by law.



Published weekly 50 times a year except last week in August and December. Subscription in print or by e-mail $647 a year. Combo subscription of print and e-mail is $747. Additional print copies mailed with full-price subscription are $100 each

Economic Dialogue (S&ED) in Washington.  From the opening ceremony, at which President Obama spoke, until the closing press conference, neither side wanted to upset the balance that links U.S. dependence on the Chinese buying U.S. Treasurys and China's need for the U.S. market for its exports.  U.S. Trade Representative (USTR) Ron Kirk sat in on the economic talks chaired by Treasury Secretary Timothy Geithner, and several trade topics, including the pending Section 421 case on tires, were mentioned briefly along with a laundry list of issues. The main forum for trade issues, however, will be the next meeting of the Joint Commission on Commerce and Trade (JCCT) that Kirk co-chairs with Commerce Secretary Gary Locke and their Chinese counterparts.  That meeting is tentatively planned for October in China.

> Missing from the public statements of Secretary of State Hillary Clinton and Geithner, who co-led the U.S. side of the talks, was any public mention of last year's hot-button issue, the undervaluation of the Chinese currency.  Although the topic reportedly was discussed in their closed-door meetings, the lack of public comment on the subject reflects reduced political interest in the exchange-rate issue in Congress and the greater need to assure the Chinese that their investment in U.S. bonds won't lose its value.

Instead of debating exchange rates, Chinese and American officials, including Obama, stressed the need for a more balanced economic relationship in which Americans save more and buy less and the Chinese expand domestic consumption and rely less on export-driven growth.  "I think the most important thing we achieved today was to agree on this broad framework for policies and reform, both China and the United States, to help lay the foundation for a more sustainable, more balanced global recovery," Geithner told reporters July 28.  "As part of that – again, this is the critical thing – that as we move to raise private savings in the United States, as we move to bring down our fiscal deficit in the future, as we move to put in place a more stable, more resilient financial system in the United States, we need to see actions in China and in other countries to shift the source of growth more to domestic demand," he said.

Chinese Vice Premier Wang Qishan said the two sides stressed the importance of taking strong measures to increase economic cooperation and trade.  "The U.S. side pledged to facilitate exports of high-technology products from the United States to China," he reported.  "The U.S. side is willing to step up cooperation with the Chinese side to work toward recognition of China's market economy status in an expeditious manner.  The two sides will work together to support increasing investment in infrastructure, continue to advance negotiations on bilateral investment agreement, and enhance cooperation in trade finance," he added.
.

## Obama Officials Faces Tough Choices on Model BIT

A July 29 public hearing on potential changes to the current model Bilateral Investment Treaty (BIT) the U.S. uses in investment treaties and free trade agreements sounded a lot like Goldilocks and the Three Bears.  Some speakers said the current model BIT is too strong; some said it was too weak; and some said it was just right.  Senior Obama administration officials will need to balance the demands from progressives for changes in the model to allow more exceptions from investment protections for environmental, natural resources and public interest concerns against business community calls for greater assurances that foreign investors will get fair and equitable treatment in BIT-signing countries.  A review of the model BIT is being conducted by State and the USTR's office, with a decision on any changes expected this fall.

Sharply different views about foreign investment were seen in statements by Todd Tucker of Public Citizen's Global Trade Watch and Stephen Canner of the U.S. Council for International Business (USCIB).  "The public is asking: as our domestic infrastructure is literally collapsing under our feet, why is the U.S. government promoting policies which incentivize investment abroad rather than directing it to crucial needs here at home?" Tucker testified.  "BITs serve [countries] well by serving as an advertisement that the country is a good place to do business," Canner said.  Critics of the BITs and foreign investment see the rules as giving undue advantages to foreign predatory investors and hurting the public interest, the environment and

domestic workers.   The international business community contends the treaties protect legiti-
mate investment from politically motivated governments and corrupt foreign courts.   The
structure of the model BIT is taking on more importance as the U.S. prepares to enter BIT
negotiations with China, Russia India, Brazil and Vietnam.

> Rep. Kevin Brady (R-Texas) was in the "don't-touch-current-model" camp.   "Now
> is not the time to weaken protection for U.S. companies abroad," he told the hear-
> ing.   "It would be unwise to alter the current model treaty," he said.   The 2004
> model BIT "addressed most, if not all, of the criticism to be heard today," Brady
> argued.   Faced with potential changes to the model that might weaken investment
> protections, the business community might end up supporting this view.

Tucker quoted presidential candidate Barack Obama's support for amending NAFTA and BITs
to assure protection for labor and environmental rights and "to make clear that fair laws and
regulations written to protect citizens in any of the three countries cannot be overridden simply
at the request of foreign investors."   Among the changes Tucker advocated is new language in
the model BIT to say "a Party shall not be prevented from adopting or maintaining measures
relating to financial services it employs for prudential reasons, including for the protection of
investors, depositors, policy holders, or persons to whom a fiduciary duty is owed by a
financial services supplier, or to ensure the integrity and stability of the financial system."

Sarah Anderson of the Institute for Policy Studies recommended amending the model to include
an exception that would allow governments to impose capital controls during an economic
crisis.   William Warren of the Forum for Democracy and Trade, whose members include state
and local governments officials, said BITs should not impede the sovereign rights of govern-
ments.   In particular, the model should shun ideological proposals based on "very radical
property rights" protections.   USCIB's Canner recommended strengthening BITs to assure the
free transfer of capital in and out of countries.   Capital controls just "cover up bad government
policies," he argued.

Business community support for strengthening BIT protections was offered by Calman Cohen,
president of the Emergency Committee for American Trade, a trade group representing many
multinational firms.   "The Model BIT should be revised to strengthen the provisions on fair and
equitable treatment, full protection and security and compensation for expropriation by requir-
ing such treatment without linking it to customary international law," he testified.   The linkage
to customary international law, which was added in 2004, provides a minimal level of protec-
tion, lower than provided under U.S. law and the BITs of most other capital exporting nations,
he explained.   A second change should modify the fair and equitable treatment standard to
clarify that both procedural and equity protections are covered by this obligation.   He proposed
adopting the standard in the Administrative Procedure Act which protects against government
action that is "arbitrary, capricious, [or] an abuse of discretion."

## BIS Stays Denial Order After Micei Files Appeal in Court

In two rare and perhaps unprecedented moves, <u>Micei International</u> of Skopje, Macedonia has
filed suit in federal court to block a BIS denial order, and BIS has stayed the order pending the
outcome of the case.   In motions filed May 19 and May 30, Micei asked the D.C. U.S. Circuit
Court to stay the denial order, set aside a default ruling issued against the firm by an admini-
strative law judge (ALJ) and to vacate the BIS denial order based on the ALJ's decision.

This may be the first court challenge of the BIS administrative settlement process and an ALJ's
determination under the Export Administration Regulations (EAR) since the *Iran Air* case in
1993 (see **WTTL**, July 5, 1993, page 1).   The suit also is a test of BIS' authority to use the
International Emergency Economic Powers Act (IEEPA) to impose a denial of exporting privi-
leges.   The BIS stay of its order apparently moots Micei's plea to the Circuit Court for a stay.
On May 14, BIS had imposed a $126,000 fine and a five-year denial of exporting privileges on
Micei because it had dealings with Yuri Montgomery, a Macedonian who was the subject

an earlier, separate denial order.  Micei had been charged with exporting an array of products, including boots, shirts and EAR99 items.  BIS based its order on an opinion by ALJ Michael Devine, who ruled that Micei had defaulted in the ALJ hearing proceedings because it had not properly responded to a proposed BIS Charging Letter and had not participated in the case.

Micei has hired attorney Clif Burns of <u>Bryan Cave</u> to represent it in its suit.  "In its June 30 filing with the D.C. Circuit, Micei made a number of assertions and presented documentary materials that were not part of the Stay Petition it had filed with BIS," the agency's July 24 stay order notes.  "BIS is continuing to evaluate and investigate questions surrounding the accuracy and foundation of those assertions, but nonetheless does not wish further delay in addressing and resolving the merits of Micei's petition for review," it adds. "In addition, Micei has recently hired new U.S.-based counsel and there are some indications that Micei may be prepared to more meaningfully engage on the issue," BIS states.

## * * * Briefs * * *

<u>USTR</u>: USTR Ron Kirk tried to quash speculation that he might return to Texas to run for Senate seat being vacated by Sen. Kay Bailey Hutchinson (R-Texas), who has said she will leave Senate to run for governor of Texas.  "I am happy where I am," Kirk told reporters July 31.  "I am not going to resign to run for the senate now or anytime in the future.  My life in politics is over," he said.

<u>ENVIRONMENTAL EXPORTS</u>: BIS is undertaking assessment of competitiveness of U.S. environmental products industry, including makers of solar panels, wind turbines and batteries.  Study will also look at impact export controls have on these firms.

<u>MAGNESIA CARBON BRICKS</u>: <u>Resco Products, Inc</u>, July 29, filed antidumping and countervailing duty complaints at ITC and ITA against imports of magnesia carbon bricks from China and antidumping complaint against imports from Mexico.

<u>EX-IM BANK</u>: Bank July 16 announced new program to buy back Ex-Im guaranteed medium- and long-term export loans from banks to give banks more liquidity.  "The Ex-Im Bank 'take-out' option will enable banks to offer much more competitive financing terms to their borrowers who wish to buy U.S. exports," said Ex-Im Senior Vice President John A. McAdams.  If guaranteed lender exercises take-out option, Ex-Im will buy, and guaranteed lender will transfer to Bank, any loans covered by take-out option and all related transaction documents in exchange for payment of loan purchase price, Ex-Im explained.  Bank will charge annual fee to lender for this option and additional fee if option is exercised.

<u>FCPA</u>: <u>Helmerich & Payne</u> entered deferred prosecution agreement with Justice July 30 and agreed to pay $1 million penalty to settle charges that it violated FCPA with payments of bribes to government officials in Argentina and Venezuela.  "The agreement recognizes H&P's voluntary disclosure and thorough self-investigation of the underlying conduct, the cooperation provided by the company to the Department, and the extensive remedial efforts undertaken by the company," Justice statement said.  In separate settlement with SEC, H&P agreed to pay $375,681 in disgorgement of profits and pre-judgment interest.

<u>MORE FCPA</u>: <u>Avery Dennison</u> of Pasedena, Calif., has entered settlements with SEC to resolve charges that it violated FCPA in connection with illegal payments its Reflectives Division of Avery (China) Co. Ltd. paid or authorized in kickbacks, sightseeing trips and gifts to Chinese government officials from 2002 to 2005.  Firm agreed to cease-and-desist order barring future violations of FCPA books and records requirements.  In administrative settlement, firm agreed to disgorge $273,213 plus $45,257 in prejudgement interest.  In civil action in D.C. U.S. District Court it agreed to pay $200,000 civil fine.

<u>POULTRY</u>: WTO Dispute-Settlement Body July 31 created panel to hear Chinese complaint against U.S. restrictions on imports of poultry from China.  Chinese object to provision in 2009 Omnibus Appropriations Act which says "none of the funds made available in this Act may be used to establish or implement a rule allowing poultry products to be imported into the United States from the People's Republic of China."  U.S. said it was disappointed by Chinese action.  "As we have stated, nothing in the measure identified by China prevents the relevant U.S. authorities from continuing to work together to reach an objective, science-based response to China's request for a declaration of equivalence with respect to poultry products," U.S. statement asserted.  "We also remain concerned with the way in which China has framed its panel request.  In particular, we must point out again that the request appears both to include measures that were not consulted upon or do not exist and to make claims under a covered agreement pursuant to which consultations were neither requested nor held," it added.

# EXHIBIT 3

**United States General Accounting Office**

# GAO

Report to the Chairman, Subcommittee on National Security, Veterans Affairs, and International Relations, Committee on Government Reform, House of Representatives

September 2002

# EXPORT CONTROLS

# Processes for Determining Proper Control of Defense-Related Items Need Improvement



**Accountability ★ Integrity ★ Reliability**

# Contents

| **Letter** | | **1** |
| --- | --- | --- |
| | Results in Brief | 2 |
| | Background | 3 |
| | Commerce Improperly Classified Items and Has Not Adhered to Regulatory Time Frames | 5 |
| | Commodity Jurisdiction Process Exceeded Time Frames and Is Affected by External Disagreements | 12 |
| | Conclusions | 18 |
| | Recommendations for Executive Action | 19 |
| | Agency Comments and Our Evaluation | 20 |
| | Scope and Methodology | 21 |
| **Appendix I** | **Comments from the Department of Commerce** | **24** |
| **Appendix II** | **Comments from the Department of State** | **39** |
| **Appendix III** | **Comments from the Department of Defense** | **44** |
| **Appendix IV** | **GAO Contact and Staff Acknowledgments** | **48** |
| **Related GAO Products** | | **49** |
| **Table** | Table 1: Commodity Classifications Completed by Commerce and Referred to State and Defense, Fiscal Years 1998-2001 | 6 |
| **Figures** | Figure 1: Median Processing Times for Commodity Classifications, Fiscal Years 1998-2001 | 11 |
| | Figure 2: Commodity Jurisdiction Process and Time Frames | 13 |

App. 23

Figure 3: Commodity Jurisdiction Determinations and Timeliness,
Fiscal Years 1998-2001                                                                    14

App. 24



**United States General Accounting Office**
**Washington, DC 20548**

September 20, 2002

The Honorable Christopher Shays
Chairman, Subcommittee on National Security,
 Veterans Affairs, and International Relations
Committee on Government Reform
House of Representatives

Dear Mr. Chairman:

The U.S. government controls the export of defense-related items to minimize the risk such exports may pose to its interests. The U.S. export control system is primarily divided between two regulatory regimes, one managed by the Department of State (State) for defense items[1] and another managed by the Department of Commerce (Commerce) for dual-use items that have both military and commercial applications. Generally, State's controls over defense items are more restrictive than Commerce's controls over dual-use items. Companies are responsible for determining which department to use and what requirements apply when exporting their items, but when in doubt can obtain government assistance through two different processes. If companies have determined that their items are Commerce-controlled but are uncertain of export licensing requirements, they may request a classification from Commerce through the commodity classification process. Commerce can refer classification requests to State and the Department of Defense (Defense) to confirm that the items are Commerce-controlled. However, if companies are unsure of which department has jurisdiction over their items, they can request a determination through the commodity jurisdiction process from State, which consults with Commerce and Defense.

Determining which department has jurisdiction over an item and how that item is controlled is fundamental to the proper implementation of the bifurcated U.S. export control system. Yet over the years, the U.S. government has experienced interagency disagreements over proper jurisdiction for items, and companies have been uncertain about which department controls the export of their items. In response to your request, we assessed how government departments assist companies in

---

[1] For the purposes of this report, "defense items" refers to defense articles and services as specified in the Arms Export Control Act.

determining the proper controls for defense-related items, specifically, (1) how Commerce implements the commodity classification process and (2) how State implements the commodity jurisdiction process.

