UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| DEFENSE DISTRIBUTED, et al., | § | |
|     Plaintiffs, | § | |
| | § | |
| v. | § | No. 1:15-cv-372-RP |
| | § | |
| U.S. DEPARTMENT OF STATE, et al., | § | |
|     Defendants. | § | |

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR
A PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR A
PRELIMINARY INJUNCTION ................................................................. 1

BACKGROUND .......................................................................................... 3

    I.      Statutory and Regulatory Framework ............................................. 3

    II.     Defendants' Regulation of Plaintiffs' Conduct ............................ 4

LEGAL STANDARD ................................................................................... 7

ARGUMENT ................................................................................................ 7

    I.      Plaintiffs' Motion for a Preliminary Injunction Should Be Denied. ................ 7

          A.    Plaintiffs Have Failed to Carry Their Burden of Demonstrating
Irreparable Injury. ................................................................. 8

          B.    The Threatened Harm to the National Security and Foreign Policy
Interests of the United States From an Injunction Outweighs any
Irreparable Harm to Plaintiffs. ............................................. 10

          C.    The Public Interest Would be Disserved By a Preliminary
Injunction. .......................................................................... 11

    II.     Plaintiffs' Motion for a Preliminary Injunction Should Be Denied
Because Plaintiffs Have Not Shown a Substantial Likelihood of Success on
the Merits. .......................................................................................... 11

          A.    The Export of CAD Files That Function to Automatically Create a
Firearm or its Components is Not the Publishing of an Item of Expressive
Speech. ............................................................................... 11

          B.    Even If Limiting the Export of CAD Files Implicates the First
Amendment, Defendants Are Likely to Prevail on Plaintiffs' First
Amendment Claims. ............................................................ 14

               1.   ITAR's Export Controls Are a Valid, Content-Neutral
Regulation of Plaintiffs' Conduct That Do Not Infringe First
Amendment Rights. ....................................................... 15

               2.   ITAR's Export Controls Are Not a Facially Unconstitutional
Prior Restraint. ............................................................. 18

               3.   ITAR's Export Controls Are Not Unconstitutionally
Overbroad. .................................................................... 21

          B.    Defendants Are Likely to Prevail on Plaintiffs' Second
Amendment Claims. ............................................................ 22

               1.   Plaintiffs Lack Standing for Their Second Amendment Claims. ........ 22

               2.   Plaintiffs Are Unlikely to Succeed on Their Second
Amendment Claims. ...................................................... 25

C.    Defendants Are Likely to Prevail on Plaintiffs' Other Claims. ................ 27

1.   ITAR's Standards Are Not Void for Vagueness. .............................. 27

2.   Application of ITAR's Export Requirements to Plaintiffs' CAD Files Does Not Exceed the Statutory Authority Granted by Congress .................................................................................................. 28

**CONCLUSION** .................................................................................................... **31**

# TABLE OF AUTHORITIES

## Cases

*AF Holdings, LLC. v. Does 1-1058,*
 752 F.3d 990 (D.C. Cir. 2014) .................................................................. 6
*Alexander v. U.S.,*
 509 U.S. 544 (1993) ................................................................................. 18
*Bernstein v. U.S. Dep't of Justice,*
 176 F.3d 1132 (9th Cir. 1999) ................................................................ 13
*Bonds v. Tandy,*
 457 F.3d 409 (5th Cir. 2006) .................................................................. 24
*Broadrick v. Oklahoma,*
 413 U.S. 601 (1973) ................................................................................. 21
*Brockett v. Spokane Arcades,*
 472 U.S. 491 (1985) ........................................................................... 21, 22
*Brown v. District of Columbia,*
 888 F. Supp. 2d 28 (D.D.C. 2012) ............................................................ 9
*Brown v. Entm't Merchants Ass'n,*
 131 S. Ct. 2729 (2011) ............................................................................ 12
*Brown v. Town of Cary,*
 706 F.3d 294 (4th Cir. 2013) .................................................................. 28
*Bullfrog Films v. Wick,*
 646 F. Supp. 492 (C.D. Cal. 1986) ......................................................... 14
*Canal Auth. of State of Fla. v. Callaway,*
 489 F.2d 567 (5th Cir. 1974) .................................................................... 8
*Capital Cities/ABC, Inc. v. Brady,*
 740 F. Supp. 1007 (S.D.N.Y. 1990) ................................................... 16, 19
*Carey v. Population Servs. Int'l,*
 431 U.S. 678 (1977) ................................................................................. 25
*City of Lakewood v. Plain Dealer Pub. Co.,*
 486 U.S. 750 (1988) ............................................................... 18, 19, 20, 21
*City of Littleton v. Z.J. Gifts D-4,*
 541 U.S. 774 (2004) ................................................................................. 20
*Clark v. Cmty. for Creative Non-Violence,*
 468 U.S. 288 (1984) ................................................................................. 15
*Coates v. City of Cincinnati,*
 402 U.S. 611 (1971) ................................................................................. 28
*Corrosion Proof Fittings v. EPA,*
 947 F.2d 1201 (5th Cir. 1991) ................................................................ 25
*Ctr. for Biological Diversity v. Salazar,*
 706 F.3d 1085 (9th Cir. 2013) .................................................................. 8
*DaimlerChrysler v. Cuno,*
 547 U.S. 332 (2006) ................................................................................. 23
*Dole v. Petroleum Treaters,*
 876 F.2d 518 (5th Cir. 1989) .................................................................. 30
*Emergency Coal. to Defend Educ. Travel v. Dep't of Treas.,*

545 F.3d 4 (D.C. Cir. 2008) ........................................................................................ 16

*Escamilla v. M2,*
Tech., 2013 WL 4577538 (E.D. Tex. 2013) ................................................................ 11

*Faculty Senate of Fla. Int'l U. v. Winn,*
477 F. Supp. 2d 1198 (S.D. Fla. 2007) ........................................................................ 9

*Feit v. Ward,*
886 F.2d 848 (7th Cir. 1989) ......................................................................................... 1

*Forsyth Cnty., Ga. v. Nationalist Movement,*
505 U.S. 123 (1992) ..................................................................................................... 21

*Frank v. Relin,*
1 F.3d 1317 (2d Cir. 1993) ............................................................................................ 1

*Freedman v. Maryland,*
380 U.S. 51 (1965) ............................................................................................... 19, 20

*Gonannies, Inc. v. Goupair.Com, Inc.,*
464 F. Supp. 2d 603 (N.D. Tex. 2006) ......................................................................... 9

*Haig v. Agee,*
453 U.S. 280 (1981) ..................................................................................................... 14

*Heller v. District of Columbia,*
670 F.3d 1244 (D.C. Cir. 2011) .................................................................................. 27

*Henderson v. Stalder,*
287 F.3d 374 (5th Cir. 2002) ...................................................................................... 23

*Holy Land Found. v. Ashcroft,*
219 F. Supp. 2d 57 (D.D.C. 2002), ............................................................................ 11

*House the Homeless v. Widnall,*
94 F.3d 176 (5th Cir. 1996) ............................................................................. 7, 12, 13

*Huitron-Guizar,*
678 F.3d 1169 ............................................................................................................. 24

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston,*
515 U.S. 557 (1995) ..................................................................................................... 12

*In re Iraq & Afg. Detainees Litig.,*
479 F. Supp. 2d 85 (D.D.C. 2007) ................................................................................ 2

*Johnson v. Moore,*
958 F.2d 92 (5th Cir. 1992) ........................................................................................ 24

*Junger v. Daley,*
209 F.3d 481 (6th Cir. 2000) ...................................................................................... 13

*Karn v. Dep't of State,*
925 F.Supp. 1 (D.D.C.1996) ....................................................................................... 13

*Katt v. Dykhouse,*
983 F.2d 690 (6th Cir. 1992) ...................................................................................... 17

*Kirby v. City of Elizabeth,*
388 F.3d 440 (4th Cir. 2004) ......................................................................................... 1

*Kleindienst v. Mandel,*
408 U.S. 753 (1972) ..................................................................................................... 18

*Kleinman v. City of San Marcos,*
597 F.3d 323 (5th Cir. 2010) ...................................................................................... 17

*Laker Airways, Ltd. v. Pan Am. World Airways, Inc.*,
   604 F. Supp. 280 (D.D.C. 1984) ................................................................. 14

*Linick v. U.S.*,
   104 Fed. Cl. 319 (Fed. Cl. 2012) .............................................................. 18

*Lorillard v. Pons*,
   434 U.S. 575 (1978) .................................................................................. 30

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992) .................................................................................. 24

*Mance v. Holder*,
   2015 WL 567302 (N.D. Tex. Feb. 11, 2015) ........................................... 25

*Marchese v. California*,
   545 F.2d 645 (9th Cir. 1976) ................................................................... 26

*Martinez v. Mathews*,
   544 F.2d 1233 (5th Cir. 1976) ........................................................... passim

*Milena Ship Mgmt. Co. v. Newcomb*,
   804 F. Supp. 846 (E.D. La. 1992) .............................................................. 8

*Miss. State Democratic Party v. Barbour*,
   529 F.3d 538 (5th Cir. 2008) ................................................................... 23

*Munn v. Ocean Springs, Miss.*,
   763 F.3d 437 (5th Cir. 2014) ............................................................. 27, 28

*N.Y. State Club Ass'n v. City of New York*,
   487 U.S. 1 (1987) ..................................................................................... 21

*NAACP v. Kyle, Tex.*,
   626 F.3d 233 (5th Cir. 2010) ................................................................... 23

*Nation Magazine v. Dep't of Def.*,
   762 F. Supp. 1558 (S.D.N.Y. 1991) ........................................................ 14

*Nat'l Rifle Ass'n v. ATF*,
   700 F.3d 185 (5th Cir. 2012) ................................................... 24, 25, 26, 27

*Near v. State of Minn.*,
   283 U.S. 697 (1931) .................................................................................. 20

*Osterweil v. Edmonson*,
   424 F. App'x 342 (5th Cir. 2011) ............................................................ 24

*Planned Parenthood Ass'n of Hidalgo Cnty. Tex. v. Suehs*,
   692 F.3d 343 (5th Cir. 2012) ........................................................... 2, 7, 14

*Promotions v. Conrad*,
   420 U.S. 546 (1975) .................................................................................. 20

*Pub. Citizen, Inc. v. Bomer*,
   274 F.3d 212 (5th Cir. 2001) ................................................................... 23

*Reeves v. McConn*,
   631 F.2d 377 (5th Cir. 1980) ................................................................... 28

*Reliable Consultants, Inc. v. Earle*,
   517 F.3d 738 (5th Cir. 2008) ................................................................... 25

*RTM Media, L.L.C. v. City of Houston*,
   584 F.3d 220 (5th Cir. 2009) ................................................................... 17

*Scott v. Flowers*,
   910 F.2d 201 (5th Cir. 1990) ..................................................................... 1

*Sec'y State of Md. v. Munson*,
  467 U.S. 947 (1984)................................................................................................ 22

*Siegel v. Lepore*,
  234 F.3d 1163 (11th Cir. 2000) ................................................................................ 9

*Spence v. Washington*,
  418 U.S. 405 (1974) ................................................................................................ 12

*Teague v. Reg'l Comm'r of Customs*,
  404 F.2d 441 (2d Cir. 1968)..................................................................................... 20

*Texas v. Johnson*,
  491 U.S. 397 (1989) ................................................................................................ 12

*Thomas v. Chicago Park Dist.*,
  534 U.S. 316 (2002) ................................................................................................ 21

*Tough Traveler, Ltd. v. Outbound Prods.*,
  60 F.3d 964 (2d Cir. 1995)....................................................................................... 9

*Turner Broad. Sys., Inc. v. FCC*,
  512 U.S. 622 (1994) ................................................................................................ 15

