IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| DEFENSE DISTRIBUTED and | § | Case No. 15-CV-372-RP |
| SECOND AMENDMENT FOUNDATION, INC., | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | |
| | § | |
| U.S. DEPARTMENT OF STATE, et al., | § | |
| | § | |
| Defendants. | § | |
| _____ | § | |

MEMORANDUM OF POINTS AND AUTHORITIES IN REPLY TO DEFENDANTS'
OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Come now Plaintiffs, Defense Distributed and Second Amendment Foundation, Inc., by

and through counsel, and submit their Memorandum of Points and Authorities in Reply to

Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction.

Dated: June 24, 2015

Respectfully submitted,

GURA & POSSESSKY, PLLC

FISH & RICHARDSON P.C.

/s/ Alan Gura
Alan Gura
Virginia Bar No. 68842*
Gura & Possessky, PLLC
105 Oronoco Street, Suite 305
Alexandria, Virginia 22314
703.835.9085 / Fax 703.997.7665
alan@gurapossessky.com

/s/ William B. Mateja
William T. "Tommy" Jacks
Texas State Bar No. 10452000
William B. Mateja
Texas State Bar No. 13185350
David S. Morris
Texas State Bar No. 24032877
FISH & RICHARDSON P.C.
One Congress Plaza, Suite 810
111 Congress Avenue
Austin, Texas 78701
(512) 472-5070 (Telephone)
(512) 320-8935 (Facsimile)
jacks@fr.com
dmorris@fr.com
mateja@fr.com

Matthew Goldstein
D.C. Bar No. 975000*
Matthew A. Goldstein, PLLC
1012 14th Street NW, Suite 620
Washington, DC 20005
202.550.0040/Fax 202.683.6679
matthew@goldsteinpllc.com

Josh Blackman
Virginia Bar No. 78292**
1303 San Jacinto Street
Houston, Texas 77002
202.294.9003/Fax: 713.646.1766
joshblackman@gmail.com

*Admitted pro hac vice
**Admission to W.D. Tex. Bar pending

Table of Contents

Table of Authorities........................................................... ii

Preliminary Statement......................................................... 1

Argument..................................................................... 1

    I.    The Government Misstates the Relevant Legal Standards. .................... 1

    II.   Defendants' Prior Restraint Scheme is Ultra Vires. .......................... 2

    III.  Defendants Ignore the Realities of Internet Accessibility and Disregard Defense Distributed's Efforts to Obtain Guidance Regarding Compliance. ....... 4

    IV.  Defendants Fail to Acknowledge that Plaintiffs' Files Are Protected Speech....... 5

    V.   Plaintiffs' Speech Does Not Threaten National Security or Foreign Policy........ 7

    VI.  Defendants' Censorship Causes Real, Irreparable Injury. .................... 10

    VII.  Plaintiffs Have Standing to Raise Their Second Amendment Claims........... 10

    VIII. Plaintiffs Will Prevail on Their Second Amendment Claims. ................ 11

    IX.  Defendants' Definition of "Export" is Unconstitutionally Overbroad. .......... 13

    X.   Defendants' Application of ITAR Is Not Content Neutral. ................... 14

    XI.  Defendants' ITAR Review Process Creates an Interminable Prior Restraint...... 14

Conclusion.................................................................. 15

Table of Authorities

Cases

*Addis v. Zimmer, Inc.,*
    2003 WL 22997870 (W.D. Tex. Nov. 12, 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Almazan v. CTB, Inc.,*
    2000 WL 33348244 (W.D. Tex. Apr. 27, 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Ass'n of Am. Physicians & Surgs. v. Tex. Med. Bd., (TMB),*
    627 F.3d 547 (5th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Bernstein v. U.S. Dep't of Justice,*
    176 F.3d 1132 (9th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6

*Boumediene v. Bush,*
    553 U.S. 723 (2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Carey v. Pop. Servs. Int'l,*
    431 U.S. 678 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*CFTC v. Vartuli,*
    228 F.3d 94 (2d Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7

*Consolidated Edison Co. of N.Y. v. Public Serv. Comm'n of N.Y.,*
    447 U.S. 530 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Const. Trades Council,*
    485 U.S. 568 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Employment Div., Dep't of Human Res. of Or. v. Smith,*
    494 U.S. 872 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Ezell v. City of Chicago,*
    651 F.3d 684 (7th Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Faculty Senate of Fla. Int'l U. v. Winn,*
    477 F. Supp. 2d 1198 (S.D. Fla. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*FDIC v. Meyer,*
    510 U.S. 471 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Junger v. Daley,*
    209 F.3d 481 (6th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6

