IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| DEFENSE DISTRIBUTED, ET AL., | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| V. | § | 1-15-CV-372  RP |
| | § | |
| UNITED STATES DEPARTMENT OF | § | |
| STATE, ET AL., | § | |
| | § | |
| Defendants. | § | |

## ORDER

Before the Court are Plaintiffs' Motion for Preliminary Injunction, filed May 11, 2015 (Clerk's

Dkt. #7), Memorandum of Points and Authorities in Support of Plaintiffs' Motion for Preliminary

Injunction, filed May 11, 2015 (Clerk's Dkt. #8) and the responsive pleadings thereto.  The Court

conducted a hearing on the motion on July 6, 2015.  Having considered the motion, responsive

pleadings, record in the case, and the applicable law, the Court is of the opinion that Plaintiffs'

motion for a preliminary injunction should be denied.  *See* FED. R. CIV. P. 65(b).

## I.  BACKGROUND

Plaintiffs Defense Distributed and the Second Amendment Foundation ("SAF") bring this

action against defendants the United States Department of State, Secretary of State John Kerry,

the Directorate of Defense Trade Controls ("DDTC"), and employees of the DDTC  in their official

and individual capacities, challenging implementation of regulations governing the "export" of

"defense articles."

Under the Arms Export Control Act ("AECA"), "the President is authorized to control the

import and the export of defense articles and defense services" and to "promulgate regulations for

the import and export of such articles and services."  22 U.S.C. § 2778(a)(1).  The AECA imposes

both civil and criminal penalties for violation of its provisions and implementing regulations,

including monetary fines and imprisonment. *Id*. § 2278(c) & (e). The President has delegated his authority to promulgate implementing regulations to the Secretary of State. Those regulations, the International Traffic in Arms Regulation ("ITAR"), are in turn administered by the DDTC and its employees. 22 C.F.R. 120.1(a).

The AECA directs that the "defense articles" designated under its terms constitute the United States "Munitions List." 22 U.S.C. § 2278(a)(1). The Munitions List "is not a compendium of specific controlled items," rather it is a "series of categories describing the kinds of items" qualifying as "defense articles." *United States v. Zhen Zhou Wu*, 711 F.3d 1, 12 (1st Cir.) *cert. denied sub nom. Yufeng Wei v. United States*, 134 S. Ct. 365 (2013). Put another way, the Munitions List contains "attributes rather than names." *United States v. Pulungan*, 569 F.3d 326, 328 (7th Cir. 2009) (explaining "an effort to enumerate each item would be futile," as market is constantly changing). The term "defense articles" also specifically includes "technical data recorded or stored in any physical form, models, mockups or other items that reveal technical data directly relating to items designated in" the Munitions List. 22 C.F.R. § 120.6

A party unsure about whether a particular item is a "defense article" covered by the Munitions List may file a "commodity jurisdiction" request with the DDTC. *See* 22 C.F.R. § 120.4 (describing process). The regulations state the DDTC "will provide a preliminary response within 10 working days of receipt of a complete request for commodity jurisdiction." *Id*. § 120.4(e). If a final determination is not provided after 45 days, "the applicant may request in writing to the Director, Office of Defense Trade Controls Policy that this determination be given expedited processing." *Id*.

According to Plaintiffs, Defense Distributed publishes files on the Internet as a means of fulfilling its primary missions to promote the right to keep and bear arms and to educate the public, as well as generating revenue. Specifically, in December 2012 Defense Distributed made available for free on the Internet privately generated technical information regarding a number of gun-related

items (the "Published Files"). (Compl. ¶¶ 22-24). Plaintiffs allege that, on May 8, 2013, Defendants sent Defense Distributed a letter stating:

> DTCC/END is conducting a review of technical data made publicly available by Defense Distributed through its 3D printing website, DEFCAD.org, the majority of which appear to be related to items in Category I of the [Munitions List]. Defense Distributed may have released ITAR-controlled technical data without the required prior authorization from the Directorate of Defense Trade Controls (DDTC), a violation of the ITAR.

(*Id*. ¶ 25).

Plaintiffs state they promptly removed the Published Files from the Internet. Further, per instruction in the May 2013 letter, Plaintiffs submitted commodity jurisdiction requests covering the Published Files on June 21, 2013. According to Plaintiffs, they have not received a response to the requests from Defendants. (*Id*. ¶¶ 26-29).

Plaintiffs further allege that, on September 25, 2014, Defense Distributed sent a request for prepublication approval for public release of files containing technical information on a machine named the "Ghost Gunner" that can be used to manufacture a variety of items, including gun parts (the "Ghost Gunner Files").[1] Following resubmission of the request, on April 13, 2015, DDTC determined that the Ghost Gunner machine, including the software necessary to build and operate the Ghost Gunner machine, is not subject to ITAR, but that "software, data files, project files, coding, and models for producing a defense article, to include 80% AR-15 lower receivers, are subject to the jurisdiction of the Department of State in accordance with [ITAR]." (*Id*. ¶¶ 28-33).

In addition, Plaintiffs allege that since September 2, 2014, Defense Distributed has made multiple requests to DOPSR for prepublication review of certain computer-aided design ("CAD") files. In December 2014, DOPSR informed Defense Distributed that it refused to review the CAD files. The DOPSR letter directed Defense Distributed to the DDTC Compliance and Enforcement

---

[1] According to Plaintiffs, Defendants identify the Department of Defense Office of Prepublication Review and Security ("DOPSR") as the government agency from which private persons must obtain prior approval for publication of privately generated technical information subject to ITAR control. (Compl. ¶ 28).

