UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| DEFENSE DISTRIBUTED, et al., | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | No. 1:15cv372-RP |
| | § | |
| U.S. DEPARTMENT OF STATE, et al., | § | |
| Defendants. | § | |

## INDIVIDUAL DEFENDANTS' MOTION TO DISMISS

This motion addresses the attempt by Plaintiff Defense Distributed to seek money damages from the personal assets of four federal employees: Kenneth Handelman, Edward Peartree, Sarah Heidema, and Glenn Smith. Defense Distributed contends that the State Department, which employs these four individuals, unconstitutionally applied federal arms-export controls to Defense Distributed's global distribution of electronic files designed to produce firearms. Defense Distributed has sued each of these individuals personally under a theory modeled on *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971).

This Court should dismiss these claims. First, the cause of action allowed in *Bivens* does not extend to this context, and even if it did, qualified immunity would protect the individual defendants, who violated no clearly established law. Second, the individual defendants are not amenable to personal jurisdiction in this forum. Third, to the extent Defense Distributed is attempting to assert the constitutional rights of potential recipients of its electronic files, it lacks standing to do so. Therefore, the individual defendants respectfully move under Federal Rule of Civil Procedure 12(b)(1), (2), and (6) to dismiss the claims against them.

## BACKGROUND

**Statutory & Regulatory Framework.** This Court's ruling on Plaintiffs' request for a preliminary injunction explains the arms-export controls at issue in this case. *See* Order 1-2, 7-9 (ECF No. 43). The statutory basis for those controls is the Arms Export Control Act (AECA), 22

U.S.C. § 2778. In passing the AECA, Congress sought to "further[] . . . world peace and the security and foreign policy of the United States" by empowering the President to "control . . . the export" of items he designates. *Id.* § 2778(a)(1). The AECA authorizes the creation of implementing regulations, *see id.*, which are called the ITAR (for International Traffic in Arms Regulations). Together, the AECA and the ITAR prohibit the unauthorized export of certain categories of items. *See id.* § 2778(a)(1), (b)(2); 22 C.F.R. §§ 120.1-.20. The State Department's Directorate of Defense Trade Controls (DDTC) administers the ITAR. *See* Order 2; Exec. Order No. 13,637(n)(i), 78 Fed. Reg. 16,129 (Mar. 8, 2013); 22 C.F.R. § 120.1(a).

Firearms and their components are among the items designated for export controls under the ITAR. *See United States v. Gonzalez*, No. 14-40344, 2015 WL 3874514, at *2 (5th Cir. June 23, 2015); 22 C.F.R. § 121.1, Category I(a), (h). The ITAR also governs exports of "[t]echnical data," that is, information "required for the design, development, production, [or] manufacture" of items, such as firearms, covered by the ITAR. 22 C.F.R. §§ 120.10(a), 121.1, Category I(i). A person "exports" technical data related to firearms by "sending or taking [it] out of the United States in any manner" or "disclosing . . . or transferring [it] to a foreign person, whether in the United States or abroad." *Id.* § 120.17(a)(1), (4). Doing so without authorization is prohibited. *See* 22 U.S.C. § 2778(b)(2), (g)(6).

**Factual Allegations.** Plaintiffs' factual allegations concern the application of these arms-export controls to the activities of Defense Distributed. Defense Distributed alleges that it is a corporation based in Austin, Texas, and "operated for the purpose of . . . facilitating global access to . . . information and knowledge related to the three-dimensional ('3D') printing of arms." Compl. ¶ 1. It further alleges that arms-export controls have been applied to at least three sets of electronic files it wants to distribute on the Internet.

Defense Distributed describes the first set of electronic files as "technical information" about "gun-related items." *Id.* ¶ 23. Defense Distributed began posting these files on the Internet in December 2012. *Id.* ¶ 24. In May 2013, unspecified "Defendants" sent a letter notifying Defense Distributed that it may have exported technical data covered by the ITAR without authorization. *Id*. ¶ 25. The letter directed Defense Distributed to the "commodity jurisdiction"

procedure to determine whether the files in question were subject to the ITAR. *Id.* ¶ 27. This procedure allows anyone unsure about whether something is covered by the ITAR to request an advance determination from the State Department. *See Gonzalez*, 2015 WL 3874514, at *4; Order 2; 22 C.F.R. § 120.4. In response to the letter, Defense Distributed allegedly removed these files from its server and submitted them to the commodity jurisdiction procedure. Compl. ¶¶ 26-27. DDTC had not issued a determination on whether the files were subject to the ITAR at the time Defense Distributed filed suit. *Id.* ¶ 29.[1]

The second set of electronic files had to do with the "Ghost Gunner," a machine "used to manufacture . . . gun parts." *Id.* ¶¶ 30, 32-33. In January 2015, following correspondence with the United States Department of Defense (DoD), Defense Distributed requested a commodity jurisdiction determination on files containing technical information about the Ghost Gunner. *Id.* ¶¶ 30-32. In April 2015, DDTC responded that "software, data files, project files, coding, and models" for producing gun components would be subject to the ITAR, but that the Ghost Gunner machine itself would not be. *Id.* ¶ 33.[2]

The third set of electronic files consisted of "computer-aided design (CAD) files," the content of which the Complaint does not specify. *Id.* ¶ 34. In January 2015, Defense Distributed sent a letter to unspecified "Defendants" asking for guidance on how to publicly release these electronic files. *Id.* ¶¶ 34, 36. Defense Distributed alleges that it had previously requested guidance from DoD, but that DoD referred the issue to DDTC, allegedly based "in whole or in part" on instructions from individual defendant Glenn Smith. *Id.* ¶¶ 34, 35. Defense Distributed had not received guidance from DDTC at the time the suit was filed. *Id.* ¶ 36.

**Plaintiffs' Claims.** Plaintiffs Defense Distributed and the Second Amendment Foundation assert that these applications of arms-export controls exceed what AECA authorizes and violate the First, Second, and Fifth Amendments. *See id.* ¶¶ 42-55, 57. In Counts One

---

[1] Defense Distributed has conceded that DDTC has since addressed its request for a commodity jurisdiction determination. *See* Notice Re: Commodity Jurisdiction Ruling (ECF No. 29).

[2] The letter referred to "software . . . for producing a defense article, to include 80% AR-15 lower receivers." *Id.* ¶ 33. An AR-15 is a type of gun. A receiver is the part of a gun that houses the firing mechanism. *See generally* 27 C.F.R. §§ 478.11, 479.11.

**Individual Defendants' Motion To Dismiss**                                                      3

through Four, Plaintiffs seek an injunction. *See* Compl. ¶¶ 42, 47, 51, 55. Although Plaintiffs refer to "Defendants" generally in reciting Counts One through Four, those claims could run only against the government itself, not individual federal employees. *See Scott v. Flowers*, 910 F.2d 201, 213 n.25 (5th Cir. 1990). Thus, the defendants on the injunctive claims are the State Department, DDTC, and various federal officers in their official capacities, *see Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985) (explaining that official-capacity claims are claims against the government).[3] Those claims will be addressed in a separate submission.

