UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| DEFENSE DISTRIBUTED, et al., | § | |
|     Plaintiffs, | § | |
| | § | |
| v. | § | No. 1:15cv372-RP |
| | § | |
| U.S. DEPARTMENT OF STATE, et al., | § | |
|     Defendants. | § | |

## INDIVIDUAL DEFENDANTS' RENEWED MOTION TO DISMISS

This motion addresses the attempt by Plaintiff Defense Distributed to seek damages from the personal assets of four current or former employees of the U.S. State Department: Kenneth Handelman, Edward Peartree, Sarah Heidema, and Glenn Smith. Defense Distributed alleges that the State Department unconstitutionally applied federal arms-export controls to prevent Defense Distributed from globally distributing electronic files designed to produce firearms. Based on these allegations, Defense Distributed has sued the four employees personally under a theory modeled on *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971).

This Court should dismiss these claims. First, the cause of action allowed in *Bivens* does not extend to this context, and even if it did, qualified immunity would protect the individual defendants, who violated no clearly established law. Second, the individual defendants are not amenable to personal jurisdiction in this forum. Third, to the extent Defense Distributed is attempting to assert the constitutional rights of potential recipients of its electronic files, it lacks standing to do so. Therefore, the individual defendants respectfully move under Federal Rule of Civil Procedure 12(b)(1), (2), and (6) to dismiss the claims against them.

## BACKGROUND

**Statutory & Regulatory Framework.** The statutory basis for the arms-export controls at issue in this case is the Arms Export Control Act (AECA), 22 U.S.C. § 2778. In passing the AECA, Congress sought to "further[] . . . world peace and the security and foreign policy of the

United States" by empowering the President to "control . . . the export" of items he designates. *Id.* § 2778(a)(1). The AECA authorizes the creation of implementing regulations, *see id.*, which are called the ITAR (for International Traffic in Arms Regulations). Together, the AECA and the ITAR prohibit the unauthorized export of certain categories of items. *See id.* § 2778(a)(1), (b)(2); *United States v. Gonzalez*, 792 F.3d 534, 537 (5th Cir. 2015); 22 C.F.R. §§ 120.1-.20. The State Department's Directorate of Defense Trade Controls (DDTC) administers the ITAR. *See* Exec. Order No. 13,637(n)(i), 78 Fed. Reg. 16,129 (Mar. 8, 2013); 22 C.F.R. § 120.1(a).

Firearms and their components are among the items designated for export controls under the ITAR. *See Gonzalez*, 792 F.3d at 537; 22 C.F.R. § 121.1, Category I(a), (h). The ITAR also governs exports of "[t]echnical data," that is, information "required for the design, development, production, [or] manufacture" of items, such as firearms, covered by the ITAR. 22 C.F.R. §§ 120.10(a), 121.1, Category I(i). A person "exports" technical data related to firearms by "sending or taking [it] out of the United States in any manner" or "disclosing . . . or transferring [it] to a foreign person, whether in the United States or abroad." *Id.* § 120.17(a)(1), (4). Doing so without authorization is prohibited. *See* 22 U.S.C. § 2778(b)(2), (g)(6).

**Plaintiffs' Allegations.** Plaintiffs' allegations concern the application of these arms-export controls to the activities of Defense Distributed. Defense Distributed alleges that it is a corporation based in Austin, Texas, and "operated for the purpose of . . . facilitating global access to . . . information and knowledge related to the three-dimensional ('3D') printing of arms." Am. Compl. ¶ 1 (ECF No. 47). It further alleges that arms-export controls have been applied to at least three sets of electronic files it wants to distribute on the Internet.

Defense Distributed describes the first set of electronic files as "technical information" about "gun-related items." *Id.* ¶ 23. Defense Distributed began posting these files on the Internet in December 2012. *Id.* ¶ 24. In May 2013, State Department employee Glenn Smith, allegedly acting "alone or in concert with other government actors," including fellow employees Sarah Heidema "and/or" Edward Peartree, sent Defense Distributed a letter. *Id.* ¶ 25. The letter notified Defense Distributed that it may have exported technical data covered by the ITAR without authorization and directed Defense Distributed to the "commodity jurisdiction" procedure. *Id.*

¶¶ 25, 27. This procedure allows anyone unsure about whether a potential export is covered by the ITAR to request an advance determination from the State Department. *See Gonzalez*, 792 F.3d at 538; 22 C.F.R. § 120.4. In response to the letter, Defense Distributed allegedly removed the files from its server and submitted them to the commodity jurisdiction procedure. Am. Compl. ¶¶ 26-27. DDTC had not issued a determination on whether the files were subject to the ITAR at the time Defense Distributed filed suit, *id.* ¶ 29, but has done so since, *see* Notice Re: Commodity Jurisdiction Ruling (ECF No. 29).

The second set of electronic files had to do with the "Ghost Gunner," a machine "used to manufacture . . . gun parts." Am. Compl. ¶¶ 30, 32-33. In January 2015, following correspondence with the Department of Defense (DoD), Defense Distributed requested a commodity jurisdiction determination on files containing technical information about the Ghost Gunner. *Id.* ¶¶ 30-32. In April 2015, DDTC responded by letter that "software, data files, project files, coding, and models" for producing gun components would be subject to the ITAR, but that the Ghost Gunner machine itself would not be. *Id.* ¶ 33.[1]

The third set of electronic files consisted of "computer-aided design (CAD) files," the content of which the Amended Complaint does not specify. *Id.* ¶ 34. In January 2015, Defense Distributed sent a letter to the State Department asking for guidance on how to publicly release these electronic files. *Id.* ¶ 36. Defense Distributed alleges that it had previously requested guidance from DoD, but that DoD referred the issue to the State Department, allegedly based "in whole or in part" on instructions from Mr. Smith. *Id.* ¶¶ 34, 35. Defense Distributed had not received guidance at the time the suit was filed. *Id.* ¶ 36.

**Plaintiffs' Claims.** In April 2015, Defense Distributed and the Second Amendment Foundation filed a lawsuit asserting that the State Department's application of arms-export controls exceeded what AECA authorizes and violated the First, Second, and Fifth Amendments. *See* Compl. ¶¶ 42-55, 57 (ECF No. 1). Both Plaintiffs sought a preliminary and permanent

---

[1] The letter referred to "software . . . for producing a defense article, to include 80% AR-15 lower receivers." Am. Compl. ¶ 33. An AR-15 is a type of gun. A receiver is the part of a gun that houses the firing mechanism. *See generally* 27 C.F.R. §§ 478.11, 479.11.

**Individual Defendants' Renewed Motion To Dismiss**　　　　　　　　　　　　　　**3**

injunction, and Defense Distributed sought damages as well. *See id.* ¶¶ 42, 47, 51, 55, 58-59; Pls.' Mot. for Prelim. Inj. (ECF No. 8).

Plaintiffs' injunctive claims are not at issue in this motion. Those claims run against the government itself, not against individual federal employees. *See Scott v. Flowers*, 910 F.2d 201, 213 n.25 (5th Cir. 1990). Thus, the defendants on the injunctive claims are the State Department, DDTC, and various federal officers in their official capacities, *see Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985) (explaining that official-capacity claims are claims against the government).[2] The injunctive claims are bound up with Plaintiffs' request for a preliminary injunction, which is currently before the Fifth Circuit on an interlocutory appeal.

