# Attachment C

(Exhibit 9 to Plaintiffs' Motion for Preliminary Injunction,
ECF No. 8-2, pp. 47-61)



**U.S. Department of Justice**

Office of Legal Counsel

---

Office of the
Deputy Assistant Attorney General

*Washington, D.C. 20530*

JUL 5 - 1984

MEMORANDUM FOR DAVIS R. ROBINSON
LEGAL ADVISER
DEPARTMENT OF STATE

Re:  Revised Proposed International Traffic in
Arms Regulations (ITAR)

    This responds to a memorandum of June 5, 1984, from Mr.
Cummings of your Office, requesting the views of this Office
on a proposed revision of the International Traffic in Arms
Regulations (ITAR), recently prepared by the Department of
State (hereinafter "current draft").  This Office has previously
provided extensive comments on an earlier proposed revision
of the ITAR (hereinafter "prior draft").  1/  See Memorandum for
William B. Robinson, Office of Munitions Control, Department
of State, from Theodore B. Olson, Assistant Attorney General,
Office of Legal Counsel (July 1, 1981) (hereinafter "1981 ITAR

---

1/  This Office first addressed constitutional issues related
to the ITAR in 1978 in a memorandum for Dr. Frank Press, the
Science Adviser to President Carter.  That opinion considered
the constitutionality of the restrictions on the dissemination
of cryptographic information developed by scientists and
mathematicians in the private sector independent of government
supervision or support.  We concluded that the ITAR's prohibi-
tion of disclosure of these "public" cryptographic ideas and
information amounted to an unconstitutional prior restraint.
See Memorandum for Dr. Frank Press, Science Adviser to the
President, from John M. Harmon, Assistant Attorney General,
Office of Legal Counsel (May 11, 1978) (attached).

Memorandum"). 2/  For reasons set forth in detail below, we believe that the current draft is an improvement over the prior draft, but that the application of the ITAR to a significant class of conduct continues to raise serious constitutional questions, which should be resolved prior to promulgation of the revised ITAR.

## I.   BACKGROUND

In our 1981 memorandum, we discussed primarily the restrictions on, and the exemptions allowed for, the "export" of "technical data."  Under the ITAR, the "export" of "technical data" is subject to a licensing requirement unless it falls within one of the exemptions.  We concluded that the prior draft of the ITAR had a number of unconstitutional applications, specifically with regard to transactions in which an exporter, unconnected with any foreign enterprise, disseminated technical data knowing or having reason to know that the data may be taken abroad and used there in the manufacture or use of arms. We noted that the coverage of the technical data provisions was so broad that they

> could be applied in a number of factual
> settings to persons who are not directly
> connected or concerned in any way with any
> foreign conduct carrying dangerous poten-
> tial for the United States.  They could be
> applied, for example, to communications of
> unclassified information by a technical

---

2/  In 1981, we also issued an opinion which addressed the constitutionality of proposed regulations under the Export Administration Act (EAA) regarding the export of technical data relating to items on the Department of Commerce's Commodities Control List.  These regulations proposed generally the same definitions, prohibitions, and licensing requirements with respect to technical data associated with commodities as the ITAR proposed for technical data associated with munitions. We concluded that the proposed EAA regulations also amounted to an unconstitutional prior restraint on the disclosure of a wide variety of protected speech.  See Memorandum for Henry D. Mitman, Director, Capital Goods Production Materials Divisions, Department of Commerce, from Theodore B. Olson, Assistant Attorney General, Office of Legal Counsel (July 28, 1981) (attached).

-2-

App. 138

> lecturer at a university or to the conversa-
> tion of a United States engineer who meets
> with foreign friends at home to discuss
> matters of theoretical interest.

1981 ITAR Memorandum at 13.

Relying on the decision in <u>United States</u> v. <u>Edler Indus-</u>
<u>tries, Inc.</u>, 579 F.2d 516 (9th Cir. 1978), we concluded in
1981 that the technical data provisions could be constitu-
tionally applied to persons or firms who assisted foreign
enterprises in the development of sensitive technological
capacities.  We also concluded, however, that in the absence
of special circumstances, such as a grave and immediate
threat to national security, the difference between direct and
immediate involvement in potentially dangerous conduct, such
as in the <u>Edler</u> case, and the speech of a lecturer or engineer
in the hypothetical posed above, could be critical for consti-
tutional purposes.  Thus, the technical data provisions could
not constitutionally be applied to the dissemination of
technical data by persons having no direct connection with
foreign conduct in settings in which there is no more than
a belief or a reasonable basis for believing:  (1) that a
foreign national may take technical data abroad; and (2) that
the data could be used by someone there in the manufacture or
use of items on the controlled munitions list.  In the absence
of special circumstances that would justify a prior restraint
on such speech, the speech was presumptively protected and
therefore could not constitutionally be subjected to a
licensing requirement.

