# EXHIBIT 3



*Export Regulation Office*
*600 14th ST NW Suite 300*
*Washington, DC 20005*

VIA E-MAIL (publiccomments@bis.doc.gov AND DDTCPublicComments@state.gov)

| | |
|---|---|
| Ms. Hillary Hess | Mr. C. Edward Peartree |
| Director, Regulatory Policy Division | Director, Office of Defense Trade Controls Policy |
| Bureau of Industry and Security | Directorate of Defense Trade Controls |
| U.S. Department of Commerce | U.S. Department of State |
| Room 2099B | PM/DDTC, SA-1, 12th Floor |
| Washington, DC  20230 | Washington, DC  20522 |

August 3, 2015

**REF:   RIN 0694–AG32 (BIS) AND RIN 1400-AD70 (DDTC)**

**RE:    Comments on Proposed Revisions to Certain EAR and ITAR Definitions**

Dear Ms. Hess and Mr. Peartree:

On behalf of International Business Machines Corporation ("IBM"), we are submitting these comments in response to the June 3, 2015 notices published by the Departments of Commerce and State concerning proposed revisions to definitions in the Export Administration Regulations ("EAR") and International Traffic in Arms Regulations ("ITAR") as stated in the above reference ("Proposed Rules"). These comments are timely submitted by the due date noted in the Proposed Rules.

IBM provides information technology products and services to customers in over 175 countries, and employs more than 379,000 persons across 75 countries worldwide.  2014 revenues were $92 billion, of which over 60 percent was generated outside the United States.  As IBM's operations are both vast and diverse, a robust internal control program is required to ensure compliance with export regulations.  Changes to the definitions within the regulations will affect the execution of the program as various areas would be impacted by the Proposed Rules, including, but not limited to the following:

- IBM's engagements involving items subject to the ITAR;
- IBM's use of cloud services for both internal and external purposes;

- Employment of foreign persons; and
- IBM's research and development functions responsible for determining the export classification of source code and technology.

IBM thanks both Departments for the opportunity to provide comments on the potential impact of the Proposed Rules. IBM supports the efforts undertaken by the Departments to improve and, wherever possible, harmonize the definitions used within the regulations as part of the Obama Administration's ongoing Export Control Reform ("ECR") initiative. It is IBM's position that many of the proposed definitions that are set forth in the Proposed Rules are an improvement on the current EAR and ITAR regulations. In particular, IBM greatly appreciates the proposed amendments to the ITAR definitions of "defense article," which would now include software and "defense services," thereby clarifying that servicing an item subject to the EAR which has been installed into a defense item would not be considered an ITAR-controlled activity.

IBM would like to offer the following recommendations for further improvements to the Proposed Rules.

**RECOMMENDATIONS**

**1. Activities That Are Not "Exports," "Reexports," or "Transfers" (EAR § 734.18) (ITAR § 120.52)**

The Proposed Rules create an exclusion from the definitions of "export," "reexport," and "transfer" for unclassified technology or software secured with end-to-end encryption using specific cryptographic modules following NIST standards and not stored in specific countries. The EAR Proposed Rule includes a provision which allows flexibility in the cryptographic methods used to meet the exclusion by including the statement "other similarly cryptographic means," whereas the ITAR Proposed Rule is rigid in its implementation.

IBM is appreciative of the exclusion and believes it will benefit industry by simplifying compliance with respect to cloud storage solutions and email transmissions; however, the use of cloud is much more pervasive and includes cloud-based software-as-a-service (SaaS) solutions and platform-as-a-service (PaaS) solutions, among others. As a result, additional exclusions are necessary to allow more freedom of action in this rapidly growing space. There is also a concern with the ITAR's proposed language, as it does not allow for industry to determine the best methods for protecting data. In addition, the referenced NIST guidance and certification requirements were not easily found.

**RECOMMENDATION**: IBM recommends that the proposed exclusion language in the EAR be adopted for both regulations. In addition, information on the referenced NIST guidance and certification requirements needs to be readily accessible on the Departments' web sites so users are more easily able to find the information. Lastly, IBM recommends that additional exclusions or exceptions be adopted in both regulations that would benefit cloud service providers and users

beyond the end-to-end encryption solutions for storage and email transmissions. Specifically, it would be helpful if two additional provisions were included:

a. Exclusion for the intracompany use of cloud solutions by foreign nationals directly employed by entities which have implemented a robust compliance program; and

b. Exclusion in the end-to-end encryption requirement for the decryption of data by the cloud user to perform operations within the cloud environment.

