# EXHIBIT 7

**DIVISION OF RESEARCH**
Office of the Vice President for Research



August 3, 2015

Mr. C. Edward Peartree
Director
Office of Defense Trade Controls Policy
U.S. Department of State
Washington, DC

RE:  ITAR Amendment – Revisions to Definitions; Data Transmission and Storage
(RIN 1400-AD70)

Dear Mr. Peartree:

I am pleased to provide comments on the proposed amendment to the International Traffic in Arms Regulations.

Texas A&M University is located in College Station, Texas with branch campuses in Galveston, Texas and Doha, Qatar. It is the flagship institution of The Texas A&M University System and home to more than 50,000 students.  It is among the nation's five largest universities, and is one of a select few academic institutions in the nation to hold triple federal designations as a land-grant, sea-grant and space-grant university.  Texas A&M University is also member of the prestigious Association of American Universities and ranks in the top tier of universities nationwide in research expenditures with more than $820 million – attracting prominent, respected scholars and researchers from around the world.

We are pleased to have the opportunity to comment on the proposed Amendment and Revisions to the Definitions to the International Traffic in Arms Regulations (ITAR) and the corresponding changes in the Export Administration Regulations (EAR).  While we appreciate the efforts that have been made to harmonize export control related definitions, we believe that the proposed changes, if adopted, will have a significant impact on Texas A&M University.  Highlighted below are our specific concerns.

### Prepublication Review - §120.49(b)

Texas A&M University has grave concerns about §120.49(b).  As drafted, the technical data that arises during, or results from, fundamental research and that is intended to be published only qualifies to the extent that the researchers are free to publish the "technical data" contained in the research "without <u>any</u> restriction or delay", including "U.S. government-imposed access and dissemination controls or research sponsor proprietary information <u>review</u>." (Emphasis added.)

Mr. C. Edward Peartree
August 3, 2015
Page 2 of 8

We believe that if this language is implemented, it will greatly increase compliance burdens requiring licenses and control plans even where no proprietary information is involved and may make university research less attractive to industry at a time when the Federal government is encouraging greater collaboration with industry to move products more quickly from the lab to the marketplace. Additionally, the proposed language is not harmonized with the EAR and is inconsistent with the way DDTC, the Department of Commerce, and the Department of Defense have interpreted the concept of fundamental research since it was first adopted in the EAR and ITAR.

NSDD-189 distinguishes fundamental research, the results of which are published and shared broadly within the scientific community, from proprietary and restricted research, the results of which are restricted for proprietary or national security reasons. The key point is the restriction. As described in the EAR §734.8(b)(2), "[p]republication review by a sponsor of university research solely to insure that the publication would not inadvertently divulge proprietary information that the sponsor has furnished to the researchers does not change the status of the research as fundamental research."

Similarly, the EAR provides that "[p]republication review by a sponsor of university research solely to ensure that the publication would not compromise patent rights does not change the status of fundamental research, so long as the review causes no more than a temporary delay in publication of the research results." (15 CFR §734.8(b)(3)) – We acknowledge that when proprietary technical information is furnished by outside sources that the furnished data and any derivative data, do not fall under the same protected status as the data resulting from fundamental research.

The proposed rule appears to confuse two very different concepts. In the case of governmental access and dissemination controls, the government does not simply review a research publication but makes a decision to approve the publication for public release or to restrict the release based on national security considerations.

Industry sponsors of university fundamental research insist on reviews simply to ensure that none of the company's proprietary material has made its way in to the research report before it is published and to give it a brief opportunity to decide whether the research has resulted in any patentable inventions. Once any proprietary material is removed and it has made its patenting decision, the company has no further interest in controlling or restricting the publication. If, by contrast, the research sponsor has reserved for itself the ability to restrict the research for proprietary reasons and will use the research results for proprietary purposes, then it no longer qualifies as fundamental research under NSDD-189, the EAR (present or revised), or the present version of the ITAR.

We recognize that it may not be possible to make all of the EAR and ITAR definitions identical under the two sets of regulations due to differences in the underlying reasons for control of items on the U.S. Munitions List or Commerce Control List. However, because information arising during, or resulting from, fundamental research is publicly available and shared broadly in the

scientific community, and is therefore not subject to control under either set of regulations, we believe the definition of "fundamental research" should be harmonized across both regulatory regimes.

Further, a non-locus based approach to evaluating fundamental research is favored in that it correctly allows for the First Amendment protections afforded to information arising during and resulting from fundamental research, even in other countries. The courts and federal agencies have long recognized this First Amendment protection.

Since fundamental research by its very definition does not involve ITAR-controlled technical data, there should not be any overriding national security consideration that would allow DDTC to impose ITAR licensing requirements on protected expression. Requiring an institutional locus within the United States in order to qualify information as fundamental research unnecessarily limits protected expression abroad.

