WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| DEFENSE DISTRIBUTED, et al., | § | |
|      Plaintiffs, | § | |
| | § | |
| v. | § | No. 1:15-cv-372-RP |
| | § | |
| U.S. DEPARTMENT OF STATE, et al., | § | |
|      Defendants. | § | |

---

## **DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT**

## TABLE OF CONTENTS

BACKGROUND .................................................................................................................1

ARGUMENT ....................................................................................................................2

I.  Plaintiffs' First Amendment Claims Should Be Dismissed.......................................2

    A.  The First Amendment Does Not Apply To The Export Of CAD Files That Function To Automatically Create A Firearm Or Its Components ........................................................................................................2

    B.  If the First Amendment Applies, This Regulation Survives First Amendment Scrutiny. ............................................................................5

    C.  ITAR's Export Controls Are Not Unconstitutionally Overbroad...............................8

    D.  ITAR's Export Controls Are Not An Unconstitutional Prior Restraint....................10

II.  Plaintiffs' Second Amendment Claims Should Be Dismissed.................................13

    A.  Plaintiffs Lack Standing to Bring a Second Amendment Challenge............................13

        1.  Defense Distributed Has Not Suffered a Harm to Second Amendment Interests.........................................................................14

        2.  SAF and Conn Williamson Have Failed to Plead Sufficient Allegations of Injury and Any Second Amendment Injury is Not Traceable to Defendants' Acts............................................................15

    B.  Plaintiffs' Second Amendment Challenge Fails on the Merits......................................16

III.  Plaintiffs' Other Claims Should Also Be Dismissed on the Merits. ...........................19

CONCLUSION.................................................................................................................20

## <u>TABLE OF AUTHORITIES</u>

**CASES**

*Ass'n of Am. Physicians & Surgeons, Inc. v. Tex. Med. Bd.*,
   627 F.3d 547 (5th Cir. 2010) ............................................................................15

*Bernstein v. U.S. Dep't. of Justice*,
   192 F.3d 1308 (9th Cir. 1999) ............................................................................4

*Bernstein v. U.S. Dep't. of Justice*,
   176 F.3d 1132 (9th Cir. 1999) ............................................................................4

*Bonds v. Tandy*,
   457 F.3d 409 (5th Cir. 2006) ............................................................................14

*Broadrick v. Oklahoma*,
   413 U.S. 601 (1973) ......................................................................................8, 9

*Brockett v. Spokane Arcades*,
   472 U.S. 491 (1985) ..........................................................................................9

*Brown v. Entm't Merchs. Ass'n*,
   564 U.S. 786 (2011) ........................................................................................17

*Brown v. Livingston*,
   524 F. Appx. 111 (5th Cir. 2013) ....................................................................15

*Bullfrog Films v. Wick*,
   646 F. Supp. 492 (C.D. Cal. 1986) ....................................................................4

*Capital Cities/ABC, Inc. v. Brady*,
   740 F. Supp. 1007 (S.D.N.Y. 1990) ................................................................11

*Catholic Leadership Coal. of Tex. v. Reisman*,
   764 F.3d 409 (5th Cir. 2014) ............................................................................10

*CFTC v. Vartuli*,
   228 F.3d 94 (2d Cir. 2000) ............................................................................3, 4

*City of Lakewood v. Plain Dealer Publ'g Co.*,
   486 U.S. 750 (1988) ............................................................................10, 11, 12

*City of Littleton v. Z.J. Gifts D-4*,
   541 U.S. 774 (2004) ..................................................................................11, 12

*Collins v. Morgan Stanley Dean Witter*,
    224 F.3d 496 (5th Cir. 2000) ........................................................................3

*Def. Distributed v. Dep't of State*,
    121 F. Supp. 3d 680 (W.D. Tex. 2015) ("*DD I*") .................................*passim*

*Def. Distributed v. Dep't of State*,
    838 F.3d 451 (5th Cir. 2016) ("*DD II*"),
    rehearing *en banc* denied, 865 F.3d 211 (5th Cir. 2017),
    *certiorari* denied, 138 S. Ct. 638 (2018) .........................................*passim*

*District of Columbia v. Heller*,
    554 U.S. 570 (2008) ....................................................................................16

*Equal Rights Ctr. v. Post Properties, Inc.*,
    633 F.3d 1136 (D.C. Cir. 2011) ...................................................................16

*Ezell v. City of Chicago*,
    651 F.3d 684 (7th Cir. 2011) ...............................................................13, 14

*Fontenot v. McCraw*,
    777 F.3d 741 (5th Cir. 2015) ......................................................................14

*Forsyth Cnty. v. Nationalist Movement*,
    505 U.S. 123 (1992) ....................................................................................11

*Freedman v. State of Md.*,
    380 U.S. 51 (1965) ......................................................................................11

*FW/PBS v. City of Dallas*,
    493 U.S. 215 (1990) ....................................................................................14

*Hazelwood Sch. Dist. v. Kuhlmeier*,
    484 U.S. 260 (1988) ....................................................................................10

*Holder v. Humanitarian Law Project*,
    561 U.S. 1 (2010) ..................................................................................4, 5, 6

*Hotze v. Burwell*,
    784 F.3d 984 (5th Cir. 2015) ......................................................................14

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*,
    515 U.S. 557 (1995) ......................................................................................3

*Junger v. Daley*,
    209 F.3d 481 (6th Cir. 2000) ........................................................................5

*Karn v. U.S. Dept. of State,*
   925 F.Supp. 1 (D.D.C. 1996) ............................................................................10

*Laker Airways, Ltd. v. Pan Am. World Airways, Inc.,*
   604 F. Supp. 280 (D.D.C. 1984) .........................................................................4

*Lewis v. Casey,*
   518 U.S. 343 (1996) ..........................................................................................14

*Mance v. Sessions,*
   880 F.3d 183 (5th Cir. 2018) .....................................................................*passim*

*Matal v. Tam,*
   137 S. Ct. 1744 (2017) .......................................................................................6

*Mather v. Central Pac. Bank,*
   2014 WL 5580963 (D. Haw. 2014) ..................................................................15

*Members of City Council of City of L.A. v. Taxpayers for Vincent,*
   466 U.S. 789 (1984) ............................................................................................9

*Milwaukee Police Ass'n v. Jones,*
   192 F.3d 742 (7th Cir. 1999) ............................................................................10

*Miss. State Democratic Party v. Barbour,*
   529 F.3d 538 (5th Cir. 2008) ............................................................................14

*N.Y. State Club Ass'n v. City of New York,*
   487 U.S. 1 (1988) ................................................................................................8

*Nat'l Rifle Ass'n of America v. Bureau of Alcohol, Tobacco, Firearms and Explosives,*
   700 F.3d 185 (5th Cir. 2012) ................................................................15, 16, 17

*Near v. Minnesota ex rel. Olson,*
   283 U.S. 697 (1931) .....................................................................................11, 12

*New York Times Co. v. United States,*
   403 U.S. 713 (1971) ..........................................................................................11

*Oller v. Roussel,*
   609 F. App'x 770 (5th Cir. 2015) .....................................................................12

*Petro-Chem Processing v. EPA,*
   866 F.2d 433 (D.C. Cir. 1989) ..........................................................................16

*Prometheus Radio Project v. FCC,*
   373 F.3d 372 (3d Cir. 2004) .........................................................................8, 18

*Pub. Citizen, Inc. v. Bomer*,
    274 F.3d 212 (5th Cir. 2001) ................................................................................ 14, 15

*Reed v. Town of Gilbert*,
    135 S. Ct. 2218 (2015) ........................................................................................ 5, 6

*S. Utah Wild. Alliance v. Palma*,
    2011 WL 2565198 (D. Utah 2011) ......................................................................15

*Sec'y of State of Md. v. Munson*,
    467 U.S. 947 (1984) ..............................................................................................9

*Second Amendment Arms v. City of Chicago*,
    135 F. Supp. 3d 743 (N.D. Ill. 2015) ................................................................14

