IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| DEFENSE DISTRIBUTED, et al., | § | Case No. 15-CV-372-RP |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | |
| | § | |
| U.S. DEPARTMENT OF STATE, et al., | § | |
| | § | |
| Defendants. | § | |
| | § | |

PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
JOINT EMERGENCY MOTION TO INTERVENE

    Plaintiffs Defense Distributed, Second Amendment Foundation, Inc., and Conn Williamson hereby submit their Memorandum of Points and Authorities in Opposition to Joint Emergency Motion to Intervene.

Dated: June 27, 2018            Respectfully submitted,

*/s/ Matthew Goldstein*
Matthew Goldstein
D.C. Bar No. 975000*
Snell & Wilmer
One Church Avenue, Suite 1500
Tucson, Arizona 85701
520.882.1248
mgoldstein@swlaw.com

*/s/ Alan Gura*
Alan Gura
Virginia Bar No. 68842*
Gura PLLC
916 Prince Street, Suite 107
Alexandria, Virginia 22314
703.835.9085/Fax 703.997.7665
alan@gurapllc.com

*/s/ Josh Blackman*
Josh Blackman
Virginia Bar No. 78292
1303 San Jacinto Street
Houston, Texas 77002
202.294.9003/Fax: 713.646.1766
joshblackman@gmail.com

*/s/ David S. Morris*
David S. Morris
Texas State Bar No. 24032877
FISH & RICHARDSON P.C.
One Congress Plaza, Suite 810
111 Congress Avenue
Austin, Texas 78701
512.472.5070/Fax 512.320.8935
dmorris@fr.com

*Admitted pro hac vice

PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
JOINT EMERGENCY MOTION TO INTERVENE

SUMMARY OF ARGUMENT

Aspiring intervenors—various groups organized not to pursue foreign policy or diplomatic interests, but to advocate for  "gun safety laws"—plainly lack standing to intervene. They cannot piggyback on the parties' previous case or controversy, which by definition is terminated by the agreement that the groups seek to overturn, nor can they independently establish any element of standing.

Moreover, the groups have monitored and participated in the case since its inception. They must have known, because it was a matter of public record, that the parties were involved in meaningful settlement discussions that would result in a "stipulation for dismissal." They candidly admit that they were aware of the settlement agreement since it was announced early this month. Nonetheless, despite having time to launch a media campaign to decry the settlement, the groups waited until the absolute last moment to spring the instant trap on the parties, their counsel, and the Court, without the courtesy of adequate notice.

This conduct is abusive, and the Court should say so. In addition to manufacturing their own emergency, the advantage of unfair surprise is designed to mask a substantively strained, if not frivolous effort to do what the law forbids: subvert Plaintiffs' Rule 41 right to settle their case on their own terms, and interfere in the Executive's discretion to conduct foreign policy and enforce the law, including by challenging licensing decisions that Congress has commanded be removed from judicial review. They seek to do this without standing, and without even any connection to their own purported organizational missions, which the settlement leaves

1

untouched. The motion for intervention should be denied.

ARGUMENT

I.    THE GROUPS NEED TO ESTABLISH AN INDEPENDENT BASIS FOR ARTICLE III STANDING,
      BECAUSE THEY OPPOSE "THE ULTIMATE RELIEF" SOUGHT BY PLAINTIFFS.

        The Groups fail to clear the threshold hurdle: they lack an independent basis for Article

III standing. "It is the law of this circuit that 'Article III does not require intervenors to

independently possess standing where the intervention is into a subsisting and continuing Article

III case or controversy and the ultimate relief sought by the intervenors is also being sought by at

least one subsisting party with standing to do so." *Steward v. Abbott*, 189 F. Supp. 3d 620, 625

(W.D. Tex. 2016) (Garcia, J.). An intervenor "need not possess Article III standing to proceed" if

she "seeks no relief beyond that sought by the Plaintiffs in this case." *Id.*

        In *Steward*, the proposed intervenor—the United States—sought "injunctive relief and

declaratory relief that [was] substantially the same ultimate relief sought by the original

Plaintiffs. . . ." *Id.* Intervention was even permissible when the intervenors "advance a different

legal theory" yet still "'seek the same ultimate relief' as the original plaintiffs." *Id.* (quoting *Ruiz

v. Estelle*, 161 F.3d 814, 833 (5th Cir.1998)). Judge Garcia noted that his opinion had a limit:

"the relief sought by the United States [did not] exceed[] the scope of relief sought by the

original Plaintiffs." *Id.* at 626. Rather, the United States' "pleadings [were] congruent to the

pleadings of the Plaintiff." *Id.* (quoting *Disability Advocates, Inc. v. Paterson*, No. 03–CV–3209

(NGG), 2009 WL 4506301, at *3 (E.D.N.Y. Nov. 23, 2009)). *Steward* illustrates with precision

why the Proposed Intervenor cannot hijack Plaintiffs' claim for standing.

2

In 2015, this Court concluded that Plaintiffs had Article III standing to "to assert a claim of a violation of the Second Amendment." *Def. Distributed v. U.S. Dep't of State*, 121 F. Supp. 3d 680, 698 (W.D. Tex. 2015), aff'd sub nom. *Def. Distributed v. United States Dep't of State*, 838 F.3d 451 (5th Cir. 2016). (The government did not dispute that the Plaintiffs had Article III standing to assert a claim for the violation of the First Amendment.) The Plaintiffs sought to halt the enforcement of the prior restraint imposed by the Defendants. Complaint at  14 (ECF No. 1). The Defendants have now agreed to suspend that prior restraint.

