# EXHIBIT B

The Honorable Robert S. Lasnik

1

2

3

4

5

6

7

8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

| | |
|---|---|
| STATE OF WASHINGTON, et al., | No. 2:18-cv-1115-RSL |
| Plaintiffs, | **FEDERAL DEFENDANTS'** |
| v. | **BRIEF IN OPPOSITION TO** |
| | **PLAINTIFFS' MOTION FOR** |
| UNITED STATES DEPARTMENT OF | **PRELIMINARY INJUNCTION** |
| STATE, et al., | |
| Defendants. | **NOTED FOR:** August 21, 2018 |

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – i

**INTRODUCTION**

The manufacture or possession of plastic guns that are undetectable is a serious federal crime, punishable by up to five years in prison. Among other statutes, the Undetectable Firearms Act prohibits the manufacture, possession, sale, import, or transfer of undetectable firearms. *See* 18 U.S.C. § 922(p). The Department of Justice, among other agencies, enforces that prohibition, and will continue to do so vigorously. Neither those enforcement efforts nor the prohibition itself is affected in any way by the actions challenged in this case.

This case is not about the regulation of U.S. persons who wish to utilize a 3D printer to manufacture their own small-caliber firearms. Rather, this case concerns the Department of State's delegated authority to control the export of defense articles and services, or technical data related thereto, that raise military or intelligence concerns. The Department is tasked with determining what technology and weaponry provides a critical military or intelligence advantage such that it should not be shipped without restriction from the United States to other countries (or otherwise provided to foreigners), where, beyond the reach of U.S. law, it could be used to threaten U.S. national security, foreign policy, or international peace and stability. Domestic activities that do not involve providing access to foreign persons, by contrast, are left to other federal agencies—and the states—to regulate.

In bringing their motion for a preliminary injunction, Plaintiffs misunderstand the fundamental limit on the State Department's authority. According to Plaintiffs, the Government's export-related determinations—specifically with respect to the export of technical data developed by Defense Distributed—have jeopardized their ability to protect the safety and health of their residents. But the domestic harms about which Plaintiffs are allegedly concerned are not properly regulated by the Department under current law. Plaintiffs' allegations of harm are not reasonably attributable to the Department's regulation of exports, but rather focus on the possibility that third parties will commit violations of the Undetectable Firearms Act or other relevant laws that are not at issue in this case. Likewise, Plaintiffs have failed to demonstrate that the facts and law clearly favor their position with respect to the

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 1

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

merits of their claims, or that it is in the public interest for the Court to second-guess the

national security determinations of the Executive Branch.

Accordingly, Plaintiffs' motion should be denied.

## BACKGROUND

### I.     Statutory And Regulatory Background

The Arms Export Control Act ("AECA"), 22 U.S.C. § 2751 *et seq*., authorizes the

President, "[i]n furtherance of world peace and the security and foreign policy of the United

States" to "control the *import* and the *export* of defense articles and defense services" and to

promulgate regulations accordingly.  22 U.S.C. § 2778(a)(1) (emphasis added).  The President

has delegated this authority to the Department in relevant part, and the Department has

accordingly promulgated the International Traffic in Arms Regulations ("ITAR"), which are

administered by the Department's Directorate of Defense Trade Controls ("DDTC").  *See* Exec.

Order No. 13637(n)(i), 78 Fed. Reg. 16,129 (Mar. 8, 2013); 22 C.F.R. §§ 120-130.  At the heart

of the AECA is the United States Munitions List ("USML"), an extensive listing of materials

that constitute "defense articles and defense services" under the ITAR.  *See* 22 C.F.R. Part 121.

As relevant here, Category I of the USML includes all firearms up to .50 caliber, and all

technical data directly related to such firearms.  *Id*. § 121.1(I)(a), (i).  Technical data is

information that "is required for the design, development, production, manufacture, assembly,

operation, repair, testing, maintenance or modification of defense articles."  *Id.* § 120.10(a)(1).

Section 2778 of the AECA authorizes the President (1) to designate those defense articles and

services to be included on the USML; (2) to require licenses for the export of items on the

USML; and (3) to promulgate regulations for the import and export of such items on the

USML.  22 U.S.C. § 2778.

The ITAR does not regulate any transfers of defense articles except those that constitute

"exports," *i.e.*, the transfer of defense articles abroad or to foreign persons, and "temporary

imports."  The ITAR's definition of exports includes, in part (1) "[s]ending or taking of a

defense article out of the United States in any manner," 22 C.F.R. § 120.17(a)(1); (2)

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 2

"[r]eleasing or otherwise transferring a defense article to an embassy or to any of its agencies or subdivisions, such as a diplomatic mission or consulate, in the United States," *id.* § 120.17(a)(4); and (3) "[r]eleasing or otherwise transferring technical data to a foreign person in the United States (a 'deemed export')," *id.* § 120.17(a)(2).

In certain cases where it is unclear whether a particular item is a defense article or defense service, the Department makes a "commodity jurisdiction" ("CJ") determination using a procedure set forth in the ITAR.  *See id.* § 120.4.  Upon written request, DDTC will provide applicants with a determination as to whether the item, service, or data is within the scope of the ITAR.  These assessments are made on a case-by-case basis through an inter-agency process, evaluating whether the item, service, or data is covered by the USML, provides the equivalent performance capabilities of a defense article on the USML, or has a critical military or intelligence advantage.  *See id.* § 120.4(d).

While the AECA and ITAR do not provide the State Department with authority to prohibit the domestic manufacture or possession of 3D-printed guns, there are other federal statutes that deal with this topic.  Most significantly, the Undetectable Firearms Act bars the manufacture, possession, sale, import, or transfer of undetectable firearms.  *See* 18 U.S.C. § 922(p); An Act to Extend the Undetectable Firearms Act of 1988 for 10 Years, Pub. L. No. 113-57, 127 Stat. 656 (2013).  Under that statute, firearms manufactured or sold in the United States must generally be capable of being detected by metal detectors and by x-ray machines. *See* 18 U.S.C. § 922(p)(1).  Those requirements are not in any way affected by the actions challenged in this case, nor are the separate federal prohibitions on the possession of firearms by felons, persons subject to restraining orders, or the mentally ill.  *See* 18 U.S.C. § 922(g)(1) (felons and certain state-law misdemeanants); *id.* § 922(g)(8) (court-issued restraining orders); *id.* § 922(g)(4) (persons adjudicated as mentally ill).  The Government continues to enforce these laws in order to address domestic safety issues related to undetectable firearms.  The Department's determination under the ITAR at issue here will not affect those enforcement efforts.

