# EXHIBIT E

UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON; STATE OF CONNECTICUT; STATE OF MARYLAND; STATE OF NEW JERSEY; STATE OF NEW YORK; STATE OF OREGON; COMMONWEALTH OF MASSACHUSETTS; COMMONWEALTH OF PENNSYLVANIA; and the DISTRICT OF COLUMBIA, | No. 2:18-cv-01115 |
| Plaintiffs, | OPPOSITION TO EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER |
| v. | ORAL ARGUMENT REQUESTED |
| UNITED STATES DEPARTMENT OF STATE; MICHAEL R. POMPEO, in his official capacity as Secretary of State; DIRECTORATE OF DEFENSE TRADE CONTROLS; MIKE MILLER, in his official capacity as Acting Deputy Assistant Secretary of Defense Trade Controls; SARAH HEIDEMA, in her official capacity as Director of Policy, Office of Defense Trade Controls Policy; DEFENSE DISTRIBUTED; SECOND AMENDMENT FOUNDATION, INC.; and CONN WILLIAMSON, | |
| Defendants. | |

OPPOSITION TO EMERGENCY MOTION
FOR TEMPORARY RESTRAINING ORDER

Immix Law Group PC

701 5th Ave Suite 4710
Seattle, WA 98104
Phone: (206) 492-7531
Facsimile: 503-802-5351

1

**TABLE OF CONTENTS**

2

3   I. THE PLAINTIFFS SEEK AN UNCONSTITUTIONAL PRIOR RESTRAINT ON

4      SPEECH ............................................................................................................. 1

5   II. THE PLAINTIFFS CANNOT SUCCEED ON THE MERITS BECAUSE THE

6      COURT HAS NO JURISDICTION ..................................................................... 3

7      A.  This Court Lacks Jurisdiction to Review State Department Licensing

8          Decisions Under the APA because of a Clear Delegation of Authority and

9          Lack of Judicially Manageable Standards ............................................... 4

10     B.  AECA Section 2778(h) Precludes the Court from Reviewing the State

11         Department's Decision to Remove Defense Articles from the USML .................. 7

12     C.  No Congressional Notification Requirements Apply ............................................ 10

13     D.  No Commodity Jurisdiction Requirements Apply ................................................. 12

14  CONCLUSION ....................................................................................................... 13

16

17

18

19

20

21

22

23

24

25

26

OPPOSITION TO EMERGENCY MOTION
FOR TEMPORARY RESTRAINING ORDER

Immix Law Group PC

701 5th Ave Suite 4710
Seattle, WA 98104
Phone: (206) 492-7531
Facsimile: 503-802-5351

## I.  The Plaintiffs Seek an Unconstitutional Prior Restraint on Speech

The Attorneys General of eight states and the District of Columbia have styled this case as a mundane administrative law matter. Their proposed remedy sounds innocuous enough, and perhaps even a little familiar: enjoin the current administration from reversing a position taken by the prior administration. However, that description of the case is dangerous window dressing. This case implicates foundational principles of free speech.

Simply put, the States demand a prior restraint of constitutionally protected speech that is *already* in the public domain. We know that "[a]ny system of prior restraints of expression comes to this Court bearing a heavy presumption against its constitutional validity." *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70 (1963). That presumption of liberty is even heavier where, as here, the speech is *already* available on the Internet, and has been available for years. In *The Pentagon Papers Case*, Justice White remarked that when "publication has *already* begun," the "efficacy of equitable relief . . . to avert anticipated damages is doubtful at best." *New York Times Co. v. U.S.*, 403 U.S. 713, 732 (1971) (White, J., concurring) (emphasis added). Yet, nine Attorneys General, who swore an oath to the Constitution, failed to even mention the First Amendment in their emergency pleadings. Such a careless disregard for the Bill of Rights fails to meet the "heavy burden" needed to justify a prior restraint. *Organization for a Better Austin v. Keefe*, 402 U.S. 415, 419 (1971).

Moreover, the prior restraints in this case would not be restricted to the named defendants: nine Attorneys General seek to infringe the liberties of *all* Americans. The settlement under siege expressly protects the rights of "*any* United States person" to "access, discuss, use, reproduce, or otherwise benefit from the technical data." ECF 2-1 at 4-5 (emphasis added). *Any* means *all*. Granting the proposed injunctive relief would not only silence the three named Defendants, but it would immediately censor over three hundred million Americans. Today, the validity of nationwide injunctions is subject to a robust debate. But never before has any court entertained a global injunction on the freedom of speech of *all* Americans.

OPPOSITION TO EMERGENCY MOTION
FOR TEMPORARY RESTRAINING ORDER
Page 1

Immix Law Group PC

701 5th Ave Suite 4710
Seattle, WA 98104
Phone: (206) 492-7531
Facsimile: 503-802-5351

The constitutional principles at stake in this case are simple enough. Yet, the facts are admittedly perplexing—especially for a Court asked to grant an emergency temporary restraining order. The most straightforward way to understand this complicated case is to trace the three documents that were generated by the State Department on July 27, 2018: (1) the license, (2) the temporary modification, and (3) the settlement agreement. They are separate, but interconnected.

1. The State Department issued a **license** that authorized Defense Distributed to publish, for "unlimited distribution," certain "technical data" that was subject to litigation in the Western District of Texas. *See* Exhibit A at 2.

2. Through the **temporary modification**, the State Department authorized the distribution of that "technical data," in addition to certain "other files," without any prior restraint. *See* Exhibit B.[1]

3. Under the terms of the **settlement agreement**, "*any* United States person" can now "access, discuss, use, reproduce, or otherwise benefit from the technical data," and "other files," that are covered by the **temporary modification**. *See* Exhibit C at 3 (emphasis added).

Let's unpack this nesting doll. Through its unique **license**, Defense Distributed can distribute the "technical data" that was at issue in the Western District of Texas litigation. However, Defense Distributed, like "any [other] United States person," can rely on the **temporary modification**, working in tandem with the **settlement agreement**, in order to "access, discuss, use, reproduce, or otherwise benefit from the technical data." These acts are *expressly* protected by the First Amendment. In *Sorrell v. IMS Health Inc.*, the Court recognized "that the *creation and dissemination* of information are speech within the meaning of the First Amendment." 564 U.S. 552, 570 (2011). *See also Bartnicki v. Vopper*, 532 U.S. 514, 527 (2001) ("[I]f the acts of 'disclosing' and 'publishing' information do not constitute speech, it is hard to

---

[1] In 1981, the Office of Legal Counsel warned the State Department that its regulation of "technical data" raised "*serious constitutional questions*." *See* Constitutionality of the Proposed Revision of the Int'l Traffic in Arms Regulations, 5 U.S. Op. Off. Legal Counsel 202, 205-06 (1981) (emphasis added).

OPPOSITION TO EMERGENCY MOTION
FOR TEMPORARY RESTRAINING ORDER
Page 2

Immix Law Group PC

701 5th Ave Suite 4710
Seattle, WA 98104
Phone: (206) 492-7531
Facsimile: 503-802-5351

imagine what does fall within that category, as distinct from the category of expressive conduct" (some internal quotation marks omitted)). *See* Josh Blackman, *The 1st Amendment, 2nd Amendment, and 3D Printed Guns*, 81 Tenn. L. Rev. 479 (2014), http://bit.ly/2OvXBvu.

Yet, the Plaintiffs seek to block all three attributes of this framework: the license, the temporary modification, and the settlement agreement. Each of these injunctions would impose a prior restraint on speech, and silence "any United States person" who was previously *authorized* by the federal government to "creat[e] and disseminat[e] . . . information."

Fortunately, the bedrock principles of the First Amendment make this case much easier. A finding that a constitutional right "'is either threatened or in fact being impaired'. . . mandates a finding of irreparable injury." *Deerfield Med. Center v. City of Deerfield Beach*, 661 F.2d 328, 338 (5th Cir. 1981) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). And "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod*, 427 U.S. at 373-74 (citations omitted). Outside of court papers, the Attorney General of Washington bluntly acknowledged the purpose of his litigation: to "make it as difficult as humanly possible to *access this information*."[2] That statement against interest, by itself, is enough to deny the Temporary Restraining Order in its entirety.

## II.  The Plaintiffs Cannot Succeed on The Merits Because the Court has no Jurisdiction

The Plaintiffs cannot succeed on the merits: the State Department's actions are not subject to judicial review, the duty to notify Congress has not yet been triggered, and the Commodity Jurisdiction procedure simply does not apply. Their entire challenge under the Administrative Procedure Act ("APA") suffers from serious misunderstandings of the Arms Export Control Act ("AECA") and International Traffic in Arms Regulations ("ITAR") requirements. This complaint cannot form the basis for emergency injunctive relief.

---

[2] Cyrus Farivar, 20 states take aim at 3D gun company, sue to get files off the Internet, *Ars Technica* (Jul. 30, 2018), http://bit.ly/2NX1dp7.

OPPOSITION TO EMERGENCY MOTION
FOR TEMPORARY RESTRAINING ORDER
Page 3

Immix Law Group PC

701 5th Ave Suite 4710
Seattle, WA 98104
Phone: (206) 492-7531
Facsimile: 503-802-5351

**A.** **This Court Lacks Jurisdiction to Review State Department Licensing Decisions Under the APA because of a Clear Delegation of Authority and Lack of Judicially Manageable Standards**

The APA expressly excludes from review "agency action [that] is committed to agency discretion by law." 5 U.S.C. § 701(a)(2). Courts determine whether an agency action is committed to the discretion of an agency based on the nature of the delegation of authority and the statutory language. *See Webster v. Doe*, 486 U.S. 592, 599-600 (1988). This narrow exception to judicial reviewability is especially prevalent in cases involving agency decisions relating to foreign affairs and national security. Such cases involve "judgments on questions of foreign policy and the national interest" that are not "fit for judicial involvement." *See Dist. No. 1, Pac. Coast Dist., Marine Eng'rs' Beneficial Ass'n v. Mar. Admin*., 215 F.3d 37, 42 (D.C. Cir. 2000).

In addition, where the language of a statute provides no justiciable standard by which a court can review the agency's exercise of its delegated authority, the matter is treated as committed to the agency's discretion. *See Webster*, 486 U.S. at 600 (a statute allowing the Director of the CIA to terminate employment of any employee whenever he found termination "advisable" for the national interest "fairly exude[d] deference" and thereby precluded judicial review under the APA). In particular, statutes have been consistently interpreted to preclude judicial review under the APA when they use language that permits an executive official, such as the President or another agency official, to take action that the official "deems" in the "national interest." *See Zhu v. Gonzales*, 411 F.3d 292, 295 (D.C. Cir. 2005) (construing a statute, which allows the Attorney General to waive a requirement if waiver is in the "national interest," as being committed to the discretion of the Attorney General).

Plaintiffs claim, without any authority, that "the State Department's actions are mandatory and non-discretionary." ECF 2 at 14. However, the AECA delegates broad authority and discretion to the President, or his delegate, to issue a license when he determines that such action is "consistent with the foreign policy interests of the United States," 22 U.S.C. § 2751,

OPPOSITION TO EMERGENCY MOTION
FOR TEMPORARY RESTRAINING ORDER
Page 4

Immix Law Group PC

701 5th Ave Suite 4710
Seattle, WA 98104
Phone: (206) 492-7531
Facsimile: 503-802-5351

and "in furtherance of world peace and the security and foreign policy of the United States." *Id.* § 2778(a)(1). "This standard fairly exudes deference to the [President], and appears to us to foreclose the application of any meaningful judicial standard of review." *See Webster*, 486 U.S. at 600. Pursuant to this authority, the State Department has issued a license under ITAR § 125.4(b)(13) for Defense Distributed and the Second Amendment Foundation (SAF) to publish certain technical data on firearms into the public domain. *See* Exhibit A. The State Department further issued a temporary modification under ITAR § 126.2 to permit United States persons to access, discuss, use, reproduce, or otherwise benefit from the technical data at issue. *See* Exhibit B.

The State Department's licensing decisions fit squarely within 5 U.S.C. § 701(a)(2)'s exclusion from judicial review, because it constitutes "agency action [that] is committed to agency discretion by law." The AECA's delegation of authority to control arms exports is decidedly one involving foreign affairs and national security—matters clearly within the State Department's discretionary authority. Furthermore, the lack of judicially manageable standards precludes review. Courts have affirmed this broad grant of authority to the President under the AECA to control the export of firearms on foreign policy grounds. In doing so, they broadly construe statutes that grant the President authority to act in such sensitive matters of foreign affairs. For example, the Federal Circuit observed:

> In the external sector of the national life, Congress does not ordinarily bind the President's hands so tightly that he cannot respond promptly to changing conditions or the fluctuating demands of foreign policy. Accordingly, when Congress uses far-reaching words in delegating authority to the President in the area of foreign relations, courts must assume, unless there is a specific contrary showing elsewhere in the statute or in the legislative history, that the legislators contemplate that the President may and will make full use of that power in any manner not inconsistent with the provisions or purposes of the Act. In a statute dealing with foreign affairs, a grant to the President which is expansive to the reader's eye should not be hemmed in or "cabined, cribbed, confined" by anxious judicial blinders.

OPPOSITION TO EMERGENCY MOTION
FOR TEMPORARY RESTRAINING ORDER
Page 5

Immix Law Group PC

701 5th Ave Suite 4710
Seattle, WA 98104
Phone: (206) 492-7531
Facsimile: 503-802-5351

*B-West Imports, Inc.* v. *United States*, 75 F.3d 633, 636 (Fed. Cir. 1996) (quoting *South Puerto Rico Sugar Co. Trading Corp. v. United States*, 334 F.2d 622, 632 (Ct. Cl. 1964)); *see also Samora* v. *United States*, 406 F.2d 1095 (5th Cir. 1969) ("The delegation to the President by subsection (a) of the power 'to control, in furtherance of world peace and the security and foreign policy of the United States, the export and import of arms, ammunition, and implements of war, including technical data relating thereto,' is directed to the conduct of international affairs, in which the executive branch of our government traditionally has been dominant.").

In *U.S. Ordnance, Inc. v. U.S. Dep't of State*, the Plaintiffs "ask[ed] the Court to direct the Department of State (the 'Department') and its employees to issue plaintiff a license to export M16 machine guns to foreign countries." 432 F. Supp. 2d 94, 99 (D.D.C. 2006), vacated as moot sub nom. *U.S. Ordnance, Inc. v. Dep't of State*, 231 F. App'x 2 (D.C. Cir. 2007). Judge Huvelle found that the court lacked subject matter jurisdiction to review the denial of the license under the Administrative Procedure Act. Specifically, the Court cited two factors court for "reject[ing] plaintiff's invocation of the APA and declin[ing] to review the agency's denial of plaintiff's applications for licenses to export M16 machine guns." *Id.* at 99. First, she cited the "clear statutory language" of the Arms Export Control Act, in which the "delegation of authority to control arms exports is decidedly one involving foreign affairs and national security." *Id.* at 98-99.

Second, Judge Huevelle recognized that there is an "absence of judicially manageable standards to guide the Court's review" concerning the issuance of export licenses. The Court added, that "the AECA provides that the President, or his delegate, may approve the exportation of defense articles when he determines that such action is 'consistent with the foreign policy interests of the United States,' and 'in furtherance of world peace and the security and foreign policy of the United States.'" *Id.* (citations and quotations omitted). *See*

OPPOSITION TO EMERGENCY MOTION
FOR TEMPORARY RESTRAINING ORDER
Page 6

Immix Law Group PC

701 5th Ave Suite 4710
Seattle, WA 98104
Phone: (206) 492-7531
Facsimile: 503-802-5351

1     *also Corrie v. Caterpillar, Inc*. 503 F.3d 974 (9th Cir. 2007) (claims that implicated sales

2     financed under the AECA were nonjusticiable).

3         This determination of whether to issue a license is for the elected branches, and not

4     the courts—and certainly not for the states—to make. Indeed, the Plaintiffs' suit stands as an

5     obstacle and frustrates the accomplishment of objectives authorized by federal export control

6     law. *See Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 375 (2000); *Nat'l Foreign*

7     *Trade Council, Inc. v. Giannoulias*, 523 F. Supp. 2d 731, 738-742 (N.D. Ill. 2007).

