# EXHIBIT G

The Honorable Robert S. Lasnik

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| STATE OF WASHINGTON, et al., | No. 2:18-cv-1115-RSL |
| Plaintiffs, | **FEDERAL DEFENDANTS'** |
| v. | **BRIEF IN OPPOSITION TO** |
| | **PLAINTIFFS' EMERGENCY** |
| UNITED STATES DEPARTMENT OF | **MOTION FOR  TEMPORARY** |
| STATE, et al., | **RESTRAINING ORDER** |
| Defendants. | **NOTED FOR:** July 30, 2018 |

## INTRODUCTION

The Department of State ("Department") has been delegated the authority to regulate the export of certain defense articles and services that raise military or intelligence concerns. The Department administers the nation's export control system by relying on laws and regulations that seek to ensure that "defense articles" useful for warfare are not shipped from the United States to other countries (or otherwise provided to foreigners), where, beyond the reach of U.S. law, they could be used to threaten U.S. national security, foreign policy, or international peace and stability.  And while these laws and regulations provide the Department with robust resources in the export arena, they provide no basis to regulate the transfer of defense articles and services, or technical data related thereto, to U.S. persons on U.S. soil.[1]

---

[1] As explained below, the Department regulates "technical data" for defense articles as a part of its regulation of exports.  Such technical data is regulated for the purpose of preventing the circumvention of export controls on munitions themselves, *i.e.*, to prevent a foreign entity from

Opposition to Motion for TRO
(No. 2:18-cv-1115-RSL) – 1

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20002
202-353-0533

In bringing their motion for a temporary restraining order, Plaintiff States and the District of Columbia misunderstand this fundamental limit on the Department's authority. According to Plaintiffs, the Government's export-related determinations—specifically with respect to the export of technical data developed by Defense Distributed—have jeopardized their ability to enforce their public safety laws. But the activities about which Plaintiffs are allegedly concerned have never been, and under current law could never be, regulated by the Department.[2] Other federal and State laws regulate the issues that concern Plaintiffs, and the Department's actions at issue here have no effect on those laws. Further, Plaintiffs' allegations of irreparable injury, tied to unspecified individuals committing unspecified violations of the law, at unspecified times, fail to demonstrate, as required under governing law, that irreparable injury is likely, as opposed to conjectural. Likewise, Plaintiffs have failed to demonstrate that it is in the national interest for the Court to second guess the national security determinations of the Executive Branch at issue here. At bottom, Plaintiffs have failed to demonstrate that the facts and law they present justify the temporary restraining order they seek. On that basis, Plaintiffs' motion should be denied.

## BACKGROUND

### I.   Statutory And Regulatory Background

The Arms Export Control Act ("AECA"), 22 U.S.C. § 2751 *et seq*., authorizes the President, "[i]n furtherance of world peace and the security and foreign policy of the United States" to "control the <u>import</u> and the <u>export</u> of defense articles and defense services" and to promulgate regulations accordingly. The President has delegated to the Department this authority, and the Department has accordingly promulgated the International Traffic in Arms

---

simply producing a defense article, the parts or finished product of which would otherwise be controlled.

[2] Notably, the Attorney General of New Jersey, counsel for Plaintiff New Jersey, appears to already be engaged in litigation against Defense Distributed in the Western District of Texas, in a case to which the United States is not a party. *See Defense Distributed, et al. v. Grewal, et al.*, ("*DD v. Grewal*") Civ. No. 1:18-cv-00637-RP (W.D. Tex.) (filed July 29, 2018). This is suggestive of where the real dispute here lies: between the Plaintiffs and a private party, whose domestic activities they wish to regulate.

Opposition to Motion for TRO
(No. 2:18-cv-1115-RSL) – 2

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20002
202-353-0533

Regulations ("ITAR"), which is administered by the Department's Directorate of Defense

Trade Controls ("DDTC").  *See* Executive Order 13637(n)(iii); 22 C.F.R. §§ 120-130.[3]  22

U.S.C. § 2778(a)(1) (emphasis added).  At the heart of the AECA is the United States

Munitions List ("USML"), an extensive listing of materials that constitute "defense articles and

defense services" under the ITAR.  22 C.F.R. Part 121.  As relevant here, Category I of the

USML includes all firearms up to .50 caliber, and all technical data directly related to such

firearms.  *See* 22 C.F.R. § 121.1(I)(a), (i).  Technical data is information that "is required for

the design, development, production, manufacture, assembly, operation, repair, testing,

maintenance or modification of defense articles."  *Id.* § 120.10(a).  Section 2778 of the AECA

authorizes the President: (1) to designate those defense articles and services to be included on

the USML; (2) to require licenses for the export of items on the USML; and (3) to promulgate

regulations for the import and export of such items on the USML.  *Id.*  T

Importantly, ITAR does not regulate any activities except those that constitute

"exports," *i.e.*, the transfer of defense articles abroad or to foreign persons, along with

"temporary imports," treated as a type of import.[4]  ITAR's definition of exports includes, in

relevant part: (1) "[s]ending or taking a defense article out of the United States in any manner,"