## Results in Brief

In implementing the commodity classification process, Commerce has improperly classified some State-controlled items as Commerce-controlled and has not adhered to regulatory time frames for responding to requests. Improper classifications have occurred because Commerce rarely obtains input from State and Defense before making decisions. Only 40 out of over 12,000 classification requests were referred by Commerce to State and Defense during the 4-year period covered by our review, even though at least 250 nonreferred requests appear to meet Commerce's referral criteria. Commerce officials told us the referral criteria are subjective and may not have been consistently applied. These officials stated they have sufficient experience to determine which items can be classified as Commerce-controlled without referring requests to State and Defense, which could delay the process. However, in several instances, Commerce improperly provided companies with classifications for State-controlled items, increasing the risk of such items being inappropriately exported. In some other instances, Commerce returned classification requests for State-controlled items to companies without notifying State, thereby limiting an opportunity for State to ensure that companies comply with statutory requirements. Commerce is also required by regulation to complete classification requests within 14 calendar days; however, Commerce took a median of 39 days to complete requests during our review period.

State has not adhered to established time frames when implementing the commodity jurisdiction process and has been unable to issue determinations for some items due to interagency disputes occurring outside the process. State exceeded the maximum 95 days established in guidance for 62 percent of the jurisdiction determinations made during our review period. Causes for delays included late input from Defense and Commerce, disagreements over the appropriate jurisdiction for an item, need for sufficient information to make determinations, and untimely initial determinations to Defense and Commerce before finalizing an item's jurisdiction. Delays in the process can discourage companies from requesting determinations, as well as affect their ability to compete in certain markets. Additionally, over 30 commodity jurisdictions for space-related items were placed on hold when the National Security Council intervened to resolve a disagreement between Commerce and State. Pending resolution of this disagreement, companies that requested

jurisdiction determinations have exported their space-related items under different controls.

This report contains recommendations to the Secretaries of Commerce, State, and Defense to improve the transparency, consistency, and timeliness of the commodity classification and commodity jurisdiction processes.  In commenting on a draft of this report, Commerce disagreed with our findings and conclusions, but it agreed to work with State, Defense, and companies to implement our recommendations.  State, in its comments on our draft report, partially concurred with our recommendations.  Defense concurred with our recommendations.

## Background

The U.S. government's controls on the export of defense-related items are primarily divided between two departments. Commerce, through its Bureau of Industry and Security, controls the export of dual-use items under the authority granted by the Export Administration Act.[2] Commerce's Export Administration Regulations[3] establish the Commerce Control List, which generally contains detailed specifications for dual-use items. State, through its Office of Defense Trade Controls, regulates exports of defense items under the authority of the Arms Export Control Act.[4] State's International Traffic in Arms Regulations[5] provide controls over defense items, which are identified in broad categories on the U.S. Munitions List. Both departments' control lists are developed with the Defense Technology Security Administration, which represents Defense on export control issues. Defense reviews both State and Commerce export licenses for national security concerns.

Commerce and State control exports differently in several key areas. Commerce seeks to balance national security, foreign policy, and economic interests when considering how to control items and review export licenses. By contrast, State gives primacy to U.S. national security and foreign policy interests. In most cases, Commerce's controls over

---

[2] 50 U.S.C. App. secs. 2401 et seq.  Authority granted by the act terminated on August 20, 2001.  Executive Order 13222 continues the export control regime established under the act and the Export Administration Regulations.

[3] 15 C.F.R. secs. 730-774.

[4] 22 U.S.C. secs. 2751 et seq.

[5] 22 C.F.R. secs. 120-130.

dual-use items are less restrictive than State's controls over defense items. State requires licenses for exports and re-exports to all destinations with few exceptions, while many items under Commerce's jurisdiction do not require licenses to most destinations. Also, some sanctions and embargoes only apply to items on the U.S. Munitions List and not to those on the Commerce Control List. For example, most exports of defense items to destinations such as China are prohibited under State, while Commerce can allow the export of many dual-use items to China.

Companies are responsible for determining whether the item they seek to export is on the Commerce Control List and, therefore, subject to Commerce's jurisdiction, or on the U.S. Munitions List and subject to State's jurisdiction. Under Commerce regulations, companies may request a commodity classification when unsure of the requirements for exporting a Commerce-controlled item.[6] After reviewing the characteristics of the item, Commerce provides an export control classification number from the Commerce Control List, which indicates the applicable controls and licensing requirements.[7] Under State regulations, companies may request a commodity jurisdiction determination from State when unsure whether an item is subject to State or Commerce controls or when requesting that an item be transferred from State to Commerce jurisdiction.[8] State is to consult with Defense and Commerce to determine the proper jurisdiction of an item based on several criteria, including its civil applications and military significance. State is the arbiter in the commodity jurisdiction process and is the only department that may change the jurisdiction of an item.

In 1996, the National Security Council issued guidance to improve the transparency and interagency coordination of the commodity classification and commodity jurisdiction processes. The Council's guidance was prompted by State and Commerce disagreement over jurisdictional determinations. This guidance also came after Commerce issued a commodity classification for State-controlled missile technology, which resulted in harm to U.S. national security when this technology was improperly transferred to China. The guidance provides referral criteria

---

[6] 15 C.F.R. 748.3.

[7] Some items may also be designated "EAR99," which serves as a general designation for items that are covered by the Export Administration Regulations but are not specified on the Commerce Control List.

[8] 22 C.F.R. 120.4.

for when Commerce should consult with State and Defense on commodity classification requests before making a decision. In addition, the guidance establishes time frames for making commodity jurisdiction determinations as well as an interagency dispute resolution process.

## Commerce Improperly Classified Items and Has Not Adhered to Regulatory Time Frames

Commerce rarely referred classification requests to State and Defense, even though some items appear to meet referral criteria. Commerce officials said they usually do not obtain input from State and Defense since they have sufficient experience to properly classify items. As a result of the limited referrals, Commerce has improperly classified some State-controlled items as Commerce-controlled. Some of these improper classifications have been identified through the license application review process. However, since many items exported under Commerce do not require licenses to most destinations, the commodity classification process is sometimes the only opportunity for State and Defense to become aware of what companies are exporting. Therefore, other improper classifications may not have been identified.  In addition, Commerce has not adhered to regulatory time frames for issuing commodity classifications.

According to the National Security Council guidance, Commerce is to refer to State and Defense all commodity classification requests for "items/technologies specifically designed, developed, configured, adapted and modified for a military application or derived from items/technologies specifically designed, developed, configured, adapted or modified for a military application." State and Defense can then provide input on whether the items are State-controlled and therefore cannot be classified on the Commerce list or need to be reviewed through the commodity jurisdiction process. The guidance also directs Commerce to promptly forward to State requests from companies asking if an item is under Commerce or State jurisdiction.

## Commerce Rarely Referred Classification Requests That Appear to Meet Criteria

Commerce has referred a limited number of commodity classification requests to State and Defense. Of the 12,457 commodity classification requests completed during fiscal years 1998 through 2001, only 40 requests were referred by Commerce to State and Defense for review.[9] Commerce cited several reasons for referring these cases, including that the items had

---

[9] Commerce referred another request in fiscal year 2001 that has not been completed.

military applications or origins, were to be exported to military end-users, or were under State control. Through the referral process the departments agreed that 12 of the requests involved items under State jurisdiction,[10] 9 involved items under Commerce jurisdiction, 18 required additional review through the commodity jurisdiction process, and 1 was withdrawn by the company after it was referred. Commerce did not refer the remaining 12,417 commodity classification requests it completed during this period. Table 1 shows the number of commodity classifications and referrals by fiscal year.

**Table 1: Commodity Classifications Completed by Commerce and Referred to State and Defense, Fiscal Years 1998-2001**

| Fiscal year | Commodity classifications completed | Commodity classifications referred |
|---|---|---|
| 1998 | 2,721 | 6 |
| 1999 | 3,004 | 5 |
| 2000 | 3,411 | 12 |
| 2001 | 3,321 | 17 |
| **Total** | **12,457** | **40** |

Source: GAO's analysis of Commerce classification data.

Commerce has based its criteria for referring commodity classification requests to State and Defense on its interpretation of the National Security Council guidance. Commerce officials told us that they follow the guidance to refer classification requests for items specifically designed for military use. For example, Commerce referred a request involving software designed to analyze and simulate submarines. However, under their interpretation of the guidance, Commerce officials do not refer all requests involving items derived from military technology, only those that have been recently adapted for civilian use. For example, Commerce referred a classification request for a military vehicle that was converted for civilian use in the early 1990s. In addition to the guidance, Commerce officials stated they refer requests involving items where jurisdiction is unclear.

In contrast, State and Defense officials said that under their interpretations of the National Security Council guidance, Commerce should be referring most, if not all, commodity classification requests to

---

[10] One of the requests involved multiple items, most of which were determined to be State-controlled.

App. 30

them. For example, Defense officials stated that Commerce should refer classification requests for all items derived from military technology regardless of how long ago this occurred. They added that most items on the Commerce Control List were derived from items designed for the military. The officials also stated that Commerce should refer all classification requests involving items with unclear jurisdiction.

Commerce has not consistently applied its referral criteria for implementing the National Security Council guidance. We identified 253 commodity classification requests that appear to meet Commerce's stated criteria for referral but were not referred to State and Defense.

- Commerce returned 123 requests to companies without providing a classification and informed these companies that State should review the items through the commodity jurisdiction process. In other instances, Commerce has referred requests when it needed to confirm which department has jurisdiction over an item.
- Commerce returned 89 requests to companies without providing a classification and informed these companies that the items were subject to State control. By definition, an item that is State-controlled meets the referral criteria of being specifically designed for a military application. Also, Commerce has referred other requests to State and Defense for items it considered to be State-controlled.
- We identified 37 requests involving items that Commerce classified without referral to State and Defense but that are included in categories that appear on both State and Commerce control lists. For example, Commerce provided companies with classifications for two sensitive missile technology items that we had previously identified as subject to unclear jurisdiction since they appear on both Commerce and State's control lists.[11]
- We found 4 classifications issued by Commerce where the requests were not referred to State and Defense, involving items with military applications, military origins, or unclear jurisdiction—all of which were reasons Commerce cited when referring other requests. For example, one request involved night vision technology, which has military origins and applications and is currently under jurisdictional review by State.

---

[11] See General Accounting Office, *Export Controls: Clarification of Jurisdiction for Missile Technology Items Needed,* GAO-02-120 (Washington, D.C.: Oct. 9, 2001).

Commerce officials stated that the referral criteria are subjective and have not always been applied consistently by Commerce officials that review classification requests. These officials acknowledged that their implementation of the referral criteria may pose some risk of improperly classifying a State-controlled item, but the risk is minimal because Commerce reviewers have sufficient experience with classifying and licensing items. They also stated that increased referrals would limit their ability to meet the regulatory requirement to process commodity classification requests in a timely manner. State and Defense officials told us that they have the necessary expertise to review classification requests to ensure proper jurisdiction. Furthermore, only State, with Defense's concurrence, has been delegated the statutory authority to determine which items are under its jurisdiction.

Commerce does not always receive sufficient information from companies to identify all classification requests that meet referral criteria. Commerce regulations require companies to provide precise technical specifications on an item when submitting a commodity classification request. However, Commerce regulations do not require companies to submit information that relates to referral criteria such as whether an item's applications are predominantly military or civil or whether an item was originally developed for military use. Commerce officials stated that they do not need this information to make classification decisions but would need additional information in some cases to determine whether to refer requests to State and Defense.

## Commerce Has Improperly Classified State-Controlled Items and Limited State's Exporter Oversight

Classification of items without input from State and Defense has resulted in Commerce improperly classifying some State-controlled items. We identified several instances in which companies have received classifications from Commerce for State-controlled items without input from State and Defense. For example, one company received classifications for items that can be used to analyze missile flight test data and subsequently submitted several license applications to Commerce to export these items. During its review of the license applications, Defense questioned Commerce's jurisdiction over the items and the company agreed to seek licenses from State to export these items in the future. Two other companies received classifications from Commerce for items containing night vision technology. However, when these companies submitted export license applications to Commerce, Defense objected to Commerce jurisdiction and recommended that the items be licensed through State. Commerce returned one license application to the company because the item may be State-controlled and advised the company to

seek a commodity jurisdiction determination from State. The item in the other license application is currently under jurisdictional review by State.

While Defense officials can identify some improper classifications through the license review process, most Commerce-controlled items do not require export licenses. Therefore, the referral of commodity classification requests could provide State and Defense their only opportunity to become aware of what companies are exporting through Commerce. Of the total classifications provided to companies during fiscal years 1998 through 2001, about two-thirds involved classifications for items that generally would not require export licenses to most destinations. A State-controlled item that is classified as a Commerce item that generally does not require a license can then be improperly exported without the appropriate government review. We identified one company that received a commodity classification for explosive detection devices that would allow the company to export them to most destinations without Commerce licenses. Another company that exports the same devices through State's licensing process notified State of its competitor's activities. This prompted State to issue a commodity jurisdiction determination that the devices are State-controlled. Until this jurisdiction determination was issued, the company obtaining licenses from State experienced a competitive disadvantage because the other company could meet customer demands more quickly by not obtaining licenses.

By not referring classification requests, Commerce also does not provide State with an opportunity to ensure that companies comply with State's governing export control statute and regulations.  Pursuant to the Arms Export Control Act,[12] State's regulations require all manufacturers of defense items to register with State, even if they are not planning to export their items.[13]  The U.S. government then uses registration information to ensure compliance with export control laws. Based on our review of classification data, we identified several companies that did not register with State, as required by law, after Commerce advised them that their items were State-controlled. State officials said that they will determine what actions are needed to have these companies comply with the regulations and whether any violations occurred. In addition, a senior State official told us that Commerce's limited referrals and improper classifications may limit State's ability to have enforcement actions taken

---

[12] 22 U.S.C. sec. 2778(b).

[13] 22 C.F.R. 122.1.

App. 33

against companies for possible export control violations since the companies have already obtained government direction to export through the Commerce system.

## Commerce Has Not Met Required Commodity Classification Time Frames

Commerce has not adhered to regulatory time frames for responding to commodity classification requests from companies. The Export Administration Regulations require Commerce to provide companies with a classification within 14-calendar days.[14] However, during fiscal years 1998 through 2001, Commerce completed only 13 percent of the commodity classifications within 14 days. Commerce took a median of 39 days to respond to classification requests during this 4-year period. Figure 1 shows the median number of days Commerce took to respond to classification requests by fiscal year.

---

[14] 15 C.F.R. 750.2.

**Figure 1: Median Processing Times for Commodity Classifications, Fiscal Years 1998-2001**



Source: GAO's analysis of Commerce classification data.

Commerce officials stated that delays in responding to classification requests are due to other priorities, limited staff resources, and companies not providing required information. Commerce officials, who review commodity classification requests, assign highest priority to processing licenses because companies rely on the timely issuance of licenses to meet customers' orders. These officials have other duties that delay their review of classification requests, which include providing information for enforcement cases. Commerce officials noted that they recently received additional hiring authority for personnel to review commodity classification requests and perform other duties, but they have not yet completed the hiring process. Commerce officials also attributed delays to companies not providing required technical specifications with their commodity classification requests, estimating that about 80 percent of requests require officials to perform additional research. If companies provided the required information, then Commerce could spend less time

App. 35

processing each commodity classification request. Commerce officials told us that they have implemented a new procedure to place requests on hold while they obtain additional information from companies, thereby reflecting Commerce's actual processing time.

## Commodity Jurisdiction Process Exceeded Time Frames and Is Affected by External Disagreements

The commodity jurisdiction process has exceeded established time frames and is affected by external disagreements. State has often not adhered to the 95-day time frame established by the National Security Council for providing companies with commodity jurisdiction determinations. Factors that delay determinations have included late input from Defense and Commerce, disagreements among the departments over the appropriate jurisdiction for an item, need for sufficient information to make determinations, and initial determinations to Defense and Commerce not issued in accordance with guidance. Delays in resolving jurisdiction requests can discourage a company from using the process and affect its ability to compete in certain markets. In addition, an interagency disagreement being resolved outside the commodity jurisdiction process has affected the resolution of some requests.