*U.S. Civil Service Comm. v. Nat'l Ass'n of Letter Carriers*,
  413 U.S. 548 (1973) ................................................................................................ 28

*U.S. v. 12 200-Ft. Reels*,
  413 U.S. 123 (1972) ................................................................................................ 14

*U.S. v. Bell*,
  414 F.3d 474 (3d Cir. 2005)..................................................................................... 17

*U.S. v. Chi Mak*,
  683 F.3d 1126 (9th Cir. 2012) ........................................................................ passim

*U.S. v. Edler Indus.*,
  579 F.2d 516 (9th Cir. 1978) .......................................................................... passim

*U.S. v. Gurrola-Garcia*,
  547 F.2d 1075 (9th Cir. 1976) ................................................................................. 26

*U.S. v. Hicks*,
  980 F.2d 963 (5th Cir. 1992) ................................................................................... 21

*U.S. v. Hoffman*,
  10 F.3d 808  (9th Cir. 1993) .................................................................................... 17

*U.S. v. Huitron-Guizar*,
  678 F.3d 1164 (10th Cir. 2012) ............................................................................... 16

*U.S. v. Mandel*,
  914 F.2d 1215 (9th Cir. 1990) ................................................................................. 18

*U.S. v. Martinez*,
  904 F.2d 601 (11th Cir. 1990) ................................................................................. 18

*U.S. v. Marzzarella*,
  614 F.3d 85 (3d Cir. 2010)....................................................................................... 26

*U.S. v. Merkt*,
  794 F.2d 950 (5th Cir. 1986) ................................................................................... 2

*U.S. v. O'Brien*,
  391 U.S. 367 (1968) .......................................................................................... 12, 17

*U.S. v. Posey*,
  864 F.2d 1487 (9th Cir. 1989) ........................................................................... 17, 18

*U.S. v. Ramsey*,
  431 U.S. 606 (1977)...................................................................................................... 2, 3
*U.S. v. South Carolina*,
  720 F.3d 518 (4th Cir. 2013) ........................................................................................... 11
*U.S. v. W.T. Grant Co.*,
  345 U.S. 629 (1953) .......................................................................................................... 9
*U.S. v. Yakou*,
  428 F.3d 241 (D.C. Cir. 1995) ......................................................................................... 30
*Voting for Am. v. Steen*,
  732 F.3d 382 (5th Cir. 2013) ........................................................................................... 16
*W. Ala. Quality of Life Coal. v. U.S. Fed. Highway Admin.*,
  302 F. Supp. 2d 672 (S.D. Tex. 2004) ............................................................................... 9
*Ward v. Rock Against Racism*,
  491 U.S. 781 (1989).................................................................................................... 15, 21
*Warth v. Seldin*,
  422 U.S. 490 (1975)......................................................................................................... 21
*Water Keeper Alliance v. Dep't of Def.*,
  152 F. Supp. 2d 155 (D.P.R. 2001),................................................................................. 11
*Winter v. Natural Res. Def. Council*,
  555 U.S. 7 (2008) ..................................................................................................... 7, 8, 11
*Wireless Agents, L.L.C. v. T-Mobile USA, Inc.*,
  No. 3:05-CV-0094, 2006 WL 1540587 (N.D. Tex. June 6, 2006) ...................................... 9
*Wolfe v. Strankman*,
  392 F.3d 358 (9th Cir. 2004) ............................................................................................. 1

## Statutes

22 U.S.C. § 2751 et seq.,................................................................................................ 3
22 U.S.C. § 2778(a)(1)............................................................................................ 3, 11, 15, 29
50 U.S.C. § 5(b) (1964) .................................................................................................. 20
22 U.S.C. § 2778(a)(2)..................................................................................................... 29
22 U.S.C. § 2778(b)(1)(A)(i) ............................................................................................ 29
22 U.S.C. § 2778(b)(2) .................................................................................................... 29

## Regulations

22 C.F.R. § 120.10 ..................................................................................................... 19, 21
22 C.F.R. § 120.10(a) ...................................................................................................... 28
22 C.F.R. § 120.10(a)(1) .................................................................................................... 7
22 C.F.R. § 120.10(a)(5) ................................................................................................... 22
22 C.F.R. § 120.16 ............................................................................................................ 4
22 C.F.R. § 120.17(a)(1) .................................................................................................... 4
22 C.F.R. § 120.17(a)(3) .................................................................................................... 4
22 C.F.R. § 120.17(a)(4) .................................................................................................... 4
22 C.F.R. § 120.3 ............................................................................................................. 27
22 C.F.R. § 120.4 .............................................................................................................. 4
22 C.F.R. § 120.4(d)(1)-(2)................................................................................................ 5

22 C.F.R. § 121.1(I)(a)..........................................................................................................3
22 C.F.R. § 125.11..............................................................................................................28
22 C.F.R. § 125.11(a)(1)......................................................................................................30
22 C.F.R. §§ 120-130............................................................................................................4
22 C.F.R. Part 120..............................................................................................................16
22 C.F.R. Part 121.........................................................................................................3, 19

**Executive Orders**

Executive Order 12637 ..........................................................................................................4

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| DEFENSE DISTRIBUTED, et al., | § | |
|     Plaintiffs, | § | |
| | § | |
| v. | § | No. 1:15-cv-372-RP |
| | § | |
| U.S. DEPARTMENT OF STATE, et al., | § | |
|     Defendants. | § | |

## DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

At issue in this litigation is the United States' system of export controls for weapons—laws and regulations that seek to ensure that articles useful for warfare or terrorism are not shipped from the United States to other countries (or otherwise provided to foreigners), where, beyond the reach of U.S. law, they could be used to threaten U.S. national security, foreign policy, or international peace and stability. Plaintiffs challenge restrictions on the export of Computer Aided Design ("CAD") files that are indispensable to the creation of guns and their components through a three-dimensional ("3D") printing process. There is no dispute that the Government does not restrict Plaintiffs from sharing CAD files domestically or from using CAD files to make or acquire firearms in the United States. Nonetheless, Plaintiffs seek a mandatory preliminary injunction to bar the Government from preventing the *export* of these design files, which can be easily used to manufacture arms overseas. Plaintiffs' characterization of such an export as the mere "publication" of information is wrong—the CAD files unquestionably control the functioning of a 3D printer and cause it to manufacture firearms. Whatever informational value there may be in the process by which 3D printing occurs, the CAD files are also functional, directly facilitate the manufacture of weapons, and may properly be regulated for export. As set forth below, Plaintiffs' motion for a preliminary injunction should be denied.[1]

---

[1] Injunctive relief designed to affect the conduct of a government entity is available only from official-capacity defendants. *See Scott v. Flowers*, 910 F.2d 201, 213 n.25 (5th Cir. 1990); *accord Wolfe v. Strankman*, 392 F.3d 358, 360 n.2 (9th Cir. 2004); *Kirby v. City of Elizabeth*, 388 F.3d 440, 452 n.10 (4th Cir. 2004); *Frank v. Relin*, 1 F.3d 1317, 1327 (2d Cir. 1993); *Feit v. Ward*, 886 F.2d 848, 858 (7th Cir. 1989); *In re Iraq & Afg. Detainees Litig.*, 479 F. Supp. 2d 85, 118-19 (D.D.C. 2007). This brief is therefore filed only on behalf of Defendants in their official

The Fifth Circuit and the Supreme Court have set forth a demanding four-part test to obtain a preliminary injunction and require that a party seeking such an "extraordinary remedy . . . clearly carr[y] the burden of persuasion" on each element.  *Planned Parenthood Ass'n of Hidalgo Cnty. Tex. v. Suehs*, 692 F.3d 343, 348 (5th Cir. 2012).  Plaintiffs here have not even attempted to demonstrate: (1) "a substantial threat of irreparable injury if the injunction were not granted," (2) "that their substantial injury outweigh[s] the threatened harm to the party whom they [seek] to enjoin," or (3) "that granting the preliminary injunction would not disserve the public interest."  *Id.*  As Defendants show below, while Plaintiffs face little immediate harm, entry of an injunction would be likely to irrevocably harm national security and foreign policy and damage the public interest.  Under these circumstances, Plaintiffs' failure to address the legal requirements for a preliminary injunction alone warrants the straightforward denial of their motion without addressing the legal issues raised by Plaintiffs' arguments on the merits.

Nonetheless, Plaintiffs also have no likelihood of success on the merits. The International Traffic in Arms Regulations ("ITAR") regulate only the export of defense articles and defense services for the legitimate and important purpose of protecting national security and U.S. foreign policy interests.  "Control of one's borders . . . is an essential feature of national sovereignty," *U.S. v. Merkt*, 794 F.2d 950, 955 (5th Cir. 1986), and it is well established that the United States has authority to regulate the trafficking of articles, particularly military articles, across those borders.  *See U.S. v. Ramsey*, 431 U.S. 606, 619 (1977) ("border search" exception to Fourth Amendment rooted in "different rules of constitutional law" than apply domestically).

Plaintiffs characterize the cross-border transmission of digital instructions that automatically generate firearms as the "publication" of expression and claim that any licensing requirement on such export is an impermissible prior restraint on speech.  But that claim is wrong both factually and legally. The Government does not seek to limit Plaintiffs from spreading ideas or information *about* 3D printing, but rather seeks to apply the generally applicable conduct regulation on exports of arms to CAD files that indisputably control the

capacities, and the term "Defendants," as used herein, does not include the individual-capacity Defendants in this action.

functioning of a 3D printer and direct it to manufacture firearms.  For these reasons, as other courts have concluded, the claim that the First Amendment forbids application of ITAR's export requirements to these items is meritless.

There is also no dispute that Plaintiffs may use these CAD files to make or acquire firearms in connection with their right to keep and bear arms under the Second Amendment. That Plaintiffs have not done so because they wish to "facilitat[e] *global* access to arms," Complaint ("Compl."), ECF No. 1 at ¶ 1,[2] calls into doubt whether their Second Amendment rights are even at issue, and in any case, Plaintiffs' Second Amendment and other claims likewise fail to satisfy the essential minimums of the legal theories that Plaintiffs assert.  The Court should therefore deny Plaintiffs' motion.

## BACKGROUND

### I.       Statutory and Regulatory Framework

The Arms Export Control Act ("AECA"), 22 U.S.C. § 2751 *et seq*., authorizes the President, "[i]n furtherance of world peace and the security and foreign policy of the United States" to "control the import and the export of defense articles and defense services" and to promulgate regulations accordingly.  22 U.S.C. § 2778(a)(1).  At the heart of the AECA is the United States Munitions List ("USML"), an extensive listing of materials that constitute "defense articles and defense services" under the AECA.  22 C.F.R. Part 121.  Category I of the USML includes all firearms up to .50 caliber, and all technical data directly related to such firearms.  *See* 22 C.F.R. § 121.1(I)(a).  Technical data is information that "is required for the design, development, production, manufacture, assembly, operation, repair, testing, maintenance or modification of defense articles."  *Id.* § 120.10(a).[3]  Section 2778(a) of the AECA authorizes the

---

[2] *See* Mem. in Support of Pls. Mot. for Prelim. Injunction, ECF No. 8 ("Pl. Br."), Ex. 1 ¶ 2 (Decl. of Cody Wilson); *id.* at App. 270 (deposit from prospective foreign "Ghost Gunner" buyer).
[3] Technical data includes information in the form of blueprints, drawings, photographs, plans, instructions or documentation," and broadly exempts information already in the public domain, as defined in Section 120.11.  *Id.* § 120.10.  On June 3, 2014, the State Department issued a Notice of Proposed Rulemaking to update, *inter alia*, the definitions of "technical data" in the ITAR, the scope of the "public domain" exemption, and the application of ITAR to technical data on the Internet.  *See* 80 Fed. Reg. 31525; Aguirre Decl. ¶ 11.  The proposal would clarify that CAD files are a form of "technical data" and make explicit that providing technical data on a publicly accessible network, such as the Internet, is an export because of its inherent accessibility to foreign powers.  80 Fed. Reg. 31525.  As relevant here, the clarified definitions in this NPRM

President: (1) to designate those defense articles and services to be included on the USML; (2) to require licenses for the export of items on the USML; and (3) to promulgate regulations for the import and export of such items on the USML. *Id.* The President has delegated to the State Department this authority, and the Department has accordingly promulgated the ITAR, which is administered by the State Department's Directorate of Defense Trade Controls ("DDTC"). *See* Executive Order 13637(n)(iii); 22 C.F.R. §§ 120-130.