*Mance* v. *Holder*, No. 4:14-cv-539-O,
   2015 U.S. Dist. LEXIS 16679 (N.D. Tex. Feb. 11, 2015). . . . . . . . . . . . . . . . . . . . . . . . . . 11

*N.L.R.B. v. Catholic Bishop of Chicago*,
   440 U.S. 490 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Nat'l Fed. Of the Blind of Texas, Inc. v. Abbott*,
   647 F.3d 202 (5th Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*New Orleans Depot Servs., Inc. v. Director, Office of Worker's Compensation Programs*,
   718 F.3d 384 (5th Cir. 2013). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*New York Times v. United States*,
   403 U.S. 713 (1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 13

*Rasul* v. *Myers*,
   563 F.3d 527 (D.C. Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Reed v. Gilbert*,
   2015 WL 2473374 (U.S. June 18, 2015). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Reid* v. *Covert*,
   354 U.S. 1 (1957). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Reliable Consultants, Inc. v. Earle*,
   517 F.3d 738 (5th Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Roberts v. U.S. Jaycees*,
   468 U.S. 609 (1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*United States v. Carter*,
   549 F. Supp. 2d 1257 (D. Nev. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*United States v. Chi Mak*,
   683 F.3d 1126 (9th Cir. 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*United States v. Edler Indus.*,
   579 F.2d 516 (9th Cir. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*United States v. Mead Corp.*,
   533 U.S. 218 (2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Universal City Studios, Inc. v. Corley*,
   273 F.3d 429 (2d Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7

*Ward v. Rock Against Racism*,
    491 U.S. 781 (1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Weste v. United States*,
    2013 WL 2896843 (W.D. Tex. June 11, 2013). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Wrenn v. District of Columbia*,
    2015 WL 3477748 (D.D.C. May 18, 2015). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10


Statutes and Rules

18 U.S.C. § 922(p). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

22 U.S.C. § 1934(a) (1970). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

22 U.S.C. § 2778(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Fed. R. Civ. P. 65. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1


Other Authorities

80 Fed. Reg. 31,525. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Black's Law Dictionary (10th ed. 2014). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

MEMORANDUM OF POINTS AND AUTHORITIES IN REPLY TO DEFENDANTS'
OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

PRELIMINARY STATEMENT

In equating the online publication of unclassified data with the export of munitions,

Defendants reveal a fundamental misunderstanding of the relevant technology at issue. This

misunderstanding extends to other basic facts, *e.g.*, DDTC did not merely "*suggest*[] that the

technical data be removed from Defense Distributed's website," Opp. 5 (emphasis added)—its

"Enforcement Division" instructed Plaintiff that its speech "should be removed from public

access immediately." App. 14. Defendants' legal arguments are in the same vein, soft-peddling a

radical restriction on basic rights as a plain export control regime having nothing to do with

Americans' ability to express and arm themselves in the United States. The arguments are

unconvincing. Plaintiffs' Motion for Preliminary Injunction (Dkt. 7) should be granted.

ARGUMENT

I.      THE GOVERNMENT MISSTATES THE RELEVANT LEGAL STANDARDS.

Plaintiffs are puzzled by the allegation that their "failure to address the legal

requirements for a preliminary injunction alone warrants the straightforward denial of their

motion," Opp. at 2, and the overheated claim that "Plaintiffs here have not even attempted to

demonstrate" three of the traditional elements, *id.* The familiar test is set out on page 10, under

"Summary of Argument," and each Roman numeral under "Argument" relates to each of the

standard elements, with a fifth section discussing Rule 65's bond requirements. It is Defendants

who apparently believe the standards must be manipulated to achieve the correct result.

The prohibitive/mandatory distinction test Defendants endorse is inapposite. While a

mandatory injunction is more difficult to obtain than a prohibitive one, two flaws undermine

1

Defendants' argument of this point. First, Defendants inexplicably assume that the status quo began with their decision to require pre-publication authorization. But as Plaintiffs demonstrated, requiring pre-publication approval of Internet speech is a new application of ITAR. For years, the government disclaimed ITAR's application of a prior restraint. It simply cannot be that every new regulatory action re-defines the "status quo," such that the Government gets a "mandatory" thumb on the scale in every case for injunctive relief. Moreover, the injunction requested is prohibitive, not mandatory. Plaintiffs seek to stop misconduct, not to obtain some new benefit.