Division for further questions on public release of the CAD files. Defense Distributed has sought additional guidance on the authorization process, but to date, Defendants have not responded. (*Id.* ¶¶ 34-36).

Plaintiffs filed this action on April 29, 2015, raising five separate claims. Specifically, Plaintiffs assert that the imposition by Defendants of a prepublication approval requirement for "technical data" related to "defense articles" constitutes: (1) an ultra vires government action; (2) a violation of their rights to free speech under the First Amendment; (3) a violation of their right to keep and bear arms under the Second Amendment; and (4) a violation of their right to due process of law under the Fifth Amendment. Plaintiffs also contend the violations of their constitutional rights entitled them to monetary damages under *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971). Plaintiffs now seek a preliminary injunction enjoining the enforcement of any prepublication approval requirement against unclassified information under the ITAR, specifically including all files Defense Distributed has submitted for DOPSR review. The parties have filed responsive pleadings. The Court conducted a hearing on July 6, 2015 and the matter is now ripe for review.

## II.  STANDARD OF REVIEW

A preliminary injunction is an extraordinary remedy and the decision to grant a preliminary injunction is to be treated as the exception rather than the rule. *Valley v. Rapides Parish Sch. Bd.,* 118 F.3d 1047, 1050 (5th Cir. 1997). The party seeking a preliminary injunction may be granted relief *only* if the moving party establishes: (1) a substantial likelihood of success on the merits; (2) a substantial threat that failure to grant the injunction will result in irreparable injury; (3) that the threatened injury out-weighs any damage that the injunction may cause the opposing party; and (4) that the injunction will not disserve the public interest. *See Hoover v. Morales,* 146 F.3d 304, 307 (5th Cir.1998); *Wenner v. Texas Lottery Comm'n,* 123 F.3d 321, 325 (5th Cir. 1997); *Cherokee*

*Pump & Equip. Inc. v. Aurora Pump,* 38 F.3d 246, 249 (5th Cir. 1994). To show a substantial likelihood of success, "the plaintiff must present a prima facie case, but need not prove that he is entitled to summary judgment." *Daniels Health Sciences, L.L.C. v. Vascular Health Sciences, L.L.C.*, 710 F.3d 579, 582 (5th Cir. 2013). *See also Janvey v. Alguire*, 647 F.3d 585, 596 (5th Cir. 2011) (same, citing CHARLES ALAN WRIGHT, ARTHUR R. MILLER, MARY KAY KANE, 11A FEDERAL PRACTICE & PROCEDURE § 2948.3 (2d ed. 1995) ("All courts agree that plaintiff must present a prima facie case but need not show that he is certain to win.")). The party seeking a preliminary injunction must clearly carry the burden of persuasion on all four requirements to merit relief. *Mississippi Power & Light Co.,* 760 F.2d 618, 621 (5th Cir. 1985).

## III.  ANALYSIS

Defendants maintain Plaintiffs have not established any of the four requirements necessary to merit grant of a preliminary injunction. Plaintiffs, of course, disagree. The Court will briefly address the parties' arguments concerning the final three requirements before turning to the core, and dispositive question, whether Plaintiffs have shown a likelihood of success on the merits of their clairms.

### A.  Injury and Balancing of Interests

Defendants suggest Plaintiffs' contention that they face irreparable injuy absent immediate relief is rebutted by their delay in filing this lawsuit. However, the Supreme Court has stated that the "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *see also Palmer v. Waxahachie Indep. Sch. Dist.*, 579 F.3d 502, 506 (5th Cir. 2009) (the "loss of First Amendment freedoms for even minimal periods of time constitutes irreparable injury justifying the grant of a preliminary injunction."). The Second Amendment protects "similarly intangible and unquantifiable interests" and a deprivation is thus considered irreparable. *Ezell v. City of Chicago*, 651 F.3d 684,

699 (7th Cir. 2011) ("for some kinds of constitutional violations, irreparable harm is presumed"). The Court thus has little trouble concluding Plaintiffs have shown they face a substantial threat of irreparable injury.

The Court has much more trouble concluding Plaintiffs have met their burden in regard to the final two prongs of the preliminary injunction inquiry. Those prongs require weighing of the respective interests of the parties and the public. Specifically, that the threatened injury out-weighs any damage that the injunction may cause the opposing party and that the injunction will not disserve the public interest. In this case, the inquiry essentially collapses because the interests asserted by Defendants are in the form of protecting the public by limiting access of foreign nationals to "defense articles."

Plaintiffs rather summarily assert the balance of interests tilts in their favor because "[I]t is always in the public interest to prevent the violation of a party's constitutional rights." *Awad v. Ziriax*, 670 F.3d 1111, 1132 (10th Cir. 2012); *see also Jackson Women's Health Org. v. Currier*, 760 F.3d 448, 458 n.9 (5th Cir. 2014) (district court did not abuse its discretion in finding injunction would not disserve public interest because it will prevent constitutional deprivations). They further assert that an injunction would not bar Defendants from controlling the export of classified information.

The Court finds neither assertion wholly convincing. While Plaintiffs' assertion of a public interest in protection of constitutional rights is well-taken, it fails to consider the public's keen interest in restricting the export of defense articles. *See Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24-25 (2008) (discussing failure of district court to consider injunction's adverse impact on public interest in national defense); *Am. Civil Liberties Union v. Clapper*, 785 F.3d 787, 826 (2nd Cir. 2015) (characterizing maintenance of national security as "public interest of the highest order"). It also fails to account for the interest – and authority – of the President and Congress in matters of foreign policy and export. *See Haig v. Agee*, 453 U.S. 280, 292 (1981) (matters relating to

conduct of foreign relations "are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference"); *United States v. Pink*, 315 U.S. 203, 222–23 (1942) (conduct of foreign relations "is committed by the Constitution to the political departments of the Federal Government"); *Spectrum Stores, Inc. v. Citgo Petroleum Corp.*, 632 F.3d 938, 950 (5th Cir. 2011) (matters implicating foreign relations and military affairs generally beyond authority of court's adjudicative powers).