At issue in this motion is Count Five, the claim for money damages by Defense Distributed.[4] A damages action directly under the Constitution is called a "*Bivens* action" after *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), which allowed a plaintiff to sue federal law enforcement agents for damages based on alleged Fourth Amendment violations. *See Minneci v. Pollard*, 132 S. Ct. 617, 621 (2012). The Complaint names as defendants Mr. Handelman, Mr. Peartree, Ms. Heidema, and Mr. Smith, each of whom is "sued individually." Compl. ¶¶ 6-9. Aside from alleging that Mr. Smith told the Defense Department not to review certain files, *see id.* ¶ 35, the Complaint does not explain what Defense Distributed alleges each individual did personally. Rather, Defense Distributed's claims hinge on its allegations against "Defendants" collectively and its assertion that each individual defendant was "responsible" in some way for administration or enforcement of the ITAR, *see id.* ¶¶ 6-9, 57-59.

## ARGUMENT

Defense Distributed wants to force Mr. Handelman, Mr. Peartree, Ms. Heidema, and Mr. Smith each to pay money from his or her personal assets. That sort of claim against individual government employees is rightly disfavored. To proceed, Defense Distributed must show that

---

[3] Kenneth Handelman has moved from his former position as Deputy Assistant Secretary for Defense Trade Controls to a position with another federal agency. Therefore, his successor, Acting Deputy Assistant Secretary Anthony M. Dearth, has been automatically substituted as a defendant on all claims against Mr. Handelman in his official capacity. *See* Fed. R. Civ. P. 25(d); *Kentucky v. Graham*, 473 U.S. at 166 n.11.

[4] The Second Amendment Foundation is not mentioned in Count Five and does not assert any entitlement to damages. *See* Compl. ¶¶ 57-59, prayer ¶ 7.

**Individual Defendants' Motion To Dismiss**                                      **4**

this Court should create such a claim in this context without statutory authorization; that each individual defendant has violated clearly established law such that he or she is not immune from suit; that each defendant is amenable to personal jurisdiction in this forum; and that Defense Distributed has standing to raise any claims it may intend to assert on behalf of third parties. Defense Distributed has shown none of this, and its damages claims should therefore be dismissed.

## I.     Defense Distributed has failed to state a claim against the individual defendants.

Even assuming Defense Distributed's factual allegations were all true, as courts do in addressing motions under Rule 12(b)(6), *see Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), it still would not have stated any viable damages claim against the individual defendants for two independent reasons: (1) Defense Distributed lacks a cause of action, and (2) the individual defendants are immune. A court may dismiss on either ground without addressing the other. *See id.* at 675-76 (directing dismissal for failure to state a claim even assuming a *Bivens* action existed in a particular context).

### A.     Defense Distributed lacks a cause of action to sue the individual defendants for damages.

In attempting to sue the individual defendants, Defense Distributed incorrectly presumes the existence of a judicially created damages action like that allowed in *Bivens*, 403 U.S. 388. Such an action "is not an automatic entitlement." *Wilkie v. Robbins*, 551 U.S. 537, 550 (2007). "[B]ecause *Bivens* suits implicate grave separation of powers concerns, 'a decision to create a private right of action is one better left to legislative judgment in the great majority of cases.'" *de la Paz v. Coy*, 786 F.3d 367, 372-73 (5th Cir. 2015) (quoting *Sosa v. Alvarez-Machain*, 542 U.S. 692, 727 (2004)). Unlike the congressionally created remedy against state officials authorized by 42 U.S.C. § 1983, judicially created *Bivens* actions against federal officials apply only in "limited settings" and are "disfavored." *Iqbal*, 556 U.S. at 675-76. The Supreme Court "has been reluctant to extend *Bivens* liability to any new context or new category of defendants," *id.* (internal quotation marks omitted), and "in most instances" has "found a *Bivens* remedy unjustified." *Wilkie*, 551 U.S. at 550. In the last thirty-five years, the Court has not approved a

new *Bivens* action, but has consistently reversed appellate decisions attempting to create new causes of action for damages. *See de la Paz*, 786 F.3d at 372; *Vance v. Rumsfeld*, 701 F.3d 193, 198 (7th Cir. 2012) (en banc).

Defense Distributed nonetheless proposes that this Court extend *Bivens* to create a nonstatutory damages action against federal employees for the application of arms-export controls. This Court should reject that proposal. A court considering whether to create a new *Bivens* action may begin by considering any existing process for protecting an interest, for "federal courts may not step in to create a *Bivens* cause of action if 'any alternative, existing process for protecting the interest amounts to a convincing reason for the Judicial Branch to refrain from providing a new and freestanding remedy in damages.'" *de la Paz*, 786 F.3d at 375 (quoting *Wilkie*, 551 U.S. at 550). "The point of examining the existing process is to determine whether Congress has explicitly or implicitly indicated 'that the Court's power should not be exercised.'" *Id.* (quoting *Bush v. Lucas*, 462 U.S. 367, 378 (1983)).

Here, alternative processes exist. In the AECA, Congress directed the creation of administrative regulations governing the designation of categories of arms for export controls; registration of exporters and manufacturers; authorization of exports; civil penalties for violations; and reporting of exports. *See* 22 U.S.C. § 2778(a)(1), (b)(1)(A)(i), (b)(2), (e), (f)(1), (i). Under this express direction, the State Department has created administrative processes that allow persons potentially subject to the ITAR to determine whether items are subject to the State Department's jurisdiction, *see* 22 C.F.R. § 120.4; to challenge administratively the Department's assertion of jurisdiction, *see id.* § 120.4(g); to ask for reconsideration and review of the Department's licensing decisions, *see id.* § 126.8(c), (d); to secure advisory opinions on licensing, *see id.* § 126.9; and to challenge the imposition of civil penalties through discovery and hearings, *see id.* §§ 128.2-.16. These administrative processes, which Congress expressly contemplated in the AECA, provide ample opportunity for a person potentially subject to the ITAR to challenge its application. They therefore undercut any suggestion that a court should engraft onto the existing statutory and regulatory scheme a damages action against individual federal employees.