At issue in this motion is the claim for money damages by Defense Distributed. A damages action directly under the Constitution is called a "*Bivens* action" after *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), which allowed a plaintiff to sue federal law enforcement agents for damages based on alleged Fourth Amendment violations. *See Minneci v. Pollard*, 132 S. Ct. 617, 621 (2012). The original Complaint named as defendants Mr. Handelman, Mr. Peartree, Ms. Heidema, and Mr. Smith, each of whom was alleged to be "responsible" in some way for administration or enforcement of the ITAR. *See* Compl. ¶¶ 6-9. The individual defendants moved to dismiss, but Plaintiffs chose to amend their Complaint rather than argue that it included any viable claims against the individuals.

In its Amended Complaint, Defense Distributed accuses the same four individuals of taking "direct actions" against it (1) to impose arms-export restrictions that Plaintiffs characterize as "fictitious"; (2) to "slow, impede or altogether prevent" DoD from acting on requests from Defense Distributed; and (3) to "single[] out" or "selectively target[]" Defense Distributed for "regulatory burdens." Am. Compl. ¶¶ 60-62, 64. The Amended Complaint leaves unclear what

---

[2] Kenneth Handelman has moved to a position with another federal agency. Therefore, his successor, Acting Deputy Assistant Secretary Anthony M. Dearth, has been automatically substituted as a defendant on all claims against Mr. Handelman in his official capacity. *See* Fed. R. Civ. P. 25(d); *Kentucky v. Graham*, 473 U.S. at 166 n.11. The caption of the Amended Complaint, which continues to list Mr. Handelman as a defendant in his official capacity, is therefore in error.

**Individual Defendants' Renewed Motion To Dismiss**                                    **4**

the "direct actions" were, when they were supposedly taken, and which of the four individual defendants allegedly took them, except in two instances. First, the Amended Complaint alleges that Mr. Smith may have acted "alone" or perhaps "in concert with" others, including Ms. Heidema "and/or" Mr. Peartree, when he sent the initial letter warning Defense Distributed of potential arms-export violations. *Id.* ¶ 25. Second, it alleges that Mr. Smith told DoD not to review certain files that Defense Distributed wanted DoD, rather than the State Department, to address. *Id.* ¶ 35. Based on these allegations, Defense Distributed seeks damages from Mr. Handelman, Mr. Peartree, Ms. Heidema, and Mr. Smith, each of whom has been "sued individually." *Id.* ¶¶ 6-9, 63.

**ARGUMENT**

Defense Distributed wants to force Mr. Handelman, Mr. Peartree, Ms. Heidema, and Mr. Smith each to pay money from his or her personal assets. That sort of claim against individual government employees is rightly disfavored. To proceed, Defense Distributed must show that this Court should create such a claim in this context without statutory authorization; that each individual defendant has violated clearly established law such that he or she is not immune from suit; that each defendant is amenable to personal jurisdiction in this forum; and that Defense Distributed has standing to raise any claims it intends to assert on behalf of third parties. Defense Distributed has shown none of these things, and its damages claims should therefore be dismissed.

**I.      Defense Distributed has failed to state a claim against the individual defendants.**

Even assuming Defense Distributed's factual allegations were all true, as courts do in addressing motions under Rule 12(b)(6), *see Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), it still would not have stated any viable damages claim against the individual defendants for two independent reasons: (1) Defense Distributed lacks a cause of action, and (2) the individual defendants are immune. A court may dismiss on either ground without addressing the other. *See id.* at 675-76 (directing dismissal for failure to state a claim even assuming a *Bivens* action existed in a particular context).

**Individual Defendants' Renewed Motion To Dismiss**                                    **5**

**A.    Defense Distributed lacks a cause of action to sue the individual defendants for damages.**

Defense Distributed incorrectly presumes the existence of a judicially created damages action like that allowed in *Bivens*, 403 U.S. 388. Such an action "is not an automatic entitlement." *Wilkie v. Robbins*, 551 U.S. 537, 550 (2007). "[B]ecause *Bivens* suits implicate grave separation of powers concerns, 'a decision to create a private right of action is one better left to legislative judgment in the great majority of cases.'" *de la Paz v. Coy*, 786 F.3d 367, 372-73 (5th Cir. 2015) (quoting *Sosa v. Alvarez-Machain*, 542 U.S. 692, 727 (2004)). Therefore, unlike the statutory action against state officials authorized by 42 U.S.C. § 1983, judicially created *Bivens* actions against federal officials apply only in "limited settings" and are "disfavored." *Iqbal*, 556 U.S. at 675-76. The Supreme Court "has been reluctant to extend *Bivens* liability to any new context or new category of defendants," *id.*, and "in most instances" has "found a *Bivens* remedy unjustified." *Wilkie*, 551 U.S. at 550. In the last thirty-five years, the Court has not approved a new *Bivens* action, but has consistently reversed appellate decisions attempting to create new causes of action for damages. *See de la Paz*, 786 F.3d at 372; *Vance v. Rumsfeld*, 701 F.3d 193, 198 (7th Cir. 2012) (en banc).

In keeping with this consistent reluctance to extend *Bivens*, this Court should reject Defense Distributed's proposal to create a nonstatutory damages action against federal employees for the application of arms-export controls. First, extending *Bivens* to this context would be inappropriate given the alternative processes already available to challenge applications of arms-export regulations. "[F]ederal courts may not step in to create a *Bivens* cause of action if 'any alternative, existing process for protecting the interest amounts to a convincing reason for the Judicial Branch to refrain from providing a new and freestanding remedy in damages.'" *de la Paz*, 786 F.3d at 375 (quoting *Wilkie*, 551 U.S. at 550). In the AECA, Congress directed the creation of an administrative regime governing arms exports. *See, e.g.*, 22 U.S.C. § 2778(a)(1), (b)(1)(A)(i), (b)(2), (e), (f)(1), (i). Under this direction, the State Department has created administrative processes that allow persons potentially subject to the ITAR to determine whether items are subject to the State Department's jurisdiction, *see* 22 C.F.R. § 120.4, and to challenge administratively the Department's assertion of jurisdiction, *see*

**Individual Defendants' Renewed Motion To Dismiss**                                    **6**

*id.* § 120.4(g).[3] The State Department's creation of these administrative processes pursuant to Congress's instructions undercuts any suggestion that a court should engraft onto the existing statutory and regulatory scheme a damages action against individual federal employees.

To be sure, *judicial* review of the State Department's decisions about arms-export controls is limited. But that is by congressional design. The AECA explicitly precludes judicial review of the Department's decision to make an item subject to arms-export controls. *See* 22 U.S.C. § 2778(h). And decisions implementing the AECA are exempt from judicial review under the Administrative Procedure Act because those decisions are highly discretionary exercises of the Executive Branch's foreign affairs functions. *See* 5 U.S.C. § 701(a)(2); *U.S. Ordnance, Inc. v. U.S. Dep't of State*, 432 F. Supp. 2d 94, 98-99 (D.D.C. 2006), *vacated on other grounds*, 231 F. App'x 2 (D.C. Cir. 2007); 22 C.F.R. § 128.1. When, as in this situation, "Congress has intentionally withheld a remedy," courts "must most refrain from providing one because it is in those situations that appropriate judicial deference is especially due to the considered judgment of Congress that certain remedies are not warranted." *Wilson v. Libby*, 535 F.3d 697, 709 (D.C. Cir. 2008) (internal quotation marks omitted).