The 1981 ITAR Memorandum did not purport to determine
the constitutionality of all possible applications of the ITAR.
We merely advised that there were a number of unconstitutional
applications which would make the regulations overbroad.  We
suggested that the regulations be narrowed to make it less
likely that they would apply, or might be thought by a court
to apply, to protected speech.

## II.  SUBSEQUENT LEGAL DEVELOPMENTS

Since we wrote our 1981 ITAR Memorandum, the Supreme
Court has decided two commercial speech cases.  In both
cases, the Court has continued the extent of protection of
commercial speech recognized in the earlier cases, upon which
our previous memorandum relied.  The details of the two more
recent cases are not relevant to our analysis here, but it is

-3-

important to note that, in our judgment, the constitutional principles upon which we relied remain intact. 3/

### III.  DISCUSSION

The current draft of the ITAR circulated by your Office was apparently intended to remedy the constitutional defects

---

3/  In Metromedia, Inc. v. San Diego, 453 U.S. 490 (1981) (plurality opinion), the Court considered a city ordinance which permitted onsite commercial advertising but prohibited offsite commercial advertising and noncommercial advertising with limited exceptions.  The plurality opinion concluded that the ordinance was constitutional as applied to commercial speech because it satisfied the standards of Central Hudson Gas & Electric Corp. v. Public Service Comm'n, 447 U.S. 557 (1981), upon which we relied in our prior opinion.  The substantial government interests in improved traffic safety and appearance of the city were directly served by the ordinance, which was no broader than necessary to accomplish those ends.  (The ban was invalidated as applied to noncommercial speech, however, because the Government's asserted interests were insufficient to justify the ban, given that commercial advertising was permitted.)  In Bolger v. Youngs Drug Products Corp., 103 S. Ct. 2875 (1983), the Court struck down a federal statute which prohibited unsolicited mailing of contraceptive advertisements.  The Court held that the statute was an unconstitutional restriction on commercial speech because the Government's interests in shielding recipients from unwanted mail which they might find offensive and aiding parents in controlling the information which their children received about birth control were insufficient to overcome the protection afforded to speech that was truthful and related to activity protected from unwanted state interference and also to important social issues.  City of Los Angeles v. Taxpayers for Vincent, No. 82-975, 52 U.S.L.W. 4594 (U.S. May 15, 1984), is a sort of sequel to Metromedia, although it is not a commercial speech case.  In Taxpayers, the Court upheld a city ordinance which prohibited the posting of signs on public property.  The Court held that the content-neutral prohibition was justified by the city's substantial esthetic interests, even as applied to signs which carried political messages. Of course, the ordinance was directed against--and prohibited --only the use of the signs.  Speech itself was not regulated and could be continued to be conveyed on public property by a speaker or distributor of leaflets.

-4-

existing in the prior draft.  The summary of the current
draft notes that the list of exemptions from the licensing
requirement of the ITAR was one of the provisions which
received the most comments and that concerns were expressed
about the relationship between that licensing requirement and
the First Amendment.  The summary states that the revision
"seeks to reflect these concerns, and certain new exemptions
are provided."  Prior draft at p. 10.  We have examined the
new exemptions as well as the revised definitions of "export"
and "technical data," and we offer the following comments.
For convenience, the relevant provisions of the prior and
current drafts are set out in full as an appendix to this
opinion.

A.   "EXPORT"

     The definition of export with regard to technical data
has been changed. 4/  The prior draft described four general
ways in which technical data could be exported:

          (1) sending, transmitting, or taking defense articles
          and defense services, including technical data, out of
          the United States in any manner, see § 121.34(a)(1);

          (2) the disclosure to a foreign national of technical
          data relating to significant military equipment in
          the United States; see § 121.34(b), first sentence 5/;

───────────────────────────

4/ The definitions of export in the current draft with regard
to "defense articles" and "defense services" seem to be
substantively unchanged from the prior draft, at least for
purposes of constitutional evaluation.  These provisions were
not within the scope of our 1981 ITAR Memorandum, and they
are not relevant here.