**2. Activities That Are Not "Exports," "Reexports," or "Transfers" (ITAR § 120.52)**

The ITAR Proposed Rule includes a provision which allows authorized foreign persons to hand carry technology and software subject to the ITAR; however, each use of this provision by the authorized foreign person must be documented.

In order for a foreign person to be authorized to obtain the technology and software in the first place, the exporter would have had to complete the export licensing process and been granted an approval. The approvals contain various provisos for use of the authorization, with which the exporter would be responsible for ensuring compliance. Adding a proviso independent from the licensing process may cause confusion for the exporter as both the license and the regulations would have to be consulted.

**RECOMMENDATION**: IBM recommends that any documentation requirements should be included within the licensing provisos.

**3.   Activities That Are Not "Deemed Reexports"**

   **A.  Requirement to Be "Certain" (EAR § 734.20(a)(2))**

In the BIS Proposed Rule, a "deemed reexport" does not occur if the "technology" or "source code" is released to a foreign national, provided the entity has received it under an export authorization (i.e., license, license exception, or NLR) and, per subparagraph (a)(2), the entity must be "certain" about the foreign national's most recent citizenship.

The term "certain" indicates that the exporter must have the information verified to a level without any doubt. IBM is concerned with the amount of documentation required to achieve this standard, as well as the level of investigation needed to remove any uncertainty. Under normal hiring practices, identity and employment verification relies on standard documentation requirements (i.e., passport, permanent resident cards, and visas). This is the standard which export regulations should follow so no additional administrative burden is placed on the exporter.

**RECOMMENDATION**: IBM recommends the removal of the "certain" standard from the proposed language and instead to the use of a knowledge standard that is based on documentation obtained during normal hiring practices.

### B. Requirement to Screen for "Substantive" Contacts (EAR § 734.20(c))

Under the proposed section, subparagraph (c) allows for an exclusion to nationals outside of Country Group A:5 as long as various conditions have been met. Under (c)(5)(ii)(B) – (D), the requirements include the need to screen the employee for "substantive" contacts with countries listed in Country Group D:5, with records maintenance at a minimum of 5 years or the duration of the employment.

This requirement is problematic in that "substantive" is an undefined term and is therefore, open to interpretation by both the exporter and the regulator. Secondly, normal business practices do not invoke a continuous screening of an individual once they have become an employee. As a result, this requirement would add administrative burden as well as a cost for conducting the additional screening throughout the span of the employee's tenure at the company. Thirdly, there is no carve out for contact with D:5 countries on behalf of the employer who may lawfully conduct business operations within the specified countries.

**RECOMMENDATION:** IBM recommends removal of the ongoing screening requirements from the exclusion. If this is not possible, IBM instead recommends the introduction of an exclusion for contact with D:5 countries as part of the individual's defined work scope.

### 4. "Peculiarly Responsible" (EAR § 772.1) (ITAR § 120.46)

The proposed definition of "peculiarly responsible" is a welcome addition to the regulations; however, it now modifies the terms which are currently included under the existing "required" definition, resulting in the introduction of the "catch and release" construct similar to that which was implemented for the term "specially designed." "Peculiarly responsible," though not defined, is a well understood concept by industry and easily explained to technical engineers and developers. The "catch and release" mechanism introduces additional complexity in that those technical personnel will now require a much broader understanding of the regulations to determine what may be controlled only for specific reasons, what may be classified as EAR99 or classified under a commodity jurisdiction, what the intent for which the item was developed, and if the item is identical to information used with items already in production. This additional complexity will complicate the classification exercise, require the inclusion of additional persons to perform this exercise, and increase the risk of classification errors by well-intentioned technical personnel who are not expert in the export regulations.

**RECOMMENDATION:** IBM recommends removal of the "catch and release" construct in the definition and limit the definition to "the technology or source code responsible for allowing an enumerated item to exceed the controlled performance levels, characteristics or functions."