For your consideration, below is suggested revised language to §120.49(b):

> (b) *Publication restrictions.* Information and software that arises during, or results from, fundamental research is intended to be published to the extent that the researchers are free to publish the information or software contained in the research without any restrictions based on U.S. government-imposed access and dissemination controls or research sponsor proprietary information restrictions. Prepublication review by a research sponsor solely to insure that the publication would not inadvertently divulge the sponsor's proprietary information or to protect patent rights related to the research does not change the status of the fundamental research, so long as the review causes no more than a temporary delay in publication of the research results.

### Fundamental Research - §120.49(a)

We believe that the description of fundamental research that appears in the jurisdictional language of §120.6 should carry through to §120.49. The open, publishable character of the research should determine whether the research qualifies as fundamental research not the geographic locus or nature of the sponsor. Additionally, information and software that arise during, or result from, fundamental research should not be subject to ITAR. This is consistent with National Security Decision Direction 189 (NSDD-189) upon which §120.49 and its regulatory predecessors are based.

For your consideration below is suggested language for §120.49:

> **§120.49 Information and software that arises during, or results from, fundamental research.**

Mr. C. Edward Peartree
August 3, 2015
Page 4 of 8

> *(a) Information and software arising during, or resulting from, fundamental research.* Unclassified information or software that arises during, or results from, fundamental research as defined in paragraph (c) of this section.
>
> \*       \*       \*
>
> **Note 1 to paragraph (a):** The inputs used to conduct fundamental research, such as information, equipment, or software are not excluded from control as "defense articles" or "technical data" except to the extent that such information, equipment, or software arose during or resulted from fundamental research.

### Definitions of basic research, applied research, and development - 120.49(c)

We appreciate the Department's efforts to clarify the distinctions between "basic research" and "applied research" within fundamental research as opposed to "development" as defined in §120.47. The emphasis on serial production as related to "development" is particularly useful. However, we believe that activities that may occur during "applied research" as part of a fundamental research project should be included in the "applied research" definition, even if they resemble some of the activities that occur during development. In this regard, we believe that the Department should include concepts and terms that are used in existing ITAR provisions such as §125.4(c)(3). We recommend an additional clause for the proposed definition of "applied research".

For your consideration, below is the suggested language for §120.49(c)(2):

> (iv) Attempts to determine the means by which a recognized and specific need may be met, including a systematic application of knowledge toward the production of useful materials, devices, and systems or methods, including the design, development, and improvement of prototypes and new processes to meet specific requirements.

For further clarity, we believe that it may be useful to add a note to paragraph (c) concerning the non-proprietary nature of applied research in the context of the fundamental research definition.

For your consideration, below is suggested language for §120.49(c):

> **Note 1 to paragraph (c):** Applied research does not include efforts whose principal aim is design, development, or testing of specific items or services to be considered for sale; these efforts are within the definition of the term development, defined in this subsection.

### Defense Articles and Education Information – §120.6 (b)(3)

The revised §120.6 definition for "defense article" makes useful distinctions between the terms for "item," "software," or "technical data" designated in §121.1. In particular, it is helpful that §120.6(b)(3) states that information and software that (i) are in the public domain; or (ii) arise during, or result from fundamental research are not subject to the ITAR. This clarity in describing precisely what sort of information is and is not subject to the ITAR should be carried

over to §120.49 [misidentified as §120.46 in the current text]. We appreciate that the Department recognizes that the fundamental research exclusion applies not merely to the research results but also the information and software that arise during the research, assuming that it otherwise meets the requirements of §120.49.

With respect to §120.6(b)(3)(iii), we make the same comment made concerning the proposed §734.3(b)(3)(iii). In neither case should these terms and the concept of "educational information" be limited to "general" scientific, mathematical, and engineering principles taught in schools. A great deal of university education in the U.S. is based on basic and applied research that is current and innovative and keeps the U.S. at the forefront of higher education throughout the world. University education today addresses not only "general principles" but also specific principles, and processes and techniques, particularly in the applied work of universities in teaching laboratories. This is particularly true in the capstone experience context. The definition of "applied research" within the definition of fundamental research in §120.49(c)(2)(ii) covers processes and techniques and should apply with equal force when this information is released in applied coursework.

If the information is provided in a catalog course, that should be sufficient to treat such information similar to information that arises during, or results from, fundamental research. In addition, academic institutions that are contemplating new curricular additions should not receive different treatment for their innovative course offerings simply because they may not yet be "commonly taught" in other schools.

For your consideration, below is suggested language for §120.6(b)(3)(iii):

> (iii) Concern scientific, mathematical and engineering principles, processes, and techniques taught in schools, and released by instruction in a catalog course or associated teaching laboratory of an academic institution;

### Defense Services §120.9(a)(1)

We have concerns about the definition of defense services. The proposed definition decouples actual use of technical data in providing defense services and instead is based on knowledge gained through the development of defense articles. Per Note 1 to paragraph (2)(1), it establishes deemed knowledge of U.S. origin technical data by virtue of participation in the development of a defense article.