*Shelby Cty. v. Holder*,
    133 S. Ct. 2612 (2013) ........................................................................................17

*Se. Promotions v. Conrad*,
    420 U.S. 546 (1975) ............................................................................................12

*Spokeo, Inc. v. Robins*,
    136 S. Ct. 1540 (2016) ........................................................................................14

*Stagg P.C. v. U.S. Dep't of State*,
    158 F. Supp. 3d 203 (S.D.N.Y. 2016),
    *aff'd*, 673 F. App'x 93 (2d Cir. 2016),
    *cert. denied*, 138 S. Ct. 721 (2018) ..................................................................... 6, 9

*Teixeira v. County of Alameda*,
    873 F.3d 670 (9th Cir. 2017) ......................................................................13, 14, 17

*Texas v. Johnson*,
    491 U.S. 397 (1989) ..............................................................................................2

*U.nited States v. Hicks*,
    980 F.2d 963 (5th Cir. 1992) ............................................................................ 8, 9

*United States v. Hsu*,
    364 F.3d 192 (4th Cir. 2004) ..............................................................................20

*United States v. Chi Mak*,
    683 F.3d 1126 (9th Cir. 2012) ......................................................................*passim*

*United States v. Edler Indus., Inc.*,
    579 F.2d 516 (9th Cir. 1978) ............................................................................ 6, 11

*United States v. Martinez,*
    904 F.2d 601 (11th Cir. 1990) ............................................................................... 7

*United States v. Posey,*
    864 F.2d 1487 (9th Cir. 1989) ............................................................................... 6

*United States v. Williams,*
    553 U.S. 285 (2008) ............................................................................................. 20

*United States v. Zhen Zhou Wu,*
    711 F.3d 1 (1st Cir. 2013),
    *cert. denied sub nom., Yufeng Wei v. United States,* 134 S. Ct. 365 (2013) .............................................. 2, 20

*Universal City Studios, Inc. v. Corley,*
    273 F.3d 429 (2d Cir. 2001) .................................................................................. 4

*Valley Forge Christian College v. Ams. United for Separation of Church and State, Inc.,*
    454 U.S. 464 (1982) ............................................................................................. 16

*Virginia v. Hicks,*
    539 U.S. 113 (2003) ............................................................................................... 9

*Voting for Am., Inc. v. Steen,*
    732 F.3d 382 (5th Cir. 2013) ........................................................................ 3, 4, 9

*Warth v. Seldin,*
    422 U.S. 490 (1975) ............................................................................................... 8

*Williams-Yulee v. Florida Bar,*
    135 S. Ct. 1656 (2015) ........................................................................................... 8

## STATUTES

18 U.S.C. § 2339B .......................................................................................................... 5

22 U.S.C. § 2778……………..........................................................................*passim*

## REGULATIONS

22 C.F.R. § 120.1 *et seq.* .............................................................................................. 2

22 C.F.R. § 120.4 ...................................................................................................... 2, 8

22 C.F.R. § 120.6 ................................................................................................ 2, 7, 20

22 C.F.R. § 120.10 ....................................................................................................*passim*

22 C.F.R. § 120.11 ............................................................................................................... 7, 11

22 C.F.R. § 120.17 ...............................................................................................................19

**RULES**

Fed. R. Civ. P. 12(b)(6).........................................................................................................4

**OTHER AUTHORITIES**

*Black's Law Dictionary* (10th ed. 2014).............................................................................8

Constitutionality of the Proposed Revision of the International
 Traffic in Arms Regulations,
       5 Op. O.L.C. 202 (1981)…………………………………………………………13

WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

DEFENSE DISTRIBUTED, et al.,
  Plaintiffs,

v.

U.S. DEPARTMENT OF STATE, et al.,
  Defendants.

§
§
§
§
§
§
§
§
§
§

No. 1:15-cv-372-RP

---

## DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT

At issue in this litigation is the United States' ability to control the export of weapons—a system of laws and regulations that seeks to ensure that articles useful for warfare or terrorism are not shipped from the United States to other countries (or otherwise provided to foreigners) without authorization, where, beyond the reach of U.S. law, they could be used to threaten U.S. national security, U.S. foreign policy interests, or international peace and stability. Plaintiffs challenge restrictions on the export of Computer Aided Design ("CAD") files and other, related files, that are indispensable to a three-dimensional ("3-D") printing process used to create firearms and their components. There is no dispute that the Government does not restrict Plaintiffs from disseminating such files domestically to U.S. persons or from using such files to make or acquire firearms in the United States. Nonetheless, Plaintiffs seek to bar the Government from preventing the *export* of these design files, which can be easily used overseas to make firearms that are subject to U.S. export controls. Plaintiffs' characterization of such an export as the mere "publication" of information is wrong—these files unquestionably direct the functioning of a 3-D printer, cause it to manufacture firearms, or otherwise enable the creation of such firearms by those abroad. Whatever informational value there may be in the process by which 3-D printing occurs, the CAD files are also functional, directly facilitate the manufacture of weapons, and may properly be regulated for export. As set forth below, Plaintiffs' Second Amended Complaint should be dismissed.

## BACKGROUND

In the spring of 2015, Plaintiffs filed their initial Complaint in this action and moved for a preliminary injunction. *See* ECF Nos. 1, 7.  On August 4, 2015, this Court entered an Order denying Plaintiffs' motion. *See Def. Distributed v. Dep't of State*, 121 F. Supp. 3d 680 (W.D. Tex. 2015) ("*DD*

*I*"). Appellate review confirmed the Court's Order, *see Def. Distributed v. Dep't of State*, 838 F.3d 451 (5th Cir. 2016) ("*DD II*"), rehearing *en banc* denied, 865 F.3d 211 (5th Cir. 2017), *certiorari* denied, 138 S. Ct. 638, after which proceedings resumed in this Court. On March 16, 2018, Plaintiffs filed the Second Amended Complaint ("SAC"). *See* ECF No. 90.

In its August 4, 2015 Order, the Court set forth an account of the statutory and regulatory provisions that are the target of Plaintiffs' challenge:

> Under the Arms Export Control Act ("AECA"), "the President is authorized to control the import and the export of defense articles and defense services" and to "promulgate regulations for the import and export of such articles and services." 22 U.S.C. § 2778(a)(1). The AECA imposes both civil and criminal penalties for violation of its provisions and implementing regulations, including monetary fines and imprisonment. *Id.* § 2278(c) & (e). The President has delegated his authority to promulgate implementing regulations to the Secretary of State. Those regulations, the International Traffic in Arms Regulation ("ITAR"), are in turn administered by the [Directorate of Defense Trade Controls ("DDTC")] and its employees. 22 C.F.R. 120.1(a).
>
> The AECA directs that the "defense articles" designated under its terms constitute the United States "Munitions List." 22 U.S.C. § 2278(a)(1). The Munitions List "is not a compendium of specific controlled items," rather it is a "series of categories describing the kinds of items" qualifying as "defense articles." *United States v. Zhen Zhou Wu*, 711 F.3d 1, 12 (1st Cir.) *cert. denied sub nom.*, *Yufeng Wei v. United States*, 134 S. Ct. 365 (2013). . . . The term "defense articles" also specifically includes "technical data recorded or stored in any physical form, models, mockups or other items that reveal technical data directly relating to items designated in" the Munitions List. 22 C.F.R. § 120.6.
>
> A party unsure about whether a particular item is a "defense article" covered by the Munitions List may file a "commodity jurisdiction" request with the DDTC. *See* 22 C.F.R. § 120.4 (describing process). The regulations state the DDTC "will provide a preliminary response within 10 working days of receipt of a complete request for commodity jurisdiction ['CJ']." *Id.* § 120.4(e). If a final determination is not provided after 45 days, "the applicant may request in writing to the Director, Office of Defense Trade Controls Policy that this determination be given expedited processing." *Id.*

*DD I* at 686-87.[1]  This regulatory framework remains in place. *See* 22 C.F.R. 120.1 *et seq.*

## ARGUMENT

### I.   Plaintiffs' First Amendment Claims Should Be Dismissed.

#### A.   The First Amendment Does Not Apply To The Export Of CAD Files That Function To Automatically Create A Firearm Or Its Components.