The Groups do not "'seek the same ultimate relief' as the original plaintiffs." *Steward*, 189 F. Supp. 3d at 625. They do not seek to lift the prior restraint at all. In fact, they seek the *exact* opposite relief: they seek to intervene to *force* the Defendants to continue imposing the prior restraint on the Plaintiffs. The relief sought by the Groups is not "congruent" with the Plaintiffs' pleadings, and vastly "exceed[s] the scope" of the present case. *Steward*, 189 F. Supp. 3d. at 625-26 (citations omitted). Therefore, they need to establish an *independent* basis for Article III jurisdiction.

The Groups cannot piggyback on the Plaintiffs' Article III standing, when their sole purpose is to defeat the Plaintiffs' claim for relief. Indeed, there is *no* "subsisting and continuing Article III case or controversy" but for the Groups' efforts to derail the settlement, and the ultimate relief sought by the Groups *is not* sought by *any* of the subsisting parties. The parties have amicably resolved their controversy. They want nothing to do with the Groups' relief.

What would happen if intervention were granted? Would the Groups commandeer the Department of Justice's briefing to persist in positions the Government would rather not pursue? If the Groups have a legitimate Article III beef with the Government, let them pay the filing fee,

3

file a complaint, and defend against the inevitably-successful Rule 12(b)(1) motion. But the Groups cannot logically force the parties to maintain a controversy they have abandoned, to pursue a result expressly disclaimed by all the existing parties—and then turn around and claim that they need not establish standing.

II.   THE GROUPS LACK STANDING.

The Groups cannot "establish an independent basis for Article III standing. First, the Groups failed to offer any "concrete plans" of how they will suffer an "injury in fact." Second, there is no "causal connection" between their purported injuries and the proposed settlement. Third, the purported injuries cannot be redressed because federal courts lack jurisdiction to review the issuance of export control licenses. Likewise, the Groups have failed to establish Article III standing for the proposed complaint in intervention. Because they cannot satisfy the requirements of Article III, the motion to intervene must be denied. *See Cadena v. OSO Dormido, LLC*, No. 1:16-CV-1009-RP, 2016 WL 4507383, at *1 (W.D. Tex. Aug. 26, 2016) (Pitman, J.) (denying motion for a temporary restraining order as court lacked subject matter jurisdiction).

**A.    The Groups Cannot Establish an Independent Basis for Article III Standing.**

The Groups buried their most critical argument in a 245-word footnote, appended to the final sentence of the brief.[1] They assert that "[e]ven if this Court were to require Proposed Intervenors to prove independent standing to intervene, Proposed Intervenors are able to

---

[1] *See* Birdon v. Shinseki, No. 07-3810, 2009 WL 4730416, at *4 (Vet. App. Dec. 11, 2009) ("Raising an argument in a footnote connotes the author's uncertainty of the argument's strength. If an argument is worth raising at all, the better practice is to raise it in the body of the brief, rather than bury it in a footnote.")

establish the necessary elements of injury, causation, and redressability." Brief at 9 n.2. This

footnote fails to clear the Article III hurdle. *Lujan v. Defenders of Wildlife* identified the three

"irreducible constitutional minimum[s] of standing:" injury in fact, traceability, and

redressability. 504 U.S. 555, 560 (1992). The Groups fail each factor.

1.      The Groups Failed to Offer Any "Concrete Plans" of How They Will
        Suffer an "Injury in Fact."

To establish standing, parties must show that they "have suffered an 'injury in fact'—an

invasion of a legally protected interest which is (a) 'concrete and particularized,' and (b) 'actual

or imminent, not 'conjectural' or 'hypothetical.'" *Id.* (citations and quotations omitted). It is not

enough to speculate that the injury could occur "some day." *Id.* at 565. Rather, parties need to

proffer a "description of concrete plans, or indeed even any specification of when the some day

will be," in order to establish an "imminent" injury." *Id.*

The Groups do not offer any "concrete plans," or any "specification" at all. They simply

claim that "[a]s a result of the Settlement Agreement, Groups *will* be forced to expend additional

resources to protect their respective missions." Br. at 7 (citing *Havens Realty Corp. v. Coleman*,

455 U.S. 363, 379 (1982)) (emphasis added). The critical word is "will." The Plaintiffs have not

asserted that they have *already* "expend[ed] additional resources" in anticipation of the

settlement. They haven't even purchased the proverbial "plane ticket" to constitute an injury.