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 3

**II.     The Government's Settlement With Defense Distributed**

In 2012, Defense Distributed published on the Internet "privately generated technical data regarding a number of gun-related items."  *Def. Distributed v. Dep't of State*, 121 F. Supp. 3d 680, 687 (W.D. Tex. 2015).  In May 2013, DDTC sent Defense Distributed a letter stating that Defense Distributed may have released ITAR-controlled technical data without the required authorization.  *See id.*  Defense Distributed removed the technical data and submitted a CJ request.  *Id.*  The company, however, and in conjunction with another non-profit, the Second Amendment Foundation, ultimately brought a lawsuit against, *inter alia*, the Department and DDTC, claiming that the requirement to obtain authorization prior to publishing the subject files on its website violated plaintiffs' rights under the First, Second, and Fifth Amendments and exceeded the Department's statutory authority.  *Id.* at 688.

In August 2015, the U.S. District Court for the Western District of Texas denied Defense Distributed's motion for a preliminary injunction.  *Id.* at 701.  For purposes of the preliminary injunction analysis, the district court considered the files to be subject to the protection of the First Amendment.  *Id.* at 691-92.  Applying intermediate scrutiny, the court concluded that "because the AECA and ITAR do not prohibit domestic communications" and plaintiffs remained "free to disseminate the computer files at issue domestically," they had not shown a substantial likelihood of success on the merits.  *Id.* at 695.

The Fifth Circuit affirmed in a split decision.  *See* 838 F.3d 451 (5th Cir. 2016). Focusing narrowly on the question of the non-merits requirements for preliminary relief, the panel majority concluded that the "Department's stated interest in preventing foreign nationals . . . from obtaining technical data on how to produce weapons and weapon parts" outweighed plaintiffs' interest in their constitutional rights.  *Id.* at 458-59.  The panel majority "decline[d] to address the merits" because plaintiffs' failure to meet any single requirement for a preliminary injunction would require affirmance of the district court.  *See id.* at 456-58.  A dissent from the panel opinion did address the merits.  *See id.* at 461 (Jones, J. dissenting). "[F]or the benefit of the district court on remand," the dissent set forth an analysis concluding

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 4

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

that "the State Department's application of its 'export' control regulations to this domestic Internet posting appears to violate the governing statute, represents an irrational interpretation of the regulations, and violates the First Amendment as a content-based regulation and a prior restraint." *Id.* at 463-64.

After plaintiffs' petitions for rehearing *en banc* and for certiorari were denied, *see* 138 S. Ct. 638 (2018); 865 F.3d 211 (5th Cir. 2017) (5 dissenting judges), proceedings resumed in district court.  In April 2018, the Government moved to dismiss plaintiffs' second amended complaint.  *See Def. Distributed*, No. 1:15-cv-372-RP, Dkt. No. 92.  Meanwhile, the district court ordered the parties to exchange written settlement demands, *see id.,* Dkt. No. 88, thereby initiating a process under which the parties were able to reach a settlement before briefing on the motion to dismiss was complete, *see id.*, Dkt. Nos. 93, 95.

Pursuant to the settlement and as relevant here, the Government agreed to the following:

(a)    Defendants' commitment to draft and to fully pursue, to the extent authorized by law (including the Administrative Procedure Act), the publication in the Federal Register of a notice of proposed rulemaking and final rule, revising USML Category I to exclude the technical data that is the subject of the Action.[1]

(b)    Defendants' announcement, while the above-referenced final rule is in development, of a temporary modification, consistent with the . . . (ITAR), 22 C.F.R. § 126.2, of USML Category I to exclude the technical data that is the subject of the Action. The announcement will appear on the DDTC website, www.pmddtc.state.gov, on or before July 27, 2018.[2]

---

[1] *See* Section III, *infra*.  At the time settlement negotiations began, the parties had long expected such a Notice of Proposed Rulemaking ("NPRM") to be issued.  *See* 78 Fed. Reg. 22,740, 22,741 (April 16, 2013) (announcing that "[t]he Department intends to publish final rules implementing the revised USML categories and related ITAR amendments periodically").  Reflecting nearly a decade of efforts to carry out a reform of export regulations and pursuant to a "comprehensive review" of the U.S. export control system, the Government has undertaken an Export Control Reform Initiative ("ECRI") that was proposed in April 2010, *see* Fact Sheet on the President's Export Control Reform Initiative (Apr. 20, 2010), https://obamawhitehouse.archives.gov/the-press-office/fact-sheet-presidents-export-control-reform-initiative, and facilitated by Executive Order No. 13637, 78 Fed. Reg. 16,129 (Mar. 8, 2013).  By January 20, 2017, this export reform process had been completed for USML categories IV through XX.

[2] Pursuant to 22 C.F.R. § 126.2, "[t]he Deputy Assistant Secretary for Defense Trade Controls may order the temporary suspension or modification of any or all of the regulations of this subchapter in the interest of the security and foreign policy of the United States."

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 5

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

(c)      Defendants' issuance of a letter to Plaintiffs on or before July 27, 2018, signed by the Deputy Assistant Secretary for Defense Trade Controls, advising that the Published Files, Ghost Gunner Files, and CAD Files are approved for public release (i.e., unlimited distribution) in any form and are exempt from the export licensing requirements of the ITAR because they satisfy the criteria of 22 C.F.R. § 125.4(b)(13). . . .

(d)      Defendants' acknowledgment and agreement that the temporary modification . . . permits any United States person, to include DD's customers and SAF's members, to access, discuss, use, reproduce, or otherwise benefit from the technical data that is the subject of the Action, and that the letter to Plaintiffs permits any such person to access, discuss, use, reproduce or otherwise benefit from the Published Files, Ghost Gunner Files, and CAD Files.

The parties executed the agreement on June 29, 2018, and the Government complied with (b) and (c) on July 27, 2018.  *See* Ex. A, Declaration of Sarah Heidema ("Heidema Decl.") ¶¶ 27, 29.  The Settlement Agreement provides that Defendants deny that they violated Plaintiffs' constitutional rights.  *See id.* ¶ 28.

## III.      The Government's Proposed Rulemaking

On May 24, 2018—after the initial exchange of settlement offers but more than one month prior to the settlement with Defense Distributed—the Departments of State and Commerce each issued a notice of proposed rulemaking ("NPRM") that implicated the technical data at issue in *Defense Distributed*.  *See* 83 Fed. Reg. 24,198 (May 24, 2018); 83 Fed. Reg. 24,166 (May 24, 2018).  In those NPRMs, the Government proposed amending the ITAR "to revise Categories I (firearms, close assault weapons and combat shotguns), II (guns and armament) and III (ammunition and ordnance) of the [USML] to describe more precisely the articles warranting export and temporary import control on the USML."  83 Fed. Reg. at 24,198.  If the NPRM is finalized as contemplated, the items removed from the USML would no longer be subject to the ITAR's authorization requirements, *see id.*, *i.e.*, no license from the Department of State would be required for their export.