8     Moreover, the states are not within the "zone of interest" to challenge these actions. *See*

9     *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014). There is no

10    basis to review the State Department's issuance of the license.

11        **B.**     **AECA Section 2778(h) Precludes the Court from Reviewing the State**

12               **Department's Decision to Remove Defense Articles from the USML**

13         The Plaintiffs contend that "Defendants have provided no explanation for the

14    Government's complete reversal of its position on the files at issue." ECF 2 at 18. Therefore, the

15    States claim, the government's actions are arbitrary and capricious. This claim is reckless. As a

16    threshold matter, the changed position began during the Obama Administration; not the Trump

17    Administration. 78 Fed. Reg. 22,740 (April 16, 2013) ("The Department intends to publish final

18    rules implementing the revised USML categories and related ITAR amendments periodically,

19    beginning with this rule.").

20        Moreover, the federal government has provided *ample* support to explain its position: the

21    Plaintiffs simply did not mention it. On May 24, 2018, the Department of State published a

22    proposed rule in the Federal Register seeking to transfer responsibility for the licensing of

23    firearms exports from the ITAR U.S. Munitions List ("USML") to the Department of Commerce

24    Export Administration Regulations ("EAR") Commerce Control List. 83 Fed. Reg. 24,198 (May

25    24, 2018). *See* Exhibit F. The proposed rule offers several detailed findings and studies to justify

26

OPPOSITION TO EMERGENCY MOTION
FOR TEMPORARY RESTRAINING ORDER
Page 7

Immix Law Group PC

701 5th Ave Suite 4710
Seattle, WA 98104
Phone: (206) 492-7531
Facsimile: 503-802-5351

transferring the responsibility from the State Department to the Commerce Department. For example:

1. **Reduce burden hours**: "The Department believes the effect of this proposed rule would decrease the number of license applications submitted to the Department under OMB Control No. 1405–0003 by approximately 10,000 annually, for which the average burden estimates are one hour per form, which results in a burden reduction of 10,000 hours per year." *Id.* at 24200.

2. **Reduced costs**: "In addition to the reduction in burden hours, there will be direct cost savings to the State Department that would result from the 10,000 license applications no longer being under the ITAR once these items are moved to the EAR." *Id.*

3. **Save taxpayers $2.5 million annually**: "It is the case, however, that the movement of these items from the ITAR would result in a direct transfer of $2,500,000 per year from the government to the exporting public, less the increased cost to taxpayers, because they would no longer pay fees to the State Department and there is no fee charged by the Department of Commerce to apply for a license.." *Id.* at 24201.

Again, the Plaintiffs repeatedly make baseless charges that the government has failed to justify this new position, yet they do not cite the Federal Register proposed rule that explains in depth why the change was made. The intent of the proposed rule is fully consistent with the AECA, which provides that "[t]he President is authorized to designate those items which shall be considered as defense articles and defense services for the purposes of this section and to promulgate regulations for the import and export of such articles and services." 22 U.S.C. § 2778(a)(1). The items so designated constitute the ITAR USML. *Id.*

Plaintiffs also make another fatal error: they repeatedly assert, without any evidence that the government failed to notify Congress prior to removing an article from the USML. However, the proposed rule—which they do not cite—is only *proposed*. It is not final. Therefore, nothing has been removed from the USML. Therefore, the requirement to notify Congress has not been triggered yet. See 22 U.S.C. § 2778(f)(1) ("The President may not remove any item from the Munitions List until 30 days after the date on which the President has provided notice of the proposed removal [to Congress]").

OPPOSITION TO EMERGENCY MOTION
FOR TEMPORARY RESTRAINING ORDER
Page 8

Immix Law Group PC

701 5th Ave Suite 4710
Seattle, WA 98104
Phone: (206) 492-7531
Facsimile: 503-802-5351

Moreover, the Settlement Agreement does not require the removal of anything from the USML. *See* Exhibit C. Rather, Section 1(a) of the agreement only requires that the State Department commit to draft and fully pursue removal of the technical data at issue in this action from the USML, "to the extent authorized by law (including the Administrative Procedure Act)." The proposed rule explained that the government was *expressly* complying with the requirements of the notice-and-comment rulemaking process, even though it determined that it was not required to do so:

> The Department of State is of the opinion that controlling the import and export of defense articles and services is a foreign affairs function of the United States government and that rules implementing this function are exempt from sections 553 (rulemaking) and 554 (adjudications) of the Administrative Procedure Act (APA). Although the Department is of the opinion that this proposed rule is exempt from the rulemaking provisions of the APA and without prejudice to its determination that controlling the import and export of defense services is a foreign affairs function, the Department is publishing this proposed rule with a 45-day provision for public comment. *Id.* at 24200.

The government engaged in a sterling rulemaking process, and more than adequately justified its agency action—the action is certainly not "arbitrary and capricious."

In any event, even if the State Department removed the subject technical data from the USML—it didn't—the AECA expressly, clearly, and unequivocally precludes judicial review of such decisions:

> **(h) Judicial review of designation of items as defense articles or services**
>
> The designation by the President (or by an official to whom the President's functions under subsection (a) have been duly delegated), in regulations issued under this section, of items as defense articles or defense services for purposes of this section **shall not be subject to judicial review**.

22 U.S.C. § 2778(h) (emphasis added).

The Plaintiffs contend that this provision is irrelevant because "the States are not challenging the federal defendants' designation of the computer code at issue as defense articles, but instead their decision to remove the code from the USML." ECF 2 at 15. We cannot repeat

OPPOSITION TO EMERGENCY MOTION
FOR TEMPORARY RESTRAINING ORDER
Page 9

Immix Law Group PC

701 5th Ave Suite 4710
Seattle, WA 98104
Phone: (206) 492-7531
Facsimile: 503-802-5351

this point enough: Nothing has been removed from the USML! The rule is only in its proposed form.

Furthermore, Plaintiffs argue that "designation," as used in 2778(h), does not include decisions on what should not be designated. They argue that the section only applies to decisions on what should be designated on the USML and not decisions on what should not be on the USML. Plaintiffs do not offer any authority to support their position. Nor can they. Courts have rejected prior attempts to narrow application of 2778(h) as "strained and unreasonable," especially in light of the overall intent of the AECA, which "was enacted to permit the Executive Branch to control the export and import of certain items in order to further 'world peace and the security and foreign policy' of the United States." *Karn v. United States Department of State*, 925 F.Supp. 1, 6 (D.D.C. 1996) ("To parse the statute as the plaintiff suggests makes little sense in light of the objectives of the AECA."); *see also U.S. v. Roth*, 628 F.3d 827, 832 (6th Cir. 2011) ("Initially, we take note that courts may not review whether items are properly designated as defense articles on the Munitions List.").

Plaintiffs' litigating position places more weight on "designation" than any reasonable construction of the statute will bear because it is axiomatic that either decision necessarily entails the other. Even if this Court was to accept Plaintiffs' argument that 2778(h) only applies to designations of items as defense articles, the question becomes one of semantics—i.e., the Court can just as easily find that proposed rule seeks to designate a limited subset of firearms as defense articles. Either way, such Department of State designations on the USML are not subject to judicial review under 2778(h).

## C.    No Congressional Notification Requirements Apply

**Not a single** **Congressional notification requirement** applies to the State Department's issuance of the subject approvals or the proposed rule. Nevertheless, throughout various sections of their Motion, the Plaintiffs claim that the State Department failed to provide Congressional

OPPOSITION TO EMERGENCY MOTION
FOR TEMPORARY RESTRAINING ORDER
Page 10

Immix Law Group PC

701 5th Ave Suite 4710
Seattle, WA 98104
Phone: (206) 492-7531
Facsimile: 503-802-5351

notifications. However, they fail to cite *any section* of the AECA that actually applies a Congressional notification requirement to the actions at issue.

To be sure, the AECA contains various Congressional notification requirements. Specifically, it requires the State Department to formally notify Congress:

- before issuance of any license or other approval for export sales of "Major Defense Equipment" that exceed certain dollar-value thresholds;

- before the approval of exports of commercial communications satellites to certain destinations and persons;

- and before approval of certain other transactions.

*See e.g.,* 22 U.S.C. §§ 2776(c), 2776(d). In addition, the President must provide Congressional notification in advance of removing an item from the USML. *Id.* at § 2778(f)(1). However, no Congressional notification requirements apply to the State Department's obligations under the terms of the Settlement Agreement.

Without question, Congressional notification requirements do not apply to the State Department's issuance of a license to publish technical data. Nor is Congressional notification required for the State Department to make a commitment to draft and to fully pursue a rulemaking authorized by law (including the Administrative Procedures Act). That commitment can include the publication in the Federal Register of a notice of proposed rulemaking, seeking to revise USML Category I to exclude the technical data that is the subject of the Action. Critically, the Settlement Agreement does not require the State Department to remove anything from the USML. It only requires that the State Department commit to draft and pursue such change in compliance with the APA and any other applicable laws, to include the AECA and its Congressional notification requirements. Any possible challenge to a potential removal is not yet ripe.

Furthermore, Congressional notification requirements do not apply to the State Department's issuance of a *temporary* order suspending or modifying the ITAR under Section 126.2. *See* Exhibit B. Here, Plaintiffs confuse and conflate the difference between a temporary

OPPOSITION TO EMERGENCY MOTION
FOR TEMPORARY RESTRAINING ORDER
Page 11

Immix Law Group PC

701 5th Ave Suite 4710
Seattle, WA 98104
Phone: (206) 492-7531
Facsimile: 503-802-5351

order under ITAR Section 126.2 and the actual removal of an article from the USML requiring Congressional notification. ITAR Section 126.2 permits the State Department to "**order** the **temporary** suspension or modification of any or all of the regulations of this subchapter in the interest of the security and foreign policy of the United States." 22 C.F.R. 126.2 (emphasis added). Such suspension is a temporary order that does not remove anything from the USML. In sharp contrast, removal of a defense article from the USML is a permanent act that requires rulemaking and Congressional notification.

Finally, as noted above, no Congressional notification is required for the State Department to issue a proposed rule that merely *proposes* a transfer defense articles to Commerce Department's export jurisdiction. Of course, § 2778(f)(1) requires that the President provide Congressional notification in advance of removing an item from the USML in a final rule, but no final rule has been issued.

### D.   No Commodity Jurisdiction Requirements Apply

Plaintiffs claim "Defendants also lack statutory authority to issue the license and temporary modification "without following the 'established procedures' for commodity jurisdiction." ECF 2 at 16. Here, the Plaintiffs fundamentally misunderstand the established scope and purpose of the ITAR commodity jurisdiction procedure. Pursuant to ITAR Section 120.4, the government can respond to public requests for case-by-case determinations of whether a particular product (*i.e.*, XYC Company's widget) is on the USML. *See* 22 C.F.R. 120.4. This Commodity Jurisdiction procedure under ITAR Part 120 is a completely separate process from the State Department licensing procedures. *See e.g.,* 22 C.F.R. 125 ("Licenses for the Export of Technical Data and Classified Defense Articles").

Plaintiffs also confuse and conflate the Commodity Jurisdiction procedure with State Department decisions to remove an entire class of items from the USML. The District Court for the District of Columbia explained this distinction in *Karn v. United States Department of State*:

OPPOSITION TO EMERGENCY MOTION
FOR TEMPORARY RESTRAINING ORDER
Page 12

Immix Law Group PC

701 5th Ave Suite 4710
Seattle, WA 98104
Phone: (206) 492-7531
Facsimile: 503-802-5351

> Designating an export such that it is subject to the AECA and the ITAR requires first describing the type of item in the regulations, and second, if asked by a potential exporter, confirming that the item in question is or is not covered by such description. The commodity jurisdiction procedure provides the latter function. . . .

925 F.Supp. 1, at 7 (D.D.C. 1996).

The commodity jurisdiction process simply does not apply to temporary modifications of the ITAR under 126.2 or other licensing decisions. Nor does it apply to agency decisions to amend the regulations to transfer export jurisdiction of defense articles to the Department of Commerce.

## III.  Conclusion

The Plaintiffs can challenge the proposed rule in due time when it is finalized. But they cannot mount a collateral attack on a legitimate executive action in order to censor speech. *See* Exhibit E. The Emergency Motion for a Temporary Restraining Order should be denied.

OPPOSITION TO EMERGENCY MOTION
FOR TEMPORARY RESTRAINING ORDER
Page 13

Immix Law Group PC

701 5th Ave Suite 4710
Seattle, WA 98104
Phone: (206) 492-7531
Facsimile: 503-802-5351

1    DATED this 31st day of July, 2018.

2                                        IMMIX LAW GROUP PC

3

4    By _____

5        Joel B. Ard, WSBA # 40104
6        Immix Law Group PC
7        701 5th Ave Suite 4710
         Seattle, WA 98104
         Phone: (206) 492-7531
8        Fax: (503) 802-5351
9        E-Mail: joel.ard@immixlaw.com
         Attorneys for defendants Defense Distributed,
10       Second Amendment Foundation, Inc., and
         Conn Williamson

11

12       Josh Blackman
         1303 San Jacinto Street
13       Houston, TX 77002
         Phone: (202) 294-9003
14       E-Mail: Josh@JoshBlackman.com
         Attorneys for defendants Defense Distributed,
15       Second Amendment Foundation, Inc., and
         Conn Williamson
16       *Admission Pro Hac Vice Pending

17

18       Matthew Goldstein
         Snell & Wilmer LLP
19       One South Church Avenue, Suite 1500
         Tucson, AZ 85701
20       Phone: (202) 550-0040
         E-Mail: mgoldstein@swlaw.com
21       Attorneys for defendants Defense Distributed,
         Second Amendment Foundation, Inc., and
22       Conn Williamson
         *Admission Pro Hac Vice Pending
23

24

25

26

OPPOSITION TO EMERGENCY MOTION                    Immix Law Group PC
FOR TEMPORARY RESTRAINING ORDER
Page 1                                            701 5th Ave Suite 4710
                                                  Seattle, WA 98104
                                                  Phone: (206) 492-7531
                                                  Facsimile: 503-802-5351

**CERTIFICATE OF SERVICE**

1

2      I certify that on July 31, 2018, I served the foregoing by filing it with the Court's

3  CM/ECF system, which automatically notifies all counsel of record.

4

5      I CERTIFY UNDER PENALTY OF PERJURY under the laws of the United States of

6  America that the foregoing is true and correct.

7      DATED this July 31, 2018.

8                                          IMMIX LAW GROUP PC

9

10                                   By

11                                          Joel B. Ard, WSBA # 40104
                                            Immix Law Group PC
12                                          701 5th Ave Suite 4710
                                            Seattle, WA 98104
13                                          Phone: (206) 492-7531
                                            Fax: (503) 802-5351
14                                          E-Mail: joel.ard@immixlaw.com

15                                          Attorneys for defendants Defense Distributed,
16                                          Second Amendment Foundation, Inc., and
                                            Conn Williamson
17

18

19

20

21

22

23

24

25

26

# Exhibit A



**United States Department of State**

*Bureau of Political-Military Affairs*
*Directorate of Defense Trade Controls*
*Washington,* D.C. 20522-0112

July 27, 2018

Mr. Cody R. Wilson, Defense Distributed, and Second Amendment Foundation, Inc.
c/o Mr. Matthew A. Goldstein
Snell & Wilmer
One South Church Avenue
Suite 1500
Tucson, AZ 85701-1630

RE:   Directorate of Defense Trade Controls Approval of Certain Files for Public Release

Dear Mr. Wilson, Defense Distributed, and Second Amendment Foundation, Inc.:

This letter is provided in accordance with section 1(c) of the Settlement Agreement in the matter of *Defense Distributed, et al., v. U.S. Department of State, et al.,* No. 15-cv-372-RP (W.D. Tx.) (hereinafter referred to as "*Defense Distributed*"). As used in this letter,

- The phrase "Published Files" means the files described in paragraph 25 of Plaintiffs' Second Amended Complaint in *Defense Distributed*.
- The phrase "Ghost Gunner Files" means the files described in paragraph 36 of Plaintiffs' Second Amended Complaint in *Defense Distributed*.
- The phrase "CAD Files" means the files described in paragraph 40 of Plaintiffs' Second Amended Complaint in *Defense Distributed*.