22 C.F.R. § 120.17(a)(1); (2) "[d]isclosing (including oral or visual disclosure) or transferring

in the United States any defense article to an embassy, any agency or subdivision of a foreign

government," *id.* § 120.17(a)(3); and (3) "[d]isclosing (including oral or visual disclosure) or

---

[3] Under the AECA, the President has delegated only the authority to regulate exports and temporary imports to the Department.  *See* Exec. Order 13637 at § 1(a) (Mar. 8, 2010); *see* 22 C.F.R. § 120.2 ("The President has delegated to the Secretary of State the authority to control the export and temporary import of defense articles and services").  Such "temporary imports" are commonly understood to be a type of export, because the term "temporary import" is defined as "bringing into the United States from a foreign country any defense article that is to be returned to the country from which it was shipped or taken, or any defense article that is in transit to another foreign destination."  22 C.F.R. § 120.18.

[4] The ITAR also regulates "brokering activities," which are actions that facilitate exports such as financing, insuring, transporting, or freight forwarding defense articles or defense services.

Opposition to Motion for TRO
(No. 2:18-cv-1115-RSL) – 3

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20002
202-353-0533

transferring technical data to a foreign person, whether in the United States or abroad." *Id.* § 120.17(a)(4).

In certain cases where it is unclear whether a particular item to be exported is a defense article or defense service, ITAR contains a "commodity jurisdiction" ("CJ") procedure. Upon written request, the DDTC will provide potential exporters with a determination as to whether the item, service, or data is within the scope of ITAR. 22 C.F.R. § 120.4. These assessments are made on a case-by-case basis through an inter-agency process, evaluating whether the article is covered by the USML, is functionally equivalent to an article on the USML, or has substantial military or intelligence application. *See id.* § 120.4(d).

## II.     The Government's Settlement With Defense Distributed

In 2012, Defense Distributed published on the Internet "privately generated technical data regarding a number of gun-related items." *Def. Distributed v. Dep't of State*, 121 F. Supp. 3d 680, 687 (W.D. Tex. 2015). In May of 2013, DDTC sent Defense Distributed a letter stating that Defense Distributed may have released ITAR-controlled technical data without the required authorization. *See id.* Defense Distributed removed the technical data and submitted a CJ request. *Id.* The company, however, and in conjunction with another non-profit, the Second Amendment Foundation, ultimately brought a lawsuit against, *inter alia*, the Department and DDTC, claiming that the requirement to obtain authorization prior to publishing the subject files on its website violated the plaintiffs' rights under the First, Second, and Fifth Amendments and exceeded the Department's statutory authority. *Id.* at 688.

In August of 2015, the U.S. District Court for the Western District of Texas denied Defense Distributed's motion for a preliminary injunction. *Id.* at 701. The district court rejected the Government's arguments that "the computer files at issue do not constitute speech and thus no First Amendment protection is afforded" such files, finding that "First Amendment protection is broad" and Defense Distributed's intent to "distribut[e] the files as 'open source'" warranted treating Defense Distributed's publication of the files as speech. *Id.* at 691-92. Applying intermediate scrutiny, the district court then concluded that "because the AECA and

Opposition to Motion for TRO
(No. 2:18-cv-1115-RSL) – 4

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20002
202-353-0533

1  ITAR do not prohibit domestic communications" and plaintiffs remained "free to disseminate

2  the computer files at issue domestically," plaintiffs had not shown a substantial likelihood of

3  success on the merits. *Id.* at 695.

4       The Fifth Circuit affirmed in a split decision. *See* 838 F.3d 451 (5th Cir. 2016).

5  Focusing narrowly on the question of the public interest and the balancing of public and private

6  interests, the panel majority concluded that the "Department's stated interest in preventing

7  foreign nationals . . . from obtaining technical data on how to produce weapons and weapon

8  parts" outweighed plaintiffs' interest in their constitutional rights. *Id.* at 458-59.  Under

9  controlling Fifth Circuit precedent, the panel majority "decline[d] to address the merits"

10  because plaintiffs' failure to meet any single requirement for a preliminary injunction would

11  require affirmance of the district court. *See id.* at 456-57 (citing *PCI Transp., Inc. v. Fort*

12  *Worth & W.R. Co.*, 418 F.3d 535, 545 (5th Cir. 2005).  A dissent from the panel opinion did

13  address the merits. *See id.* at 461 (Jones, J. dissenting). "[F]or the benefit of the district court

14  on remand," the dissent set forth an analysis concluding that "the State Department's

15  application of its 'export' control regulations to this domestic Internet posting appears to

16  violate the governing statute, represents an irrational interpretation of the regulations, and

17  violates the First Amendment as a content-based regulation and a prior restraint." *Id.* at 463-

18  64. Quoting *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2226 (2015), the dissenting opinion

19  explained that the content-based nature of the Government's regulation rendered it

20  Government's regulation "presumptively unconstitutional . . .  justified only if the government

21  proves they are narrowly tailored to serve compelling state interests."  838 F.3d at 468.