According to the National Security Council guidance, all commodity jurisdiction requests are to be resolved through a State-led process within a maximum 95-calendar day time frame. During that period, State refers requests to Commerce and Defense, providing them up to 45 days to recommend the appropriate jurisdiction for an item.[15] State is also to resolve any disagreements over jurisdiction between the departments and issue a determination to the company. If the departments disagree on the appropriate jurisdiction for an item, they can escalate initial jurisdiction determinations to higher levels within State and ultimately to the President. Figure 2 shows each step in the commodity jurisdiction process and the associated time frames for issuing determinations.

---

[15] The National Security Council guidance indicates that Commerce and Defense should provide their recommendations within 35 calendar days, but they may request 10 additional days to submit recommendations for extraordinary cases.

**Figure 2: Commodity Jurisdiction Process and Time Frames**



Source: Based on National Security Council guidance.

## Commodity Jurisdiction Determinations Have Not Been Timely

State has not adhered to the time frames established in guidance for responding to commodity jurisdiction requests. Of the 802 commodity jurisdiction determinations made by State between October 1, 1997, and May 31, 2001, 62 percent took over the maximum 95 days to resolve.[16] State took a median of 118 days to issue a jurisdiction determination, with 25 percent taking twice as long as the established maximum time frame. Figure 3 shows the total number of determinations and those that took over 95 days to resolve by fiscal year.

**Figure 3: Commodity Jurisdiction Determinations and Timeliness, Fiscal Years 1998-2001**



Note: Fiscal year 2001 includes only those cases resolved by May 31, 2001.

Source: GAO's analysis of State commodity jurisdiction data.

---

[16] We requested data on jurisdiction determinations made during fiscal years 1998 through 2001. However, State only provided data on determinations made from fiscal year 1998 through May 31, 2001.

App. 38

While State consistently referred jurisdiction requests to Defense and Commerce in a timely manner, State has not adhered to established time frames for issuing commodity jurisdiction determinations generally due to four contributing factors. First, for the majority of determinations made between October 1, 1997, and May 31, 2001, Commerce and Defense did not provide their recommendations on the appropriate jurisdiction within 45 calendar days. Specifically, Commerce took a median of 81 days while Defense took 69 days to provide State with their respective recommendations. State officials explained that they are reluctant to make jurisdictional determinations without input from the other departments, particularly since Defense has a statutory role in developing the U.S. Munitions List. Defense and Commerce officials told us they are sometimes late because commodity jurisdictions are low priority. According to these officials, their limited staff resources are primarily devoted to reviewing export license applications. For example, during our review period, Defense had one official responsible for administering the commodity jurisdiction process and coordinating input from technical experts, but it has recently hired an additional staff person. Additional time may be needed for the departments to provide their recommendations in certain cases. For 3 of the 34 commodity jurisdiction files we reviewed, Defense officials requested additional time to provide their recommendations, citing either internal disagreements about the appropriate jurisdiction or the precedent setting nature of the case.

Second, State's ability to resolve jurisdiction requests has been delayed by disagreements between the departments over the appropriate jurisdiction for an item. When Commerce and Defense both provided recommendations to State, they conflicted 35 percent of the time. In such cases, State took a median of 51 additional days to issue a determination. According to State officials, they attempted to reconcile the departments' positions by discussing the cases with the departments and conducting further research on the military applications and origins of the item. In one of the commodity jurisdiction files we reviewed where there was disagreement between the departments, State indicated that it was suspending the established time frame because the case was complex.

Third, the issuance of commodity jurisdiction determinations has been delayed by the need for sufficient information. In some instances, State officials told us that they have not always found the information and justifications from Commerce to be sufficient for them to make determinations. In several of the commodity jurisdiction files we reviewed, Commerce did not fully address whether the items have predominate civil applications or performance equivalents to those used in civil applications,

App. 39

which are among the criteria State uses when determining jurisdiction. According to Commerce and State officials, Commerce has recently improved the quality of input to State. Furthermore, State officials told us they need to conduct additional research on an item before making a determination, regardless of the quality of input from Commerce and Defense.

Fourth, State has not always issued initial determinations in accordance with the guidance. State is to provide Commerce and Defense with initial jurisdiction determinations no later than 55 calendar days after receiving a request, even when those departments have not provided their input. If Commerce and Defense do not object within 5 days, State's decision becomes final. According to Commerce and Defense officials, commodity jurisdictions become a priority when they receive State's initial determinations, so they can provide input before the determinations become final. A senior State official told us that State would prefer to receive Commerce and Defense's input as set out in the guidance before issuing an initial determination. Our review of commodity jurisdiction files indicated that most did not contain documentation on initial determinations. Those files that did contain documentation indicated that State issued initial determinations more than 75 days after receiving the request. Additionally, State has not tracked the issuance of initial determinations in its commodity jurisdiction database.

While the commodity jurisdiction process is used to assist companies, State's delays may discourage companies from requesting jurisdiction determinations. For example, officials from two companies told us that they are reluctant to request determinations in the future because of delays they have experienced in the process. Officials with other companies expressed dissatisfaction with the process because they were unable to obtain information from State on the status of their pending requests. Therefore, companies may determine jurisdiction on their own or seek jurisdiction guidance outside the process.

Delays in the commodity jurisdiction process may also affect a company's ability to compete in certain markets. An item is generally subject to State's export controls until State determines otherwise. As a result, pending the resolution of a commodity jurisdiction request, the item is subject to State's restrictions and generally requires a license to be exported. Under current U.S. law, most items subject to State's jurisdiction

App. 40

cannot be licensed for export to China.[17] Commerce does not have a comparable restriction on the export of dual-use items to China. For example, officials with one company informed us that they were unable to compete for a significant contract in China while waiting over a year for a commodity jurisdiction determination. State eventually determined that the item in question was subject to Commerce's jurisdiction, which it did in 36 percent of the cases resolved during our review period. Officials with other companies also stated that delays in receiving jurisdiction determinations have affected their ability to compete in certain markets.

## Interagency Disagreement Outside the Process Affects Resolution of Some Commodity Jurisdiction Requests

Commodity jurisdiction requests for space-related items have remained unresolved for several years due to an interagency jurisdictional debate occurring outside the established commodity jurisdiction process. In March 1999, State and Commerce issued regulations pursuant to a change in law that transferred commercial satellites and related items from Commerce's jurisdiction to State's jurisdiction.[18] Commerce and State disagreed on what constituted "related items" and whether the law transferred certain space-related items to State. The National Security Council initiated an interagency review to resolve the disagreement and determine jurisdiction over these items. At the direction of the National Security Council, State placed commodity jurisdiction cases for space-related items on hold until an interagency agreement could be reached and implemented. As a result, State officials said they placed 33 commodity jurisdiction cases on hold, most of which have been open since 1999. In 2001, State and Commerce announced the resolution of the disagreement, and they are currently developing regulations to specify control over these items.

While their commodity jurisdiction requests remain on hold, companies have exported their space-related items through both departments. Officials with four companies told us that they have been exporting their space-related items through State. Officials with another company told us, that based on advice from Commerce, they have been exporting their space-related items through Commerce. State and Commerce officials confirmed that companies could export such items through Commerce.

---

[17] P.L. 101-246, Feb. 16, 1990. Under the statute, licensing of State-controlled items for export to China is prohibited unless the President reports to Congress that (1) China has achieved certain political and human rights reforms or (2) it is in the U.S. national interest.

[18] P.L. 105-261, Oct. 17, 1998.

However, neither department issued written guidance specifying what companies with pending commodity jurisdiction requests should do.

While the origins of the jurisdictional disagreement over space-related items were unique, disagreements between departments over the jurisdiction of other items could limit State's ability to make determinations through the commodity jurisdiction process. For example, State has placed a jurisdiction request involving night vision technology on hold until jurisdiction for that technology is decided through the ongoing review of the U.S. Munitions List.[19] State officials said they expect this review of night vision technology to be difficult and time-consuming to complete. Defense and Commerce officials also told us that there is considerable interagency debate on how night vision technology should be controlled.

## Conclusions

The bifurcated U.S. export control system seeks to manage risks by balancing national security and foreign policy with economic interests. Commerce has altered this balance by not implementing the commodity classification process in a manner that considers other stakeholder interests. While State's implementation of the commodity jurisdiction process allows for the consideration of multiple interests, it is slow to reach decisions and, in some cases, has been affected by larger interagency disputes occurring outside of the process. Existing guidance was intended to improve transparency and coordination within these processes, but problems persist. If the U.S. export control system is to effectively manage risk, these processes have to balance stakeholder interests, be transparent to stakeholders, and efficiently reach and communicate decisions. In the absence of this, the U.S. government faces the possibility of defense-related items being exported without the proper level of government review and control to protect national interests. Also, companies may export similar items under different controls, placing some companies at a competitive disadvantage or at risk of violating U.S. export control laws.

---

[19] State and Defense are reviewing and revising different portions of the U.S. Munitions List on an annual basis, as part of the Defense Trade Security Initiative, to ensure that coverage on the list is appropriate. See General Accounting Office, *Defense Trade: Analysis of Support for Recent Initiatives*, GAO/NSIAD-00-191 (Washington, D.C.: Aug. 31, 2000).

# Recommendations for Executive Action

To increase transparency to stakeholders and minimize the risk of Commerce making jurisdictional determinations through the commodity classification process, we recommend that the Secretary of Commerce direct the Bureau of Industry and Security to promptly review existing guidance and develop, with the concurrence of the appropriate entities within State and Defense, criteria for referring commodity classification requests to those departments. In developing the criteria, the departments should agree on a common definition of terms to be contained in the criteria. Until the departments develop and implement referral criteria, the risk of Commerce improperly classifying State-controlled items will continue to exist.

To increase transparency and assist State in enforcing its statutory requirements, we recommend that the Secretary of Commerce direct the Bureau of Industry and Security to develop, with the concurrence of State's Office of Defense Trade Controls, procedures for referring requests that are returned to companies because the items are State-controlled or require a commodity jurisdiction review.

To ensure that Commerce has sufficient information to make timely and appropriate commodity classifications, we recommend that the Secretary of Commerce direct the Bureau of Industry and Security to revise guidance for companies on the information to be provided with commodity classification requests and consider including a requirement for information on an item's origins and applications.

To comply with existing time frames for responding to classification requests, we recommend that the Secretary of Commerce direct the Bureau of Industry and Security to assess the amount of resources needed, then reallocate resources as appropriate.

To improve the timeliness of the commodity jurisdiction process, we recommend that the Secretaries of State, Commerce, and Defense direct the respective entities within their departments to assess the amount of resources needed to make jurisdiction recommendations and determinations within established time frames, then either reallocate resources as appropriate or seek changes to the established time frames that are consistent with available resources. We also recommend that the Secretary of State direct the Office of Defense Trade Controls to issue initial determinations in accordance with the guidance.

To improve transparency and consistency of the commodity classification and jurisdiction processes, we recommend that the Secretaries of State,

Commerce, and Defense revise interagency guidance to incorporate any changes to the referral process and time frames for making decisions.

# Agency Comments and Our Evaluation

We received written comments on a draft of this report from Commerce, State, and Defense, which are reprinted in appendixes I, II, and III, respectively, along with our detailed evaluation of their comments. Commerce disagreed with our findings and conclusions, which it believes are based on erroneous facts and, therefore, are fundamentally flawed. Specifically, Commerce did not agree with our finding that 253 classification requests, which were not referred, appear to meet Commerce's referral criteria and, therefore, should have been referred. Commerce asserts that it did not improperly classify State-controlled items. Additionally, Commerce indicated that State and Defense's position that most commodity classifications should be referred does not reflect the National Security Council guidance. However, Commerce agreed to work with other departments and companies to implement our recommendations and noted it has allocated resources to ensure the timely issuance of its classifications and State's jurisdiction determinations. In responding to our draft, State partially concurred with our findings and recommendations. State noted that it has made progress in reducing the amount of time needed to issue jurisdiction determinations. Citing improved timeliness and deference to Defense's national security views, State did not agree that it needs to implement our recommendation to issue initial determinations in a timely manner, but it did agree to enlist greater cooperation from other departments in meeting established time frames. In its comments, Defense concurred with our recommendations.

We disagree with Commerce's characterization of our findings and conclusions and are confident that our report accurately assesses Commerce's implementation of the commodity classification process. As stated in our report, we identified at least 253 classification requests that appear to meet the referral criteria. By Commerce's own admission, requests involving State-controlled items or those in need of a jurisdictional review were returned to the companies without referral to State and Defense, which is not consistent with the referral criteria. In addition, Commerce inconsistently applied the criteria because in some instances it referred requests that met the criteria. Our report highlights the risk of Commerce improperly classifying State-controlled items through the commodity classification process. We identified several instances in which Commerce classified State-controlled items, including explosive detection devices that were determined to be State-controlled through the commodity jurisdiction process. Commerce's position

regarding the interpretation of the National Security Council guidance by State and Defense demonstrates that the criteria are subjective and that the departments have not reached a consensus on which requests should be referred. While we cannot verify whether State has decreased the amount of time needed to process jurisdiction requests, we agree that State should enlist the cooperation of other departments to improve timeliness. We continue to recommend that State issue initial determinations in accordance with established guidance because this is a mechanism to improve timeliness, while still providing Defense and Commerce with an opportunity to provide input before a final determination is made.

## Scope and Methodology

To assess how Commerce implements the commodity classification process, we reviewed relevant laws, regulations, and the National Security Council guidance to identify the criteria for the process and examined how Commerce implemented the criteria. We discussed the process and the referral criteria with officials from Commerce's Bureau of Industry and Security, State's Office of Defense Trade Controls, and Defense's Defense Technology Security Administration. We reviewed 41 commodity classification requests Commerce referred to State and Defense during fiscal years 1998 through 2001 and identified the reasons for referral. We analyzed commodity classification data for fiscal years 1998 through 2001 and selected 34 cases to review that were not referred to State and Defense. We compared the characteristics of the items in the 34 cases with Commerce's stated referral criteria, as well as items identified as State-controlled in Defense's review of Commerce licenses. We reviewed the data and identified nonreferred requests returned to companies without classifications because the items either were State-controlled or needed a commodity jurisdiction review. We then confirmed whether the companies involved in these cases appeared in State's registration database. In addition, we reviewed the classification data to identify the export control classification numbers provided to companies. We then compared those classification numbers with classification numbers that cover items appearing on both the Commerce and State control lists. To determine Commerce's timeliness in providing classifications, we analyzed the time elapsed between the receipt of the classification request and the issuance of the classification. To assess the reliability of Commerce's classification data, we compared information in selected files to the data. During our analysis, we found some minor inaccuracies with Commerce's data, which did not adversely affect its overall reliability.