Importantly, ITAR does not regulate any activities except those that constitute "exports," *i.e.*, the transfer of defense articles abroad or to foreign persons. ITAR's definition of exports includes, in relevant part: (1) "[s]ending or taking a defense article out of the United States in any manner," 22 C.F.R. § 120.17(a)(1); (2) "[d]isclosing (including oral or visual disclosure) or transferring in the United States any defense article to an embassy, any agency or subdivision of a foreign government," *id.* § 120.17(a)(3); and (3) "[d]isclosing (including oral or visual disclosure) or transferring technical data to a foreign person, whether in the United States or abroad." *Id.* § 120.17(a)(4).

In the vast majority of circumstances, there is no doubt as to whether a particular item to be exported is a defense article or defense service. *See* Declaration of Lisa V. Aguirre ("Aguirre Decl.") ¶ 19. For those cases in which there is doubt, however, ITAR contains a "commodity jurisdiction" ("CJ") procedure. Upon written request, the DDTC will provide potential exporters with a determination as to whether the item, service, or data is within the scope of ITAR. 22 C.F.R. § 120.4. These assessments are made on a case-by-case basis through an inter-agency process, evaluating whether the article is covered by the USML, is functionally equivalent to an article on the USML, or has substantial military or intelligence application. *See id.* § 120.4(d).

## II.    Defendants' Regulation of Plaintiffs' Conduct

On May 8, 2013, shortly after learning about Defense Distributed's unrestricted posting of CAD files to the Internet, the DDTC's Enforcement Division sent a letter to Defense Distributed noting that "it is unlawful to export any defense article or technical data for which a

---

would simply confirm that treatment of the Plaintiffs' posting of the CAD files to the Internet under the current regulations would remain the same, and thus Defendants do not anticipate the NPRM would impact application of the ITAR to the files at issue in this case.

license or written approval is required without first obtaining the required authorization from the DDTC." Pl. Br. at App. 14; *see* Ex. 1. Observing that "disclosing (including oral or visual disclosure) or transferring foreign data to a foreign person, whether in the United States or abroad, is considered an export," DDTC requested that Defense Distributed submit CJ determination requests for ten CAD files and that Defense Distributed "treat [this] technical data as ITAR-controlled" until DDTC could "provide[] Defense Distributed with final CJ determinations." Pl. Br. at App. 14-15. These files included "a trigger guard, grips, two receivers, a magazine for AR-15 rifles, and a handgun named 'The Liberator.'" Pl. Br. at App. 1, ¶ 3. DDTC therefore suggested that the technical data be removed from Defense Distributed's website—*i.e.*, a location in which it would be disclosed without limitation to a foreign person, *see* 22 C.F.R. § 120.16, should any foreign person visit Defense Distributed's website and download the file, during the review process. Defendants did not suggest in any way that Defense Distributed's CAD files could not be provided to U.S. persons within the U.S. or otherwise used, altered, or discussed in ways that would not constitute "exports."

On June 21, 2013, Defense Distributed filed CJ requests for the ten items identified in the DDTC letter. Defense Distributed described its submissions as "data files" that are "essentially blueprints that can be read by CAD software . . . [as] a means of creating physical 3D models of objects." Pl. Br. at App. 208. These data files instruct 3D printers to create:

> (1) sixteen . . . parts and components of the ["Liberator"] pistol [which] could be assembled into a single shot .380 caliber firearm;
> (2) a barrel and grip for a .22 caliber pistol;
> (3) a solid piece of plastic in the shape of [a 125 mm BK-14M High Explosive Anti-Tank ("HEAT") Warhead];
> (4) a plastic piece in the shape of [a 5.56/.223] muzzle brake;
> (5) nineteen . . . components of a pistol slide for the Springfield XD-40;
> (6) a slip-on sound moderator for an air gun;
> (7) "The Dirty Diane" . . . an oil filter silencer adapter;
> (8) a model of a sub-caliber insert [for] a cylinder with a .22 bore;
> (9) Voltock Electronic Black Powder System . . . models of cylinders of various bores;
> (10)   a model of a sight for a VZ-58 rifle.

Pl. Br. at App. 210.

At no time did Defense Distributed inquire about whether ITAR would affect its distribution of CAD files to U.S. persons within the United States or would limit its ability, or

that of other U.S. persons, to use the CAD files in 3D printing.[4]

While the Government reviewed Defense Distributed's first CJ ten requests, Defense Distributed submitted an additional request on January 2, 2015, seeking a determination on: (1) the "Ghost Gunner," a "3-axis, computer-numerically-controlled [machine] . . . designed, developed, and manufactured by Defense Distributed to *automatically manufacture* publicly available designs with nearly zero user interaction." Pl. Br. at App. 267 (emphasis added). On April 15, 2015, DDTC provided a CJ determination to Defense Distributed, finding that the Ghost Gunner would not be subject to the jurisdiction of the Department of State (although "project files, data files, or any form of technical data for producing a defense article" would be subject to ITAR jurisdiction). *Id*. at App. 280-81.

On June 4, 2015, review of Defense Distributed's first ten requests was completed and DDTC provided CJ determinations for the requested items. *See* Aguirre Decl. ¶ 28. As explained in DDTC's determination letter, the Department of State determined that only six of the CAD files were subject to ITAR control: those for the "Liberator pistol," ".22 [caliber] electric [pistol]," "5.56/.223 muzzle brake," "Springfield XD-40 tactical slide assemble," "sub-caliber insert," and "VZ-58 front sight." *Id*. In finding the CAD files to be within the commodity jurisdiction of the State Department, DDTC classified the CAD files as technical data under Category I, subsection (i) of the USML, relying on the definition of technical data in § 120.10(a)(1). As DDTC's letter explained, these determinations require that a "license or other approval . . . pursuant to the ITAR" be obtained before any export of these CAD files. *Id*.

As to the items determined to be within ITAR's commodity jurisdiction, the CJ review process concluded that Defense Distributed's CAD files constitute electronic data that can be used, in conjunction with a 3D printer, to automatically, and without further human intervention, generate a defense article or a component of a defense article identified on the USML. *See*

---

[4] ITAR jurisdiction is limited to *exports* of defense articles and related technical data and does not prohibit the transmission of defense articles from one U.S. person to another known to be a U.S. person within the U.S. Although DDTC's May 8, 2013 letter expressed DDTC's concerns about Defense Distributed's unrestricted postings to the Internet, the availability of online material to users outside the U.S. can be limited in a number of ways. For example, Internet users can be generally located using their Internet Protocol addresses. *See generally AF Holdings, v. Does 1-1058*, 752 F.3d 990, 996 (D.C. Cir. 2014) (discussing geolocation services).

Aguirre Decl. ¶¶ 29-30.  The CAD files are "technical data" that are regulated by the ITAR because, absent such regulation, providing the CAD designs to a foreign person or foreign government would be equivalent to providing the defense article itself, enabling the complete circumvention of ITAR's export regulations.

## LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy never awarded as of right."  *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 24 (2008).  Rather, a plaintiff seeking a preliminary injunction must show: "(1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction were not granted, (3) that their substantial injury outweighed the threatened harm to the party whom they sought to enjoin, and (4) that granting the preliminary injunction would not disserve the public interest."  *Suehs*, 692 F.3d at 348.  "In each case, courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief."  *Winter*, 555 U.S. at 24.  Due to its "extraordinary" nature, no preliminary injunction should be "granted unless the party seeking it has clearly carried the burden of persuasion on all four requirements."  *Id.* (internal quotation omitted).

Here, Plaintiffs' burden is even higher, given the nature of the injunction they seek. Plaintiffs ask this Court to enjoin Defendants "from enforcing any prepublication approval requirement against unclassified information under the International Traffic in Arms Regulations."  Proposed Order, ECF No. 7, at 1.  This request constitutes "[m]andatory preliminary relief, which goes well beyond simply maintaining the status quo *pendente lite*."  *Martinez v. Mathews*, 544 F.2d 1233, 1243 (5th Cir. 1976) (citations omitted).  Such relief "is particularly disfavored, and should not be issued unless the facts and law clearly favor the moving party."  *Id.* (citations omitted); *see also Milena Ship Mgmt. Co. v. Newcomb*, 804 F. Supp. 846, 852-55 (E.D. La. 1992).

## ARGUMENT

### I.    Plaintiffs' Motion for a Preliminary Injunction Should Be Denied.

Plaintiffs must persuasively demonstrate that each of the four conditions for a preliminary

injunction is met, not just a single element of their choosing.  *See Winter*, 555 U.S. at 20.  This

requirement serves interests of critical importance; among them, "preserv[ation] of the court's

ability to render a meaningful decision on the merits" based on a fully developed record and the

reasoned and considered arguments of the parties.  *Canal Auth. of State of Fla. v. Callaway*, 489

F.2d 567, 573 (5th Cir. 1974); *Ctr. for Biological Diversity v. Salazar*, 706 F.3d 1085, 1090 (9th

Cir. 2013).  Nevertheless, Plaintiffs have elected to rely on only one element of the standard:

their likelihood of success.  They give short shrift—less than one page in a brief for which the

Court granted leave to extend the page limits to thirty—to the three other elements.  Plaintiffs'

failure to address these other elements alone warrants denial of their motion.

**A.**     **Plaintiffs Have Failed to Carry Their Burden of Demonstrating Irreparable Injury**.

As the Supreme Court explained in *Winter*, because "[a] preliminary injunction is an

extraordinary remedy," courts must consider the actual "effect on each party of the granting or

withholding" of relief and do so "[i]n each case."  555 U.S. at 24.  But Plaintiffs have

disregarded this principle and offered no specifics to support their claim of irreparable harm

other than the allegation that Defendants have infringed upon their constitutional rights.  *See* Pl.

Br. at 29.  This *pro forma* statement—particularly in light of Defendants' demonstration below

that Plaintiffs' rights have not been violated—is insufficient to carry Plaintiffs' burden to obtain

a mandatory injunction.

The presumption that alleged violations of constitutional rights can be sufficient to

presume irreparable injury for purposes of injunctive relief should only be made "where there is

an 'imminent likelihood that *pure speech* will be chilled or prevented altogether'," and the

circumstances presented here undercut Plaintiffs' argument that such injury has occurred.