Defendants also erroneously suggest that because Defense Distributed's website contains advertising, and offers the Ghost Gunner for sale, the commercial speech doctrine applies. Opp. at 16, n. 13. But Defense Distributed is a "non-profit corporation," Wilson Decl. ¶ 24, whose goal is "to publish and distribute, *at no cost to the public*, such information and knowledge on the Internet *in promotion of the public interest*." *Id.* ¶ 2 (emphasis added). Even if Plaintiffs charged for downloading the files, their speech would still be predominantly expressive. That Defense Distributed cannot afford to give away the Ghost Gunner for free, and sells the machine to fund its charitable operations, does not alter the fact that the Ghost Gunner files more than "implicitly advocate for [plaintiff's] views, ideas, goals, causes, and values." *Nat'l Fed. Of the Blind of Texas, Inc. v. Abbott*, 647 F.3d 202, 212-13 (5th Cir. 2011).

II.   DEFENDANTS' PRIOR RESTRAINT SCHEME IS ULTRA VIRES.

Defendants' flawed understanding of the technology at issue guides their unconstitutional interpretation of the Arms Export Control Act ("AECA"). To the Government, posting CAD files on the Internet "would be *equivalent* to providing the defense article itself." Opp. at 7 (emphasis added). This conclusion cannot be reconciled with the AECA's plain text or intent.

Congress authorized the President "to control the import and the *export* of defense

2

articles and defense services and to provide foreign policy guidance to persons of the United States involved in the export and import of such articles and services." 22 U.S.C. § 2778(a)(1) (emphasis added). The AECA does not define "export," and, "[i]n the absence of such a definition, [courts] construe a statutory term in accordance with its ordinary or natural meaning." *FDIC v. Meyer*, 510 U.S. 471, 476 (1994); *see also New Orleans Depot Servs., Inc. v. Director, Office of Worker's Compensation Programs,* 718 F.3d 384, 391 (5th Cir. 2013). Defendants' claim hinges on the  court accepting its novel argument that an "export" includes public speech in the United States, not directed at a particular listener, if a foreign person can listen. This is far afield from the well-accepted, unambiguous definition of export: "[a] product or service created in one country and transported to another." Black's Law Dictionary (10th ed. 2014).

Defendants cite to *United States v. Edler Indus.*, 579 F.2d 516, 521 (9th Cir. 1978) for the proposition that the subject files are ITAR-controlled because Congress intended to control technical data "directly relevant to the production of a specified article on the Munitions List." Opp. at 29. This is a red herring because Congressional intent to control "technical data" under the AECA is not at issue in this action.[1] The question of whether Plaintiffs' public speech contains ITAR-controlled technical data is irrelevant if public speech is not considered an "export." Moreover, it is important to note that the conduct at issue in *Edler* involved private speech, not public speech; and the *Edler* court found that, regardless of the Congressional intent to control technical data under AECA's predecessor, the Mutual Security Act of 1954, 22 U.S.C. § 1934(a) (1970), ITAR must be narrowly applied to avoid interfering with constitutionally protected speech. *Edler Indus.*, 579 F.2d at 521. Even if the Court departs from the ordinary or

---

[1] *See* Opp. at 11 ("Plaintiffs do not suggest that Defendants lack authority under the AECA to construct a narrowly-tailored regime to regulate the export of certain technical data.").

natural meaning of the term "export" in determining Congressional intent, the AECA is silent or ambiguous with respect to public speech. Defendants' command to remove data from Defense Distributed's website preceded by two years the June 3, 2015 notice of proposed rulemaking. 80 Fed. Reg. 31,525. The prepublication approval requirement's informal imposition on a "case-by-case" basis, based on internal, unpublished guidelines, closely resembles the "ruling letters" at issue in *United States v. Mead Corp* that "respond to transactions of the moment." 533 U.S. 218, 223 (2001); Opp. at 4 ("These assessments are made on a *case-by-case basis* through an inter-agency process, evaluating whether the article is covered by the USML") (emphasis added). As a result, *Skidmore*, rather than *Chevron* deference is appropriate. *Id.* at 228.

Defendants' application of ITAR to all public speech clearly exceeds permissible bounds. It is unreasonable to assume that Congress ever expected the AECA would be used to censor public speech by citizens inside the United States merely because foreign persons can listen.

III.  DEFENDANTS IGNORE THE REALITIES OF INTERNET ACCESSIBILITY AND DISREGARD DEFENSE DISTRIBUTED'S EFFORTS TO OBTAIN GUIDANCE REGARDING COMPLIANCE.