As to Plaintiff's second contention, that an injunction would not bar Defendants from controlling the export of classified information, it is significant that Plaintiffs maintain the posting of files on the Internet for free download does not constitute "export" for the purposes of the AECA and ITAR. But Defendants clearly believe to the contrary. Thus, Plaintiffs' contention that the grant of an injunction permitting them to post files that Defendants contend are governed by the AECA and ITAR would not bar Defendants from controlling "export" of such materials stand in sharp constrast to Defendants' assertion of the public interest. The Court thus does not believe Plaintiffs have met their burden as to the final two prongs necessary for granting Plaintiffs a preliminary injunction. Nonetheless, in an abundance of caution, the Court will turn to the core of Plaintiffs' motion for a preliminary injunction, whether they have shown a likelihood of success on their claims

**B. Ultra Vires**

Plaintiffs first argue Defendants are acting beyond the scope of their authority in imposing a prepublication requirement on them under the AECA. A federal court has no subject matter jurisdiction over claims against the United States unless the government waives its sovereign immunity and consents to suit. *Danos v. Jones*, 652 F.3d 577, 581 (5th Cir. 2011) (citing *FDIC v. Meyer*, 510 U.S. 471, 475 (1994)). The ultra vires exception to sovereign immunity provides that "where the officer's powers are limited by statute, his actions beyond those limitations are considered individual and not sovereign actions," or "ultra vires his authority," and thus not

protected by sovereign immunity.  *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 689 (1949).  To fall within the ultra vires exception to sovereign or governmental immunity, a plaintiff must "do more than simply allege that the actions of the officer are illegal or unauthorized." *Danos*, 652 F.3d at 583.  Rather, the complaint must allege facts sufficient to establish that the officer was acting "without any authority whatever," or without any "colorable basis for the exercise of authority."  *Id*. (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 101 n.11 (1984)).

The statute at issue provides:

> In furtherance of world peace and the security and foreign policy of the United States, the President is authorized to control the import and the export of defense articles and defense services and to provide foreign policy guidance to persons of the United States involved in the export and import of such articles and services. The President is authorized to designate those items which shall be considered as defense articles and defense services for the purposes of this section and to promulgate regulations for the import and export of such articles and services.

22 U.S.C. § 2778(a)(1).  "Export" is defined, in pertinent part, as including "[d]isclosing (including oral or visual disclosure) or transferring technical data to a foreign person whether in the United States or abroad."  22 C.F.R. § 120.17(a)(4).  Plaintiffs argue this definition falls outside Congressional intent in authorizing restriction of export of defense articles because, as interpreted by Defendants, it includes public speech within the United States.

Notably, Plaintiffs do not suggest Defendants lack authority under the AECA to regulate export of defense articles.  Further, under the AECA, decisions are required to

> take into account whether the export of an article would contribute to an arms race, aid in the development of weapons of mass destruction, support international terrorism, increase the possibility of outbreak or escalation of conflict, or prejudice the development of bilateral or multilateral arms control or nonproliferation agreements or other arrangements.

22 U.S.C. § 2778(a)(2).  Defense Distributed admits its purpose is "facilitating *global* access to, and the collaborative production of, information and knowledge related to the three-dimensional ("3D") printing of arms."  (Compl. ¶ 1) (emphasis added).  Facilitating global access to firearms

8

undoubtedly "increase[s] the possibiliity of outbreak or escalation of conflict." Defense Distributed, by its own admission, engages in conduct which Congress authorized Defendants to regulate. Plaintiffs have not, therefore, shown Defendants are acting without any "colorable basis for the exercise of authority." Accordingly, they have not shown a likelihood of success on their ultra vires challenge.

## C. First Amendment

Plaintiffs next argue Defendants' interpretation of the AECA violates their First Amendment right to free speech. In addressing First Amendment claims, the first step is to determine whether the claim involves protected speech, the second step is to identify the nature of the forum, and the third step is to assess whether the justifications for exclusion from the relevant forum satisfy the requisite standard. *Cornelius v. NAACP Legal Defense & Educ. Fund, Inc.*, 473 U.S. 788, 797 (1985).

As an initial matter, Defendants argue the computer files at issue do not constitute speech and thus no First Amendment protection is afforded. First Amendment protection is broad, covering "works which, taken as a whole, have serious literary, artistic, political, or scientific value, regardless of whether the government or a majority of the people approve of the ideas these works represent." *Miller v. California*, 413 U.S. 15, 34 (1973). *See also Brown v. Entm't Merchants Ass'n*, 131 S. Ct. 2729, 2733 (2011) (video games' communication of ideas and social messages suffices to confer First Amendment protection). Defendants, however, maintain the computer files at the heart of this dispute do not warrant protection because they consist merely of directions to a computer. In support, they rely on a Second Circuit opinion which held that computer instructions that "induce action without the intercession of the mind or the will of the recipient" are not constitutionally protected speech. *Commodity Futures Trading Comm'n v. Vartuli*, 228 F.3d 94, 111 (2nd Cir. 2000).