**Individual Defendants' Motion To Dismiss**                                                                    **6**

To be sure, *judicial* review of the State Department's decisions about arms-export controls is limited. But that is by congressional design. The AECA explicitly precludes judicial review of the Department's decision to make an item subject to arms-export controls. *See* 22 U.S.C. § 2778(h). And decisions implementing the AECA are exempt from judicial review under the Administrative Procedure Act because those decisions are highly discretionary exercises of the Executive Branch's foreign affairs functions. *See* 5 U.S.C. § 701(a)(2); *U.S. Ordnance, Inc. v. U.S. Dep't of State*, 432 F. Supp. 2d 94, 98-99 (D.D.C. 2006), *vacated on other grounds*, 231 F. App'x 2 (D.C. Cir. 2007); 22 C.F.R. § 128.1. These limits on judicial review are no reason to create a *Bivens* action, however. "[I]t is where Congress has intentionally withheld a remedy" that courts "must most refrain from providing one because it is in those situations that appropriate judicial deference is especially due to the considered judgment of Congress that certain remedies are not warranted." *Wilson v. Libby*, 535 F.3d 697, 709-10 (D.C. Cir. 2008).

In any event, the existence of alternative processes is not the end of the inquiry, for the Supreme Court has "rejected the claim that a *Bivens* remedy should be implied simply for want of any other means for challenging a constitutional deprivation in federal court." *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 69 (2001); *see also Schweiker v. Chilicky*, 487 U.S. 412, 421-22 (1988) ("The absence of statutory relief for a constitutional violation . . . does not by any means necessarily imply that courts should award money damages against the officers responsible for the violation."). Even if no alternative process exists, a court must still "weigh[] reasons for and against the creation of a new cause of action" while "paying particular heed . . . to any *special factors counselling hesitation* before authorizing a new kind of federal litigation." *Wilkie*, 551 U.S. at 550, 554 (emphasis added). This threshold — that a factor counsels hesitation — is "'remarkably low.'" *de la Paz*, 786 F.3d at 379 (quoting *Arar v. Ashcroft*, 585 F.3d 559, 574 (2d Cir. 2009) (en banc)). "'Hesitation' is 'counseled' whenever thoughtful discretion would pause even to consider.'" *Arar*, 585 F.3d at 574.

Multiple factors counsel hesitation in creating the sort of *Bivens* action proposed by Defense Distributed. "The Supreme Court has expressly counseled that matters touching upon foreign policy and national security fall within an area of executive action in which courts have

long been *hesitant* to intrude absent congressional authorization." *Id.* at 575 (internal quotation marks omitted); *see also de la Paz*, 786 F.3d at 379; *Lebron v. Rumsfeld*, 670 F.3d 540, 549 (4th Cir. 2012). The enforcement of arms-export controls necessarily implicates foreign policy and national security. *See* Order 6 (recognizing "the interest — and authority — of the President and Congress in matters of foreign policy and export"); *see also United States v. Mandel*, 914 F.2d 1215, 1223 (9th Cir. 1990) (calling decisions about restricting exports as part of Commerce Department's export-control regime "quintessentially matters of policy entrusted by the Constitution to the Congress and the President"); *Samora v. United States*, 406 F.2d 1095, 1098 (5th Cir. 1969) (explaining that the AECA's predecessor statute was "directed to the conduct of international affairs, in which the executive branch of our government traditionally has been dominant").

The arms-export controls in the AECA and the ITAR are no exception. The purpose of the AECA is to "further[] . . . world peace and the security and foreign policy of the United States." 22 U.S.C. § 2778(a)(1). Both the AECA and the ITAR direct that the Department of State consider a range of military, foreign-policy, and national-security implications in making decisions about designating arms for export control and in authorizing exports. *See, e.g.*, 22 U.S.C. §  2778(a)(2); 22 C.F.R. §§ 120.3(a), 120.4(d)(3)(2), 128.1. Courts should hesitate before creating a *Bivens* action that would second-guess such decisions, which are traditionally assigned to the Executive Branch. *Cf. Holder v. Humanitarian Law Project*, 561 U.S. 1, 34 (2010) (recognizing that "national security and foreign policy concerns arise in connection with efforts to confront evolving threats in an area where information can be difficult to obtain and the impact of certain conduct difficult to assess"). Hesitation is especially appropriate because, through the AECA and the ITAR, Congress and the Executive are exercising their foreign-policy and military responsibilities in concert — Congress by broadly delegating authority and the Executive by implementing that authority through regulation. *See Lebron*, 670 F.3d at 549.

Moreover, to the extent Defense Distributed complains that the State Department's application of arms-export regulations has been too slow or opaque, *see, e.g.*, Compl. ¶¶ 15, 29, 36, crafting a cause of action to address that complaint would raise workability concerns that

**Individual Defendants' Motion To Dismiss**                                                                                    **8**

counsel further hesitation. In *Wilkie v. Robbins*, the Supreme Court rejected a proposed *Bivens* action that would have redressed the allegedly overzealous exercise of federal regulatory powers in retaliation for a landowner's assertion of his property rights. 551 U.S. at 554-63. In light of the "serious difficulty" in devising a "workable cause of action" that would address when a government employee had gone too far in asserting public interests, the Court declined to create a cause of action. *Id.* at 562. Similarly, in this case, workability concerns counsel against creating a cause of action against individual federal employees when a government agency is alleged to have acted too slowly. There is no evident standard to judge how long is too long or how deliberate is too deliberate — especially when, as in this case, an agency is confronted with a novel application of an emerging technology that implicates national security and foreign policy. Courts must hesitate before creating a freestanding damages action without any clear statutory standard "that could guide an employee's conduct and a judicial factfinder's conclusion," *id.* at 561.

All this is not to say that Congress could not create a damages action like that proposed by Defense Distributed. *See Klay v. Panetta*, 758 F.3d 369, 376-77 (D.C. Cir. 2014). "'Congress is in a far better position than a court to evaluate the impact of a new species of litigation' against those who act on the public's behalf." *Wilkie*, 551 U.S. at 562 (quoting *Bush*, 462 U.S. at 389). "And Congress can tailor any remedy to the problem perceived, thus lessening the risk of raising a tide of suits threatening legitimate initiative on the part of the Government's employees." *Id.* Deference to Congress is especially warranted in this context because the AECA contemplates an ongoing congressional role in overseeing the implementation of arms-export regulations. *See, e.g.*, 22 U.S.C. § 2778(f)(1), (2), (j)(3)(C).

In contrast, judicial creation of a nonstatutory damages action would be inappropriate given the statutory delegation of authority to regulate arms exports, statutory limits on judicial review of arms-export regulations, and the institutional and practical factors that counsel hesitation. Because Defense Distributed lacks a cause of action, its damages claims should be dismissed.

**B.     Qualified immunity protects the individual defendants from suit.**

Even if a cause of action did exist, the individual defendants would be immune from suit. "The law generally disfavors expansive civil liability" for actions by government officials "because such liability 'can entail substantial social costs, including the risk that fear of personal monetary liability and harassing litigation will unduly inhibit officials in the discharge of their duties.'" *Wyatt v. Fletcher*, 718 F.3d 496, 503 (5th Cir. 2013) (quoting *Anderson v. Creighton*, 483 U.S. 635, 638 (1987)). The Supreme Court has therefore granted government officials a qualified immunity that protects them "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The immunity applies even if an official makes "a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal quotation marks omitted). It thus "gives government officials breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law." *Carroll v. Carman*, 135 S. Ct. 348, 350 (2014) (internal quotation marks omitted).