Even if these alternative processes did not exist, the Supreme Court has "rejected the claim that a *Bivens* remedy should be implied simply for want of any other means for challenging a constitutional deprivation in federal court." *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 69 (2001). A court must still "weigh[] reasons for and against the creation of a new cause of action" while "paying particular heed . . . to any *special factors counselling hesitation* before authorizing a new kind of federal litigation." *Wilkie*, 551 U.S. at 550, 554 (emphasis added). This threshold — that a factor counsels hesitation — is "'remarkably low.'" *de la Paz*, 786 F.3d at 379 (quoting *Arar v. Ashcroft*, 585 F.3d 559, 574 (2d Cir. 2009) (en banc)). "'Hesitation' is 'counseled' whenever thoughtful discretion would pause even to consider.'" *Arar*, 585 F.3d at 574.

---

[3] Separate regulations provide for reconsideration and review of the Department's licensing decisions, *see* 22 C.F.R. § 126.8(c), (d); advisory opinions on licensing, *see id.* § 126.9; and discovery and hearings before the imposition of civil penalties, *see id.* §§ 128.2-.16.

Multiple factors counsel hesitation before creating a *Bivens* action designed to challenge the application of arms-export controls. Most notably, "[t]he Supreme Court has expressly counseled that matters touching upon foreign policy and national security fall within an area of executive action in which courts have long been *hesitant* to intrude absent congressional authorization." *Id.* at 575 (internal quotation marks omitted); *see also de la Paz*, 786 F.3d at 379; *Lebron v. Rumsfeld*, 670 F.3d 540, 549 (4th Cir. 2012). The enforcement of arms-export controls necessarily implicates foreign policy and national security. *See* Order on Prelim. Inj. 6 (recognizing "the interest — and authority — of the President and Congress in matters of foreign policy and export"); *see also* 22 U.S.C. § 2778(a)(1) (explaining that purpose of AECA is to "further[] . . . world peace and the security and foreign policy of the United States"); *United States v. Mandel*, 914 F.2d 1215, 1223 (9th Cir. 1990) (calling decisions about restricting exports as part of Commerce Department's export-control regime "quintessentially matters of policy entrusted by the Constitution to the Congress and the President"); *Samora v. United States*, 406 F.2d 1095, 1098 (5th Cir. 1969) (explaining that the AECA's predecessor statute was "directed to the conduct of international affairs, in which the executive branch of our government traditionally has been dominant"). Hesitation is especially appropriate because the AECA and the ITAR reflect a joint exercise of foreign-policy and national-security authority by Congress and the Executive. *See Lebron*, 670 F.3d at 549.

Moreover, to the extent Defense Distributed complains that the State Department's application of arms-export regulations has been too slow or opaque, *see, e.g.*, Am. Compl. ¶¶ 15, 29, 36, crafting a cause of action to address that complaint would raise workability concerns that counsel further hesitation. *Cf. Wilkie*, 551 U.S. at 554-63 (rejecting proposed *Bivens* action that would have redressed the allegedly overzealous exercise of federal regulatory powers in light of the "serious difficulty" in devising a "workable cause of action"); *Duxbury Trucking, Inc. v. Mass. Highway Dep't*, No. 04cv12118, 2009 WL 1258998, at *7 (D. Mass. Apr. 29, 2009) (declining under *Wilkie* to create *Bivens* claim against federal officials "alleged to have been delinquent and deliberately obfuscatory in carrying out their duties"). There is no evident standard to judge how long is too long or how deliberate is too deliberate — especially when, as

**Individual Defendants' Renewed Motion To Dismiss**                                                **8**

in this case, an agency is confronted with a novel application of an emerging technology that implicates national security and foreign policy. Courts must hesitate before creating a freestanding damages action without any clear statutory standard "that could guide an employee's conduct and a judicial factfinder's conclusion." *Wilkie*, 551 U.S. at 561.

The Amended Complaint's conclusory accusations of improper motive, *see* Am. Compl. ¶¶ 60-64, do not make a nonstatutory damages claim any more appropriate for this context. Allegations of illegitimate motive do not support the recognition of *Bivens* claims that would otherwise be inappropriate in a given context. *See M.E.S., Inc. v. Snell*, 712 F.3d 666, 672 (2d Cir. 2013); *W. Radio Servs. Co. v. U.S. Forest Serv.*, 578 F.3d 1116, 1118 (9th Cir. 2009) (rejecting proposed *Bivens* claim despite allegations that officials' "delays and inactions violated the First Amendment . . . by treating [the plaintiff] unfavorably in retaliation for its prior litigation against the Forest Service"); *XP Vehicles, Inc. v. Dep't of Energy*, No. 13cv37, 2015 WL 4249167, at *19-21 (D.D.C. July 14, 2015) (rejecting proposed *Bivens* claim despite allegations that agency action was motivated by political favoritism). Allegations of illegitimate motive are especially irrelevant when, as in this case, they are wholly conclusory. *See Left Fork Mining Co., Inc. v. Hooker*, 775 F.3d 768, 778 (6th Cir. 2014) (rejecting *Bivens* action proposed by plaintiff who "ha[d] done little to show how the [federal government's] actions stemmed from improper motive, aside from stating that they were"); *see also infra* pp. 15-16.

All this is not to say that Congress could not create a damages action like that proposed by Defense Distributed. *See Klay v. Panetta*, 758 F.3d 369, 376-77 (D.C. Cir. 2014). "'Congress is in a far better position than a court to evaluate the impact of a new species of litigation' against those who act on the public's behalf." *Wilkie*, 551 U.S. at 562 (quoting *Bush v. Lucas*, 462 U.S. 367, 389 (1983)). "And Congress can tailor any remedy to the problem perceived, thus lessening the risk of raising a tide of suits threatening legitimate initiative on the part of the Government's employees." *Id.* In the absence of action by Congress, however, no nonstatutory action should be created.

### B.   Qualified immunity protects the individual defendants from suit.

Even if a cause of action did exist, the individual defendants would be immune from suit. "The law generally disfavors expansive civil liability" for actions by government officials "because such liability 'can entail substantial social costs, including the risk that fear of personal monetary liability and harassing litigation will unduly inhibit officials in the discharge of their duties.'" *Wyatt v. Fletcher*, 718 F.3d 496, 503 (5th Cir. 2013) (quoting *Anderson v. Creighton*, 483 U.S. 635, 638 (1987)). The Supreme Court has therefore granted government officials a qualified immunity that protects them "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The immunity applies even if an official makes "a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal quotation marks omitted). It thus "gives government officials breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law." *Carroll v. Carman*, 135 S. Ct. 348, 350 (2014) (internal quotation marks omitted).

Even at the motion-to-dismiss stage, the burden is on the plaintiff to show that qualified immunity does not apply. *Jones v. Lowndes County*, 678 F.3d 344, 351 (5th Cir. 2012). The plaintiff "must plead specific facts that both allow the court to draw the reasonable inference that the defendant is liable for the harm he has alleged and that defeat a qualified immunity defense with equal specificity." *Backe v. LeBlanc*, 691 F.3d 645, 648 (5th Cir. 2012). To defeat qualified immunity, the facts alleged must show "(1) that the official violated a statutory or constitutional right" and "(2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2080 (2011) (quoting *Harlow*, 457 U.S. at 818). A court need not address these two issues in any particular order. *See Reichle v. Howards*, 132 S. Ct. 2088, 2093 (2012). Rather, "courts may grant qualified immunity on the ground that a purported right was not 'clearly established' by prior case law, without resolving the often more difficult question whether the purported right exists at all." *Id.* And there are compelling reasons to proceed promptly to the issue of clearly established law, since the Supreme Court has

"repeatedly stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *Wood v. Moss*, 134 S. Ct. 2056, 2065 n.4 (2014) (internal quotation marks omitted).