5/ This sentence describes a narrower category than category
(4), see p. 6, infra, because it applies only to technical data
relating to significant military equipment, not all technical
data, but this category is also broader than category (4)
because, as applied to technical data relating to significant
military equipment, this provision does not require that the
transferor know or have reason to know that the technical
data will be disclosed outside the United States.

-5-

(3) the disclosure of technical data to a foreign national abroad, see id., second sentence 6/; and

(4) the disclosure of technical data to a foreign national in the United States when the transferor knows or has reason to know that the disclosed technical data will be disclosed outside the United States, see id., third sentence. 7/

Travel abroad by a U.S. national or permanent resident with personal knowledge of technical data was excluded from the definition of export.  See id., fourth sentence.

Under the current draft, these four categories appear to be consolidated into two:

. (1) sending or taking technical data outside the United States in any manner except for travel by a person with personal knowledge of technical data, see § 121.20(c); and

(2) disclosing or transferring technical data to a foreign person, whether in the United States or abroad, unless an exemption is applicable.  See § 121.20(d).

It appears to us that the first category of export under both the prior and current drafts is substantively identical, although in slightly different form.  Under the prior draft, travel abroad was also exempted, although the exemption was contained in the subsection relating to disclosure and did not specifically refer to sending or taking technical data out of the United States.

The difference between the two drafts is that the second, third, and fourth categories of exports in the prior draft have

---

6/ As drafted, the first sentence of § 121.34(b) referred also to disclosures of technical data relating to significant military equipment abroad.  Given that this second sentence refers to disclosure of any technical data abroad, the reference in the first sentence to disclosure abroad of technical data relating to significant military equipment seems superfluous.

7/ This provision seems duplicative of § 121.34(a)(2), which refers to the transfer of technical data to a foreign national in the United States in circumstances in which the transferor knows or has reason to know that the technical data will be sent, transmitted, or taken out of the United States.

-6-

been condensed into the second category in the current draft.
On its face, and without regard to the exemptions, the scope
of coverage of the current draft is broader because it applies
to all disclosures and transfers of technical data to a foreign
person in the United States and abroad, unless exempted,
whereas the prior draft seemed to require that the transferor
know or have reason to know that technical data other than that
relating to significant military equipment would be disclosed
outside the United States.   Thus, whether the coverage of the
current draft is narrower for constitutional purposes than the
prior draft depends on the scope of the exemptions provided in
the current draft.   We examine those exemptions in detail below,
although we will discuss the definition of "technical data"
first in order to complete the background for our inquiry.

B.   "TECHNICAL DATA"

     Both the prior and the current drafts describe generally
three types of technical data.   Two are substantially identical:

          (1) classified information relating to defense articles
          and defense services, see § 121.315(b) (prior draft)
          and § 121.30(a) (current draft); and

          (2) information covered by a patent secrecy order, see
          § 121.315(c) (prior draft), or an invention secrecy
          order, see § 121.30(b) (current draft).

     The third category is described in the prior draft as
"unclassified information not in the public domain relating
directly to" various categories of information.   See § 121.315(a).
The current draft is phrased in terms of "information which is
not classified pursuant to U.S. laws and regulations and which
is directly related to" generally the same kinds of information.
See § 121.30(c).   Essentially, this information relates to the
"design, engineering, development, production, processing, manu-
facture, operation, overhaul, repair, maintenance, or recon-
struction of defense articles."   The current draft specifically
includes "information which advances the state of the art of
articles on the U.S. Munitions List."   See § 121.30(c). 8/

---

8/  The prior draft differs by referring to information which
is related to "training" in the operation, use, overhaul,
repair, or maintenance of an article.   This difference does
not appear to be a substantive change.   The prior draft
also included "performance of a defense service" within the
definition of technical data.   Performance of a defense
service is now specifically covered in § 121.18.