### 5. "Release" (EAR §734.15; ITAR §120.50)

The proposed definition of "release" in the Proposed Rules under subparagraph (a)(1) includes "visual or other inspection" by a foreign person which reveals a controlled defense item or

"technology" or "source code" subject to the EAR. The newly defined term fails to indicate what level of access is subject to the control, which has been a historical area of confusion for industry. Specifically, does the "release" include both theoretical access and actual access, or is it limited to when an identifiable release has occurred? As an example, if a foreign person is given general access to a server which contains a database of controlled technical data, theoretical access has occurred; however, it is not until that individual visually inspects the contents of the database that controlled technical data has been provided.

**RECOMMENDATION**: IBM recommends both definitions be revised to indicate that "release" only occurs when EAR or ITAR controlled "technology" or "source code" has been visually inspected.

### 6. "Transfer" (In-Country) (EAR § 734.16) and "Retransfer" (ITAR § 120.51)

The proposed EAR definition of "transfer" and the proposed ITAR definition of "retransfer" include a change in end use as part of the defined term. This is an expansion on the current reach of the regulations. To determine a change in end use would require an exporter to continuously monitor how the exported item is being used by the third party. In a traditional sales environment, an exporter would not have visibility to how an exported item is being used unless the exporter and recipient were in a joint agreement which extends the relationship past the point of sale. This is not a typical sales model, and this level of knowledge would not be attainable during the normal course of business. Once a traditional sale is complete, the information on how the product is being used is not available.

**RECOMMENDATION**: IBM recommends the definitions be revised to remove a change in end use. Alternatively, the definition should be modified to indicate the obligation for the "transfer" or "retransfer" is on the ultimate consignee, not the original exporter.

### 7. "Defense Services" (ITAR § 120.9)

Under the proposed definition of "defense service," the Note to paragraph (a) lists various activities which are not included as a "defense service." The exclusions, specifically under number 3, include the servicing of items subject to the EAR, except as described in paragraph (a)(5) of this section. However, under (a)(5), the furnishing of assistance on a defense article or an item specially designed for a defense article to the government of a §126.1 listed country is a controlled defense service. As (a)(5) clearly defines that the items must be a defense article or an item specially designed for a defense item, the items would not be "subject to the EAR." This automatically disqualifies the activity described in exclusion number 3 to the Note to paragraph (a). As a result, the reference to the exclusion in (a)(5) is not required.

**RECOMMENDATION**: IBM recommends the removal of the reference to the (a)(5) exclusion in number 3 to the Note to paragraph (a).

### 8. "Public Domain" (ITAR § 120.11)

Under the ITAR Proposed Rule, eligibility for the release into the "public domain" of "technical data" or software hinges on a requirement to obtain a pre-approval through one of several listed U.S. government sources. In addition, in Note 1, a user is ineligible to further export, reexport or transfer information in the "public domain," if that user has "knowledge" that the information was placed in the "public domain" without obtaining the required authorizations.

The ability to place "technical data" or software in the "public domain" is protected under the First Amendment of the Constitution (i.e., freedom of speech). Placing pre-publication requirements would be a violation of an individual's fundamental rights.

Further, depending upon the interpretation of Note 1, this Note potentially places an unnecessary burden and a risk of violation on persons which would like to further export, reexport or transfer information from a published source. The Department arguably could take the view that due diligence in this context includes verification of an existing authorization. Such an interpretation would place a burden on the user for information which has been placed in a medium where the data is considered to be freely available without restriction. In addition, without performing due diligence, any future dissemination of the data puts the user at risk of violating the regulations.

**RECOMMENDATION**: IBM recommends that the pre-publication requirement on information being released into the "public domain" as well as Note 1 be removed from the final rule. If Note 1 is maintained, IBM recommends that the Department specify that there is no affirmative duty on the part of users to inquire about the authorization status of information found in the "public domain."

\*   \*   \*

In addition to the specific recommendations previously described, IBM believes that definitions should be consistently listed in the definitions sections of each regulation (i.e. EAR § 772 and ITAR § 120). Interspersing some definitions within the regulatory text and others within the definition sections causes confusion for industry and increases the risk of error. Placement consistency will help to alleviate that issue.

IBM feels these are the most critical changes necessary to ensure the Proposed Rules are able to be easily implemented and understood. We thank you for the opportunity to comment.

Lillian M. Norwood
Manager, Export Regulation Office
Government & Regulatory Affairs
IBM Corporation