Note 1 to paragraph (a)(1) states that a person is deemed to have knowledge of U.S.-origin technical data directly related to a defense article if the person "participated in the development of a defense article" described in the same USML paragraph or "accessed (physically or electronically) technical data directly related to the defense article that is the subject of the assistance, prior to performing the service."

We believe that there should be a clear connection to using the technical data in providing the assistance. As currently proposed, the definition relies on the knowledge of an individual's past experience and memory. This is a highly subjective criterion, which we believe will be difficult from both a compliance and an enforcement standpoint.

For your consideration, below is suggested language for §120.9(a)(1):

> (1) The furnishing of assistance (including training) . . . by a U.S. person or foreign person in the United States who either uses U.S.-origin technical data directly related to the defense article that is the subject of the assistance in the course of providing the assistance or who bases the assistance on U.S.-origin technical data directly related to the defense article that is the subject of the assistance.

### Public Domain Information -Defense articles §§120.9(a)(2) and 120.47

§120.9(a)(2) covers the furnishing of assistance in "the development of a defense article, or the integration of a defense article with any other item regardless of whether that item is subject to the ITAR or technical data is used".

We are concerned that changes to the definition of defense services in §120.9 (a)(2) (i.e., "integration" using public domain information) may adversely affect a number of university activities including the normal sharing of academic information traditionally understood to be outside the scope of regulation under the ITAR.

Noticeably absent from the proposed changes to "defense services" is consistent qualification of technical data or assistance "significantly and directly related to" defense articles on the USML. Currently, §120.9(a)(2) appears to be drafted specifically to capture exchanges that are not significantly and directly related to defense articles on the USML. Without the "significantly and directly related to [a defense article]" qualifier, we believe the definition of defense services is unduly broad, and may interfere with First Amendment protected expression.

### Public Domain - §124.1

We are concerned about the characterization of technical data and software as not being in the public domain if it has been made available to the public without authorization from the government. We believe that the language will be difficult to interpret and implement and has the potential to be overly broad in scope. In particular, it is unclear how the restriction will impact data and software available to the public currently.

### Conforming Changes to §124.1 and Licensing Guidance

It should be noted that whatever the final form of §120.9(a), the requirements applicable to manufacturing license agreements and technical assistance agreements in §124.1 will need to be revised to clarify that a defense service requiring such an agreement no longer includes a defense

service using only public domain information. Conforming changes will also be required for DDTC's licensing guidance.

For your consideration, below is suggested language for §120.49:

> **§120.49 Information and software that arises during, or results from, fundamental research.**
>
> *(a) Information and software arising during, or resulting from, fundamental research.* Unclassified information or software that arises during, or results from, fundamental research as defined in paragraph (c) of this section.
>
>   \*    \*    \*
>
> **Note 1 to paragraph (a):** The inputs used to conduct fundamental research, such as information, equipment, or software are not excluded from control as "defense articles" or "technical data" except to the extent that such information, equipment, or software arose during or resulted from fundamental research.

### End-to-End Encryption Standard §120.52(a)(4)

We believe the addition of §120.52 listing activities that are not exports, reexports or transfers is a useful addition to the ITAR. In particular, the exclusion of sending, taking or storing technical data or software that is secured using end-to-end encryption from export activities is welcome to the academic research community as it will reduce the faculty burden associated with international travel and the need to monitor and conduct research using main campus resources while abroad.

### Effective Date of the Final Rule

While the revised definitions do not make changes to the USML or the CCL, as written they have a significant impact on regulatory burden for U.S. universities. Most industry sponsors of university research, as well as many foundations, require limited time prepublication review to prevent the inadvertent disclosure of sponsor proprietary information and to permit seeking of patent protection as applicable. Most universities with policies on publication restrictions have defined limits written into their policy for prepublication reviews. U.S. universities have until now interpreted such reviews as within the scope of fundamental research. If the proposed changes to the ITAR §120.49(b) Prepublication Review go to final rule without changes, Texas A&M University, like many other universities, will need to change its business practices associated with review and negotiation of sponsored research agreements as well as the management of access to sponsored research. These changes will require implementation of new procedures to determine applicability of the ITAR for fundamental research with prepublication review, determination of commodity jurisdictions for research awards with sponsor review (to determine whether EAR or ITAR definition of "fundamental research" applies), implementation of technology control plans and applications for export licenses for the participation of foreign nationals in the research, monitoring of those plans, and removal of the plans once the

prepublication review has occurred, as well as revised export compliance training for affected departments on campus. Importantly, such review would be required retrospectively for current projects. We believe that these procedures will also require additional staffing for export compliance. Texas A&M University favors as much lead time as possible for implementation and suggests, at a minimum, a 6 month delay in the effective date, and further that the revised regulations be applicable only to new sponsored research begun after the effective date of the Final Rule.

Thank you for the opportunity to provide comments on the proposed changes.

Sincerely,

Dr. Glen A. Laine
Vice President for Research