The First Amendment does not encompass all types of conduct. *Texas v. Johnson*, 491 U.S.

---

[1] Unless otherwise stated, all internal citations and quotation marks have been omitted in this brief.

397, 404 (1989). At a minimum, conduct must be sufficiently expressive and communicative to other persons to qualify for protection under the First Amendment. *See Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*, 515 U.S. 557, 569 (1995); *see also Voting for Am., Inc. v. Steen*, 732 F.3d 382, 389 (5th Cir. 2013) ("[N]on-expressive conduct does not acquire First Amendment protection whenever it is combined with another activity that involves protected speech."). "To determine whether particular conduct possesses sufficient communicative elements to be embraced by the First Amendment, courts look to whether the conduct shows an intent to convey a particular message and whether the likelihood was great that the message would be understood by those who viewed it." *Steen*, 732 F.3d at 388.

Plaintiffs cannot carry their burden to prove that the First Amendment applies to their technical data for the manufacture of firearms and their components. As an initial matter, the relevant ITAR provisions govern the export of defense articles and defense services, including related technical data. As applied to Plaintiffs' CAD files, the regulations are properly focused on restricting an export that can unquestionably facilitate the creation of defense articles abroad. Indeed, the CJ requests Defense Distributed submitted to DDTC illustrate that the mere publication of ideas is not at issue.[2] The CJ requests make clear the CAD files are functional: "essentially blueprints that can be read by CAD software," ECF No. 8-2, Pl. Br. at App. 208,[3] to generate firearms, firearms components, or other defense articles "automatically." *Id.* at 267. Further, in its CJ requests, Defense Distributed itself described its role solely in terms of nonexpressive conduct: "Although DD converted this information into CAD file format, DD does not believe that it created any new technical data for the production of the gun."[4] *Id.* at 211. Plaintiffs' own description

---

[2] "[D]ocuments that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to her claim." *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498-99 (5th Cir. 2000).

[3] Defendants determined that only the CAD files, and not Defense Distributed's related files (such as "read-me" text files), fell within ITAR's commodity jurisdiction. Ex. A, attached hereto.

[4] Defendants recognize that, in its Order denying Plaintiffs' preliminary injunction motion, the Court concluded that "the files [are] subject to the protection of the First Amendment," at least "for the purpose of the preliminary injunction analysis," relying on representations "Plaintiffs made . . . at the hearing that Defense Distributed is interested in distributing the files as 'open source.'" *DD I*, 121 F. Supp. 3d at 692. The Court's provisional conclusion at the PI stage may be revisited, however, and as set forth below, even under that view Plaintiffs' claims should be dismissed. Notwithstanding the notice the Court provided that this allegation is important, Plaintiffs make no

of the items thus removes their conduct from the purview of the First Amendment. *See CFTC v. Vartuli*, 228 F.3d 94, 111 (2d Cir. 2000) (rejecting First Amendment challenge to prohibition on distributing software, and emphasizing that software provided "automatic" advice and, rather than educating the consumer, provided explicit instructions about whether to buy or sell); *Universal City Studios, Inc. v. Corley*, 273 F.3d 429, 454 (2d Cir. 2001) (upholding injunction prohibiting the Internet posting of computer software that facilitated the unlawful reproduction of movies stored on DVDs, because the injunction "target[ed] only the nonspeech component" of the software). Nor have Plaintiffs adequately alleged that the intended export of CAD files "shows an intent to convey a particular message" or that "the likelihood was great that the message would be understood by those who viewed it." *See Steen*, 732 F.3d at 388. Moreover, Plaintiffs do not even allege that they have undertaken any effort to engage in purely domestic distribution of their CAD files, whether on the Internet or otherwise, suggesting their true interests lie in export, not expression. These deficiencies, coupled with the First Amendment's limited application abroad, *e.g.*, *Laker Airways v. Pan Am. World Airways*, 604 F. Supp. 280 (D.D.C. 1984); *Bullfrog Films v. Wick*, 646 F. Supp. 492, 502 (C.D. Cal. 1986), warrant dismissal of Plaintiffs' First Amendment claim pursuant to Rule 12(b)(6).[5]

To be sure, the SAC does reference a Ninth Circuit case, *Bernstein v. U.S. Dep't of Justice*, SAC ¶¶ 21, 28, which extended First Amendment protections to computer source code on the theory that it can be read and understood by humans and, unless subsequently compiled, could not directly control the functioning of a computer. *See* 176 F.3d 1132, 1139-43 (9th Cir. 1999). The opinion in that case, however, was subsequently withdrawn and rehearing granted, suggesting the Court should be cautious before relying on it. *See Bernstein v. U.S. Dep't. of Justice*, 192 F.3d 1308 (9th Cir. 1999). And even assuming, *arguendo*, that the Ninth Circuit's conclusion were correct as to the source code of software—a conclusion with which Defendants disagree—the CAD files here do not merely cause a computer to function generally, but provide specific direction to a machine in furtherance of

---

mention in the SAC of their alleged "open source" intention or any other stated intent for "the files . . . to be used by others as a baseline" for discussion. *Compare id.* at *with* SAC, ECF No. 90 (lacking any reference to "open source" distribution).

[5] Should the Court conclude, as Defendants contend, that Plaintiffs' exports are not sufficiently expressive, the appropriate standard of review would be rational-basis scrutiny, which ITAR plainly satisfies. *See Steen*, 732 F.3d 382, 392 (5th Cir. 2013) (a statute that "regulate[s] conduct alone and do[es] not implicate the First Amendment" should receive rational-basis scrutiny).

manufacturing firearms and defense articles.[6]

    B.  <u>If the First Amendment Applies, This Regulation Survives First Amendment Scrutiny.</u>

"Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed," which includes laws that "defin[e] regulated speech by particular subject matter . . . [or] by its function or purpose." *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2227 (2015). As a result, the Court should assess whether application of the ITAR "furthers a compelling interest and is narrowly tailored to achieve that interest." *Id.* at 2231.

The Supreme Court's analysis in *Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010) ("*HLP*") illustrates why application of the ITAR to Defense Distributed's would-be export of 3-D printing information is permissible. There, the Supreme Court upheld a restriction on providing "material support or resources to a foreign terrorist organization," 18 U.S.C. § 2339B(a)(1), as applied to a group that sought to "facilitate only the lawful, nonviolent purposes" of certain foreign groups. *HLP*, 561 U.S. at 8. The Court recognized that the particular activities in which the plaintiffs wished to engage—legal training and political advocacy—"consist[ed] of communicating a message" and thus, unlike the computer files at issue here, had an expressive component. *See id.* at 28. But the Court nonetheless upheld the statute against a First Amendment challenge, concluding that Congress had permissibly determined that even support for peaceable, lawful conduct "can further terrorism by foreign groups." *Id.* at 30.

In considering the First Amendment challenge in *HLP*, the Court emphasized that the issues presented "implicate[d] sensitive and weighty interests of national security and foreign affairs." *Id.* at 33-45; *see also id.* at 28 ("Everyone agrees that the Government's interest in combating terrorism is an urgent objective of the highest order."). Giving deference to the Government's determinations of the likely consequences of allowing the material support at issue, the Court also concluded that the statute was narrowly tailored to achieve those important interests. *See id.* at 33-37. In doing so, the

---

[6] As this Court noted, the Sixth Circuit in *Junger v. Daley*, 209 F.3d 481, 485 (6th Cir. 2000) similarly "found . . . 'computer source code is . . . protected by the First Amendment.'" *DD I* at 692 (quoting *Junger*). Like *Bernstein*, however, the precedential value of this opinion is nil in light of the dismissal with prejudice agreed to by plaintiff in that case on remand. *See Junger v. Dep't of Commerce*, No. 96-cv-1723-JG, Dkt. No. 123 (N.D. Oh. Nov. 16, 2000).