*Lujan*, 504 U.S. at 592 (Blackmun, J., dissenting). Instead, they have put all of their eggs in a

single basket: if the settlement is finalized, they "*will* be forced to expend additional resources to

protect their respective missions." When these expenditures will be spent, we do not know. How much will they spend? The court's guess is as good as ours. Such a posture puts the Groups in the *same* position as the animal rights activists in *Lujan*: they have no "imminent" injury. [2]

Consistent with *Lujan*, the Fifth Circuit's precedents applying *Havens Realty Corp. v. Coleman* only consider resources that have *already* been expended in response to some action. For example, the analysis in *N.A.A.C.P. v. City of Kyle, Tex.* is inherently backwards looking: "an organization may establish injury in fact by showing that it *had diverted* significant resources to counteract the defendant's conduct; hence, the defendant's conduct significantly and '*perceptibly impaired*' the organization's ability to provide its 'activities—with the consequent drain on the organization's resources. . . ." *N.A.A.C.P. v. City of Kyle, Tex.*, 626 F.3d 233, 238 (5th Cir. 2010) (quoting *Havens*, 455 U.S. at 379) (emphasis added). Such an injury, the Fifth Circuit observed, must be "'concrete and demonstrable.'" *Id.* The Court *only* used the past tense: "diverted" and "impaired."

Unsurprisingly, courts applying *Havens Realty* consider resources that were already "diverted" and conduct that was already "impaired." For example, in *Louisiana ACORN Fair Hous. v. LeBlanc*, the 5th Circuit rejected a *Havens* claim because, during trial, a witness failed

---

[2] In the "Supplemental Briefing in Support of Motion for Leave to Intervene," and accompanying Declarations, the Groups raise an entirely new argument that is designed to remedy a fatal flaw in their initial motion: that the "Proposed Intervenors have *expended* significant efforts countering the parties' conduct." Br. at 3. That is, they have *already* expended resources. This statement is in conflict with their prior claim that "[a]s a result of the Settlement Agreement, Proposed Intervenors *will* be forced to expend additional resources to protect their respective missions." That is, they *will* expend resources. Their initial brief made no reference to resources *already expended*. The failure of the Groups to raise this argument in their initial pleading must constitute waiver. Plaintiffs have moved to strike Part B of this brief, and specific paragraphs of the accompanying Declarations.

to "mentioned any specific projects ACORN had to put on hold" or "describe in any detail how ACORN had to re-double efforts in the community to combat discrimination." 211 F.3d 298, 305 (5th Cir. 2000). Again, the dispute centered on resources *already diverted*. This Court has applied *Havens* with a similar retrospective perspective: "'general allegations of activities *related to monitoring*' . . . that are not paired with an allegation that such *costs* are fairly traceable to the defendant's conduct, fail to confer organizational standing." *American Civil Rights Union v. Martinez-Rivera*, 166 F. Supp. 3d 779, 788–89 (W.D. Tex. 2015) (Moses, J.) (quoting *Ass'n of Cmty. Organizations for Reform Now v. Fowler*, 178 F.3d 350, 359 (5th Cir. 1999)). That is "activities" and "monitoring" already performed, and "costs" already expended. Likewise, in a recent high-profile case concerning the Constitution's Emoluments Clauses, the Southern District of New York rejected a *Havens Realty* claim following extensive briefing and a hearing. *See Citizens for Responsibility & Ethics in Washington v. Trump*, 276 F. Supp. 3d 174, 190 (S.D.N.Y. 2017) ("CREW fails to allege either that Defendant's actions have impeded its ability to perform a particular mission-related activity, or that it was forced to expend resources to counteract and remedy the adverse consequences or harmful effects of Defendant's conduct.").

Here, the Groups only speculate and hypothesize how the settlement will impact their activities. The Groups fret that once approved, the Settlement Agreement would "make Groups' work untenable." Br. at 7. The brief explains that their work is to "pass and enforce gun safety laws in Congress and throughout the country." Br. at 6. All of these activities are prospective, and will only be incurred *after* the agreement goes into effect. Again, the pleadings do not assert that they have *already* diverted resources in anticipation of the settlement.

Under Fifth Circuit precedent, Groups must show that the defendants' actions *already* "significantly and '*perceptibly impaired*' the organization's ability to provide its 'activities.'"  For example, in *City of Kyle*, the Fifth Circuit observed that the Plaintiffs had "not identified any specific projects that the [Home Builders Association of Greater Austin] had to put on hold or otherwise curtail in order to respond to the revised ordinances." *City of Kyle*, 626 F.3d at 238. Therefore, the Plaintiffs "ha[d] not demonstrated that the diversion of resources here concretely and 'perceptibly impaired' the HBA's ability to carry out its purpose." *Id.* at 239. Rather, the Fifth Circuit concluded, "they have established "simply a setback to the organization's abstract social interests." *Id.* (quoting *Havens*, 455 U.S. at 379).

What "specific projects" might the Groups have "to put on hold"? The pleadings are silent. We only know that the Groups speculate their work will become "untenable" and they will "be forced to expend additional resources to protect their respective missions." At most, this case resembles a hypothetical addressed by Judge Moses:  "[t]he presence of a conflict between the defendant's conduct and the organization's mission is 'necessary—though not alone sufficient— to establish standing;' importantly, an organization's claim to standing cannot rest on allegations of such a conflict alone." *Martinez-Rivera*, 166 F. Supp. 3d at 789. Any potential injury is entirely self-inflicted.[3]

Perhaps after the settlement goes into effect, the Groups can demonstrate through evidence how they have already "*diverted significant* resources to counteract the defendant's

---

[3] *See* Josh Blackman, *CREW's Self-Inflicted Injury in the Emoluments Clause Challenge*, Josh Blackman's Blog (Jan. 22, 2017), http://bit.ly/2OjaXet.

conduct" and that the settlement would "significantly and '*perceptibly impaired*' the organization's ability to provide its 'activities—with the consequent drain on the organization's resources. . . ." *N.A.A.C.P. v. City of Kyle, Tex.*, 626 F.3d 233, 238 (5th Cir. 2010) (quoting *Havens*, 455 U.S. at 379) (emphasis added). However, based on the face of the pleadings—the only basis on which injunctive relief can be granted—they have failed to meet this burden. Litigation costs do not count.