The Commerce NPRM explains both the rationale for the proposed transfer as well as the review process undertaken by the Government.  As it explained, the process included a "review of those categories by the Department of Defense, which worked with the Departments

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

of State and Commerce in preparing the amendments."  83 Fed. Reg. at 24,166.  The review was intended to ensure that items remaining on the USML are either "inherently military or otherwise warrant[ing] control on the USML" or "of a type common to nonmilitary firearms applications, possess parameters or characteristics that provide a critical military or intelligence advantage to the United States, and are almost exclusively available from the United States." *Id.*  Put simply, the goal was to ensure that items remaining on the USML in the categories in question, and therefore subject to export controls under the ITAR, are military weapons and related items that could present a critical military or intelligence advantage.

## IV.    Procedural History

On July 30, 2018, Plaintiffs filed the instant action against, *inter alia*, the Department, the Secretary of State, DDTC, and Defense Distributed.  Compl., ECF No. 1.  Plaintiffs alleged that the Government's settlement with Defense Distributed adversely affected their public safety laws, in violation of the Administrative Procedure Act ("APA") and the Tenth Amendment to the U.S. Constitution.  *Id.* at 21-41.  Also on July 30, 2018, Plaintiffs moved for a temporary restraining order against Defendants, Mot. for TRO, Dkt. No. 2, which the Court granted on July 31, 2018, Dkt. No. 23 ("Order").

In its Order, the Court held that Plaintiffs had demonstrated irreparable injury because "[i]f an injunction is not issued and the status quo alters . . . , the proliferation of these firearms will have many of the negative impacts on a state level that the federal government once feared on the international stage."  Order at 7.  Further, the Court determined that Plaintiffs were likely to succeed on the merits of their APA claim because "[t]here is no indication" that, prior to entering into the settlement agreement, the Government either provided 30-day notice to Congress pursuant to 22 U.S.C. § 2278(f)(1) or obtained the concurrence of the Secretary of Defense pursuant to Executive Order 13637.  *Id.* at 6.

The Court also found that Plaintiffs have standing "[f]or purposes of this temporary order."  *Id.* at 6 n.2.  The Court based this determination on the "clear and reasonable fear" expressed by Plaintiffs, as well as the Court's finding that "there is no separation of the internet

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 7

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

between domestic and international audiences." *Id.*  Finally, the Court found that "the balance of hardships and the public interest tip sharply in plaintiffs' favor." *Id.* at 7.  Consequently, the Court enjoined the Government "from implementing or enforcing the 'Temporary Modification of Category I of the United States Munitions List' and the letter to Cody R. Wilson, Defense Distributed, and Second Amendment Foundation issued by the U.S. Department of State on July 27, 2018," and required that the Government "preserve the status quo *ex ante* as if the modification had not occurred and the letter had not been issued." *Id.*  The Court did not enjoin Defense Distributed in any manner.  *Id.*

Plaintiffs amended their complaint on August 2, 2018, Am. Compl., Dkt. No. 29, and moved for a preliminary injunction on August 9, 2018, Dkt. No. 43 ("Pls.' Mot.").  As agreed to by the parties, the TRO remains in effect until August 28, 2018.  *See* Order, Dkt. No. 30.

## ARGUMENT

"[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam) (citation omitted).  A plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009) (citation omitted).  Alternatively, "'serious questions going to the merits' and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011); *see also Leiva-Perez v. Holder*, 640 F.3d 962, 967-68 (9th Cir. 2011).  Plaintiffs bear the burden of demonstrating that each of these four factors is met.  *DISH Network Corp. v. FCC*, 653 F.3d 771, 776-77 (9th Cir. 2011).

Plaintiffs here ask the Court to suspend and enjoin enforcement of actions already taken by the Government pursuant to its obligations under the settlement agreement.  *See* Pls.' Mot.

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 8

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

at 1; *see also* Pls.' Proposed Order, Dkt. No. 43-3.  Through this requested relief, Plaintiffs seek

not to "maintain the status quo" pending litigation, but to place themselves in a better position

than they were in before the onset of the current controversy through an award of "the exact

same ultimate relief" they seek.  *Taiebat v. Scialabba*, No. 17-0805, 2017 WL 747460, at *2-3

(N.D. Cal. Feb. 27, 2017).  "In general, that kind of judgment on the merits in the guise of

preliminary relief is a highly inappropriate result."  *Senate of Cal. v. Mosbacher*, 968 F.2d 974,

978 (9th Cir. 1992).[3]

## I.   Plaintiffs Have Not Shown That The Department's Action Will Cause Irreparable Harm.

A preliminary injunction serves the "limited purpose" of "preserv[ing] the relative

positions of the parties until a trial on the merits can be held."  *Univ. of Tex. v. Camenisch*, 451

U.S. 390, 395 (1981).  Accordingly, "[a]n essential prerequisite" before granting preliminary

relief is a showing that irreparable injury is likely in the absence of an injunction.  *See Dollar

Rent A Car of Wash., Inc. v. Travelers Indem. Co.*, 774 F.2d 1371, 1375 (9th Cir. 1985); *Winter

v. Nat. Res. Def. Council*, 555 U.S. 7, 19 (2008).

Plaintiffs argue that the "threat to public safety" allegedly caused by the Department's

settlement agreement constitutes irreparable harm.  Pls.' Mot. at 19-24.  Specifically, they

claim that the settlement agreement "will make it significantly easier to produce undetectable,

untraceable weapons, pos[e] unique threats to the health and safety of the States' residents and

employees, and compromis[e] the States' ability to enforce their laws and keep their residents

and visitors safe."  *Id.* at 19.  These harms alleged by Plaintiffs with respect to the specific

items at issue in this motion fall well short of irreparable harm.

First, Plaintiffs contend that removal of Defense Distributed's files from the USML will

lead to the "proliferation of downloadable guns."  Pls.' Mot. at 19.  They refer further to "the

unique threats of irreparable harm to the States posed by permitting 3D-printed weapons files to

---

[3] The Government leaves to the private party Defendants the question of whether and how their individual rights should be considered in this analysis.