The Department understands that Defense Distributed submitted the Published Files, Ghost Gunner Files, and CAD Files to the Department of Defense's Defense Office of Prepublication and Security Review (DOPSR) in 2014 to request review for approval for public release pursuant to International Traffic in Arms Regulations (ITAR) § 125.4(b)(13). It is our further understanding that DOPSR did not make a determination on the eligibility of these files for release, but instead referred you to the Directorate of Defense Trade Controls (DDTC) regarding public release of these files.

I advise you that for the purposes of ITAR § 125.4(b)(13), the Department of State is a cognizant U.S. government department or agency, and DDTC has authority to issue the requisite approval for public release. To that end, I approve the Published Files, Ghost Gunner Files, and CAD Files for public release (i.e., unlimited distribution). As set forth in ITAR § 125.4(b)(13), technical data approved for public release by the cognizant U.S. government department or agency is not subject to the licensing requirements of the ITAR.

Sincerely,

Acting Deputy Assistant Secretary for the
Directorate of Defense Trade Controls

# Exhibit B

NOTICE: **GENERAL**

07/27/18

# Temporary Modification of Category I of the United States Munitions List

Consistent with the International Traffic in Arms Regulations (ITAR), 22 C.F.R. § 126.2, the Acting Deputy Assistant Secretary for Defense Trade Controls has determined that it is in the interest of the security and foreign policy of the United States to temporarily modify United States Munitions List (USML) Category I to exclude the following technical data identified in the Settlement Agreement for the matter of Defense Distributed, et al., v. U.S. Department of State, et al, Case No. 15-cv-372-RP (W.D. Tex.) (hereinafter "Defense Distributed"):

- "Published Files," i.e., the files described in paragraph 25 of the Second Amended Complaint in Defense Distributed.
- "Ghost Gunner Files," i.e., the files described in paragraph 36 of the Second Amended Complaint in Defense Distributed.
- "CAD Files," i.e., the files described in paragraph 40 of the Second Amended Complaint in Defense Distributed.
- "Other Files," i.e., the files described in paragraphs 44-45 of the Second Amended Complaint in Defense Distributed, insofar as those files regard items exclusively: (a) in Category I(a) of the USML, as well as barrels and receivers covered by Category I(g) of the USML that are components of such items; or (b) items covered by Category I(h) of the USML solely by reference to Category I(a), excluding Military Equipment. Military Equipment means (1) Drum and other magazines for firearms to .50 caliber (12.7 mm) inclusive with a capacity greater than 50 rounds, regardless of jurisdiction of the firearm, and specially designed parts and components therefor; (2) Parts and components specially designed for conversion of a semi-automatic firearm to a fully automatic firearm; (3) Accessories or attachments specially designed to automatically stabilize aim (other than gun rests) or for automatic targeting, and specially designed parts and components therefor.

This temporary modification will remain in effect while the final rule referenced in paragraph 1(a) of the Settlement Agreement is in development.
Please see the Settlement Agreement and the Second Amended Compliant for additional information.

---

NOTICE: **GENERAL**

07/25/18

# Public Comments on USML Categories I–III

# Exhibit C

## SETTLEMENT AGREEMENT

Defense Distributed ("DD"), Second Amendment Foundation, Inc. ("SAF"), and Conn

Williamson (collectively, "Plaintiffs,") and the United States Department of State ("State"), the

Secretary of State, the Directorate of Defense Trade Controls ("DDTC"), the Deputy Assistant

Secretary, Defense Trade Controls, and the Director, Office of Defense Trade Controls Policy

(collectively, "Defendants"), out of a mutual desire to resolve all of the claims in the case

captioned *Defense Distributed, et al. v. Dep't of State, et al.*, Case No. 15-cv-372-RP (W.D.

Tex.) (the "Action") without the need for further litigation and without any admission of liability,

hereby stipulate and agree as follows:

Plaintiffs and Defendants do hereby settle all claims, issues, complaints, or actions

described in the case captioned, and any and all other claims, complaints, or issues that have

been or could have been asserted by Plaintiffs against Defendants in accordance with the

following terms and conditions:


1.      *Consideration*: In consideration of Plaintiffs' agreement to dismiss the claims in the

Action with prejudice as described in paragraph 2, below, Defendants agree to the following, in

accordance with the definitions set forth in paragraph 12, below:

(a)      Defendants' commitment to draft and to fully pursue, to the extent authorized by

law (including the Administrative Procedure Act), the publication in the Federal

Register of a notice of proposed rulemaking and final rule, revising USML

Category I to exclude the technical data that is the subject of the Action.

(b)      Defendants' announcement, while the above-referenced final rule is in

development, of a temporary modification, consistent with the International

Traffic in Arms Regulations (ITAR), 22 C.F.R. § 126.2, of USML Category I to exclude the technical data that is the subject of the Action. The announcement will appear on the DDTC website, www.pmddtc.state.gov, on or before July 27, 2018.

(c)   Defendants' issuance of a letter to Plaintiffs on or before July 27, 2018, signed by the Deputy Assistant Secretary for Defense Trade Controls, advising that the Published Files, Ghost Gunner Files, and CAD Files are approved for public release (i.e., unlimited distribution) in any form and are exempt from the export licensing requirements of the ITAR because they satisfy the criteria of 22 C.F.R. § 125.4(b)(13). For the purposes of 22 C.F.R. § 125.4(b)(13) the Department of State is the cognizant U.S. Government department or agency, and the Directorate of Defense Trade Controls has delegated authority to issue this approval.

(d)   Defendants' acknowledgment and agreement that the temporary modification of USML Category I permits any United States person, to include DD's customers and SAF's members, to access, discuss, use, reproduce, or otherwise benefit from the technical data that is the subject of the Action, and that the letter to Plaintiffs permits any such person to access, discuss, use, reproduce or otherwise benefit from the Published Files, Ghost Gunner Files, and CAD Files.

(e)   Payment in the amount of $39,581.00.  This figure is inclusive of any interest and is the only payment that will be made to Plaintiffs or their counsel by Defendants under this Settlement Agreement. Plaintiffs' counsel will provide Defendants'

2

counsel with all information necessary to effectuate this payment.

The items set forth in subparagraphs (a) through (e) above constitute all relief to be provided in settlement of the Action, including all damages or other monetary relief, equitable relief, declaratory relief, or relief of any form, including but not limited to, attorneys' fees, costs, and/or relief recoverable pursuant to 2 U.S.C. § 1302, 2 U.S.C. § 1311, 2 U.S.C. § 1317, 22 U.S.C. § 6432b(g), 28 U.S.C. § 1920, Fed. R. Civ. P. 54(d), and the Local Rules.

2.    *Dismissal with Prejudice:* At the time of the execution of this Settlement Agreement, Plaintiffs agree to have their counsel execute and provide to Defendants' counsel an original Stipulation for Dismissal with Prejudice pursuant to Fed. R. Civ. P. 41(a)(1)(A)(ii) and 41(a)(1)(B).  Counsel for Defendants agree to execute the stipulation and file it with the Court in the Action, no sooner than 5 business days after the publication of the announcement described in Paragraph 1(b) of this Settlement Agreement and issuance of the letter described in Paragraph 1(c) of this Settlement Agreement. A copy of the Stipulation for Dismissal with Prejudice is attached hereto.

3.    *Release:* Plaintiffs, for themselves and their administrators, heirs, representatives, successors, or assigns, hereby waive, release and forever discharge Defendants, and all of their components, offices or establishments, and any officers, employees, agents, or successors of any such components, offices or establishments, either in their official or

3

individual capacities, from any and all claims, demands and causes of action of every

kind, nature or description, whether currently known or unknown, which Plaintiffs may

have had, may now have, or may hereafter discover that were or could have been raised

in the Action.

4.  *No Admission of Liability:* This Settlement Agreement is not and shall not be construed

as an admission by Defendants of the truth of any allegation or the validity of any claim

asserted in the Action, or of Defendants' liability therein. Nor is it a concession or an

admission of any fault or omission in any act or failure to act. Nor is it a concession or

admission as to whether the monetary or equitable relief, attorneys' fees, costs, and

expenses sought by Plaintiffs in the Action, are reasonable or appropriate. None of the

terms of the Settlement Agreement may be offered or received in evidence or in any way

referred to in any civil, criminal, or administrative action other than proceedings

permitted by law, if any, that may be necessary to consummate or enforce this Settlement

Agreement. The terms of this Settlement Agreement shall not be construed as an

admission by Defendants that the consideration to be given hereunder represents the

relief that could be recovered after trial.  Defendants deny that they engaged in *ultra vires*

actions, deny that they violated the First Amendment, Second Amendment, or Fifth

Amendment of the United States Constitution, and maintain that all of the actions taken

by Defendants with respect to Plaintiffs comply fully with the law, including the United

States Constitution.

4

5.     *Merger Clause:* The terms of this Settlement Agreement constitute the entire agreement of Plaintiffs and Defendants entered into in good faith, and no statement, remark, agreement or understanding, oral or written, which is not contained therein, shall be recognized or enforced. Plaintiffs acknowledge and agree that no promise or representation not contained in this Settlement Agreement has been made to them and they acknowledge and represent that this Settlement Agreement contains the entire understanding between Plaintiffs and Defendants and contains all terms and conditions pertaining to the compromise and settlement of the disputes referenced herein. Nor does the Parties' agreement to this Settlement Agreement reflect any agreed-upon purpose other than the desire of the Parties to reach a full and final conclusion of the Action, and to resolve the Action without the time and expense of further litigation.

6.     *Amendments:* This Settlement Agreement cannot be modified or amended except by an instrument in writing, agreed to and signed by the Parties, nor shall any provision hereof be waived other than by a written waiver, signed by the Parties.

7.     *Binding Successors*: This Settlement Agreement shall be binding upon and inure to the benefit of Plaintiffs and Defendants, and their respective heirs, executors, successors, assigns and personal representatives, including any persons, entities, departments or agencies succeeding to the interests or obligations of the Parties.

8.  *Consultation with Counsel:* Plaintiffs acknowledges that they have discussed this
    Settlement Agreement with their counsel, who has explained these documents to them
    and that they understand all of the terms and conditions of this Settlement Agreement.
    Plaintiffs further acknowledge that they have read this Settlement Agreement, understand
    the contents thereof, and execute this Settlement Agreement of their own free act and
    deed. The undersigned represent that they are fully authorized to enter into this
    Settlement Agreement.

9.  *Execution:* This Settlement Agreement may be executed in one or more counterparts,
    each of which shall be deemed an original, and all of which together constitute one and
    the same instrument, and photographic copies of such signed counterparts may be used in
    lieu of the original.

10. *Jointly Drafted Agreement:* This Settlement Agreement shall be considered a jointly
    drafted agreement and shall not be construed against any party as the drafter.

11. *Tax and Other Consequences:* Compliance with all applicable federal, state, and local tax
    requirements shall be the sole responsibility of Plaintiffs and their counsel. Plaintiffs and
    Defendants agree that nothing in this Settlement Agreement waives or modifies federal,
    state, or local law pertaining to taxes, offsets, levies, and liens that may apply to this

Settlement Agreement or the settlement proceeds, and that Plaintiffs are executing this Settlement Agreement without reliance on any representation by Defendants as to the application of any such law.

12.   *Definitions*: As used in this Settlement Agreement, certain terms are defined as follows:

-   The phrase "*Published Files*" means the files described in paragraph 25 of Plaintiffs' Second Amended Complaint.
-   The phrase "*Ghost Gunner Files*" means the files described in paragraph 36 of Plaintiffs' Second Amended Complaint.
-   The phrase "*CAD Files*" means the files described in paragraph 40 of Plaintiffs' Second Amended Complaint.
-   The phrase "*Other Files*" means the files described in paragraphs 44-45 of Plaintiffs' Second Amended Complaint.
-   The phrase "*Military Equipment*" means (1) Drum and other magazines for firearms to .50 caliber (12.7 mm) inclusive with a capacity greater than 50 rounds, regardless of jurisdiction of the firearm, and specially designed parts and components therefor; (2) Parts and components specially designed for conversion of a semi-automatic firearm to a fully automatic firearm; (3) Accessories or attachments specially designed to automatically stabilize aim (other than gun rests) or for automatic targeting, and specially designed parts and components therefor.
-   The phrase "*technical data that is the subject of the Action*" means: (1) the Published Files; (2) the Ghost Gunner Files; (3) the CAD Files; and (4) the Other Files insofar as those files regard items exclusively: (a) in Category I(a) of the United States Munitions List (USML), as well as barrels and receivers covered by Category I(g) of the USML that are components of such items; or (b) items

7

covered by Category I(h) of the USML solely by reference to Category I(a), excluding Military Equipment.

Dated: _June 29_, 2018

Dated: _June 29_, 2018

Matthew A. Goldstein
Snell & Wilmer LLP
One South Church Ave. Ste. 1500
Tucson, Arizona 85701
*Counsel for Plaintiffs*

Dated: _June 29_, 2018

Eric J. Soskin
Stuart J. Robinson
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., N.W.
Washington, D.C. 20001
Tel. (202) 353-0533

*Counsel for Defendants*

8

# Exhibit D

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| DEFENSE DISTRIBUTED, et al., | § | Case No. 15-CV-372-RP |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | |
| | § | |
| U.S. DEPARTMENT OF STATE, et al., | § | |
| | § | |
| Defendants. | § | |
| | § | |

PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
JOINT EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER

Plaintiffs Defense Distributed, Second Amendment Foundation, Inc., and Conn Williamson hereby submit their Memorandum of Points and Authorities in Opposition to Joint Emergency Motion for Temporary Restraining Order.

Dated: June 27, 2018                    Respectfully submitted,

/s/ Matthew Goldstein                    /s/ Josh Blackman
Matthew Goldstein                        Josh Blackman
D.C. Bar No. 975000*                     Virginia Bar No. 78292
Snell & Wilmer                           1303 San Jacinto Street
One Church Avenue, Suite 1500            Houston, Texas 77002
Tucson, Arizona 85701                    202.294.9003/Fax: 713.646.1766
520.882.1248                             joshblackman@gmail.com
mgoldstein@swlaw.com


/s/ Alan Gura                            /s/ David S. Morris
Alan Gura                                David S. Morris
Virginia Bar No. 68842*                  Texas State Bar No. 24032877
Gura PLLC                                FISH & RICHARDSON P.C.
916 Prince Street, Suite 107             One Congress Plaza, Suite 810
Alexandria, Virginia 22314               111 Congress Avenue
703.835.9085/Fax 703.997.7665            Austin, Texas 78701
alan@gurapllc.com                        512.472.5070/Fax 512.320.8935
                                         dmorris@fr.com

*Admitted pro hac vice

PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
JOINT EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER

SUMMARY OF ARGUMENT

The putative intervenor groups lack any basis to obtain injunctive relief. Quite apart from their complete lack of standing, briefed separately on the motion for intervention, (1) the relief these groups seek is flatly barred by statute and court rule; (2) the Groups are not suffering any injury that needs to be remedied; (3) relief would harm the parties and reward inequitable behavior; and (4) frustrate the public interest in promoting settlements and democratic self-government.

ARGUMENT

I.    STATUTES AND COURT RULE FLATLY BAR THE GROUPS FROM SUCCEEDING ON THE MERITS.

On May 24, 2018, the Department of State published a proposed rule in the Federal Register seeking to transfer responsibility for the licensing of firearms exports from the ITAR U.S. Munitions List ("USML") to the Department of Commerce Export Administration Regulations ("EAR") Commerce Control List. 83 Fed. Reg. 24,198 (May 24, 2018). While the EAR will require licenses for exports of firearms, the EAR does not impose a prior restraint on so-called "technical data"—that is, public speech. As a result, following the effective date of the final rule, Plaintiffs, and everyone else in the United States, will be free to publish the technical data that is the subject of this action.