22       After plaintiffs' petitions for rehearing *en banc* and for certiorari were denied, *see* 138

23  S. Ct. 638 (2018); 865 F.3d 211 (5th Cir. 2017) (5 dissenting judges), proceedings resumed in

24  district court.  In April of 2018, the Government moved to dismiss plaintiffs' second amended

25  complaint. *See* Civ. No. 1:15-cv-372-RP (Dkt. No. 92).  Although preserving the argument—

26  previously rejected by the district court—that Defense Distributed's Internet posting did not

27  qualify for First Amendment protection, the Government acknowledged that, under *Reed*, strict

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20002
202-353-0533

scrutiny would apply to plaintiffs' claims. *See generally id.* Meanwhile, the district court ordered the parties to exchange written settlement demands, *see* Civ. No. 1:15-cv-372-RP (Dkt. No. 88), thereby initiating a process under which the parties were able to reach a settlement before briefing on the motion to dismiss was complete. *See* Civ. No. 1:15-cv-372-RP (Dkt. Nos. 93, 95).

Pursuant to the settlement[5] and as relevant here, the Government agreed to the following:

(a)     Defendants' commitment to draft and to fully pursue, to the extent authorized by law (including the Administrative Procedure Act), the publication in the Federal Register of a notice of proposed rulemaking and final rule, revising USML Category I to exclude the technical data that is the subject of the Action.[6]

(b)     Defendants' announcement, while the above-referenced final rule is in development, of a temporary modification, consistent with the . . . (ITAR), 22

---

[5] Available at:
https://www.pmddtc.state.gov/sys_attachment.do?sys_id=46108f31dbaf9b40529d368d7c96198d.
[6] At the time settlement negotiations began, the parties had long expected such an NPRM to be issued. *See* 78 Fed. Reg. 22,740 (April 16, 2013) (announcing that "[t]he Department intends to publish final rules implementing the revised USML categories and related ITAR amendments periodically"). Reflecting nearly a decade of efforts to carry out a reform of export regulations and pursuant to a "comprehensive review" of the U.S. export control system, the Government has undertaken an Export Control Reform Initiative ("ECRI") that was proposed in April, 2010, *see* Fact Sheet on the President's Export Control Reform Initiative (Apr. 20, 2010), *available at*: https://obamawhitehouse.archives.gov/the-press-office/fact-sheet-presidents-export-control-reform-initiative, and facilitated by Executive Order 13637 (Mar. 8, 2013). By January 20, 2017, this export reform process had been completed for USML categories IV through XX.

Indeed, this NPRM was completed before signing of the settlement agreement. On May 24, 2018—after the initial exchange of settlement offers but more than one month prior to the settlement with Defense Distributed—the Government addressed the remaining USML categories with a notice of proposed rulemaking ("NPRM"). *See* 83 Fed. Reg. 24,198 (May 24, 2018); 83 Fed. Reg. 24,166 (May 24, 2018). In that NPRM, the Government has proposed amending the ITAR "to revise Categories I (firearms, close assault weapons and combat shotguns), II (guns and armament) and III (ammunition and ordnance) of the [USML] to describe more precisely the articles warranting export and temporary import control on the USML." 83 Fed. Reg. 24,198. If so removed, these items would no longer be subject to the ITAR's authorization requirements. *See id.*

Opposition to Motion for TRO
(No. 2:18-cv-1115-RSL) – 6

C.F.R. § 126.2, of USML Category I to exclude the technical data that is the subject of the Action. The announcement will appear on the DDTC website, www.pmddtc.state.gov, on or before July 27, 2018.[7]

(c)    Defendants' issuance of a letter to Plaintiffs on or before July 27, 2018, signed by the Deputy Assistant Secretary for Defense Trade Controls, advising that the Published Files, Ghost Gunner Files, and CAD Files are approved for public release (i.e., unlimited distribution) in any form and are exempt from the export licensing requirements of the ITAR because they satisfy the criteria of 22 C.F.R. § 125.4(b)(13). For the purposes of 22 C.F.R. § 125.4(b)(13) the Department  of State is the cognizant U.S. Government department or agency, and the Directorate of Defense Trade Controls has delegated authority to issue this approval.

(d)    Defendants' acknowledgment and agreement that the temporary modification of USML Category I permits any United States person, to include DD's customers and SAF's members, to access, discuss, use, reproduce, or otherwise benefit from the technical data that is the subject of the Action, and that the letter to Plaintiffs permits any such person to access, discuss, use, reproduce or otherwise benefit from the Published Files, Ghost Gunner Files, and CAD Files.

The parties executed the Settlement Agreement on June 29, 2018, and the Government complied with items (b) and (c) on July 27, 2018.

## III.    Plaintiffs' Lawsuit And Motion For A Temporary Restraining Order

On July 30, 2018, Plaintiffs—eight States and the District of Columbia—filed the instant action against, *inter alia*, the Department, the Secretary of State, DDTC, and Defense Distributed.  Compl., ECF No. 1.  Plaintiffs allege that the Government's settlement with Defense Distributed has adversely affected their public safety laws, in violation of the Administrative Procedure Act ("APA") and the Tenth Amendment to the U.S. Constitution.  *Id.* at 21-41.  They seek declaratory and injunctive relief, including an injunction requiring the rescission of the terms of the Settlement Agreement.  *Id.* at 48.  Also on July 30, 2018, Plaintiffs moved for a temporary restraining order against Defendants.  Mot. for Temporary Restraining Order ("TRO Mot."), ECF No. 2.