App. 45

To assess how State implements the commodity jurisdiction process, we identified the steps in the commodity jurisdiction process as established in relevant regulations and the National Security Council guidance and discussed the implementation of the process with officials from the relevant offices at State, Defense, and Commerce. We requested State's data for commodity jurisdiction determinations and open cases during fiscal years 1998 through 2001. However, State did not provide complete data for fiscal year 2001. We analyzed the data to determine the time taken to complete key steps in the process. We reviewed 34 selected commodity jurisdiction files. We discussed reasons for delays as well as the interagency disagreement over space-related items with State, Commerce, and Defense officials. We also reviewed documents related to the history of the space-related interagency disagreement. To assess the reliability of State's commodity jurisdiction data, we compared the information in the files reviewed to the data and found inconsistencies. However, we determined that these are the best available data and are sufficiently reliable for assessing timeliness.

We discussed the commodity classification and jurisdiction processes with companies. To select companies, we analyzed Commerce and State data to identify companies that had experience with one or both processes. We also obtained recommendations from industry associations and others to develop a list of additional companies that had used these processes. We then conducted structured interviews with officials from 31 companies, which included small, medium, and large companies with varying degrees of experience in using the export control processes.

We conducted our work from May 2001 through September 2002 in accordance with generally accepted government auditing standards. The time taken by State, Commerce, and Defense to respond to our requests for information and data adversely affected the timeliness of our reporting.

We will send copies of this report to the Chairmen and Ranking Minority Members of the House Committees on Government Reform, on International Relations, and on Armed Services and Senate Committees on Governmental Affairs, on Foreign Relations, on Armed Services, and on Banking, Housing, and Urban Affairs. We will also send copies to the Secretaries of State, Commerce, and Defense; the Director, Office of Management and Budget; and the Assistant to the President for National Security Affairs. In addition, this report will be made available at no charge on the GAO Web site at http://www.gao.gov.

If you or your staff have questions concerning this report, please contact me at (202) 512-4841. Others making key contributions to this report are listed in appendix IV.

Sincerely yours,

Katherine V. Schinasi
Director, Acquisition and Sourcing Management

# Appendix I: Comments from the Department of Commerce

Note: GAO comments supplementing those in the report text appear at the end of this appendix.



**UNITED STATES DEPARTMENT OF COMMERCE**
**Bureau of Industry and Security**
Washington, D.C. 20230
September 9, 2002

Ms. Katherine V. Schinasi
Director, Acquisition and Sourcing Management
United States General Accounting Office
Washington, D.C. 20548

Dear Ms. Schinasi:

Thank you for the opportunity to comment on the draft General Accounting Office (GAO) report titled EXPORT CONTROLS: Processes for Determining Proper Control of Defense-Related Items Need Improvement.

The report reaches two principal conclusions with respect to the Commerce Department's commodity classification practices: (1) that the Commerce Department has failed to refer to the Departments of State and Defense certain commodity classification requests received from exporters during the period 1998-2001 that should have been referred, consistent with guidance issued by the National Security Council (NSC) in 1996, and (2) that, "as a result of the limited referrals, Commerce has improperly classified some State-controlled items as Commerce-controlled." We believe that both conclusions are based on erroneous facts and, therefore, are fundamentally flawed.

See comment 1.

The report's conclusions are all premised on the GAO's identification of 253 (out of over 12,000) commodity classification requests that the Commerce Department received that the GAO believes, "appear to meet Commerce's referral criteria" but that the Commerce Department did not refer. Commerce Department staff has reviewed these 253 requests. It turns out that in 212 of these cases Commerce did not issue the requester a commodity classification at all, but instead referred the requester to the State Department. With respect to the remaining, 41 cases – more accurately, 39 cases, as the GAO appears to have double-counted two cases – the report provides a superficial explanation of why the GAO believes referral was merited in those cases or how the products in those cases were classified incorrectly. In fact, after review, we have determined that those 39 requests did not require referral under either the 1996 NSC guidance or the Commerce Department's own criteria. Moreover, those 39 requests were, in any event, classified correctly.

To be sure, there may be differences among the agencies as to what ideally the referral practice should be with respect to commodity classification requests. The report itself cites unnamed representatives of the Departments of State and Defense who believe that the Commerce Department "should be referring most, if not all, commodity classifications to them." Whatever the potential merits of such a broad referral policy (which would likely entail substantial lengthening of the classification process with concomitant economic costs), this approach clearly does not reflect the guidance set forth by the NSC in 1996 and should not be used as the benchmark against which to judge Commerce Department practices.

**Appendix I: Comments from the Department of Commerce**

Ms. Katherine V. Schinasi
Page 2

For the reasons stated above, we would urge that, prior to finalization of this report, the GAO meet with Commerce Department technical experts and clarify misunderstandings regarding the classification requests that purportedly form the basis of the report's conclusions.  More detailed comments on the report are attached.

Sincerely,

*Matthew S. Borman*

Matthew S. Borman
Deputy Assistant Secretary

Attachment

Appendix I: Comments from the Department
of Commerce

**Department of Commerce Comments on the Draft GAO Report**
<u>**EXPORT CONTROLS:  Processes for Determining Proper Control**
**of Defense-Related Items Need Improvement**</u>
**(GAO Code 120062)**

**GENERAL COMMENTS**

See comment 1.

1. <u>The Report's Conclusions about Commerce's Classification Processes Are Fundamentally Flawed because They Are Based on Erroneous Facts</u>.  The Report's conclusions are premised on its assertion that during the period 1998-2001, the Commerce Department failed to refer to other agencies 253 commodity classification requests that should have been referred.  The Report states that, "as a result of the limited referrals, the Commerce Department has improperly classified some State-controlled items as Commerce-controlled."

We have reviewed the 253 classification requests identified by the GAO and believe that they do not support the GAO's conclusions.  212 of the 253 requests identified by the GAO never resulted in the issuance of a classification by the Commerce Department at all and, therefore, could not have been "improperly classified" by Commerce.  Rather, upon an initial review of these classification requests, the requests were returned to the applicants and the applicants were referred directly to the State Department.[1]

See comment 2.

We have determined that the 41 remaining cases (which are in fact only 39 cases because the GAO "double counted" two of the cases) did result in issuance of a commodity classification but did <u>not</u> require referral to the other agencies.  The GAO's premise for believing that these requests should have been referred was apparently that the items at issue in those requests appear to be covered by both the U.S. Munitions List (USML) and the Commerce Control List (CCL).  However, as the Commerce Department noted in response to a previous GAO report (GAO Code 707550), the fact that an item might appear to be covered by both the USML and the CCL does not necessarily mean that jurisdiction over the item is unclear (and thus that a referral is required).  The CCL describes – in far greater specificity than the USML – relevant technical control parameters agreed upon by the Departments of Commerce, State, and Defense.  An item that meets those parameters is not on the USML by interagency agreement.  For example, one of the non-referred classifications that the GAO identified was for AFLATOXIN.  Although toxins

---

[1] Classification requests that clearly involve items specifically designed, developed, configured, adapted, or modified for a military application are returned to the exporter without action and with instructions that the exporter consult with the State Department.  It is not necessary to consult with the Departments of State or Defense when it is clear that the Commerce Department does *not* have jurisdiction.  In these cases, the applicant is directed to the Department of State.  Putting such cases into the referral process would likely prolong the process for the exporter and needlessly consume limited government resources.  It remains the exporter's responsibility to comply with all export laws, regardless of whether the Commerce Department or the State Department has jurisdiction.

Appendix I: Comments from the Department
of Commerce

that fall outside the CCL control parameters might be covered by the USML, this toxin is clearly on the CCL (Export Control Classification Number (ECCN) 1C351.d.l 1).  This item, therefore, is not under State jurisdiction and did not require referral.

See comment 3.

In any event, we have reviewed the 39 remaining cases and determined that they were correctly classified because they all clearly fell within the relevant CCL entries.  The GAO's report provides no evidence to the contrary[2].

See comment 4.

2.  The Report Erroneously Faults Commerce for "Rarely" Referring Commodity Classification Requests.  As noted above, the Report's conclusion – that the Commerce Department did not refer classification requests that it should have – is fundamentally erroneous.  More generally, the Report suggests that the Commerce Department refers classification requests too "rarely."  In fact, the Commerce Department refers inter-agency those requests that it is required to refer under the National Security Council's (NSC) 1996 Guidance.

The NSC Guidance provides that the Commerce Department will share commodity classification requests with the Departments of State and Defense for items specifically designed, developed, configured, adapted, or modified for a military application, or derived from items specifically designed, developed, configured, adapted, or modified for a military application.  These criteria define a narrow category of items and clearly belie the assertions of representatives of State and Defense, as provided in the Report, that the Commerce Department "should be referring most, if not all, commodity classifications to them."

The dual-use export control system administered by the Commerce Department is broad in scope – covering all items in the U.S. economy, except items specifically under the jurisdiction of other Departments.  Commodity classification requests cover the full range of these items.  With respect to many of these requests, there is no issue about the item potentially being "designed . . . for a military application" or "modified for a military application," and thus subject to referral under the NSC Guidance.  Rather, these requests concern whether an item is appropriately classified under one CCL sub-category or another.  Accordingly, it is appropriate that Commerce Department referrals be relatively "rare."[3]

See comment 5.

To be sure, the NSC Guidance could be interpreted in such an awkward fashion as to merit referral of a larger array of commodity classification requests.  For example, a product such as the *Barbie Chat With Me* walkie talkie could require referral because the first portable FM two-

_____

[2] The GAO Report also made reference to an additional four cases that will be discussed later in these comments.

[3] It should be noted that, even if GAO were correct about the 253 requests discussed above (which it is not), Commerce Department referrals would still be relatively rare – i.e., they would occur in approximately 2 percent of the cases.

2

Appendix I: Comments from the Department
of Commerce

way radio was originally designed by Motorola for the U.S. Army Signal Corps in 1940.  This is not how the NSC Guidance has been traditionally interpreted, and such an interpretation would result in inefficient use of scarce government resources and an unnecessary burden on U.S. exporters.

See comment 6.

3.  The Report Fails to Evaluate Compliance with All NSC-Mandated Referral Processes. Although the Report reviews Commerce Department referral and classification decisions under the 1996 NSC guidance, it does not evaluate implementation of the reciprocal NSC requirement that the State Department refer certain munitions license applications to the Commerce Department for review.  Since 1996, the Commerce Department has received only one informal

See comment 7.

referral of a munitions license from the State Department.  The Report also fails to evaluate whether jurisdictional decisions by the State Department or jurisdictional assertions by the Defense Department are consistent with jurisdictional criteria set forth in the International Traffic in Arms Regulations (ITAR).  If incorrect, such decisions could adversely affect U.S. economic welfare, and could also can skew perceptions of what types of items appropriately merit commodity classification referrals.

See comment 8.

4.  The Report Fails to Recognize the Nature of Commodity Classification Determinations. Commodity classification requests are not licensing determinations.  Rather, they are objective, determinations as to whether an item meets the technical parameters of a specific ECCN.  The Report fails to note that the Commerce Department officials responsible for commodity classifications are seasoned engineers with experience in industry and the military.  Commerce Department engineers have the ability to properly evaluate the technical specifications of a commodity and match those specifications to one of the detailed ECCN entries on the CCL.  It is also important to note that the ITAR does not define what is meant by specifically designed, developed, configured, adapted, or modified for a military application.

See comment 9.

5.  Commerce Cannot Confirm GAO's Assertions regarding Median Processing Times for Commodity Jurisdiction Cases.  The Commerce Department is unable to verify the GAO's assertions regarding the median processing time of the Commerce Department for commodity jurisdiction responses to State.  The Commerce Department does not have access to data used by the GAO for its review.  We would note, however, that the data should exclude the time the case was not under the Commerce Department's control (i.e., the time between the Commerce Department's initial response and when the Commerce Department might reopen the case to appeal the State Department's initial determination); otherwise, the median processing time will be overstated.  We would further note that the amount of time between the Commerce Department's initial recommendation and the State Department's initial determination is considerable.  For example, on one commodity jurisdiction case, the Commerce Department provided its initial response to the State Department on November 6, 2000, and reopened the case on February 15, 2001 to appeal the State Department's initial determination.  Because the Commerce Department's electronic database used to track these cases is old and relatively unsophisticated, it shows the Commerce Department as taking 126 days to process this case.

3

Appendix I: Comments from the Department
of Commerce

This figure represents the number of days from initial referral to the Commerce Department until the Commerce Department's appeal of State Department's initial determination was completed. This number is far greater than the actual number of days the Commerce Department had the case. For this case, the Commerce Department's actual review time was 24 days; the State Department's was 102 days. This limitation will be addressed in the redesign of the Commerce Department's Export Control Classification System (ECASS); however, it is an important characteristic for the GAO to note in calculating median processing time.

**SPECIFIC COMMENTS**

**Page 2**

See comment 10.

As noted above, the Commerce Department disagrees with the assertion that it has improperly classified some State-controlled items. The Commerce Department also disagrees that 253 that were not referred commodity classification requests appear to meet the referral criteria.

Regarding classification processing times, the Commerce Department is taking several steps to reduce such times, including hiring additional engineers (six in fiscal year 2002 and an additional four, if the budget request is appropriated, in fiscal year 2003), implementing the ability to place commodity classifications on hold without action status in ECASS while licensing analysts wait for additional information from the exporter, and improving the electronic commodity classification system as part of the ECASS upgrade.

As noted above, the Commerce Department cannot evaluate GAO's calculation of our median processing time for commodity jurisdiction requests. For commodity jurisdiction requests for space qualified items, the Department of Commerce, State, and Defense have reached agreement on this issue. The Departments of Commerce and State will be issuing implementing rules soon.

**Page 3**

See comment 11.

It should be noted that the export control system administered by the Commerce Department has considerable input from the Department of State and the Department of Defense, which clear on all substantive changes to the Export Administration Regulations (EAR), including changes to the CCL. Under Executive Order 12981, as amended, those Departments can make recommendations on all license applications submitted to the Commerce Department.

**Page 4**

See comment 12.

On the specific case referenced, jurisdiction on the specific technical data at issue was not clearly delineated in the EAR and the ITAR.

4

Appendix I: Comments from the Department
of Commerce

**Page 5**

See comment 13.

As noted above, the Commerce Department disagrees that it has improperly classified items. The GAO has only one example of a case in which it alleges the Commerce Department classified an item as on the CCL and the State Department subsequently issued an inconsistent commodity jurisdiction determination. However, the GAO refused to provide the Commerce Department any information on this case; thus, the Commerce Department cannot evaluate the GAO's assertion. The Commerce Department notes that when this item was placed on the CCL, through an interagency cleared rule, there was no corresponding change to the USML. The GAO also failed to review whether the State Department's determination comported with the USML criteria set forth in the ITAR.

**Page 6**

Regarding the classification request for a military vehicle converted for civilian use, it should be noted that this involves the civil derivative of that vehicle. The Commerce Department properly referred this request because it was not for the finished vehicle (which has been classified under the EAR for nearly 10 years), but rather for the frame and power transfer systems which have a higher percentage of commonality between the civil and the military versions of the vehicle.

See comment 14.

As noted above, the notion that most, if not all, classifications should be referred to the Departments of State and Defense is inconsistent with the scope and establishment of the CCL and Commerce Department jurisdiction.

**Pages 7-10**

See comment 15.