*Faculty Senate of Fla. Int'l U. v. Winn*, 477 F. Supp. 2d 1198 (S.D. Fla. 2007) (declining to find

irreparable harm in limits on foreign academic research) (quoting *Siegel v. Lepore*, 234 F.3d

1163, 1178 (11th Cir. 2000) (en banc)).  First, Plaintiffs' claim of imminent irreparable injury is

significantly undermined by their delay in seeking judicial relief.  Plaintiffs challenge the State

Department's application of the ITAR to unrestricted postings of technical data on their

website—an application of which they have been aware since receiving the State Department's

May 8, 2013 letter.  *See* Compl. ¶¶ 25-27.  Nearly two years later, on May 6, 2015, Plaintiffs

filed this lawsuit.  ECF No. 1.  "[D]elay in seeking a remedy is an important factor bearing on

the need for a preliminary injunction."  *Gonannies, Inc. v. Goupair.Com, Inc.*, 464 F. Supp. 2d

603, 609 (N.D. Tex. 2006) (quoting *Wireless Agents, L.L.C. v. T-Mobile USA, Inc.*, No. 3:05-

CV-0094, 2006 WL 1540587, at *3 (N.D. Tex. June 6, 2006)).  The two-year delay between the

challenged action and the filing of this lawsuit seriously "undercuts the sense of urgency that

ordinarily accompanies a motion for preliminary relief and suggests that there is, in fact, no

irreparable injury."  *Tough Traveler, Ltd. v. Outbound Prods.*, 60 F.3d 964, 968 (2d Cir. 1995)

(internal quotation marks and citation omitted); *see Brown v. District of Columbia*, 888 F. Supp.

2d 28, 32 (D.D.C. 2012) (noting as relevant to the irreparable harm analysis the fact that plaintiff

waited almost seven months to file lawsuit).

      Second, irreparable harm can be "neither speculative nor remote," but must be "actual

and imminent."  *W. Ala. Quality of Life Coal. v. U.S. Fed. Highway Admin.*, 302 F. Supp. 2d

672, 684 (S.D. Tex. 2004) (quoting *U.S. v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953)).  As

discussed above, the State Department's jurisdiction over Defense Distributed's technical data

extends only to its export, and the State Department has not suggested that ITAR imposes any

limitation on Plaintiffs' actual distribution of technical data to U.S. persons in the United States.

Yet despite actual knowledge of U.S. persons interested in obtaining this technical data,

allegedly including co-Plaintiff Second Amendment Foundation ("SAF") and some of its

members, Defense Distributed has apparently done nothing to distribute the technical data in a

manner that would not constitute an export.  Nor have Plaintiffs made any inquiry of Defendants

about any measures Defense Distributed could take that would allow it to post the technical data

on the Internet without violating ITAR.  Plaintiffs' apparent failure to exercise these options

undermines their claim that they have incurred an actual, imminent, and irreparable harm.  In

these circumstances, Plaintiffs' brief citation to inapposite case law does not demonstrate

"irreparable injury," let alone satisfy the heightened standard for a mandatory injunction.[5]

---

[5] The cases relied on by Plaintiffs presented immediate instances of harm not illustrated in
Plaintiffs' threadbare allegations here.  For example, in *Deerfield Med. Ctr. v. Deerfield Beach*,
irreparable harm existed with respect to an abortion clinic denied zoning privileges and its

**B.** **The Threatened Harm to the National Security and Foreign Policy Interests of the United States From an Injunction Outweighs any Irreparable Harm to Plaintiffs.**

As explained in detail in the Declaration of Lisa V. Aguirre, Director of the Office of Defense Trade Controls Management, the Department of State has concluded that: (1) export of Defense Distributed's CAD files could cause serious harm to U.S. national security and foreign policy interests; and (2) a preliminary injunction in this case would be likely to cause such harm.

As Plaintiffs described in their submissions to Defendants, their CAD files constitute the functional equivalent of defense articles: capable, in the hands of anyone who possesses commercially available 3D printing equipment, of "automatically" generating a lethal firearm that can be easily modified to be virtually undetectable in metal detectors and other security equipment. *See* Aguirre Decl. ¶ 35; Pl. Br. at App. 208-59.[6]  The unrestricted provision of such undetectable firearms by U.S. persons to individuals in other countries—particularly those countries with stricter firearms regulations that may not have the same security preparedness as the United States—presents a serious risk of acts of violence in those countries.  The State Department is particularly concerned that Plaintiffs' proposed export of undetectable firearms technology could be used in an assassination, for the manufacture of spare parts by embargoed nations, terrorist groups, or guerrilla groups, or to compromise aviation security overseas in a manner specifically directed at U.S. persons.[7]  *See* Aguirre Decl. ¶ 35.  As with the export of firearms themselves, these potential risks to U.S. foreign policy and national security interests warrant subjecting Defense Distributed's CAD files to ITAR's export licensing of technical data.

**C.** **The Public Interest Would be Disserved By a Preliminary Injunction**.

The threat of harm to U.S. foreign policy and national security interests tilts the public

---

"physician and those women for whom he would otherwise perform the operation in the meantime."  661 F.2d 328, 338 (5th Cir. 1981).  Similarly, in *Elrod v. Burns*, the Court found irreparable injury where challenged patronage requirements imposed on plaintiffs an obligation to "pledge [] allegiance to another political party" and avoid "associat[ing] with others of [their] political persuasion." 427 U.S. 347, 355-56 (1976).
[6] Indeed, in part for this reason, the Liberator design includes the insertion a sufficient amount of metal into the resulting firearm to ensure its detectability.  *See* Aguirre Decl. ¶ 35.  Although this instruction promotes users' compliance with federal law prohibiting the manufacture of undetectable firearms, federal law does not prevent the manufacture of undetectable firearms by users outside the United States, and the Liberator remains operable without the inserted metal.
[7] The harm is reinforced by the fact that entry of an injunction is likely to bring attention to the availability of the CAD files on the Internet.  *See* Aguirre Decl. ¶ 37.

interest factor heavily in the Government's favor, particularly in the context of a mandatory injunction. *See Winter*, 555 U.S. at 24; *U.S. v. South Carolina*, 720 F.3d 518, 533 (4th Cir. 2013) ("injury to the nation's foreign policy" weighs in favor of the United States in public interest inquiry); *accord Water Keeper Alliance v. Dep't of Def.*, 152 F. Supp. 2d 155, 163 (D.P.R. 2001), *aff'd* 271 F.3d 21, 34-35 (1st Cir. 2001). This is true even where, as here, the harms from an injunction are likely to be felt abroad rather than domestically, because—as recognized by Congress in enacting the AECA, *see* 22 U.S.C. § 2778(a)(1)—"[b]oth the Government and the public have a strong interest in curbing" violent regional conflicts elsewhere in the world, especially when such conflict implicates "the security of the United States and the world as a whole." *Holy Land Found. v. Ashcroft*, 219 F. Supp. 2d 57, 84 (D.D.C. 2002), *aff'd* 333 F.3d 156 (D.C. Cir. 2003). Plaintiffs' barebones discussion of the public interest cannot supersede the demonstrated possibility of harm to national security and foreign policy provided by Defendants. *See Escamilla v. M2 Tech.*, 2013 WL 4577538 (E.D. Tex. 2013) (injunction that would harm "issues of national security," even "indirectly," would disserve public interest).[8]

## II.    Plaintiffs' Motion for a Preliminary Injunction Should Be Denied Because Plaintiffs Have Not Shown a Substantial Likelihood of Success on the Merits.

Plaintiffs have also failed to demonstrate either a likelihood of success on the merits for a preliminary injunction or that "the facts and law clearly favor" their claims; accordingly, they have failed to meet their burden for a mandatory injunction. *See Martinez*, 544 F.2d at 1243.

### A.    The Export of CAD Files That Function to Automatically Create a Firearm or its Components is Not the Publishing of an Item of Expressive Speech.

Underpinning Plaintiffs' First Amendment claims is the assumption that Plaintiffs seek to "publish" CAD files for 3D printers and that doing so is no different than the "publication of an idea." Pl. Br. at 14-15. Plaintiffs themselves recognize this is a critical threshold issue on which they must succeed, *see id.*, but they have failed to make the requisite showing on the merits to obtain a mandatory preliminary injunction.

---

[8] Importantly, because ITAR restricts only exports, any public interest in persons in the U.S. obtaining Defense Distributed's CAD files, whether to manufacture a firearm or for any other lawful purpose, is not affected by the absence of an injunction. The possibility of such a public interest therefore does not weigh against the Government's interests in regulating the export of the CAD files.

Although "speech" under the First Amendment is not limited to written or spoken words, *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*, 515 U.S. 557, 569 (1995), the Supreme Court has made clear that the First Amendment does not encompass all types of conduct. *See Texas v. Johnson*, 491 U.S. 397, 404 (1989) ("[W]e have rejected 'the view that an apparently limitless variety of conduct can be labeled 'speech' whenever the person engaging in the conduct intends thereby to express an idea'" (quoting *U.S. v. O'Brien,* 391 U.S. 367, 376 (1968))). At a minimum, conduct must be sufficiently expressive and communicative to other persons to qualify for protection under the First Amendment. *See Hurley*, 515 U.S. at 569; *Spence v. Washington*, 418 U.S. 405, 409 (1974))). *Cf. Brown v. Entm't Merchants Ass'n*, 131 S. Ct. 2729, 2733 (2011) (First Amendment protects video games because they "communicate ideas—and even social messages—through many familiar literary devices (such as characters, dialogue, plot, and music) and through features distinctive to the medium (such as the player's interaction with the virtual world)"). The ITAR regulations at issue govern the export of defense articles and defense services, including related technical data. As applied to Plaintiffs' CAD files, the regulations are properly focused on restricting an export that can unquestionably facilitate the creation of defense articles abroad.

The CJ requests submitted by Defense Distributed to DDTC themselves illustrate that the mere publication of ideas is not at issue. According to the CJ requests, the CAD files are functional: "essentially blueprints that can be read by CAD software," Pl. Br. at App. 208, to "automatically" generate firearms, firearms components, or other defense articles, *id.* at 267.[9] Further, in its commodity jurisdiction requests, Defense Distributed characterized its role solely in terms of nonexpressive conduct: "Although DD converted this information into CAD file format, DD does not believe that it created any new technical data for the production of the gun." *Id.* at 211. Plaintiffs' own description of the items and planned course of conduct thus fails to establish that the export of CAD files is mere "speech" for First Amendment purposes.

The cases on which Plaintiffs rely fail to establish that the law clearly favors their claim

---

[9] In the CJ determinations, Defendants concluded that only the CAD files, and not Defense Distributed's related files (such as "read-me" text files), fell within the commodity jurisdiction of ITAR.

that export of CAD files is an act of protected speech.  Plaintiffs rely primarily on *Universal City Studios, Inc. v. Corley*, a Second Circuit copyright decision holding that computer code and computer programs can qualify for First Amendment protection.  273 F.3d 429, 445-49 (2d Cir. 2001).  Yet *Corley* expressly distinguished, and thereby recognized the continuing validity of, a prior Second Circuit opinion, *CFTC v. Vartuli*, which held that computer instructions that "induce action without the intercession of the mind or the will of the recipient" are not constitutionally protected speech.  228 F.3d 94, 111 (2d Cir. 2000); *see Corley*, 273 F.3d 448 at n.20 (distinguishing from its holding *Vartuli* and other situations where "a human's mental faculties do not intercede in executing the instructions"), *id.* at 449 (confirming that code used to communicate to a program user is "not necessarily protected" and that code used to communicate to a computer is "never protected").  Importantly, *Vartuli* held that the fact that some users of the computer instructions at issue might interact with those instructions, rather than simply following them, did not change the constitutional analysis: it was the functionality of the code, not its use, that determined whether the regulations were consistent with the First Amendment.[10]  *See Vartuli*, 228 F.3d at 110-12.  Plaintiffs' failure to prove a substantial likelihood of success on this issue alone would be a sufficient basis to deny their motion.  *See Suehs*, 692 F.3d at 348.