Conceding that Plaintiffs may share the disputed technical data with other Americans, and that Plaintiffs may use the technical data "to make or acquire firearms in the United States," Defendants nonetheless assert that the speech's ordinary Internet publication would constitute an export of defense articles. Opp. at 1, 14-16. Thus, should a foreigner somehow come into contact with a file posted on the Internet for the sole audience of a U.S. person, the publisher could be subject to severe civil and criminal penalties.[2]

Defendants' suggestion that their prior restraint could be avoided if Plaintiffs restricted

_____

[2] Defendants offer that "no one need risk criminal prosecution or civil sanction because it is possible to get an advance determination as to" ITAR's application. Opp. at 28. The nearly two years Plaintiff waited to resolve its commodity jurisdiction request is a long time to stay silent.

access to their files to U.S. internet protocol ("IP") addresses, Aguirre Decl. at ¶ 16; Opp. at 1, 5,

14-15, n. 4, is naïve at best. First, as any unintentional disclosure to a foreign person is a strict

liability offense under ITAR, relying on IP address filtering to keep oneself on the right side of

the law is hardly prudent. Moreover, IP addresses can be faked ("spoofed") quite easily,

allowing foreign nationals to access files on the Internet domestically or abroad at Plaintiffs'

peril.[3] And, even if Plaintiffs were somehow able to always limit access to domestic IP

addresses, there is no way to stop a foreign person from looking at (or using) a U.S. person's

internet connection. Every embassy in Washington is steps away from free, domestic IP WiFi.

And the State Department has *never before*, including in its latest proposed notice for

rulemaking, offered IP filtering as an acceptable method to publish files to the Internet (much

less a safe harbor). In sum, Defendants have effectively declared the Internet a forbidden ground

for collaboration if a CAD file might fall within their overbroad definition of "technical data."[4]

IV.   DEFENDANTS FAIL TO ACKNOWLEDGE THAT PLAINTIFFS' FILES ARE PROTECTED SPEECH.

       Defendants give short shrift to the two leading precedents relating to First Amendment

protection for computer code, *Bernstein* and *Junger*, relegating them to a sparse footnote and

dubbing them the "other two cases cited by Plaintiffs." Opp. at 13, n. 10 (citing *Bernstein v. U.S.

Dep't of Justice*, 176 F.3d 1132, 1139-43 (9th Cir. 1999); *Junger v. Daley*, 209 F.3d 481, 485

(6th Cir. 2000)). Both of these cases held—as the government must acknowledge—that

---

[3] *Weste v. United States*, 2013 WL 2896843, at *14 (W.D. Tex. June 11, 2013); *United States v. Carter*, 549 F. Supp. 2d 1257, 1268-69 (D. Nev. 2008).

[4] Although Defendants fault Defense Distributed for not "inquir[ing] about whether" the files could be limited to "U.S. persons within the United States," or how "to post the technical data on the Internet without violating ITAR," Opp. at 5, 9, 14, Defense Distributed repeatedly sought guidance on ITAR compliance to no avail. Pl. Br. at 19-20; App. 3-4, ¶¶ 10-11; Exs. 18-23.

computer code is protected by the First Amendment.[5] Indeed, Plaintiffs' files are more

expressive than *Bernstein*'s encryption algorithm or *Junger*'s source code.

Unable to challenge *Bernstein* and *Junger*'s core holding, Defendants change the facts,

conflating the CAD and Ghost Gunner files in question and claiming that these are purely

functional. But the two file types are distinct, and they are each expressive.[6] Defendants'

confusion is based on a declaration by one Lisa Aguirre, who appears without a curriculum vitae

and whose qualifications are unknown. *Addis v. Zimmer, Inc.,* 2003 WL 22997870, at *1 (W.D.

Tex. Nov. 12, 2003) (striking an expert whose report lacked a curriculum vitae); *Almazan v.

CTB, Inc.,* 2000 WL 33348244, at *7 (W.D. Tex. Apr. 27, 2000) (recognizing importance of c.v.

in assessing design expert's qualifications). Her declaration, based on "personal knowledge" and

"information provided to [her] in [her] official capacity," mischaracterizes the technology's

operation, and repeatedly conflates the commodity jurisdiction requests. Aguirre Decl. at ¶ 4.

Wilson's supplemental declaration responds to Aguirre's errors. Ex. 1 at ¶¶ 37-45.

Simply stated, and as elaborated by Wilson, CAD files are not "executable," and creating

the Liberator indeed "requires additional craftsmanship, know-how, tools, and materials,"

contrary to Aguirre's position. Aquirre Decl. ¶ 29.b; Ex. 1 at ¶¶ 4-36. This is *not* a case where "a

human's mental faculties do not intercede," but rather the files "communicate information

comprehensible to a human [and] qualify as speech." *Universal City Studios, Inc. v. Corley*, 273

F.3d 429, 448 (2d Cir. 2001). Accordingly, *CFTC v. Vartuli*, 228 F.3d 94 (2d Cir. 2000), upon

---

[5] Contrary to the Defendants' assertion, Opp. at 13 n. 10, Plaintiffs discuss *Bernstein*'s history. Pl. Br. n. 8.