As Plaintiffs point out, one year later, the Second Circuit addressed the issue of whether computer code constitutes speech at some length in *Universal City Studios, Inc. v. Corley*, 273 F.3d 429 (2nd Cir. 2001).[2] The court made clear the fact that computer code is written in a language largely unintelligible to people was not dispositive, noting Sanskrit was similarly unintelligible to many, but a work written in that language would nonethless be speech. Ultimately, the court concluded "the fact that a program has the capacity to direct the functioning of a computer does not mean that it lacks the additional capacity to convey information, and it is the conveying of information that renders instructions 'speech' for purposes of the First Amendment." *Id*. at 447 (discussing other examples of "instructions" which qualified as speech under First Amendment). Similarly, the Sixth Circuit has found "[b]ecause computer source code is an expressive means for the exchange of information and ideas about computer programming . . . it is protected by the First Amendment," even though such code "has both an expressive feature and a functional feature." *Junger v. Daley*, 209 F.3d 481, 485 (6th Cir. 2000).

Although the precise technical nature of the computer files at issue is not wholly clear to the Court, Plaintiffs made clear at the hearing that Defense Distributed is interested in distributing the files as "open source." That is, the files are intended to be used by others as a baseline to be built upon, altered and otherwise utilized. Thus, at least for the purpose of the preliminary injunction analysis, the Court will consder the files as subject to the protection of the First Amendment.

In challenging Defendants' conduct, Plaintiffs urge this Court to conclude the ITAR's imposition of a prepublication requirement constitutes an impermissible prior restraint. Prior restraints "face a well-established presumption against their constitutionality." *Marceaux v. Lafayette City-Parish Consol. Gov't*, 731 F.3d 488, 493 (5th Cir. 2013). *See also Organization for*

---

[2] Defendants are correct that the *Corley* court did not overrule the decision in *Vartuli*. However, the *Corley* court itself distinguished the decision in *Vartuli* as limited, because it was based on the manner in which the code at issue was marketed. That is, the defendants themselves marketed the software as intended to be used "mechanically" and "without the intercession of the mind or the will of the recipient." *Corley*, 273 F.3d at 449 (quoting *Vartuli*, 228 F.3d at 111). Plaintiffs here have not so marketed or described the files at issue.

*a Better Austin v. Keefe*, 402 U.S. 415, 419 (1971) ("Any prior restraint on expression comes ... with a 'heavy presumption' against its constitutional validity"); *Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 150–51 (1969) (noting "the many decisions of this Court over the last 30 years, holding that a law subjecting the exercise of First Amendment freedoms to the prior restraint of a license without narrow, objective, and definite standards to guide the licensing authority, is unconstitutional"). "[A] system of prior restraint avoids constitutional infirmity only if it takes place under procedural safeguards designed to obviate the dangers of a censorship system." *Collins v. Ainsworth*, 382 F.3d 529, 539 (5th Cir. 2004) (quoting *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 559 (1975)).

The "heavy presumption" against constitutional validity of prior restraint is not, however, "a standard of review, and judicial decisions analyzing prior restraints have applied different standards of review depending on the restraint at issue." *Catholic Leadership Coal. of Tex. v. Reisman*, 764 F.3d 409, 438 (5th Cir. 2014). *See, e.g.*, *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 33 (1984) (order prohibiting dissemination of discovered information before trial "is not the kind of classic prior restraint that requires exacting First Amendment scrutiny"); *Perry v. McDonald*, 280 F.3d 159, 171 (2nd Cir. 2001) (context in which prior restraint occurs affects level of scrutiny applied);, 192 F.3d 742, 749 (7th Cir. 1999) ("We note initially that the [plaintiff] is simply wrong in arguing that all prior restraints on speech are analyzed under the same test.").

No party suggests posting of information on the Internet for general free consumption is not a public forum. The next inquiry is thus the applicable level of protection afforded to the files at issue. Content-neutral restrictions on speech are examined under intermediate scrutiny, meaning they are permissible so long as they are narrowly tailored to serve a significant governmental interest and leave open ample alternative channels for communication of the information. *Turner Broad. Sys. v. FCC*, 520 U.S. 180, 213–14 (1997); *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989). Content-based restrictions are examined under strict scrutiny, meaning they must be

narrowly drawn to effectuate a compelling state interest. *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 46 (1983).

Not surprisingly, the parties disagree as to whether the ITAR imposes content-based restrictions. "Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed." *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2227 (2015). Plaintiffs here argue, because the regulations restrict speech concerning the entire topic of "defense articles" the regulation is content-based. "A regulation is not content-based, however, merely because the applicability of the regulation depends on the content of the speech." *Asgeirsson v. Abbott*, 696 F.3d 454, 459 (5th Cir. 2012). Rather, determination of whether regulation of speech is content-based "requires a court to consider whether a regulation of speech 'on its face' draws distinctions based on the message a speaker conveys." *Reed*, 135 S. Ct. at 2227. *See also Ward*, 491 U.S. at 791 (principal inquiry in determining content-neutrality, "is whether the government has adopted a regulation of speech because of disagreement with the message it conveys").