Even at the motion-to-dismiss stage, the burden is on the plaintiff to show that qualified immunity does not apply. *Jones v. Lowndes County, Miss.*, 678 F.3d 344, 351 (5th Cir. 2012). To do so, plaintiffs must plead facts showing "(1) that the official violated a statutory or constitutional right" and "(2) that the right was 'clearly established' at the time of the challenged conduct." *al-Kidd v. Ashcroft*, 131 S. Ct. 2074, 2080 (2011) (quoting *Harlow*, 457 U.S. at 818). A court need not address these two issues in any particular order. *See Reichle v. Howards*, 132 S. Ct. 2088, 2093 (2012). Rather, "courts may grant qualified immunity on the ground that a purported right was not 'clearly established' by prior case law, without resolving the often more difficult question whether the purported right exists at all." *Id.*

There are compelling reasons not to wait to address whether an asserted right is clearly established, even if a court is not yet ready to decide whether a constitutional right has been violated at all. Qualified immunity is not just a defense to liability, but an immunity from suit designed to protect government employees from the burdens of discovery and trial. *See Pearson*,

555 U.S. at 231. For that reason, the Supreme Court has "repeatedly stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *Wood v. Moss*, 134 S. Ct. 2056, 2065 n.4 (2014) (internal quotation marks omitted).

In this case, immunity can be readily resolved now because Defense Distributed is unable to show that any alleged conduct by any individual defendant violated clearly established law. A right is clearly established when "at the time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right.'" *al-Kidd*, 131 S. Ct. at 2083 (quoting *Anderson*, 483 U.S. at 640) (alterations in *al-Kidd*). This is a "high bar." *Wyatt*, 718 F.3d at 503. The plaintiff must identify either "controlling authority" or, possibly, a "robust consensus of cases of persuasive authority." *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2023 (2014) (internal quotation marks omitted).[5] Moreover, this authority must "define[] the contours of the right in question with a high degree of particularity." *Wyatt*, 718 F.3d at 503 (internal quotation marks omitted). The Supreme Court has "'repeatedly told courts . . . not to define clearly established law at a high level of generality,' since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced." *Plumhoff*, 134 S. Ct. at 2023 (quoting *al-Kidd*, 131 S. Ct. at 2074). Although "a case directly on point" is not required to clearly establish a right, "existing precedent must have placed the statutory or constitutional question beyond debate." *Taylor*, 135 S. Ct. at 2044.

The rights asserted by Defense Distributed are hardly beyond debate. Not only is the factual context novel, but the application of constitutional doctrines to this context is unsettled. Qualified immunity therefore protects the individual defendants.

---

[5] Decisions from the Supreme Court's most recent term have stopped short of accepting that a "robust consensus" could clearly establish a claimed right. *See Taylor v. Barkes*, 135 S. Ct. 2042, 2044 (2015) (holding that weight of authority did not clearly establish a right even "to the extent that" a robust consensus could clearly establish a right); *City & County of San Francisco v. Sheehan*, 135 S. Ct. 1764, 1778 (2015) (same). This Court need not resolve that issue, since neither controlling authority nor a robust consensus would clearly establish the rights asserted by Defense Distributed.

**Individual Defendants' Motion To Dismiss**                                          **11**

1.    **Defense Distributed has failed to show a violation of any clearly established First Amendment right.**

Defense Distributed contends that the application of arms-export controls to the unrestricted Internet distribution of its electronic files violates the First Amendment. Compl. ¶¶ 44-46, 57. As it explained in more detail in its preliminary injunction briefing, Defense Distributed contends that these files are "protected expression" and that the arms-export controls amount to an "unconstitutional prior restraint" and are "overbroad." *Id.* ¶ 44-45; Pl. Mot. for Prelim. Inj. 14-24 (ECF No. 8). Defense Distributed presumably would have cited in its briefing the sort of precedent necessary to overcome qualified immunity: "controlling authority" or a "robust consensus of persuasive authority" that would "specifically prohibit" application of the arms-export regulations as inconsistent with the First Amendment. *Wyatt*, 718 F.3d at 503. Yet Defense Distributed has not identified any controlling case or robust consensus condemning the application of arms-export controls to electronic files designed to produce firearms. And even resolved into its constituent parts, no aspect of Defense Distributed's First Amendment argument is established beyond debate.

To begin with, precedent does not clearly establish that Defense Distributed's electronic files constitute protected speech. This Court was willing, "at least for the purpose of the preliminary injunction analysis," to "consider the files as subject to the protection of the First Amendment." Order 10. But no extant, controlling case had already applied the First Amendment to electronic files, like Defense Distributed's, that are designed to produce weapons. And existing cases have not reached a consensus on whether computer code is protected speech in all circumstances. *See Allied Veterans of the World, Inc. v. Seminole County*, 783 F. Supp. 2d 1197, 1203 (M.D. Fla 2011) ("Although some courts have determined that computer code can constitute protected speech in certain circumstances, such code is not always protected."), *aff'd*, 568 F. App'x 922 (11th Cir. 2012). Whereas some cases have treated computer code as protected speech, others have treated it as mere conduct — a means of making a computer perform a function. *Compare Commodity Futures Trading Comm'n v. Vartuli*, 228 F.3d 94, 111-12 (2d Cir. 2000), *and Karn v. U.S. Dep't of State*, 925 F. Supp. 1, 10 n.19 (D.D.C. 1996), *with Universal City Studios, Inc. v. Corley*, 273 F.3d 429, 447-49 (2d Cir. 2001), *and Junger v. Daley*, 209 F.3d

481, 485 (6th Cir. 2000). Even those cases finding computer code to be protected have emphasized the difficult, context-dependent nature of the question.  *See Universal City*, 273 F.3d at 445 (recommending cautious, case-by-case approach to "tailoring familiar constitutional rules to novel technological circumstances"); *Junger*, 209 F.3d at 484 ("The issue of whether or not the First Amendment protects encryption source code is a difficult one because source code has both an expressive feature and a functional feature.").

Compounding the lack of clarity as to the First Amendment's coverage are open questions about whether the First Amendment protects the sort of transmissions abroad that ITAR addresses. *See, e.g.*, *Laker Airways, Ltd. v. Pan Am. World Airways, Inc.*, 604 F. Supp. 280, 287 (D.D.C. 1984) (finding "less clear . . . whether even American citizens are protected specifically by the First Amendment with respect to their activities abroad"). Plaintiffs themselves suggest that whether they enjoy First Amendment rights to send their electronic files overseas "is not definitively clear." Pls.' Reply in Supp. of Prelim. Inj. 13 (ECF No. 37).