In this case, immunity can be resolved readily because Defense Distributed is unable to show that any alleged conduct by any individual defendant violated clearly established law. A right is clearly established when "at the time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right.'" *al-Kidd*, 131 S. Ct. at 2083 (quoting *Anderson*, 483 U.S. at 640) (alterations in *al-Kidd*). This is a "high bar." *Wyatt*, 718 F.3d at 503. The plaintiff must identify either "controlling authority" or, possibly, a "robust consensus of cases of persuasive authority." *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2023 (2014) (internal quotation marks omitted).[4] This authority must "define[] the contours of the right in question with a high degree of particularity." *Wyatt*, 718 F.3d at 503 (internal quotation marks omitted). The Supreme Court has "'repeatedly told courts . . . not to define clearly established law at a high level of generality,' since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced." *Plumhoff*, 134 S. Ct. at 2023 (quoting *al-Kidd*, 131 S. Ct. at 2074). Although "a case directly on point" is not required to clearly establish a right, "existing precedent must have placed the statutory or constitutional question beyond debate." *Taylor*, 135 S. Ct. at 2044.

### 1.   Defense Distributed has failed to show a violation of any clearly established First Amendment right.

Defense Distributed contends that the application of arms-export controls to the Internet distribution of its electronic files violates the First Amendment in two ways. First, Defense

---

[4] Decisions from the Supreme Court's most recent term have stopped short of accepting that a "robust consensus" could clearly establish a claimed right. *See Taylor v. Barkes*, 135 S. Ct. 2042, 2044 (2015) (holding that weight of authority did not clearly establish a right even "to the extent that" a robust consensus could clearly establish a right); *City & County of San Francisco v. Sheehan*, 135 S. Ct. 1765, 1778 (2015) (same). This Court need not address that issue in this case, however, since neither controlling authority nor a robust consensus would clearly establish the rights asserted by Defense Distributed.

Distributed contends that its electronic files are "protected expression" that the application of arms-export controls suppresses. Am. Compl. ¶¶44-45. Second, Defense Distributed contends that the arms-export controls have been "selectively applied" to it and that its exercise of its right to free speech "was a substantial or motivating factor" in the State Department's actions. Am. Compl. ¶¶ 46, 61, 64. Neither theory is supported by factual allegations that would establish the violation of any First Amendment right beyond debate.

### a.   Defense Distributed has failed to show that the application of arms-export regulations to its electronic files violated any clearly established First Amendment right.

As it explained in more detail in its preliminary injunction briefing, Defense Distributed argues that the electronic files discussed in its Amended Complaint are "protected expression" and that the arms-export controls at issue amount to an "unconstitutional prior restraint" and are "overbroad." *Id.* ¶ 44-45; Pl. Mot. for Prelim. Inj. 14-24 (ECF No. 8). Defense Distributed presumably would have cited in its briefing the sort of precedent necessary to overcome qualified immunity: "controlling authority" or a "robust consensus of persuasive authority" that would "specifically prohibit" application of the arms-export regulations as inconsistent with the First Amendment. *Wyatt*, 718 F.3d at 503. Yet Defense Distributed has not identified any controlling case or robust consensus condemning the application of arms-export controls to electronic files designed to produce firearms. And even resolved into its constituent parts, no aspect of Defense Distributed's argument is established beyond debate.

To begin with, precedent does not clearly establish that Defense Distributed's electronic files constitute protected speech. This Court has been willing, "at least for the purpose of the preliminary injunction analysis," to "consider the files as subject to the protection of the First Amendment." Order for Prelim. Inj. 10 (ECF No. 43). But no extant, controlling case had already applied the First Amendment to electronic files, like Defense Distributed's, that are designed to produce weapons. And existing cases have not reached a consensus on whether computer code is protected speech in all circumstances. *See Allied Veterans of the World, Inc. v. Seminole County*, 783 F. Supp. 2d 1197, 1203 (M.D. Fla. 2011) ("Although some courts have determined that computer code can constitute protected speech in certain circumstances, such

code is not always protected."), *aff'd*, 568 F. App'x 922 (11th Cir. 2012). Whereas some cases have treated computer code as protected speech, others have treated it as mere conduct — a means of making a computer perform a function. *Compare Commodity Futures Trading Comm'n v. Vartuli*, 228 F.3d 94, 111-12 (2d Cir. 2000), *and Karn v. U.S. Dep't of State*, 925 F. Supp. 1, 10 n.19 (D.D.C. 1996), *with Universal City Studios, Inc. v. Corley*, 273 F.3d 429, 447-49 (2d Cir. 2001), *and Junger v. Daley*, 209 F.3d 481, 485 (6th Cir. 2000). Even those cases finding computer code to be protected have emphasized the difficult, context-dependent nature of the question. *See Universal City*, 273 F.3d at 445 (recommending cautious, case-by-case approach to "tailoring familiar constitutional rules to novel technological circumstances"); *Junger*, 209 F.3d at 484 ("The issue of whether or not the First Amendment protects encryption source code is a difficult one because source code has both an expressive feature and a functional feature.").

Compounding the lack of clarity as to the First Amendment's coverage are open questions about whether the First Amendment protects the sort of transmissions abroad that the AECA and the ITAR address. *See, e.g.*, *Laker Airways, Ltd. v. Pan Am. World Airways, Inc.*, 604 F. Supp. 280, 287 (D.D.C. 1984) (finding "less clear . . . whether even American citizens are protected specifically by the First Amendment with respect to their activities abroad"). Plaintiffs themselves allow that whether they enjoy First Amendment rights to send their electronic files overseas "is not definitively clear." Pls.' Reply in Supp. of Prelim. Inj. 13 (ECF No. 37).

Even if the electronic files at issue were characterized as protected speech, there would still be no clear First Amendment problem. Defense Distributed cites neither a controlling case nor a robust consensus of cases that has applied strict scrutiny to controls on the dissemination of similar electronic files. Rather, as this Court has recognized, *see* Order on Prelim. Inj. 11-13, courts have applied intermediate scrutiny to restrictions on the dissemination of computer code and other electronic files. *E.g.*, *United States v. Chi Mak*, 683 F.3d 1126, 1135 (9th Cir. 2012); *Junger*, 209 F.3d at 485; *Karn*, 925 F. Supp. at 10-11; *cf. Universal City*, 273 F.3d at 451.[5] As

---

[5] Also pointing to intermediate scrutiny is the apparently commercial nature of Defense Distributed's dissemination of electronic files. *See* Defs.' Opp'n to Pls.' Mot. for Prelim. Inj. 16 n.3 (ECF No. 32).

**Individual Defendants' Renewed Motion To Dismiss**                                              **13**

this Court has also recognized, *see* Order on Prelim. Inj. 13-16, courts have found that the application of arms-export controls in those instances satisfied intermediate scrutiny. *E.g.*, *Chi Mak*, 683 F.3d at 1135; *Karn*, 925 F. Supp. at 11. Given this precedent, a reasonable official could readily conclude that application of arms-export controls to Defense Distributed's files would survive First Amendment scrutiny as well.