-7-

Two changes have been made in the definition of technical
data in the current draft, which specifically excludes informa-
tion in the "public domain" and "general mathematical and
engineering information which is only and [sic] indirectly
useful in the defense field."  Information in the public domain
is defined to include information which is published and
generally accessible or available to the public at newsstands
and bookstores, through certain subscriptions, through certain
mailing privileges, and at public libraries.  In the prior
draft, these same types of information were exempt by general
exemptions from the licensing requirement, rather than through
exclusions from the definition of technical data.  <u>See</u>
§ 125.11(a)(1) and (10).  Thus, although the definitions of
technical data in the prior and current drafts differ because
of the exclusion in the current draft of information in the
public domain and general mathematical or engineering informa-
tion, we do not believe that this difference amounts to a sub-
stantive change in the coverage of the regulations.  If the
scope of the application of the licensing scheme under the
current draft is narrower, it would be only if the scope of
the exemptions were broader.  We turn therefore to an exami-
nation of the exemptions.

C.  EXEMPTIONS

The prior draft contained ten exemptions.  The current
draft contains thirteen.  Of the ten exemptions provided in
the prior draft, the first related to technical data which was
published or otherwise generally available to the public.
The last related to "information which was not designed or
intended to be used, or which could not reasonably be expected
to be used, in direct application in the design, production,
[etc.], of defense articles (for example, general mathematical,
engineering, or statistical information not purporting to have
or not reasonably expected to be given direct application to
defense articles)."  As noted above, these categories of
information are generally covered in the current draft by
exclusions from the definition of technical data.  Thus, there
are eight exemptions contained in the prior draft which must
be compared to the current draft, and four additional exemp-
tions provided in the current draft to examine.

Six of the exemptions appear to be substantively identical
to, if not verbatim repetitions from, the prior draft.  These
provisions are identified in the footnote below and are not

-8-

relevant to our discussion. 9/  The two remaining exemptions
contained in the prior draft have been narrowed in the current

| 9/ Category of Exemption | Prior Draft | Current Draft |
|---|---|---|
| Export in furtherance of a manufacturing license or technical assistance agreement approved by the Department of State. | § 125.11(a)(3). | § 125.4(b)(2) |
| Export in furtherance of a contract between the exporter and the U.S. Government which provides for the export of certain technical data. | § 125.11(a)(4) | § 125.4(b)(3) |
| Export of manuals and aids relating to lawfully exported articles to the same recipient. | § 125.11(a)(5) | § 125.4(b)(5) |
| Export of additional copies or certain revised copies of technical data previously exported or authorized to be exported to the same recipient. | § 125.11(a)(6) | § 125.4(b)(4) |
| Export of data relating to firearms and ammunition not in excess of .50 caliber. | § 125.11(a)(7) | § 125.4(b)(6). |
| Export of data directly relating to classified information previously exported to the same recipient. | § 125.11(a)(9) | § 125.4(b)(8) |

App. 145

draft.  The revision does not appear to raise any constitu-
tional issues. 10/

The current draft contains five new exemptions.  (For
convenience, we will refer to these five exemptions by the
subsection number of § 125.4(b) of the current draft.)  Two
of the exemptions, subsections (1) and (11), do not alleviate
the effect of the licensing requirement as a prior restraint
on the export of technical data as defined in the regulations.
Subsection (1) exempts information which relates to defense
articles but does not qualify as technical data pursuant to
the definition in § 121.30.  Because we are concerned in this
memorandum only with information which is defined as technical
data and subject to export restrictions because of that defini-
tion, subsection (1), although useful for purposes of clarity,

_____

10/ The prior draft contained an exemption, § 125.11(a)(2),
for information approved for public release by any U.S. Govern-
ment department or agency having authority to classify informa-
tion and material which did not disclose details relating to
articles on the munitions list.  The corresponding provision in
the current draft, § 125.4(b)(13), exempts information approved
for public release by the federal department or agency which
originated or developed the information.  We understand that the
purpose of this change was to make clear that only the depart-
ment or agency which generated the information could confer the
exemption for export by prior approval of the information for
public release.  This change was designed to prevent a situation
in which the action by one agency of releasing to the public
information of another agency, even if not authorized to do so,
would have the consequence of not only putting that information
into the public domain but also triggering the exemption and
thereby allowing export of that information without a license.
We must caution, however, that we are not sure that this revi-
sion will have the intended effect.  If the information is
publicly released by any agency of the Government, we do not
know how that information could be "recaptured" by the Govern-
ment.  Once the information is in the public domain, we cannot
conceive of circumstances in which its export could be consti-
tutionally restricted.

The second change relates to technical data which is being
returned to the original source of import.  In the prior draft,
the exemption applied to all technical data.  See § 125.11(a)(8).
The current draft is limited to information which is not
classified technical data.  See § 125.4(b)(7).  We understand
that the purpose of this change is to withdraw the exemption
allowed under the prior version for the export of classified
information without a license.