Court explained that "Congress and the Executive are uniquely positioned to make principled distinctions between activities that will further terrorist conduct and undermine United States foreign policy, and those that will not." *Id.* at 35. Thus, where "sensitive interests in national security and foreign affairs [are] at stake," *id.* at 36, courts applying First Amendment scrutiny must give "significant weight" to the "political branches['] . . . determination" of what is "necessary."[7]

Here, Congress and the Executive Branch have concluded that restrictions on the export of arms are essential to the promotion of "world peace and the security and foreign policy of the United States." 22 U.S.C. § 2778(a)(1). Courts have likewise recognized "the Government's important interest in regulating the international dissemination of military information." *United States v. Chi Mak*, 683 F.3d 1126, 1135 (9th Cir. 2012); *see also United States v. Posey*, 864 F.2d 1487, 1496 (9th Cir. 1989) (citing *United States v. Edler Indus., Inc.* 579 F.2d 516, 520 (9th Cir. 1978)). Indeed, on appeal from this Court's denial of Plaintiffs' motion for a preliminary injunction, the Fifth Circuit explained that "the State Department's stated interest in preventing foreign nationals— including all manner of enemies of this country—from obtaining technical data on how to produce weapons and weapons parts" constitutes "a very strong public interest in national defense and national security." *DD II*, 838 F.3d at 458; *accord Posey*, 864 F.2d at 1497 ("Technical data that is relatively harmless and even socially valuable when available domestically may, when sent abroad, pose unique threats to national security."); *Stagg P.C. v. U.S. Dep't of State*, 158 F. Supp. 3d 203, 210-11 (S.D.N.Y.), *aff'd*, 673 F. App'x 93 (2d Cir. 2016), *cert. denied*, 138 S. Ct. 721 (2018) (holding that injunction barring enforcement of the ITAR's licensing provisions "would have very serious adverse impacts on the national security of the United States"; among the "parade of horribles" would be the release of "digital plans for 3D-printable plastic firearms").

Plaintiffs do not contest this point, either in their SAC or elsewhere. *See* Pls'. Mem. in

---

[7] Although Defendants previously briefed this case as one involving a "content-neutral" Regulation to which "intermediate scrutiny" would apply, *see* Defs.' Opp. to Pls.' Mot. for a PI at 15-18, ECF No. 32, and the Court adopted this reasoning, *see DD I*, 121 F. Supp. 3d at 694, the Supreme Court has made clear that "laws that, though facially content neutral . . . cannot be justified without reference to the content of the regulated speech . . . must also satisfy strict scrutiny." *Reed*, 135 S. Ct. at 2227. *Matal v. Tam*, 137 S. Ct. 1744, 1765-66 (2017) ("laws 'targeted at specific subject matter'" are to be treated "as content based discrimination") (citing *Reed*); *see also DD II*, 838 F.3d at 468-69 (Jones, J., dissenting).

Support of PI at 28, ECF No. 8 (acknowledging that "Plaintiffs do not question that the Government has a compelling interest in regulating the exportation of arms"). That concession, coupled with the deference owed by this Court to national security and foreign policy judgments of the Executive Branch, *e.g., HLP*, 561 U.S. at 35; *United States v. Martinez*, 904 F.2d 601, 602 (11th Cir. 1990), leaves no doubt as to the importance of the Government's interests in this case.

The ITAR's licensing requirements are also narrowly tailored to achieve the Government's compelling interests. In longstanding regulations, the Department of State has consistently and reasonably concluded that it is not possible to meaningfully curtail the overseas dissemination of arms if unfettered access to technical data essential to the production of those arms is permitted. *See* 22 C.F.R. §§ 120.6, 120.10; *see also Chi Mak*, 683 F.3d at 1135 ("The authority to regulate arms traffic would be of negligible practical value if it encompassed only the exportation of particular military equipment but not the exportation of blueprints specifying the construction of the very same equipment."). Nevertheless, the statutory and regulatory scheme confirms that the Government "has been conscious of its own responsibility to consider how its actions may implicate constitutional concerns." *HLP*, 561 U.S. at 35; *see* SAC ¶ 20 (recognizing Government's efforts "to address First Amendment concerns").

For example, the "ITAR makes a point to specifically exclude numerous categories from designation, such as general scientific, mathematical, or engineering papers." *Chi Mak*, 683 F.3d at 1135 (citing *HLP*, 561 U.S. at 35-36). The regulations also exclude from the definition of "technical data" "basic marketing information on function or purpose or general system descriptions of defense articles." 22 C.F.R. 120.10(b). Also excluded is information within the public domain, *id.*, broadly defined as "information which is published and which is generally accessible or available to the public," *inter alia*, "[t]hrough sales at newsstands and bookstores," "[a]t libraries open to the public or from which the public can obtain documents," and "[t]hrough unlimited distribution at a conference, meeting, seminar, trade show or exhibition, generally accessible to the public, in the United States," *id.* § 120.11. And of course, the AECA and ITAR restrict only the export of technical data: "Plaintiffs are free to disseminate the computer files at issue domestically in public or private forums, including via the mail or any other medium that does not provide the ability to

disseminate the information internationally." *DD I* at 695 (rejecting argument that Defendants' interpretation of "export" was overbroad); *see also id.* at 696 ("ITAR provides a method through the commodity jurisdiction request process for determining whether information is subject to its export controls") (citing 22 C.F.R. § 120.4). *Cf. U.S. v. Hicks*, 980 F.2d 963, 970-72 (5th Cir. 1992) (holding statute prohibiting intimidation of flight crew withstood First Amendment strict scrutiny because, as here, the statute "does not cast a sweeping net at amorphous categories of speech"; "the operative term in the instant case[] ["intimidate" in *Hicks*, as "export" here] is a word that is not simply associated with a type of speech, but includes conduct as well"; and "encompasses only a relatively narrow range of speech").

To be sure, a dissent from the Fifth Circuit's opinion in *DD II* rejected this analysis, concluding that the application of the ITAR here could not survive strict scrutiny. But that opinion incorrectly analyzed the question of "overinclusive[ness]," resting its conclusion on a purported distinction between an "export" and "domestic posting on the Internet." *See DD II*, 838 F.3d at 470-71 (Jones, J., dissenting). But "[b]y nature, the Internet is uniform everywhere. Its content is not dependent on geographic or metropolitan boundaries." *Prometheus Radio Project v. FCC*, 373 F.3d 372, 469 (3d Cir. 2004) (Scirica, C.J., concurring in part and dissenting in part). Overinclusiveness can be measured only with respect to available, less-restrictive alternatives, *see Williams-Yulee v. Fla. Bar*, 135 S. Ct. 1656, 1671 (2015), and because the Internet has no dividing lines, the ITAR's regulation of the export of technical data must encompass all such postings to achieve its ends.[8]

C.   ITAR's Export Controls Are Not Unconstitutionally Overbroad.

Plaintiffs also raise an "overbreadth" challenge to the ITAR's regulation of technical data. *See* SAC ¶ 55. Overbreadth is an exception to the prudential standing requirement that a plaintiff may only "assert his own legal rights and interests." *Warth v. Seldin*, 422 U.S. 490, 499 (1975). In circumstances where a regulation is alleged to be so broad that it is incapable of any permissible application, courts may allow a party to bring a facial challenge to a statute because it threatens

---

[8] Nor is it the case that defining "export" to include the transfer abroad of information is improper, as the Fifth Circuit dissent suggests in reliance on, *inter alia*, dictionary definitions of "the verb 'export.'" *DD II*, 838 F.3d at 466-67. But the <u>noun</u> "export" is defined as "[a] product <u>or service</u> created in one country and transported to another." *Export* (noun form), *Black's Law Dictionary* (10th ed. 2014) (emphasis added).

others not before the court. *See N.Y. State Club Ass'n v. City of New York*, 487 U.S. 1, 14 (1987); *Broadrick v. Oklahoma*, 413 U.S. 601 (1973). Overbreadth is "strong medicine" to be used "sparingly and only as a last resort," *Broadrick*, 413 U.S. at 613, and a plaintiff must show that the alleged "overbreadth of a statute [is] not only [] real, but substantial . . . judged in relation to the statute's plainly legitimate sweep," *id.* at 615; *see also Steen*, 732 F.3d at 387 (describing this test for First Amendment facial challenges as "daunting").