Due to the exigencies of these proceedings, Groups should not be permitted to speculate and make up costs already that were not referenced in the initial pleadings. Fundamental fairness demands that Plaintiffs not be forced to shadowbox against a moving target—especially when our constitutional rights are at stake.[4] Under the 5th Circuit's precedents, the Groups cannot state a *Havens Realty* claim as a means to *enjoin* an action that hasn't even happened yet, and in which no resources have yet been they have not yet diverted any resources. There is no injury in fact.

> 2. There is No "Causal Connection" between the Purported Injuries and the Proposed Settlement.

*Lujan*'s second factor requires a "causal connection between the injury and the conduct complained of—the injury has to be 'fairly ... trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not before the court.'" *Lujan*, 504 U.S. at 461. The Groups' argument is far too attenuated to satisfy *Lujan*. The syllogism goes like this: (1) If the Defendants issue the Plaintiffs a license; (2) and Plaintiffs share CAD files;  (3) then terrorists and criminals will use those shared files to manufacture

---

[4] Plaintiffs advance this argument in our Motion to Strike.

firearms; (4) and "the security and safety of Groups' members [will be] *directly* threatened" as they will face "terroristic and violent threats, at home, in public places, and while traveling abroad;" so (5) it will become more difficult to lobby for gun control laws.

The Groups state, without any evidence, that "[a] temporary restraining order and preliminary injunction to enjoin Defense Distributed and the Government are not merely necessary forms of relief, but quite simply the *only* available forms of relief that will prevent these files from becoming publicly available worldwide and jeopardizing the national security of the United States and its citizens." Br. at 3-4. This parade of horribles is premised on a false perception of reality: so long as the government builds a virtual wall around the Plaintiffs, criminals and terrorists will be unable to 3D-print firearms. Nonsense.

The Fifth Circuit observed that "all of the Published Files continue to be shared online on third party sites like The Pirate Bay." *Def. Distributed v. United States Dep't of State*, 838 F.3d 451, 456 (5th Cir. 2016). In dissent, Judge Jones observed that since the government imposed its prior restraint on the Plaintiffs, "technology has not stood still: design files are now available on the Internet for six- and eight-shot handguns that can be produced with 3D printing largely out of plastic materials. *Id.* at 466 (Jones, J., dissenting).

The groups assert in their supplemental filings that "Defense Distributed and Cody Wilson have confirmed through public announcements, media statements, and this litigation that they plan to release technical information that is not yet available on the Internet and that will enable the manufacture of firearms." Supp. Br. at 7. This argument is simply incorrect. The 10 files that Plaintiffs announced he would share on August 1 are *already* available on the internet—namely on Grabcad.com or CNCguns.com:

1. The AR-15 assembly has been online since 2007 (available at https://grabcad.com/library/ar-15-m16-a1 and https://www.cncguns.com/downloads.html);
2. the VZ .58 assembly (available at https://grabcad.com/library/vz-58-rifle-1);
3. the AR-10 assembly (available at https://grabcad.com/library/ar-10-battle-rifle-7-62x51mm-1);
4. the Liberator Pistol Assembly (available at https://grabcad.com/library/liberator-guns-full-1 and https://thepiratebay.org/torrent/8444391/DefDist_Liberator_Pistol);
5. the Beretta M9 assembly (available at https://grabcad.com/library/beretta-92fs);
6. the 1911 Assembly has been online since 2000s (available at https://grabcad.com/library/colt-m1911-a1-2 and https://www.cncguns.com/downloads.html);
7. the 10/22 Assembly has been online since 2000s (available at https://grabcad.com/library/ruger-10-22-1 and https://www.cncguns.com/downloads.html);
8. the 308 80% lower (available at  https://www.cncguns.com/downloads.html);
9. the AR-15 80% lower (available at https://grabcad.com/library/mil-spec-ar-15-lower and https://www.cncguns.com/downloads.html);
10. the Ghost Gunner 2 assembly is not subject to ITAR.[5]

(The government has not taken any action against CNCGuns and GrabCad for hosting these files.) An injunction from this court cannot unring the bell. Rather, an injunction would only prevent the Plaintiffs—who have been silenced for five years—from exercising their rights with the *permission* of the government. The purported injuries cannot be "trace[d]" to the settlement, "fairly," or in any manner.

   3.  The Purported Injuries Cannot Be Redressed Because Federal Courts Lack Jurisdiction to Review the Issuance of Export Control Licenses.