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 9

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

be posted on the internet." Pls.' Mot. at 20.  But the core inadequacy of Plaintiffs' claims of irreparable harm is that they are not caused by, and cannot be traced to, the Department's regulatory actions or the challenged settlement agreement.  Rather, if these harms occur at all, it will be because individuals violate the separate prohibitions of the Undetectable Firearms Act and other relevant domestic laws.  Indeed, Plaintiffs' claim of irreparable harm is based on a fundamental misconception of the relevant law and the authority of the Department as the federal agency that administers it.  The AECA and ITAR have not conferred upon the Department the authority to regulate or otherwise prohibit the domestic acquisition of defense articles and services by U.S. persons or domestic communications to U.S. persons.  *See generally* 22 U.S.C. § 2778.  Rather, as noted above, the agency's only relevant authority pursuant to the AECA and ITAR is limited to *exports* of defense articles and related technical data.  *Id.* § 2778(a)(1).  Critically, neither the AECA nor ITAR prohibits the transmission of defense articles among U.S. persons within the United States.  Therefore, the Department has never prohibited Defense Distributed, or any other company or individual, from providing their files to U.S. persons on U.S. soil, including by, *e.g.*, providing such technical data through the mail, distributing DVDs containing such data, or other means.  *See Def. Distributed*, 121 F. Supp. 3d at 695 ("Plaintiffs are free to disseminate the computer files at issue domestically in public or private forums, including via the mail or any other medium that does not provide the ability to disseminate the information internationally."); *see also* Heidema Decl. ¶ 12.  To the extent Defense Distributed and others have not previously disseminated the computer files at issue within Plaintiffs' boundaries, such inaction is attributable to their own decisions and not to the Department's regulatory authority.  Plaintiffs therefore cannot plausibly suggest that the Government's settlement regarding Defense Distributed's foreign export of its files has harmed or imminently harm Plaintiffs' ability to enforce their statutory schemes, prevent or solve crimes, or protect public health.[4]  Should any of the harms about which Plaintiffs are concerned

---

[4] The declarations submitted by Plaintiffs do not address these deficiencies.  *See generally* Dkt. No. 43-2.  Not only are the harms described equally speculative as those presented in Plaintiffs' motion, but these declarations

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

occur, it will be because individuals have violated separate domestic prohibitions, such as the

Undetectable Firearms Act.  *See* 18 U.S.C. § 922(p)(1).

For this reason, the types of harms that Plaintiffs identify do not support the granting of

injunctive relief in the circumstances of this case.  All of the concerns identified are harms that

might result from the domestic availability of 3D-printed guns in the United States, but such

concerns have little to do with whether particular files should be regulated for foreign export on

national security grounds.  Their relation to the State Department's exercise of authority and

the settlement agreement is speculative.  For example, Plaintiffs contend that someone of

questionable "age, mental health, or criminal history" may procure the necessary equipment,

download files made specifically available as a result of the Department's settlement, assemble

an operable firearm, and commit a crime, *see* Pls.' Mot. at 19-20.  But such actions would

violate domestic prohibitions on the use of firearms.  The Department does not regulate the

files at issue for their availability to U.S. persons in the United States, and it is speculative to

claim that these domestic consequences would follow from the Department of State's actions

under the ITAR.

Plaintiffs' claims regarding the "unique threats" posed by firearms made by a 3D-

printing process fail for the same reasons.  *See id.* at 20-24.  For instance, they assert

shortcomings in the ability of metal detectors to discern the presence of firearms made from a

3D printer, *see id.* at 20-21, but nothing in the State Department actions challenged in this case

purports to permit the domestic production of undetectable firearms.  Such production is illegal

due to separate authority that regulates domestic conduct.  *See* 18 U.S.C. § 922(p)(1).

Plaintiffs also argue that 3D-printed firearms "present unique challenges to law

enforcement," particularly with respect to tracing weapons and conducting forensic testing on

bullets.  Pls' Mot. at 21-22.  Again, Plaintiffs can only speculate as to whether such a harm

would result from a decision by the Department of State not to regulate the export of the

---

confirm the domestic availability of the subject files notwithstanding the Department's regulatory efforts.  Camper Decl. ¶ 10, Dkt. No. 43-2; Patel Decl. ¶ 14, Dkt. No. 43-2.

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 11

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

1    Defense Distributed's files for national security reasons.

2        Similarly conjectural are Plaintiffs' assertions about a "[h]eightened risk of terrorist

3    attacks." *Id.* at 23.  As reflected in the State and Commerce NPRMs, the Government proposed

4    transferring certain items in USML Category I, which encompass Defense Distributed's files,

5    only because it has determined that such a transfer would not injure the national security

6    interests of the United States.  *See* 83 Fed. Reg. at 24,198; 83 Fed. Reg. at 24,166; *see also*

7    Heidema Decl. ¶ 19.  So Plaintiffs here seek to base injunctive relief on speculative harms to

8    national security that exist quite apart from the challenged actions and even that the

9    Government has considered and rejected.  Moreover, concerns that children "may mistake

10   [these weapons] for toys" exist apart from export control requirements, and it is at best

11   conjecture that the modification of export control requirements would have any effect on the

12   alleged harm.[5]

13       At best, Plaintiffs have only identified harms that may result from 3D-printed guns

14   *generally*, not from the challenged actions regulating foreign exports.  But there are already

15   laws aimed at domestic conduct that seek to prevent such harms.  As the Ninth Circuit has

16   made clear, it is the likelihood of harm from the actions that are sought to be enjoined that is

17   relevant for the preliminary injunction analysis.  *See Park Vill. Apartment Tenants Ass'n v.*

18   *Mortimer Howard Tr.*, 636 F.3d 1150, 1160 (9th Cir. 2011).  Plaintiffs simply cannot tie their

19   fear of *domestic* irreparable injury to a statutory regime dealing with *foreign* export, especially

20   when there are separate statutes governing domestic manufacture, possession, and sale that

---

22   [5] The two cases Plaintiffs cite—*Maryland v. King*, 567 U.S. 1301 (2012), and *United States v. Ressam*, 679
     F.3d 1069 (9th Cir. 2012)—are inapposite.  *See* Pls.' Mot. at 19, 24.  In *Maryland*, Chief Justice Roberts, sitting as
23   Circuit Justice, granted a stay of judgment overturning a criminal conviction pending disposition of the State's
     petition for a writ of certiorari.  *Maryland*, 567 U.S. at 1301.  Chief Justice Roberts wrote that a stay was
24   appropriate because "there is . . . an ongoing and concrete harm to Maryland's law enforcement and public safety
     interests." *Id.*  As is made clear in the subsequent sentences omitted by Plaintiffs, however, such irreparable harm
     arose from the fact that, as a result of the judgment, "Maryland may not employ a duly enacted statute [its DNA
25   Collection Act] to help prevent [serious] injuries." *Id.*  Here, by contrast, the Department's settlement has not
     prevented any of Plaintiffs from employing their public safety statutes.  *Ressam* is also readily distinguishable.
26   There a terrorist brought explosives into the United States in the trunk of a rental car.  *Ressam*, 679 F.3d at 1073.
     After a U.S. customs inspector detected Ressam's nervousness, she sent the car for a secondary inspection, where
27   the contraband was located.  *Id.*  Thus not only does *Ressam* involve a weapon wholly distinct from a 3D-printed
     gun, but it only demonstrates that existing law enforcement measures are able to thwart such attempted attacks.