The Groups now mount a collateral attack to the State Department rule by challenging the parties' Settlement Agreement in this action, which requires the State Department's performance of the following actions, in relevant part:

1

(a)      Defendants' **commitment to draft and to fully pursue, to the extent authorized by law (including the Administrative Procedure Act),** the publication in the Federal Register of a notice of proposed rulemaking and final rule, revising USML Category I to exclude the technical data that is the subject of the Action."

(b)      Defendants' announcement, while the above-referenced final rule is in development, of a **temporary modification**, consistent with the International Traffic in Arms Regulations (ITAR), 22 C.F.R. § 126.2, of USML Category I to exclude the technical data that is the subject of the Action. The announcement will appear on the DDTC website, www.pmddtc.state.gov, on or before July 27, 2018.

(c)      Defendants' issuance of a letter to Plaintiffs on or before July 27, 2018, signed by the Deputy Assistant Secretary for Defense Trade Controls, advising that the Published Files, Ghost Gunner Files, and CAD Files are **approved for public release** (i.e., unlimited distribution) in any form and are exempt from the export licensing requirements of the ITAR because they satisfy the criteria of 22 C.F.R. § 125.4(b)(13).

(d)      **Defendants' acknowledgment and agreement** that the temporary modification of USML Category I permits any United States person, to include DD's customers and SAF's members, to access, discuss, use, reproduce, or otherwise benefit from the technical data that is the subject of the Action, and that the letter to Plaintiffs permits any such person to access, discuss, use, reproduce or otherwise benefit from the Published Files, Ghost Gunner Files, and CAD Files.

More specifically, the Groups seek injunctive relief under the Administrative Procedure Act ("APA") and "constitutionally-mandated Separations of Powers" to enjoin the State Department from committing to draft and to fully pursue an amendment to the regulations to remove certain firearms from the ITAR USML under Section 1(a) of the Settlement Agreement; and from issuing licenses for public speech concerning technical data on firearms through the authorizations provided at sections 1(b)-(d) of the Settlement Agreement.

And they seek to enjoin "the parties," TRO Mot., Dkt. 97, including "the plaintiffs," Proposed Order, Dkt. 97-2, from executing the Settlement Agreement.

The Groups cannot obtain the relief they request because the Court lacks jurisdiction to review Department of State decisions on what articles to designate on the USML; lacks jurisdiction to review State Department license decisions under the Arms Export Control Act ("AECA"); because no Congressional notification requirements apply to the State Department's performance under the Settlement Agreement, and because the Court lacks jurisdiction to question or supervise Plaintiffs' exercise of their Rule 41 rights.

**A.      AECA Section 2778(h) Precludes the Court from Reviewing the State Department's Decision to Remove Defense Articles from the USML.**

The AECA provides that "[t]he President is authorized to designate those items which shall be considered as defense articles and defense services for the purposes of this section and to promulgate regulations for the import and export of such articles and services." 22 U.S.C. § 2778(a)(1). The items so designated constitute the ITAR USML. *Id.*

As a preliminary matter, Section 1(a) of the Settlement Agreement does not require the removal of anything from the USML. Rather, it only requires that the State Department commit to draft and fully pursue removal of the technical data at issue in this action from the USML, "to the extent authorized by law (including the Administrative Procedure Act)."

Even if the Settlement Agreement requires removal of the subject technical data from the USML, the AECA expressly bars the Court from reviewing such State Department designations of articles under the ITAR because 22 U.S.C. § 2778(h) expressly, clearly, and unequivocally precludes judicial review of such decisions:

**(h) Judicial review of designation of items as defense articles or services**

The designation by the President (or by an official to whom the President's functions under subsection (a) have been duly delegated), in regulations issued under this section,

3

of items as defense articles or defense services for purposes of this section **shall not be subject to judicial review**.

22 U.S.C. § 2778(h) (emphasis added).

**B.      The Court Lacks Jurisdiction to Review State Department License Decisions Under the APA because of a Clear Delegation of Authority and Lack of Judicially Manageable Standards.**

The Groups are challenging the State Department's agreement to provide an order temporarily modifying the ITAR, an accompany acknowledgement of same, and a letter to Plaintiffs approving or otherwise licensing the publication of the technical data at issue. These State Department licensing decisions are not subject to judicial review under the APA because the AECA's delegation of authority to control arms exports is decidedly one involving foreign affairs and national security—matters clearly within the State Department's discretionary authority; and the lack of judicially manageable standards precludes review.

Whether an agency action is committed to the discretion of an agency depends on the nature of the delegation of authority and the statutory language. *See Webster v. Doe*, 486 U.S. 592, 599-600 (1988). This narrow exception to judicial reviewability is especially prevalent in cases involving agency decisions relating to foreign affairs and national security because these cases involve "judgments on questions of foreign policy and the national interest" that are not "fit for judicial involvement." *See Dist. No. 1, Pac. Coast Dist., Marine Eng'rs' Beneficial Ass'n v. Mar. Admin.*, 215 F.3d 37, 42 (D.C. Cir. 2000). Here, the AECA clearly provides authority to the President, or his delegate, to issue a license when he determines that such action is "consistent with the foreign policy interests of the United States," 22 U.S.C. § 2751, and "in

4

furtherance of world peace and the security and foreign policy of the United States." *Id.* § 2778(a)(1).

In addition, where the language of a statute provides no justiciable standard by which a court can review the agency's exercise of its delegated authority, the matter is treated as committed to the agency's discretion. *See Webster*, 486 U.S. at 600 (a statute allowing the Director of the CIA to terminate employment of any employee whenever he found termination "advisable" for the national interest "fairly exude[d] deference" and thereby precluded judicial review under the APA). In particular, if the statute uses language that permits an executive official, such as the President or another agency official, to take action that the official "deems" in the "national interest," these statutes have been consistently interpreted to preclude judicial review under the APA. *See Zhu v. Gonzales*, 411 F.3d 292, 295 (D.C. Cir. 2005) (construing a statute, which allows the Attorney General to waive a requirement if waiver is in the "national interest," as being committed to the discretion of the Attorney General).

*U.S. Ordnance, Inc. v. U.S. Department of State*, is especially relevant to articles at issue in this present case. 432 F.Supp.2d 94 (2006). In *U.S. Ordnance*, Plaintiff challenged the State Department's denial of a license to export M16 machine guns. After noting the broad scope of the AECA delegation of authority to the President in matters of foreign affairs and national security, the court held that "given the clear statutory language and the absence of judicially manageable standards to guide the Court's review, it must reject plaintiffs invocation of the APA and decline to review the agency's denial of plaintiff's applications for licenses to export M16 machine guns." *Id.* at 99. For the reasons stated in *U.S. Ordnance,* this Court must reject Intervenors' attempt to challenge State Department licensing decisions under the APA based on

5

the clear statutory authority conferred to the Department of State and lack of judicially

manageable standards. During oral arguments, counsel for the Groups should be asked to explain

why they failed to reference the fact that decisions concerning the issuance of license are not

subject to judicial review.

      **C.**      **No Congressional Notification Requirements Apply to the Settlement Agreement.**

Throughout various sections of their briefings and proposed Complaint in Intervention,

the Groups claim that the State Department failed to provide Congressional notification for the

Settlement Agreement. However, they fail to cite any section of the AECA that actually imposes

a Congressional notification requirement to the Settlement Agreement.

The AECA contains various Congressional notification requirements.[1] Specifically, the

statute requires the State Department to formally notify Congress before issuance of any license

or other approval for export sales of "Major Defense Equipment" that exceed certain dollar-value

thresholds, before the approval of exports of commercial communications satellites to certain

destinations and persons, and before approval of certain other transactions. *See e.g.,* 22 U.S.C. §§

2776(c), 2776(d). In addition, as cited by the Groups, the President must provide Congressional

notifications in advance of removing an item from the USML. *Id.* at § 2778(f)(1). However, no

Congressional notification requirements apply to the State Department's obligations under the

terms of the Settlement Agreement.

Specifically, no Congressional notification requirement applies to the State Department

issuance of a license to publish technical data. Nor is Congressional notification required for the

---

[1] *See e.g.,* Matthew A. Goldstein, "Addressing Congressional Notification Requirements

State Department to make a commitment to draft and to fully pursue, to the extent authorized by law (including the Administrative Procedures Act), the publication in the Federal Register of a notice of proposed rulemaking and a final rule, revising USML Category I to exclude the technical data that is the subject of the Action. Critically, the Settlement Agreement does not require the State Department to remove anything from the USML. It only requires that the State Department commit to draft and pursue such change in compliance with the APA and any other applicable laws, to include the AECA and its Congressional notification requirements. That's it.

Further, no Congressional notification requirements apply to the State Department's issuance of a temporary order suspending or modifying the ITAR under Section 126.2. Here, Intervenors confuse and conflate the difference between a temporary order under ITAR Section 126.2 and actual removal of an article from the USML requiring Congressional notification. ITAR Section 126.2 permits the State Department to "**order** the **temporary** suspension or modification of any or all of the regulations of this subchapter in the interest of the security and foreign policy of the United States." 22 C.F.R. 126.2 (emphasis added). Such suspension is a temporary order that does not remove anything from the USML. In sharp contrast, removal of a defense article from the USML is a permanent act that requires rulemaking and Congressional notification.

Plaintiffs further note that at Count I of their proposed Complaint in Intervention, the Groups claim that "Defendants lack statutory authority to determine that the Plaintiffs' CAD files should be removed from the Category I list without following the 'established procedures' for commodity jurisdiction." Pr.Compl. ¶ 80. Here, the Groups misunderstand the established

—— Best Practices," WorldECR, Issue 71 (August 2018).

scope and purpose of the ITAR commodity jurisdiction procedure. ITAR Section 120.4 is used

for case-by-case determinations of whether a particular product (i.e., XYC Company's widget) is

on the USML, and not for determinations on whether to remove entire classes of items from the

USML. *Karn v. United States Department of State* illustrated this point::

> Designating an export such that it is subject to the AECA and the ITAR requires first describing the type of item in the regulations, and second, if asked by a potential exporter, confirming that the item in question is or is not covered by such description. The commodity jurisdiction procedure provides the latter function... 925 F.Supp. 1, 7 (D.D.C. 1996)

The commodity jurisdiction process simply does not apply to temporary modifications of

the ITAR under 126.2 or other licensing decisions. Nor does it apply to agency decisions to

amend the regulations to transfer export jurisdiction of defense articles to the Department of

Commerce.

**D.     The Court Cannot Constrain the Plaintiffs' Right to Dismiss Their Action.**

Fed. R. Civ. P. 41(a)(1) provides Plaintiffs two avenues to voluntarily dismiss their

action, without court intervention. The case law tends to focus on this rule's first subdivision:

allowing for dismissal without consent prior to service of an answer or motion for summary

judgment. However, the considerations appear equally applicable to the second method of court-

free dismissal: one stipulated to by the parties.

Without question, Plaintiffs can at this time proceed under *either* subdivision to dismiss

their case, although the settlement agreement contemplates the stipulation of Rule 41(a)(1)(ii).

The Department of Justice currently has the stipulation in hand.

The rights of Rule 41 are absolute. A Rule 41(a)(1) dismissal

8

itself closes the file. There is nothing the defendant can do to fan the ashes of that action into life and the court has no role to play. This is a matter of right running to the plaintiff and may not be extinguished or circumscribed by adversary or court. There is not even a perfunctory order of court closing the file. Its alpha and omega was the doing of the plaintiff alone. He suffers no impairment beyond his fee for filing.

*Am. Cyanamid Co. v. McGhee*, 317 F.2d 295, 297 (5th Cir. 1963); *Amerijet Int'l, Inc. v. Zero Gravity Corp. (In re Amerijet Int'l, Inc.)*, 785 F.3d 967, 973 (5th Cir. 2015). "Subject to certain restrictions not here relevant, Federal Rule of Civil Procedure 41(a)(1) on its face grants a plaintiff an unconditional right . . . ." *Pilot Freight Carriers, Inc. v. International Brotherhood of Teamsters*, 506 F.2d 914, 915 (5th Cir. 1975). "The court ha[s] no power or discretion to deny plaintiffs' right to dismiss or to attach any condition or burden to that right." *Williams v. Ezell*, 531 F.2d 1261, 1264 (5th Cir 1976).

Insofar as the Groups purport to have the Court enjoin the Plaintiffs from dismissing their complaint (if they are satisfied that the Government has lived up to its obligations under the settlement agreement), their motion must fail. Nor can they intervene in the case for the purpose of frustrating Plaintiffs' unconditional Rule 41 rights.

Rule 41 is the other side of the ITAR coin. ITAR forbids judicial review of licensing decisions. Rule 41 forbids judicial interference in the right of dismissal where it applies. There can be no success on the merits.

II.     THE GROUPS WOULD NOT SUFFER IRREPARABLE HARM WERE THEIR MOTION DENIED.

As noted in our other briefing, the Settlement Agreement does not purport to restrict the Groups' activities in any way. They remain free to pursue their institutional interests against those of the Plaintiffs.

Nor can the Court determine that national security—the interest secured by ITAR—

9

would be harmed by virtue of the Settlement Agreement. If the Court cannot question the Government's national security claims when those are asserted to defeat Plaintiffs' speech rights, the Court cannot purport to override the Government's considered judgment that the settlement agreement *does not* harm national security. And, as discussed in our opposition to the Group's intervention, there is an innocuous reason why the government now takes the position it does: While this case was being litigated, the Obama and Trump Administrations have engaged in a sophisticated and detailed plan to transition the regulation of certain technical data from the jurisdiction of the State Department to the jurisdiction of the Commerce Department.

This Court has already settled the threshold question: Plaintiffs face irreparable harm from the continued suppression of their speech rights. "The Court . . . has little trouble concluding Plaintiffs have shown they face a substantial threat of irreparable injury." *Defense Distributed* v. *Dept. of State*, 121 F. Supp. 3d 680, 689 (W.D. Tex. 2015).

III.    THE EQUITIES, AND THE PUBLIC INTEREST, FAVOR DENIAL OF THE MOTION.

Plaintiffs' constitutional rights, and the parties' interest, as well as the judicial interest, in settling disputes, surely outweigh this transparent public relations stunt. And Plaintiffs renew their objections to the last-minute ambush tactics employed here. These tactics continue well into this day with this morning's unwarranted supplemental briefing that raise novel arguments and points of law. (Plaintiffs moved separately to strike portions of those last-minute pleadings). The First Amendment secures the Groups an ample array of fora in which to express themselves and seek attention for their cause. This Court, and this case, is not the place to question the Government's exercise of its foreign policy powers.

Previously, the parties disputed which public interest—the exercise of constitutional

10

rights, or the rights of a democratic polity to its government—should prevail. Here, these

interests are no longer opposed, but aligned in favor of denying the motion. And to these

interests should be added the interest in encouraging settlements and sparing the Court of

controversies that no longer arise under Article III.

CONCLUSION

The motion for temporary restraining order should be denied.

Dated: June 27, 2018                          Respectfully submitted,

_/s/ Matthew Goldstein_                        _/s/ Josh Blackman_
Matthew Goldstein                              Josh Blackman
D.C. Bar No. 975000*                           Virginia Bar No. 78292
Snell & Wilmer                                 1303 San Jacinto Street
One Church Avenue, Suite 1500                  Houston, Texas 77002
Tucson, Arizona 85701                          202.294.9003/Fax: 713.646.1766
520.882.1248                                   joshblackman@gmail.com
mgoldstein@swlaw.com


_/s/ Alan Gura_                                _/s/ David S. Morris_
Alan Gura                                      David S. Morris
Virginia Bar No. 68842*                        Texas State Bar No. 24032877
Gura PLLC                                      FISH & RICHARDSON P.C.
916 Prince Street, Suite 107                   One Congress Plaza, Suite 810
Alexandria, Virginia 22314                     111 Congress Avenue
703.835.9085/Fax 703.997.7665                  Austin, Texas 78701
alan@gurapllc.com                              512.472.5070/Fax 512.320.8935
                                               dmorris@fr.com

*Admitted pro hac vice

11

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that the foregoing document was filed electronically in compliance with Local Rule CV-5(a) on July 27, 2018, and was served via CM/ECF on all counsel who are deemed to have consented to electronic service.  Local Rule CV-5(b)(1).