---

[7] Pursuant to 22 C.F.R. § 126.2, "[t]he Deputy Assistant Secretary for Defense Trade Controls may order the temporary suspension or modification of any or all of the regulations of this subchapter in the interest of the security and foreign policy of the United States."

Opposition to Motion for TRO
(No. 2:18-cv-1115-RSL) – 7

1

2                                    **ARGUMENT**

3          As with a preliminary injunction, a temporary restraining order "is an extraordinary and

4   drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries

5   the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam)

6   (citation omitted); *see Stuhlbarg Intern. Sales Co., Inc. v. John D. Brush and Co., Inc.*, 240

7   F.3d 832, 839 n.7 (9th Cir. 2001) (explaining that the analysis for granting a temporary

8   restraining order is "substantially identical" to that for a preliminary injunction).  A plaintiff

9   "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable

10  harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that

11  an injunction is in the public interest." *Am. Trucking Ass'ns*, 559 F.3d at 1052 (citation

12  omitted).  A "possibility" of irreparable harm is insufficient; irreparable harm must be *likely*

13  absent an injunction.  *Id*; *see also Winter*, 555 U.S. at 22 (rejecting Ninth Circuit's earlier rule

14  that the "possibility" of irreparable harm, as opposed to its likelihood, was sufficient in some

15  circumstances to justify preliminary relief).  Alternatively, "'serious questions' going to the

16  merits' and a balance of hardships that tips sharply towards the plaintiff can support issuance of

17  a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of

18  irreparable injury and that the injunction is in the public interest." *All. for the Wild Rockies v.

19  Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011); *see also Leiva-Perez v. Holder*, 640 F.3d 962,

20  967-68 (9th Cir. 2011).  Plaintiffs bear the burden of demonstrating that each of these four

21  factors is met.  *DISH Network Corp. v. FCC*, 653 F.3d 771, 776-77 (9th Cir. 2011).

22         The standard for a preliminary injunction is even higher where, as here, Plaintiffs seek a

23  mandatory or affirmative injunction that would alter the status quo rather than preserve it.  *See,

24  e.g.*, *Stanley v. Univ. of S. Cal.*, 13 F.3d 1313, 1320 (9th Cir. 1994); *Texas Children's Hosp. v.

25  Burwell*, 76 F. Supp. 3d 224, 247 (D.D.C. 2014); *Sweis v. U.S. Foreign Claims Settlement

26  Comm'n*, 950 F. Supp. 2d 44, 48 (D.D.C. 2013).  A mandatory injunction "goes well beyond

27  simply maintaining the status quo *pendente lite* and is particularly disfavored." *Garcia v.

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20002
202-353-0533

*Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (citation omitted).  Such relief should be denied "unless the facts and law clearly favor the moving party."  *Id.*; *see also Hernandez v. Sessions*, 872 F.3d 976, 999 (9th Cir. 2017) (explaining that mandatory injunctions are "subject to a higher standard than prohibitory injunctions" and are only permissible when "'extreme or very serious damage will result' that is not 'capable of compensation in damages,' and the merits of the case are not 'doubtful'" (citation omitted)).

Plaintiffs here seek far more than a prohibitory injunction.  They ask the Court to suspend and enjoin enforcement of actions already taken by the Government pursuant to its obligations under the Settlement Agreement.  *See* TRO Mot. at 1-2; *see also* Pls.' Proposed Order, ECF No. 2-1.  Through this requested relief, Plaintiffs seek not to "maintain the status quo" pending litigation, but to place themselves in a better position than they were in before the onset of the current controversy through an award of "the exact same ultimate relief" they seek in their Complaint.  *Taiebat v. Scialabba*, 2017 WL 747460, at *2-3 (N.D. Cal. Feb. 27, 2017). "In general, that kind of judgment on the merits in the guise of preliminary relief is a highly inappropriate result."  *Senate of Cal. v. Mosbacher*, 968 F.2d 974, 978 (9th Cir. 1992).[8]

## I.    Plaintiffs Have Not Shown They Will Be Irreparably Harmed

A temporary restraining order "is granted only if there is a true emergency which requires "preserving the status quo and preventing irreparable harm."  *R.F. by Frankel v. Delano Union School District*, 224 F. Supp. 3d 979, 987 (E.D. Cal. 2016) (quoting *Granny Goose Foods, Inc. v. Bhd. of Teamsters and Auto Truck Drivers Local No. 70*, 415 U.S. 423, 439 (1974)); *cf. Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981) (preliminary injunction serves the "limited purpose" of "preserv[ing] the relative positions of the parties until a trial on the merits can be held").  Accordingly, "[a]n essential prerequisite" before granting preliminary relief is a showing that irreparable injury is likely in the absence of an injunction.  *See Dollar Rent A Car of Wash., Inc. v. Travelers Indem. Co.*, 774 F.2d 1371, 1375 (9th Cir. 1985);

---

[8] The Government leaves to the private party Defendants the question of whether and how their individual rights should be considered in this analysis.