In addition to the 253 licenses referenced above, GAO also discusses "several" non-referred classifications that it claims were improperly classified (page 8 of the Report). Despite Commerce Department requests, GAO refused to provide either the classification numbers or the related license application numbers for these cases. As a result, the Commerce Department is unable to address in detail GAO's assertions. Nonetheless, several comments can be made based on the information in the Report. First, if the State Department or the Defense Department raise a jurisdictional claim in processing a license application submitted to the Commerce Department, the application generally must be returned without action to the exporter to apply for a commodity jurisdiction determination from the State Department. Returning such applications to the applicant does not reflect agreement by the Commerce Department that the item may be on the USML. Rather, it reflects the practical reality that the application cannot be further processed without a commodity jurisdiction determination. Second, for the four classifications noted on page 7 of the Report, three of which involved night vision equipment, there is an interagency MOU on night vision items that the Commerce Department applies to such commodity classifications. In the case of the explosive detection devices covered under ECCN 2A993 (page 7 and 9), this CCL control was approved interagency, but there was no counterpart revision of the USML. Classifications for such items were likely proper under existing guidelines. The

5

App. 54

**Appendix I: Comments from the Department of Commerce**

Commerce Department also notes that GAO did not discuss any of these cases with Commerce Department technical experts during this review. Such a discussion would have led to a better informed analysis of these cases.

See comment 16.

Also see above comments on steps the Commerce Department is taking to improve the timeliness of its classifications. Specific to Commerce Department actions having an impact on State Department enforcement actions, the Commerce Department fails to see how returning classification requests to applicants and informing them to contact State could affect enforcement actions. If anything, Commerce Department responses should strengthen enforcement cases by putting companies on notice to contact the State Department.

**Page 15**

See above comments on Commerce Department commodity jurisdiction processing times.

**Page 18**

See comment 17.

The Commerce Department has not altered the balance of the dual-use export control system. Even by GAO's calculations, only a very small percentage of classification requests would be referred to the Departments of State and Defense. Not considering the cases for which the Commerce Department told applicants to contact the State Department, the number of cases identified is less than one-third of 1 percent. This hardly represents an altering of the balance. Moreover, of the cases GAO identified to the Commerce Department, our review indicates these classifications were properly not referred and properly classified based on the interagency cleared criteria in the EAR. Consequently, although improvements can be made to the classification review system, it does not represent a risk to national security. Regarding the impact on industry, the Commerce Department notes that GAO failed to review how the Departments of State and Defense apply the ITAR criteria for USML items and State Department's sharing of munitions license applications with the Commerce Department under the NSC guidance.

**COMMENTS ON GAO'S RECOMMENDATIONS**

See comment 18.

As set forth above, the Commerce Department believes that the draft report is fundamentally flawed with respect to its conclusions concerning the Commerce Department's commodity classification processes, and urges further consultation between GAO and the Department before finalizing the study. Such further consultation may affect the GAO's recommendations. In the event that GAO decides not to seek further consultation, we offer the following comments on the recommendations provided.

Recommendation:    *Promptly review existing guidance and develop, with the concurrence of the appropriate entities within State and Defense, criteria for referring commodity classification requests to those departments.*

6

Appendix I: Comments from the Department
of Commerce

Comment:    The Commerce Department supports an interagency review of the NSC
            guidance, including referral of munitions license applications and
            application of the ITAR criteria for the USML, to address any mis-
            perception that the Commerce Department does not refer enough
            classifications.

Recommendation:  *Develop with the concurrence of State's Office of Defense Trade Controls,
                 procedures for referring requests that are returned to companies because
                 the items are State-controlled or require a commodity jurisdiction review.*

Comment:    The Commerce Department will discuss this recommendation with the
            State Department to determine the most effective way to address this
            issue.

Recommendation:  *Revise guidance for companies on the information to be provided with
                 commodity classification requests and consider including a requirement
                 for information on an item's origins and applications.*

Comment:    The Commerce Department will solicit public comment on this
            recommendation.  Note that the EAR provides exporters detailed guidance
            in Section 748.3 and Supplement No.1 to part 748 on the correct way to
            submit classification requests and the type of information needed to
            conduct a technical analysis.  On GAO's suggestion that exporters should
            be required to provide information on an item's origin and applications,
            exporters are currently required to provide the name of the manufacturer,
            if known, and a technical description of the items.  Applying this
            recommendation too broadly could have the unintended consequence of
            catching clearly commercial items, such as the toy described above.

Recommendation:  *Assess the amount of resources needed to comply with the regulations,
                 then either reallocate resources as appropriate or make a regulatory
                 change that reflects a time frame that is consistent with available
                 resources.*

See comment 19.

Comment:    The Commerce Department has already done this in its fiscal year 2002
            and 2003 budget requests. The time frame for commodity classifications is
            set by statute.

Recommendation:  *Direct the respective entities within their departments to assess the
                 amount of resources needed to make jurisdiction recommendations and
                 determinations within established time frames, then either reallocate
                 resources as appropriate or seek changes to the established time frame
                 that are consistent with available resources.*

7


Comment:           As noted above, the Commerce Department has already done so.

Recommendation:    *Revise interagency guidance to incorporate any changes to the referral
                   process and time frames for making decisions.*

Comment:           This recommendation will be covered in addressing the first
                   recommendation.

8

App. 57

**Appendix I: Comments from the Department of Commerce**

The following are GAO's comments on the Department of Commerce's letter dated September 9, 2002.

## GAO Comments

1. Commerce misrepresented our findings and conclusions because it incorrectly combined two different findings related to the commodity classification process by suggesting that we concluded that all 253 requests resulted in improper classifications. The 253 requests identified in our report represent cases that appear to meet the National Security Council or Commerce's stated referral criteria but were not referred to State and Defense for interagency review. Separately, our report discusses several instances in which Commerce improperly classified State-controlled items. We concluded that not referring commodity classification requests that appear to meet the referral criteria increases the risk of improper classification.

   As already noted in our report, 212 commodity classification requests were returned to companies without classifications because Commerce determined that the items involved were either State-controlled or possibly State-controlled. Commerce's footnote acknowledges that these requests clearly meet the National Security Council referral criteria as they involve items "specifically designed, developed, configured, adapted, or modified for a military application," yet Commerce stated that it is not necessary to refer such requests. However, as stated in our report, we identified instances in which Commerce referred similar requests to State and Defense. We also found that by not consistently referring such requests, Commerce does not provide State with an opportunity to ensure that companies comply with the Arms Export Control Act. For example, we identified several companies that did not register with State after Commerce returned their classification requests and advised them that their items were State-controlled.

   The identification of the remaining 41 classification requests that were not referred, despite appearing to meet the referral criteria, was based on our analysis of Commerce's data. We did not find any duplicates and were not able to independently verify Commerce's statement. We, therefore, have no basis for revising the numbers contained in our report.

2. Commerce maintains that an item appearing on both control lists does not necessarily mean that it is unclear which department has jurisdiction over the item, because Commerce's control list contains

App. 58

technical control parameters that differentiate jurisdiction. We do not
agree because Commerce's control list does not always provide such
technical control parameters. For example, the requests we identified
as having unclear jurisdiction were classified in Commerce Control
List categories that either contain technical control parameters
identical to those on the U.S. Munitions List or do not contain specific
parameters to clearly differentiate those items that are
Commerce-controlled.

3.  As discussed in comment 1, these cases were identified as appearing to
    meet the referral criteria but were not referred to State and Defense.

4.  We disagree that Commerce refers requests as required by the National
    Security Council guidance. As noted in our report, Commerce officials
    admitted that they inconsistently apply the guidance. Defense and
    State officials informed us that under their interpretations of the
    guidance, Commerce should be referring most, if not all, commodity
    classifications. The guidance does not provide a common definition of
    terms to be used when applying the criteria. Commerce officials
    informed us that they have never met with Defense or State officials to
    define key terms or to agree on a common interpretation of the
    guidance. Further, we disagree with Commerce's assertion that the
    253 commodity classification requests that we identified represent all the
    requests that should have been referred. After reviewing a subset of
    Commerce data, we found at least 253 requests that appear to meet the
    referral criteria, but we did not conclude that this represents all the
    requests that should have been referred.

5.  As discussed in our report, the departments have different
    interpretations of the National Security Council guidance, particularly
    as it relates to items derived from military applications. There is no
    "traditional" interpretation of the guidance. The example Commerce
    provides in its comments does not reflect the complexity or sensitivity
    of the types of items, such as night vision devices, which may meet the
    referral criteria.

6.  The objectives of our report were to assess how Commerce and State,
    respectively, implement the commodity classification and commodity
    jurisdiction processes, not to assess the implementation of the
    National Security Council guidance as it relates to other processes
    such as licensing.

Appendix I: Comments from the Department
of Commerce

7.  We assessed the implementation of the commodity jurisdiction
    process and did not evaluate the resulting determinations. In its
    implementation of the commodity jurisdiction process, State provides
    Commerce and Defense the opportunity to provide input on
    jurisdiction determinations and to escalate requests when there is a
    disagreement over the appropriate jurisdiction for an item.

8.  Our report clearly reflects the nature of commodity classifications and
    the fact that they are not licensing determinations. We would note,
    however, that of the classifications provided by Commerce during our
    review period, about two-thirds involved classifications for items that
    generally would not require export licenses to most destinations. As a
    result, the classification process may be the only opportunity for State
    and Defense to become aware of what companies are exporting. While
    Commerce officials may be knowledgeable about the Commerce
    Control List, State and Defense officials have the authority and
    expertise to determine whether an item is covered by the
    U.S. Munitions List. The National Security Council guidance was issued
    to improve interagency coordination and transparency by providing
    State and Defense a role in the commodity classification process.

9.  Our analysis of Commerce's median processing time for commodity
    jurisdiction cases is based on data provided by State. The median
    processing time, as contained in the report, reflects the amount of time
    that lapsed between when State referred the case to Commerce and
    when Commerce provided its initial input. Therefore, our calculation
    does not need to be revised.

10. See comments 1 and 15.

11. While Commerce notes that State and Defense have roles in reviewing
    Commerce's regulations and license applications, we are not
    incorporating this comment because it is not relevant to understanding
    the roles of these departments in the commodity classification
    process.

12. The technical data that Commerce refers to in its comment involved
    State-controlled missile technology that was exported to China based
    on an improper Commerce classification. A congressional inquiry
    determined that U.S. national security was harmed as a result. This
    incident highlights the risk of Commerce making commodity
    classification decisions without input from State and Defense. We note

that Commerce admits that jurisdiction is not always clearly delineated
between Commerce and State regulations.

13. Our report identifies several instances in which Commerce improperly
classified State-controlled items. The one case referred to in
Commerce's comments involved explosive detection devices that were
classified by Commerce but were later determined to be
State-controlled through the commodity jurisdiction process. When
these devices were reviewed through the commodity jurisdiction
process, Commerce provided its recommendation on the appropriate
jurisdiction and chose not to escalate State's determination that the
items were State-controlled. As we explained to Commerce officials,
we were unable to provide Commerce with documents or other
evidence related to this case due to our policy to protect proprietary
information.

14. As noted in comment 8, the National Security Council guidance
provides a role for State and Defense in the commodity classification
process. Furthermore, Commerce's comment reflects a disagreement
with State and Defense as to which commodity classification requests
should be referred in accordance with the guidance.

15. In our report, we identified three instances in which jurisdictional
questions were raised during the license application review process.
These license applications involved items for which Commerce had
previously issued commodity classifications, but were identified by
Defense in the license review process as being State-controlled. While
Commerce may not agree with Defense's position, Commerce does not
have the authority to determine which items are not subject to State's
jurisdiction. By law, Commerce can only control, and therefore
classify, items that are not controlled by another department. In its
comments, Commerce refers to an interagency memorandum of
understanding regarding which department has jurisdiction over
certain night vision devices. However, there is currently an interagency
disagreement on how the memorandum should be interpreted and, as
mentioned in our report, an interagency debate on how night vision
devices are to be controlled. Commerce also refers to the case
involving the explosive detection devices and suggests that it did not
improperly classify the devices. However, the devices were ultimately
determined to be State-controlled through the commodity jurisdiction
process, as discussed in comment 13. Also, we did not provide
Commerce with the requested information because it was proprietary
information obtained from other sources. While we did not discuss

these specific cases with Commerce officials to protect the identity of the companies involved, we did review government documents related to the cases and discussed the cases with company and other government officials.

16. Commerce states that when it returns a classification request to a company indicating that the item is subject to State's jurisdiction, it puts the company on notice. However, Commerce's practice does not provide State with an opportunity to obtain information on companies that need to register with State.

17. Our conclusion considers the effects our findings have on the entire export control system, which consists of separate regulatory regimes for defense and dual-use items. As noted in comments above, we did not attempt to identify all commodity classification requests that appear to meet referral criteria or those that resulted in improper classifications. The examples contained in the report are illustrative of weaknesses in Commerce's implementation of the commodity classification process. Furthermore, one improper classification can have serious implications for U.S. national security, as demonstrated by the release of missile technology to China discussed in the report. In discussing the impact on industry, Commerce's comments do not acknowledge that improper classifications can place companies at a competitive disadvantage. Specifically, a company may be exporting through State while its competitor may be exporting the same item through Commerce, based on an improper classification from Commerce.

18. The findings contained in our draft report were discussed in detail with Commerce officials before the draft was provided to Commerce for official comment. After considering Commerce's written comments, we are confident that the report accurately reflects information provided by Commerce, Defense, State, and company officials during our review.

19. We have revised our recommendation because Commerce believes that it cannot change the time frame for responding to commodity classification requests.

# Appendix II: Comments from the Department of State

Note: GAO comments supplementing those in the report text appear at the end of this appendix.



**United States Department of State**

*Washington, D.C.  20520*

SEP 1 0 2002

Dear Ms. Westin:

    We appreciate the opportunity to review your draft report, "EXPORT CONTROL:  Processes for Determining Proper Control of Defense-Related Items Need Improvement," GAO-02-996, GAO Job Code 120062.

    The Department's comments are enclosed for incorporation, along with this letter, as an appendix to the GAO final report.

    If you have any questions regarding this response, please contact Peter Berry, Office of Defense Trade Controls,  Bureau of Political Military Affairs on (202) 663-2806.

                    Sincerely,

                    Christopher B. Burnham
                    Assistant Secretary and
                    Chief Financial Officer

Enclosure:

    As stated.

cc:  GAO/ASM - Ms. Schinasi
     State/OIG – Mr. Berman
     State/PM - Mr. Maggi


Ms. Susan S. Westin,
    Managing Director,
        International Affairs and Trade,
            U.S. General Accounting Office.

Appendix II: Comments from the Department
of State

---

Department of State Comments on GAO Draft Report

EXPORT CONTROLS: Processes for Determining Proper Control
of Defense-Related Items Need Improvement
(GAO-02-996, GAO Code 120062)

State Department comments on this draft report are set
forth in detail.  As always, Department officers are
prepared to discuss and elaborate on these comments in
person at any time.

The State Department welcomes the opportunity to
comment on the draft report, entitled "Processes for
Determining Proper Control of Defense-Related Items Need
Improvement."  We agree with your observation that what is
controlled is fundamental to proper implementation of the
system and we are committed to meeting established time
lines.  Over the past year have take steps to better do so.
See comment 1.   We appreciated the finding that the commodity jurisdiction
("CJ") requests managed by the Department were consistently
transparent and coordinated interagency with Defense and
Commerce in all instances.  It would appear appropriate to
highlight this more visibly in the draft report because the
specific purpose of the April 15, 1996, NSC procedures on
commodity jurisdiction and commodity classification is, as
stated in that document, "to improve interagency
coordination and transparency."