Further, Plaintiffs' stated intent to distribute their CAD designs abroad or across U.S. national boundaries also suggests that the First Amendment's application may be limited here. "It is less [than] clear . . . whether even American citizens are protected specifically by the First Amendment with respect to their activities abroad."  *Laker Airways, Ltd. v. Pan Am. World*

---

[10]  The other two cases cited by Plaintiffs also indicate that code that is purely functional does not warrant First Amendment protection.  In *Bernstein v. U.S. Dep't of Justice*, 176 F.3d 1132, 1139-43 (9th Cir. 1999) and *Junger v. Daley*, 209 F.3d 481, 485 (6th Cir. 2000), the courts held that First Amendment protections extended to computer source code on the theory that it can be read and understood by humans and, unless subsequently compiled, could not directly control the functioning of a computer.  *See also Karn v. Dep't of State*, 925 F.Supp. 1, 9 n.19 (D.D.C. 1996) (computer source code alone is "merely a means of commanding a computer to perform a function").  Even assuming, *arguendo*, that conclusion were correct as to the source code of software here it is undisputed that the CAD files control the functioning of a device.  Indeed, here, the CAD files do not merely cause a computer to function generally, but specifically direct a machine to manufacture a firearm and defense articles.  Plaintiffs' reliance on these cases also ignores that the Ninth Circuit opinion in *Bernstein* was subsequently withdrawn and rehearing granted, *see Bernstein v. U.S. Dep't. of Justice*, 192 F.3d 1308 (9th Cir. 1999), and that, after remand, the plaintiff in *Junger* stipulated to dismissal with prejudice.  *See* Notice of Dismissal, *Junger v. Dep't of Commerce*, No. 96-cv-1723-JG, Dkt. No. 123 (N.D. Ohio Nov. 16, 2000).

*Airways, Inc.*, 604 F. Supp. 280 (D.D.C. 1984) (finding that aliens have no First Amendment rights abroad); *see Bullfrog Films v. Wick*, 646 F. Supp. 492, 502 (C.D. Cal. 1986) ("No Supreme Court case squarely holds that the First Amendment applies abroad."); *cf. U.S. v. 12 200-Ft. Reels*, 413 U.S. 123, 125 (1972) (explaining that adjudication of rights at "national borders" implicates "considerations and different rules of constitutional law from domestic regulations").  Even courts that have applied the First Amendment to international speech have recognized that overseas speech or conduct that endangers national security may be outside First Amendment protection.  *See, e.g.*, *Haig v. Agee*, 453 U.S. 280, 308 (1981) (even "assuming . . . that First Amendment protections reach beyond our national boundaries," likelihood of damage to national security rendered speech by a former CIA employee "not protected by the Constitution"); *accord Bullfrog Films*, 646 F. Supp. at 502.  Here, where Plaintiffs deliberately seek to use the Internet to distribute CAD files abroad and have made no effort to engage in purely domestic distribution, whether on the Internet or otherwise, their foreign distribution of CAD files may not be protected by the First Amendment.

In any event, the Court need not resolve finally the constitutional question at this stage in light of Plaintiffs' failure to meet their burden with regard to the other required elements for an injunction.  *Cf. Nation Magazine v. Dep't of Def.*, 762 F. Supp. 1558, 1572 (S.D.N.Y. 1991) (refraining from deciding, absent "a full record," constitutional questions regarding the First Amendment and military interests abroad).  Moreover, as explained below, even assuming that Defense Distributed's files constitute protected speech, Defendants may properly restrict their export, consistent with the First Amendment.

**B.  Even If Limiting the Export of CAD Files Implicates the First Amendment, Defendants Are Likely to Prevail on Plaintiffs' First Amendment Claims.**

Plaintiffs' First Amendment theory relies heavily on the notion that the Internet is merely a means of "publication" of ideas, but this characterization misleads when describing CAD files that generate defense articles and/or their parts with minimum human intervention.  Plaintiffs consistently use the terms "publish" or "publication," *see, e.g.*, Pl. Br. at 1, 5, 8, 13, 14, but in fact it is an "export" that is at issue.  ITAR does not prohibit Plaintiffs from distributing these

files to U.S. persons in the United States.  Similarly, Defendants have not restricted Plaintiffs'
rights to use the Internet to discuss 3D printing, firearms, the Second Amendment, or engage in
other expression.  Rather, the narrow issue here is Plaintiffs' alleged desire to "facilitat[e] global
access" to the CAD files, *i.e.*, to disseminate the automatic ability to make firearms worldwide.

1.  **ITAR's Export Controls Are a Valid, Content-Neutral Regulation of Plaintiffs'
    Conduct That Do Not Infringe First Amendment Rights.**

Plaintiffs contend that ITAR's export controls on technical data should be subject to strict
scrutiny, Pl. Br. at 23-24, but this argument is in error.  "[R]egulations that are unrelated to the
content of speech" receive less demanding First Amendment scrutiny because they ordinarily
"pose a less substantial risk of excising certain ideas or viewpoints from the public dialogue."
*Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 642 (1994).  And where the Government's
purpose in imposing a regulation is "justified without reference to the content of the regulated
speech," such regulation is content-neutral.  *Clark v. Cmty. for Creative Non-Violence*, 468 U.S.
288, 293 (1984).  It is the Government's purpose, not other factors, that is the "controlling
consideration" in this determination.  *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989).

ITAR regulates the conduct of exporting defense articles for the purpose of "further[ing]"
world peace [and] the [national] security and foreign policy interests" of the United States, 22
U.S.C. § 2778(a)(1), and Defense Distributed's files function to "automatically" produce such
articles or their components.  Pl. Br. at App. 267.  ITAR's regulation of technical data,
particularly Defense Distributed's CAD files, is part and parcel of its regulation of the export of
defense articles, a regulation unrelated to the suppression of free expression.  *See U.S. v. Chi
Mak*, 683 F.3d 1126, 1134-35 (9th Cir. 2012) ("AECA prohibits export without a license of
items on the USML without regard to content or viewpoint . . . , defines [] technical data based
on its *function*," and is therefore "content-neutral") (emphasis in original); *U.S. v. Edler Indus.*,
579 F.2d 516, 520 (9th Cir. 1978) (recognizing the equivalence for arms control purposes of
"military equipment" and the "blueprints specifying the construction of the very same
equipment").  The overarching policy objective set forth by Congress and the State Department
is to control the spread of defense articles abroad (and related services and technical data)

because munitions and materiel can be used to jeopardize the United States' security interests, a content-neutral interest.[11]  *See Emergency Coal. to Defend Educ. Travel v. Dep't of Treas.*, 545 F.3d 4, 13-14 (D.C. Cir. 2008).

Plaintiffs' CAD files directly instruct a device to automatically carry out the specified task of manufacturing a defense article.  Whatever expressive value may exist in the theory of the CAD files, they indisputably function to create a weapon.  Thus, the ITAR may restrict their export on the basis of the *literal* functionality to create the very defense articles that could also indisputably be restricted for export.  Moreover, the AECA and ITAR do not attempt in any way to restrict the free flow of public information and ideas about CAD files or 3D printing, either domestically or internationally.  *See* Aguirre Decl. ¶ 30; 22 C.F.R. Part 120.  This regulatory scheme is obviously not the product of government hostility toward the spread of ideas about 3D printing of firearms, but rather against the very *means* to easily do so.  Accordingly, ITAR's limits on the export of Defense Distributed's CAD files are not directed at the content of expression.  *See Chi Mak*, 683 F.3d at 1135; *cf. Capital Cities/ABC, Inc. v. Brady*, 740 F. Supp. 1007, 1013 (S.D.N.Y. 1990) (holding content-neutral a licensing requirement applied to U.S. TV network's broadcasts from Cuba, as part of overall scheme regulating imports and exports).[12] For this reason, strict scrutiny does not apply to a First Amendment analysis of export controls on these CAD files.[13]

---

[11] The government's interest in limiting the distribution of firearms abroad also does not implicate the Second Amendment.  *Cf. U.S. v. Huitron-Guizar*, 678 F.3d 1164 (10th Cir. 2012) (rejecting attempt by non-U.S. person to assert Second Amendment rights).

[12] Should the Court conclude, as Defendants contend above, that Plaintiffs' exports are not expressive at all, *see supra* Part II.A, the appropriate standard of review would be rational-basis scrutiny, which ITAR plainly satisfies.  *See Voting for Am. v. Steen*, 732 F.3d 382, 392 (5th Cir. 2013) (a statute that "regulate[s] conduct alone and do[es] not implicate the First Amendment" should receive rational-basis scrutiny).

[13] Also suggesting that the applicable First Amendment protections are reduced is Plaintiffs' characterization of those to whom they wish to supply their CAD files as "customers," Pl. Br. at 27, and Plaintiffs' allegation that their Internet postings of CAD files are intended to "generate revenue."  Compl. ¶ 22; *see id.* ¶ 24 (Internet postings would have "generated advertising revenue").  Plaintiffs also discuss "offering . . . items for sale," such as "jigs and code."  Pl. Br. at App. 3-4, n.1.  Restrictions on "particular type[s] of commercial transaction[s]" are generally treated as regulations of conduct, not speech, *see, e.g., Katt v. Dykhouse*, 983 F.2d 690, 695-96 (6th Cir. 1992); *U.S. v. Bell*, 414 F.3d 474 (3d Cir. 2005).  Even if treated as speech, it is well-established that "commercial speech enjoys lesser, intermediate-scrutiny constitutional protection."  *RTM Media, L.L.C. v. City of Houston*, 584 F.3d 220, 224 (5th Cir. 2009).

Under intermediate scrutiny, the Government's regulation of "'speech' and 'non-speech' elements [] united in a course of conduct" must be sustained if it is "within the constitutional power of the government; it furthers an important or substantial governmental interest; the government interest is unrelated to the suppression of free expression; and the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." *Kleinman v. City of San Marcos*, 597 F.3d 323, 328 (5th Cir. 2010) (quoting *O'Brien*, 391 U.S. at 376). As the Ninth Circuit held in *Chi Mak*, these standards are met by the "AECA and its implementing regulations," including ITAR. 683 F.3d at 1135. Regulation of arms trafficking is an "important interest" of the Government with "unquestionable legitimacy." *Id.* (quoting *Edler*, 579 F.2d at 520). "The technical data regulations substantially advance that interest, unrelated to the suppression of expression, because they set forth clear procedures for seeking approval for export licenses and policies for limiting USML-designation." *Id.* Nor is the restriction greater than essential: "ITAR makes a point to specifically exclude numerous categories from designation, such as general scientific, mathematical, or engineering papers," as well as other materials in the public domain. *Chi Mak*, 683 F.3d at 1135; *see U.S. v. Hoffman*, 10 F.3d 808 at *4 (9th Cir. 1993) (unpublished disposition) (if defense articles are "in the public domain, then the AECA does not prohibit their exportation"). Accordingly, even if subjected to a heightened standard of review under the First Amendment, ITAR's regulation of technical data exports is constitutional. *See id.*; *see also U.S. v. Posey*, 864 F.2d 1487 (9th Cir. 1989).[14]

Importantly, the government interests at issue here are the type that merit great deference, even in the context of a First Amendment challenge. *See Kleindienst v. Mandel*, 408 U.S. 753, 766-69 (1972). Courts have recognized that the decision on whether to control a particular commodity for export is one that inherently involves national security and foreign policy judgments that should be left to the discretion of the Executive branch. *See U.S. v. Martinez*, 904

---

[14] Defendants do not concede that application of strict scrutiny would be fatal to the application of ITAR to Defense Distributed's CAD files, particularly given that Plaintiffs themselves acknowledge the government interests at issue here as "compelling." *See* Pl. Br. at 28. In light of the arguments set forth herein, however, Plaintiffs have not met the high burden of persuasion required to obtain a mandatory injunction even under a lesser standard of review. *See Martinez*, 544 F.2d at 1243.