[6] Defendants' brief discusses only the CAD, not the Ghost Gunner files, and their submissions fail to address the broader array of files Plaintiffs seek to publish. See Complaint ¶ 37.

which Defendants heavily rely, is simply inapposite. *Vartuli* concerned software-generated currency trading instructions which did not require the human mind's intercession—users were told that they "must 'follow the signals with no second guessing.'" *Vartuli*, 228 F.3d at 111. In contrast, Defense Distributed's software files, which are open-source for philosophical reasons, invite the user's mind to intercede, modify and customize the code and any related construction of a gun or gun part. Ex. 1 at ¶ 46.

Importantly, the CAD files and the Ghost Gunner files can both be used in the generation of a product and are expressive themselves. "[T]he fact that a program has the capacity to direct the functioning of a computer does not mean that it lacks the additional capacity to convey information, and it is the conveying of information that renders instructions 'speech' for purposes of the First Amendment." *Universal City*, 273 F.3d at 447.

V.      PLAINTIFFS' SPEECH DOES NOT THREATEN NATIONAL SECURITY OR FOREIGN POLICY.

As Justice Stewart recognized in the "Pentagon Papers" case, a prior restraint is justified only where the disclosure will "surely result in *direct, immediate, and irreparable* damage to our Nation or its people." *New York Times v. United States*, 403 U.S. 713, 730 (1971) (Stewart, J., concurring) (emphasis added). Defendants' alleged national security and foreign policy harms are indirect, indeterminate, and speculative. They do not even come close to meeting the threshold identified by the Supreme Court in the Pentagon Papers case, where the national security implications were far more concrete and actionable than anything identified in this case.

Defendants' claim of national security and foreign policy harms centers around the notion that the Liberator's design allows the creation of "a lethal firearm that can be easily modified to be virtually undetectable in metal detectors and other security equipment." Opp. at 10 (citing Aguirre Decl. at ¶ 35); Aguirre Decl. at n. 9. But just about any firearm, in the wrong

7

hands, can theoretically threaten national security. Could Defendants banish *all* firearms-related speech from the Internet by asserting "national security?" And why stop with firearms? Countless technologies may be repurposed by a foreign military.

In any event, Defendants again show a fundamental misunderstanding of the relevant technology, ignoring the fact that one of the modifications required to render the Liberator "undetectable by metal detectors"—the removal of the steel firing pin component—also renders it a paperweight.[7] Ex. 1 at 33. Furthermore, its substantial physical size and obvious appearance as a firearm or firearm component (complete with a trigger guard and handgrip) render it readily detectable by X-ray machines, millimeter wave machines, pat-downs, and physical bag searches. Of course, as noted *supra*, Aguirre has not been proffered as an expert in firearms functionality, nor is there any evidence that she could qualify as one.

Moreover, assuming, *arguendo*, that the Liberator, as designed, could somehow be converted into a working, undetectable gun, the design itself is not for an undetectable (i.e., illegal, per 18 U.S.C. § 922(p)) firearm. *Id.* at ¶¶ 14, 33. Just as a long-barreled shotgun is not regulated under the National Firearms Act because it might be sawed off with a hacksaw, the constitutionally-protected sharing of the Liberator files on domestic web sites should not be restrained based on the speculative (and false) theory that someone could remove all of the metal components from it and still have a functioning firearm. Moreover, plans and instructions for building much more easily concealable (though equally capable of firing projectiles) devices such as pen guns or "zip" guns are widely available in books and on Internet forums.

The other items for which Plaintiffs have submitted commodity jurisdiction requests are

---

[7] For that matter, bullets are detectable.

similarly unlikely to create a threat to national security. For example, files substantially similar to Defense Distributed's AR-15 lower CAD files have long been hosted online by other individuals and organizations. App. 283-84. The alleged risk associated with the online posting of the "80% AR-15 lower receiver" Ghost Gunner CNC file Defendants identified as subject to the ITAR (App. 280-81) is even more attenuated, as the Internet is replete with downloadable CAD files for complete (as opposed to "80%" complete) AR-15 lower receivers.

Defendants rely heavily on *United States v. Chi Mak*, 683 F.3d 1126 (9th Cir. 2012), in pressing their "national security" shibboleth, but that case—involving the sharing of stolen military secrets—is wholly inapposite. *Chi Mak*'s China-bound CD containing encrypted "export-controlled naval technology," 683 F.3d at 1131, was not public speech, and the defendant was not a public speaker. In contrast, Plaintiffs seek to publish information lawfully possessed by them on the Internet. Notably, the *Chi Mak* court instructed the jury that the Government bore the burden of proving that the contested technical data was not in the public domain. *Id*. at 1132.