Employing this inquiry, the Supreme Court has found regulations to be content-neutral where the regulations are aimed not at suppressing a message, but at other "secondary effects." For example, the Supreme Court upheld a zoning ordinance that applied only to theaters showing sexually-explicit material, reasoning the regulation was content-neutral because it was not aimed at suppressing the erotic message of the speech but instead at the crime and lowered property values that tended to accompany such theaters. *Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 47–48 (1986). The Supreme Court similarly upheld a statute establishing buffer zones only at clinics that performed abortions, concluding the statute did not draw content-based distinctions as enforcement authorities had no need to examine the content of any message conveyed and the stated purpose of the statute was public safety. *McCullen v. Coakley*, 134 S. Ct. 2518, 2531 (2014) (noting violation of statute depended not "on what they say," but "simply on where they say it"). The

Fifth Circuit has likewise found regulations content-neutral, even where the regulation governed a specific topic of speech. *See Kagan v. City of New Orleans*, 753 F.3d 560, 562 (5th Cir. 2014), *cert. denied*, 135 S. Ct. 1403 (2015) (upholding regulation requiring license for a person to charge for tours to City's points of interest and historic sites, "for the purpose of explaining, describing or generally relating the facts of importance thereto," finding regulation "has no effect whatsoever on the content of what tour guides say"); *Asgeirsson*, 696 F.3d at 461 (holding Texas' Open Meeting Act, prohibiting governmental body from conducting closed meetings during which public business or public policy over which the governmental body has supervision or control is discussed, to be content-neutral, because closed meetings: (1) prevent transparency; (2) encourage fraud and corruption; and (3) foster mistrust in government).

The ITAR, on its face, clearly regulates disclosure of "technical data" relating to "defense articles." The ITAR thus unquestionably regulates speech concerning a specific topic. Plaintiffs suggest that is enough to render the regulation content-based, and thus invoke strict scrutiny. Plaintiffs' view, however, is contrary to law. The Fifth Circuit rejected a similar test, formulated as "[a] regulatory scheme that requires the government to 'examine the content of the message that is conveyed' is content-based regardless of its motivating purpose," finding the proposed test was contrary to both Supreme Court and Fifth Circuit precedent. *Asgeirsson*, 696 F.3d at 460.

The ITAR does not regulate disclosure of technical data based on the message it is communicating. The fact that Plaintiffs are in favor of global access to firearms is not the basis for regulating the "export" of the computer files at issue. Rather, the export regulation imposed by the AECA is intended to satisfy a number of foreign policy and national defense goals, as set forth above. Accordingly, the Court concludes the regulation is content-neutral and thus subject to intermediate scrutiny. *See United States v. Chi Mak*, 683 F.3d 1126, 1135 (9th Cir. 2012) (finding the AECA and its implementing regulations are content-neutral).

The Supreme Court has used various terminology to describe the intermediate scrutiny

standard. *Compare Ward*, 491 U.S. at 798 ("a regulation of the time, place, or manner of protected speech must be narrowly tailored to serve the government's legitimate, content-neutral interests but that it need not be the least restrictive or least intrusive means of doing so"), with *Bd. of Trs. of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 480 (1989) (requiring "the government goal to be substantial, and the cost to be carefully calculated," and holding "since the State bears the burden of justifying its restrictions, it must affirmatively establish the reasonable fit we require"), and *Turner*, 520 U.S. at 189 (regulation upheld under intermediate scrutiny if it "further[s] an important or substantial governmental interest unrelated to the suppression of free speech, provided the incidental restrictions d[o] not burden substantially more speech than is necessary to further those interests"). The Court will employ the Fifth Cicuit's most recent enunciation of the test, under which a court must sustain challenged regulations "if they further an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." *Time Warner Cable, Inc. v. Hudson*, 667 F.3d 630, 641 (5th Cir. 2012)

The Court has little trouble finding there is a substantial governmental interest in regulating the dissemination of military information. Plaintiffs do not suggest otherwise. *See Holder v. Humanitarian Law Project*, 561 U.S. 1, 28 (2010) (noting all parties agreed government's interest in combating terrorism "is an urgent objective of the highest order"). Nor do Plaintiffs suggest the government's regulation is directed at suppressing free expression. Rather, they contend the regulations are not sufficiently tailored so as to only incidentally restrict their freedom of expression.

The only circuit to address whether the AECA and ITAR violate the First Amendment has concluded the regulatory scheme survives such a challenge. In so doing, the Ninth Circuit concluded the technical data regulations substantially advance the government's interest, unrelated to the suppression of expression, because the regulations provide clear procedures for seeking

14

necessary approval. *Chi Mak*, 683 F.3d at 1135 (citing 22 C.F.R § 120.10(a) (the determination of designation of articles or services turns on whether an item is "specifically designed, developed, configured, adapted, or modified for a military application, and has significant military or intelligence applicability such that control under this subchapter is necessary")). The Ninth Circuit also concluded the regulations were not more burdensome than necessary, noting the "ITAR makes a point to specifically exclude numerous categories from designation, such as general scientific, mathematical, or engineering papers." *Id.* (citing *Humanitarian Law Project*, 561 U.S. at 29 (upholding material support statute against First Amendment challenge where the statute provided narrowing definitions to avoid infringing upon First Amendment interests)).[3]

Plaintiffs' challenge here is based on their contention that Defendants have applied an overbroad interpretation of the term "export." Specifically, Plaintiffs argue that viewing "export" as including public speech, including posting of information on the Internet, imposes a burden on expression which is greater than is essential to the furtherance of the government's interest in protecting defense articles.

But a prohibition on Internet posting does not impose an insurmountable burden on Plaintiffs' domestic communications. This distinction is significant because the AECA and ITAR do not prohibit domestic communications. As Defendants point out, Plaintiffs are free to disseminate the computer files at issue domestically in public or private forums, including via the mail or any other medium that does not provide the ability to disseminate the information internationally.