Even if the computer code at issue were characterized as protected speech, there would still be no clear First Amendment problem with the application of arms-export controls to Defense Distributed's electronic files. Defense Distributed cites no controlling case or robust consensus of cases that would treat computer code as subject to strict scrutiny. Rather, as this Court has recognized, *see* Order 11-13, courts considering restrictions on the dissemination of computer code have applied intermediate scrutiny. *E.g.*, *United States v. Chi Mak*, 683 F.3d 1126, 1135 (9th Cir. 2012); *Junger*, 209 F.3d at 485; *Karn*, 925 F. Supp. at 10-11; *cf. Universal City*, 273 F.3d at 451.[6] As this Court has also recognized, *see* Order 13-16, courts have found that the application of arms-export controls to dissemination of computer code satisfies intermediate scrutiny. *E.g.*, *Chi Mak*, 683 F.3d at 1135; *Karn*, 925 F. Supp. at 11. Given this precedent, a reasonable official could readily conclude that application of arms-export controls to Defense Distributed's computer code would survive First Amendment scrutiny.

---

[6] Also pointing to intermediate scrutiny is the apparently commercial nature of Defense Distributed's dissemination of computer code. *See* Defs.' Opp'n to Pls.' Mot. for Prelim. Inj. 16 n.3 (ECF No. 32).

**Individual Defendants' Motion To Dismiss**                                                    **13**

Moreover, neither controlling precedent nor any robust consensus clearly establishes that the arms-export controls at issue violate the First Amendment through prior restraint or overbreadth. "[T]he precise boundaries of the constitutional prohibitions on prior restraints are not well defined." *Catholic Leadership Coal. of Texas v. Reisman*, 764 F.3d 409, 437 (5th Cir. 2014). Nevertheless, courts that have assessed the AECA and the ITAR have found no unconstitutional prior restraint. *See Chi Mak*, 683 F.3d at 1136. Likewise, extant cases have upheld the AECA and the ITAR against challenges for overbreadth. *See id.*; *Karn*, 925 F. Supp. at 13 (calling overbreadth concerns "not genuine").

In sum, whatever this Court or other courts may ultimately determine about the application of arms-export controls to emerging technologies like those promoted by Defense Distributed, existing precedent does not clearly point to any violation of the First Amendment. Therefore, the individual defendants are entitled to qualified immunity from Defense Distributed's First Amendment claims.

> **2.    Defense Distributed has failed to show a violation of any clearly established Second Amendment right.**

Defense Distributed also claims its Second Amendment rights were violated. Compl. ¶ 57. Although Defense Distributed describes the rights at issue as rights "to acquire arms" and "to make arms," *id.* ¶¶ 49-50, it does not allege any interference with its own acquisition or production of arms, *see* Order 17-18. Rather, Defense Distributed appears to be asserting a right under the Second Amendment for a corporation to disseminate on the Internet materials that third parties may use to produce arms. *See* Compl. ¶ 51. No such right is clearly established under the Second Amendment. [7]

---

[7] To the extent Defense Distributed is seeking to vindicate its own asserted right to acquire or to make arms, it has failed to allege facts to suggest any interference with that right, and therefore lacks standing. *See* Defs.' Opp'n to Pls.' Mot. for Prelim. Inj. 22-25. Defense Distributed may not assert, in the guise of a constitutional damages action, "the rights of its patrons," Compl. ¶¶ 57-58, or some other third party to acquire or to make arms. *See infra* p. 23. This Court has not answered the "very close question" of Defense Distributed's standing to seek a preliminary injunction because it concluded that the Second Amendment Foundation had such standing. Order 17-20. But the Foundation's standing (if any) to bring *injunctive* claims is irrelevant to Defense Distributed's *damages* claims, for a party must demonstrate standing for each claim it seeks to press, *see DaimlerChrysler Corp. v. Cuno*, 547 U.S. 353, 352 (2006).

**Individual Defendants' Motion To Dismiss**                                      **14**

In *District of Columbia v. Heller*, 554 U.S. 570 (2008), the Supreme Court "identified the Second Amendment's central right as the right to defend oneself in one's home, and concluded that an absolute ban on home handgun possession — a gun-control law of historic severity — infringed the Second Amendment's core." *Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 700 F.3d 185, 194 (5th Cir. 2012). In *Heller*, however, "the Court took care to note that it was not purporting to 'clarify the entire field' of the Second Amendment." *United States v. Portillo-Muñoz*, 643 F.3d 437, 440 (5th Cir. 2011) (quoting *Heller*, 554 U.S. at 635). Beyond *Heller*'s core holding, there is little consensus on the Second Amendment's application to particular restrictions. *See, e.g.*, *Powell v. Tompkins*, 783 F.3d 332, 348 (1st Cir. 2015) (rejecting notion "that a 'consensus' has developed among the circuits regarding some limited right under the Second Amendment to keep and bear operable firearms outside the home for the purpose of self-defense"); *Burgess v. Town of Wallingford*, 569 F. App'x 21, 23 (2d Cir. 2014) ("Even at present, we are unsure of the scope of that right."); *Sutterfield v. City of Milwaukee*, 751 F.3d 542, 571 (7th Cir.) ("Whether and to what extent the Second Amendment protects an individual's right to possess a particular gun . . . is an issue that is just beginning to receive judicial attention."), *cert. denied*, 135 S. Ct. 478 (2014); *United States v. Masciandaro*, 638 F.3d 458, 475 (4th Cir. 2011) (Wilkinson, J., for panel majority) (recognizing "the dilemma faced by lower courts in the post-*Heller* world: how far to push *Heller* beyond its undisputed core holding"); *United States v. Marzzarella*, 614 F.3d 85, 101 (3d Cir. 2010) ("Second Amendment doctrine remains in its nascency, and lower courts must proceed deliberately when addressing regulations unmentioned by *Heller*.").