Moreover, neither controlling precedent nor any robust consensus clearly establishes that the arms-export controls at issue violate the First Amendment through prior restraint or overbreadth. "[T]he precise boundaries of the constitutional prohibitions on prior restraints are not well defined." *Catholic Leadership Coal. of Tex. v. Reisman*, 764 F.3d 409, 437 (5th Cir. 2014). Nevertheless, courts that have assessed the AECA and the ITAR have found no unconstitutional prior restraint. *See Chi Mak*, 683 F.3d at 1136. Likewise, extant cases have upheld the AECA and the ITAR against challenges for overbreadth. *See id.*; *Karn*, 925 F. Supp. at 13 (calling overbreadth concerns "not genuine").

Defense Distributed nevertheless insists that Justice Department memoranda issued decades ago clearly establish a First Amendment violation. *See* Am. Compl. ¶¶ 18-19, 57-58. To determine whether a purported right is clearly established, however, courts look to "prior *case law*." *Reichle*, 132 S. Ct. at 2093 (emphasis added). When there is not a "*case* directly on point, . . . existing *precedent* must have placed the statutory or constitutional question beyond debate." *Taylor*, 135 S. Ct. at 2044 (emphasis added). Advisory memoranda, even if issued from an authoritative source, do not clearly establish the law for purposes of qualified immunity. *See Gibbs v. Lomas*, 755 F.3d 529, 541 (7th Cir. 2014); *Price v. Akaka*, 3 F.3d 1220, 1225 (9th Cir. 1993). In any event, the memoranda apparently referred to in the Amended Complaint do not clearly establish that the application of arms-export restrictions to Defense Distributed's Internet distribution of its electronic files is impermissible. Written in 1978, 1981, and 1984, they necessarily did not address — and did not purport to address — the application of arms-export controls to the dissemination of a technology that had not yet been developed (electronic files for the 3D printing of firearms components) through a technology that had not yet been developed (the modern global Internet). *See* Pls.' Mot. for Prelim. Inj., Exs. 6-7, 9, ECF No. 8-2 at 9-39, 47-

61.[6] Because neither these memoranda nor any case law clearly established that the State Department's actions in this case violated the First Amendment, qualified immunity protects the individual defendants from suit.

> **b.     Defense Distributed has failed to show that it was selectively regulated in violation of any clearly established First Amendment right.**

Defense Distributed also contends that it has been "selectively targeted" for regulation and that its "exercise of its right to free speech under the First Amendment was a substantial or motivating factor." Am. Compl. ¶ 64. For multiple reasons, however, Defense Distributed has not stated a viable claim for selective regulation.

First, Defense Distributed has failed to allege adequately that any clearly protected activity motivated the application of arms-export controls. A plaintiff alleging retaliatory enforcement must show that its activities were protected under the First Amendment. *See Keenan v. Tejeda*, 290 F.3d 252, 258 (5th Cir. 2002). If the plaintiff's activities were not clearly protected, qualified immunity precludes a retaliation claim. *See Lane v. Franks*, 134 S. Ct. 2369, 2381 (2014). The purported "speech" described in the Amended Complaint is the global dissemination of Defense Distributed's electronic files. *See* Am. Compl. ¶¶ 22-26, 30, 34, 37. As discussed above, it is not beyond debate that the global dissemination of those electronic files constitutes protected speech. *See supra* pp. 12-13. Qualified immunity therefore applies.

Second, Defense Distributed has failed to allege facts sufficient to support its conclusory assertions of improper motive. A claim for invidious discrimination in violation of the First Amendment requires that a plaintiff "plead and prove that the defendant acted with discriminatory purpose." *Iqbal*, 556 U.S. at 676; *see also Keenan*, 290 F.3d at 258. Sufficiently pleading discriminatory purpose requires more than conclusory allegations. *See Iqbal*, 556 U.S.

---

[6] This Court may review these memoranda on this motion to dismiss under Rule 12(b)(6) because they are attached to the motion, referred to in the pleadings, and central to Plaintiffs' claims. *See Brand Coupon Network, LLC v. Catalina Mktg. Corp.*, 748 F.3d 631, 635 (5th Cir. 2014).

at 679-81.[7] But the Amended Complaint provides nothing else. The Amended Complaint recites that Defense Distributed was "selectively targeted," that its speech was a "substantial or motivating factor," and that the individual defendants "singled [Defense Distributed] out" for "regulatory burdens" that prevented it from speaking on "matters" that "other similarly situated parties" could address. *See* Am. Compl. ¶¶ 61, 64. Like the allegations disregarded as conclusory in *Iqbal*, however, "[t]hese bare assertions, . . . amount to nothing more than a formulaic recitation of the elements of a constitutional discrimination claim." 556 U.S. at 681. As such, they are insufficient to support a viable claim for selective regulation.

Third, Defense Distributed's claim fails because the regulatory actions taken here had an objectively reasonable basis. A plaintiff attacking an enforcement action as retaliatory typically must show that the challenged action lacked an objectively reasonable basis. For example, a plaintiff cannot proceed with an action for retaliatory prosecution without pleading and proving lack of probable cause (that is, an objectively reasonable basis) to prosecute. *See Hartman v. Moore*, 547 U.S. 250, 265-66 (2006). And a plaintiff cannot proceed with an action for retaliatory arrest if "probable cause existed . . . or if reasonable police officers could believe probable cause existed" *Keenan*, 290 F.3d at 262. Similarly, when government officials enforce civil regulations, that enforcement should be shielded from liability if it is supported by an objectively reasonable basis. At a minimum, there is no clearly established right to be free from a purportedly retaliatory regulatory action that is otherwise objectively supported. *Cf. Reichle*, 132 S. Ct. at 2093-94 (concluding that qualified immunity barred claim for allegedly retaliatory arrest because the "right to be free from a retaliatory arrest that is otherwise supported by probable cause" is not clearly established). Despite Defense Distributed's insistence to the contrary, *see,*

---

[7] In *Iqbal*, the plaintiffs asserted that they had been singled out for bad treatment on the basis of their religion. *See* 556 U.S. at 680. They asserted that the federal officers they sued personally "'knew of, condoned, and willfully and maliciously agreed to subject [a plaintiff]' to harsh conditions of confinement 'as a matter of policy, solely on account of [his] religion, race, and/or national origin and for no legitimate penological interest.'" *Id.* (quoting operative complaint). These "bare assertions," the Supreme Court explained, were "conclusory and not entitled to be assumed true." *Id.* at 681.

**Individual Defendants' Renewed Motion To Dismiss**                                    **16**

*e.g.*, Am. Compl. ¶ 59, a reasonable government employee could believe there was an objectively reasonable basis for applying arms-export controls to the electronic files at issue. A reasonable government employee could conclude that Defense Distributed's electronic files are "technical data" covered by the ITAR, since they are information "required for the design, development, production, [or] manufacture" of firearms components. *See* 22 C.F.R. §§ 120.10(a), 121.1, Category I(i). A reasonable government employee also could conclude that the global dissemination of these files through the Internet at least arguably amounted to an "export," that is, "sending or taking [the technical data] out of the United States in any manner" or "disclosing . . . or transferring [it] to a foreign person." *Id.* § 120.17(a)(1). Although Plaintiffs contest the validity of these regulations, they have pointed to no cases establishing that a reasonable government employee would lack any arguable, objective basis for applying them to the global dissemination of electronic files through the Internet. And since Defense Distributed cannot show that an arguable, objective basis was lacking, it cannot state a First Amendment retaliation or discrimination claim that overcomes qualified immunity.