-10-

does not affect our consideration of the scope of the prohibi-
tion of the export of technical data without a license or
without an exemption from the licensing requirement.

Subsection (11) exempts the export of technical data
pursuant to an arrangement with the Department of Defense or
NASA which requires such exports if the exporter has been
granted an exemption in writing from the licensing provisions
by the Office of Munitions Control.  In our view, the require-
ment of obtaining an exemption in writing is no different for
purposes of First Amendment analysis from the requirement
of obtaining the license itself.  Both operate as a prior
restraint, and both can be subject to the discretion of the
executive officer from whom each must be sought. 11/  We do
not believe, therefore, that this exemption significantly
affects the scope of the licensing requirement under the ITAR.

Two of the new exemptions do provide greater freedom from
prior restraint on the export of technical data, although they
apply only in narrow factual circumstances.  Subsection (9)
exempts an export by a U.S. corporation to a U.S. person employed
by that corporation overseas, subject to two conditions:  that
the information must be used solely by U.S. persons and the U.S.
person must be directly employed by the U.S. corporation and not
by a foreign subsidiary.  The exemption is further subject to
the limitations found in § 125.1(b) of the current draft, which
precludes use of the license for export of technical data for
foreign production purposes or technical assistance unless
approved in advance by the Department of State.

Subsection (12) exempts any exports specifically exempted
under Part 126 of the subchapter of the ITAR, which includes
shipments by or for federal agencies, certain exemptions for
unclassified technical data exported to and for use in Canada,
and certain exports under the foreign military sales program.
With the exception of the exemption for exports to Canada,
these exemptions do not significantly narrow the scope of the
licensing requirement as applied to private persons.

By expanding the exemptions to the licensing requirement,
these two exemptions, subsections (9) and (12), do improve
the constitutional status of the ITAR, which, as our prior

---

11/  We understand from Mr. Cummings that this written consent
may actually take the form of a license or, for reasons
relating to customs or possibly other laws, it may take the
form of a letter granting consent.

-11-

opinion concluded, suffered from overbreadth because of the
number of unconstitutional applications which we believed the
ITAR to have.  To the extent that the exemptions are expanded,
the overbreadth is reduced.  Our concern, however, is that
neither of these exemptions addresses the specific examples
of unconstitutional prior restraint identified in our prior
opinion, that is, "communications of unclassified information
by a technical lecturer at a university or to the conversation
of a United States engineer who meets with foreign friends at
home to discuss matters of theoretical interest."  See 1981
ITAR Memorandum at 13.

       The remaining exemption, subsection (10), appears to be
an effort to address these types of situations, although this
exemption is also insufficient to eliminate the licensing
requirement in the two specific factual settings posed in the
hypothetical above, as well as other situations which may be
easily suggested.  Subsection (10) exempts disclosure of
unclassified information by U.S. corporations or academic
institutions to foreign persons who are their bona fide and
full time regular employees 12/ if an employee's permanent
abode is in the United States; an employee is not a national
of a country to which exports are specifically prohibited
by the ITAR 13/; and the corporation or institution informs
that employee in writing that the technical data may not be
transferred to other foreign persons without the written

_____

12/  As we understand from Mr. Cummings, this exemption was
intended to be exercised by the employment office of the
corporation or the university, which would have the responsibi-
lity for informing its employees of the extent of their rights
to disclosure to other employees without the prior written
consent of the Office of Munitions Control.

13/  Pursuant to § 126.1 of the current draft, these countries
are:  Albania, Bulgaria, Cuba, Czechoslovakia, East Germany,
Estonia, Hungary, Kampuchea, Latvia, Lithuania, North Korea,
Outer Mongolia, Poland, Rumania, the Soviet Union, Vietnam,
and any other country or area with respect to which the United
States maintains an arms embargo or "whenever an export would
not otherwise be in furtherance of world peace and the security
and foreign policy of the United States."  We assume that these
other countries are publicly announced, from time to time,
according to some objective criteria, so that their identity
and the basis for the prohibition of exports to that country
may be known to potential exporters.