First, Plaintiffs' overbreadth claim fails because, for the reasons described above, the AECA and ITAR are not directed at speech, but rather to the export of defense articles and related technical data, 22 U.S.C. 2778(a)(1); 22 C.F.R § 120.1. *See Virginia v. Hicks*, 539 U.S. 113, 124 (2003) ("Rarely, if ever, will an overbreadth challenge succeed against a law or regulation that is not specifically addressed to speech or to conduct necessarily associated with speech"); *see also Members of City Council of City of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 800 n.19 (1984). Further, "[c]ourts need not entertain an overbreadth challenge 'where the parties challenging the statute are those who desire to engage in protected speech that the overbroad statute purports to punish.'" *Hicks*, 980 F.2d at 969 (quoting *Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 504 (1985)). Thus, no overbreadth challenge is "appropriate if the first amendment rights asserted" on behalf of third parties are "essentially coterminous" with those asserted by the plaintiffs themselves. *Id.* And an overbreadth challenge should not properly lie if the regulations have been applied permissibly to Plaintiffs. *See Sec'y of State of Md. v. Munson*, 467 U.S. 947, 958 (1984). Here, because Defense Distributed's explicit purpose is international in nature—to promote "global access to . . . 3D[] printing of arms," SAC ¶ 1— the ITAR is being applied directly in its intended manner.

Additionally, Plaintiffs' overbreadth claim fails on the merits. The ITAR's export controls on technical data have a substantially permissible purpose. Specifically, these regulations prevent the circumvention of export controls on munitions by proscribing the export of instructions, blueprints, or—as in the instant case—the automated processes to produce such munitions. *See Stagg PC*, 158 F. Supp. 3d at 210-11; *Chi Mak*, 683 F.3d at 1135. Further, Plaintiffs have nowhere alleged that the regulations have been applied in a substantial number of impermissible ways. To the contrary, they plead that "[a]t the time Defense Distributed posted the Published Files, there was no publicly

known case of Defendants enforcing a prepublication approval requirement under the ITAR." SAC ¶ 27. Plaintiffs' theory also ignores that the regulations do not extend to domestic distribution of technical data to U.S. persons and carve out a wide exemption for "public domain" data that helps ensure their reach is appropriately limited. *See* 22 C.F.R. § 120.10(b)(5). Accordingly, Plaintiffs' overbreadth claim is without merit. *See Chi Mak*, 683 F. 3d at 1136 (rejecting overbreadth challenge); *Karn v. Dep't of State*, 925 F. Supp. at 13 (D.D.C. 1996) ("plaintiff's overbreadth concerns [about the ITAR's 'technical data' provision] are not genuine").

D.  ITAR's Export Controls Are Not An Unconstitutional Prior Restraint.

Plaintiffs' repeated references to the regulations as a "prior restraint," *e.g.*, SAC ¶¶ 17-22, 40-45, 54-57, do not advance their First Amendment claim. As this Court previously explained, the Fifth Circuit has recognized that "judicial decisions analyzing prior restraints have applied different standards of review depending on the restraint at issue." *DD I*, 121 F Supp. 3d at 692 (quoting *Catholic Leadership Coal. of Tex. v. Reisman*, 764 F.3d 409, 438 (5th Cir. 2014)). For example, while a prior restraint involving "a facially content-based restriction on political speech in a public forum" is subject to strict scrutiny, "a prior restraint on speech in a non-public forum at a school is constitutional if reasonably related to legitimate pedagogical goals." *Milwaukee Police Ass'n v. Jones*, 192 F.3d 742, 749 (7th Cir. 1999) (citing *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 273 (1988)), cited in *Catholic Leadership Coal.*, 764 F.3d at 438.

The licensing scheme at issue here could not plausibly give rise to the sort of censorship that has caused courts to invalidate prior restraints on news publications or public rallies. Heightened concerns about prior restraints arise when "a licensing law gives a government official or agency substantial power to discriminate based on the content or viewpoint of speech by suppressing disfavored speech or disliked speakers." *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 759 (1988). For such concerns to arise, the "law must have a close enough nexus to expression, or to conduct commonly associated with expression, to pose a real and substantial threat of . . . censorship risks." *Id.* By contrast, "laws of general application that are not aimed at conduct commonly associated with expression and do not permit licensing determinations to be made on the basis of ongoing expression or the words about to be spoken[] carry with them little danger of

10

censorship." *Id.* at 760-61. The provisions at issue fall squarely in this latter category. The AECA and ITAR are part of a scheme designed to curtail the spread of defense articles to foreign nationals, in this case, CAD files that directly facilitate the 3-D printing of firearms. Far from being aimed at restricting expression, the regulations "specifically carve out exceptions to the law for the types of information that are subject to the highest levels of First Amendment protection, for example, published scholarly works." *Chi Mak*, 683 F.3d at 1136; *see* 22 C.F.R. § 120.11(a).

While computer files could, in some circumstances, be distributed for expressive purposes, it nonetheless stands in obvious contrast to activities such as parading, posting signs, distributing handbills, or publishing newspapers, which are always (or almost always) done for expressive purposes. Cases involving restrictions on those activities are inapposite here. *See, e.g.*, *New York Times Co. v. United States*, 403 U.S. 713 (1971) (publication of Pentagon Papers in the newspaper); *Near v. Minnesota ex rel. Olson*, 283 U.S. 697 (1931) (publication of charges of official misconduct in newspaper); *Forsyth Cty. v. Nationalist Movement*, 505 U.S. 123 (1992) (permit for protest march). Thus, Plaintiffs' attempt to shoehorn the AECA and ITAR into the classic prior restraint framework is unpersuasive. *Chi Mak*, 683 F.3d at 1136 (rejecting similar prior restraint argument); *see also Edler Indus.*, 579 F.2d at 521 (same). *Cf. Capital Cities/ABC, Inc. v. Brady*, 740 F. Supp. 1007, 1013 (S.D.N.Y. 1990) (upholding against First Amendment challenge licensing strictures for international television broadcasts without concluding such a licensing system constituted a prior restraint).

The ITAR's focus on the activity of exporting also mitigates two of the principal concerns raised by classic prior restraint on expression. First, "[b]ecause the censor's business is to censor," when the government establishes a censorship board like that in *Freedman* and requires it to determine whether a film is "moral and proper," it is likely that the institutional bias of the censors will lead to the suppression of speech that should be permitted. *Freedman v. Md.*, 380 U.S. 51, 52, 57 (1965). In contrast, "laws of general application that are not aimed at conduct commonly associated with expression" do not raise the same concerns about censorship because it will only be a "rare occasion [when] an opportunity for censorship will exist." *Lakewood*, 486 U.S. at 760-61. Second, laws directing determinations about, e.g., "moral" expression raise concern about whether such discretion is unreviewable. *See City of Littleton v. Z.J. Gifts D-4*, 541 U.S. 774, 782-83 (2004)

(upholding licensing scheme that relied on less-subjective criteria than *Freedman*). But where the statute in question regulates general conduct, these concerns are mitigated because "application of the statute to areas unrelated to expression will provide the courts a yardstick with which to measure the licensor's occasional speech-related decision." *Lakewood*, 486 U.S. at 761. Here, regulation of the export of 3-D printing files in furtherance of national security and foreign policy does not focus on the content of expression, moral or otherwise. Nor have Plaintiffs sufficiently alleged that licensing applications are denied at a rate demonstrating an "institutional bias of a censor" here. *See id.*[9]