*Lujan*'s third factor requires that "it must be 'likely,' as opposed to merely 'speculative,' that the injury will be "redressed by a favorable decision." *Lujan*, 504 U.S. at 561. The Groups neglect to mention an inescapable facet of export control law: there is no judicial review of the

---

[5] We have attached an exhibit that lists screenshots of the files on other sites.

decision to grant, or not grant a license. The Groups injury *cannot* be remedied in this Court. In *U.S. Ordnance, Inc. v. U.S. Dep't of State*, the Plaintiffs "ask[ed] the Court to direct the Department of State (the 'Department') and its employees to issue plaintiff a license to export M16 machine guns to foreign countries." 432 F. Supp. 2d 94, 99 (D.D.C. 2006), vacated as moot sub nom. *U.S. Ordnance, Inc. v. Dep't of State*, 231 F. App'x 2 (D.C. Cir. 2007). Judge Huvelle found that the court lacked subject matter jurisdiction to review the denial of the license under the Administrative Procedure Act. Specifically, the Court cited two factors court for "reject[ing] plaintiff's invocation of the APA and decline[ing] to review the agency's denial of plaintiff's applications for licenses to export M16 machine guns." *Id.* at 99. First, she cited the clear statutory language" of the Arms Export Control Act, in which the "delegation of authority to control arms exports is decidedly one involving foreign affairs and national security." *Id.* at 98-99.

Second, Judge Huevelle recognized that there is an "absence of judicially manageable standards to guide the Court's review" concerning the issuance of export licenses. The Court added, that "the AECA provides that the President, or his delegate, may approve the exportation of defense articles when he determines that such action is 'consistent with the foreign policy interests of the United States,' and 'in furtherance of world peace and the security and foreign policy of the United States.'" *Id.* (citations and quotations omitted). This determination is for the elected branches, and not the courts—and certainly not for the Groups—to make. The Groups have failed to explain, or perhaps failed to recognize, that the decision to grant the Plaintiffs a license is immune from judicial review. Their purported injury *cannot* be redressed by an injunction.

Alternatively, the Proposed Intervenor contend that under *Lujan*, they do not need to

"'meet[] all the normal standards for redressability and immediacy'" required for standing." Br.

at 7 (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 572 n. 7 (1992)). However, Footnote 7

of *Lujan* only dispenses the redressability prong where the party "has been accorded a procedural

right to protect his concrete interest." The Groups do not have any "procedural right" to

intervene under the Administrative Procedure Act (APA). Indeed, the Code of Federal

Regulations expressly exempts decisions concerning the issuance of license from judicial review

under the APA:

> The administration of the Arms Export Control Act is a foreign affairs function
> encompassed within the meaning of the military and foreign affairs exclusion of the
> Administrative Procedure Act and is thereby expressly exempt from various provisions of
> that Act. Because the exercising of the foreign affairs function, including the decisions
> required to implement the Arms Export Control Act, is highly discretionary, it is
> excluded from review under the Administrative Procedure Act.

22 C.F.R. § 128.1

Finally, the mere fact that they the Groups are associations interested in gun control does

not provide them with an interest in "challenging the regulatory scheme that governs" export

control law—a matter not subject to judicial review. *See Wal-Mart Stores v. TABC*, 834 F.3d 562

(5th Cir. 2016).   Because the redressability prong of *Lujan* is not satisfied, the motion to

intervene cannot stand.

### B.    The Groups Fail to Even Articulate any Basis for Article III Associational Standing.

The Groups recognize the gossamer threads on which their standing claim rests. As an

13

alternative argument—in the same 245-word footnote—the Groups state that they "*may* also establish associational standing to intervene on behalf of their individual members." Brief at 10, n.2 (emphasis added). The key word is "may." The Groups do not identify a single member of any organization who could serve as a nominal plaintiff. Rather, they reference hypothetical "American citizens [who are] . . . the intended beneficiaries of gun control and anti-terror laws enacted by this country." Such threadbare allegations, which fail to even name a single member, cannot serve as the basis for associational standing.[6]

Additionally, the Groups claim that "[b]y virtue of the Settlement Agreement, and the online publishing of Defense Distributed's weapons files, the security and safety of Groups' members is *directly* threatened." *Id.* (emphasis added). Not possibly threaten, or feasibly threaten. *Directly threaten.* The Groups adduce *zero* evidence that the settlement will "*directly* threaten[]" the "security and safety" of unknown "members." Critically, the Groups do not argue that there is a likelihood that the members will be threatened, or that an injury may be traceable to the settlement. Rather, they state, without equivocation, that the settlement will result in a "direct[] threat."

The claim is breathtaking. Federal courts cannot allow individuals to challenge the Executive's diplomatic and foreign policy decisions on grounds that such decisions harm their personal security. One can predict an avalanche of citizen lawsuits targeting every foreign arms sale, the "nuclear deals" with Iran and North Korea, decisions to impose or lift embargos, decisions to meet or not meet with foreign leaders or participate or abstain from international

---

[6] The Group's supplemental briefing provides no additional information concerning the basis of an associational claim.

organizations, and so on. These concerns may all be legitimate, but they are not a ticket to federal court. Cf. *Schlesinger v. Holtzman*, 414 U.S. 1321 (1973) (staying unilateral order entered by Justice Douglas that halted bombings in Cambodia).