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 12

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

1    remain unaffected by the challenged actions.

2         Finally, Plaintiffs have overlooked "[t]he possibility that . . . other corrective relief will

3    be available," in which case temporary relief is unavailable.  *Sampson v. Murray*, 415 U.S. 61,

4    90 (1974).  Plaintiffs retain the full authority to enforce their public safety laws, including

5    lawful restrictions on firearms possession and transfer, against any and all violators of the law.

6    And as discussed above other federal public safety laws regulating, *inter alia*, the possession of

7    firearms by felons and the mentally ill, and federal laws requiring that firearms contain

8    sufficient metal to be detectable, remain in force.  These laws—which, unlike the AECA and

9    ITAR, address domestic, criminal conduct—provide "other corrective relief" on an ongoing

10   basis.

11   **II. Plaintiffs Have Not Shown A Likelihood Of Success On The Merits**

12        Although their Amended Complaint asserts claims under both the APA and the Tenth

13   Amendment, Am. Compl. ¶¶ 218-47, Plaintiffs' motion for a preliminary injunction discusses

14   only their APA claims, Pls.' Mot. at 10-19.  As to either category of claims, Plaintiffs have

15   failed to establish that "the law and the facts clearly favor" their position, as required under the

16   heightened mandatory injunction standard.  *See Stanley*, 13 F.3d at 1320.

17        **A.      Plaintiffs Lack Article III Standing To Assert Their Claims.**

18        "Article III of the Constitution limits the jurisdiction of federal courts to 'Cases' and

19   'Controversies,'" and "[t]he doctrine of standing gives meaning to these constitutional limits by

20   'identify[ing] those disputes which are appropriately resolved through the judicial process.'"

21   *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2341 (2014) (citation omitted).  Standing,

22   "which is built on separation-of-powers principles, serves to prevent the judicial process from

23   being used to usurp the powers of the political branches."  *Clapper v. Amnesty Int'l USA*, 568

24   U.S. 398, 408 (2013).  The "irreducible constitutional minimum of standing" has three

25   elements: that a plaintiff suffer a concrete injury-in-fact, that the injury be fairly traceable to the

26   challenged action of the defendant, and that it be likely (as opposed to speculative) that the

27

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

injury will be redressed by a favorable decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992).

Plaintiffs claim they satisfy the requirements of Article III standing because the Department's settlement has injured their sovereign, proprietary, and quasi-sovereign interests. Pls.' Mot. at 7-9. Plaintiffs fail to carry their burden with respect to each of these theories. First, Plaintiffs assert that the settlement agreement has injured their sovereign interests in their "abilities to enforce their statutory codes," their "border integrity," and their "ability to protect their residents from injury and death." *Id.* at 8. But neither U.S. export controls generally, nor the challenged settlement agreement, prevents states from acting to enforce their own laws or protect state residents.[6] Thus, Plaintiffs cannot demonstrate that the injuries they allege are "fairly traceable" to the Department's settlement with Defense Distributed. *See Lujan*, 504 U.S. at 560.[7] Plaintiffs repeatedly assert that the Government's "deregulation" has jeopardized safety and security. *See* Pls.' Mot. at 8; *see also id.* at 10 (claiming "threats to . . . the safety of the States' own employees and residents [] are caused by the Government's sudden decision to deregulate the posting of 3D-printed gun files on the internet"). Again, Plaintiffs' arguments are premised on a misconception of the AECA and ITAR, and the state of affairs prior to the settlement of Defense Distributed's claims. As the Government has previously explained, it regulates the transfer of items constituting exports and temporary imports pursuant to the AECA and ITAR, and it has no authority to regulate the transmission of technical data exclusively from U.S. persons to U.S. persons within the United States under those authorities.

---

[6] Plaintiffs find no support in *California v. Sessions*, 284 F. Supp. 3d 1015, 1029 (N.D. Cal. 2018), *see* Pls.' Mot. at 8 n.25, where the court found injury-in-fact based on allegations that the Government "seeks to compel [the State] to change its policies" and threatened loss of funds that were promised under federal law. Here, the Department does not seek a change in Plaintiffs' laws or policies, nor has it threatened to withhold any funds.

[7] Although Plaintiffs claim the requirement to establish this second standing factor is "relaxed" because they are "vested with a procedural right," Pls.' Mot. at 7, they have failed to explain the nexus between their alleged procedural rights and the interests they assert. *See Ashley Creek Phosphate Co. v. Norton*, 420 F.3d 934, 938 (9th Cir. 2005) ("[A] plaintiff asserting a procedural injury does not have standing absent a showing that the 'procedures in question are designed to protect some threatened concrete interest of his that is the ultimate basis of his standing'. . . . A free-floating assertion of a procedural violation, without a concrete link to the interest protected by the procedural rules, does not constitute an injury in fact." (citation omitted)).

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 14

1    Thus, during the entire pendency of Defense Distributed's lawsuit against the Government, the

2    ITAR did not limit Defense Distributed—or any other entity—from "free[ly] . . .

3    disseminat[ing] the computer files at issue domestically in public or private forums," including

4    within Plaintiffs' borders. *Def. Distributed*, 121 F. Supp. 3d at 695. Plaintiffs therefore cannot

5    plausibly assert that the Government's "deregulation" has affected—let alone seriously

6    jeopardized—their ability to protect their interests. *See* Pls.' Mot. at 8; Am. Compl. ¶ 17.

7         Moreover, separate laws aimed at domestic conduct continue to address domestic public

8    safety concerns. It remains that case that any person who might obtain the necessary

9    equipment and materials, download the files from Defense Distributed's website, properly

10   construct an operable firearm, and render the firearm undetectable would be engaging in an

11   action forbidden by federal law. *See* 18 U.S.C. § 922(p)(1). Thus, Plaintiffs cannot establish

12   that the challenged actions, which concern whether an item must be regulated for export from

13   the United States, restrict their ability or authority to protect public safety in their states. *See*

14   *Clapper*, 568 U.S. at 409.

15        Plaintiffs fare no better in invoking their alleged proprietary or quasi-sovereign

16   interests. Pls.' Mot. at 8-9; Am. Compl. ¶¶ 15-18. According to Plaintiffs, they have suffered

17   proprietary injury insofar as "[t]he deregulation . . . make[s] state, county, and municipal jails

18   and prisons more dangerous for guards and inmates." Pls' Mot. at 8. As an initial matter, they

19   offer no support that such an injury is properly asserted under the doctrine of proprietary

20   interests rather than as *parens patriae*. *Pennsylvania v. Kleppe*, 533 F.2d 668, 671 (D.C. Cir.