By: */s/ Alan Gura*
     Alan Gura

# Exhibit E

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| DEFENSE DISTRIBUTED and SECOND AMENDMENT FOUNDATION, | § § § | Case No. 1:18-CV-637 |
| | § | COMPLAINT |
| Plaintiffs, | § | |
| | § | |
| v. | § | |
| | § | |
| GURBIR S. GREWAL, individually, and in his official capacity as Attorney General of New Jersey; MICHAEL FEUER, individually, and in his official capacity as Los Angeles City Attorney, | § § § § § | |
| | § | |
| Defendants. | § § | |

COMPLAINT

Plaintiffs Defense Distributed and Second Amendment Foundation, Inc., by and through undersigned counsel, complain of Defendants as follows:

INTRODUCTION

Pursuant to a license and other authorization from the State Department, Defense Distributed has published and will continue to publish Computer-Aided Design (CAD) and Computer-Numeric Control (CNC) files on its Internet servers in furtherance of its mission to promote firearms knowledge and possession. The Second Amendment Foundation's members and supporters are among Defense Distributed's audience. New Jersey's Attorney General (Gurbir S. Grewal) and Los Angeles's City Attorney (Michael Feuer), have waged an ideologically-fueled program of intimidation and harassment against Defense Distributed. Grewal and Feuer have

threatened and intend to drag Defense Distributed before all manner of far-flung criminal and civil tribunals in an effort to silence the organization.

Alas these state and municipal officers from across the country cannot veto Defense Distributed's constitutionally-protected and federally-licensed speech. The Defendants' threatened legal actions violate the First Amendment speech rights of Defense Distributed and its audience, including SAF's members; run afoul of the Dormant Commerce Clause; infringe upon the Second Amendment rights of those who would make use of the knowledge disseminated by Defense Distributed; constitute a tortious interference with Defense Distributed's business; and are in any event, federally pre-empted by Congress's export control laws as well as Defense Distributed's export license, by which the State Department has explicitly authorized the speech that the Defendants are seeking to silence. Plaintiffs are entitled to declaratory and injunctive relief, damages, and attorney fees.

*The Parties*

1.      Plaintiff Defense Distributed is a Texas corporation organized under the laws of the State of Texas, whose headquarters are located in Austin, Texas, and whose principal place of business is located in Austin, Texas. Defense Distributed was organized and is operated for the purpose of defending the civil liberty of popular access to arms guaranteed by the United States Constitution through facilitating access to, and the collaborative production of, information and knowledge related to the production of arms; and to publish and distribute, at no cost to the public, such information and knowledge on the Internet in promotion of the public interest.

2.      Consistent with the President's role as Commander and Chief, and the delegation of Congress's powers under the Commerce and Necessary and Proper Clauses, Congress has

conferred the President with the exclusive authority to issue licenses and other forms of authorizations for the export of technical data on firearms controlled under the Arms Export Control Act ("AECA"), 22 U.S.C. § 2751 et seq. The President has delegated this authority to the State Department. Executive Order 13637 of March 8, 2013.

3. Pursuant to its exclusive authority under the AECA, the State Department issued a license expressly authorizing the Plaintiffs to publish certain firearms files for "unlimited distribution" pursuant to ITAR § 125.4(b)(13). *See* Exhibit A.

4. Further pursuant to its exclusive authority under the AECA, the State Department issued an authorization under ITAR § 126.2 to allow every U.S. person to access, discuss, use, reproduce or otherwise benefit from technical data for the development, production, and/or use of firearms. *See* Exhibit B.

5. Plaintiff Second Amendment Foundation, Inc., is a non-profit membership organization incorporated under the laws of Washington with its principal place of business in Bellevue, Washington. SAF has over 650,000 members and supporters nationwide, including members in Texas, New Jersey, and Los Angeles. The purposes of SAF include promoting the exercise of the right to keep and bear arms; and education, research, publishing and legal action focusing on the constitutional right to privately own and possess firearms, and the consequences of gun control. SAF brings this action on behalf of its members. Cody Wilson, Defense Distributed's principal, is a SAF member. SAF members seek to download the files shared by Defense Distributed, as well as use Defense Distributed's facilities to share their own files with others

6. Defendant Gurbir S. Grewal is the Attorney General of New Jersey. He is sued in his official and individual capacities.

7.   Defendant Michael Feuer is the City Attorney for Los Angeles, California. He is sued in his official and individual capacities.

JURISDICTION AND VENUE

8.   This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1332, 1367, 2201, and 2202.

9.   Plaintiff Defense Distributed resides within the jurisdiction of the U.S. District Court.

10.   Venue lies in this Court pursuant to 28 U.S.C. § 1391(b)(2), as a substantial part of the events or omissions giving rise to the claim occurred, and a substantial part of property that is the subject of the action, are situated within the Western District of Texas.

11.   This action involves actions taken by Defendants in New Jersey and Los Angeles with respect to the Plaintiffs' business, activities, and property in Austin. Therefore, venue lies in this Court pursuant to 28 U.S.C. § 1391(b)(3), because there is no district in which this action may otherwise be brought, and both Defendants are subject to this Court's personal jurisdiction.

*Defendants' Threats of Legal Actions Against Defense Distributed*

12.   On July 26, 2018, Defendant Grewal sent a letter to Defense Distributed's headquarters in Austin, Texas.

13.   The letter "directed [Plaintiff] to cease and desist from publishing printable-gun computer files for use by New Jersey residents." *See* Exhibit C.

14.   Grewal asserted that publishing these files would violate New Jersey's "public nuisance laws." *Id.*

15.   Grewal's letter closed with a clear and present threat: "Should you fail to comply

with this letter, my Office will initiate legal action barring you from publishing these files before August 1, 2018." *Id.*

16.     In a press release, Grewal explicitly reiterated that threat: "Attorney General Grewal threatened Defense Distributed with 'legal action' if it fails to comply with his demand." Grewal also expressed his belief that "[p]osting this material online is no different than driving to New Jersey and handing out hard-copy files on any street corner." *See* Exhibit D.

17.     On July 27, 2018, Defendant Feuer caused to be filed in this Court, in the case of *Defense Distributed v. U.S. Dep't of State*, No. 1:15-CV-372-RP, a letter addressed to the Hon. Robert Pitman, who was then presiding over that case. *See* Exhibit E.

18.     The letter, at Dkt. 109-1, expressed Feuer's belief that Defense Distributed's publication of files "would pose a direct and immediate threat to public safety in the City of Los Angeles, and cause numerous violations of California and City laws designed to protect the public from gun violence." *Id.*

19.     Feuer noted that "[as] the City's chief lawyer and prosecutor, it is [his] job to enforce the gun laws of the City and California." *Id.*

20.     Feuer added that "Defense Distributed's blueprints" may violate California civil and criminal laws. *Id.*

21.     Feuer threatened Defense Distributed with legal action: "his office is authorized to file lawsuits to 'enjoin' the manufacture, importation, or possession of an undetectable firearm." *Id.*

22.     Feuer expressed his intent to seek to intervene in that case, for the express purpose of silencing Defense Distributed. *Id.*

23.     To convey this message, at least two of Feuer's attorneys appeared telephonically

during an emergency hearing before Judge Pitman. (At that juncture, the City of Los Angeles was not yet a party to the case, nor had it even filed a motion to intervene.)

24. On July 28, 2019, Feuer released the following tweet from the @CityAttorneyLA Account: "City Atty Mike Feuer & @ManhattanDA Cyrus Vance, Jr. to @StateDept: NO #DIY #guns! #gunviolence #GunControl #gunsense ▶️▶️https://goo.gl/L377y3 @ProsecutorsAGV." *See* Exhibit F.

25. That tweet linked to a press release from the Prosecutors Against Gun Violence, which is chaired by the Los Angeles City Attorney and the Manhattan District Attorney. It stated that Defense Distributed's "blueprints should not be published under any circumstances." *See* Exhibit G.

26. On information and belief, Plaintiffs anticipate further legal actions from the Manhattan District Attorney.

*Plaintiff Responds to Defendant Grewal*

27. On July 27, 2018, Plaintiff responded to Grewal. *See* Exhibit H. Plaintiff explained that the "Letter takes only vague and general positions regarding nuisance and negligence law." Plaintiff also explained that "all actions contemplated by Defense Distributed are fully protected by the First Amendment, and [Grewal's] attempts to prevent such actions constitute an unconstitutional prior restraint and otherwise violate the United States Constitution and the New Jersey Constitution." Plaintiff added that "the Letter constitutes an unlawful threat, in violation of Defense Distributed's Constitutional rights," and "demand[ed] that [the Defendant] withdraw the Letter."

28. Plaintiff conveyed to the Grewal that "at this time Defense Distribute will attempt to restrict files made available on the internet to prevent download within New Jersey." Plaintiff

stated that "this [modification] should not be construed as an acknowledgment of the validity of your position, and Defense Distributed reserves all of its rights in this regard."

<em>Great, Irreparable, and Continuing Harm</em>

29.     But for Defendant Grewal's letter, Defense Distributed would freely distribute the files in New Jersey. However, Defense Distributed has taken steps to prevent the distribution of files in New Jersey because Defense Distributed reasonably fears that Defendant Grewal would pursue civil enforcement proceedings against Plaintiff. *See* Exhibit H. Users with New Jersey-based IP Addresses are currently blocked from accessing the files. *See* Exhibit I. [1]

30.     But for Defendant Feuer's letter, Defense Distributed would freely distribute the files in Los Angeles. However, Defense Distributed has already taken steps to prevent the distribution of files in Los Angeles because Defense Distributed reasonably fears that Defendant Feuer would pursue civil and t enforcement proceedings against Plaintiff. Users with Los Angeles-based IP Addresses are currently blocked from accessing the files. *See* Exhibit I.

31.     Notwithstanding its efforts to placate the Defendants, a legitimate controversy exists between Defense Distributed, and Defendants Grewal and Feuer, as to the legality of Defense Distributed's conduct. Defense Distributed can reasonably expect a continuing campaign of harassment and intimidation aimed at silencing it and tortiously interfering with its business.

32.     Defense Distributed is entitled to appropriate declaratory and injunctive relief against all further acts of harassment and intimidation by Grewal, Feuer, and all others who may act in concert with them.

COUNT ONE

---

[1] Defense Distributed also blocked access to the files from IP addresses based in the following foreign countries: Islamic Republic of Iran, Belarus, Myanmar (Burma), Burundi, Cote d'Ivoire, Cuba, The Democratic Republic of the Congo, Iraq, Lebanon, Liberia, Libyan Arab Jamahiriya, Democratic People's Republic of Korea, Somalia, Sudan, Syrian Arab Republic, Yemen, and Zimbabwe.

42 U.S.C. § 1983

RIGHT OF FREE SPEECH—U.S. CONST. AMEND. I

33.    Defendants' threats of legal actions are invalid on their face, and as applied to Plaintiffs' public speech, are an unconstitutional prior restraint on protected expression. *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70 (1963).

34.    Defendants' interruption and prevention of Plaintiffs from publishing the subject files, under color of law, violates Plaintiffs' rights under the First Amendment to the United States Constitution, by virtue of the Fourteenth Amendment, causing Plaintiffs, their customers, visitors and members significant damages, in violation of 42 U.S.C. § 1983.

35.    Plaintiffs are therefore entitled to declaratory and injunctive relief, and an award of damages and attorney fees, against Defendants.

COUNT TWO

42 U.S.C. § 1983

"DORMANT" COMMERCE CLAUSE, U.S. CONST. ART. I, § 8

36.    The threatened legal actions would not only require Plaintiffs to cease sharing files on its Texas-based servers within New Jersey and Los Angeles, respectively, but would also prohibit Plaintiffs from sharing the files within Texas, and other states.

37.    The Supreme Court has recognized that the "Commerce Clause . . . precludes the application of a state statute to commerce that takes place wholly outside of the State's borders, whether or not the commerce has effects within the State." *Healy v. Beer Inst., Inc.*, 491 U.S. 324, 336 (1989).

38.    Through the threatened legal actions, New Jersey and Los Angeles "project[s] its

legislation" into other states, in violation of the "Dormant" Commerce Clause. *See* Brown-Forman Distillers Corp. v. New York State Liquor Auth., 476 U.S. 573, 583 (1986). *See also Am. Booksellers Found. v. Dean*, 342 F.3d 96, 103–04 (2nd Cir. 2003); *Publius v. Boyer-Vine*, 237 F. Supp. 3d 997, 1025 (E.D. Cal. 2017); *Nat'l Fed'n of the Blind v. Target Corp.*, 452 F. Supp. 2d 946, 958–59 (N.D. Cal. 2006).

39.     Defendants' interruption and prevention of Plaintiffs from publishing the subject files on its Texas-based servers, under color of law, violates the Plaintiffs rights to freely participate in intrastate and interstate commerce under the "Dormant" Commerce Clause, U.S. Const. art. I, § 8.

40.     Defendants' actions have caused Plaintiffs, their customers, visitors and members significant damages, in violation of 42 U.S.C. § 1983. *See Dennis v. Higgins*, 498 U.S. 439 (1991).

41.     Plaintiffs are therefore entitled to declaratory and injunctive relief, and an award of damages and attorney fees, against Defendants.

COUNT THREE

42 U.S.C. § 1983

RIGHT TO KEEP AND BEAR ARMS—U.S. CONST. AMEND. II

42.     The fundamental Second Amendment right to keep and bear arms inherently embodies two complimentary guarantees: the right to acquire arms, and the right to make arms.

43.     If one cannot acquire or create arms, one cannot exercise Second Amendment rights. Infringing upon the creation and acquisition of arms of the kind in common use for traditional lawful purposes violates the Second Amendment, as applied to the states by virtue of the Fourteenth Amendment. *District of Columbia v. Heller*, 554 U.S. 570, 627 (2008); *McDonald*

*v. City of Chicago*, 561 U.S. 742 (2010).

44.     By forbidding Defense Distributed from distributing files that concern the lawful manufacture of firearms, Defendants are violating the Second Amendment rights of Plaintiffs, their customers, members, and visitors.

45.     Defendants' interruption and prevention of Plaintiffs from publishing the subject files, under color of law, violates Plaintiffs' rights under the Second Amendment to the United States Constitution, by virtue of the Fourteenth Amendment, causing Plaintiffs, their customers, visitors and members significant damages, in violation of 42 U.S.C. § 1983.

46.     Plaintiffs are therefore entitled to declaratory and injunctive relief, and an award of damages and attorney fees, against Defendants

COUNT FOUR

THE SUPREMACY CLAUSE, U.S. CONST. ART. VI, CL. 2

PRE-EMPTION BASED ON EXPORT LICENSE ISSUED BY THE STATE DEPARTMENT

47.     Consistent with the President's role as Commander and Chief, and the delegation of Congress's powers under the Commerce and Necessary and Proper Clauses, Congress has conferred the President with the exclusive authority to issue licenses and other forms of authorizations for the export of technical data on firearms controlled under the Arms Export Control Act ("AECA"), 22 U.S.C. § 2751 et seq. The President has delegated this authority to the State Department. Executive Order 13637 of March 8, 2013.

48.     Pursuant to its exclusive authority under the AECA,  the State Department issued a license expressly authorizing the Plaintiffs to publish certain firearms files for "unlimited distribution" pursuant to ITAR § 125.4(b)(13).  *See* Exhibit A.

49.     Further pursuant to its exclusive authority under the AECA, the State Department issued an authorization under ITAR § 126.2 to allow every U.S. person to access, discuss, use, reproduce or otherwise benefit from technical data for the development, production, and/or use of firearms. *See* Exhibit B.

50.     The Defendants' threatened legal actions conflict with the State Department's exclusive authority and seek to interfere with this federal licensing framework. *See* Exhibits C, D, and E.

51.     In a press release, Defendant Grewal expressly stated that he seeks to override the federal government's licensing framework: "The federal government is no longer willing to stop Defense Distributed from publishing this dangerous code, and so New Jersey must step up." *See* Exhibit D.