Opposition to Motion for TRO
(No. 2:18-cv-1115-RSL) – 9

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20002
202-353-0533

1    *Winter*, 555 U.S. at 19.  "Irreparable harm" is traditionally defined as harm for which there is

2    no adequate legal remedy, such as an award of damages.  *Ariz. Dream Act Coal. v. Brewer*, 855

3    F.3d 957, 978 (9th Cir. 2017).  Such harm must also be "concrete and particularized."  *Koff v.*

4    *Ahern*, No. 14-CV-04680, 2015 WL 1050167, at *3 (N.D. Cal. Mar. 9, 2015) (quoting

5    *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009)); *accord Los Angeles Mem'l Coliseum*

6    *Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1201 (9th Cir. 1980).  This standard is

7    demanding: "Mere injuries, however substantial, in terms of money, time and energy

8    necessarily expended in the absence of a stay, are not enough" to qualify as irreparable, and

9    "[t]he possibility that adequate compensatory or other corrective relief will be available at a

10   later date . . . weighs heavily against a claim of irreparable harm." *Sampson v. Murray*, 415

11   U.S. 61, 90 (1974).

12         Plaintiffs appear to argue that they will be irreparably harmed by Defense Distributed's

13   publication of the subject files because such publication will undermine their ability to enforce

14   their public safety laws.  *See* TRO Mot. at 18-23.  But neither the facts nor the law support this

15   claim here, where there has been no change in the application of federal law to the distribution

16   of the subject files domestically and where Plaintiffs concede the speculative nature of their

17   harms.

18         First, the core inadequacy of Plaintiffs' argument is Plaintiffs' fundamental

19   misconception of the relevant law and the authority of the State Department as the federal

20   agency that administers it.  The AECA and ITAR have not conferred upon or delegated to the

21   Department the authority to regulate 3D printing, domestic communications to U.S. persons, or

22   the domestic manufacture of firearms.  Rather, as noted above, the agency's authority pursuant

23   to the AECA and ITAR is limited to *exports* of defense articles and related technical data.

24   Critically, neither the AECA nor ITAR prohibits the transmission of defense articles from one

25   U.S. person to another U.S. person within the United States, and so the Department has never

26   prohibited Defense Distributed, or any other company or individual, from providing technical

27   data to U.S. persons on U.S. soil, including by, *e.g.*, providing such technical data through the

Opposition to Motion for TRO
(No. 2:18-cv-1115-RSL) – 10

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20002
202-353-0533

mail, distributing DVDs containing such data, or other means.  *See Def. Distributed*, 121 F. Supp. 3d at 695 ("Plaintiffs are free to disseminate the computer files at issue domestically in public or private forums, including via the mail or any other medium that does not provide the ability to disseminate the information internationally.").  To the extent Defense Distributed and others have not previously disseminated the computer files at issue within Plaintiffs' boundaries, such inaction is attributable to their own decisions and not to the Department's regulatory authority.[9]  Plaintiffs therefore cannot plausibly suggest that the Government's temporary modification of its exercise of export authority has or imminently will cause any harm to Plaintiffs' ability to enforce their statutory schemes.

Plaintiffs also fail to carry their burden because, as they themselves admit, the harms they identify are speculative.  *See* TRO Mot. at 19 ("If a TRO does not issue before August 1, 2018, the harm that will result *could be* enormous and irreparable." (emphasis added)).[10] Plaintiffs raise the specter of unspecified "black market dealers" and "mentally ill" persons who may one day procure the correct equipment, materials, and files—specifically from Defense Distributed's website, notwithstanding the apparent availability of such files

---

[9] Indeed, the Department has never purported to prevent Defense Distributed from posting the subject files on its website, provided it did so in a manner that did not constitute an export.  *See id*.  As Defendants argued in the Western District of Texas, although DDTC's May 8, 2013 letter expressed DDTC's concerns about Defense Distributed's unrestricted postings to the Internet, the availability of online material to users outside the U.S. can be limited in a number of ways. For example, Internet users can be generally located using their Internet Protocol addresses. *See generally AF Holdings, v. Does 1-1058*, 752 F.3d 990, 996 (D.C. Cir. 2014) (discussing geolocation services).

[10] The Government understands from the separate litigation between Defense Distributed and the Attorney General of New Jersey that Defense Distributed has already published the subject files on its website.  *See* Compl., *DD v. Grewal* at p.1 (Dkt No. 1, July 29, 2018) ("Defense Distributed has published and will continue to publish Computer-Aided Design (CAD) and Computer-Numeric Control (CNC) files on its Internet servers . . ."); *see also* "8 States Take Aim at 3D Gun Company . . .," *Ars Technica* (July 30, 2018), available at: https://arstechnica.com/tech-policy/2018/07/20-states-take-aim-at-3d-gun-company-sue-to-get-files-off-the-internet/ ("the files went up last Friday evening").  If so, and as Plaintiffs acknowledge, there would be no basis for a TRO.  *See* TRO Mot. at 19 ("[I]f the files are publicly released . . . they cannot be clawed back.").