Your report recommended that the Department consider
either assigning additional resources to the Office of
Defense Trade Controls in order to meet the goal
established in the NSC procedures of a 95-day cumulative
timeline for responding to commodity jurisdiction requests
submitted by exporters or revising the goal.  We agree with
the spirit of this objective and in March 2001, in response
to a recommendation from the Department of State's Office
of Inspector General, Office of Audits, did, in fact,
assign an additional full time officer to the CJ function.
Since then, there has been steady progress made in reducing
See comment 2.   timelines, as reflected in the following data (which we
shared with the GAO team):

Table 1: Progress Toward 95-Day Cumulative Timeline

|  | STATE/DTC | DOD/DTSA | DOC/BIS |
|---|---|---|---|
| 10/01/00-09/30/01 | 148 days | 87 days | 98 days |

App. 64

Appendix II: Comments from the Department
of State

03/12/01-07/30/02    133 days         86 days         88 days

10/01/01-07/31/02    113 days[1]       83 days         79 days

See comment 3.

    The Department believes that at the current rate, the median overall timeline for CJs will be consistent with the NSC goal of 95 days by the end of the first half of fiscal year 03. If it is not, the Department will consider whether additional resources should be assigned or the timeline revised at that time.  We are also instituting other enhancements consistent with our commitments to State's OIG.  For example, we have entered into discussions with Commerce (BIS) to map-out a pilot program for full electronic CJ submissions.  This program should be initiated during 2003.  Similarly, as noted to the GAO audit team, we are developing an approach for making greater information available as a matter of public record on CJ determinations via the DTC Internet web site, while protecting those business interests accorded confidentiality under Section 38(e) of the AECA.  This approach will also be initiated during 2003, subject to further consultation with the Department's Office of the Legal Adviser and with the U.S. defense industry through the relevant advisory committee (i.e., Defense Trade Advisory Group).

See comment 4.

    Your report also recommended that "the Secretary of State direct the Office of Defense Trade Controls to issue initial determinations in accordance with the guidance" (even when other departments have not provided their input).  We disagree with this recommendation in view of the overall improvement in CJ timelines (noted above) and in light of the longstanding policy and practice of ODTC, which the Department believes should continue, to accord great deference in this area to the national security views of the Department of Defense. A better approach, which we are following, is to enlist greater cooperation from other departments in meeting established timelines consistent with U.S. foreign policy and security interests.  The Bureau of Political-Military Affairs is committed to adhering to established time lines and is approaching senior DoD officials to emphasize the importance of timely responses in CJ decision-making, and will also continue to

---

[1] 113 days represents the total median time required for all CJ processing in FY 2002 to date.  For example, the 83 day median review time at DoD is included within the 113 days.

App. 65

**Appendix II: Comments from the Department of State**

See comment 5.

remind other interagency participants of the established guidelines.  If our approach does not produce the desired results over the next twelve months, we will re-examine your recommendations.

Related to your recommendations in this area, please allow us to point out also that the draft report appears to omit that ODTC is consistently meeting the 5-day timelines for initial referral of CJ applications to other agencies and that these referrals are for the express purpose (spelled-out in the NSC Procedures) of providing other departments with a basis upon which to submit recommendations to ODTC, preparatory to ODTC's initial determination.  In this respect, it is not the case, as the draft report may unintentionally imply, that CJ submissions are not being acted upon until after the notional 55-day period for initial determination.  The data on this point indicate that ODTC has consistently acted upon all CJ requests received from US exporters in a timely fashion:

Table 2: Referrals by State Now Beat 5-Day Initial Timeline

|  | Interagency Referral by DTC |
|---|---|
| 10/01/97-09/30/01 | 6 Days |
| 03/12/01-Present | 4 Days |

The following are GAO's comments on the Department of State's letter dated September 10, 2002.

# GAO Comments

1. While State consistently referred commodity jurisdiction requests to Commerce and Defense, we found indications in State's data that a limited number of requests were not referred to both departments. However, we could not confirm with State whether these cases were not referred because State officials did not provide responses to questions regarding specific jurisdiction requests.

2. During our review, State officials showed us the information contained in State's table 1. However, they did not provide us with the supporting data that would be needed to verify State's progress in reducing the amount of time to process jurisdiction requests. Furthermore, as noted in the report, State officials did not provide us with complete data for fiscal year 2001, despite our requests.

3. While we recognize State's efforts to reduce the amount of time to process jurisdiction requests, we note that the National Security Council guidance establishes 95 days as the maximum amount of time in which escalated cases are to be resolved. According to the guidance, final jurisdiction determinations should be issued in less than 65 days after a request is received, unless the case is escalated.

4. The issuance of an initial determination prior to receiving input from Defense or Commerce still provides Defense and Commerce an opportunity to express their views on the appropriate jurisdiction for an item, as those departments can escalate the initial determination if they disagree. Also, as discussed in the report, the issuance of an initial determination serves to increase the priority level Defense and Commerce assign to commodity jurisdiction reviews and is, therefore, a mechanism for facilitating the timely resolution of jurisdiction requests. We agree that State should emphasize to the other departments the importance of receiving timely input.

5. We revised the text to reflect the amount of time taken by State to refer jurisdiction requests to Defense and Commerce once it received the requests. Our analysis of State's data indicates that State took a median of 5 days to refer a request to Defense and 6 days to refer a request to Commerce for our review period.

# Appendix III: Comments from the Department of Defense

Note: A GAO comment supplementing those in the report text appears at the end of this appendix.



**OFFICE OF THE UNDER SECRETARY OF DEFENSE**
2000 DEFENSE PENTAGON
WASHINGTON, DC 20301-2000

POLICY

SEP  3 2002

I-02/011713

Ms. Katherine Schinasi
Director, Acquisition and Sourcing Management
U.S. General Accounting Office
441 G Street, N.W.
Washington, D.C. 20548

Dear Ms. Schinasi:

    This is the Department of Defense (DoD) response to the GAO draft report, "EXPORT CONTROLS:  Processes for Determining Proper Control of Defense-Related Items Need Improvement," dated August 8, 2002 (GAO Code 120062/GAO-02-996)."

    Specific remarks related to your recommendations are attached.  Thank you for the opportunity to comment on this draft report.

Sincerely yours,

Lisa Bronson
Deputy Under Secretary of Defense,
    Technology Security Policy and
    Counterproliferation

Attachment:
As stated



**GAO DRAFT REPORT – DATED AUGUST 8, 2002**
**GAO CODE 120062/GAO-02-996**

**"EXPORT CONTROLS:  Processes for Determining Proper Control of**
**Defense-Related Items Need Improvement"**

**COMMENTS**
**TO THE RECOMMENDATIONS**

**RECOMMENDATION 1:**  To increase transparency to stakeholders and minimize the risk of Commerce making jurisdictional determinations through the commodity classification process, the GAO recommended that the Secretary of Commerce direct the Bureau of Industry and Security to promptly review existing guidance and develop, with the concurrence of the appropriate entities within State and Defense, criteria for referring commodity classification requests to those departments.  In developing the criteria, the departments should agree on a common definition of terms to be contained in the criteria. Until the departments develop and implement referral criteria, the risk of Commerce improperly classifying State-controlled items will continue to exist.  (p. 19/GAO Draft Report)

See comment 1.

**RESPONSE:**  In many respects the existing guidance is generally straightforward.  The larger problem is the lack of sufficient information contained in commodity classification requests.  We are prepared to work with Commerce to develop and implement additional referral criteria.

**RECOMMENDATION 3:**  To insure that Commerce has sufficient information to make timely and appropriate commodity classifications, we recommend that the Secretary of Commerce direct the Bureau of Industry and Security to revise guidance for companies on the information to be provided with commodity classification requests and consider including a requirement for information on an item's origins and applications.

**RESPONSE:**  Although this recommendation is not directed to DoD, we concur with this recommendation, particularly regarding the inclusion of a requirement for information on an item's origins and applications to be mandatory information submitted with commodity classification requests.  Such information should not only improve the timeliness and quality of the Commerce response, but also reduce the number of classification requests referred to the commodity jurisdiction process due to insufficient information.  We are prepared to assist Commerce in revising guidance related to commodity classification requests and suggest that this could be done in conjunction with the GAO's recommended development and implementation of commodity classification referral criteria (see Recommendation 1).

**RECOMMENDATION 5:**  To improve the timeliness of the commodity jurisdiction
process, the GAO recommended that the Secretaries of State, Commerce, and Defense
direct the respective entities within their departments to assess the amount of resources
needed to make jurisdiction recommendations and determinations within established time
frames, then either reallocate resources as appropriate or seek changes to the established
time frame that are consistent with available resources.  (p. 19/GAO Draft Report)

**RESPONSE:**  As noted in your report, DTSA has recently hired an additional staff
person to work on commodity jurisdiction requests.  While we anticipate that this action
will greatly contribute to reducing Defense processing time, we will continue to monitor
and assess the overall commodity jurisdiction review process and take further action as
necessary.

**RECOMMENDATION 6:**  To improve transparency and consistency of the commodity
classification and jurisdiction processes, the GAO recommended that the Secretaries of
State, Commerce, and Defense revise interagency guidance to incorporate any changes to
the referral process and time frames for making decisions.  (p. 20/GAO Draft Report)

**RESPONSE:**  We are prepared to work with State and Commerce to improve
transparency and consistency of both the commodity classification and commodity
jurisdiction processes.

**Appendix III: Comments from the Department of Defense**

The following is GAO's comment on the Department of Defense's letter dated September 3, 2002.

## GAO Comment

1. Because Commerce, State, and Defense officials expressed different interpretations of the National Security Council guidance during our review, we do not agree that the existing guidance is generally straightforward.

App. 71

# Appendix IV: GAO Contact and Staff Acknowledgments

## GAO Contact

Anne-Marie Lasowski, (202) 512-4146

## Acknowledgments

John Neumann, Johana R. Ayers, Raymond H. Denmark, W. William Russell IV, Richard K. Geiger, Markques Y. McKnight, and Christina Sklarew also made significant contributions to this report.

App. 72

# Related GAO Products

*Defense Trade: Lessons to Be Learned from the Country Export Exemption.* GAO-02-63.  Washington, D.C.: March 29, 2002.

*Export Controls: Reengineering Business Processes Can Improve Efficiency of State Department License Reviews.* GAO-02-203. Washington, D.C.: December 31, 2001.

*Export Controls: Clarification of Jurisdiction for Missile Technology Items Needed.* GAO-02-120. Washington, D.C.: October 9, 2001.

*Defense Trade: Information on U.S. Weapons Deliveries to the Middle East.* GAO-01-1078. Washington, D.C.: September 21, 2001.

*Export Controls: State and Commerce Department License Review Times Are Similar.* GAO-01-528. Washington, D.C.: June 1, 2001.

*Export Controls: Regulatory Change Needed to Comply with Missile Technology Licensing Requirements.* GAO-01-530. Washington, D.C.: May 31, 2001.

*Defense Trade: Observations on Issues Concerning Offsets.* GAO-01-278T. Washington, D.C.: December 15, 2000.

*Defense Trade: Data Collection and Coordination on Offsets.* GAO-01-83R. Washington, D.C.: October 26, 2000.

*Defense Trade: Contractors Engage in Varied International Alliances.* GAO/NSIAD-00-213. Washington, D.C.: September 7, 2000.

*Defense Trade: Analysis of Support for Recent Initiatives.* GAO/NSIAD-00-191. Washington, D.C.: August 31, 2000.

*Foreign Military Sales: Changes Needed to Correct Weaknesses in End-Use Monitoring Program.* GAO/NSIAD-00-208. Washington, D.C.: August 24, 2000.

*Defense Trade: Status of the Department of Defense's Initiative on Defense Cooperation.* GAO/NSIAD-00-190R. Washington, D.C.: July 19, 2000.

*Defense Trade: Identifying Foreign Acquisitions Affecting National Security Can Be Improved.* GAO/NSIAD-00-144. Washington, D.C.: June 29, 2000.

**Related GAO Products**

*Foreign Military Sales: Efforts to Improve Administration Hampered by Insufficient Information.* GAO/NSIAD-00-37. Washington, D.C.: November 22, 1999.

*Foreign Military Sales: Review Process for Controlled Missile Technology Needs Improvement.* GAO/NSIAD-99-231. Washington, D.C.: September 29, 1999.

*Defense Trade: Department of Defense Savings from Export Sales Are Difficult to Capture.* GAO/NSIAD-99-191. Washington, D.C.: September 17, 1999.

*Defense Trade: Status of the Defense Export Loan Guarantee Program.* GAO/NSIAD-99-30. Washington, D.C.: December 21, 1998.

*Defense Trade: U.S. Contractors Employ Diverse Activities to Meet Offset Obligations.* GAO/NSIAD-99-35. Washington, D.C.: December 18, 1998.

*Defense Trade: Weaknesses Exist in DOD Foreign Subcontract Data.* GAO/NSIAD-99-8. Washington, D.C.: November 13, 1998.

Page 74

| | |
|---|---|
| **GAO's Mission** | The General Accounting Office, the investigative arm of Congress, exists to support Congress in meeting its constitutional responsibilities and to help improve the performance and accountability of the federal government for the American people. GAO examines the use of public funds; evaluates federal programs and policies; and provides analyses, recommendations, and other assistance to help Congress make informed oversight, policy, and funding decisions. GAO's commitment to good government is reflected in its core values of accountability, integrity, and reliability. |
| **Obtaining Copies of GAO Reports and Testimony** | The fastest and easiest way to obtain copies of GAO documents at no cost is through the Internet. GAO's Web site (www.gao.gov) contains abstracts and full-text files of current reports and testimony and an expanding archive of older products. The Web site features a search engine to help you locate documents using key words and phrases. You can print these documents in their entirety, including charts and other graphics.<br><br>Each day, GAO issues a list of newly released reports, testimony, and correspondence. GAO posts this list, known as "Today's Reports," on its Web site daily. The list contains links to the full-text document files. To have GAO e-mail this list to you every afternoon, go to www.gao.gov and select "Subscribe to daily E-mail alert for newly released products" under the GAO Reports heading. |
| **Order by Mail or Phone** | The first copy of each printed report is free. Additional copies are $2 each. A check or money order should be made out to the Superintendent of Documents. GAO also accepts VISA and Mastercard. Orders for 100 or more copies mailed to a single address are discounted 25 percent. Orders should be sent to:<br><br>U.S. General Accounting Office<br>441 G Street NW, Room LM<br>Washington, D.C. 20548<br><br>To order by Phone:   Voice:   (202) 512-6000<br>                            TDD:    (202) 512-2537<br>                            Fax:     (202) 512-6061 |
| **To Report Fraud, Waste, and Abuse in Federal Programs** | Contact:<br><br>Web site: www.gao.gov/fraudnet/fraudnet.htm<br>E-mail: fraudnet@gao.gov<br>Automated answering system: (800) 424-5454 or (202) 512-7470 |
| **Public Affairs** | Jeff Nelligan, managing director, NelliganJ@gao.gov (202) 512-4800<br>U.S. General Accounting Office, 441 G Street NW, Room 7149<br>Washington, D.C. 20548 |

**PRINTED ON** ♲ **RECYCLED PAPER**

# EXHIBIT 4

## UNCLASSIFIED

**United States Department of State
and the Broadcasting Board of Governors**

# Office of Inspector General

# Review of the U.S. Munitions List and the Commodity Jurisdiction Process

**Memorandum Report 01-FP-M-027, March 2001**



IMPORTANT NOTICE

This report is intended solely for the official use of the Department of State or the Broadcasting Board of Governors, or any agency or organization receiving a copy directly from the Office of Inspector General. No secondary distribution may be made, in whole or in part, outside the Department of State or the Broadcasting Board of Governors, by them or by other agencies or organizations, without prior authorization by the Inspector General. Public availability of the document will be determined by the Inspector General under the U.S. Code, 5 U.S.C. 552. Improper disclosure of this report may result in criminal, civil, or administrative penalties.