F.2d 601, 602 (11th Cir. 1990); *U.S. v. Mandel*, 914 F.2d 1215, 1223 (9th Cir. 1990).  Under

Plaintiffs' broad First Amendment theory, export restrictions on the designs to build a rocket, or

software that controls a radar, or technical data concerning missile systems, would all be subject

to strict scrutiny on the theory that each such item has informational content as well.  *See* Pl. Br.

at 23-24.  It is no answer to suggest, as Plaintiffs do, that the question turns on whether

information is "classified."  *See, e.g.*, Pl. Br. at 11.  Courts have squarely rejected this argument:

> if the government wished to prevent technical data from being sent to foreign powers, it
> would be required to suppress the information altogether, at home as well as abroad.
> This outcome would blur the fact that national security concerns may be more sharply
> implicated by the export abroad of military data than by the domestic disclosure of such
> data.  Technical data that is relatively harmless . . . when available domestically may,
> when sent abroad, pose unique threats to national security.  It would hardly serve First
> Amendment values to compel the government to purge the public libraries of every scrap
> of data whose export abroad it deemed for security reasons necessary to prohibit.

*Posey*, 864 F.2d at 1496-97.  *Cf. Linick v. U.S.*, 104 Fed. Cl. 319, 321 (Fed. Cl. 2012) (Patent

Office may "order that an invention be kept secret" if "divulgence might harm national security,"

regardless of whether the "Government itself [has] any interest in the invention").

      **2.**      **ITAR's Export Controls Are Not a Facially Unconstitutional Prior Restraint.**

      Plaintiffs also have no likelihood of success on the merits of their theory that restrictions

on the export of the CAD files constitute an unlawful prior restraint on speech.  "The doctrine of

prior restraint originated in the common law of England, where prior restraints of the press were

not permitted, but punishment after publication was."  *Alexander v. U.S.*, 509 U.S. 544, 553

(1993).  The classic administrative prior restraint is what is often described as a licensing scheme

for speech, where the plaintiff's right to speak is conditioned on prior approval from the

government.  *See City of Lakewood v. Plain Dealer Pub. Co.*, 486 U.S. 750, 757 (1988).  Such a

prior restraint is contrasted with prohibitions on certain speech enforced by punishment *after* the

fact, which is not a prior restraint.  *See id.* at 764 (distinguishing between statute imposing

prohibition on speech and one conditioning speech on obtaining a license or permit).  A licensing

requirement for conduct that incidentally impacts expression is not such a classic prior restraint,

however, and courts have so concluded in the context of the AECA and ITAR, and other

prohibitions on imports and exports.  *See, e.g.*, *Edler Indus.*, 579 F.2d at 521; *Chi Mak*, 683 F.3d

1136.  *Cf. Capital Cities/ABC*, 740 F. Supp. 1007 (upholding against First Amendment challenge licensing requirements applied to international television broadcasts without concluding such a licensing system constituted a prior restraint).[15]

Plaintiffs rely heavily on *Freedman v. Maryland*, 380 U.S. 51 (1965)—the case that generally defines the requirements for licensing schemes that affect expression—but both the nature of ITAR and the circumstances here demonstrate that ITAR differs significantly from the prior restraint considered in that case.  The "censorship statute" at issue in *Freedman* made it unlawful to exhibit any motion picture unless a state Board of Censors judged the film to be "moral and proper" and not "tend[ing] . . . to debase or corrupt morals or incite to crimes."  380 U.S. at 52 & n.2.  Unlike in *Freedman*, ITAR's export licensing requirement is not directed at a vast and open-ended category of expressive speech like films, but instead governs the act of providing defense articles or related technical data to those outside the United States (or to foreign persons inside the United States), a much narrower category of conduct that is not characteristically expressive nor remotely comparable to the licensing of adult films domestically.  *Compare* 22 C.F.R. Part 121 (the USML) *and* 22 C.F.R. § 120.10 (defining technical data) *with* 380 U.S. at 52; *see also Teague v. Reg'l Comm'r of Customs*, 404 F.2d 441, 446 (2d Cir. 1968) (application of Trading with the Enemy Act, 50 U.S.C. § 5(b) (1964) to academic publications imported from Cuba did not constitute a prior restraint in light of broader regulatory purpose of Act).  The Ninth Circuit in *Edler* thus concluded that ITAR's licensing requirements for technical data, as long as such data is "significantly and directly related to specific articles on the USML," constitute an appropriate means to "control the conduct of

---

[15] Plaintiffs' reliance on opinions of the Department of Justice's Office of Legal Counsel ("OLC"), Pl. Br. at 3, 18, to support their prior restraint claims is misplaced.  These opinions necessarily analyzed the issues at a relatively high level of generality, and do not address the particular application or circumstances presented here.  *See* Pl. Br. at App. 139 (OLC opinions do not "purport to determine the constitutionality of all possible applications of the ITAR").  Thus, Plaintiffs' lengthy quotation of OLC's July 1, 1981 opinion regarding "dissemination of technical data," Pl. Br. at 18, is inapposite.  As the July 1, 1981 opinion made clear, its discussion focused on domestic distribution of technical data to foreign persons who might subsequently take that data abroad, for example, "the conversation of a United States engineer who meets with foreign friends at home to discuss matters of theoretical interest," *id.* at App. 127-28, not a situation like the present where Plaintiffs seek to themselves engage in the overseas transmission of technical data.

assisting foreign enterprises to obtain military equipment and related technical expertise," and "not an unconstitutional prior restraint on speech."  579 F.2d at 521.[16]

ITAR's focus on the activity of exporting also mitigates two of the principal concerns raised by classic prior restraint on expression.  First, "[b]ecause the censor's business is to censor," when the government establishes a censorship board like that in *Freedman* and requires it to determine whether a film is "moral and proper," it is likely that "the institutional bias of a censorship board . . . [will] lead to the suppression of speech that should be permitted." *Freedman*, 380 U.S. at 57.  In contrast, "laws of general application that are not aimed at conduct commonly associated with expression" do not raise the same concerns about censorship because it will only be a "rare occasion [when] an opportunity for censorship will exist." *Lakewood*, 486 U.S. at 760-61.  Second, laws directing determinations about, e.g., "moral" expression raise concern about whether such discretion is unreviewable. *See City of Littleton v. Z.J. Gifts D-4*, 541 U.S. 774, 782-83 (2004) (upholding licensing scheme that relied on less-subjective criteria than *Freedman*).  But where the statute in question regulates general conduct, these concerns are mitigated because "application of the statute to areas unrelated to expression will provide the courts a yardstick with which to measure the licensor's occasional speech-related decision." *Lakewood*, 486 U.S. at 761.  Indeed, the regulation of the export of technical data in furtherance of national security and foreign policy does not focus on the content of expression, moral or otherwise.  And the vast majority of ITAR licensing applications are approved, *see* Aguirre Decl. ¶ 33, demonstrating that there is no "institutional bias of a censor" at issue here. *See id.*[17]

---

[16] Prior restraints are traditionally disfavored in substantial part because it is presumed that after-the-fact punishment is available in the absence of a prior restraint. *See Near v. State of Minn.*, 283 U.S. 697, 718-19 (1931); *Se. Promotions v. Conrad*, 420 U.S. 546, 558-59 (1975).  Here, however, such an approach is apt to be inadequate because the ITAR licensing system is intended to prevent irreversible harm to national security and foreign policy that may ensure from export. *See Chi Mak*, 683 F.3d at 1136 ("national security concerns may be more sharply implicated by the export abroad of military data than by domestic disclosure").  In the export context, after-the-fact punishment is likely available only for the exporter because foreign actors making harmful use of military data are likely often to be beyond the reach of U.S. prosecution.

[17] For similar reasons, these statutory criteria are precise enough to avoid the dangers of "a licensing statute placing unbridled discretion" in the hands of DDTC.  Pl. Br. at 20-21 (quoting *Lakewood*, 486 U.S. at 757).  The unbridled discretion doctrine applies only where a statute or regulation lacks "narrow, objective, and definite standards to guide the licensing authority," and the Supreme Court has explained that such standards do not require "perfect clarity and precise guidance." *Forsyth Cnty., Ga. v. Nationalist Movement*, 505 U.S. 123, 131 (1992); *Ward*, 491

**3.      ITAR's Export Controls Are Not Unconstitutionally Overbroad.**

Plaintiffs also raise an "overbreadth" challenge to ITAR's regulation of technical data.
*See* Pl. Br. at 16-17.  Overbreadth is an exception to the prudential standing requirement that a
plaintiff may only "assert his own legal rights and interests."  *Warth v. Seldin*, 422 U.S. 490, 499
(1975).  In circumstances where a regulation is alleged to be so broad that it is incapable of *any*
permissible application, courts may allow a party to bring a facial challenge to a statute because
it threatens others not before the court.  *See N.Y. State Club Ass'n v. City of New York*, 487 U.S.
1, 14 (1987); *Broadrick v. Oklahoma*, 413 U.S. 601 (1973).  Overbreadth is "strong medicine" to
be used "sparingly and only as a last resort," *Broadrick*, 413 U.S. at 613, and a plaintiff must
show that the alleged "overbreadth of a statute [is] not only [] real, but substantial . . . judged in
relation to the statute's plainly legitimate sweep."  *Id.* at 615.

Here, Plaintiffs' overbreadth claim cannot meet these standards.  First, "[c]ourts need not
entertain an overbreadth challenge 'where the parties challenging the statute are those who desire
to engage in protected speech that the overbroad statute purports to punish.'"  *U.S. v. Hicks*, 980
F.2d 963, 969 (5th Cir. 1992) (quoting *Brockett v. Spokane Arcades*, 472 U.S. 491, 504 (1985)).
Thus, no overbreadth challenge is "appropriate if the first amendment rights asserted" on behalf
of third parties are "essentially coterminous" with those asserted by the plaintiffs themselves.  *Id.*
Here, as the Supreme Court observed in *Brockett*, "[t]here is . . .  no want of a proper party to
challenge the [regulations], no concern that the attack on the [regulations] will be unduly delayed
or protected speech discouraged."  472 U.S. at 504.  And, indeed, an overbreadth challenge
should not properly lie if the regulations have been applied *permissibly* to Plaintiffs, which they
have for the reasons outlined above. *See Sec'y State of Md. v. Munson*, 467 U.S. 947, 958 (1984).

Second, even if the merits of Plaintiffs' overbreadth claim are reached, ITAR's export

---

U.S. at 794.  As the Ninth Circuit has recognized, the listing of defense articles in the USML and
the definition of technical data "delineate narrowly the scope of information subject to arms
controls" and thus do not violate the First Amendment.  *Chi Mak*, 683 F.3d at 1136; *see* 22
C.F.R. § 120.10 (defining technical data as the matter "required for the design development,
production, manufacture, assembly, operation, repair, testing, maintenance or modification of
defense articles . . . includ[ing] . . . blueprints, drawings, photographs, plans, instructions and
documentation"); USML Category I(a) (defining included firearms).  These criteria provide
"adequate standards to guide the official's decision."  *Thomas v. Chicago Park Dist.*, 534 U.S.
316, 323 (2002).

controls on technical data have a substantially permissible purpose.  Plaintiffs have nowhere demonstrated that the regulations have been applied in a substantial number of impermissible ways.[18]  To the contrary, the regulations serve the vital purpose of preventing the circumvention of export controls on munitions by the method of providing foreign powers the technical know-how, instructions, blueprints, or—as in the instant case—the automated processes to produce such munitions.  *See* Aguirre Decl. ¶ 14.  Further, the regulations do not extend to domestic distribution of technical data to U.S. persons and carve out a wide exemption for "public domain" data that helps ensure their reach is appropriately limited.  *See* 22 C.F.R. § 120.10(a)(5). For this reason, there is simply no substantial overbreadth here, and Plaintiffs are not likely to succeed on this claim.  *See Chi Mak*, 683 F. 3d at 1136 (rejecting overbreadth challenge).