Here, in contrast, it is obvious that for many months (and, in some cases, for years), Defendants have been aware of other examples of online sharing of other CAD files for firearm and firearm component designs, and they have done nothing to stop such publication.[8] The CAD files for the Liberator itself remain available on the Internet (though not through Defense Distributed). Moreover, given the rapid development and availability of 3D scanners, including ones interfacing directly with 3D printers, it is difficult to see what safety gains, if any, might come from restricting Plaintiffs' fundamental liberties in this case. Wilson Supp. Decl., ¶ 48.

---

[8] App. 211-12, 283-84. Aguirre's claim that existing material identified as being in the public domain did not contain CAD files, Aguirre Decl. ¶ 29(c), is thus particularly baffling.

VI.    DEFENDANTS' CENSORSHIP CAUSES REAL, IRREPARABLE INJURY.

Defendants are entirely too dismissive of the fact that each additional day that passes

without relief being granted is an additional day in which Americans' free speech is stifled and

the right to keep and bear arms for self-defense is infringed. There is no serious dispute that, as a

matter of law, the public interest in protecting First and Second Amendment freedoms will be

irreparably harmed. *See Ezell v. City of Chicago*, 651 F.3d 684, 699 (7th Cir. 2011); *Wrenn v.*

*District of Columbia*, 2015 WL 3477748 at *9 (D.D.C. May 18, 2015). Defendants' reliance on

*Faculty Senate of Fla. Int'l U. v. Winn*, 477 F. Supp. 2d 1198 (S.D. Fla. 2007), for the

proposition that "limits on foreign academic research" do not cause irreparable First Amendment

harm, is spurious. The case involved the loss of travel funding, and the court merely applied the

familiar rule that money damages are not irreparable, but compensable. Had the Government

actually barred academic research, the opinion would have doubtless read very differently.

Defendants audaciously use their own two years of bureaucratic delay to argue that

Plaintiffs have waited too long to seek relief. Opp. at 8-9. But Plaintiffs jumped through every

hoop Defendants asked them to jump through, spending time and money in a good faith effort to

comply with Defendants' ambiguous, interminable regime. This lawsuit was filed on May 6,

2015, only 21 days after Defendants' April 15, 2015 response to Defense Distributed's Ghost

Gunner commodity jurisdiction requests, barring distribution of the Ghost Gunner files.

VII.    PLAINTIFFS HAVE STANDING TO RAISE THEIR SECOND AMENDMENT CLAIMS.

Defendants do not question Plaintiffs' standing to raise their First and Fifth Amendment

claims, assailing only Plaintiffs' Second Amendment standing on grounds that they do not,

themselves, seek to manufacture arms. But they have no real response to the simple fact that

"vendors and those in like positions . . . have been uniformly permitted to resist efforts at

10

restricting their operations by acting as advocates for the rights of third parties who seek access to their market or function," *Carey* v. *Pop. Servs. Int'l*, 431 U.S. 678, 684 (1977) (quotation omitted); *Reliable Consultants, Inc.* v. *Earle*, 517 F.3d 738, 743 (5th Cir. 2008); *Mance* v. *Holder*, No. 4:14-cv-539-O, 2015 U.S. Dist. LEXIS 16679, at *25 n.8 (N.D. Tex. Feb. 11, 2015).

To the extent it was not obvious to the Government, from the first set of declarations, that Plaintiffs' members, customers and visitors want to access the files for the purpose of manufacturing firearms for self-defense, that much is now made clear in the supplemental declarations. The attacks on SAF's associational standing are spurious. SAF easily meets the test for associational standing. Its members who have unambiguously declared their intent to download files from Defense Distributed and SAF's websites are barred from accessing files, are injured, and would thus "[a] otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Id.*; *Ass'n of Am. Physicians & Surgs. v. Tex. Med. Bd., (TMB)*, 627 F.3d 547, 550 (5th Cir. 2010).

VIII.   PLAINTIFFS WILL PREVAIL ON THEIR SECOND AMENDMENT CLAIMS.

As is often the case, the Government asserts a (specious) standing defense because it lacks any meaningful defense on the merits. Remarkably, there is no real answer to the Second Amendment claim *actually made* by the Plaintiffs. Defendants expend a great deal of effort arguing that the Second Amendment does not protect the right to export weapons. For the sake of argument, so stipulated.[9] But Plaintiffs are not claiming the right to export weapons. Plaintiffs,

---

[9]Although far from the issues raised in this case, it would appear that the Government can no more bar Americans from taking guns with them overseas for the purpose of self-defense, than it can ban Americans from leaving the country with their books or religious articles.

who have the exclusive and absolute authority to define their own claims, claim the right to acquire and manufacture arms. The Government does not appear to contest that much.