Nor is the Court convinced by Plaintiffs' suggestion that the ban on Internet posting does not prevent dissemination of technical data outside national borders, and thus does not further the

---

[3] The Ninth Circuit has also rejected a First Amendment challenge to the AECA's predecessor, the Mutual Security Act of 1954. *See United States v. Edler Indus., Inc.*, 579 F.2d 516, 521 (9th Cir. 1978) (holding statute and regulations not overbroad in controlling conduct of assisting foreign enterprises to obtain military equipment and related technical expertise and licensing provisions of statute not an unconstitutional prior restraint on speech).

government's interests under the AECA. The Ninth Circuit addressed and rejected a similar suggestion, namely that the only way the government can prevent technical data from being sent to foreign persons is to suppress the information domestically as well, explaining:

> This outcome would blur the fact that national security concerns may be more sharply implicated by the export abroad of military data than by the domestic disclosure of such data. Technical data that is relatively harmless and even socially valuable when available domestically may, when sent abroad, pose unique threats to national security. It would hardly serve First Amendment values to compel the government to purge the public libraries of every scrap of data whose export abroad it deemed for security reasons necessary to prohibit.

*United States v. Posey*, 864 F.2d 1487, 1496-97 (9th Cir. 1989).

The Court also notes, as set forth above, that the ITAR provides a method through the commodity jurisdiction request process for determining whether information is subject to its export controls. *See* 22 C.F.R. § 120.4 (describing process). The regulations include a ten day deadline for providing a preliminary response, as well as a provision for requesing expedited processsing. 22 C.F.R. § 120.4(e) (setting deadlines). Further, via Presidential directive, the DDTC is required to "complete the review and adjudication of license applications within 60 days of receipt." 74 Fed. Reg. 63497 (December 3, 2009). Plaintiffs thus have available a process for determining whether the speech they wish to engage in is subject to the licensing scheme of the ITAR regulations.

Accordingly, the Court concludes Plaintiffs have not shown a substantial likelihood of success on the merits of their claim under the First Amendment.

**D. Second Amendment**

Plaintiffs also argue the ITAR regulatory scheme violates their rights under the Second Amendment. Defendants contend Plaintiffs cannot succeed on this claim, both because they lack standing to raise it, and because the claim fails on the merits. As standing is jurisdictional, the Court will turn to that issue first.

### a. Standing

Article III of the Constitution limits the jurisdiction of federal courts to cases and controversies. *United States Parole Comm'n v. Geraghty*, 445 U.S. 388, 395 (1980). "One element of the case-or-controversy requirement is that [plaintiffs], based on their complaint, must establish that they have standing to sue." *Raines v. Byrd*, 521 U.S. 811, 818 (1997). This requirement, like other jurisdictional requirements, is not subject to waiver and demands strict compliance. *Raines*, 521 U.S. at 819; *Lewis v. Casey*, 518 U.S. 343, 349 n.1 (1996). To meet the standing requirement a plaintiff must show (1) she has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000); *Consol. Cos., Inc. v. Union Pacific R.R. Co.*, 499 F.3d 382, 385 (5th Cir. 2007); *Fla. Dep't of Ins. v. Chase Bank of Tex. Nat'l Ass'n*, 274 F.3d 924, 929 (5th Cir. 2001) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)). "The party invoking federal jurisdiction bears the burden of establishing these elements." *Lujan*, 504 U.S. at 561.

Defendants correctly point out Defense Distributed is in full possession of the computer files at issue and thus cannot argue it is being prevented from exercising its rights under the Second Amendment.[4] Plaintiffs maintain Defense Distributed nonetheless has standing because it is "entitled to assert the Second Amendment rights of [its] customers and website visitors." (Plf. Brf. at 27). A litigant is generally limited to asserting standing only on behalf of himself. *See Kowalski v. Tesmer*, 543 U.S. 125, 129 (2004) (a party "generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties"). The

---

[4] No party addressed whether a corporation such as Defense Distributed itself possesses Second Amendment rights.

Supreme Court has recognized a limited exception when the litigant seeking third-party standing has suffered an "injury in fact" giving him a "sufficiently concrete interest" in the outcome of the issue, the litigant has a "close" relationship with the third party on whose behalf the right is asserted and there is a "hindrance" to the third party's ability to protect his own interests. *Powers v. Ohio*, 499 U.S. 400, 411 (1991).

Plaintiffs argue they meet this test, asserting Defense Distributed acts as a "vendor" or in a like position by way of offering the computer files for download to visitors of its website. *See Carey v. Population Servs. Int'l*, 431 U.S. 678, 684 (1977) ("vendors and those in like positions . . . have been uniformly permitted to resist efforts at restricting their operations by acting as advocates for the rights of third parties who seek access to their market or function"); *Reliable Consultants, Inc. v. Earle*, 517 F.3d 738, 743 (5th Cir. 2008) (Supreme Court precedent holds providers of product have standing to attack ban on commercial transactions involving product). As an initial matter, it is not at all clear that distribution of information for free via the Internet constitutes a commercial transaction.[5] Moreover, Plaintiffs do not explain how visitors to Defense Distributed's website are hindered in their ability to protect their own interests. In fact, the presence of SAF as a plaintiff suggests to the contrary. Thus, whether Defense Distributed has standing to assert a claim of a violation of the Second Amendment is a very close question.

Lack of standing by one plaintiff is not dispositive, however. *See Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264 (1977) (court need not decide third-party standing question, "[f]or we have at least one individual plaintiff who has demonstrated standing to assert these rights as his own"). And SAF's standing presents a much less difficult question. It asserts it has standing, as an association, to assert the rights of its members. *See Warth v.*

---

[5] Defense Distributed describes itself as organized and operated "for the purpose of defending the civil liberty of popular access to arms guaranteed by the United States Constitution" through "facilitating global access to" information related to 3D printing of firearms, and specifically "to publish and distribute, *at no cost to the public*, such information and knowledge on the Internet in promotion of the public interest." (Compl. ¶ 1) (emphasis added).