Defense Distributed has cited neither a controlling case nor a robust consensus establishing that the Second Amendment protects *distribution* of arms — much less *global distribution* — by a *business*. The Complaint refers to *Mance v. Holder*, 74 F. Supp. 3d 795 (N.D. Tex. 2015), *appeal docketed sub nom. Mance v. Lynch*, No. 15-10311 (5th Cir. Apr. 14, 2015). But *Mance* is not controlling, and it was not decided in time to clearly establish the law for this case. *See al-Kidd*, 131 S. Ct. at 2083 (explaining that "*existing* precedent must have placed the statutory or constitutional question beyond debate") (emphasis added). Moreover,

*Mance* does not represent a consensus view. Numerous decisions reject the idea that the Second Amendment protects a right to manufacture or to distribute arms, either for money or otherwise. *See, e.g.*, *United States v. Chafin*, 423 F. App'x 342, 344 (4th Cir. 2011) (per curiam) (sales); *Colo. Outfitters Ass'n v. Hickenlooper*, 24 F. Supp. 3d 1050, 1064 n.13, 1074 (D. Colo. 2014) (lending); *Teixeira v. County of Alameda*, No. 12cv3288, 2013 WL 4804756, at *6, 8 (N.D. Cal. Sept. 9, 2013) (sales), *appeal docketed*, No. 13-17132 (9th Cir. Oct. 23, 2013); *United States v. Conrad*, 923 F. Supp. 2d 843, 852 (W.D. Va. 2013) (giving or selling); *Mont. Shooting Sports Ass'n v. Holder*, No. 09cv147, 2010 WL 3926029, at *21 (D. Mont. Aug. 31, 2010) (manufacture and sale), *adopted*, 2010 WL 3909431 (D. Mont. Sept. 29, 2010), *and aff'd on other grounds*, 727 F.3d 975, 982 (9th Cir. 2013). Nor is there any consensus that the Second Amendment extends to businesses such as Defense Distributed. *See Colo. Outfitters*, 24 F. Supp. 3d at 1062 n.12; *see also* Order 17 n.14 (noting that no party has yet addressed whether a corporation has Second Amendment rights). Because Defense Distributed cannot point to "controlling authority" or a "robust consensus of persuasive authority" that would clearly establish a Second Amendment right for a business to disseminate electronic files designed to produce firearms, qualified immunity protects the individual defendants from suit. *Wyatt*, 718 F.3d at 503.

### 3.   Defense Distributed has failed to show a violation of any clearly established Fifth Amendment right.

Finally, Defense Distributed asserts a violation of its Fifth Amendment due process rights. *See* Compl. ¶¶ 53-55, 57. Defense Distributed invokes "[v]agueness doctrine," under which "'an enactment is void . . . if its prohibitions are not clearly defined.'" Pls.' Mot. for Prelim. Inj. 24 (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972)). But Plaintiffs have not "made precisely clear which portion of the ITAR language they believe is unconstitutionally vague." Order 23. Nor has Defense Distributed identified any controlling authority or robust consensus clearly establishing that the AECA, the ITAR, or any terms used in either are unconstitutionally vague. In the absence of any such precedent, which is necessary to

overcome qualified immunity, *see Wyatt*, 718 F.3d at 503, the individual defendants are immune from Defense Distributed's claim under the Fifth Amendment.[8]

> **4.    Defense Distributed has failed to allege facts that would show any constitutional violation by Kenneth Handelman or Sarah Heidema personally.**

Even if Defense Distributed could show that *some* federal official violated its clearly established constitutional rights, it still would have failed to assert any viable *Bivens* claim against Kenneth Handelman or Sarah Heidema. As noted above, qualified immunity "protects government officials from liability for civil damages 'unless a plaintiff pleads *facts* showing . . . that *the official* violated a statutory or constitutional right.'" *Wood*, 134 S. Ct. at 2066-67 (quoting *al-Kidd*, 131 S. Ct. at 2080) (emphases added). Defense Distributed has not pled facts showing that Mr. Handelman or Ms. Heidema violated any of its constitutional rights.

The requirement that a plaintiff must "plead *facts*" is critical. Courts do not credit "mere conclusory statements," or "bare assertions . . . amount[ing] to nothing more than a 'formulaic recitation of the elements.'" *Iqbal*, 556 U.S. at 678, 681 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Rather, "[t]o survive a motion to dismiss, a complaint must contain sufficient *factual* matter, accepted as true, to state a claim to relief that is plausible on its face." *Id.* at 678 (internal quotation marks omitted, emphasis added).

Equally critical is the Supreme Court's instruction that a plaintiff must show that "*the official* violated a statutory or constitutional right," *Wood*, 134 S. Ct. at 2066-67 (quoting *al-Kidd*, 131 S. Ct. at 2080) (emphasis added). When individual-capacity claims are at stake, "each Government official, his or her title notwithstanding, is only liable for his or her own misconduct." *Iqbal*, 556 U.S. at 677. To pursue a *Bivens* claim, therefore, "a plaintiff must plead that each Government-official defendant, through the official's *own individual* actions, has violated the Constitution." *Id.* at 676 (emphasis added). In such an individual-capacity suit, "it is

---

[8] Defense Distributed also mentions the "rights . . . of its patrons under the . . . Fifth Amendment[]," but neither its Complaint nor its briefing on the preliminary injunction makes clear what sort of Fifth Amendment right a "patron" might have against application of a regulation to someone else. Moreover, Defense Distributed lacks standing to assert its purported patrons' Fifth Amendment rights. *See infra* p. 23.

**Individual Defendants' Motion To Dismiss**                                    **17**

particularly important . . . that the complaint make clear exactly *who* is alleged to have done *what* to *whom*, to provide each individual with fair notice as to the basis of the claims against him or her, as distinguished from collective allegations against the state." *Robbins v. Oklahoma*, 519 F.3d 1242, 1250 (10th Cir. 2008). Collective allegations that do not differentiate among a group of defendants are insufficient to state a viable constitutional tort claim against any particular individual. *Id.*; *accord Marcilis v. Twp. of Redford*, 693 F.3d 589, 596 (6th Cir. 2012) (allegations that "refer[red] to all defendants generally and categorically" were insufficient); *Arar v. Ashcroft*, 585 F.3d 559, 569 (2d Cir. 2009) (en banc) (allegations that referred to "undifferentiated" defendants were insufficient).

Defense Distributed's factual allegations are insufficient to show that Ms. Heidema or Mr. Handelman personally took any action at all toward Defense Distributed, let alone any action that would have violated any of its clearly established constitutional rights. The Complaint mentions Ms. Heidema and Mr. Handelman in only three places: once, in describing the position each held, *see* Compl. ¶¶ 6, 8; again, in alleging that each was aware of certain Department of Justice memoranda, *see id.* ¶ 18; and finally, in reciting in purely conclusory terms the claims against them, *see id.* ¶¶ 57-59. Entirely absent are factual allegations describing any conduct by either individual personally. Otherwise, the Complaint refers only to "Defendants" collectively, without distinction as to which individual defendant (or other, unnamed official) is at issue. These collective references are insufficient for Ms. Heidema and Mr. Handelman to ascertain what particular unconstitutional acts they are alleged to have committed. *Cf. Robbins*, 519 F.3d at 1250. Because Defense Distributed has failed to adequately allege that Ms. Heidema or Mr. Handelman has violated any of its constitutional rights, the claims against them should be dismissed.[9]

---

[9] For the same reason, Defense Distributed's allegations against the other individual defendants, Edward Peartree and Glenn Smith, are also deficient. Defense Distributed at least could have alleged in good faith that Mr. Peartree and Mr. Smith each sent a letter asserting the State Department's regulatory jurisdiction. But neither the Complaint nor any of Defense Distributed's other submissions suggest any basis for claims against Ms. Heidema or Mr. Handelman personally.