Fourth, Defense Distributed has failed to allege facts to show that Sarah Heidema or Kenneth Handelman was a "final decision-maker" on any decision related to Defense Distributed. The law remains "unsettled" on "whether someone who is not a final decision-maker and makes a recommendation that leads to the plaintiff being harmed can be liable for retaliation." *Culbertson v. Lykos*, 790 F.3d 608, 627 (5th Cir. 2015). Therefore, qualified immunity protects a person who is not a final-decision maker from a retaliation claim. *See id.* Even if the Amended Complaint included non-conclusory allegations to suggest that Ms. Heidema or Mr. Handelman took any action against Defense Distributed at all — and it does not, *see infra* pp. 20-21 — it falls far short of alleging that either was a final decision-maker. Thus, at a minimum, this aspect of Defense Distributed's claim against Ms. Heidema and Mr. Handelman should be dismissed.

**Individual Defendants' Renewed Motion To Dismiss**                                    **17**

### 2. Defense Distributed has failed to show a violation of any clearly established Second Amendment right.

Defense Distributed also claims its Second Amendment rights were violated. Am. Compl. ¶ 62. Although Defense Distributed asserts that it has rights "to acquire arms" and "to make arms," *id.* ¶¶ 49-50, it does not allege any interference with its own acquisition or production of arms, *see* Order on Prelim. Inj. 17-18. And Defense Distributed may not assert, in the guise of a constitutional damages action, "the rights of its visitors, customers and patrons" to acquire or to make arms, Am. Compl. ¶ 63. *See infra* p. 25. Rather, Defense Distributed appears to be asserting a right under the Second Amendment for a corporation to disseminate on the Internet materials that third parties may use to produce arms. *See* Am. Compl. ¶ 51. No such right is clearly established under the Second Amendment.

In *District of Columbia v. Heller*, 554 U.S. 570 (2008), the Supreme Court "identified the Second Amendment's central right as the right to defend oneself in one's home, and concluded that an absolute ban on home handgun possession — a gun-control law of historic severity — infringed the Second Amendment's core." *Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 700 F.3d 185, 194 (5th Cir. 2012). In *Heller*, however, "the Court took care to note that it was not purporting to 'clarify the entire field' of the Second Amendment." *United States v. Portillo-Muñoz*, 643 F.3d 437, 440 (5th Cir. 2011) (quoting *Heller*, 554 U.S. at 635). Beyond *Heller*'s core holding, there is little consensus on the Second Amendment's application to particular restrictions. *See, e.g.*, *Powell v. Tompkins*, 783 F.3d 332, 348 (1st Cir. 2015) (rejecting notion "that a 'consensus' has developed among the circuits regarding some limited right under the Second Amendment to keep and bear operable firearms outside the home for the purpose of self-defense"); *Burgess v. Town of Wallingford*, 569 F. App'x 21, 23 (2d Cir. 2014) ("Even at present, we are unsure of the scope of that right."); *Sutterfield v. City of Milwaukee*, 751 F.3d 542, 571 (7th Cir.) ("Whether and to what extent the Second Amendment protects an individual's right to possess a particular gun . . . is an issue that is just beginning to receive judicial attention."), *cert. denied*, 135 S. Ct. 478 (2014); *United States v. Masciandaro*, 638 F.3d 458, 475 (4th Cir. 2011) (Wilkinson, J., for panel majority) (recognizing "the dilemma faced by lower courts in the post-*Heller* world: how far to push

*Heller* beyond its undisputed core holding"); *United States v. Marzzarella*, 614 F.3d 85, 101 (3d Cir. 2010) ("Second Amendment doctrine remains in its nascency, and lower courts must proceed deliberately when addressing regulations unmentioned by *Heller*.").

Defense Distributed has cited neither a controlling case nor a robust consensus establishing that the Second Amendment protects *distribution* of arms — much less *global distribution* — by a *business*. The Amended Complaint refers to *Mance v. Holder*, 74 F. Supp. 3d 795 (N.D. Tex. 2015), *appeal docketed sub nom. Mance v. Lynch*, No. 15-10311 (5th Cir. Apr. 14, 2015). *See* Am. Compl. ¶ 49. But *Mance* is not controlling, and it was not decided in time to clearly establish the law for this case. *See al-Kidd*, 131 S. Ct. at 2083 (explaining that "*existing* precedent must have placed the statutory or constitutional question beyond debate") (emphasis added). Moreover, *Mance* does not represent a consensus view. Numerous decisions reject the idea that the Second Amendment protects a right to manufacture or to distribute arms, either for money or otherwise. *See, e.g.*, *United States v. Chafin*, 423 F. App'x 342, 344 (4th Cir. 2011) (per curiam) (sales); *Colo. Outfitters Ass'n v. Hickenlooper*, 24 F. Supp. 3d 1050, 1064 n.13, 1074 (D. Colo. 2014) (lending); *Teixeira v. County of Alameda*, No. 12cv3288, 2013 WL 4804756, at *6, 8 (N.D. Cal. Sept. 9, 2013) (sales), *appeal docketed*, No. 13-17132 (9th Cir. Oct. 23, 2013); *United States v. Conrad*, 923 F. Supp. 2d 843, 852 (W.D. Va. 2013) (giving or selling); *Mont. Shooting Sports Ass'n v. Holder*, No. 09cv147, 2010 WL 3926029, at *21 (D. Mont. Aug. 31, 2010) (manufacture and sale), *adopted*, 2010 WL 3909431 (D. Mont. Sept. 29, 2010), *and aff'd on other grounds*, 727 F.3d 975, 982 (9th Cir. 2013). Nor is there any consensus that the Second Amendment extends to businesses such as Defense Distributed. *See Colo. Outfitters*, 24 F. Supp. 3d at 1062 n.12; *see also* Order 17 n.14 (noting that no party has yet addressed whether a corporation has Second Amendment rights). Because Defense Distributed cannot point to "controlling authority" or a "robust consensus of persuasive authority" that would clearly establish a Second Amendment right for a business to disseminate electronic files designed to produce firearms, qualified immunity protects the individual defendants from suit. *Wyatt*, 718 F.3d at 503.

**Individual Defendants' Renewed Motion To Dismiss**                                    **19**

### 3. Defense Distributed has failed to show a violation of any clearly established Fifth Amendment right.

Finally, Defense Distributed asserts a violation of its Fifth Amendment due process rights. *See* Compl. ¶¶ 53-55, 57. Defense Distributed invokes the "[v]agueness doctrine," under which "'an enactment is void . . . if its prohibitions are not clearly defined.'" Pls.' Mot. for Prelim. Inj. 24 (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972)). But Plaintiffs have not "made precisely clear which portion of the ITAR language they believe is unconstitutionally vague," Order on Prelim. Inj. 23, even though they had an opportunity to do so when they amended their Complaint. Nor has Defense Distributed ever identified any controlling authority or robust consensus clearly establishing that the AECA, the ITAR, or any terms used in either are unconstitutionally vague. In the absence of any such precedent, which is necessary to overcome qualified immunity, *see Wyatt*, 718 F.3d at 503, the individual defendants are immune from Defense Distributed's claim under the Fifth Amendment.[8]

### 4. Defense Distributed has failed to allege facts that would show any constitutional violation by Kenneth Handelman or Sarah Heidema personally.

Even if Defense Distributed could show that *some* federal official violated its clearly established constitutional rights, it still would have failed to assert any viable *Bivens* claim against Kenneth Handelman or Sarah Heidema. When individual-capacity claims are at stake, "each Government official, his or her title notwithstanding, is only liable for his or her own misconduct." *Iqbal*, 556 U.S. at 677. To pursue a *Bivens* claim, therefore, "a plaintiff must plead that each Government-official defendant, through the official's *own individual* actions, has violated the Constitution." *Id.* at 676 (emphasis added).