-12-

consent of the Office of Munitions Control.  Under this sub-
section, an exemption would be provided for full time, regular
employees of a single corporation or university to discuss
technical data among themselves.  What is not exempt, however,
without the prior written consent of the Office of Munitions
Control, is a disclosure of the information by an employee of
a corporation or university to a foreign national who is a
part-time or temporary employee of that corporation or univer-
sity; a full time employee of another corporation or univer-
sity; another professional person attending a conference or
a seminar at the corporation or university; a student; or a
friend.

We recognize the attempt made to address the concerns
raised in our prior opinion, and, as we stated with regard to
the new exemptions provided in subsections (9) and (12), to the
extent that subsection (10) constricts the area of application
of the licensing requirement, the additional exemption reduces
the area of potential unconstitutional application of that
requirement.  We have identified, however, a number of circum-
stances in which the prior written consent of the Office of
Munitions Control would be required for disclosure of the
technical data.  As noted above, with regard to subsection
(11), which requires the written consent of that Office for
export of certain technical data pursuant to an arrangement
with the Department of Defense or NASA, we do not believe
that there is a constitutionally significant distinction
between the requirement of obtaining prior written consent
and obtaining a license.  See note 11, supra.  In some of
these circumstances, as well as others, we believe that the
ITAR may still be read to operate as a prior restraint on the
speech of "persons having no direct connection with foreign
conduct in settings in which there is no more than belief or
a reasonable basis for believing (1) that a foreign national
may take the technical data abroad and (2) that the data
could be used by someone there in the manufacture or use of
items on the Munitions List."  1981 ITAR Memorandum at 14.
As we concluded in that memorandum, "[i]n the absence of
special circumstances that would justify prior restraint,
such speech is arguably protected and, as a general rule,
cannot be subjected constitutionally to the . . . licensing
requirement."  Id.

We are aware of the case law interpreting 22 U.S.C. § 2778,
the statutory authority for the ITAR, which requires a specific
intent willfully to export particular goods on the Munitions
List without a license.  See, e.g., United States v. Hernandez,
662 F.2d 289, 292 (5th Cir. 1981) ("statute's requirement of
willfulness connote[s] a voluntary and intentional violation

-13-

of a known legal duty," that is, "that the defendant knew that he was unlawfully exporting weapons on the Munitions List"); United States v. Beck, 615 F.2d 441, 449-50 (7th Cir. 1980) (conviction requires "proof that the defendants (1) exported or attempted to export (2) goods on the United States Munitions List (3) without first having obtained a license for the export (4) willfully"); and United States v. Wieschenberg, 604 F.2d 326, 331 (5th Cir. 1979) (to sustain a conviction for conspiracy to violate the statute, "government must prove that the defendants agreed to and specifically intended to export without a license particular property that is restricted by the Munitions List").  It may be that the standard of knowledge and intent that is imposed by these cases with regard to the export of defense articles might, as applied to technical data, be sufficient to broaden, in effect, the scope of the exemption under subsection (10) to the extent consistent with the constitutional standard articulated in our previous memorandum and reaffirmed here.

We remain of the opinion, however, that on their face, the ITAR still present some areas of potentially unconstitutional application, and, moreover, that we cannot be certain whether existing case law would be sufficient to narrow the range of application to a constitutionally sufficient extent. In any event, as we advised in our 1981 Memorandum with regard to the overbreadth present in the prior draft, we believe that "the best legal solution . . . is for the Department of State, not the courts, to narrow the regulations." See 1981 ITAR Memorandum at 15.

## IV.   CONCLUSION

We have carefully examined the definitions of "export" and of "technical data," as well as the exemptions provided from the licensing requirement, under the current draft of the ITAR, and we believe that the scope of the exemptions is broader, and the coverage of the licensing requirement therefore narrower, in at least three specific areas of importance to private persons:  exports by disclosures to certain employees of U.S. corporations overseas (subsection (9)); certain exports to Canada (subsection (12)); and exports by disclosure of technical data by U.S. corporations and academic institutions to foreign nationals who are their full time, regular employees, subject to certain conditions (subsection (10)).  Notwithstanding these additional exemptions, however, we have identified certain areas which still appear to us to

-14-

present sensitive constitutional issues.  As we previously
recommended, this remaining overbreadth should be eliminated
by more narrowly drafted regulations.

Larry D. Simms
Deputy Assistant Attorney General
Office of Legal Counsel

Attachments:

    Appendix of regulations
    Memorandum of May 11, 1978, for Dr. Frank Press
    Memorandum of July 28, 1981, for Henry D. Mitman

-15-