In addition, Plaintiffs are mistaken in suggesting that the State Department's processing times render the scheme an impermissible prior restraint. *See* SAC ¶¶ 40-43. To begin with, that argument depends on the incorrect conclusion that the licensing scheme is a classic prior restraint subject to *Freedman*'s rigorous procedural requirements. Moreover, on its face, the licensing determination appropriately involves considerations of numerous difficult questions of national security or foreign policy. *See* 22 U.S.C. § 2778(a)(2) (requiring consideration of "whether the export of an article would contribute to an arms race, aid in the development of weapons of mass destruction, support international terrorism, increase the possibility of an outbreak or escalation of conflict, or prejudice the development of bilateral or multilateral arms control or nonproliferation agreements or other arrangements."). Given the stakes and the complexity of the issues involved, there is no basis for Plaintiffs' apparent view that such determinations must be made hastily. Further, there is no legal obligation to obtain a CJ determination before exporting items or data that are not subject to the regulations. As a technical matter, the availability of such determinations thus does not impose a prior restraint. As a practical matter, such determinations will be sought (and may be time consuming) only in difficult cases that require extensive review. And to reiterate, no license, and therefore no determination, is required for domestic distribution to U.S. persons. *Cf. Oller v. Roussel*, 609 F. App'x 770, 774 (5th Cir. 2015) ("To the extent [plaintiff's] First Amendment claims

---

[9] While prior restraints are disfavored in substantial part because it is presumed that after-the-fact punishment is available in the absence of a prior restraint, *see Near v. Minn.*, 283 U.S. 697, 718-19 (1931); *Se. Proms. v. Conrad*, 420 U.S. 546, 558-59 (1975), here, such after-the-fact punishment cannot suffice because of the possible irreversible harm to national security and foreign policy that could not be remedied by later punishment. *See Chi Mak*, 683 F.3d at 1136 ("national security concerns may be more sharply implicated by the export abroad of military data than by domestic disclosure").

arise from a 'prior restraint' on his speech, we find that he fails to show evidence that Defendants have prohibited him from stating his beliefs or censored his speech [given] . . . [t]hat Defendants have allowed Oller to use his textbook as secondary material, discuss his views during class, and publish and speak about his views outside the classroom.").

Finally, Plaintiffs cannot advance their argument by relying on opinions from the Office of Legal Counsel ("OLC") in the Justice Department. SAC ¶ 18. These opinions necessarily analyzed the issues at a relatively high level of generality, and do not address the particular application or circumstances presented here. For example, in one opinion the Justice Department cited the Government's "compelling interest in suppressing the development and use of sensitive technologies abroad," and concluded that the provision of "technical advice" was "an integral part of conduct that the government has a compelling interest in suppressing by appropriate means." Constitutionality of the Proposed Revision of the International Traffic in Arms Regulations, 5 Op. O.L.C. 202, 208 (1981), ECF No. 8-2, App. 123. Written in 1981, the opinion understandably did not analyze the First Amendment implications of the dissemination of computer files on the Internet. Instead, the examples of applications that would raise constitutional concern involved "communications of unclassified information by a technical lecturer at a university" or "the conversation of a United States engineer who meets with foreign friends at home to discuss matters of theoretical interest." *Id.* at 212 (App. 127). This case, however, does not involve university lectures or discussions of matters of theoretical interest at a dinner party. Rather, the regulation's application in this case involves the dissemination of computer files to foreign nationals that can be used to automatically generate firearms, parts, or components that are on the U.S. Munitions List.

Plaintiffs have therefore failed to state a claim for relief under the First Amendment.

## II.    Plaintiffs' Second Amendment Claims Should Be Dismissed.

A.    Plaintiffs Lack Standing to Bring a Second Amendment Challenge.

Plaintiffs' Second Amendment claims are based on two collateral constitutional guarantees Defendants allegedly infringe: "the right to acquire arms, and the right to make arms." SAC ¶ 59; *see Ezell v. City of Chi.*, 651 F.3d 864, 704 (7th Cir. 2011); *Teixeira v. Cty of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017). Yet the SAC is deficient in allegations of injury to support these claims,

notwithstanding the principle that "if the plaintiff does not carry his burden 'clearly to allege facts demonstrating that he is a proper party to invoke judicial resolution of the dispute,' then dismissal for lack of standing is appropriate." *Hotze v. Burwell*, 784 F.3d 984, 993 (5th Cir. 2015) (quoting *FW/PBS v. City of Dallas*, 493 U.S. 215, 231 (1990)); *see Spokeo, Inc. v. Robins,* 136 S. Ct. 1540, 1547 (2016) ("at the pleading stage, the plaintiff must clearly . . . allege facts demonstrating" standing").[10]

     1.  <u>Defense Distributed Has Not Suffered a Harm to Second Amendment Interests.</u>

     To establish standing, "a plaintiff must show: (1) it has suffered, or imminently will suffer, a concrete and particularized injury-in-fact; (2) the injury is fairly traceable to the defendant's conduct; and (3) a favorable judgment is likely to redress the injury." *Miss. State Democratic Party v. Barbour*, 529 F.3d 538, 544 (5th Cir. 2008). The SAC alleges no injury to Defense Distributed associated with any Second Amendment claims: Plaintiffs have not set forth any facts describing how Defense Distributed is limited in its "right to acquire arms" or its "right to make arms." As the Court recognized in the context of Plaintiffs' equally-deficient original Complaint, "Defense Distributed is in full possession of the computer files at issue and thus cannot argue it is being prevented from exercising its rights under the Second Amendment." *DD I* at 696-97. Nor should Defense Distributed be permitted to assert Second Amendment claims on behalf of would-be downloaders of its files: although courts have recognized a right to "firearms retailers to sue on behalf of their potential customers," *Second Amendment Arms v. City of Chi.*, 135 F. Supp. 3d 743, 751 (N.D. Ill. 2015), such standing has not been recognized for a non-profit entity making its services available for free. *See, e.g., id.* (would-be firearms retailer); *Teixeira*, 873 F.3d at 677 (same); *Ezell*, 651 F.3d 704.

     Defense Distributed would also fail to meet the generally-applicable test for standing on behalf of a third-party: it has not, nor could it plausibly, allege the existence of "a close relation" with unnamed, likely-anonymous, and non-paying website visitors, nor has it identified any obstacle to those visitors asserting their own Second Amendment interests. *See Bonds v. Tandy*, 457 F.3d 409, 416 n.11 (5th Cir. 2006) (requiring these elements for a third-party standing claim). Defense Distributed has therefore failed to set forth specific facts indicating that its Second Amendment

---

[10] In reviewing a motion to dismiss for lack of standing, "[t]he court must evaluate each plaintiff's Article III standing for each claim; 'standing is not dispensed in gross.'" *Fontenot v. McCraw*, 777 F.3d 741, 746 (5th Cir. 2015) (quoting *Lewis v. Casey*, 518 U.S. 343, 358 n.6 (1996)).

rights have been injured in fact.  *See Pub. Citizen, Inc. v. Bomer*, 274 F.3d 212, 218 (5th Cir. 2001).