###    C.    Groups Have Failed to Establish Article III Standing for the Proposed Complaint in Intervention.

In another footnote, the Plaintiffs state, "[i]f this Court determines that the Groups do not satisfy the test for intervention under Fed. R. Civ. P. 24, the Groups request leave to file the proposed complaint in intervention as a new, related action in this Court, and further request that the Court preserve the status quo pending such filing (which would similarly seek immediate injunctive relief)." Brief at 2 n.1. The analysis in Part I.B, *supra*, illustrates why there is no Article III standing to permit injunctive relief with respect to the proposed complaint. Likewise, the Groups cannot rely on associational standing for reasons discussed in Part I.C, *supra*. Specifically, the proposed complaint in intervention lists as parties the Brady Campaign to Prevent Gun Violence, Everytown for Gun Safety, and Giffords. Exhibit B at ¶ 22-26. The proposed complaint makes no reference to associational standing, and fails to identify a single member. As drafted, the proposed complaint in intervention cannot provide any basis for injunctive relief. That the Groups felt compelled to include a proposed complaint demonstrates that they believe that that this matter could be litigated in a different civil action.

If this court finds that the Groups lacks standing, based on the motion for leave to intervene, no additional relief can be granted based on the proposed complaint in intervention.

III.    THE GROUPS HAVE NO RIGHT TO INTERVENE, NOR SHOULD THEY BE ALLOWED TO DO SO.

In the Fifth Circuit, parties must satisfy four factors to intervene as a matter of right:

(1) the application for intervention must be timely; (2) the applicant must have an interest relating to the property or transaction which is the subject of the action; (3) the applicant must be so situated that the disposition of the action may, as a practical matter, impair or impede his ability to protect that interest; (4) the applicant's interest must be inadequately represented by the existing parties to the suit.

*Texas v. United States*, 805 F.3d 653, 657 (5th Cir. 2015); FED. R. CIV. P. 24(a). Alternatively, "permissive intervention is 'wholly discretionary with the [district] court.'" *See United States v. Tex. E. Transmission Corp.*, 923 F.2d 410, 416 (5th Cir. 1991); FED. R. CIV. P. 24(b).

All of the relevant factors point to a denial of intervention. First, the motion was not timely: the Groups have been on notice since March that a settlement was in the works, yet waited till one day before the settlement was finalized to file their motion. Second, the Groups have no interest, whatsoever, in protecting national security. Indeed, an injunction would interpose the judiciary into the delicate field of foreign affairs. Third, the Groups can represent their interests in other proceedings. This case is little more than a collateral attack on the executive branch's proposed rulemaking. Finally, there is an innocuous reason for the settlement: the settlement ensures that the Plaintiffs are treated consistently with all similarly-situated parties following the rulemaking. It's that simple.

### A.   Tardy Groups, Who Were Put on Notice About Planned Settlement Three Months Ago, Cannot Intervene.

The Groups state that they "have taken prompt action to intervene and file this Motion shortly after acquiring the full text of the Settlement Agreement from the Internet on or about July 19, 2018." Br. at 5. Their chronology is incomplete. First, on March 28, 2018, the Defendants "move[d] for a two-week extension, until April 13, 2018, of the current deadline to

respond to Plaintiffs' written offer of settlement." ECF No. 91. At that point, the Groups—amici in this case— received electronic notice that a settlement was in the works. Even if they did not know the precise contours of the settlement, they had to reason to know that intervention could be necessary to defend their interests. Any reasonable settlement would invariably result in the Plaintiffs receiving some of their desired relief.

Second, on April 30, 2018, the Plaintiffs and Defendants notified the Court that we "have reached a tentative settlement agreement in the above-captioned matter, subject to formal approval by Government officials with appropriate approval authority." ECF No. 93. The Brady Campaign indicates that around July 12, 2018, it "filed a Freedom of Information Act request with the federal government immediately upon learning of the Settlement Agreement." Br. at 4, 8. Yet, it was on notice in April that a settlement was "tentative[ly]" approved. Brady took no action for nearly two months.

Third, on June 28, 2018, the Plaintiffs and Defendants notified the Court that "that Government officials with appropriate approval authority have approved the parties' settlement agreement. Accordingly, Plaintiffs and Defendants expect to conclude the agreement and submit a stipulation for dismissal on or before August 4, 2018." ECF No. 95. The Groups could have filed a motion to intervene at any point after June 28, 2018. They did not need to wait to review the actual settlement.[7]

Fourth, the Groups learned of the settlement on July 10, 2018. Yet, they waited nearly 15

---

[7] In their supplemental filing, the Groups assert that the June 28, 2018 status report "did not mention the substance of the settlement agreement."

17

days before filing their emergency motion to intervene.[8] In light of this chronology, the tardy

Groups should not be allowed to intervene at this late juncture. The Fifth Circuit has identified

> four factors that must be considered when evaluating whether a motion to intervene was timely: Factor 1. The length of time during which the would-be intervenor actually or reasonably should have known of his interest in the case before he petitioned for leave to intervene. Factor 2. The extent of prejudice that the existing parties to the litigation may suffer as a result of the would-be intervenor's failure to apply for intervention as soon as he actually knew or reasonably should have known of his interest in the case. Factor 3. The extent of the prejudice that the would-be intervenor may suffer if his petition for leave to intervene is denied. Factor 4. The existence of unusual circumstances militating either for or against a determination that the application is timely.

*Ross v. Marshall*, 426 F.3d 745, 754 (5th Cir. 2005) (citing *Stallworth v. Monsanto Co.*, 558 F.2d

257, 264–66 (5th Cir. 1977)).