21   1976) ("The alleged injuries to the state's economy and the health, safety, and welfare of its

22   people clearly implicate the parens patriae rather than the proprietary interest of the state.").[8]

23   But even if such interests were "proprietary," Plaintiffs have failed to demonstrate that any

24   harm based on the possibility of 3D-printed guns infiltrating prisons and injuring persons is

25

26        [8] The cases cited by Plaintiffs, *see* Pls.' Mot. at 8 n.29, do not involve jails or prisons but instead discuss a
27   state as land owner or "participa[nt] in a business venture," *Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S.
     592, 601 (1982); as operator of a public university, *Washington v. Trump*, 847 F.3d 1151, 1159 (9th Cir. 2017);
     and licensing activities, *Texas v. United States*, 787 F.3d 733, 748 (5th Cir. 2015).

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

imminent and concrete and would not be prevented by domestic laws regulating undetectable firearms. *See Aziz v. Trump*, 231 F. Supp. 3d 23, 33 (E.D. Va. 2017) (state seeking to assert injury to its proprietary interest is "subject to the same law of standing as any other party in federal court"). *Compare Washington v. Trump*, 847 F.3d 1151, 1159 (9th Cir. 2017) (supporting allegations of proprietary injury by identifying individuals prevented from attending, teaching at, or participating in the educational mission of state schools), *cert. denied sub. nom*, *Golden v. Washington*, 138 S. Ct. 448 (2017).

Plaintiffs' assertions about their quasi-sovereign interests unquestionably sound in the doctrine of *parens patriae. See* Pls.' Mot. at 8-9; *see also Washington v. Chimei Innolux Corp.*, 659 F.3d 842, 847 (9th Cir. 2011) (explaining that the "doctrine of *parens patriae* allows a sovereign to bring suit on behalf of its citizens when the sovereign alleges injury to a sufficiently substantial segment of its population, articulates an interest apart from the interests of particular private parties, and expresses a quasisovereign interest"). But to the extent Plaintiffs seek to vindicate the interests of private citizens, *see* Pls.' Mot. at 8-9; Am. Compl. ¶ 16 (referring to need to "[e]nsur[e] the safety of their residents"), they fail to create any "actual controversy between the State[s] and the defendant[s]," *Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592, 602 (1982), and so lack standing as *parens patriae. See also Oregon v. Legal Servs. Corp.*, 552 F.3d 965, 974 (9th Cir. 2009) (allowing a state to "bring suit on behalf of its citizens solely by virtue of its interest that its citizens benefit from voluntary federal grants" would "make the *parens patriae* doctrine 'too vague to survive the standing requirements of Art. III." (citation omitted)). It is also well established that a state "does not have standing as *parens patriae* to bring an action against the Federal government." *Sierra Forest Legacy v. Sherman*, 646 F.3d 1161, 1178 (9th Cir. 2011) (citation omitted); *see also Massachusetts v. Mellon*, 262 U.S. 447, 485-86 (1923); *Citizens Against Ruining the Env't v. EPA*, 535 F.3d 670, 676 (7th Cir. 2008).

### B.      Plaintiffs Lack Prudential Standing.

Plaintiffs fail to satisfy prudential requirements of standing as well. "The APA imposes

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 16

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

'a prudential standing requirement in addition to the requirement, imposed by Article III of the Constitution, that the plaintiff have suffered an injury in fact.'" *Havasupai Tribe v. Provencio*, 876 F.3d 1242, 1253 (9th Cir. 2017) (citation omitted).  Prudential standing requires that an interest asserted by a plaintiff be "arguably within the zone of interests to be protected or regulated by the statute that he says was violated." *Id.* (citation omitted); *see also Ashley Creek Phosphate Co. v. Norton*, 420 F.3d 934, 939 (9th Cir. 2005) ("The prudential standing analysis examines whether 'a particular plaintiff has been granted a right to sue by the statute under which he or she brings suit.'" (citation omitted)).  While the zone of interests test is not "demanding," it nevertheless forecloses suit "when a plaintiff's 'interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit.'" *Match–E–Be–Nash–She–Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 225 (2012).

Here, Plaintiffs do not fall within the zone of interests protected by the AECA, particularly with respect to the provision on which they rely.  *See Bennett v. Spear*, 520 U.S. 154, 175-76 (1997) (emphasizing that zone of interests test is applied in the context of "the particular provision of law upon which the plaintiff relies").  The AECA "is designed to protect against the national security threat created by the unrestricted flow of military information abroad." *United States v. Posey*, 864 F.2d 1487, 1495 (9th Cir. 1989); *accord United States v. Chi Mak*, 683 F.3d 1126, 1134 (9th Cir. 2012) (AECA "was intended to authorize the President to control the import and export of defense articles and defense services in 'furtherance of world peace and the security and foreign policy of the United States.'" (quoting 22 U.S.C. § 2778(a)(1))); *see also* Am. Compl. ¶ 27 (acknowledging that "[t]he purpose of the AECA is to reduce the international trade in arms and avoid destabilizing effects abroad through arms exports").[9]  In this context Congress enacted 22 U.S.C. § 2778(f)(1), which provides that "[t]he

---

[9] Plaintiffs' attempt to characterize the AECA as designed to protect "domestic security" rather than "national security" is unavailing.  *See* Pls.' Mot. at 9.  By Plaintiffs' reasoning, any national security determination made by the Government would be subject to second-guessing by Plaintiffs because it affects their residents.  Yet they offer no authority to support such a position.  *See id.*; *cf. Hamdi v. Rumsfeld*, 542 U.S. 507, 580 (2004) (Thomas, J., dissenting) ("The national security . . . is the primary responsibility and purpose of the Federal Government.").

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

President may not remove any item from the Munitions List until 30 days after the date on which the President has provided notice of the proposed removal to" certain congressional committees.  As the legislative history makes clear, Congress enacted this provision in response to "legitimate industry concerns" and cautioned the Executive Branch to "avoid unnecessary export regulation."  H.R. Rep. No. 97-58, at 21-22 (1981).  Thus Plaintiffs—who neither exercise congressional oversight of the Department nor function as would-be exporters, and whose alleged harms concern purely domestic, non-military matters, fail to meet the zone of interests test.  *Cf. People ex rel. Hartigan v. Cheney*, 726 F. Supp. 219, 227 (C.D. Ill. 1989) (Illinois not within zone of interest of the Base Closure and Realignment Act, because, as here, the state "is not the subject of the Secretary's action" and "states have no constitutional or statutory role in federal military policy").