52.     New Jersey and Los Angeles can no more prohibit the operation of a federally licensed export framework than could Maryland prohibit the operation of a federally chartered bank. *See McCulloch v. Maryland*, 17 U.S. 316 (1819).

53.     The threatened legal actions are preempted based on Defense Distributed's Export License that was issued by the State Department.

54.     "[I]f an individual claims federal law immunizes him from state regulation, the court may issue an injunction upon finding the state regulatory actions preempted." *Armstrong v. Exceptional Child Ctr., Inc.*, 135 S. Ct. 1378, 1384 (2015).

55.     Plaintiffs are therefore entitled to injunctive relief against Defendants' threat of legal actions that are pre-empted.

COUNT FIVE

THE SUPREMACY CLAUSE, U.S. CONST. ART. VI, CL. 2

EXPRESS PREEMPTION

56.     Through federal export control law, Congress has expressly preempted state law.

57.     Therefore, the threatened legal actions are expressly preempted by federal export control law. *See English v. General Elec. Co*., 496 U.S. 72, 78-79 (1990).

58.     "[I]f an individual claims federal law immunizes him from state regulation, the court may issue an injunction upon finding the state regulatory actions preempted." *Armstrong v. Exceptional Child Ctr., Inc.*, 135 S. Ct. 1378, 1384 (2015).

59.     Plaintiffs are therefore entitled to injunctive relief against Defendants' threat of legal actions that are pre-empted.

COUNT SIX

THE SUPREMACY CLAUSE, U.S. CONST. ART. VI, CL. 2

FIELD PREEMPTION

60.     Congress has occupied the entire field of export control law.

61.     Therefore, the threatened legal actions are preempted by field preemption. *See English v. General Elec. Co*., 496 U.S. 72, 79 (1990).

62.     "[I]f an individual claims federal law immunizes him from state regulation, the court may issue an injunction upon finding the state regulatory actions preempted." *Armstrong v. Exceptional Child Ctr., Inc.*, 135 S. Ct. 1378, 1384 (2015).

63.     Plaintiffs are therefore entitled to injunctive relief against Defendants' threat of legal actions that are pre-empted by federal export control law.

COUNT SEVEN

THE SUPREMACY CLAUSE, U.S. CONST. ART. VI, CL. 2

CONFLICT PREEMPTION

64.    The threatened legal actions would stand as an obstacle and would frustrate the accomplishment of objectives authorized by federal export control law. *See Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 375 (2000); *Nat'l Foreign Trade Council, Inc. v. Giannoulias*, 523 F. Supp. 2d 731, 738-742 (N.D. Ill. 2007).

65.    Therefore, the threatened legal actions are preempted by conflict preemption.

66.    "[I]f an individual claims federal law immunizes him from state regulation, the court may issue an injunction upon finding the state regulatory actions preempted." *Armstrong v. Exceptional Child Ctr., Inc.*, 135 S. Ct. 1378, 1384 (2015).

67.    Plaintiffs are therefore entitled to injunctive relief against Defendants' threat of legal actions that are pre-empted by federal export control law.

COUNT EIGHT

TORTIOUS INTERFERENCE WITH CONTRACTS

68.    Defensed Distributed receives advertising revenue from its file-sharing system through contracts with third-parties.  In the past, these revenues have exceeded $75,000 per annum.

69.    Defendants willfully and intentionally sought to interfere with those contracts.

70.    Defense Distributed has taken steps to prevent the distribution of files in New Jersey and Los Angeles because Defense Distributed reasonably fears that Defendants Grewal and Feuer would pursue civil and criminal enforcement proceedings against Plaintiff for doing so.

71.    The willful and intentional actions of Defendants Grewal and Feuer have proximately and directly caused damages to Defense Distributed's contracts.

72.     The willful and intentional actions of Defendants Grewal and Feuer have resulted in actual damages.

73.     Defendants' conduct, as described in this complaint, constitutes tortious interference with contracts. *See ACS Inv'rs, Inc. v. McLaughlin*, 943 S.W.2d 426, 430 (Tex.1997).

74.     Plaintiffs are therefore entitled to injunctive relief against Defendants' tortious interference with contracts.


COUNT NINE

TORTIOUS INTERFERENCE WITH PROSPECTIVE CONTRACTS

75.     There was a reasonable probability that Defense Distributed was to enter into contract(s) to do business with other third parties in New Jersey and Los Angeles.

76.     The threatened legal actions constitute a wrongful, deliberate, willful, intentional or otherwise tortious interference with prospective contracts in New Jersey and Los Angeles.

77.     Plaintiffs are therefore entitled to injunctive relief against Defendants' tortious interference with prospective contracts.


PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that judgment be entered in their favor and against Defendant as follows:

1.     A declaration, and injunctive relief, to prevent Defendants' threatened legal actions that violate the First Amendment to the United States Constitution;

2.     A declaration, and injunctive relief, to prevent Defendants' threatened legal actions

that violate the Dormant Commerce Clause;

3.      A declaration, and injunctive relief, to prevent Defendants' threatened legal actions that violate the Second Amendment to the United States Constitution;

4.      A declaration, and injunctive relief, to prevent Defendants' threatened legal actions that are preempted based on Defense Distributed's Export License that was issued by the State Department;

5.      A declaration, and injunctive relief, to prevent Defendants' threatened legal actions that are expressly preempted by federal export control law;

6.      A declaration, and injunctive relief, to prevent Defendants' threatened legal actions that are preempted by field preemption by federal export control law;

7.      A declaration, and injunctive relief, to prevent Defendants' threatened legal actions that are preempted by conflict preemption by federal export control law;

8.      A declaration, and injunctive relief, to prevent Defendants' threatened legal actions that tortiously interfere with contracts, and damages to be determined for Defendants' tortious interference with contracts;

9.      A declaration, and injunctive relief, to prevent Defendants' threatened legal actions that tortiously interfere with prospective contracts, and damages to be determined for Defendants' tortious interference with prospective contracts;

10.     Actual damages in an amount according to proof at trial;

11.     Attorney fees and costs pursuant to 42 U.S.C. § 1988; and

12.     Any other further relief as the Court deems just and appropriate.


The Plaintiffs hereby demand a jury trial.

Dated: July 29, 2018          Respectfully submitted,

<u>Alan Gura</u>
Virginia Bar No. 68842*
Gura PLLC
916 Prince Street, Suite 107
Alexandria, Virginia 22314
703.835.9085 / Fax 703.997.7665
alan@gurapllc.com
*Admission pro hac vice pending

<u>/s/ Josh Blackman</u>
Virginia Bar No. 78292
1303 San Jacinto Street
Houston, Texas 77002
202.294.9003/Fax: 713.646.1766
Josh@JoshBlackman.com
Counsel of Record

# Exhibit F

# DEPARTMENT OF STATE

## 22 CFR Parts 121, 123, 124, 126, and 129

[Public Notice 10094]

RIN 1400–AE30

## International Traffic in Arms Regulations: U.S. Munitions List Categories I, II, and III

**AGENCY:** Department of State.

**ACTION:** Proposed rule.

**SUMMARY:** The Department of State (the Department) proposes to amend the International Traffic in Arms Regulations (ITAR) to revise Categories I (firearms, close assault weapons and combat shotguns), II (guns and armament) and III (ammunition and ordnance) of the U.S. Munitions List (USML) to describe more precisely the articles warranting export and temporary import control on the USML. Items removed from the USML would become subject to the Export Administration Regulations (EAR).

**DATES:** The Department will accept comments on this proposed rule until July 9, 2018.

**ADDRESSES:** Interested parties may submit comments within 45 days of the date of publication by one of the following methods:

• *Email: DDTCPublicComments@ state.gov* with the subject line, "ITAR Amendment—Categories I, II, and III."

• *Internet:* At *www.regulations.gov,* search for this notice using Docket DOS–2017–0046.

Comments received after that date will be considered if feasible, but consideration cannot be assured. Those submitting comments should not include any personally identifying information they do not desire to be made public or for information for which a claim of confidentiality is asserted, because those comments and/or transmittal emails will be made available for public inspection and copying after the close of the comment period via the Directorate of Defense Trade Controls website at *www.pmddtc.state.gov.* Parties who wish to comment anonymously may do so by submitting their comments via *www.regulations.gov,* leaving the fields that would identify the commenter blank and including no identifying information in the comment itself.

**FOR FURTHER INFORMATION CONTACT:** Robert Monjay, Office of Defense Trade Controls Policy, Department of State, telephone (202) 663–2817; email *DDTCPublicComments@state.gov.*

ATTN: Regulatory Change, USML Categories I, II, and III.

**SUPPLEMENTARY INFORMATION:** The Directorate of Defense Trade Controls (DDTC), U.S. Department of State, administers the International Traffic in Arms Regulations (ITAR) (22 CFR parts 120 through 130). The items subject to the jurisdiction of the ITAR, *i.e.,* "defense articles," are identified on the ITAR's U.S. Munitions List (USML) (22 CFR 121.1). With few exceptions, items not subject to the export control jurisdiction of the ITAR are subject to the jurisdiction of the Export Administration Regulations (EAR, 15 CFR parts 730 through 774, which includes the Commerce Control List (CCL) in Supplement No. 1 to part 774), administered by the Bureau of Industry and Security (BIS), U.S. Department of Commerce. Both the ITAR and the EAR impose license requirements on exports and reexports. The Department of Commerce is publishing a companion rule in this edition of the **Federal Register**.

Pursuant to section 38(a)(1) of the Arms Export Control Act (AECA), all defense articles controlled for export or import are part of the United States Munitions List under the AECA. All references to the USML in this rule, however, are to the list of AECA defense articles that are controlled for purposes of export or temporary import pursuant to the ITAR, and not to the list of AECA defense articles on the United States Munitions Import List (USMIL) that are controlled by the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) for purposes of permanent import under its regulations at 27 CFR part 447. References to the USMIL are to the list of AECA defense articles controlled by ATF for purposes of permanent import.

Section 38(b)(1)(A)(ii) of the AECA, requires, with limited exceptions, registration of persons who engage in the business of brokering activities with respect to the manufacture, export, import, or transfer of any defense article or defense service designated by the President as such under section 38(a)(1) and licensing for such activities. Through Executive Order 13637, the President delegated the responsibility for registration and licensing of brokering activities to the Department of State with respect to defense articles or defense services controlled either for purposes of export by the Department of State or for purposes of permanent import by ATF. Section 129.1(b) of the ITAR states this requirement. As such, all defense articles described in the USMIL or the USML are subject to the brokering controls administered by the

U.S. Department of State in part 129 of the ITAR. The transfer of defense articles from the ITAR's USML to the EAR's CCL for purposes of export controls does not affect the list of defense articles controlled on the USMIL under the AECA for purposes of permanent import or brokering controls for any brokering activity, including facilitation in their manufacture, export, permanent import, transfer, reexport, or retransfer. This rule proposes adding a new paragraph (b)(2)(vii) to § 129.2 to update the enumerated list of actions that are not considered brokering. This change is a conforming change and is needed to address the movement of items from the USML to the CCL that will be subject to the brokering controls, to ensure that the U.S. government does not impose a double licensing requirement on the export, reexport or retransfer of such items.

The Department of State is engaged in an effort to revise the U.S. Munitions List so that its scope is limited to those defense articles that provide the United States with a critical military or intelligence advantage or, in the case of weapons, are inherently for military end use. The articles now controlled by USML Categories I, II, and III that would be removed from the USML under this proposed rule do not meet this standard, including many items which are widely available in retail outlets in the United States and abroad.

## Revision of Category I

This proposed rule revises USML Category I, covering firearms and related articles, to control only defense articles that are inherently military or that are not otherwise widely available for commercial sale. In particular, the revised category will not include non-automatic and semi-automatic firearms to caliber .50 (12.7mm) inclusive, currently controlled under paragraph (a), and all of the parts, components, accessories, and attachments specially designed for those articles. Such items will be subject to the new controls in Export Control Classification Numbers 0A501, 0A502, 0A503, 0A504, 0A505, 0B501, 0B505, 0D501, 0D505, 0E501, and 0E502. Such controls in Category 0 of the CCL will be published in a separate rule by the Department of Commerce.

Paragraph (a) of USML Category I will cover firearms that fire caseless ammunition. Paragraph (b) will continue to cover fully automatic firearms to caliber .50 (12.7mm) inclusive. Paragraph (c) will cover firearms specially designed to integrate fire control, automatic tracking, or automatic firing systems, and all

weapons previously described in paragraph (c) that remain on the USML will be covered by paragraph (a), (b) or (c) of this category or by Category II. Paragraph (d) will cover fully automatic shotguns. Paragraph (e) will continue to cover silencers, mufflers, sound suppressors, and specially designed parts and components; flash suppressors will be subject to the EAR. Paragraph (f) will be reserved, as riflescopes and other firearms sighting devices may be controlled in USML Category XII if they have night vison or infrared capabilities, and other riflescopes will be subject to the EAR. Paragraph (g) will continue to cover barrels, receivers (frames), bolts, bolt carriers, slides, or sears, specially designed for the firearms in Category I. Paragraph (h) will cover high capacity (greater than 50 rounds) magazines, and parts and components to convert a semi-automatic firearm into a fully automatic firearm, and accessories or attachments specially designed to automatically stabilize aim (other than gun rests) or for automatic targeting. Paragraph (i) will continue to cover the technical data and defense services.

A new (x) paragraph will be added to USML Category I, allowing ITAR licensing for commodities, software, and technology subject to the EAR, provided those commodities, software, and technology are to be used in or with defense articles controlled in USML Category I *and* are described in the purchase documentation submitted with the license application.

The note to Category I will be retained, with conforming revisions. A new second note will be added to clarify the terms "firearm," "fully automatic," and "caseless ammunition".

**Revision of Category II**

This proposed rule revises USML Category II, covering guns and armament, establishing a bright line between the USML and the CCL for the control of these articles.

Most significantly, paragraph (j), controlling parts and components, will be revised to enumerate the articles controlled therein.

Paragraph (a) will be revised to enumerate the articles controlled in that paragraph. The articles currently covered in paragraph (c) (apparatus and devices for launching or delivering ordnance) still warranting control on the ITAR will be included in new paragraph (a)(4). A new paragraph (a)(5) will be added for developmental guns and armaments funded by the Department of Defense and the specially designed parts and components of those developmental guns and armaments. The articles currently controlled in paragraph (f),

engines for self-propelled guns and howitzers in paragraph (a), will be on the CCL in ECCN 0A606. Tooling and equipment for the production of articles controlled in USML Category II, currently in paragraph (g), will be on the CCL in ECCN 0B602. Test and evaluation equipment, currently in paragraph (h), will be on the CCL in ECCN 0B602. Certain autoloading systems controlled in paragraph (i) will be moved to paragraphs (j)(9) and (11).

A new (x) paragraph will be added to USML Category II, allowing ITAR licensing for commodities, software, and technology subject to the EAR, provided those commodities, software, and technology are to be used in or with defense articles controlled in USML Category II *and* are described in the purchase documentation submitted with the application.

**Revision of Category III**

This proposed rule revises USML Category III, covering ammunition and ordnance, to establish a bright line between the USML and the CCL for the control of these articles and to be consistent with the changes to Category I.

Most significantly, paragraphs (a) and (d) will be revised to remove broad catch-alls and enumerate the articles to be controlled therein. For example, paragraph (a), which controls ammunition for articles in USML Categories I and II, will be revised to specifically list the ammunition that it controls. A new paragraph (a)(10) will be added for developmental ammunition funded by the Department of Defense and the parts and components specially designed for such developmental ammunition. Ammunition not enumerated in paragraph (a) will be subject to the EAR. Likewise, revised paragraph (d), which controls parts and components, will enumerate the articles it controls; those articles not identified but currently captured via the catch-all will be subject to the EAR.

Additionally, paragraph (c), which controls production equipment and tooling, will be removed and placed into reserve. The articles currently covered by this paragraph will be subject to the EAR.

A new (x) paragraph will be added to USML Category III, allowing ITAR licensing for commodities, software, and technology subject to the EAR, provided those commodities, software, and technology are to be used in or with defense articles controlled in USML Category III *and* are described in the purchase documentation submitted with the application.