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20002
202-353-0533

1   elsewhere, *see* TRO Mot. at 20—and then assemble the firearm, render it undetectable, and

2   commit a crime. *See id.* at 22-23. This assertion involves an attenuated chain of events that

3   cannot remotely meet the high standard of irreparable harm required by the Ninth Circuit,

4   particularly in the context of a mandatory prohibition. *See Park Vill. Apartment Tenants Ass'n*

5   *v. Mortimer Howard Trust*, 636 F.3d 1150, 1160 (9th Cir. 2011) ("[T]he person or entity

6   seeking injunctive relief must demonstrate that irreparable injury is *likely* in the absence of an

7   injunction. An injunction will not issue if the person or entity seeking injunctive relief shows a

8   mere possibility of some remote future injury, or a conjectural or hypothetical injury." (internal

9   quotation marks and citations omitted)).

10      Finally, Plaintiffs have overlooked "[t]he possibility that . . . other corrective relief will

11   be available at a later date," in which case temporary relief is unavailable. Yet Plaintiffs retain

12   the full authority to enforce their state public safety laws, including lawful restrictions on

13   firearms possession and transfer, against any and all violators of the law. And, as explained

14   below, *see infra* n. 11, other federal public safety laws regulating, *inter alia*, the possession of

15   firearms by felons and the mentally ill, and federal laws requiring that firearms contain

16   sufficient metal to be detectable remain in force. These public safety laws—which, unlike the

17   AECA and ITAR, address domestic, criminal conduct—provide "other corrective relief" on an

18   ongoing basis.

19   **II. Plaintiffs Have Not Shown A Likelihood Of Success On The Merits**

20      Although the Complaint asserts claims under both the APA and the Tenth Amendment,

21   Compl. at 41-47, their motion for a temporary restraining order discusses only their APA

22   claims. *See* TRO Mot. at 13-18. As to either category of claims, Plaintiffs have failed to

23   establish that "the law and the facts clearly favor" their position, as required under the

24   heightened mandatory injunction standard. *See Stanley*, 13 F.3d at 1320.

25         **A.      Plaintiffs Lack Standing To Assert Their Claims**

26      "Article III of the Constitution limits the jurisdiction of federal courts to 'Cases' and

27   'Controversies,'" and "[t]he doctrine of standing gives meaning to these constitutional limits by

Opposition to Motion for TRO
(No. 2:18-cv-1115-RSL) – 12

1  'identify[ing] those disputes which are appropriately resolved through the judicial process.'"

2  *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2341 (2014) (citation omitted).  Standing,

3  "which is built on separation-of-powers principles, serves to prevent the judicial process from

4  being used to usurp the powers of the political branches."  *Clapper v. Amnesty Int'l USA*, 568

5  U.S. 398, 408 (2013).  The "irreducible constitutional minimum of standing" has three

6  elements: that a plaintiff suffer a concrete injury-in-fact, that the injury be fairly traceable to the

7  challenged action of the defendant, and that it be likely (as opposed to speculative) that the

8  injury will be redressed by a favorable decision.  *Lujan v. Defs. of Wildlife*, 504 U.S. 555 560–

9  61 (1992) (internal citations omitted).

10  Perhaps recognizing that they have no standing to bring an action against the Federal

11  Government as *parens patriae*, *see Sierra Forest Legacy v. Sherman*, 646 F.3d 1161, 1178 (9th

12  Cir. 2011) (citation omitted), Plaintiffs instead claim that they satisfy the requirements under

13  Article III because the Government's settlement "seriously jeopardiz[es] the States' ability to

14  enforce their public safety laws."  TRO Mot. at 12.  Specifically, Plaintiffs assert that the

15  settlement adversely affects who may purchase and possess firearms, as well as how such

16  firearms are purchased.  *Id.*  Plaintiffs' theory, however, is fundamentally flawed.

17  First, and for the reasons described above, Plaintiffs' argument regarding standing is

18  premised on a misconception of the AECA and ITAR, and the state of affairs prior to the

19  settlement of Defense Distributed's claims.  As the Government has previously explained, the

20  Department regulates exports pursuant to the AECA and ITAR, and it has no authority to

21  regulate the transmission of technical data from U.S. persons to U.S. persons within the United

22  States.  Thus, during the entire pendency of Defense Distributed's lawsuit against the

23  Government, the ITAR did not stop Defense Distributed's ability "free[ly] to disseminate the

24  computer files at issue domestically in public or private forums," including within the borders

25  of Plaintiffs' States.  *Def. Distributed*, 121 F. Supp. 3d at 695.  Plaintiffs therefore cannot

26  plausibly assert that the Government's decision to reach a settlement has affected—let alone

27

Opposition to Motion for TRO
(No. 2:18-cv-1115-RSL) – 13

seriously jeopardized—their ability to "create and enforce a legal code" with respect to certain public safety laws.[11]  *See* TRO Mot. at 12.