## UNCLASSIFIED

OFFICE OF INSPECTOR GENERAL

MEMORANDUM REPORT 01-FP-M-027

REVIEW OF THE U.S. MUNITIONS LIST AND THE COMMODITY

JURISDICTION PROCESS

MARCH 2001

EXECUTIVE SUMMARY

The National Defense Authorization Act for FY 2000, Public Law 106-65, Title XIV, Section 1402, Annual Report on Transfers of Militarily Sensitive Technology to Countries and Entities of Concern, requires the Inspectors General of the Departments of Commerce, Defense, Energy, and State to audit the U.S. Government policies and procedures for export of technologies and technical information to countries and entities of concern. The law specifies that these Inspectors General submit an annual report due March 31 of each year beginning in 2000 and ending in 2007. During FY 2001, the Department of State Office of Inspector General (OIG) assessed the export licensing process to determine whether the policies and procedures for developing, maintaining, and revising the U. S. Munitions List (USML) were adequately protecting the export of militarily sensitive technologies. As part of this objective, we also assessed the policies and procedures in place at the Office of Defense Trade Controls (DTC) for processing commodity jurisdiction cases in a timely and transparent manner. Through the commodity jurisdiction process, DTC advises exporters on whether an item is subject to the USML.

OIG found that the policies and procedures for developing, maintaining, and revising the USML were adequately protecting the export of militarily sensitive technologies. Our review of selected commodity jurisdiction cases indicated that the Department of State (the Department) consistently gave deference to the views of the national security agencies in making a commodity jurisdiction determination. Additionally, DTC concurred with recommendations made by a defense or intelligence agency. We found, however, that the policies and procedures for the commodity jurisdiction process needed improvement. The process took too long and was not always transparent. OIG also found that DTC had not performed a comprehensive review of the USML since 1993. OIG believes that Defense Trade Security Initiative (DTSI) number 17, which calls for a multiyear review of all USML categories, is a good way to revise and potentially improve the wording and descriptions of certain USML categories and commodities.

SCOPE OF REVIEW

The primary objective of this review was to evaluate the process for placing items on the USML and the policies and procedures for considering amendments and revisions to it. We also assessed the policies and procedures in place at DTC for processing commodity jurisdiction cases in a timely and transparent manner. In conducting this review, we interviewed Department officials and reviewed documents at DTC, including the International Traffic in Arms

Regulations (ITAR) and commodity jurisdiction files and records.  In addition, we discussed the USML and the commodity jurisdiction process with exporters and a Washington, DC, think tank.  We also spoke with officials from the Departments of Commerce, Defense, and Energy.  The work was performed between October 2000 and January 2001.  Major contributors to this report were Max Aguilar, Herbert Harvell, and Bryan Tenney.

## BACKGROUND

### The U.S. Munitions List

The United States controls the export of certain goods and technologies for national security, foreign policy, or nonproliferation reasons under the authority of several laws.  The principal legislation for controlling the export of goods and technologies with military capabilities is the Arms Export Control Act of 1976.  Under the Arms Export Control Act, the President has primary responsibility for designating items on the USML as defense articles or services.  In Executive Order 11958, the President delegated this authority to the Secretary of State.  Within the Department, the Bureau of Political-Military Affairs, DTC, licenses U.S. companies that export munitions commodities.  Munitions commodities are items that only have military uses, such as long range missiles.  DTC uses the ITAR to administer its authority under the Arms Export Control Act.  The ITAR contains regulations that companies must follow to submit a license.  The ITAR also contains the USML, which identifies those items, technologies, and services that have been specifically designed, developed, configured, adapted, or modified for a military application, and could, if exported, jeopardize national security or foreign policy interests of the United States.  The USML has 21 categories.

### The Commodity Jurisdiction Process

If an exporter is uncertain whether an article or service is covered by the USML, DTC provides a determination using commodity jurisdiction procedures.  An exporter's commodity jurisdiction request identifies the product, article, or services in question and includes a history of the product's design.  The determination process entails consulting among the Departments of Commerce, Defense, and State, and other government agencies and industry in appropriate cases.  The Departments of Commerce and Defense provide the technical analysis on the request and send their recommendations to DTC.  DTC then analyzes the recommendations and makes a decision on whether the commodity is a USML item.  A DTC official stated that the commodity jurisdiction process was developed to help the exporter.

### National Security Council Guidelines

In April 1996, the National Security Council (NSC) issued guidelines on how the State Department commodity jurisdiction and Commerce Department commodity classification processes are supposed to work.  An NSC official stated that the 1996 guidance was the result of interagency coordination at the Assistant Secretary and Deputy Assistant Secretary levels at the Departments of Commerce, Defense, and State.  The guidance was created because of a great

App. 79

deal of disagreement between Commerce and State about the way commodity jurisdictions and classifications were being granted at those Departments.

The NSC commodity jurisdiction guidelines specify that a decision will be made within a 95-calendar-day cumulative timeline (starting from the date DTC receives a complete commodity jurisdiction request). The time is allocated as follows:

Routine Determination (up to 60 days)

- Referral by DTC of commodity jurisdiction applications to other agencies:    5 days

- Departments submit recommendations to Director of DTC
    (Departments may request 10 additional days to submit
    recommendations for extraordinary cases):    35 days

- Decision by Director of DTC:    10 days

First escalation period (up to 15 days)

- Escalation period for the Department(s) contesting the DTC decision:    5 days

- Decision by Department of State Assistant Secretary for Political-Military
    Affairs:    10 days

Second escalation period (up to 15 days)

- Escalation period for the Department(s) contesting the Assistant
    Secretary's decision:    5 days

- Decision by Department of State Under Secretary/Secretary:    10 days

Third escalation period (up to 5 days)

- Escalation period for the Department(s) contesting the Under Secretary's/
    Secretary's decision:    5 days

- Right of escalation up to the President of the United States:

**Previous Work**

In June 1999, OIG issued a report entitled *Export Licensing* (99-CI-018). This audit found that, overall, the export licensing process is working as intended and that the Department consistently executed its export licensing responsibilities in accordance with established policies and procedures. However, OIG found that the end-use monitoring (Blue Lantern program)

App. 80

process used in munitions licensing could be improved by:  1) placing more emphasis on the selection criteria used to initiate Blue Lantern checks, 2) closely monitoring the requests that overseas posts are tasked to complete, and 3) ensuring overseas posts have the technical expertise to conduct the checks.  OIG also found that supervisory reviews of routine license processing and additional training opportunities for licensing officers was needed.  OIG concluded that these needs were symptomatic of a larger problem at DTC – insufficient resources to meet its expanding mandate.  Overall, OIG made 11 recommendations to DTC.  DTC agreed with 9 of the 11 recommendations and took appropriate steps to comply with the 9.  Of the 11 OIG recommendations, 7 are closed, and 4 require additional work to be closed.

In March 2000, OIG issued a report entitled *Department of State Controls Over the Transfer of Militarily Sensitive Technologies to Foreign Nationals from Countries and Entities of Concern* (00-CI-008).  OIG found that DTC did not systematically track foreign nationals listed on export licenses, but instead relied heavily on self-policing by U.S. companies supplemented by a few selected compliance reviews.  Therefore, although licensing agreements may have been in place requiring adherence to policies and procedures protecting sensitive information, the risk of unauthorized release persisted.  OIG recommended that DTC improve the Department's ability to monitor the transfer of technical information to foreign nationals and inform responsible parties of applicable licensing requirements.  Overall, OIG made three recommendations to DTC.  DTC agreed with all three.  Of the three recommendations, one is closed, and two require additional work to be closed.

## RESULTS OF REVIEW

### The U.S. Munitions List

OIG found that the policies and procedures for developing, maintaining, and revising the USML were adequately protecting the export of militarily sensitive technologies.  However, DTC had not performed a comprehensive review of the USML since 1993.  OIG believes that the DTSIs, especially number 17, which calls for a multiyear review of USML categories, are a good way to revise and potentially improve the wording and descriptions of certain USML categories and the commodities controlled on the USML.

#### USML Revisions

There are very few revisions to the USML.  DTC officials stated that changes to the USML occur infrequently because of the nature of the commodities controlled.  DTC cannot unilaterally recommend placing items on the USML because the office neither develops military sensitive technology, nor has the technical capacity to make such decisions.  The Department of Defense research labs, for example, can recommend that a new technology be added to the USML.  Congress and the President can also make changes to the USML.  The most recent addition to the USML was made when Congress gave the satellite category back to the Department of State (from the Department of Commerce) in March 1999.  All changes to the USML are reported in the *Federal Register* and the Department must submit a report to Congress at least 30 days before any item is removed from the USML.

During our review, we found that some in the export community believed that the U.S. Government is controlling too many commodities on the USML. For example, a major Washington, DC, think tank, the Center for Strategic and International Studies, conducted a study on the U.S. military export control system and summarized that:

> The U.S. export control system for military equipment that has evolved over the past 40 years is viewed as increasingly counterproductive. Controls on military exports were designed to protect American technology and serve as a tool of foreign policy. The current architecture of export controls was developed in the 1970s, but business practices have evolved substantially since that time. Rather than protecting technology, the system now causes larger security problems. Export controls are driving a wedge between the United States and its allies and causing other countries to avoid American technology and components because of frustrations with the export licensing process. Interoperability between U.S. and allied forces in the field will suffer.

Part of the frustration expressed by the Center for Strategic and International Studies stems from the fact that the USML is not examined periodically to ensure that it is still meeting its objectives under the Arms Export Control Act. DTC did not have a mechanism for periodic reviews of the USML and for determining whether commodities currently controlled still merited being on the USML. DTC officials last performed a comprehensive "scrub" of the USML at the beginning of 1993 at the directive of the President. Department of Defense officials were consulted, and the results of the review were reported in a *Federal Register* notice dated July 22, 1993. The DTC official that worked on the 1993 review indicated that a few categories in the USML could still be revised to clarify wording and commodity descriptions.

A September 1999 Department of Defense White Paper on Arms and Technology Transfer concluded, "The USML should be reviewed to identify items and technologies that should no longer be controlled either because they represent low-risk transactions, or because of their widespread availability, are no longer controllable." Because no entity has done a comprehensive analysis of all USML categories in approximately 8 years to determine whether the commodities controlled on it are in accord with current day realities, a detailed, thorough review of the list is needed. As this report was being written, the Department of Defense, under DTSI 17, was undertaking just such a review.

### Defense Trade Security Initiative Number 17

In May 2000, a series of DTSIs were announced by the Secretary of State. The objective of those initiatives is to improve export controls. One initiative, number 17, calls for a periodic review of the USML. In response to DTSI 17, Defense drafted a plan for reviews of approximately one-quarter of the USML per year. The plan lists four goals of the reviews: identification of USML items that are more properly controlled on the Commerce Control List (CCL); identification of items that should no longer be controlled on either the USML or the CCL; identification of additions to the USML, primarily because of new technological developments; and clarification of USML language to ensure that users of the list can easily

identify the items requiring export licenses. The five USML categories that are currently under review by the Department of Defense are firearms, explosives, aircraft, toxicological agents, and nuclear weapons. After Defense develops its specific recommendations pertaining to the USML, it will consult with DTC about the findings. The director of DTC agreed that the USML should be reviewed periodically. However, he stated that it would only be useful if the review updated and clarified relevant categories, but not if it were used merely to accomplish the objective of "dumbing down" the USML to make it better resemble the CCL through removal of military parts and components from the USML to the benefit of the international gray arms market and other criminal elements.

The Department of Defense White paper, the findings of the Center for Strategic and International Studies, and the DTSI, illustrate that there is a strong body of thought that reviewing the USML periodically is beneficial. OIG believes that the planned review of the USML is a good plan of action. If commodities controlled on the USML no longer present national security or foreign policy dangers, then the items should be removed from the list. Therefore, we concluded that DTSI 17 is needed and the cycle of USML category reviews begun in May 2000 should be continued into the future.

**Commodity Jurisdiction Process**

Annually, DTC receives 200–400 commodity jurisdiction requests. During the course of our review, we audited the FY 2000 commodity jurisdiction cases processed at DTC. In FY 2000, DTC received 220 commodity jurisdiction requests. As of November 2000, of the 220 requests, DTC had issued jurisdictional rulings for only 103 of those items; 117 items were still awaiting a determination by DTC. Of the 103 jurisdictional rulings, 56 were determined to be CCL jurisdictional items, 29 were USML jurisdictional items, 7 were split jurisdictions (both CCL and USML), 8 were returned without action for lack of information, and 3 were withdrawn by the exporter. OIG selected a judgmental sample of 20 commodity jurisdiction cases from the 103 jurisdictional rulings for FY 2000.

The sample of 20 cases OIG examined included the following:

- all 7 cases where split jurisdiction was recommended by DTC,

- 6 cases where DTC ruled USML jurisdiction after receiving conflicting recommendations from Defense and Commerce,

- 2 cases where the jurisdictional request had not been referred to Defense and Commerce, and

- 5 randomly selected cases from the remaining 88 rulings that had been completed by DTC in FY 2000.

Based on reviewing the files for the sample cases, we found that the policies and procedures for the commodity jurisdiction process were adequate; however, two components of

the process need improvement.  OIG found that the process took far too long and was not always transparent.

### Timeliness of the Commodity Jurisdiction Process Needs Improvement

As highlighted in the background section of this report, routine commodity determination should take no more than 60 calendar days.  The commodity jurisdiction process at DTC, however, took an excessive amount of time.  The average processing time for the 20 cases in our sample was 196 calendar days, or almost 6 1/2 months.  However, in two cases, the request was not properly referred out per the NSC guidelines, which significantly decreased the amount of time to grant a determination.  If these cases are not included in the calculation, the average processing time increases to 214 days, or a little over 7 months.  Also, in one case, a company was applying for small technical modifications to a prior determination and not an actual commodity jurisdiction ruling.  This case was only referred to Defense.  Because the company was not asking for reconsideration on the jurisdiction, Defense replied in only 19 calendar days and the answer was sent out by DTC in 35 calendar days.  If this case is also taken out of the calculation, the average increases to 224 calendar days, or 7 1/2 months.  This amount of processing time is far too long, especially taking into account that many of the exporters making the requests work in fast-paced environments where decisions have to be made quickly.  OIG believes that DTC should make every effort to process the cases within the NSC 60-day guidance.

There are two reasons why the commodity jurisdiction process took so long at DTC.  First, the Departments of Commerce and Defense have been extremely slow to respond to DTC's referrals.  In one case in our sample, it took Commerce 289 calendar days to respond to DTC.  In other cases in our sample, it took Commerce 180, 163, and 155 calendar days to respond.  Also, in all FY 2000 commodity jurisdiction requests DTC received, there were several other cases (not in our sample) that were at Defense and Commerce for more than 200 calendar days, and 95 cases as those agencies for than 100 days.  Overall, in the 20 cases in the FY 2000 sample, Commerce averaged 110 calendar days to respond to commodity jurisdiction requests, and Defense averaged 88 calendar days to respond.  For all FY 2000 cases closed at DTC, Defense averaged 76 calendar days to respond, and Commerce averaged 117 calendar days.  Using the NSC guidelines, Commerce and Defense should return their recommendations to DTC in 35 days, except in an extraordinary case.  In that case, the agencies are granted another 10 days.