**B.     Defendants Are Likely to Prevail on Plaintiffs' Second Amendment Claims.**

Plaintiffs are also unable to carry their burden for a mandatory preliminary injunction for their Second Amendment claims because the Court lacks subject matter jurisdiction over these claims, and Plaintiffs have not established that the facts and law are clearly in their favor.

**1.     Plaintiffs Lack Standing for Their Second Amendment Claims.**

According to Plaintiffs, Defendants have infringed upon "two complimentary [sic] guarantees" of the Second Amendment: "the right to acquire arms, and the right to make arms." Compl. ¶ 49; Pl. Br. at 25-29.  Yet none of the Plaintiffs have demonstrated that they have standing to pursue such Second Amendment claims.  To establish standing, "a plaintiff must show: (1) it has suffered, or imminently will suffer, a concrete and particularized injury-in-fact; (2) the injury is fairly traceable to the defendant's conduct; and (3) a favorable judgment is likely to redress the injury."  *Miss. State Democratic Party v. Barbour*, 529 F.3d 538, 544 (5th Cir. 2008) (citation omitted).  Plaintiffs must also demonstrate standing for each claim asserted. *DaimlerChrysler v. Cuno*, 547 U.S. 332, 352-53 (2006).

With respect to Defense Distributed, Plaintiffs have failed to establish an injury associated with their claims because they have not set forth any facts indicating that Defense

---

[18] Indeed, Plaintiffs plead precisely the opposite.  *See* Compl. ¶ 24 ("At the time Defense Distributed posted the Published Files, there was no publicly known case of Defendants enforcing a prepublication approval requirement under the ITAR.").

Distributed's ability to manufacture or acquire arms has been or imminently will be restricted in any way.  Rather, Plaintiffs have alleged only a restriction on Defense Distributed's ability to post certain files on its website.  *See* Compl. ¶¶ 22-37.  Plaintiffs acknowledge that Defense Distributed is in possession of the CAD files that it could use to manufacture firearms or components.  *See* Compl. ¶ 37.  And Cody Wilson, the "co-founde[r] and now lead[er] [of] Defense Distributed," Pl. Br. at App. 1 ¶ 2, possesses an ATF license to manufacture firearms.  *See* BUREAU OF ALCOHOL, TOBACCO, FIREARMS, AND EXPLOSIVES, Listing of Federal Firearms Licensees at lines 61673 & 61675 (May 2015), *available at* https://www.atf.gov/file/83411/ (last accessed June 3, 2015).[19]  Plaintiffs have therefore failed to set forth specific facts indicating that Defense Distributed's alleged Second Amendment rights have been injured in fact.  *See Pub. Citizen, Inc. v. Bomer*, 274 F.3d 212, 218 (5th Cir. 2001).

Plaintiffs have likewise failed to demonstrate that SAF has direct standing to pursue its Second Amendment claims.[20]  "An organization has standing to sue on its own behalf if it meets the same standing test that applies to individuals."  *Henderson v. Stalder*, 287 F.3d 374, 381 (5th Cir. 2002) (citation and internal quotation marks omitted).  Plaintiffs do not claim that SAF seeks to manufacture or acquire arms, nor is the suggestion that SAF "would expend its resources to publish and promote" CAD files, Compl. ¶ 38, indicative of a "concrete and demonstrable" injury related to these ostensible Second Amendment rights.  *Cf. NAACP v. Kyle, Tex.*, 626 F.3d 233, 238 (5th Cir. 2010).  Nor is the alleged injury to SAF fairly traceable to Defendants' conduct, which directly affected Defense Distributed only.

To the extent SAF asserts associational Second Amendment claims, its standing fares no better.  *See* Pl. Br. at 28, App. 7; *see also* Compl. ¶ 2.  An association lacks standing to bring a claim on behalf of its members unless "its members would otherwise have standing to sue in their own right."  *Nat'l Rifle Ass'n v. ATF*, 700 F.3d 185, 191 (5th Cir. 2012) (*NRA*) (citation omitted).  SAF cannot meet this test.  The members' alleged "keen interest" in the CAD files, *see*

---

[19] This monthly report is published by ATF as an online spreadsheet.  Updates are made available at https://www.atf.gov/content/firearms/firearms-industry/listing-FFLs.
[20] It is unclear from Plaintiffs' Complaint and motion whether they contend that SAF has direct standing or is asserting associational standing only.

Compl. ¶ 38; *see also* Pl. Br. at App. 6-11, is insufficient to demonstrate that their Second Amendment rights have been injured "in a personal and individual way" as required by Article III. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 563 (1992). This is particularly true for the injunctive relief sought here: SAF members' allegations of future injury, *see* Pl. Br. at App. 9, 11, are purely speculative. *See Lujan*, 504 U.S. at 564; *Osterweil v. Edmonson*, 424 F. App'x 342, 344 (5th Cir. 2011); *Johnson v. Moore*, 958 F.2d 92, 94 (5th Cir. 1992).

   Plaintiffs have also failed to establish traceability for any injury to SAF's members to Defendants' actions. Accessing and sharing 3D printing files, *see* Pl. Br. at App. 9, 11, is neither a necessary nor sufficient precondition to manufacturing or acquiring arms. Further, Plaintiffs plead that SAF has members "nationwide" only, Compl. ¶ 2, and ITAR does not limit the ability of Defense Distributed or SAF to distribute CAD files directly to U.S. persons within the United States (or otherwise prevent SAF members from acquiring the CAD files). *See* Aguirre Decl. ¶ 16; *cf. Huitron-Guizar*, 678 F.3d at 1169-70. Therefore, any alleged violation of SAF's members' Second Amendment rights is not fairly traceable to any action taken by Defendants.[21]

   Nor can Plaintiffs obtain standing by "assert[ing] the Second Amendment rights of their customers and website visitors." Pl. Br. at 27. Plaintiffs have failed to satisfy the requirements for such third-party standing because they have: (1) failed to adequately allege that they themselves suffered an injury in fact; (2) never demonstrated that they have "a close relation" to the unspecified "customers and website visitors"; and (3) not described any hindrance to these customers' and website visitors' ability to protect their own interests. *See Bonds v. Tandy*, 457 F.3d 409, 416 n.11 (5th Cir. 2006). In contrast to the cases cited by Plaintiffs, no commercial transaction has occurred and no vendor-vendee relationship appears to exist between Plaintiffs and their "customers." *Compare* Compl. ¶¶ 5-6 *with Carey v. Population Servs. Int'l*, 431 U.S. 678 (1977) (vendor relationship) *and Reliable Consultants, Inc. v. Earle*, 517 F.3d 738 (5th Cir. 2008) (commercial transactions). More importantly, however, the Fifth Circuit has explained

---

[21] Although SAF's members assert that they have been unable to "locate [firearms files] on Defense Distributed's website," they make no allegation that they have attempted to request files from Defense Distributed through other channels, an activity outside the purview of ITAR. *See* Pl. Br. at App. 8-11.

that "*Carey* . . . gives *jus tertii* standing to a party only if the party directly affected is incapable of asserting its own interests." *Corrosion Proof Fittings v. EPA*, 947 F.2d 1201, 1210 n.6 (5th Cir. 1991), *opinion clarified* (Nov. 15, 1991) (citations omitted).  There is no reason to doubt that Plaintiffs' unspecified "customers and website visitors" are "independent entit[ies], fully capable of asserting their own rights."  *See id.*

### 2.    Plaintiffs Are Unlikely to Succeed on Their Second Amendment Claims.

Assuming Plaintiffs could establish their standing, they have failed to consistently identify the nature of the Second Amendment right that they seek to enforce or a likelihood of success on these claims.  Plaintiffs primarily focus on the claim that the Second Amendment encompasses a right to make or acquire arms.  Compl. ¶¶ 48-51; Pl. Br. at 26.  Elsewhere, they describe the right as "constitutional protection" of "any components necessary to the functioning of one's constitutionally-protected firearm."  Pl. Br. at 26.  At another point, they assert their Second Amendment claim as an infringement on the right to "operate a business that provides Second Amendment services."  Compl. ¶ 49 (quoting *Mance v. Holder*, 2015 WL 567302, at *15 n.8 (N.D. Tex. Feb. 11, 2015); Pl. Br. at 27 (same).  Regardless of the Second Amendment right claimed, however, Defendants have at most restricted Defense Distributed's ability to *export* arms-related technical data, and the Second Amendment does not provide such a right.

The Second Amendment protects "the right of the people to keep and bear Arms."  U.S. Const. amend. II.  In *District of Columbia v. Heller*, the Supreme Court held that "the District's ban on handgun possession in the home violates the Second Amendment, as does its prohibition against rendering any lawful firearm in the home operable for the purpose of immediate self-defense."  554 U.S. 570, 635-36 (2008).  In holding that the Second Amendment secures an individual right, the Court emphasized that the "central right" secured is "to defend oneself in one's home," a right that "is not unlimited."  *NRA*, 700 F.3d at 193-94; *Heller*, 554 U.S. at 635.

The Fifth Circuit, like other Courts of Appeals, has adopted a two-step framework for analyzing firearms restrictions challenged on Second Amendment grounds:

> [T]he first step is to determine whether the challenged law impinges upon a right protected by the Second Amendment—that is, whether the law regulates conduct that falls within the scope of the Second Amendment's guarantee; the second step is to

> determine whether to apply intermediate or strict scrutiny to the law, and then to determine whether the law survives the proper level of scrutiny.

*NRA*, 700 F.3d at 194 (citations omitted). "To determine whether a law impinges on the Second Amendment right, we look to whether the law harmonizes with the historical traditions associated with the Second Amendment guarantee." *Id.* (citing *Heller*, 554 U.S. at 577-628). "If the challenged law burdens conduct that falls outside the Second Amendment's scope, then the law passes constitutional muster." *Id.* at 195 (citing *U.S. v. Marzzarella*, 614 F.3d 85, 89 (3d Cir. 2010)). "If the law burdens conduct that falls within the Second Amendment's scope, we then proceed to apply the appropriate level of means-end scrutiny." *Id.*

Here, the Court's inquiry can end at Step One because the challenged regulations do not impose any burden, let alone a substantial burden, on conduct historically protected by the Second Amendment. The Second Amendment's "central right" is the right to use arms in self-defense in the home, not to export arms across international borders. *Cf. U.S. v. Gurrola-Garcia*, 547 F.2d 1075, 1079 n.6 (9th Cir. 1976) ("Certainly the Second Amendment guarantee of 'the right of the people to keep and bear Arms' . . . does not protect the efforts of a person to take munitions across an international border and into a foreign country" (citing *Marchese v. California*, 545 F.2d 645, 647 (9th Cir. 1976))). Restrictions on arms-related exports are "firmly historically rooted," and therefore harmonize with historic tradition. *See NRA*, 700 F.3d at 204. For example, prior to the Revolution, it was high treason for British subjects to sell arms to the King's enemies. 4 WILLIAM BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND 82-83 (1769). The early republic similarly placed restrictions on arms-related exports. In 1794, just three years after ratification of the Bill of Rights, "the exportation of munitions of war was prohibited for a year." 7 JOHN BASSETT MOORE, A DIGEST OF INTERNATIONAL LAW, § 1098 (1906). These restrictions have also been used to advance foreign policy interests during times of peace. In 1902, for example, Congress ratified a treaty with Britain that prevented the export of firearms to certain regions of the Pacific in order to promote international "humanitarian purposes." 2 MOORE, § 229. These historical restrictions therefore confirm that the "activities covered" by the challenged ITAR provisions are "presumptively not protected from regulation by the Second Amendment." *NRA*, 700 F.3d at 196 (quoting *Heller v. District of Columbia*, 670

F.3d 1244, 1253 (D.C. Cir. 2011) (*Heller II*)).