Obviously, restricting the Internet publication of 3D printing and CNC files used to manufacture firearms impacts this fundamental right, and so the Government bears a heightened scrutiny burden in proving the constitutionality of its restrictions. Even were the Court to assume, for the sake of argument, that Internet publication is a form of export, it is not, like sailing a container ship into the ocean *purely* so. Is the Internet not used by American citizens, within the United States, to exchange information? Plaintiffs' Internet publication will, as intended, cause information to be delivered, received, and used domestically. However many foreign downloads Defendants might stop, banning this activity infringes Second Amendment rights within the United States.

With respect to step-two of the Second Amendment inquiry, Defendants assume without discussion that intermediate scrutiny would apply. Why? Their action impedes the exercise of core Second Amendment rights by responsible, law-abiding Americans. And even under intermediate scrutiny, Defendants barely attempt to show why such a breathtakingly radical restriction—banishing all firearms-related technical data from the Internet—would constitutionally "fit" their interests.

Indeed, the Supreme Court has recognized that when two constitutional rights work "in conjunction," they "reinforc[e]" each other, forming a "hybrid claim." *Employment Div., Dep't of Human Res. of Or. v. Smith*, 494 U.S. 872, 881-82 (1990). These claims warrant "heightened scrutiny." *See Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984). The first two Amendments work in tandem to protect expressive content about the right to keep and bear arms.

12

IX.   DEFENDANTS' DEFINITION OF "EXPORT" IS UNCONSTITUTIONALLY OVERBROAD.

Defendants' surreal construction of the term "export" cannot be reconciled with the First Amendment's protection of speech that is accessible to foreign persons—even if it affects national security. Under Defendants' view, the State Department could require the *New York Times* to seek permission to "export" the Pentagon Papers—also known as publishing a newspaper—lest a foreigner read the article over the shoulder of a U.S. citizen. *Cf. New York Times*, supra, 403 U.S. 713. To avoid the constitutional difficulties with the government's interpretation of the statute, this Court should construe the meaning of "export" as narrowly as possible, excluding the infinite construction that includes sharing public information onto the Internet.[10] The Government's position threatens Americans' basic freedom to communicate amongst themselves via the Internet.

Echoing its response to the Second Amendment claim, the Government remains willfully oblivious to the fact that Internet speech frequently occurs domestically, exclusively between two Americans. But also echoing its claims regarding the lack of a Second Amendment right to export arms, Defendants assert that Plaintiffs enjoy no First Amendment rights overseas. Perhaps it is not definitively clear that the Government is wrong on this claim, but close enough: "When the Government reaches out to punish a citizen who is abroad, the shield which the Bill of Rights and other parts of the Constitution provide to protect his life and liberty should not be stripped away just because he happens to be in another land." *Reid* v. *Covert*, 354 U.S. 1, 6 (1957)

---

[10] *Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Const. Trades Council*, 485 U.S. 568, 578 (1988) ("the section is open to a construction that obviates deciding whether a congressional prohibition of handbilling on the facts of this case would violate the First Amendment"); *N.L.R.B. v. Catholic Bishop of Chicago*, 440 U.S. 490, 500 (1979) ("an Act of Congress ought not be construed to violate the Constitution if any other possible construction remains available.").

13

(plurality opinion); cf. *Rasul* v. *Myers*, 563 F.3d 527, 531 (D.C. Cir. 2009) (per curiam). And while "practical considerations" may inform the question of what rights Americans enjoy *overseas*, *Boumediene* v. *Bush*, 553 U.S. 723, 761-62 (2008), the only relevant Americans here are on American soil.[11]

X.   DEFENDANTS' APPLICATION OF ITAR IS NOT CONTENT NEUTRAL.

Defendants argue that strict scrutiny should not apply to ITAR's export controls, as those controls are allegedly content-neutral. Opp. at 15.  According to Defendants, their national security and foreign-policy based purpose is the controlling consideration in determining the content neutrality of the export controls in question. *Id.* (citing *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)). But last week's Supreme Court decision in *Reed v. Gilbert*, 2015 WL 2473374, *8 (U.S. June 18, 2015), distinguishes *Ward*, recognizing that a government's purpose is not relevant when a law is content-based on its face. "[A] speech regulation targeted at a specific subject matter is content based even if it does not discriminate among viewpoints within that subject matter."  2015 WL 2473374 at *9 (citing *Consolidated Edison Co. of N.Y. v. Public Serv. Comm'n of N.Y.*, 447 U.S. 530, 537 (1980)). When a particular type of speech (or speaker) is given treatment that is different from another kind of speech (or speaker), strict scrutiny applies. *Id.* at 10-12. Here, Plaintiffs' Internet speech is regulated based on the fact that it pertains to firearms. *Reed* clearly holds that strict scrutiny applies.