*Seldin*, 422 U.S. 490, 511 (1975) ("[e]ven in the absence of injury to itself, an association may have standing solely as the representative of its members").  Associational standing requires showing: (1) the association's members have standing to sue in their own right; (2) the interests at issue are germane to the association's purpose; and (3) the participation of individual members in the lawsuit is not required.  *Ass'n of Am. Physicians & Surgeons, Inc. v. Tex. Med. Bd.*, 627 F.3d 547, 550-51 (5th Cir. 2010) (citing *Hunt v. Wash. St. Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977)).  "The first prong requires that at least one member of the association have standing to sue in his or her own right."  *National Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 185, 191 (5th Cir. 2012).

Defendants limit their challenge to SAF's standing solely to whether any of its members have standing to sue in their own right.  Specifically, Defendants contend SAF has merely asserted a conjectural injury, by suggesting its members would access computer files in the future.  In response, SAF has provided affidavit testimony from two of its members stating they would access the computer files at issue via the Defense Distributed website, study, learn from and share the files, but are unable to do so due to Defendants' interpretation of the ITAR regulatory scheme.  (Plf. Reply Exs. 3-4).  This testimony satisfies the "injury in fact" portion of the standing inquiry.

Defendants further contend any injury is not fairly traceable to their conduct.  They argue the ITAR does not prevent SAF members in the United States from acquiring the files directly from Defense Distributed.  But this argument goes to the burden imposed on SAF members, which is a question aimed at the merits of the claim, not standing.  *See Davis v. United States*, 131 S. Ct. 2419, 2434, n.10 (one must not "confus[e] weakness on the merits with absence of Article III standing").  In this case, the inability of SAF members to download the computer files at issue off the Internet is the injury in fact of the SAF members, and is clearly traceable to the conduct of Defendants.  The Court therefore finds SAF has standing to assert a claim of a violation of the Second Amendment.  *See Nat'l Rifle Ass'n*, 700 F.3d at 192 (NRA had standing, on behalf of its

members under 21, to bring suit challenging laws prohibitingfederal firearms licensees from selling handguns to 18-to-20-year-olds); *Ezell v. City of Chicago*, 651 F.3d 684, 696 (7th Cir. 2011) (SAF and Illinois Rifle Association had associational standing to challenge city ordinances requiring one hour of firing range training as prerequisite to lawful gun ownership and prohibiting all firing ranges in city)*; Mance v. Holder*, 2015 WL 567302, at *5 (N.D. Tex. Feb. 11, 2015) (non-profit organization dedicated to promoting Second Amendment rights had associational standing to bring action challenging federal regulatory regime as it relates to buying, selling, and transporting of handguns over state lines).

### b. Merits

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. The Supreme Court has recognized that the Second Amendment confers an individual right to keep and bear arms. *See District of Columbia v. Heller*, 554 U.S. 570, 595 (2008). The Fifth Circuit uses a two-step inquiry to address claims under the Second Amendment. The first step is to determine whether the challenged law impinges upon a right protected by the Second Amendment—that is, whether the law regulates conduct that falls within the scope of the Second Amendment's guarantee. The second step is to determine whether to apply intermediate or strict scrutiny to the law, and then to determine whether the law survives the proper level of scrutiny. *Nat'l Rifle Ass'n*, 700 F.3d at 194.

In the first step, the court is to "look to whether the law harmonizes with the historical traditions associated with the Second Amendment guarantee." *Id*. (citing *Heller*, 554 U.S. at 577-628). Defendants argue at some length that restriction by a sovereign of export of firearms and other weapons has a lengthy historical tradition. Plaintiffs do not contest otherwise. Rather, Plaintiffs contend the conduct regulated here impinges on the ability to manufacture one's own

firearms, in this case, by way of 3D printing.

While the founding fathers did not have access to such technology,[6] Plaintiffs maintain the ability to manufacture guns falls within the right to keep and bear arms protected by the Second Amendment. Plaintiffs suggest, at the origins of the United States, blacksmithing and forging would have provided citizens with the ability to create their own firearms, and thus bolster their ability to "keep and bear arms." While Plaintffs' logic is appealing, Plaintiffs do not cite any authority for this proposition, nor has the Court located any. The Court further finds telling that in the Supreme Court's exhaustive historical analysis set forth in *Heller*, the discussion of the meaning of "keep and bear arms" did not touch in any way on an individual's right to manufacture or create those arms. The Court is thus reluctant to find the ITAR regulations constitute a burden on the core of the Second Amendment.

The Court will nonetheless presume a Second Amendment right is implicated and proceed with the second step of the inquiry, determining the appropriate level of scrutiny to apply. Plaintiffs assert strict scrutiny is proper here, relying on their contention that a core Second Amendment right is implicated. However, the appropriate level of scrutiny "depends on the nature of the conduct being regulated *and* the degree to which the challenged law burdens the right." *Nat'l Rifle Ass'n*, 700 F.3d at 195 (emphasis added).