## II.   Defense Distributed's claims against the individual defendants should be dismissed under Rule 12(b)(2) for lack of personal jurisdiction.

Defense Distributed is attempting to force the individual defendants to defend their personal assets in a court in Texas even though none of them is alleged to be a Texas resident. Defense Distributed can pursue these claims in this Court only if personal jurisdiction over the individual defendants is proper here. *See Walden v. Fiore*, 134 S. Ct. 1115, 1121 (2014). Defense Distributed bears the burden of establishing personal jurisdiction over the non-resident individual defendants. *See Clemens v. McNamee*, 615 F.3d 374, 378 (5th Cir. 2010). When, as is usual, a district court addresses personal jurisdiction without an evidentiary hearing, a plaintiff must carry its burden by making a prima facie showing that personal jurisdiction is proper. *See Monkton Ins. Servs., Ltd. v. Ritter*, 768 F.3d 429, 431 (5th Cir. 2014); *Ham v. La Cienega Music Co.*, 4 F.3d 413, 415 (5th Cir. 1993). In assessing whether a plaintiff has carried this burden, a court is not limited to the allegations of the complaint, but may consider the contents of the record at the time of the motion. *See Paz v. Brush Engineered Materials, Inc.*, 445 F.3d 809, 812 (5th Cir. 2006). A court will "accept the plaintiff's uncontroverted, nonconclusional factual allegations as true and resolve all controverted allegations in the plaintiff's favor." *Panda Brandywine Corp. v. Potomac Elec. Power Co.*, 253 F.3d 865, 868 (5th Cir. 2001) (per curiam). But "the prima-facie-case requirement does not require the court to credit conclusory allegations, even if uncontroverted." *Id.* at 869.

Defense Distributed has not established a prima facie case for personal jurisdiction over the individual defendants by a federal court sitting in Texas. Because Federal Rule of Civil Procedure 4(k)(1)(A) adopts the territorial limits applicable to courts of the state in which a federal district court is located, a federal court looks to state law in determining the limits of its jurisdiction over persons. *See Walden*, 134 S. Ct. at 1121. The jurisdiction of Texas courts extends to the limits of due process, so only those limits are at issue here. *See Clemens*, 615 F.3d at 378. Due process, in turn, requires a showing of "minimum contacts." *Walden*, 134 S. Ct. at 1121. Thus, "[t]o establish that personal jurisdiction is proper, the plaintiff must show that the nonresident defendant purposefully availed [himself] of the benefits and protections of the forum state by establishing minimum contacts with the forum state." *Monkton*, 768 F.3d at 431 (internal

**Individual Defendants' Motion To Dismiss**                                                    **19**

quotation marks omitted). A plaintiff cannot aggregate a group of defendants' contacts, but must show that each defendant individually has sufficient minimum contacts to support jurisdiction. *See Rush v. Savchuk*, 444 U.S. 320, 331-32 (1980).

There are two ways in which a showing of minimum contacts can support personal jurisdiction, and Defense Distributed has made neither showing. First, a plaintiff may demonstrate contacts sufficient to support general jurisdiction, "which permits a court to assert jurisdiction over a defendant based on a forum connection unrelated to the underlying suit." *Walden*, 134 S. Ct. at 1122 n.6. The standard for general jurisdiction is "difficult to meet" and requires "extensive contacts between a defendant and a forum." *Johnston v. Multidata Sys. Int'l Corp.*, 523 F.3d 602, 609-10 (5th Cir. 2008) (internal quotation marks omitted). "For an individual, the paradigm forum for the exercise of general jurisdiction is the individual's domicile." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 131 S. Ct. 2846, 2853 (2011). None of the individual federal defendants is alleged to be domiciled in Texas or to have any other extensive contacts here. Therefore, Defense Distributed has not alleged contacts sufficient to establish general jurisdiction over the individual defendants.

Defense Distributed has also failed to offer allegations that could support specific jurisdiction, "in which the suit 'aris[es] out of or relate[s] to the defendant's contacts with the forum,'" *Daimler AG v. Bauman*, 134 S. Ct. 746, 754 (2014) (quoting *Helicopteros Nacionales de Colom., S.A. v. Hall*, 466 U.S. 408, 414 n.8 (1984)) (alterations in *Daimler AG*). For an exercise of specific jurisdiction to comport with due process, "the defendant's suit-related conduct must create a substantial connection with the forum State." *Walden*, 134 S. Ct. at 1121. That connection "must arise out of contacts that the 'defendant *himself*' creates with the forum State," and the contacts must be "with the forum State itself," not just "with persons who reside there." *Id.* at 1122 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985)). A court therefore looks to whether a defendant "purposefully directed" his activities toward the forum

**Individual Defendants' Motion To Dismiss**                                              **20**

state or "purposefully availed [him]self of the privileges of conducting activities there." *Monkton*, 768 F.3d at 433.[10]

None of the individual defendants has a connection with Texas substantial enough to support specific jurisdiction here. The first sort of allegation Defense Distributed makes against the individual defendants is that they oversee or enforce arms-export regulations. *See* Compl. ¶¶ 6-9 (alleging that individual defendants are "responsible" for "administration" of arms-export regulations, "enforcement" of those regulations, or both); *id.* ¶ 16 (alleging that DDTC is "operated by the individual Defendants"); *id.* ¶ 57 (alleging that "Defendants are propagating customs, policies, and practices"). These allegations are conclusory and should be disregarded. *Panda Brandywine*, 253 F.3d at 869. Even if these allegations were not conclusory, they would still be insufficient, for an allegation that a government employee oversees enforcement of federal policies nationwide does not support personal jurisdiction in every forum where those policies are enforced. *See Hill v. Pugh*, 75 F. App'x 715, 719 (10th Cir. 2003); *Munns v. Clinton*, 822 F. Supp. 2d 1048, 1078 (E.D. Cal. 2011); *Oksner v. Blakey*, No. 07-2273, 2007 WL 3238659, at *9 (N.D. Cal. Oct. 31, 2007), *aff'd*, 347 F. App'x 290, 292-93 (9th Cir. 2009); *Mahmud v. Oberman*, 508 F. Supp. 2d 1294, 1302 (N.D. Ga. 2007), *aff'd sub nom. Mahmud v. U.S. Dep't of Homeland Sec.*, 262 F. App'x 935, 936 (11th Cir. 2008); *Vu v. Meese*, 755 F. Supp. 1375, 1378 (E.D. La. 1991).