Conclusory allegations of individual action are insufficient to state a constitutional damages claim. *See Iqbal*, 556 U.S. at 678, 681. For example, in *Iqbal*, the plaintiffs alleged that one of the individual defendants was the "principal architect" of an invidious policy, that another

---

[8] Defense Distributed also mentions the "rights . . . of its visitors, customers and patrons under the . . . Fifth Amendment[]," Am. Compl. ¶ 63, but none of its filings explain what sort of Fifth Amendment right a third party might have against application of a regulation or how Defense Distributed could have standing to assert any such right, *see infra* p. 25.

**Individual Defendants' Renewed Motion To Dismiss**                                      **20**

individual defendant was "instrumental" in adopting and executing it, and that both defendants "knew of" and "condoned" application of the policy to the plaintiff. *Id.* at 680-81. These allegations were disregarded as "conclusory and not entitled to be assumed true." *Id.* at 681.

Defense Distributed's allegations against Mr. Handelman and Ms. Heidema are no more substantial than the allegations disregarded as conclusory in *Iqbal*. The Amended Complaint alleges that Mr. Handelman was a Deputy Assistant Secretary in the Department of State and that he was "responsible for the operation and management of DDTC," including "administration and enforcement of the ITAR." Am. Compl. ¶ 6. But simply stating an official's position is not enough to establish personal liability. *See Iqbal*, 556 U.S. at 677. The Amended Complaint goes on to allege that Mr. Handelman took "direct action," and that other individual defendants took "direct actions," either "alone or in concert" with him. Am. Compl. ¶¶ 61-63. But the Amended Complaint never explains what "direct action" Mr. Handelman supposedly took or which "direct actions" others supposedly took in concert with him. Against Mr. Handelman, the Amended Complaint offers only the sort of "unadorned, the-defendant-unlawfully-harmed-me accusation" that is insufficient to state a claim. *Iqbal*, 556 U.S. at 678.

The Amended Complaint's allegations against Ms. Heidema are similarly insubstantial. Aside from allegations about her position, *see* Am. Compl. ¶ 8, and unspecified "direct actions," *id.* ¶¶ 61-63, the Amended Complaint includes only one additional sort of allegation against Ms. Heidema: that Mr. Smith, in sending a letter to Defense Distributed, "act[ed] alone or in concert with" her "and/or" Mr. Peartree. *Id.* ¶ 25. This equivocal allegation that Ms. Heidema may have acted "in concert" with others is just the sort of conclusory allegation of conspiracy that courts routinely disregard. *See, e.g.*, *McAfee v. 5th Cir. Judges*, 884 F.2d 221, 222 (5th Cir. 1989) (per curiam). Thus, the allegations against Ms. Heidema, like the allegations against Mr. Handelman, are insufficient to state a claim.[9]

---

[9] Defense Distributed's allegations against Edward Peartree, which parallel the allegations against Ms. Heidema, are also insufficient. Defense Distributed did not even bother to amend its Complaint to assert that Mr. Peartree sent any letters concerning its electronic files, even though at least one such letter already appears in the record. Defense Distributed's allegations against Glenn Smith now include the assertion that he sent the initial letter warning of a potential

(continued)

## II. Defense Distributed's claims against the individual defendants should be dismissed under Rule 12(b)(2) for lack of personal jurisdiction.

Defense Distributed is attempting to force the individual defendants to defend their personal assets in Texas even though none of them is alleged to be a Texas resident. Defense Distributed cannot pursue these claims in this Court unless personal jurisdiction over these nonresidents is proper here. *See Walden v. Fiore*, 134 S. Ct. 1115, 1121 (2014). As the plaintiff, Defense Distributed bears the burden of making a prima facie case for personal jurisdiction. *See Monkton Ins. Servs. v. Ritter*, 768 F.3d 429, 431 (5th Cir. 2014). In assessing whether a plaintiff has carried this burden, a court is not limited to the allegations of the complaint, but may consider the contents of the record at the time of the motion. *See Paz v. Brush Engineered Materials, Inc.*, 445 F.3d 809, 812 (5th Cir. 2006). A court will "accept the plaintiff's uncontroverted, nonconclusional factual allegations as true and resolve all controverted allegations in the plaintiff's favor." *Panda Brandywine Corp. v. Potomac Elec. Power Co.*, 253 F.3d 865, 868 (5th Cir. 2001) (per curiam). But "the prima-facie-case requirement does not require the court to credit conclusory allegations, even if uncontroverted." *Id.* at 869.

Defense Distributed has not established a prima facie case for personal jurisdiction. To satisfy due process,[10] a plaintiff must show that a nonresident defendant established "minimum contacts" with the forum state. *Monkton*, 768 F.3d at 431 (internal quotation marks omitted). When, as in this case, a plaintiff is attempting to establish specific personal jurisdiction — that is, personal jurisdiction premised on a defendant's contacts with the forum state, *see Daimler AG v. Bauman*, 134 S. Ct. 746, 754 (2014) — "the defendant's suit-related conduct must create a

---

regulatory violation. *Compare* Am. Compl. ¶¶ 25-27; *with* Compl. ¶¶ 25-27. But the Amended Complaint's other allegations against Mr. Smith, such as the allegations that he took "direct action," Am. Compl. ¶¶ 60-62, and the allegation that DoD refused to review some of Defense Distributed's electronic files "with specific direction from [him]," *id.* ¶ 35, are wholly conclusory. *See Chavez v. United States*, 683 F.3d 1102, 1110 (9th Cir. 2012) (disregarding as conclusory an allegation that individual defendants "personally reviewed and thus, knowingly ordered, directed, sanctioned or permitted" allegedly unconstitutional conduct).

[10] Due process is relevant because Federal Rule of Civil Procedure 4(k)(1)(A) adopts the territorial limits applicable to courts of the state in which a federal district court sits. *See Walden*, 134 S. Ct. at 1121. The jurisdiction of Texas courts extends to the outer bounds of due process, so only those limits are at issue. *See Clemens v. McNamee*, 615 F.3d 374, 378 (5th Cir. 2010).

**Individual Defendants' Renewed Motion To Dismiss** 22

substantial connection with the forum State," *Walden*, 134 S. Ct. at 1121.[11] That connection "must arise out of contacts that the 'defendant *himself*' creates with the forum State," and the contacts must be "with the forum State itself," not just "with persons who reside there." *Walden*, 134 S. Ct. at 1122 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985)). A court therefore looks to whether a defendant "purposefully directed" his activities toward the forum state or "purposefully availed [him]self of the privileges of conducting activities there." *Monkton*, 768 F.3d at 433.

Defense Distributed has not shown that any of the individual defendants has created a connection with Texas substantial enough to support specific personal jurisdiction here. Defense Distributed cannot build a prima facie case on the sort of conclusory allegations that pervade the Amended Complaint. *See Panda Brandywine*, 253 F.3d at 869; *see also supra* pp. 15-16, 21. In particular, Defense Distributed's allegation that the individual defendants took mostly unspecified "direct actions . . . with the specific intent of . . . disrupting [Defense Distributed's] operations in Texas," Am. Compl. ¶ 60, is entirely conclusory. *Cf. Iqbal*, 556 U.S. at 680.