      2.  SAF and Conn Williamson Have Failed to Plead Sufficient Allegations of Injury and Any <u>Second Amendment Injury is Not Traceable to Defendants' Acts.</u>

      Associational standing is available for Second Amendment claims under the same standards as for other claims, *see Nat'l Rifle Ass'n of America v. Bureau of Alcohol, Tobacco, Firearms and Explosives*, 700 F.3d 185, 191 (5th Cir. 2012) ("*NRA*"), but this requires that the organization demonstrate that "its members would otherwise have standing to sue in their own right,"[11] including by pleading that they have suffered a concrete, specific injury sufficient to confer Article III standing. *Id.*

      Here, SAF and Mr. Williamson have failed to sufficiently plead an injury. Even if their alleged "keen interest" in Defense Distributed's files and vague claim that they would "access" such files, SAC ¶ 45, were sufficient to demonstrate a First Amendment injury, their further suggestion that, after doing so, they would "use the files for . . . the manufacture of firearms . . . that they would keep operable and use for self-defense" is a "hypothetical and conjectural" allegation about the usage of these files that is insufficient to satisfy the obligation to plead injury. *Compare Brown v. Livingston*, 524 F. App'x. 111, 114-15 (5th Cir. 2013). It is true that this Court previously held that Mr. Williamson, and by implication, SAF as an organization, <u>had</u> demonstrated injury. *See DD I* at 698. But the Court recognized this standard had been met not by the original Complaint, but by supplementary "affidavit testimony." *Id.* Plaintiffs have added a bare sentence of conclusory allegations to reinforce the pleaded allegations in the SAC. *Compare* SAC at ¶ 45 *with* Compl., ECF No. 1 at ¶ 38. Thus, because Plaintiffs have now been on notice that their pleadings are defective as to standing and have failed to cure this defect through two amended complaints, the Court should dismiss the Second Amendment claims for failure to allege a sufficient injury. *See Mather v. Cent. Pac. Bank*, 2014 WL 5580963 at *3 (D. Haw. 2014) (dismissal after "failure to cure the defects identified" as to standing); *cf. S. Utah Wild. All. v. Palma*, 2011 WL 2565198 (D. Utah 2011) (similar).

      Further, given the passage of nearly three years since the filing of those affidavits, the Court

---

[11] Associational standing also requires that a plaintiff organization establish that "the interests it seeks to protect are germane to the organization's purpose; and [that] . . . the participation of individual members" in the lawsuit is not required. *Ass'n of Am. Physicians & Surgeons, Inc. v. Tex. Med. Bd.*, 627 F.3d 547, 550 (5th Cir. 2010).  Defendants are not aware of any reason to believe that the Second Amendment Foundation's purpose is not "germane" to the Second Amendment interests at issue here or that participation of SAF's members would be required in this action.

should not continue to credit the injuries alleged therein as ongoing. *Cf. Equal Rights Ctr. v. Post Properties, Inc.*, 633 F.3d 1136, 1141 (D.C. Cir. 2011) (questioning validity of claims of injury based on lapse of time between complaint and affidavit). To the extent Mr. Williamson or SAF's other members seek to acquire and make arms based on Defense Distributed's 3-D printing files, they have had ample opportunity to seek access to those files via offline means, given that the ITAR governs only exports and would not limit the ability of Defense Distributed or SAF to provide 3-D printing files directly to Americans within United States borders. For similar reasons, the evident lack of action on the part of SAF and Mr. Williamson to obtain the files they insist are needed to exercise their Second Amendment rights should be treated as "incurred voluntarily," and thus, no longer "fairly can be traced to the challenged action." *See Petro-Chem Processing v. EPA*, 866 F.2d 433, 438 (D.C. Cir. 1989) (quoting *Valley Forge Christian Coll. v. Ams. United*, 454 U.S. 464, 472 (1982)).

      B.   Plaintiffs' Second Amendment Challenge Fails on the Merits.

      In *Mance v. Sessions*, the Fifth Circuit set forth the governing approach for Second Amendment analysis of regulations that restrict the access of prospective firearms owners and users to firearms protected by the Second Amendment. *See* 880 F.3d 183 (5th Cir. 2018). Applying the analysis set forth in *Mance* here establishes that Defendants may, consistent with the Second Amendment, limit the international distribution of electronic files which enable the 3-D printing of firearms. Thus, even if the Court concludes that one or more Plaintiffs have standing to assert a Second Amendment claim, that claim should be dismissed.

      The Second Amendment "guarantee[s] the individual right to possess and carry weapons in case of confrontation." *District of Columbia v. Heller*, 554 U.S. 570, 592 (2008). Conducting an "extensive analysis of the historical context of the Second Amendment, the Court concluded 'that the Second Amendment, like the First and Fourth Amendments, codified a pre-existing right' to keep and bear arms . . . [for which] self-defense . . . was the central component." *Mance*, 880 F.3d at 187 (quoting *Heller*, 554 U.S. at 592, 599). To determine whether a federal statute is consonant with this right, the Fifth Circuit requires a "two-step approach. . . . [T]he first step is to determine whether the challenged law impinges upon a right protected by the Second Amendment . . . ; the second step is . . . to determine whether the law survives the proper level of scrutiny." *NRA*, 700

16

F.3d 194. Here, just as pleading deficiencies leave doubt as to Plaintiffs' standing, they leave unclear the extent of the "encroach[ment] on the core of the Second Amendment." *Id.* at 195. Although the "core Second Amendment right . . . wouldn't mean much without the ability to acquire arms," *Teixeira*, 873 F.3d at 677, including through their manufacture, the pleadings do not establish the extent to which that core is infringed here.

Under these circumstances, the Fifth Circuit's approach in *Mance* may guide the Court's inquiry. There, the Fifth Circuit first addressed whether "the laws and regulations at issue withstand strict scrutiny," before examining whether "the strict, rather than intermediate, standard of scrutiny is applicable," and the same approach is permissible here. *Mance*, 880 F.3d at 188; *see id.* at 196 (Owen, J., concurring) ("it is prudent first to apply strict scrutiny," and, if the Court concludes that the challenged law "satisfies that heightened standard, it is unnecessary to resolve whether strict scrutiny is *required*"). For a firearms restriction to satisfy strict scrutiny, "the Government 'must specifically identify an actual problem in need of solving,' and the 'curtailment of the constitutional right must be actually necessary to the solution.'" *Mance*, 880 F.3d at 188 (quoting *Brown v. Entm't Merchs. Ass'n*, 564 U.S. 786, 799 (2011)).

Applying this standard, the Fifth Circuit in *Mance* reversed and vacated a district court decision enjoining the enforcement of two federal statutory provisions and a regulation that "generally prohibit the direct sale of a handgun by a federally licensed firearms dealer (FFL) to a person who is not a resident of the state in which the FFL is located." *Mance*, 880 F.3d at 185. Emphasizing that "current burdens on constitutional rights 'must be justified by current needs,'" the Fifth Circuit first assessed the nature of the government interest served by the restrictions, and recognized that "there is a compelling government interest in preventing circumvention of the handgun laws of various states." *Id.* at 189-90 (quoting *Shelby Cty. v. Holder*, 133 S. Ct. 2612, 2619 (2013)). Likewise here, there is an equally compelling interest in preventing the circumvention of laws restricting the export of firearms, particularly to hostile foreign state and non-state adversaries.

As noted above, Plaintiffs have previously conceded the compelling nature of the interest in regulating the export of arms, and that interest encompasses the export of the 3-D printing files at issue here. For this reason, Congress did not limit the scope of the AECA merely to the regulation

of exports of physical weapons like firearms or bombs, but recognized that the transfer of ideas, expertise, and knowledge beyond the borders of the United States can be just as inimical to the national interest as the transfer of objects: hence the inclusion of "defense services," alongside "defense articles" in the AECA's coverage. 22 U.S.C. § 2778(a)(1).

As explained above, the ITAR restrictions here are narrowly tailored to this concededly compelling interest. *See* Part I.B, *supra.* Defense Distributed explicitly promotes "global" use of its ideas, SAC ¶ 1, so the compelling interest in limiting the transfer of arms abroad requires that the ITAR be applied to Defense Distributed. And, applying the approach the Fifth Circuit employed in *Mance* where "[a]ll concede[d] there is a compelling government interest," a review of the available alternatives shows none that would effectively protect the interests at issue. *See* 880 F.3d at 190-92.