The *Stallworth* test is not designed as "'tool of retribution to punish the tardy would-be

intervenor, but rather [should serve as] a guard against prejudicing the original parties by the

failure to apply sooner.'" *Id*. The exigent nature of these proceedings illustrates, with precision,

how the "tardy would-be intervenor[s]" have exceedingly prejudiced the Plaintiffs and the

Defendants.

First, the Groups report that they "acquir[ed] the full text of the Settlement Agreement

from the Internet on or about July 19, 2018." At that point, they had already been on notice for

three months that a settlement was in the works, for two months that a settlement was tentatively

approved, and three weeks that a settlement was approved, and for one week after they saw

excerpts of the Settlement Agreement. Supp. Br. at 3. At each of these junctures, the Groups

---

[8] The Motion to Intervene totaled and the Motion for a Temporary Restraining Order totaled 16 pages. It does not take a reputed law firm like Blank Rome 15 days to draft 16 pages of pleadings. Counsel for Plaintiffs—who do not have the resources of a national law firm-- drafted far more pages than that in less than 24 hours during exigent circumstances.

"reasonably should have known of [their] interest in the case." Id. Any settlement with the government would invariably result in the government permitting the Plaintiffs to do something they could not do before. Yet, the Groups waited an additional week to ambush Plaintiffs with an emergency motion filed at 11:30 p.m. on June 25, 2018.

Second, this literal 11th-hour filing has already resulted in extreme prejudice to the Plaintiffs. When the motion was filed, several of Plaintiffs' attorneys had already went to sleep for the evening. As a result, the team only had a few hours to prepare a plan in advance of the Court's 2:00 p.m. hearing. At the hearing, the Court posed the Plaintiffs with a dilemma. If the Plaintiffs consented to a delay of the settlement, there would be additional time to complete the briefing. However, Plaintiffs could not consent to such an arrangement. A finding that a constitutional right "'is either threatened or in fact being impaired'. . . mandates a finding of irreparable injury." *Deerfield Med. Center v. City of Deerfield Beach*, 661 F.2d 328, 338 (5th Cir. 1981) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod*, 427 U.S. at 373-74 (citations omitted).

The Plaintiffs have been silenced for nearly six years. Litigation-by-ambush will not force us to consent to an additional moment of silence. Instead, counsel for Plaintiffs stayed up all night preparing these urgent pleadings, and traveled on short notice to attend the hearing in Austin.[9] The prejudice to the Plaintiffs is self-evident.

In contrast to the extreme prejudice suffered by the parties, the groups would suffer no

---

[9] In addition, Plaintiffs had to expend additional efforts at this late juncture to move to strike novel arguments raised in supplemental pleadings.

19

prejudice were their proposed intervention denied. First, as the groups note in seeking alternative relief, *nothing* bars them from filing their (meritless) lawsuit against the Government. Indeed, the Plaintiffs are not even named as parties in the groups' proposed complaint. The groups may pursue whatever relief they desire without intervening. The very fact that the groups propose such alternative relief themselves, and have gone to the lengths of *drafting a complaint that they could have filed at any time and still could file*, belies any prejudice they would suffer were they denied intervention.

More to the point, as discussed below, the settlement agreement does not implicate any of the groups' gun-control efforts, which they remain as free to pursue as they did before this lawsuit was filed. The groups, and their allies, have an endless array of options with which to attempt to frustrate Plaintiffs. And to the extent the groups claim that only their intervention could stop the files' publication, that proverbial ship has long ago sailed out the previously open barn doors with the published files, which just about everyone on the Internet continues to be free to publish without any governmental interference—everyone, that is, except the Plaintiffs. To the extent that publication of the files is harmful, perhaps the Government should have done something about this over the past several years, while everyone *but* the Plaintiffs has been publishing the files. In any event, it is the role of the United States government to determine whether a given harm to national security is permissible. Not the judiciary, and certainly not lobbying groups.

**B.     The Groups Lack An Interest in This Case.**

20

Nobody questions the groups' commitment to what they describe as "gun safety laws." Nor have Plaintiffs questioned that "gun safety laws" might yet be enacted to regulate the production of firearms. But this ill-conceived intervention attempt highlights the central conceptual difficulty of what has been happening here: the defendants are not the Department of Justice or any police organization, and the relevant federal statute has not been enacted as a "gun safety law" in furtherance of the Government's interests in interstate commerce. Rather, this case concerns a putative effort by the State Department to regulate international arms trafficking "[i]n furtherance of world peace and the security and foreign policy of the United States." 22 U.S.C. § 2278(a)(1). Congress has delegated that responsibility to "the President," *id.*, not to the Brady Center.

For their part, the groups assert that they "work to pass and enforce gun safety laws in Congress and throughout the country." Int. Br. 6. They are free to keep working. Indeed, their true complaint here is that they must do more of this work, because it is not the State Department's role to regulate "gun safety" in the United States. Absolutely nothing here implicates the groups' work, or precludes their success. Should Congress or any state enact laws regulating the production of firearms or speech related to such production, presumably the groups would have an interest in defending such laws. And, because the groups' interests are not implicated in the case, there is no need to examine whether their interests are adequately represented in the case. The groups themselves do not claim an interest in the sound pursuit of foreign policy, or the Plaintiffs' rights.