> **C.     Plaintiffs' APA Claims Are Meritless.**
>
> > **1.     The Department's Actions Accord With Its Delegated Authority.**

Plaintiffs cannot establish likely success on the merits of any of their claims. First, Plaintiffs claim that the Government has failed to comply with the AECA's 30-day notice requirement to Congress.  *See* Pls.' Mot. at 11-12; *see also id.* at 13-14 (challenging Department's reliance on 22 C.F.R. § 126.2); Am. Compl. ¶¶ 220-22, 231.  But Plaintiffs again betray their misunderstanding of the governing law.  The statutory provision they invoke provides that "the President may not *remove* any *item* from the Munitions List until 30 days after the date on which the President has provided notice of the proposed removal" to the appropriate congressional committees.  22 U.S.C. § 2778(f)(1) (emphases added).  Pursuant to the plain text of the AECA, an "item" refers to the USML's categories or subcategories—*e.g.*, "Fully automatic firearms to .50 caliber inclusive (12.7 mm)," 22 C.F.R. § 121.1—and not specific articles or commodities related thereto.  22 U.S.C. § 2778(a)(1) ("The President is authorized to designate those items which shall be considered as defense articles and defense services for the purposes of this section and to promulgate regulations for the import and export of such articles and services.  The items so designated shall constitute the United States

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 18

Munitions List."); *see Def. Distributed*, 121 F. Supp. 3d at 687 ("The Munitions List 'is not a compendium of specific controlled items,' rather it is a 'series of categories describing the kinds of items' qualifying as 'defense articles.'" (quoting *United States v. Zhen Zhou Wu*, 711 F.3d 1, 12 (1st Cir. 2013))). Thus, the Department's settlement agreement did not affect any "item" of the USML. The Department's settlement regarding the files at issue in *Defense Distributed* does not implicate the 30-day notice requirement of 22 U.S.C. § 2778(f)(1).

To the extent the Court finds the AECA's reference to "item" or "remove" to be ambiguous, the Department's interpretation of these terms is entitled to at least *Skidmore* deference. Under *Skidmore*, a court must defer to an agency's interpretation provided it is "persuasive and reasonable," considering "'the thoroughness evident in its consideration, the validity of its reasoning, [and] its consistency with earlier and later pronouncements.'" *Fox Television Stations, Inc. v. Aereokiller, LLC*, 851 F.3d 1002, 1013 (9th Cir. 2017) (quoting *United States v. Mead Corp*., 533 U.S. 218, 228 (2001))). The Department has consistently held the view since at least 2011 that only the permanent removal of items, *i.e.*, the categories or subcategories of the USML, implicate the 30-day notice requirement. *See* Heidema Decl. ¶¶ 9, 30, 32. Further, the Department's position accords with both the AECA's text and the original purpose of 22 U.S.C. § 2778(f)(1), which was to encourage the Executive Branch to remove items from the USML. *See* H.R. Rep. No. 97-58, at 22 ("[T]he committee expects the executive branch will avoid unnecessary export regulation . . . ."). Additionally, Congress has been aware of the Department's interpretation and yet has not addressed it in amendments to the AECA. *See* Pub. L. No. 113-296, 128 Stat. 4075 (2014); Heidema Decl. ¶ 9. "These circumstances provide further evidence—if more is needed—that Congress intended the Agency's interpretation, or at least understood the interpretation as statutorily permissible." *Fox Television Stations*, 851 F.3d at 1014 (quoting *Barnhart v. Walton*, 535 U.S. 212, 220 (2002)).

To the extent the Court concludes that notice to Congress was required under 22 U.S.C. § 2278(f)(1), Defendants request that the Court simply extend the TRO for an additional 45

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 19

1    days so that the State Department can consider providing the notice to Congress—rather than

2    entering the more sweeping preliminary injunction that Plaintiffs seek.

3         Similarly, Plaintiffs' misreading of 22 C.F.R. § 126.2 is fatal to their argument that the

4    Department has "[m]isuse[d]" the temporary modification regulation.  *See* Pls.' Mot. at 13-14.

5    That regulation, by definition, effectuates only a "temporary" modification, and thus does not

6    constitute a "removal" such that a 30-day notice is required.  *See* 22 C.F.R. § 126.2.  Nor can

7    Plaintiffs cast doubt on the reasonableness of the Department's interpretation of § 126.2 by

8    claiming that its national security determination "is not the sort of emergency stopgap measure

9    contemplated by 22 C.F.R. § 126.2."  Pls.' Mot. at 14.   It is well established that an agency is

10   entitled to "substantial deference" in interpreting its regulations.  *E.g.*, *Lezama-Garcia v.*

11   *Holder*, 666 F.3d 518, 525 (9th Cir. 2011).  And Plaintiffs' purported national security

12   pronouncements, *see* Pls.' Mot. at 14; *see also id.* at 18, offer no basis to challenge the

13   Department's findings in this regard.  *E.g.*, *United States v. Hawkins*, 249 F.3d 867, 873 n.2

14   (9th Cir. 2001) ("[C]ourts have long recognized that the Judicial Branch should defer to

15   decisions of the Executive Branch that relate to national security.").

16        Plaintiffs also cannot state a claim related to Executive Order 13637, pursuant to which

17   designations or changes in designations "of items or categories of items that shall be considered

18   as defense articles and defense services subject to export control under section 38 (22 U.S.C.

19   § 2778) shall have the concurrence of the Secretary of Defense."  Exec. Order No. 13637

20   § 1(n)(i).  *See* Pls.' Mot. at 13; Am. Compl. ¶¶ 221-22, 231, 246.  Again, the Department has

21   not changed the designations "of items or categories of items."  Further, Plaintiffs' argument

22   fails because the Executive Order creates no rights for Plaintiffs to enforce.  Exec. Order No.

23   13637 § 6(c); *cf. Defenders of Wildlife v. Jackson*, 791 F. Supp. 2d 96, 120 (D.D.C. 2011)

24   (Exec. Order No. 13186).  Most importantly, as stated in the Commerce NPRM, "[t]he changes

25   described in this proposed rule and in the State Department's companion proposed rule on

26   Categories I, II, and III of the USML are based on a review of those categories by the

27   Department of Defense, which worked with the Departments of State and Commerce in

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 20

preparing the amendments."  83 Fed. Reg. at 24,166; *see also* Heidema Decl. ¶ 31 (discussing

concurrence specific as to subject files).

The Court should also reject Plaintiffs' argument that the Department, in settling

*Defense Distributed*, engaged in an "unlawful attempt to abrogate state and federal law."  Pls.'