**Conforming ITAR Changes**

Additionally, conforming changes will be made to several sections of the ITAR that refer to the current controls in USML Category I(a). These sections will be amended because they all refer to firearms that will be controlled on the CCL. Section 123.16(b)(2) will be revised to remove reference to the firearms exemptions at § 123.17(a) through (e), which describe the firearms exemptions, because the paragraphs will be removed as a consequence of the control of non-automatic and semi-automatic firearms on the CCL. For the same reason, § 123.16(b)(6) will be revised to describe only the remaining exemption at § 123.17 (personal protective gear), and § 123.16(b)(7) will be reserved. Section 123.17 will be amended to remove paragraphs (a) through (e), consistent with changes made to the USML. Section 123.18, as it describes exemptions for firearms that will be controlled for export by the Department of Commerce, will be removed and placed into reserve. Revision of § 124.14(c)(9) will remove the example of "sporting firearms for commercial resale." The policy guidance on Zimbabwe in § 126.1(s) will be revised to remove reference to the firearms exemption in § 123.17.

Section 129.1(b) of the ITAR will be revised to clarify that the regulations on brokering activities in part 129 apply to those defense articles and defense services designated as such on the USML and those items described on the USMIL (27 CFR 447.21). Section 129.4 of the ITAR will also be revised to clarify brokering requirements for items on the USMIL that are subject to the brokering requirements of the AECA. The items that will move to the CCL for export control purposes, yet are on the USMIL for permanent import purposes, remain subject to the brokering requirements of part 129 with respect to all brokering activities, including facilitation in their manufacture, export, permanent import, transfer, reexport, or retransfer. The revisions also clarify that foreign defense articles that are on the USMIL require brokering authorizations.

**Request for Comments**

The Department welcomes comments from the public and specifically requests input on the following matters:

(1) A key goal of this rulemaking is to ensure the USML and the CCL together control all the items that meet Wassenaar Arrangement commitments embodied in its Munitions List Categories 1, 2 and 3 (WA–ML1, WA–ML2 and WA–ML3). Readers are asked to identify any potential gap in coverage

brought about by the changes for USML Categories I, II and III contained in this notice and the new Category 0, 0x5zz ECCNs published separately by the Department of Commerce when reviewed together.

(2) The Department seeks to establish clear distinctions between the USML and the CCL for the control of firearms, large guns, armaments, ordnance and ammunition. The public should provide any specific examples of firearms (or parts, components, accessories thereof), large guns, armaments, ordnance or ammunition whose jurisdiction is unclear based on this revision.

(3) The Department has, in the past, adopted a delayed effective date of 180 days for rules revising entire categories of the USML and moving items to the CCL. The Department seeks to allow industry sufficient time to implement this rule, including time to make changes to IT systems, technology controls plans, and other business processes. The public should provide input on the time necessary to implement any final rule for these categories, as well as a description of any increased burden that, in the view of the commenter, would be imposed on businesses or individuals should this rule be adopted.

**Regulatory Analysis and Notices**

*Administrative Procedure Act*

The Department of State is of the opinion that controlling the import and export of defense articles and services is a foreign affairs function of the United States government and that rules implementing this function are exempt from sections 553 (rulemaking) and 554 (adjudications) of the Administrative Procedure Act (APA). Although the Department is of the opinion that this proposed rule is exempt from the rulemaking provisions of the APA and without prejudice to its determination that controlling the import and export of defense services is a foreign affairs function, the Department is publishing this proposed rule with a 45-day provision for public comment.

*Regulatory Flexibility Act*

Since the Department is of the opinion that this proposed rule is exempt from the rulemaking provisions of 5 U.S.C. 553, it does not require analysis under the Regulatory Flexibility Act.

*Unfunded Mandates Reform Act of 1995*

This proposed amendment does not involve a mandate that will result in the expenditure by State, local, and tribal governments, in the aggregate, or by the private sector, of $100 million or more in any year and it will not significantly or uniquely affect small governments. Therefore, no actions were deemed necessary under the provisions of the Unfunded Mandates Reform Act of 1995.

*Small Business Regulatory Enforcement Fairness Act of 1996*

This rulemaking has been found not to be a major rule within the meaning of the Small Business Regulatory Enforcement Fairness Act of 1996.

*Executive Orders 12372 and 13132*

This rulemaking will not have substantial direct effects on the States, on the relationship between the national government and the States, or on the distribution of power and responsibilities among the various levels of government. Therefore, in accordance with Executive Order 13132, it is determined that this rulemaking does not have sufficient federalism implications to require consultations or warrant the preparation of a federalism summary impact statement. The regulations implementing Executive Order 12372 regarding intergovernmental consultation on Federal programs and activities do not apply to this rulemaking.

*Executive Orders 12866 and 13563*

Executive Orders 12866 and 13563 direct agencies to assess all costs and benefits of available regulatory alternatives and, if regulation is necessary, to select regulatory approaches that maximize net benefits (including potential economic, environmental, public health and safety effects, distributed impacts, and equity). The Department believes that the benefits of this rulemaking largely outweigh any costs, in that many items currently controlled on the more-restrictive USML are being moved to the CCL. We request comment from the public on any impact that would be imposed on the public if this rule were adopted.

Executive Order 13563 emphasizes the importance of considering both benefits and costs, both qualitative and quantitative, of harmonizing rules, and of promoting flexibility. This rule has been designated a ''significant regulatory action,'' although not economically significant, under section 3(f) of Executive Order 12866. Accordingly, the rule has been reviewed by the Office of Management and Budget (OMB).

The Department believes the effect of this proposed rule would decrease the number of license applications submitted to the Department under OMB Control No. 1405–0003 by approximately 10,000 annually, for which the average burden estimates are one hour per form, which results in a burden reduction of 10,000 hours per year.

The Department of Commerce estimates that 4,000 of the 10,000 licenses that were required by the Department will be eligible for license exceptions or otherwise not require a separate license under the EAR. The Department of Commerce estimates that 6,000 transactions will require an individual validated license. The Department of Commerce will be collecting the information necessary to process license applications under OMB Control No. 0694–0088. The Department of Commerce estimates that OMB Control No. 0694–0088 takes approximately 43.8 minutes for a manual or electronic submission. The Department of Commerce estimates that the 6,000 licenses constitute a burden of 4,380 hours for this collection. The Department estimates a reduction in burden of 10,000 hours due to the proposed transition of these items to the Department of Commerce. The Department of Commerce estimates that the burden of submitting license applications for these items to the Department of Commerce will be 4,380 burden hours. Therefore, the net burden would be reduced by 5,620 hours. The Department estimates that the burden hour cost for completing a license application is $44.94 per hour. Therefore, the estimated net reduction of 5,620 burden hours per year is estimated to result in annual burden hour cost reduction of $252,562.80. There may also be other State Department forms that will no longer need to be submitted and that may further reduce the burden hours for applicants. The Department is seeking comments on the reduction from the other forms, as referenced below.

In addition to the reduction in burden hours, there will be direct cost savings to the State Department that would result from the 10,000 license applications no longer being required under the ITAR once these items are moved to the EAR. Pursuant to the AECA, ITAR, and associated delegations of authority, every person who engages in the business of brokering activities, manufacturing, exporting, or temporarily importing any defense articles or defense services must register with the Department of State and pay a registration fee. The Department of State adopted the current fee schedule to align the registration fees with the cost of licensing, compliance and other

related activities. The Department of Commerce would incur additional costs to administer these controls and process license applications. However, the Department of Commerce does not charge a registration fee to exporters under the EAR and we are unable to estimate the increase in costs to the Department of Commerce to process the new license applications. Therefore, we are unable to provide an estimate of the net change in resource costs to the government from moving these items from the ITAR to the EAR. It is the case, however, that the movement of these items from the ITAR would result in a direct transfer of $2,500,000 per year from the government to the exporting public, less the increased cost to taxpayers, because they would no longer pay fees to the State Department and there is no fee charged by the Department of Commerce to apply for a license.

The Department welcomes comments from the public on the net reduction in burden described within this section, particularly if there are additional burden reductions that are not reflected here (please provide number of hours or cost) or if the estimates noted here appear otherwise inaccurate.

Estimated Cost Savings

The Department of State is of the opinion that controlling the import and export of defense articles and services is a foreign affairs function of the United States government and that rules implementing this function are exempt from Executive Order 13771 (82 FR 9339, February 3, 2017). Although the Department is of the opinion that this proposed rule is exempt from E.O. 13771 and without prejudice to its determination that controlling the import and export of defense services is a foreign affairs function, this proposed rule is expected to be an E.O. 13771 deregulatory action. The Department has conducted this analysis in close consultation with the Department of Commerce. The total annual recurring dollar cost savings is estimated to be $1,376,281 for purposes of E.O. 13771 for the Department of State.

*Executive Order 12988*

The Department of State has reviewed this rulemaking in light of sections 3(a) and 3(b)(2) of Executive Order 12988 to eliminate ambiguity, minimize litigation, establish clear legal standards, and reduce burden.

*Executive Order 13175*

The Department of State has determined that this rulemaking will not have tribal implications, will not impose substantial direct compliance costs on Indian tribal governments, and will not preempt tribal law. Accordingly, Executive Order 13175 does not apply to this rulemaking.

*Paperwork Reduction Act*

Notwithstanding any other provision of law, no person is required to respond to, nor is subject to a penalty for failure to comply with, a collection of information, subject to the requirements of the Paperwork Reduction Act of 1995 (44 U.S.C. 3501 *et seq.*) (PRA), unless that collection of information displays a currently valid OMB control number.

The Department of State believes there would be a reduction in burden for OMB Control No. 1405–0003, Application/License for Permanent Export of Unclassified Defense Articles and Related Unclassified Technical Data. This form is an application that, when completed and approved by Department of State, constitutes the official record and authorization for the commercial export of unclassified U.S. Munitions List articles and technical data, pursuant to the AECA and ITAR. For an analysis of the reduction in burden for OMB Control No. 1405–0003, see the above Section for E.O. 12866. The Department of State requests comments on the collection of information or potential reduction in burden be sent also to the Office of Information and Regulatory Affairs of OMB, Attention: Desk Officer for Department of State, at *OIRA_Submission@omb.eop.gov* or Attention: Desk Officer for Department of State, Office of Information and Regulatory Affairs of OMB, 725 17th St. NW, Washington, DC 20503.

List of Subjects in 22 CFR Parts 121, 123, 124, 126, and 129

Arms and munitions, Exports.

Accordingly, for the reasons set forth above, title 22, chapter I, subchapter M, parts 121, 123, 124, 126, and 129 are proposed to be amended as follows:

**PART 121—THE UNITED STATES MUNITIONS LIST**

■ 1. The authority citation for part 121 continues to read as follows:

**Authority:** Secs. 2, 38, and 71, Pub. L. 90–629, 90 Stat. 744 (22 U.S.C. 2752, 2778, 2797); 22 U.S.C. 2651a; Pub. L. 105–261, 112 Stat. 1920; Section 1261, Pub. L. 112–239; E.O. 13637, 78 FR 16129.

■ 2. Section 121.1 is amended by revising U.S. Munitions List Categories I, II, and III to read as follows:

**§ 121.1   The United States Munitions List.**

\*   \*   \*   \*   \*

**Category I—Firearms and Related Articles**

\*(a) Firearms using caseless ammunition.

\*(b) Fully automatic firearms to .50 caliber (12.7 mm) inclusive.

\*(c) Firearms specially designed to integrate fire control, automatic tracking, or automatic firing (*e.g.,* Precision Guided Firearms (PGFs)), and specially designed parts and components therefor.

**Note to paragraph (c):** Integration does not include only attaching to the firearm or rail.

\*(d) Fully automatic shotguns regardless of gauge.

\*(e) Silencers, mufflers, and sound suppressors, and specially designed parts and components therefor.

(f) [Reserved]

(g) Barrels, receivers (frames), bolts, bolt carriers, slides, or sears specially designed for the articles in paragraphs (a), (b), and (d) of this category.

(h) Parts, components, accessories, and attachments, as follows:

(1) Drum and other magazines for firearms to .50 caliber (12.7 mm) inclusive with a capacity greater than 50 rounds, regardless of jurisdiction of the firearm, and specially designed parts and components therefor;

(2) Parts and components specially designed for conversion of a semi-automatic firearm to a fully automatic firearm.

(3) Accessories or attachments specially designed to automatically stabilize aim (other than gun rests) or for automatic targeting, and specially designed parts and components therefor.

(i) Technical data (*see* § 120.10 of this subchapter) and defense services (*see* § 120.9 of this subchapter) directly related to the defense articles described in paragraphs (a), (b), (d), (e), (g), and (h) of this category and classified technical data directly related to items controlled in ECCNs 0A501, 0B501, 0D501, and 0E501 and defense services using the classified technical data. (*See* § 125.4 of this subchapter for exemptions.)

(j)–(w) [Reserved]

(x) Commodities, software, and technology subject to the EAR (*see* § 120.42 of this subchapter) used in or with defense articles.

**Note to paragraph (x):** Use of this paragraph is limited to license applications for defense articles where the purchase documentation includes commodities, software, or technology subject to the EAR (*see* § 123.1(b) of this subchapter).

**Note 1 to Category I:** Paragraphs (a), (b), (d), (e), (g), (h), and (i) of this category exclude: Any non-automatic or semi-

automatic firearms to .50 caliber (12.7 mm) inclusive; non-automatic shotguns; BB, pellet, and muzzle loading (*e.g.,* black powder) firearms; and parts, components, accessories, and attachments of firearms and shotguns in paragraphs (a), (b), (d), and (g) of this category that are common to non-automatic firearms and shotguns. The Department of Commerce regulates the export of such items. See the Export Administration Regulations (15 CFR parts 730 through 774).

**Note 2 to Category I:** The following interpretations explain and amplify the terms used in this category:

(1) A firearm is a weapon not over .50 caliber (12.7 mm) which is designed to expel a projectile by the deflagration of propellant.

(2) A fully automatic firearm or shotgun is any firearm or shotgun which shoots, is designed to shoot, or can readily be restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger.

(3) Caseless ammunition is firearm ammunition without a cartridge case that holds the primer, propellant, and projectile together as a unit.

## Category II—Guns and Armament

(a) Guns and armament greater than .50 caliber (12.7 mm), as follows:

\*(1) Guns, howitzers, artillery, and cannons;

\*(2) Mortars;

\*(3) Recoilless rifles;

\*(4) Grenade launchers; or

(5) Developmental guns and armament greater than .50 caliber (12.7 mm) funded by the Department of Defense and specially designed parts and components therefor.

**Note 1 to paragraph (a)(5):** This paragraph does not control guns and armament greater than .50 caliber (12.7 mm) (a) in production, (b) determined to be subject to the EAR via a commodity jurisdiction determination (*see* § 120.4 of this subchapter), or (c) identified in the relevant Department of Defense contract or other funding authorization as being developed for both civil and military applications.

**Note 2 to paragraph (a)(5):** Note 1 does not apply to defense articles enumerated on the U.S. Munitions List, whether in production or development.

**Note 3 to paragraph (a)(5):** This provision is applicable to those contracts or other funding authorizations that are dated (one year after publication of the final rule), or later.

**Note 1 to paragraph (a)(5):** This paragraph does not include: Non-automatic and non-semi-automatic rifles, carbines, and pistols between .50 (12.7 mm) and .72 caliber (18.288 mm) that are controlled on the CCL under ECCN 0A501; shotguns controlled on the CCL under ECCN 0A502; or black powder guns and armaments manufactured between 1890 and 1919 controlled on the CCL under ECCN 0A602.

**Note 2 to paragraph (a):** Guns and armament when integrated into their carrier (*e.g.,* ships, ground vehicles, or aircraft) are controlled in the category associated with the carrier. Self-propelled guns and armament are controlled in USML Category VII. Towed guns and armament and stand-alone guns and armament are controlled under this category.

(b) Flame throwers with a minimum effective range of 20 meters.

(c) [Reserved]

\*(d) Kinetic energy weapon systems specially designed for destruction or rendering mission-abort of a target.