Plaintiffs cannot salvage their theory of standing by claiming that "the imminent widespread availability of undetectable and untraceable weapons will make it far more difficult for the States to protect the safety of those within their borders."  *See id.*  "This theory stacks speculation upon hypothetical upon speculation, which does not establish an 'actual or imminent' injury."  *N.Y. Regional Interconnect, Inc. v. FERC*, 634 F.3d 581, 587 (D.C. Cir. 2011) (quoting *Lujan*, 504 U.S. at 560).  Again, Plaintiffs necessarily speculate that a dangerous individual otherwise unable to procure a firearm will obtain the necessary equipment and materials, download the files from Defense Distributed's website (as opposed to another source), properly construct an operable firearm, render the firearm undetectable—an action separately forbidden by federal law, *see* 18 U.S.C. § 922(p)—and endanger the safety of persons living within the States' borders; this possible chain of events does not approach the bar set by Article III.  *See Clapper*, 568 U.S. at 409 ("Although imminence is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes—that the injury is certainly impending.  Thus, we have repeatedly reiterated that threatened injury must be certainly impending to constitute injury in fact, and that [a]llegations of possible future injury are not sufficient." (internal quotation marks and citations omitted)).

---

[11] Nor is it the case that the AECA and ITAR provide the basis in federal law for the regulation of firearms by Plaintiffs' litany of persons of concern, such as "minors, persons convicted of felonies, persons subject to protection and no-contact orders, and persons who are mentally ill." Questions of the application of the ITAR to plaintiffs' files do not affect the separate federal prohibitions on the possession of firearms by felons, persons subject to restraining orders, or the mentally ill.  *See* 18 U.S.C. §§ 922 (g)(1) (felons and certain state-law misdemeanants); 922(g)(8) (court-issued restraining orders); 922(g)(4) (persons adjudicated as mentally ill).  A separate statute, also unrelated to the AECA and ITAR, bars the manufacture, possession, sale, import, or transfer of undetectable firearms.  *See* 18 U.S.C. § 922(p); *An Act to Extend the Undetectable Firearms Act of 1988 for 10 Years*, Pub. L. 113-57 (Dec. 2 2013).

Opposition to Motion for TRO
(No. 2:18-cv-1115-RSL) – 14

### B.    Plaintiffs' APA Claims Are Unpersuasive

Even if the Court were to reach Plaintiffs' APA claims, it should find that they are unsupported by the facts and the law.  First, Plaintiffs claim that the Government has failed to comply with the AECA's 30-day notice requirement to Congress.  *See* TRO Mot. at 15-16.  But Plaintiffs again betray their misunderstanding of the governing law.  The statutory provision they invoke provides that "the President may not remove any *item* from the Munitions List until 30 days after the date on which the President has provided notice of the proposed removal to the Committee on International Relations of the House of Representatives and to the Committee on Foreign Relations of the Senate in accordance with the procedures applicable to reprogramming notifications."  22 U.S.C. § 2278(h) (emphasis added).  An "item" of the USML refers to the USML's categories or subcategories—e.g., "Fully automatic firearms to .50 caliber inclusive (12.7 mm)," 22 C.F.R. § 121.1—and not specific articles or commodities related thereto.  *See Def. Distributed*, 121 F. Supp. 3d at 687 ("The Munitions List 'is not a compendium of specific controlled items,' rather it is a 'series of categories describing the kinds of items' qualifying as 'defense articles.'" (quoting *United States v. Zhen Zhou Wu*, 711 F.3d 1, 12 (1st Cir. 2013))).  Thus the Department's temporary modification of technical data related to a specific article or commodity, such as the files regarding which Defense Distributed brought its claims—would not implicate the 30-day notice requirement of 22 U.S.C. § 2278(h).

Plaintiffs likewise misread the ITAR's provisions concerning CJ determinations, which they suggest were required prior to the Department's decision.  *See* TRO Mot. at 16.  Neither the ITAR nor the APA requires that the Department initiate the CJ process in the absence of a request from a potential exporter.  *See generally* 22 C.F.R. § 120.4.  And in any event, the issuance of the NPRM, *see* note 6, *supra*, reflects the Department's current determination that technical data such as that at issue here does not warrant ITAR control and that the underlying Category I firearms to which the technical data relates do not "provide the United States with a critical military or intelligence advantage" and are not "inherently for a military end use" and thus should be removed from USML Category I.  *See* 83 Fed. Reg. 24,198 (May 24, 2018); 83

Opposition to Motion for TRO
(No. 2:18-cv-1115-RSL) – 15

Fed. Reg. 24,166 (May 24, 2018).  Thus a separate CJ decision would be unnecessary.  *See* 22 C.F.R. § 120.4.

Plaintiffs next challenge the Department's determination that the temporary modification is consistent with the United States' national security and foreign policy.  *See* TRO Mot. 16-17.  However, as evidenced by their lack of supporting authority, *see id.*, Plaintiffs offer no basis to challenge the Executive Branch's findings in this regard.  *E.g.*, *United States v. Hawkins*, 249 F.3d 867, 873 n.2 (9th Cir. 2001) ("[C]ourts have long recognized that the Judicial Branch should defer to decisions of the Executive Branch that relate to national security.").  Significantly, the Department's publication of the NPRM reflects the conclusion that the underlying Category I firearms to which the technical data relates do not "provide the United States with a critical military or intelligence advantage" and are not "inherently for a military end use" and thus should be removed from USML Category I.