DTC did not impose or enforce deadlines on Commerce or Defense.  OIG believes that a DTC notification process of sending letters to Commerce and Defense when a deadline is approaching and when a deadline has passed would help ensure that Commerce and Defense get their recommendations to DTC within the NSC time guidelines and, as a byproduct, improve responsiveness to exporters.

> **Recommendation 1:**  We recommend that the Office of Defense Trade Controls develop procedures to regularly notify the Departments of Commerce and Defense of deadlines for specific cases, in order to conform with the National Security Council time guidelines.

App. 84

DTC agreed with this recommendation and will enforce systematic deadlines on the other agencies.

The second reason for the long processing time of commodity jurisdiction requests at DTC is because even in the cases where Defense and Commerce responded in a relatively timely fashion, in many instances, DTC still took months to issue a determination. For example, in one case, it took the exporter 10 months to get an answer from DTC, even though Commerce and Defense returned their recommendations to DTC within 3 1/2 months. In another case, it took an exporter almost 11 months to get a response from DTC, although DTC had received the Commerce and Defense recommendations within 3 1/2 months. DTC officials stated that this case involved interagency dispute, and a meeting was held with the company, at their request, prior to DTC's issuance of the final letter. The slow processing time at DTC contradicts the NSC guidance, which states that the process is supposed to take no more than 60 calendar days from start to finish. In our sample, we found that commodity jurisdiction cases took an average of 195 calendar days. This abnormally long processing time does not present the general public with a positive image of dealing with the U.S. Government.

**Recommendation 2:** In coordination with recommendation 1, we recommend that the Office of Defense Trade Controls develop and implement a plan to improve its commodity jurisdiction procedures in order to meet the National Security Council time guidelines.

DTC agreed with this recommendation and will try to improve its own deadlines. DTC plans to deploy additional resources to accomplish this.

DTC officials provided several explanations on why it took so long to process commodity jurisdiction requests. First, DTC cited a continuing staffing problem. As a result, for up to 6 months during FY 2000, an officer at DTC was not assigned to cover the commodity jurisdiction process. During this time, the commodity jurisdiction portfolio was given to a manager who was already heavily burdened and did not give his full attention to the commodity jurisdiction process. Second, a DTC official stated that the office has higher priorities than the commodity jurisdiction process; its highest priority is to process approximately 44,000 export licenses annually. Third, DTC officials believe that some exporters have distorted the intent of the commodity jurisdiction process, which was originally supposed to be a vehicle to help the exporter. Because some companies submit the same request multiple times without submitting new data, DTC officials believe that, in some cases, the process has evolved beyond its original intent and that some exporters are attempting to get DTC to take their particular commodity off the USML. Last, a DTC official stated that in some cases the delays were due to the type of commodities and their complexity.

In OIG's 1999 audit report on export licensing, we found that inadequate resources had made it increasingly difficult for DTC to meet its broadening mandate. During discussions with the director of DTC for this review, OIG learned that the resource authorization situation has been alleviated, due to an early decision by Secretary Powell to approve recruitment and full staffing of DTC at authorized full-time equivalent (FTE) levels and expedited security

clearances.  As of March 11, 2001, DTC has 71 FTE authorized and 55 full-time State employees on board.  The office has also enlarged its staff of military officers on detail from the Pentagon from four to eight, drawing on funds made available by Congress in the FY 1999 National Defense Authorization Act.  In order to provide an appropriate career path and be consistent with "notwithstanding" provisions related to grade structure enacted in the Foreign Relations Authorization Act for FY 2000 and 2001, six new GS-14 positions and three new GS-15 positions have been established within the authorized personnel ceiling.  Full staffing is expected by the Summer of 2001.  OIG believes that when DTC staffing initiatives have been completed, this should help it accomplish its mandated workload within NSC guidelines.

### Better Transparency is Needed in the Commodity Jurisdiction Process

The ITAR requires that all commodity jurisdiction cases be sent to Commerce and Defense.  DTC, however, was not referring all commodity jurisdiction requests to Commerce and Defense, thus calling into question the transparency of the process.  In our sample, there were two cases that were not staffed out to Commerce and Defense.  In the first case, a DTC official stated that it was obvious that the commodity (F-16 Aircraft Hydraulic Speed Brake Values) was a USML item, so DTC did not go through the formal procedures of asking Commerce and Defense for their recommendations.  DTC did send Commerce a fax informing it of what it had done with the case.  Commerce then sent a fax back agreeing with DTC's action.  Overall, DTC processed this case in just 7 calendar days.  In the second case, the item was also obviously a USML item (Technical Drawings and Blueprints Created for the U.S. Air Force Entitled: "BLU-109/B Bomb, 2000 lb., Penetrator Explosive;" Created by Lockheed Missiles & Space Company, Inc;).  Therefore, DTC did not refer it out, although it did fax Commerce and Defense its intentions – Defense concurred, and Commerce did not contest it.

As stated above, the ITAR states that DTC shall notify Commerce and Defense of the initiation of each case.  When cases are not referred to Commerce and Defense, those agencies have no way to recommend whether the commodity is a USML or a CCL item.  It also sheds doubt upon why DTC was not referring all cases to Commerce and Defense.  Consequently, in the future, all commodity jurisdiction cases should be properly referred to Commerce and Defense, both the initiation and the resolution of the case.

**Recommendation 3:**  We recommend that the Office of Defense Trade Controls inform the relevant agencies of all the commodity jurisdiction requests it receives and inform relevant agencies of its decision on each jurisdiction request.

DTC disagreed with the recommendation.  DTC believes that the premise of OIG's recommendation is that the relevant agencies are not being informed of all commodity jurisdiction requests and all decisions taken on them.  They stated that the crux of OIG's recommendation relates to two cases where, in fact, the agencies were informed of both requests and both decisions, but after DTC made an initial ruling.  They also stated that OIG cites two cases out of hundreds available to it.

OIG disagrees with DTC's response on two counts. First, there were not "hundreds" of cases, because DTC only processed 103 of 220 cases they received in FY 2000. Of that 103, OIG sampled 20, where we found 2 cases (10 percent) that were not properly referred to the other agencies according to both the ITAR and the NSC guidelines. Second, despite the fact that OIG recognized that these were "obviously" USML items, DTC still did not follow the ITAR and NSC guidelines, which clearly state that DTC shall notify Commerce and Defense of the initiation of each case.

Another transparency-related issue in the commodity jurisdiction process is that Commerce and Defense were unable to see each other's positions on a case unless they specifically asked for it. Consequently, Commerce and Defense did not know whom the other agency recommended as the jurisdictional authority. The system also relied on both Commerce and Defense sending couriers to pick up each individual commodity jurisdiction package, and signed and dated commodity jurisdiction letters. Each commodity jurisdiction package contains background information submitted by the exporter on the particular commodity. This arrangement has also resulted in problems because, according to the DTC commodity jurisdiction officer, occasionally Commerce claimed a specific commodity jurisdiction case was not included in a package months after it was picked up.

DTC did not have a computer interface with the other agencies involved in the commodity jurisdiction process. DTC did not even have an external, unclassified e-mail system. Therefore, if agencies had questions pertaining to the status of a specific case, they had to call DTC. Also, because no computer interface existed for commodity jurisdiction cases, history on specific types of commodities was unavailable to Commerce or Defense. A computer database providing historical knowledge to all agencies involved in this process would be useful for several reasons. First, it could be helpful in reviewing commodity jurisdiction resubmissions from the same company or for like products. Second, it would be favorable if the situation arises again where DTC does not have an officer covering the commodity jurisdiction process full-time. The person temporarily covering the process could access the database and obtain historical data on the particular commodity. Third, a computer database could also improve timeliness by electronically warning Commerce and Defense when they are approaching a deadline.

Overall, OIG believes that automation of the commodity jurisdiction process would be an excellent method to improve interagency communication and solve the problems related to timeliness and transparency noted above. OIG believes that a secure system interface between the Departments of Commerce, Defense, and State is technologically feasible. Relying on manual, paper processes in the modern day world is outdated. Because there is no system interfaces between the agencies involved in the commodity jurisdiction process, the process is inhibited from running as smoothly as it could. Improved transparency and timeliness in the commodity jurisdiction process could be achieved through automation of the process, whether through the use of a database accessible by Commerce and Defense, or at the least, e-mail connectivity.

**Recommendation 4:**  We recommend that the Office of Defense Trade Controls create a more efficient and transparent commodity jurisdiction process by coordinating with the Departments of Commerce and Defense to obtain a secure automated system for processing, referring, and storing historical data on commodity jurisdiction cases.

**Recommendation 5:**  We recommend that the Office of Defense Trade Controls coordinate with the Bureau of Information Resource Management and establish an e-mail system.

DTC requested that the consideration of these recommendations be deferred until the next congressionally mandated audit, which will examine the information technology systems at each of the agencies involved in the export licensing process and their compatibility.  This audit is scheduled to begin in the spring of 2001.

Because the next joint-OIG audit will examine the information technology systems at each of the agencies involved in the export licensing process and their compatibility, OIG agrees to defer these issues until the next report, with the caveat that these recommendations be fully examined and potentially implemented then.

### Unresolved Jurisdiction Issues Concerning Night-Vision Technology

Night-vision technology-related commodities are an example of where the USML and CCL must be clarified.  Since 1998, Commerce and State have disputed which agency has jurisdictional authority for certain night-vision technologies.  In 1992, a classified memorandum of understanding (MOU) was signed between the Departments of Commerce, Defense, and State concerning night-vision technology.  A Department of State official in the Bureau of Nonproliferation (NP) indicated that the MOU worked fine until 1998.  Then, however, controversy ensued because the MOU was ignored, partially due to rapid changes in night-vision technology.  It became unclear where certain night-vision commodities should be licensed, at DTC under the USML or at Commerce under the CCL.  The NP official explained that the controversy was exacerbated because Defense began sending recommendations on night-vision commodities to Commerce that sometimes recommended USML and sometimes did not.  Concurrently, the political pendulum started to shift toward procontrol views with the report by the Cox Committee.  Simultaneously, a case pertaining to one of the disputed night-vision commodities had been escalated to the NSC by Commerce.  The NSC, however, has not yet ruled on the case.

OIG was informed that a dialogue started in the fall of 1999 related to the night-vision commodities in dispute.  Attempts to resolve the controversy failed and the dispute continued to fester among the agencies.  According to an NP official, it was evident that there were enormous problems defining a system versus a component related to certain night-vision technologies, and Defense was unwilling to decide whether these commodities were CCL or USML.  An interagency meeting hosted by Defense convened in April 2000.  Defense, five industry representatives, Commerce, and a State Department NP official attended the meeting.  DTC was invited, but was unable to attend.  The meeting's goal was to come to some consensus on the

night-vision commodities in dispute.  However, even after the meeting, the NP official felt that the controversy was not resolved.  The NP official commented in November 2000:

> The exporter is in real limbo.  This has been a 15-to-16-month process.  A policy of comity on these commodities has been suspended.  We are killing the manufacturers of sensor equipment (a night-vision technology) because of arbitrariness.  The overwhelming impression is that we are doing this to the export community because we can.  We have to have a real determination on some of these things (as to whether they are USML or CCL).

The dispute over which agency, the Department of Commerce or the Department of State or both, should have jurisdiction over night-vision commodities must be resolved.  If the Commerce, Defense, and State Departments renegotiated the 1992 night-vision commodities MOU, it could provide the framework for delineating future commodity, system, and component licensing procedures.  Additionally, OIG believes that the DTSI 17 process for 2002 could provide a review of the USML category that covers night-vision technology and aid interagency cooperation on this intricate commodity.

> **Recommendation 6:**  We recommend that the Office of Defense Trade Controls coordinate with the Departments of Commerce and Defense in updating the 1992 memorandum of understanding on night-vision commodities and request that the Department of Defense add the U.S. Munitions List category for night-vision commodities to the DTSI Number 17 review for 2002.

DTC disagrees with this recommendation.  They stated that responsibility for renegotiating the MOU resides with the Department's Bureau of Nonproliferation, Office of Export Controls and Conventional Arms Nonproliferation Policy.  Concerning the second part of the recommendation, DTC proposed that night-vision technologies and space-qualified items be part of the first year review by Defense under DTSI 17.  Because their proposal was not agreed upon, DTC has already initiated the process to bring about resolutions to the current cases identified by OIG.

OIG's recommendation is that the agencies involved in this dispute resolve the problem.  OIG will close this recommendation when DTC, as the Department's jurisdiction authority, in coordination with the Departments of Defense and Commerce, has resolved the issue.

**No Written Guide for the Government Jurisdiction Process**

Because of the interagency impasse on the night-vision commodities, the Office of Export Control and Conventional Arms Nonproliferation Policy initiated the government jurisdiction process.  The government jurisdiction process is supposed to work in a manner similar to DTC's commodity jurisdiction process, except in this case, it is a government agency that is initiating the request, rather than an exporter.  OIG notes that DTC is in charge of the government jurisdiction process and opened 14 government jurisdiction requests in FY 2000.  Of the 14 requests, DTC issued two rulings.  Out of the 14 government jurisdiction cases opened by

DTC in FY 2000, 6 were initiated by the Department of Defense, 7 by the U.S. Customs Service, and 1 by the Department of Energy.

To resolve the night-vision technology deadlock, the Office of Export Control and Conventional Arms Nonproliferation Policy sent a memo to DTC on June 28, 2000, requesting government jurisdiction rulings for 33 night-vision commodities. The memo states that "the appropriate method for determining jurisdiction, the commodity jurisdiction process described in ITAR 120.4, has been largely ignored for certain products, according to our information." Separately, throughout the summer and fall of 2000, DTC received technical arguments on about 28 thermal imaging/night-vision technologies from Defense. Almost 6 months later, as of December 2000, the Director of DTC established his position that the commodity jurisdiction process was the proper vehicle for these cases and informed OIG in February 2001 that letters will be sent by DTC to the affected exporters.

The government jurisdiction process failed to solve the night-vision technology controversy because there is confusion as to how the process is supposed to operate. The Director of DTC believed that the government jurisdiction process is designed to support law enforcement agencies, such as Customs. OIG believes that the confusion stems from the lack of official, written guidance for the process. Even though DTC had opened other government jurisdiction cases in FY 2000, in this instance, DTC decided that the commodity jurisdiction route was the proper way to proceed. Because this process is supposed to work in a manner similar to the commodity jurisdiction process and DTC opened 14 government jurisdiction cases in FY 2000, we believe DTC should consult with the NSC and other relevant government agencies and then write policies and procedures for the government jurisdiction process. The procedures should make it clear how the process will operate, when government agencies should use it, and the timeframes for the process.

**Recommendation 7:** We recommend that the Office of Defense Trade Controls establish written policies and procedures for the government jurisdiction process in coordination with all government agencies involved in the commodity jurisdiction process.

DTC partially agreed with the intent of the recommendation. They will remind other agencies and other State offices through a written notice that jurisdictional questions involving U.S. exporters must be resolved through the commodity jurisdiction procedures, while the government jurisdiction process is normally reserved for law enforcement purposes or instances in which a Federal agency seeks clarification as to equipment it has developed or owns.