Even if the Court concludes that Plaintiffs' claims implicate conduct protected by the Second Amendment, the challenged provisions readily withstand intermediate scrutiny. The Fifth Circuit has applied intermediate scrutiny to laws that, like ITAR's export controls, do not prevent a "law-abiding, responsible adult" from "possess[ing] and us[ing] a handgun to defend his or her home and family," *See id.* at 195 (citations omitted). In applying intermediate scrutiny, the relevant inquiry is "whether there is a reasonable fit between the law and an important government objective." *Id.* at 207. Here, for the same reasons that ITAR's limits on technical data satisfy intermediate scrutiny under the First Amendment, the regulations survive such review under the Second Amendment. *See supra* Part II.B.[22] For these reasons, Plaintiffs are unlikely to succeed on their Second Amendment claims.

## C.  Defendants Are Likely to Prevail on Plaintiffs' Other Claims.

### 1.  ITAR's Standards Are Not Void for Vagueness.

Plaintiffs are also unlikely to succeed in their vagueness challenge to the ITAR's restrictions on the export of defense articles, including "components and parts for firearms" and "technical data" relating to those firearms, components, and parts. These restrictions neither "fail[] to provide [people] of ordinary intelligence fair notice of what is prohibited [n]or . . . authorize[] . . . discriminatory enforcement." *Munn v. Ocean Springs, Miss.*, 763 F.3d 437, 439 (5th Cir. 2014). As explained above, the State Department has enumerated the categories of defense articles for which export is prohibited in the USML, and ITAR specifically defines "technical data" as that which is "required for the design development, production, manufacture, assembly, operation, repair, testing, maintenance or modification of defense articles . . . includ[ing] . . . blueprints, drawings, photographs, plans, instructions and documentation." 22

---

[22] In the nomenclature supplied by *NRA*, ITAR: (1) is "focused on a particular problem," namely, unauthorized exports that pose a danger to national security or foreign policy; (2) implicates a concededly compelling government interest; and (3) employs "means that were reasonably adapted to achieving the objective," by compiling and maintaining on the USML those defense articles and defense services that pose a danger to national security and foreign policy, and reasonably defining "export" to address the ways that items can be disseminated. *See NRA*, 700 F.3d at 208-09; 22 C.F.R. § 120.3, 120.17; *see also* Pl. Br. at 11 ("Nor do Plaintiffs suggest that uploading files to the Internet cannot be viewed, in some sense, as an export."), 28 (acknowledging that interest is compelling).

C.F.R. § 120.10(a).  This definition, which accords with the ordinary meaning of the words "technical" and "data," constitutes a "comprehensible normative standard" in which a "standard of conduct is specified."  *Coates v. City of Cincinnati*, 402 U.S. 611, 614 (1971).  If "technical data" as so defined nevertheless "lack[s] the clarity [Plaintiffs] would insist on, it is because . . . 'we can never expect mathematical certainty from our language.'"  *Brown v. Town of Cary*, 706 F.3d 294, 306 (4th Cir. 2013); *accord Munn*, 763 F.3d at 440.  In addition, even if an individual were truly uncertain about the definition of "technical data," that person can apply for a license or submit a CJ request to DDTC.  Thus, no one need risk criminal prosecution or civil sanction because it is possible to get an advance determination as to the application of ITAR.  *See U.S. Civil Service Comm. v. Nat'l Ass'n of Letter Carriers*, 413 U.S. 548, 580 (1973).

Plaintiffs' contention that the exclusion of information in the public domain from ITAR renders the regime unconstitutionally vague is even less well-founded.  The purpose of the vagueness doctrine in the First Amendment context is to protect against enactments that would limit "the free dissemination of ideas."  *Reeves v. McConn*, 631 F.2d 377, 383 (5th Cir. 1980).  Inclusion of the public domain exception in ITAR explicitly promotes the values of free speech and protects First Amendment interests, not the opposite.  Similarly, repeal of ITAR's previous requirement that "[t]he burden for obtaining . . . approval for the publication of technical data . . . is on the [entity] seeking publication," 49 Fed. Reg. 47,682 (Dec. 6, 1984), *see* 22 C.F.R. § 125.11 n.3 (1978), lessens any First Amendment harms caused by ITAR, and does not thereby demonstrate that ITAR's straightforward regulation of exports is impermissibly vague.

2. **Application of ITAR's Export Requirements to Plaintiffs' CAD Files Does Not Exceed the Statutory Authority Granted by Congress**.

Plaintiffs' claim that Congress has not provided the authority to regulate their transmittal of automated firearms assembly techniques ignores the plain text of the statute.  The AECA provides that "the President is authorized to control the import and the export of defense articles and defense services . . . [and] is authorized to designate those items which shall be considered as defense articles and defense services for the purposes of this section and to promulgate regulations for the import and export of such articles and services.  The items so designated shall

constitute the USML." 22 U.S.C. § 2778(a)(1).  In doing so, Congress authorized the President to "take into account whether the export of an article would contribute to an arms race, aid in the development of weapons of mass destruction, support international terrorism, increase the possibility of outbreak or escalation of conflict, or prejudice the development of bilateral or multilateral arms control or nonproliferation agreements or other arrangements."  *Id.* § 2778(a)(2).  In addition, the statute requires that "every person . . . who engages in the business of manufacturing, exporting, or importing any defense articles or defense services designated by the President under subsection (a)(1) of this section shall register with the United States Government agency charged with the administration of this section."  *Id.* § 2778(b)(1)(A)(i). And "[e]xcept as otherwise specifically provided in regulations issued under subsection (a)(1)…, no defense articles or defense services designated by the President under subsection (a)(1) . . . may be exported or imported without a license for such export or import."  *Id.* § 2778(b)(2).  The plain text of the statute therefore directly authorizes the export licensing scheme at issue here.

Plaintiffs concede that this language provides "authority under the AECA to . . . regulate the export of certain technical data," and that "uploading files to the Internet can[] be viewed . . . as an export," but contend that reading these two authorities together—as authorization to regulate technical data on the Internet—is "not what Congress had in mind."  Pl. Br. at 12.  But that argument cannot possibly be sustained under a plain reading of the statutory authority.  As Defense Distributed itself described in its "Ghost Gunner" application, the technical data in files for that device functions "to automatically find, align, and mill" firearms and their components. *Id*. at App. 267.  In the crafting of the AECA, Congress expressed specific concern that "arms transfers [not] become an automatic, unregulated process."  H.R. Rep. No. 94-1144, at 12 (1976), *reprinted in* 1976 U.S.C.C.A.N. 1378, 1388.  The regulation of Defense Distributed's technical data thus fits with Congress's intent "that the technical data subject to control would be directly relevant to the production of a specified article on the Munitions List." *Edler Indus.*, 579 F.2d at 521 (noting that the legislative history of AECA's predecessor statute announced Congress's direct intention to "allow[] control of munitions, 'including relevant technical data.'") (quoting S. Rep. No. 83-1799, at 57 (1954), *reprinted in* U.S.C.C.A.N. 3175, 3244).  Thus, Plaintiffs'

*ultra vires* argument is unpersuasive because it would permit the automatic, "virtual export" of defense articles by anyone willing to undertake the expedient of creating a digital model, sending that digital version abroad, and thereby enabling foreign recipients to "automatically" create an unlimited number of identical copies of the original defense article.[23]  *Cf. Edler*, 579 F.2d at 520 ("The authority to regulate arms traffic would be of negligible practical value if it encompassed only the exportation of particular military equipment but not the exportation of blueprints specifying the construction of the very same equipment.").

Nor do the opinions issued to the State Department by OLC demonstrate that ITAR's regulations of technical data exceed the scope of authority granted by Congress.  To the contrary, the July 1, 1981 OLC opinion recognizes that, under ITAR, the State Department has "*traditionally undertaken* to regulate the export of technical *information*" through the technical data provisions.  *Id.*  Although OLC acknowledged as "somewhat unclear" the delegation of technical data authority, *see* Pl. Br. at App. 125, 129 & nn.7, 11, these opinions are drafted at a high level of generality and nowhere do they state that authority is lacking to regulate matters similar to the CAD files at issue here.[24]

## CONCLUSION

For the foregoing reasons, Plaintiffs' Motion for a Preliminary Injunction should be denied.

---

[23] As Plaintiffs note, the State Department's administration of ITAR and the USML has long subjected technical data, including computer code, to export controls.  *See* Pl. Br. at 3; *see also Edler*, 579 F.2d at 519.  Congress has repeatedly ratified the USML, incorporating its definitions into subsequent enactments and requiring the Executive to report to Congress in advance of the removal "of any item from the Munitions List."  *See* P.L. 107-228 § 1406; *id.* § 1403; *see also, e.g.*, PL 104-64 § 573 (relying on USML to restrict scope of antiterrorism assistance provided to foreign countries); Omnibus Diplomatic Security and Antiterrorism Act of 1986, P.L. 99-399 § 509(a) (prohibiting export of items on USML to countries providing support for international terrorism).  "Congressional actions after the interpretation by the [Executive Branch] . . . indicate acquiescence" where Congress "revisit[s]" a statute without "seek[ing] . . . to change the [] definition."  *Dole v. Petroleum Treaters*, 876 F.2d 518, 522 (5th Cir. 1989); *see also Lorillard v. Pons*, 434 U.S. 575, 580 (1978).  Congress has elsewhere ratified ITAR's definitions of persons subject to its requirements.  *See, e.g.*, *U.S. v. Yakou*, 428 F.3d 241, 243-44 (D.C. Cir. 1995).

[24] Neither the 1980 official guidance, nor the amendment to ITAR published on December 6, 1984, *see* 49 Fed. Reg. 47,682, indicates that Defendants lack the authority to regulate Plaintiffs' *export* of technical data via the Internet.  *See* Compl. ¶¶ 19-20.  The former makes clear that it is addressing the "publication of data *within the United States*."  The language removed from ITAR by the latter amendment fell within the public domain exemption to ITAR, and concerned only "the publication of technical data" for purposes of placing such data in the public domain.  *See* 22 C.F.R. § 125.11(a)(1) n.3 (1978); Pl. Br. App. 200.  As explained *supra* Part II.B, publication of technical data is not equivalent to the *export* of such data.

Dated: June 10, 2015

RICHARD L. DURBIN, JR.
Acting United States Attorney
Western District of Texas


ZACHARY C. RICHTER
Assistant United States Attorney
Western District of Texas

Respectfully submitted,

BENJAMIN C. MIZER
Principal Deputy Assistant Attorney General
Civil Division

ANTHONY J. COPPOLINO
Deputy Branch Director
Federal Programs Branch

/s/ *Eric J. Soskin*
ERIC J. SOSKIN
Pennsylvania Bar No. 200663
STUART J. ROBINSON
California Bar No. 267183
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., NW
Washington, DC 20530
Phone: (202) 514-9239;
Fax: (202) 616-8460
Email: stuart.j.robinson@usdoj.gov

*Attorneys for Defendants*

**CERTIFICATE OF SERVICE**

I certify that on June 10, 2015, I electronically filed this document with the Clerk of Court using the CM/ECF system, which will send notification to

Alan Gura, alan@gurapossessky.com
William B. Mateja, mateja@fr.com
William T. "Tommy" Jacks, jacks@fr.com
David S. Morris, dmorris@fr.com
Matthew Goldstein, matthew@goldsteinpllc.com
*Attorneys for Plaintiffs*

In addition, I have dispatched this document using the United States Postal Service to the following, who is not listed as a CM/ECF participant:

Josh Blackman
1303 San Jacinto Street
Houston, TX 77002


*/s/ Eric J. Soskin*
ERIC J. SOSKIN
Trial Attorney