XI.   DEFENDANTS' ITAR REVIEW PROCESS CREATES AN INTERMINABLE PRIOR RESTRAINT.

In response to the charge that its imposition of ITAR on Plaintiffs creates a prior

---

[11] Defendants' allegation that Plaintiffs' First Amendment rights are coterminous with the threatened expressive rights of *all* third parties, Opp. at 21, is speculative. A regulation as broad and arbitrary as Defendants' may have numerous unforeseeable applications.

restraint, Defendants respond that Defense Distributed can simply file a commodity jurisdiction request for a quick resolution of any issues. This is, at best, a rose-colored view of the process. The government casually notes that "[o]n June 21, 2013, Defense Distributed filed CJ requests for the ten items identified in the DDTC letter." Opp. at 5. Two paragraphs, and two years later, the brief continues, "On June 4, 2015, review of Defense Distributed's first ten requests was completed." Opp. at 6. It was during this two-year delay that Plaintiffs' speech rights were censored, and held in limbo. Defendants dare to suggest that Plaintiffs' "claim of imminent irreparable injury is significantly undermined by the[] delay in seeking judicial relief." Opp. at 8. However, not until Plaintiffs filed suit did Defendants *finally* reply to the Liberator commodity jurisdiction request. In contrast, the commodity jurisdiction request for the Ghost Gunner was resolved in only four months—shortly after this litigation commenced. The Government's disparate processing of the commodity jurisdiction requests provides even more evidence of the content-based nature of the procedures Defendants employ in administering their prior restraint.

Aguirre claims, "in my experience, the overwhelming majority of ITAR licensing applications are approved outright or approved with conditions intended to safeguard the defense article being exported." Aguirre Decl. at ¶ 33. However, Defendants do not identify any procedures used to review license applications for public speech. This failure is significant in light of Defense Distributed's January 5, 2015 request for licensing guidance which, to date, Defendants have not responded to. App. 305. Even if the prepublication requirement satisfies other First Amendment concerns, the Defendants' continued failure to provide any indicia of adequate procedures, defeats their prior restraint under both the First and Fifth Amendments.

CONCLUSION

The motion for preliminary injunction should be granted.

Dated:  June 24, 2015                        Respectfully submitted,

GURA & POSSESSKY, PLLC                       FISH & RICHARDSON P.C.

/s/ Alan Gura                                /s/ William B. Mateja
Alan Gura                                    William T. "Tommy" Jacks
Virginia Bar No. 68842*                      Texas State Bar No. 10452000
Gura & Possessky, PLLC                       William B. Mateja
105 Oronoco Street, Suite 305                Texas State Bar No. 13185350
Alexandria, Virginia 22314                   David S. Morris
703.835.9085 / Fax 703.997.7665             Texas State Bar No. 24032877
alan@gurapossessky.com                       FISH & RICHARDSON P.C.
                                             One Congress Plaza, Suite 810
                                             111 Congress Avenue
Matthew Goldstein                            Austin, Texas 78701
D.C. Bar No. 975000*                         (512) 472-5070 (Telephone)
Matthew A. Goldstein, PLLC                   (512) 320-8935 (Facsimile)
1012 14th Street NW, Suite 620               jacks@fr.com
Washington, DC 20005                         dmorris@fr.com
202.550.0040/Fax 202.683.6679                mateja@fr.com
matthew@goldsteinpllc.com

Josh Blackman
Virginia Bar No. 78292**
1303 San Jacinto Street
Houston, Texas 77002
202.294.9003/Fax: 713.646.1766
joshblackman@gmail.com


*Admitted pro hac vice
**Admission to W.D. Tex. Bar pending

16

Certificate of Service

The undersigned certifies that the foregoing document was filed electronically in compliance with Local Rule CV-5(a) on June 24, 2015, and was served on all counsel who are deemed to have consented to electronic service. Local Rule CV-5(b)(1). Any and all other counsel of record not deemed to have consented to electronic service were served with a true and correct copy of the foregoing by U.S. Mail and/or electronic mail on June 24, 2015.


/s/ William B. Mateja
William B. Mateja