The burden imposed here falls well short of that generally at issue in Second Amendment cases. SAF members are not prevented from "possess[ing] and us[ing] a handgun to defend his or her home and family." *Id*. at 195 (citations omitted). The Fifth Circuit's decision in *National Rifle Association* is instructive. At issue was a regulatory scheme which prohibited federally licensed firearms dealers from selling handguns to persons under the age of twenty-one. The court reasoned that only intermediate scrutiny applied for three reasons: (1) an age qualification on

---

[6] Nonetheless, "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Heller*, 554 U.S. at 582.

commercial firearm sales was significantly different from a total prohibition on handgun possession; (2) the age restriction did not strike at the core of the Second Amendment by preventing persons aged eighteen to twenty from possessing and using handguns for home defense because it was not a historical outlier; and (3) the restriction only had temporary effect because the targeted group would eventually age out of the restriction's reach.  *Id*. at 205–07.  In this case, SAF members are not prohibited from manufacturing their own firearms, nor are they prohibited from keeping and bearing other firearms.  Most strikingly, SAF members in the United States are not prohibited from acquiring the computer files at issue directly from Defense Distributed.  The Court thus concludes only intermediate scrutiny is warranted here.  *See also Nat'l Rifle Ass'n of Am., Inc. v. McCraw*, 719 F.3d 338, 347-48 (5th Cir. 2013), *cert. denied*, 134 S. Ct. 1365 (2014) (applying intermediate scrutiny to constitutional challenge to state statute prohibiting 18-20-year-olds from carrying handguns in public).

As reviewed above, the regulatory scheme of the AECA and ITAR survives an intermediate level of scrutiny, as it advances a legitimate governmental interest in a not unduly burdensome fashion.  *See also McCraw*, 719 F.3d at 348 (statute limiting under 21-year-olds from carrying handguns in public advances important government objective of advancing public safety by curbing violent crime); *Nat'l Rifle Ass'n*, 700 F.3d at 209 ("The legitimate and compelling state interest in protecting the community from crime cannot be doubted.").  Accordingly, the Court finds Plaintiffs have not shown a substantial likelihood of success on the merits.

**E.  Fifth Amendment**

Plaintiffs finally argue the prior restraint scheme of the ITAR is void for vagueness and thus in violation of their right to due process.  "It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined."  *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972).  The Fifth Amendment prohibits the enforcement of vague criminal laws, but

the threshold for declaring a law void for vagueness is high. "The strong presumptive validity that attaches to an Act of Congress has led this Court to hold many times that statutes are not automatically invalidated as vague simply because difficulty is found in determining whether certain marginal offenses fall within their language." *United States v. Nat'l Dairy Prods. Corp*., 372 U.S. 29, 32 (1963). Rather, it is sufficient if a statute sets out an "ascertainable standard." *United States v. L. Cohen Grocery Co.*, 255 U.S. 81, 89 (1921). A statute is thus void for vagueness only if it wholly "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008).

Plaintiffs here assert broadly that ITAR is unconstitutionally vague because "persons of ordinary intelligence" must guess as to whether their speech would fall under its auspices. As an initial matter, the Court notes at least two circuits have rejected due process challenges to the AECA and ITAR, and upheld criminal convictions for its violation. *See Zhen Zhou Wu*, 711 F.3d at 13 (rejecting defendants' argument "that this carefully crafted regulatory scheme—which has remained in place for more than a quarter century—is unconstitutionally vague" as applied to them); *United States v. Hsu*, 364 F.3d 192, 198 (4th Cir. 2004) (holding the AECA and its implementing regulations not unconstitutionally vague as applied to defendants). Plaintiffs neither acknowledge those decisions nor explain how their rationale is inapplicable to their situation.

The Supreme Court has recently noted its precedent generally limits such challenges to "statutes that tied criminal culpability" to conduct which required "wholly subjective judgments without statutory definitions, narrowing context, or settled legal meanings." *Humanitarian Law Project*, 561 U.S. at 20 (quoting *Williams*, 553 U.S. at 306). Plaintiffs' challenge here is additionally hampered because they have not made precisely clear which portion of the ITAR language they believe is unconstitutionally vague.

To the degree Plaintiffs contend "defense articles" is vague, as Defendants point out, the

term "defense articles" is specifically defined to include items on the Munitions List, which contains twenty-one categories of governed articles, as well as information "which is required for the design, development, production, manufacture, assembly, operation, repair, testing, maintenance or modification of defense articles" which additionally "includes information in the form of blueprints, drawings, photographs, plans, instructions or documentation." *See* 22 C.F.R. §§ 120.6 (defining "defense articles"), 120.10 (a) (defining technical data) & 121.1 (Munitions List). Although lengthy, the cited regulations do not themselves include subjective terms, but rather identify items with significant specificity. For example, the first category "Firearms, Close Assault Weapons and Combat Shotguns" includes eight subcategories such as "Nonautomatic and semi-automatic firearms to caliber .50 inclusive (12.7 mm)," as well as six interpretations of the terms. 22 C.F.R. § 121.1. The Court has little trouble finding these provisions survive a vagueness challenge.

The term "export" is also defined in the ITAR, although at lesser length. At issue here, "export" is defined to include "[d]isclosing (including oral or visual disclosure) or transferring technical data to a foreign person, whether in the United States or abroad." 22 C.F.R. § 120.17(a)(4). Plaintiffs here admit they wish to post on the Internet, for free download, files which include directions for the 3D printing of firearms. Persons of ordinary intelligence are clearly put on notice by the language of the regulations that such a posting would fall within the defintion of export.

Accordingly, the Court concludes Plaintiffs have not shown a likelihood of success on the merits of their claim under the Fifth Amendment.

### IV.  CONCLUSION

Plaintiffs' Motion for Preliminary Injunction (Clerk's Dkt. #7) is hereby **DENIED**.

**SIGNED** on August 4, 2015.

ROBERT L. PITMAN
UNITED STATES DISTRICT JUDGE