The other sort of allegation Defense Distributed makes is that "Defendants" have sent letters and otherwise asserted regulatory authority over Defense Distributed's dissemination of electronic files. *See* Compl. ¶¶ 25, 27, 33, 35. To begin with, it is unclear how Defense Distributed believes these letters would support jurisdiction over Ms. Heidema or Mr. Handelman, whose amenability to personal jurisdiction must be assessed individually. *See Rush*, 444 U.S. at 331-32. Defense Distributed's own evidence shows that neither Ms. Heidema nor

---

[10] The Fifth Circuit also considers "whether the plaintiff's cause of action arises out of or results from the defendant's forum-related contacts," — i.e., that jurisdiction is specific rather than general — and "whether the exercise of personal jurisdiction is fair and reasonable." *Monkton*, 768 F.3d at 433. When, as in this case, minimum contacts are lacking, a court need not analyze overall fairness. *See Stuart v. Spademan*, 772 F.2d 1185, 1194 n.7 (5th Cir. 1985).

**Individual Defendants' Motion To Dismiss**                                                    **21**

Mr. Handelman sent these letters. *See* Pl. Mot. for Prelim. Inj., Ex. 1 (Doc. 8-1 at 15-17), Ex. 17 (Doc. 8-5 at 21-22). And apart from the equivocal and conclusory allegation that undifferentiated "Defendants" acted "alone or in concert with other government actors" in sending the first letter, *see* Compl. ¶ 25, there is nothing in the Complaint or the record linking Ms. Heidema or Mr. Handelman to any decision about Defense Distributed in particular.

In any event, under the Fifth Circuit's *Stroman Realty* cases, the assertion of regulatory authority over a Texas resident by an out-of-state sovereign does not give rise to personal jurisdiction in Texas. In *Stroman Realty, Inc. v. Wercinski*, 513 F.3d 476, 479-81 (5th Cir. 2008), and *Stroman Realty, Inc. v. Antt*, 528 F.3d 382, 383-84 (5th Cir. 2008), a business based in Texas tried to sue government regulators in other states after those regulators ordered the business to cease Internet postings and other communications about real estate listings in those states without licenses. The Fifth Circuit held that personal jurisdiction in Texas was lacking. *See Antt*, 528 F.3d at 385-87; *Wercinski*, 513 F.3d at 483. The out-of-state regulators did not "purposefully avail" themselves of the benefits of Texas law in attempting to enforce other laws. *See Antt*, 528 F.3d at 386; *Wercinski*, 513 F.3d at 484-85. And the out-of-state regulators did not "purposefully direct" conduct at Texas, even though their conduct had effects in Texas, since the aim of their conduct was regulation of activities outside Texas. *See Wercinski*, 513 F.3d at 485-87.

Similarly, the assertion of regulatory authority by a federal employee in this case cannot support personal jurisdiction over that employee individually. Just like the state regulators in the *Stroman Realty* cases, the individual defendants in this case allegedly required compliance with licensing requirements as a precondition to directing communications outside Texas. In enforcing federal arms-export laws, the individual defendants have not availed themselves of the benefits of any Texas law. And although the assertion of federal regulatory authority may have an effect in Texas, no federal employee has purposefully directed any activity there, for the focus of the regulatory enforcement is not Texas, but the transnational export of technical data. Thus, as in the *Stroman Realty* cases, the assertion of regulatory authority in this case does not support personal jurisdiction in Texas. *See also Mahmud*, 508 F. Supp. 2d at 1301-02 & n.7 (finding no personal jurisdiction in Georgia over a federal official who made a licensing decision

**Individual Defendants' Motion To Dismiss**                                    **22**

elsewhere, even though the official mailed a notice of the decision to the plaintiff in Georgia). Because personal jurisdiction is lacking, the claims against the individual defendants should be dismissed.[11]

### III.   Any damages claims by Defense Distributed for purported infringements on its patrons' alleged rights should be dismissed under Rule 12(b)(1) for lack of standing.

In addition to asserting its own "individual rights," Defense Distributed also premises its claims for damages on "violations" of the "individual rights . . . of its patrons under the First, Second and Fifth Amendments." Compl. ¶¶ 57-58. But Defense Distributed lacks standing to maintain a damages claim for the violation of a third party's rights. *See Conn v. Gabbert*, 526 U.S. 286, 292-93 (1999); *Barker v. Halliburton Co.*, 645 F.3d 297, 300 (5th Cir. 2011). Therefore, this portion of Defense Distributed's damages claim should be dismissed for lack of subject-matter jurisdiction. *See Sample v. Morrison*, 406 F.3d 310, 312 (5th Cir. 2005).

**CONCLUSION**

For the foregoing reasons, this Court should dismiss under Rule 12(b)(1), (2), and (6) the claims against Kenneth Handelman, Edward Peartree, Sarah Heidema, and Glenn Smith in their respective individual capacities.

---

[11] Defense Distributed also fails to identify a proper basis for venue in this forum for the individual-capacity damages claims. *See generally McCaskey v. Cont'l Airlines, Inc.*, 133 F. Supp. 2d 514, 523 (S.D. Tex. 2001) (noting "well established" rule that "in a case involving multiple defendants and multiple claims, the plaintiff bears the burden of showing that venue is appropriate as to each claim and as to each defendant"). The Complaint asserts that venue is proper under 28 U.S.C. § 1391(e)(1)(B) and (C). *See* Compl. ¶ 11. Section 1391(e), however, does not apply to claims against federal employees as individuals. *See Stafford v. Briggs*, 444 U.S. 527, 543-45 (1980).

Respectfully submitted,

RICHARD L. DURBIN, JR.
United States Attorney

By:    */s/ Zachary C. Richter*
        ZACHARY C. RICHTER
        Assistant United States Attorney
        Texas Bar No. 24041773
        816 Congress Avenue, Suite 1000
        Austin, Texas 78701
        (512) 916-5858 (phone)
        (512) 916-5854 (fax)
        Zachary.C.Richter@usdoj.gov

        *Attorneys for Individual Defendants*
        *Kenneth Handelman, C. Edward Peartree,*
        *Sarah J. Heidema & Glenn Smith*

**CERTIFICATE OF SERVICE**

I certify that on August 13, 2015, I electronically filed this document with the Clerk of Court using the CM/ECF system, which will send notification to

Alan Gura, alan@gurapossessky.com
William B. Mateja, mateja@fr.com
William T. "Tommy" Jacks, jacks@fr.com
David S. Morris, dmorris@fr.com
Matthew Goldstein, matthew@goldsteinpllc.com
Josh Blackman, joshblackman@gmail.com
*Attorneys for Plaintiffs*

Eric J. Soskin, eric.soskin@usdoj.gov
Stuart J. Robinson, stuart.j.robinson@usdoj.gov
*Attorneys for U.S. State Department, Directorate of Defense Trade Controls & Official-Capacity Defendants*

*/s/ Zachary C. Richter*
ZACHARY RICHTER
Assistant United States Attorney