Even if these allegations were not entirely conclusory, they still would not support a prima facie case. The Amended Complaint alleges in various ways that the individual defendants hold certain positions in the government in which they oversee or enforce arms-export controls. *See, e.g.*, Am. Compl. ¶¶ 6-9. But an allegation that a government employee oversees enforcement of federal policies nationwide does not support personal jurisdiction in every forum where those policies are enforced. *See Hill v. Pugh*, 75 F. App'x 715, 719 (10th Cir. 2003); *Munns v. Clinton*, 822 F. Supp. 2d 1048, 1078 (E.D. Cal. 2011); *Oksner v. Blakey*, No. 07-2273, 2007 WL 3238659, at *9 (N.D. Cal. Oct. 31, 2007), *aff'd*, 347 F. App'x 290, 292-93 (9th Cir. 2009); *Mahmud v. Oberman*, 508 F. Supp. 2d 1294, 1302 (N.D. Ga. 2007), *aff'd sub nom.*

---

[11] Defense Distributed has not even attempted to allege facts that would show general personal jurisdiction, in which a court "assert[s] jurisdiction over a defendant based on a forum connection unrelated to the underlying suit." *Walden*, 134 S. Ct. at 1122 n.6. The standard for general jurisdiction is "a difficult one to meet" and requires "extensive contacts between a defendant and a forum." *Johnston v. Multidata Sys. Int'l Corp.*, 523 F.3d 602, 609-10 (5th Cir. 2008) (internal quotation marks omitted). No such extensive contacts are alleged.

*Mahmud v. U.S. Dep't of Homeland Sec.*, 262 F. App'x 935, 936 (11th Cir. 2008); *Vu v. Meese*, 755 F. Supp. 1375, 1378 (E.D. La. 1991).

The Amended Complaint also alleges in various ways that some of the individual defendants asserted the State Department's regulatory jurisdiction over Defense Distributed. *See, e.g.*, Am. Compl. ¶¶ 25-27, 35, 60-62. Under the Fifth Circuit's *Stroman Realty* cases, however, the assertion of regulatory authority over a Texas resident by an out-of-state sovereign does not give rise to personal jurisdiction in Texas. In *Stroman Realty, Inc. v. Wercinski*, 513 F.3d 476, 479-81 (5th Cir. 2008), and *Stroman Realty, Inc. v. Antt*, 528 F.3d 382, 383-84 (5th Cir. 2008), a business based in Texas tried to sue government regulators in other states after those regulators ordered the business to cease Internet postings and other communications about real estate listings in those states without licenses. The Fifth Circuit held that personal jurisdiction in Texas was lacking. *See Antt*, 528 F.3d at 385-87; *Wercinski*, 513 F.3d at 483. The out-of-state regulators did not "purposefully avail" themselves of the benefits of Texas law in attempting to enforce other laws. *See Antt*, 528 F.3d at 386; *Wercinski*, 513 F.3d at 484-85. And the out-of-state regulators did not "purposefully direct" conduct at Texas, even though their conduct had effects in Texas, since the aim of their conduct was regulation of activities outside Texas. *See Wercinski*, 513 F.3d at 485-87.

Similarly, the assertion of regulatory authority by a federal employee in this case cannot support personal jurisdiction over that employee individually. Just like the state regulators in the *Stroman Realty* cases, the individual defendants in this case allegedly required compliance with licensing rules as a precondition to directing communications outside Texas. In enforcing federal arms-export laws, the individual defendants have not availed themselves of the benefits of any Texas law. And although the assertion of federal regulatory authority may have an effect in Texas, no federal employee has purposefully directed any activity here, for the focus of the regulatory enforcement was not Texas, but the transnational export of technical data. Thus, as in the *Stroman Realty* cases, the assertion of regulatory authority in this case does not support personal jurisdiction in Texas. *See also Mahmud*, 508 F. Supp. 2d at 1301-02 & n.7 (finding no personal jurisdiction in Georgia over a federal official who made a licensing decision elsewhere,

even though the official mailed a notice of the decision to the plaintiff in Georgia). Because personal jurisdiction is lacking, the claims against the individual defendants should be dismissed.[12]

### III.   Any damages claims by Defense Distributed for purported infringements on its patrons' alleged rights should be dismissed under Rule 12(b)(1) for lack of standing.

In addition to asserting its own "individual rights," Defense Distributed also premises its claims for damages on "violations" of the "individual rights . . . of its visitors, customers and patrons under the First, Second and Fifth Amendments." Am. Compl. ¶ 62. But Defense Distributed lacks standing to maintain a damages claim for the violation of a third party's rights. *See Conn v. Gabbert*, 526 U.S. 286, 292-93 (1999); *Barker v. Halliburton Co.*, 645 F.3d 297, 300 (5th Cir. 2011). Therefore, this portion of Defense Distributed's damages claim should be dismissed for lack of subject-matter jurisdiction. *See Sample v. Morrison*, 406 F.3d 310, 312 (5th Cir. 2005).

### CONCLUSION

Defense Distributed has now had two opportunities to articulate viable individual-capacity claims against Kenneth Handelman, Edward Peartree, Sarah Heidema, and Glenn Smith. Both times, it has failed. This Court should now dismiss the individual-capacity damages claims under Rule 12(b)(1), (2), and (6), and because of Defense Distributed's repeated failure, should do so with prejudice.

---

[12] Defense Distributed has now failed in both versions of its Complaint to identify a proper basis for venue in this forum over the individual-capacity damages claims. *See generally McCaskey v. Cont'l Airlines, Inc.*, 133 F. Supp. 2d 514, 523 (S.D. Tex. 2001) (noting "well established" rule that "in a case involving multiple defendants and multiple claims, the plaintiff bears the burden of showing that venue is appropriate as to each claim and as to each defendant"). The Amended Complaint, like the original Complaint, asserts that venue is proper under 28 U.S.C. § 1391(e)(1)(B) and (C). *See* Am. Compl. ¶ 11; Compl. ¶ 11. As the individual defendants pointed out in their original motion to dismiss, Section 1391(e) does not apply to claims against federal employees as individuals. *See Stafford v. Briggs*, 444 U.S. 527, 543-45 (1980).

Respectfully submitted,

RICHARD L. DURBIN, JR.
United States Attorney


By: */s/ Zachary C. Richter*
  ZACHARY C. RICHTER
  Assistant United States Attorney
  Texas Bar No. 24041773
  816 Congress Avenue, Suite 1000
  Austin, Texas 78701
  (512) 916-5858 (phone)
  (512) 916-5854 (fax)
  Zachary.C.Richter@usdoj.gov

  *Attorneys for Individual Defendants*
  *Kenneth Handelman, C. Edward Peartree,*
  *Sarah J. Heidema & Glenn Smith*

## CERTIFICATE OF SERVICE

I certify that on September 14, 2015, I electronically filed this document with the Clerk of Court using the CM/ECF system, which will send notification to

Alan Gura, alan@gurapossessky.com
William B. Mateja, mateja@fr.com
William T. "Tommy" Jacks, jacks@fr.com
David S. Morris, dmorris@fr.com
Matthew Goldstein, matthew@goldsteinpllc.com
Josh Blackman, joshblackman@gmail.com
*Attorneys for Plaintiffs*

Eric J. Soskin, eric.soskin@usdoj.gov
Stuart J. Robinson, stuart.j.robinson@usdoj.gov
*Attorneys for U.S. State Department, Directorate of Defense Trade Controls & Official-Capacity Defendants*


*/s/ Zachary C. Richter*
ZACHARY RICHTER
Assistant United States Attorney

**Individual Defendants' Renewed Motion To Dismiss**                                    **27**