The claims set forth in the SAC suggest two alternatives by which Defendants could act to reduce the alleged burden on the Second Amendment rights of SAF, Mr. Williamson, and others. As with the alternatives considered in *Mance,* however, neither would effectively satisfy Defendants' interest in preventing persons from circumventing export controls for munitions technology.  First, Plaintiffs, like the Fifth Circuit dissent described above, *see DD II,* 838 F.3d at 470-71, suggest that the distribution of technical data over the Internet could be exempted from ITAR's export controls. But the Internet does not have separate parts, "domestic" and "foreign." *Prometheus Radio,* 373 F.3d at 469. If Mr. Williamson and SAF could access Defense Distributed's "files on the Internet," so too could innumerable foreign persons or entities, and thus, the United States' efforts to regulate the export of firearms and of firearms technical data would alike be rendered nullities.[12]  The other alternative suggested by Plaintiffs' pleadings is for Defendants to permit Defense Distributed to place its files into the public domain, in which case they would not be subject to ITAR's restrictions

---

[12] The Government previously stated that there may be means of limiting access to files posted on the Internet to assure that such postings are distributed only domestically. *See* 7/6/2015 Tr. at 32-34, ECF No. 50. But in its narrow-tailoring analysis in *Mance,* the Fifth Circuit made clear that it is "unrealistic to expect" that a compelling public interest can be protected by "expecting . . . each of [hundreds of thousands of private parties to] become, and remain knowledgeable about" a wide variety of subjects necessary to protect the public interest.  *See Mance,* 880 F.3d at 190.  In *Mance,* that subject was "the handgun laws of the 50 states and the District of Columbia." *Id.*  Here, that subject would be the means of identifying U.S. persons who are the residents of the 50 states and D.C., a comparable subject, and the means of falsely identifying one's self over the Internet as a U.S. person, a subject area that is likely to be intricately complex and ever-changing.

on the export of technical data. *See* 22 C.F.R. § 120.10. Yet this would be even less effective at protecting the public interest in export control as the 3-D printing plans for firearms—and thus, the ability to make export-controlled firearms—could then be taken abroad using all sorts of means, not just by transmission over the Internet. Given that the available alternatives clearly would be ineffective at preventing the broad circumvention of export controls for munitions technology, and that the ITAR is narrowly constructed to regulate only the transfer abroad of arms or the equivalent,[13] the Court should find the challenged restriction to be narrowly tailored to a compelling interest, and therefore, permitted by the Second Amendment. *See Mance*, 880 F.3d at 192. And for the same reasons, the challenged restriction would also satisfy intermediate scrutiny. *See id.* at 196.

## III.     Plaintiffs' Other Claims Should Also Be Dismissed on the Merits.

The SAC contains two additional claims, each of which the Court analyzed in depth in its Order denying Plaintiffs' 2015 motion for a preliminary injunction. First, Plaintiffs seek to enjoin application of the ITAR to Defense Distributed as an *ultra vires* action by the State Department. Second, Plaintiffs assert that the ITAR's limits on the export of technical data are unconstitutionally vague. The Court should now apply its prior analysis to dismiss these claims.

Plaintiffs first allege that application of the ITAR is *ultra vires* in light of a "1985 ITAR amendment." SAC ¶ 52; *see id.* ¶ 17 (describing this amendment as having removed "Footnote 3 to former ITAR Section 125.11"). This Court previously found there was no "likelihood of success" as to this claim, given that the AECA authorizes the regulation of exports and that Defense Distributed's stated purpose of "facilitating global access to firearms" falls squarely within the conduct Congress has authorized the ITAR to regulate. *See DD I* at 690-91. The Court should apply this analysis and dismiss the *ultra vires* claim. Further, even beyond the Court's prior analysis, Plaintiffs' allegation that a licensing requirement for exports of technical data exceeds the "authority conferred by Congress," *id.* ¶ 52, is inconsistent with the plain text of the AECA. Section 2778 authorizes regulation of "technical data," and it provides for "export licenses" to be required,

---

[13] *See* 22 C.F.R. § 120.17(a), supplying relevant definitions of exports, including § 120.17(a)(1) ("[s]ending or taking a defense article out of the United States in any manner"); § 120.17(a)(2) ("transferring technical data to a foreign person in the United States); § 120.17(a)(4), "transferring a defense article to an embassy . . . in the United States").

explicitly recognizing "technical data" as within the scope of the licensing requirement. 22 U.S.C. §§ 2778(b)(2); 2778(f)(2)(A). In short, Defendants' actions could only be *ultra vires* by exceeding constitutional limitations, not statutory limits.[14]

Plaintiffs' final claim is that the ITAR's regulation of the export of technical data is unconstitutionally vague under the Due Process Clause of the Fifth Amendment. SAC ¶¶ 63-65. As the Court previously observed, this challenge is "hampered because [Plaintiffs] have not made precisely clear which portion of the ITAR language they believe is unconstitutionally vague," ECF No. 43 at 23, a shortcoming Plaintiffs have not rectified in the SAC. *Compare* SAC ¶¶ 11-15 *with* Compl. ¶¶ 12-15. As the Court recognized, "persons of ordinary intelligence are clearly put on notice by the language of the regulations" that "post[ing], on the Internet, . . . directions for the 3D printing of firearms" falls within the scope of the ITAR. *DD I* at 700-01 (quoting *United States v. Williams*, 553 U.S. 285, 304 (2008) (a statutory term is vague only if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement")). The ITAR's "carefully crafted regulatory scheme," *Zhen Zhou Wu*, 711 F.3d at 13, which defines the terms "defense articles" and "technical data" at length, provides fair notice and is not susceptible to a vagueness challenge. *See DD I* at 701 (describing 22 C.F.R. §§ 120.6 (defining "defense articles"), 120.10(a) (defining technical data) & 121.1 (Munitions List)). Equally, the term "export" is explicitly defined to include "[a]n actual shipment or transmission out of the United States," or "a release in the United States of technical data to a foreign person." 22 C.F.R. § 120.17. For this reason, this Court found no likelihood of success as to Plaintiffs' vagueness challenge, and this Court should now dismiss consistent with its previous analysis. *See DD I* at 700-01 (citing *Zhen Zhou Wu*, 711 F.3d at 13; *U.S. v. Hsu*, 364 F.3d 192 (4th Cir. 2004)).

## CONCLUSION

For the foregoing reasons, Plaintiffs' Second Amended Complaint should be dismissed.

---

[14] Indeed, Plaintiffs acknowledge that the 1985 amendment, on which their *ultra vires* claim hinges, *see* SAC ¶ 52, was enacted not because of limitations imposed by the Congress in the AECA, but "to address First Amendment concerns." *Id.* ¶ 20. This further confirms that no *ultra vires* claim survives dismissal of the constitutional claims.

Dated: April 6, 2018                    Respectfully submitted,

                                        CHAD A. READLER
                                        Acting Assistant Attorney General
                                        Civil Division

                                        JOHN F. BASH
                                        United States Attorney

                                        ANTHONY J. COPPOLINO
                                        Deputy Branch Director
                                        Federal Programs Branch

                                        /s/ ERIC J. SOSKIN
                                        ERIC J. SOSKIN
                                        Pennsylvania Bar No. 200663
                                        STUART J. ROBINSON
                                        California Bar No. 267183
                                        Trial Attorneys
                                        United States Department of Justice
                                        Civil Division, Federal Programs Branch
                                        20 Massachusetts Ave., NW, Room 7116
                                        Washington, DC 20530
                                        Phone: (202) 353-0533
                                        Fax: (202) 616-8470
                                        Email: Eric.Soskin@usdoj.gov

                                        *Attorneys for U.S. Government Defendants*

**CERTIFICATE OF SERVICE**

I certify that on April 6, 2018, I electronically filed this document with the Clerk of Court using the CM/ECF system, which will send notification to

Alan Gura, alan@gurapllc.com
William B. Mateja, mateja@polsinelli.com
William T. "Tommy" Jacks, jacks@fr.com
David S. Morris, dmorris@fr.com
Matthew A. Goldstein, matthew@goldsteinpllc.com
Joshua M. Blackman, joshblackman@gmail.com
*Attorneys for Plaintiffs*

*/s/ Eric J. Soskin*
ERIC J. SOSKIN
Senior Trial Counsel