Finally, the brief asserts that the Brady Campaign to Prevent Gun Violence, Everytown for Gun Safety, and Giffords will "represent the interests of their individual members that have

now been abandoned by the Government defendants." Id. Namely, their members will face

"terroristic and violent threats, at home, in public places, and while traveling abroad." Id. The

notion that gun control groups can protect their members from terrorist threats "while traveling

abroad"—*parens patriae*—is risible. The United States government retains its interest in

protecting all Americans, consistent with the constitutional rights of all Americans.  There is no

basis for the court to permit intervention based on such illusory and conclusive allegations

 **C. Denial of Intervention Would Not Impede the Groups' Interests**.

  Plaintiffs, of course, do not share all of the groups' points of view, but they do not

begrudge their "work to pass and enforce gun safety laws in Congress and throughout the

country." The groups may seek to silence Plaintiffs' First Amendment rights, but that effort has

never been, and is not here, reciprocated.

  To the extent that the groups claim that their interests are to stop the files' publication,

rather than to advocate or work for "gun safety laws," their Congressional allies have made no

small showing of their intent to regulate Plaintiffs' publication and the production of firearms.

Their law enforcement allies have not remained silent, either. Hours before yesterday's

emergency telephonic hearing, New Jersey's Attorney General wrote Plaintiffs to "initiate legal

action barring [them] from publishing these files before August 1, 2018." Exh. A. This is not the

first time Defense Distributed has heard from New Jersey's Attorney General, who plainly

believes that New Jersey's existing laws reach Plaintiffs' publication. The notion that this

settlement will stop legal efforts to curtail Plaintiffs' speech is, sadly, fantastical.

  Moreover, as detailed in opposition to the motion for a temporary restraining order, the

files remain, as they long have, in common public distribution. Not by virtue of Plaintiffs' recent

actions—Plaintiffs have strictly complied with the State Department's 2013 admonishment—but because the Government has done nothing to stop *others* from publishing the files.

**D.     The "Existence of Unusual Circumstances" Militate Emphatically Against Intervention.**

After three years of litigation, the Plaintiffs and the government have finally reached a settlement. This settlement will ensure that the all claims are resolved before the government undertakes a rulemaking to shift jurisdiction over export controls from the State Department to the Commerce Department. An injunction here would frustrate the federal government's ability to make decisions concerning national security and foreign affairs. It is difficult to think of more "unusual circumstances" that would justify an 11th-hour intervention.

The Groups suggest that this settlement was reached for some sort of improper motives. Br. at 3 ("the Government has capitulated to plaintiffs' position."); Id. ("It is shocking, therefore, that the Government has abdicated the correct position it took concerning national security."). There is a far more innocuous reason for the settlement, which should be apparent to anyone who has studied the posture of the case. This Court's prior ruling, which the Fifth Circuit affirmed, arose on a motion for preliminary injunction. Following the Supreme Court's denial of certiorari, the case was remanded to this Court so the parties could proceed on the merits.

While this case was being litigated, the Obama and Trump Administrations have engaged in a sophisticated and detailed plan to transition the regulation of certain technical data from the jurisdiction of the State Department to the jurisdiction of the Commerce Department. And, in May 2018, the State Department announced its plan to amend ITAR to that effect. That shift placed the Department of Justice in an odd position: the Plaintiffs, and the Plaintiffs alone, would

23

still be litigating against a soon-to-be-repealed State Department regime. Such a defense would be completely irrational, and would have likely resulted in a complete victory for the Plaintiffs. Reasonably, the Plaintiffs and Defendants reached a settlement agreement. It's that simple. In today's rancorous culture, it is unfortunate that friends of the court have charged the federal government with bad faith, based on wild speculation.

CONCLUSION

The motion for intervention should be denied.

Dated: June 27, 2018                                    Respectfully submitted,

*/s/ Matthew Goldstein*                                 */s/ Josh Blackman*
Matthew Goldstein                                       Josh Blackman
D.C. Bar No. 975000*                                    Virginia Bar No. 78292
Snell & Wilmer                                          1303 San Jacinto Street
One Church Avenue, Suite 1500                           Houston, Texas 77002
Tucson, Arizona 85701                                   202.294.9003/Fax: 713.646.1766
520.882.1248                                            joshblackman@gmail.com
mgoldstein@swlaw.com

*/s/ Alan Gura*                                         */s/ David S. Morris*
Alan Gura                                               David S. Morris
Virginia Bar No. 68842*                                 Texas State Bar No. 24032877
Gura PLLC                                               FISH & RICHARDSON P.C.
916 Prince Street, Suite 107                            One Congress Plaza, Suite 810
Alexandria, Virginia 22314                              111 Congress Avenue
703.835.9085/Fax 703.997.7665                           Austin, Texas 78701
alan@gurapllc.com                                       512.472.5070/Fax 512.320.8935
                                                        dmorris@fr.com

*Admitted pro hac vice

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that the foregoing document was filed electronically in compliance with Local Rule CV-5(a) on July 27, 2018, and was served via CM/ECF on all counsel who are deemed to have consented to electronic service.  Local Rule CV-5(b)(1).

By: */s/ Alan Gura*
    Alan Gura

25