Mot. at 14-15; Am. Compl. ¶¶ 227, 233, 239.  Specifically, Plaintiffs claim that the temporary

modification, which "permits any United States person" to use the subject files, "conflicts with

many of the States' respective laws regulating firearms," as well as provisions of the Gun

Control Act, 18 U.S.C. § 922(g), (x).  Pls.' Mot. at 14.  Yet the Government does not suggest,

and has never suggested, that the settlement agreement conflicts with or otherwise preempts

such laws.  To the contrary, the Department has consistently emphasized that its actions are

taken only pursuant to its authority to regulate the United States' system of export controls, not

domestic activity.  *See Def. Distributed*, 121 F. Supp. 3d at 695.  The provisions of the Gun

Control Act cited by Plaintiffs remain in force, as do the protections for state law legislated by

Congress in the Gun Control Act.  *See* 18 U.S.C. § 927.  Thus, the laws invoked by Plaintiffs

remain unaffected by the settlement agreement, and there is no basis to substitute Plaintiffs'

understanding of the agreement for the far more reasonable interpretation of the Government.[10]

### 2.    The Department's Actions Were Not Arbitrary And Capricious.

Finally, Plaintiffs claim that the Department's actions were arbitrary and capricious

because they constitute an unexplained reversal of the agency's prior position concerning

whether the subject files are ITAR controlled.  *See* Pls.' Mot. at 15-17; Am. Compl. ¶¶ 238-39.

Insofar as Plaintiffs challenge the Government's litigation strategy in *Defense Distributed* or its

decision to enter into a settlement to resolve that litigation, such decisions are committed to

agency discretion by law and thus not subject to judicial review, 5 U.S.C. § 701(a)(2).  *See*

*Heckler v. Chaney*, 470 U.S. 821 (1985); *Exec. Bus. Media, Inc. v. U.S. Dep't of Def.*, 3 F.3d

---

[10] Similarly, the Court should not accept Plaintiffs' accusations of deliberate efforts by the Government to circumvent the law, Pls.' Mot. at 14; *see also id.* at 4 (suggesting the Government settled "covert[ly]").  *United States v. Boyce*, 38 F. Supp. 3d 1135, 1151 (C.D. Cal. 2014), *aff'd*, 683 F. App'x 654 (9th Cir. 2017) ("Government officials are presumed to carry out their duties in good faith.").

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

759, 761 (4th Cir. 1993) ("[T]he Attorney General has broad discretion and even plenary authority to control litigation under 28 U.S.C. 516 and 519, and [] such decisions are not judicially reviewable."); *accord United States v. Carpenter*, 526 F.3d 1237, 1241-42 (9th Cir. 2008) (recognizing Attorney General's plenary discretion to settle litigation, but noting that in cases—unlike this one—where plaintiffs allege that Attorney General has "exceeded [his] legal authority," such claims are reviewable).[11]

Moreover, as the relevant NPRMs indicate, the Department has concluded that ITAR control of such technical data is not warranted.  *See generally* 83 Fed. Reg. 24,198; 83 Fed. Reg. at 24,166.  These NPRMs have not been withdrawn and remain the official position of the Government.[12]  *Cf. Pennzoil Co. v. Dep't of Energy*, 680 F.2d 156, 171 (Temp. Emer. Ct. App. 1982).  Further, the rationale for this determination is provided in the Commerce NPRM, which explains that the "review was focused on identifying the types of articles that are now controlled on the USML that are either (i) inherently military and otherwise warrant control on the USML or (ii) if of a type common to non-military firearms applications, possess parameters or characteristics that provide a critical military or intelligence advantage to the United States, and are almost exclusively available from the United States."  83 Fed. Reg. at 24,166 ("Thus, the scope of the items described in this proposed rule is essentially commercial items widely available in retail outlets and less sensitive military items.").  This case is only about the determination of the Government that the technical data at issue would not give a military or intelligence advantage and is therefore not properly subject to export controls.  Only those weapons of a type that is inherently military or that is not otherwise widely available for commercial sale are properly subject to such controls.  The Government has not made any determination that 3D-printed guns should not be regulated domestically, and indeed the Government intends to apply those authorities that regulate such firearms and supports

---

[11] Plaintiffs contend that in accepting the settlement agreement, Defendants agreed to exceed their legal authority.  As explained in the balance of this memorandum, that is not accurate.

[12] Further, Plaintiffs cite no authority for the proposition that the APA requires the Department to release "reports, studies, or analyses" in support of its decision regarding a temporary modification pending a larger rulemaking effort.  *See* Pls.' Mot. at 16.

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

Plaintiffs' efforts to do so as well.

### III.    The Balance of Equities And The Public Interest Weigh Against Entry Of A Preliminary Injunction

Finally, Plaintiffs cannot show the balance of equities and public interest factors— which are merged when the Government is a party, *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014)—tips sharply in their favor, particularly given the mandatory injunction they seek.  First, because the Department has no authority to restrict U.S. persons from sharing these files with other U.S. persons within the United States, the harms identified by Plaintiffs cannot be prevented by an injunction in this case.  *See Def. Distributed*, 121 F. Supp. 3d at 687 (files previously available on Defense Distributed's website).  Moreover, the public interest is not served by restraining the ability of the Executive Branch to exercise its discretion to determine whether harm to national security requires export controls on particular items.  *Cf. Virginian Ry. Co. v. Sys. Fed'n No. 40*, 300 U.S. 515, 552 (1937) (statutory scheme of Congress "is in itself a declaration of public interest and policy which should be persuasive" to courts).

Further, the Government notes that the possibility of manufacturing small-caliber firearms from a 3D-printing process has been publicly discussed since 2013.  Heidema Decl. ¶ 26 n.5.  Yet Plaintiffs allege no efforts on their part to enact additional legislation regarding the manufacture of such firearms, *see* Am. Compl. ¶¶ 68-217, and not a single Plaintiff submitted comments in response to the NPRMs, Heidema Decl. ¶ 23.  This further demonstrates that the balance of equities weighs in Defendants' favor.

### CONCLUSION

For the foregoing reasons, the motion for a preliminary injunction should be denied.

Dated:  August 15, 2018                    Respectfully submitted,

CHAD A. READLER
Acting Assistant Attorney General

ANNETTE L. HAYES

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 23

1

Acting United States Attorney

2

KERRY KEEFE
Civil Chief

3

4

JOHN R. GRIFFITHS
Director, Federal Programs Branch

5

ANTHONY J. COPPOLINO
Deputy Director, Federal Programs Branch

6

7

*/s/ Steven A. Myers*
STEVEN A. MYERS

8

ERIC J. SOSKIN
STUART J. ROBINSON

9

Attorneys
U.S. Department of Justice

10

Civil Division, Federal Programs Branch

11

20 Massachusetts Ave. NW
Washington, D.C. 20530

12

(202) 305-8648 (telephone)
(202) 616-8460 (facsimile)

13

steven.a.myers@usdoj.gov

14

*Attorneys for Federal Defendants*

15

16

17

18

19

20

21

22

23

24

25

26

27

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 24

1

## **CERTIFICATE OF SERVICE**

2        I hereby certify that on August 15, 2018, I electronically filed the foregoing brief using

3    the Court's CM/ECF system, causing a notice of filing to be served upon all counsel of record.

4

5    Dated: August 15, 2018                              */s/ Steven A. Myers*
                                                          Steven A. Myers

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 25

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648