**Note to paragraph (d):** Kinetic energy weapons systems include but are not limited to launch systems and subsystems capable of accelerating masses larger than 0.1g to velocities in excess of 1.6 km/s, in single or rapid fire modes, using methods such as: Electromagnetic, electrothermal, plasma, light gas, or chemical. This does not include launch systems and subsystems used for research and testing facilities subject to the EAR, which are controlled on the CCL under ECCN 2B232.

(e) Signature reduction devices specially designed for the guns and armament controlled in paragraphs (a), (b), and (d) of this category (*e.g.,* muzzle flash suppression devices).

(f)–(i) [Reserved]

(j) Parts, components, accessories, and attachments, as follows:

(1) Gun barrels, rails, tubes, and receivers specially designed for the weapons controlled in paragraphs (a) and (d) of this category;

(2) Sights specially designed to orient indirect fire weapons;

(3) Breech blocks for the weapons controlled in paragraphs (a) and (d) of this category;

(4) Firing mechanisms for the weapons controlled in paragraphs (a) and (d) of this category and specially designed parts and components therefor;

(5) Systems for firing superposed or stacked ammunition and specially designed parts and components therefor;

(6) Servo-electronic and hydraulic elevation adjustment mechanisms;

(7) Muzzle brakes;

(8) Bore evacuators;

(9) Independently powered ammunition handling systems and platform interface components as follows:

(i) Mounts;

(ii) Carriages;

(iii) Gun pallets;

(iv) Hydro-pneumatic equilibration cylinders; or

(v) Hydro-pneumatic systems capable of scavenging recoil energy to power howitzer functions;

**Note to paragraph (j)(9):** For weapons mounts specially designed for ground vehicles, *see* Category VII.

(10) Recoil systems to mitigate the shock associated with the firing process of guns integrated into air platforms and specially designed parts and components therefor;

(11) Independent ammunition handling systems for the guns and armament controlled in paragraphs (a), (b), and (d) of this category;

(12) Ammunition containers/drums, ammunition chutes, ammunition conveyor elements, and ammunition container/drum entrance and exit units, specially designed for the guns and armament controlled in paragraphs (a), (b), and (d) of this category;

(13) Aircraft/gun interface units to support gun systems with a designed rate of fire greater than 100 rounds per minute and specially designed parts and components therefor;

(14) Prime power generation, energy storage, thermal management, conditioning, switching, and fuel-handling equipment, and the electrical interfaces between the gun power supply and other turret electric drive components specially designed for kinetic weapons controlled in paragraph (d) of this category;

(15) Kinetic energy weapon target acquisition, tracking fire control, and damage assessment systems and specially designed parts and components therefor; or

\*(16) Any part, component, accessory, attachment, equipment, or system that:

(i) Is classified;

(ii) Contains classified software; or

(iii) Is being developed using classified information.

"Classified" means classified pursuant to Executive Order 13526, or predecessor order, and a security classification guide developed pursuant thereto or equivalent, or to the corresponding classification rules of another government or intergovernmental organization.

(k) Technical data (*see* § 120.10 of this subchapter) and defense services (*see* § 120.9 of this subchapter) directly related to the defense articles described in paragraphs (a), (b), (d), (e), and (j) of this category and classified technical data directly related to items controlled in ECCNs 0A602, 0B602, 0D602, and 0E602 and defense services using the classified technical data. (*See* § 125.4 of this subchapter for exemptions.)

(l)–(w) [Reserved]

(x) Commodities, software, and technology subject to the EAR (*see* § 120.42 of this subchapter) used in or with defense articles.

Note to paragraph (x): Use of this paragraph is limited to license applications for defense articles where the purchase documentation includes commodities, software, or technology subject to the EAR (*see* § 123.1(b) of this subchapter).

### Category III—Ammunition and Ordnance

*(a) Ammunition, as follows:

(1) Ammunition that incorporates a projectile controlled in paragraph (d)(1) or (3) of this category;

(2) Ammunition preassembled into links or belts;

(3) Shotgun ammunition that incorporates a projectile controlled in paragraph (d)(2) of this category;

(4) Caseless ammunition manufactured with smokeless powder;

Note to paragraph (a)(4): Caseless ammunition is ammunition without a cartridge case that holds the primer, propellant, and projectile together as a unit.

(5) Ammunition, except shotgun ammunition, based on non-metallic cases, or non-metallic cases that have only a metallic base, which result in a total cartridge mass 80% or less than the mass of a brass- or steel-cased cartridge that provides comparable ballistic performance;

(6) Ammunition employing pyrotechnic material in the projectile base and any ammunition employing a projectile that incorporates tracer materials of any type having peak radiance above 710 nm and designed to be observed primarily with night vision optical systems;

(7) Ammunition for fully automatic firearms or guns that fire superposed or stacked projectiles;

(8) Electromagnetic armament projectiles or billets for weapons with a design muzzle energy exceeding 5 MJ;

(9) Ammunition, not specified above, for the guns and armaments controlled in Category II; or

(10) Developmental ammunition funded by the Department of Defense and specially designed parts and components therefor.

Note 1 to paragraph (a)(10): This paragraph does not control ammunition (a) in production, (b) determined to be subject to the EAR via a commodity jurisdiction determination (*see* § 120.4 of this subchapter), or (c) identified in the relevant Department of Defense contract or other funding authorization as being developed for both civil and military applications.

Note 2 to paragraph (a)(10): Note 1 does not apply to defense articles enumerated on the U.S. Munitions List, whether in production or development.

Note 3 to paragraph (a)(10): This provision is applicable to those contracts or other

funding authorizations that are dated (one year after publication of the final rule), or later.

(b) Ammunition/ordnance handling equipment specially designed for the articles controlled in this category, as follows:

(1) Belting, linking, and de-linking equipment; or

(2) Fuze setting devices.

(c) [Reserved]

(d) Parts and components for the articles in this category, as follows:

(1) Projectiles that use pyrotechnic tracer materials that incorporate any material having peak radiance above 710 nm or are incendiary, explosive, steel tipped, or contain a core or solid projectile produced from one or a combination of the following: tungsten, steel, or beryllium copper alloys;

(2) Shotgun projectiles that are flechettes, incendiary, tracer, or explosive;

Note to paragraph (d)(2): This paragraph does not include explosive projectiles specially designed to produce noise for scaring birds or other pests (*e.g.,* bird bombs, whistlers, crackers).

(3) Projectiles of any caliber produced from depleted uranium;

(4) Projectiles not specified above, guided or unguided, for the items controlled in USML Category II, and specially designed parts and components therefor (*e.g.,* fuzes, rotating bands, cases, liners, fins, boosters);

(5) Canisters or sub-munitions (*e.g.,* bomblets or minelets), and specially designed parts and components therefor, for the guns or armament controlled in USML Category II;

(6) Hardened cores, regardless of caliber, produced from one or a combination of the following: tungsten, steel, or beryllium copper alloy;

(7) Cartridge cases, powder bags, or combustible cases for the items controlled in USML Category II;

(8) Non-metallic cases, including cases that have only a metallic base, for the ammunition controlled in paragraph (a)(5) of this category;

(9) Cartridge links and belts for fully automatic firearms and guns controlled in USML Categories I or II;

(10) Primers other than Boxer, Berdan, or shotshell types;

Note to paragraph (d)(10): This paragraph does not control caps or primers of any type in use prior to 1890.

(11) Safing, arming, and fuzing components (to include target detection and proximity sensing devices) for the ammunition in this category and specially designed parts therefor;

(12) Guidance and control components for the ammunition in this

category and specially designed parts therefor;

(13) Terminal seeker assemblies for the ammunition in this category and specially designed parts and components therefor;

(14) Illuminating flares or target practice projectiles for the ammunition controlled in paragraph (a)(9) of this category; or

*(15) Any part, component, accessory, attachment, equipment, or system that:

(i) Is classified;

(ii) Contains classified software; or

(iii) Is being developed using classified information.

"Classified" means classified pursuant to Executive Order 13526, or predecessor order, and a security classification guide developed pursuant thereto or equivalent, or to the corresponding classification rules of another government or intergovernmental organization.

(e) Technical data (*see* § 120.10 of this subchapter) and defense services (*see* § 120.9 of this subchapter) directly related to the defense articles enumerated in paragraphs (a), (b), and (d) of this category and classified technical data directly related to items controlled in ECCNs 0A505, 0B505, 0D505, and 0E505 and defense services using the classified technical data. (*See* § 125.4 of this subchapter for exemptions.).

(f)–(w) [Reserved]

(x) Commodities, software, and technology subject to the EAR (*see* § 120.42 of this subchapter) used in or with defense articles.

Note to paragraph (x): Use of this paragraph is limited to license applications for defense articles where the purchase documentation includes commodities, software, or technology subject to the EAR (*see* § 123.1(b) of this subchapter).

Notes to Category III: 1. This category does not control ammunition crimped without a projectile (blank star) and dummy ammunition with a pierced powder chamber.

2. This category does not control cartridge and shell casings that, prior to export, have been rendered useless beyond the possibility of restoration for use as a cartridge or shell casing by means of heating, flame treatment, mangling, crushing, cutting, or popping.

3. Grenades containing non-lethal or less lethal projectiles are under the jurisdiction of the Department of Commerce.

\*    \*    \*    \*    \*

### PART 123—LICENSES FOR THE EXPORT OF DEFENSE ARTICLES

■ 3. The authority citation for part 123 continues to read as follows:

**Authority:** Secs. 2, 38, and 71, Pub. L. 90–629, 90 Stat. 744 (22 U.S.C. 2752, 2778,

Case 2:18-cv-01115-RSL   Document 11-6   Filed 07/31/18   Page 8 of 9

2797); 22 U.S.C. 2753; 22 U.S.C. 2651a; 22 U.S.C. 2776; Pub. L. 105–261, 112 Stat. 1920; Sec 1205(a), Pub. L. 107–228; Sec. 520, Pub. L. 112–55; Section 1261, Pub. L. 112–239; E.O. 13637, 78 FR 16129.

■ 4. Section 123.15 is amended by revising paragraph (a)(3) to read as follows:

### § 123.15 Congressional certification pursuant to Section 36(c) of the Arms Export Control Act.

(a) * * *

(3) A license for export of defense articles controlled under Category I paragraphs (a) through (g) of the United States Munitions List, § 121.1 of this subchapter, in an amount of $1,000,000 or more.

* * * * *

■ 5. Section 123.16 is amended by revising paragraphs (b)(2) introductory text and (b)(6) and removing and reserving paragraph (b)(7) to read as follows:

### § 123.16 Exemptions of general applicability.

* * * * *

(b) * * *

(2) Port Directors of U.S. Customs and Border Protection shall permit the export of parts or components without a license when the total value does not exceed $500 in a single transaction and:

* * * * *

(6) For exemptions for personal protective gear, refer to § 123.17.

* * * * *

■ 6. Section 123.17 is amended by revising the section heading, removing and reserving paragraphs (a) through (e), and revising paragraph (j) to read as follows:

### § 123.17 Exemption for personal protective gear.

* * * * *

(j) If the articles temporarily exported pursuant to paragraphs (f) through (i) of this section are not returned to the United States, a detailed report must be submitted to the Office of Defense Trade Controls Compliance in accordance with the requirements of § 127.12(c)(2) of this subchapter.

* * * * *

### § 123.18 [Removed and Reserved]

■ 7. Section 123.18 is removed and reserved.

## PART 124—AGREEMENTS, OFF-SHORE PROCUREMENT, AND OTHER DEFENSE SERVICES

■ 8. The authority citation for part 124 continues to read as follows:

**Authority:** Secs. 2, 38, and 71, Pub. L. 90–629, 90 Stat. 744 (22 U.S.C. 2752, 2778, 2797); 22 U.S.C. 2651a; 22 U.S.C. 2776; Section 1514, Pub. L. 105–261; Pub. L. 111–266; Section 1261, Pub. L. 112–239; E.O. 13637, 78 FR 16129.

■ 9. Section 124.14 is amended by revising paragraph (c)(9) to read as follows:

### § 124.14 Exports to warehouses or distribution points outside the United States.

* * * * *

(c) * * *

(9) Unless the articles covered by the agreement are in fact intended to be distributed to private persons or entities (e.g., cryptographic devices and software for financial and business applications), the following clause must be included in all warehousing and distribution agreements: "Sales or other transfers of the licensed article shall be limited to governments of the countries in the distribution territory and to private entities seeking to procure the licensed article pursuant to a contract with a government within the distribution territory, unless the prior written approval of the U.S. Department of State is obtained."

* * * * *

## PART 126—GENERAL POLICIES AND PROVISIONS

■ 10. The authority citation for part 126 continues to read as follows:

**Authority:** Secs. 2, 38, 40, 42 and 71, Pub. L. 90–629, 90 Stat. 744 (22 U.S.C. 2752, 2778, 2780, 2791 and 2797); 22 U.S.C. 2651a; 22 U.S.C. 287c; E.O. 12918, 59 FR 28205; 3 CFR, 1994 Comp., p. 899; Sec. 1225, Pub. L. 108–375; Sec. 7089, Pub. L. 111–117; Pub. L. 111–266; Section 7045, Pub. L. 112–74; Section 7046, Pub. L. 112–74; E.O. 13637, 78 FR 16129.

■ 11. Section 126.1 is amended by revising paragraph(s) to read as follows:

### § 126.1 Prohibited exports, imports, and sales to or from certain countries.

* * * * *

(s) Zimbabwe. It is the policy of the United States to deny licenses or other approvals for exports or imports of defense articles and defense services destined for or originating in Zimbabwe, except that a license or other approval may be issued, on a case-by-case basis, for the temporary export of firearms and ammunition for personal use by individuals (not for resale or retransfer, including to the Government of Zimbabwe).

* * * * *

## PART 129—REGISTRATION AND LICENSING OF BROKERS

■ 12. The authority citation for part 129 continues to read as follows:

**Authority:** Section 38, Pub. L. 104–164, 110 Stat. 1437, (22 U.S.C. 2778); E.O. 13637, 78 FR 16129.

■ 13. Section 129.1 is amended by revising paragraph (b) to read as follows:

### § 129.1 Purpose.

* * * * *

(b) All brokering activities identified in this subchapter apply equally to those defense articles and defense services designated in § 121.1 of this subchapter and those items designated in 27 CFR 447.21 (U.S. Munitions Import List).

■ 14. Section 129.2 is amended by:

■ a. In paragraph (b)(2)(v), removing the word "or" at the end of the paragraph;

■ b. Removing the period at the end of paragraph (b)(2)(vi) and adding "; or" in its place; and

■ c. Adding paragraph (b)(2)(vii). The addition reads as follows:

### § 129.2 Definitions.

* * * * *

(b) * * *

(2) * * *

(vii) Activities by persons to facilitate the export, reexport, or transfer of an item subject to the EAR that has been approved pursuant to a license or license exception under the EAR or a license or other approval under this subchapter.

* * * * *

■ 15. Section 129.4 is amended by revising paragraphs (a)(1) and (a)(2)(i) to read as follows:

### § 129.4 Requirement for approval.

(a) * * *

(1) Any foreign defense article or defense service enumerated in part 121 of this subchapter (see § 120.44 of this subchapter, and § 129.5 for exemptions) and those foreign origin items on the U.S. Munitions Import List (see 27 CFR 447.21); or

(2) * * *

(i) Firearms and other weapons of a nature described by Category I(a) through (d), Category II(a) and (d), and Category III(a) of § 121.1 of this subchapter or Category I(a) through (c), Category II(a), and Category III(a) of the

U.S. Munitions Import List (*see* 27 CFR 447.21);

* * * * *

■ 16. Section 129.6 is amended by revising paragraph (b)(3)(i) to read as follows:

**§ 129.6   Procedures for obtaining approval.**

* * * * *

(b) * * *

(3) * * *

(i) The U.S. Munitions List (*see* § 121.1 of this subchapter) or U.S. Munitions Import List (*see* 27 CFR 447.21) category and sub-category for each article;

* * * * *

[FR Doc. 2018–10366 Filed 5–21–18; 8:45 am]

**BILLING CODE 4710–25–P**