Additionally, Plaintiffs claim that the Department's temporary modification would impermissibly "allow 'any United States person' to manufacture, possess, and sell firearms made from the files," and thus "would violate numerous provision of the States' respective statutory schedules regulating firearms."  TRO Mot. at 17.  Yet the Government does not suggest, and has never suggested, that the Settlement Agreement preempts such State laws. To the contrary, the Department has consistently emphasized that its actions are taken only pursuant to its authority to regulate the United States' system of export controls, not domestic activity.  Significantly, the provisions cited above of the Gun Control Act, 18 U.S.C. § 922 and subparts, remain in force, as do the protections for State law legislated by Congress in the Gun Control Act.  *See* 18 U.S.C. § 927 ("Effect on state law").[12]  Thus, the State laws invoked by Plaintiffs remain unaffected by the Settlement Agreement.

---

[12] 18 U.S.C. § 927 provides that:

> No provision of this chapter shall be construed as indicating an intent on the part of the Congress to occupy the field in which such provision operates to the exclusion of the law of any State on the same subject matter, unless there is a direct and positive conflict between such provision and the law of the State so that the two cannot be reconciled or consistently stand together

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20002
202-353-0533

Finally, Plaintiffs claim that the Department's actions were arbitrary and capricious because they constitute an unexplained reversal of the agency's prior position concerning whether the subject files are ITAR controlled.  *See* TRO Mot. at 17-18.  But as the NPRM indicates, the Department has concluded that ITAR control of such technical data is not warranted.  *See generally* 83 Fed. Reg. 24,198.  Further, Plaintiffs cite no authority for the proposition that the APA requires the Department to release "reports, studies, or analyses" in support of its decision regarding a temporary modification.  *See id.*  This argument, therefore, is insufficient to carry Plaintiffs' burden.

### III. The Balance of Equities and the Public Interest Weigh Strongly Against Entry of a Preliminary Injunction

Plaintiffs likewise cannot show the balance of equities tips in their favor.  Under the third prong of the inquiry for preliminary relief, courts "balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief."  *See Winter*, 555 U.S. at 24.  Under the fourth prong, the courts consider the public interest.  *Id.* at 21.  Where the Federal Government is a party, the balance of equities and public interest factors may be merged.  *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014).

Plaintiffs do not seriously attempt to argue that these factors weigh in their favor.  Instead, they recycle their conclusory claims about the "likelihood of extreme, irreparable, concrete harm to public safety," and then purport to shift the burden onto the Government.  *See* TRO Mot. at 23.  This showing is plainly insufficient to warrant to extraordinary relief sought by Plaintiffs.

Moreover, as noted above, Plaintiffs are not seeking merely to preserve the status quo, but instead seek a mandatory injunction compelling specific actions to be undertaken by the Government, namely compelling the Department to regulate the subject files as ITAR controlled.  *See* TRO Mot. at 1-2.  Further, any harm would be minimal if, as the Government understands the current posture, Defense Distributed has already published the subject files on its website.  *See DD v. Grewal* at 1 (Dkt. No. 1, July 29, 2018); *see also Defense Distributed*,

Opposition to Motion for TRO
(No. 2:18-cv-1115-RSL) – 17

121 F. Supp. 3d at 687 ("in December 2012, Defense Distributed make available for free on the Internet [3-D printing files," which remained until "May 8, 2013," after which "they promptly removed" the files).  Finally, allowing the Court, by issuing the requested temporary restraining order, to substitute its judgment for the Department's is not in the public interest.  *See Virginian Ry. Co. v. Sys. Fed'n No. 40*, 300 U.S. 515, 552 (1937) (statutory scheme of Congress "is in itself a declaration of public interest which should be persuasive" to courts).  The relief Plaintiffs seek would frustrate and displace the Department's exercise of discretion by replacing its determination of when ITAR control is warranted.  *See* Pls.' Proposed Order at 1. The public interest, therefore, weighs against the entry of the injunctive relief Plaintiffs seek here.

## CONCLUSION

For the foregoing reasons, the motion for a temporary restraining order should be denied.

Dated:  July 31, 2018                                Respectfully submitted,

                                                     CHAD A. READLER
                                                     Acting Assistant Attorney General

                                                     ANNETTE L. HAYES
                                                     Acting United States Attorney

                                                     KERRY KEEFE
                                                     Civil Chief

                                                     ANTHONY J. COPPOLINO
                                                     Deputy Director, Federal Programs Branch

                                                      */s/ Eric J. Soskin*
                                                     ERIC J. SOSKIN, PA Bar #200663
                                                     STUART J. ROBINSON
                                                     Attorneys
                                                     U.S. Department of Justice
                                                     Civil Division, Federal Programs Branch
                                                     P.O. Box 883
                                                     Washington, D.C. 20044
                                                     (202) 353-0533 (telephone)
                                                     (202) 616-8470 (facsimile)

Opposition to Motion for TRO
(No. 2:18-cv-1115-RSL) – 18

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20002
202-353-0533

Eric.Soskin@usdoj.gov

*Attorneys for Federal Defendants*

Opposition to Motion for TRO
(No. 2:18-cv-1115-RSL) – 19

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20002
202-353-0533