# EXHIBIT J

The Honorable Robert S. Lasnik

1

2

3

4

5

6

7

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT SEATTLE**

| | |
|---|---|
| 8  STATE OF WASHINGTON; STATE OF | NO. 2:18-cv-01115-RSL |
| 9  CONNECTICUT; STATE OF MARYLAND; STATE OF NEW JERSEY; STATE OF NEW | PLAINTIFF STATES' MOTION FOR A |
| 10 YORK; STATE OF OREGON; COMMONWEALTH OF | PRELIMINARY INJUNCTION |
| 11 MASSACHUSETTS; COMMONWEALTH OF PENNSYLVANIA; DISTRICT OF | **HEARING DATE: AUGUST 21, 2018** |
| 12 COLUMBIA; STATE OF CALIFORNIA; STATE OF COLORADO; STATE OF | |
| 13 DELAWARE; STATE OF HAWAII; STATE OF ILLINOIS; STATE OF IOWA; STATE | |
| 14 OF MINNESOTA; STATE OF NORTH CAROLINA; STATE OF RHODE ISLAND; | |
| 15 STATE OF VERMONT and COMMONWEALTH OF VIRGINIA, | |

16                                Plaintiffs,

            v.

17

18 UNITED STATES DEPARTMENT OF
STATE; MICHAEL R. POMPEO, in his
19 official capacity as Secretary of State;
DIRECTORATE OF DEFENSE TRADE
20 CONTROLS; MIKE MILLER, in his official
capacity as Acting Deputy Assistant Secretary
21 of Defense Trade Controls; SARAH
HEIDEMA, in her official capacity as Director
22 of Policy, Office of Defense Trade Controls
Policy; DEFENSE DISTRIBUTED; SECOND
23 AMENDMENT FOUNDATION, INC.; AND
CONN WILLIAMSON,

24                                Defendants.

MOTION FOR PRELIMINARY
INJUNCTION
2:18-cv-01115-RSL

i

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue. Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

## I.   INTRODUCTION AND RELIEF REQUESTED

In April 2018, Defendants[1] entered a covert agreement with an organization run by a self-described "crypto-anarchist" to authorize the unrestricted dissemination of downloadable guns via the internet. When the deal came to light, the Plaintiff States promptly filed this lawsuit, and this Court entered a temporary restraining order (Dkt. # 23) (TRO). The White House then announced that "the Justice Department made a deal without the President's approval" and "the President is glad this effort was delayed" by the TRO.[2] The Plaintiff States now ask the Court to continue to preserve the status quo by converting its TRO to a preliminary injunction.

The merits are clear: Defendants' removal of 3D printable gun files from the U.S. Munitions List violated multiple statutory requirements and will irreparably harm the States absent preliminary relief. Along with this motion, the States submit numerous declarations[3] of former government officials, senior law enforcement officers, scholars, and other experts to establish the profound consequences the States and their residents will suffer if undetectable, untraceable, 3D-printable weapons become readily available across the globe. Defendants themselves have acknowledged that permitting the online dissemination of 3D-printable weapons will pose significant threats, having taken that very position for five years in numerous letters and court pleadings. President Trump succinctly summarized Defendants' actions when he tweeted that deregulating printable-gun files "doesn't seem to make much sense!"[4]

## II.   FACTUAL AND STATUTORY BACKGROUND

The statutory and factual background is set forth in the States' Emergency Motion for

---

[1] Because this motion seeks relief against the Government Defendants only (*see* Dkt. # 29 (First Amended Complaint), at 1), all general references to "Defendants" pertain to the Government Defendants. "Private Defendants" refers to Defense Distributed, the Second Amendment Foundation, and Conn Williamson.

[2] Declaration of Jeffrey Rupert (Rupert Decl), Ex. 1 (White House Press Briefing 8/1/2018) at 14 of 19.

[3] These declarations are included in the Appendix submitted with this motion.

[4] Dkt. # 15-2.

MOTION FOR PRELIMINARY INJUNCTION
2:18-cv-01115-RSL

1

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue. Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

Temporary Restraining Order (Dkt. # 2 at pp. 4–11), and is briefly summarized below.

**A.      AECA and Its Implementing Regulations**

The Arms Export Control Act (the Act or AECA), 22 U.S.C. § 2751 *et seq.*, authorizes the President to control the import and export of "defense articles"—including firearms and related "technical data," 22 C.F.R. §§ 120.10(a), 121.1(I)(a)—by including them on the U.S. Munitions List. The President delegated his export-control authority to the State Department, which promulgated the International Traffic in Arms Regulations (the Regulations or ITAR), administered by the State Department's Directorate of Defense Trade Controls (the Directorate or DDTC). Exec. Order No. 13,637, 78 Fed. Reg. 16,129 (Mar. 8, 2013); 22 C.F.R. §§ 120–30.

The Act provides that the Executive Branch "may not remove any item from the Munitions List" without providing 30 days' notice to the House Committee on Foreign Affairs and the Senate Committee on Foreign Relations. 22 U.S.C. § 2778(f)(1); *see* Dkt. # 16 at 15. Executive Order 13637 establishes the scope of the authority delegated to the State Department, and provides that "changes in designations" (including removal of an item from the Munitions List) "shall have the concurrence of the Secretary of Defense." Exec. Order No. 13637, §1(n).

Where "doubt exists" as to whether a particular article is covered by the Munitions List, the Regulations contain a commodity jurisdiction (CJ) procedure whereby the Directorate will determine whether certain items or data are subject to regulation. 22 C.F.R. § 120.4.

**B.      The Federal Government Begins Regulating Defense Distributed's Conduct in 2013**

In or around early May 2013, Defense Distributed posted on DEFCAD.org certain Computer Aided Design ("CAD") files that could be used to automatically manufacture the "Liberator" pistol and other 3D-printed weapons.[5] The Directorate's enforcement division sent

---

[5] Dkt. # 29, ¶ 39; Dkt. # 29-1, Ex. 4 (Aguirre Decl.), ¶ 35 & n.9.

MOTION FOR PRELIMINARY
INJUNCTION
2:18-cv-01115-RSL

2

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue. Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

a letter advising Defense Distributed that posting the files likely violated the Regulations.[6] Defense Distributed complied by removing the files and submitting CJ determination requests.[7] In the CJ procedure, the Directorate determined that the files for the Liberator and certain other weapons, as well as files which could instruct a 3D printer to produce firearms using the "Ghost Gunner" automated firearms metal milling machine, were subject to the Regulations.[8]

**C.     Defense Distributed Sues the Federal Government in 2015, Losing at Every Stage**

In May 2015, Defense Distributed sued the Government in a Texas federal district court, seeking to enjoin its regulation of the files. In defending against that lawsuit, the Government stated it was "particularly concerned that [the] proposed export of undetectable firearms technology could be used in an assassination, for the manufacture of spare parts by embargoed nations, terrorist groups, or guerilla groups, or to compromise aviation security overseas in a manner specifically directed at U.S. persons."[9]

The district court ruled for the Government, finding that "[f]acilitating global access to firearms undoubtedly increases the possibility of outbreak or escalation of conflict." *Def. Distributed v. U.S. Dep't of State*, 121 F. Supp. 3d 680, 691 (W.D. Tex. 2015) (quotation marks omitted). The Fifth Circuit affirmed the denial of a preliminary injunction, citing both the national security implications of the CAD files and the permanent nature of the internet. *Def. Distributed v. U.S. Dep't of State*, 838 F.3d 451, 460–61 (5th Cir. 2016) (files posted online would remain there "essentially forever," and thus "the national defense and national security interest would be harmed forever"). The Supreme Court denied *certiorari*. 138 S. Ct. 638 (2018).

The Government then moved to dismiss Defense Distributed's complaint on April 6,

---

[6] Dkt. # 29-1, Ex. 5.
[7] Rupert Decl., Ex. 2 (Defense Distributed's Motion for Prelim. Inj.) at 7–8.
[8] Dkt. # 29-1, Ex. 4 (Aguirre Decl.), ¶ 29(b) & Exs. 5, 6.
[9] Rupert Decl., Ex. 3 (Government's Opp. to Motion for Prelim. Inj.) at 10; *see also* Dkt. # 29-1, Ex. 4 (Aguirre Decl.), ¶ 35 (describing national and global security risks associated with disseminating the files online).

MOTION FOR PRELIMINARY
INJUNCTION
2:18-cv-01115-RSL

3

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

2018, arguing that posting the CAD files online "can unquestionably facilitate the creation of defense articles abroad" and that "the Department of State has consistently and reasonably concluded that it is not possible to meaningfully curtail the overseas dissemination of arms if unfettered access to technical data essential to the production of those arms is permitted."[10]

**D.      The State Department Reaches a Covert Settlement with Defense Distributed**

**1.      The settlement is revealed a day after the rulemaking comment period closes**

By April 20, just weeks after the Government moved to dismiss, it had reached a settlement with Defense Distributed.[11] However, the Settlement Agreement was not executed until June 29, and was not made public until July 10.[12] In the Settlement Agreement, the State Department committed to: (a) "draft and . . . fully pursue" a notice of proposed rulemaking (NPRM) and final rule revising Munitions List Category I to exclude the "technical data that is the subject of the Action"[13]; (b) announce a "temporary modification" of Category I to exclude the data; (c) issue a letter to Defense Distributed advising that its files are "approved for public release (i.e., unlimited distribution)" and exempt from the Regulations; and (d) acknowledge and agree that the Temporary Modification "permits any United States person" to "access, discuss, use, reproduce, or otherwise benefit from" the data and that the Letter "permits any such person to access, discuss, use, reproduce or otherwise benefit from" Defense Distributed's files.[14]

**2.      The State Department complies with the Settlement Agreement**

The Government published the promised rulemaking notices on May 24, with comment periods that concluded on July 9—the day before the Settlement Agreement was publicly

---

[10] Rupert Decl., Ex. 4 (Government's Motion to Dismiss) at 7.
[11] Rupert Decl., Ex. 5 (Motion to Stay Proceedings to Complete Settlement).
[12] Dkt. # 29, ¶ 53, Dkt. # 29-1, Ex. 6.
[13] This term includes both Defense Distributed's files and a broad range of "Other Files." *Infra* at 12–13.
[14] Dkt. # 29-1, Ex. 6.

MOTION FOR PRELIMINARY
INJUNCTION
2:18-cv-01115-RSL                    4                    ATTORNEY GENERAL OF WASHINGTON
                                                              800 Fifth Avenue. Suite 2000
                                                                Seattle, WA 98104-3188
                                                                   (206) 464-7744

released.[15] The State Department's proposed rule would remove all non-automatic firearms up to .50 caliber and any related technical data from the Munitions List, and those items would instead be governed by the Commerce Department's Export Administration Regulations (EAR).[16] Unlike the ITAR, the EAR does not apply to any technical data posted on the internet.[17] In other words, if Commerce's proposed rule were to become final, and the Temporary Modification and Letter were not enjoined, Commerce's regulations would prevent it from regulating downloadable gun files once they are posted—even on national security grounds.[18]

On July 27, 2018, as promised, the Directorate published on its website the Temporary Modification, announcing its determination "that it is in the interest of the security and foreign policy of the United States to temporarily modify [Munitions List] Category I to exclude" the technical data referenced in the Settlement Agreement.[19] In a departure from past practice, the Temporary Modification was not published in the Federal Register.[20]

Also on July 27, 2018, as promised, the Directorate sent a letter to Defense Distributed (the Letter) approving its files for "public release (i.e., unlimited distribution)" and stating they were not subject to the Regulations.[21] The same day, the parties stipulated to dismiss the case.[22]

---

[15] *See* 83 Fed. Reg. 24,198 (May 24, 2018).

[16] *See id.*

[17] *See* 15 C.F.R. §§ 734.3(b), 734.7(a) (excluding from EAR jurisdiction "published" information and software, including that made available for "[p]ublic dissemination (i.e., unlimited distribution) in any form . . . including posting on the Internet on sites available to the public . . . .").

[18] As the Commerce Department's rulemaking notice explains, "if a gun manufacturer posts a firearm's operation and maintenance manual on the internet," the "manual would no longer be 'subject to the EAR.'" 83 Fed. Reg. 24,166, 24,167 (May 24, 2018) (citing 15 C.F.R. §§ 734.3(b), 734.7(a)). While proposed rule is not challenged here, it underscores the need for an injunction to prevent irreparable harm.

[19] Dkt. # 29-1, Ex. 7. The U.S. Department of Justice has represented that on July 31, following the issuance of the TRO, the notice of the Temporary Modification was removed from the DDTC's website and the Letter was rescinded as "a nullity during the pendency of the [TRO]." Rupert Decl., Ex. 6.

[20] *See, e.g.*, 2 Fed. Reg. 41,172 (Aug. 30, 2017); 80 Fed. Reg. 78,130 (Dec. 29, 2015); 80 Fed. Reg. 37,974 (Jul. 2, 2015). These are the three most recent temporary modifications of the Munitions List published in the Federal Register. Notably, none of them temporarily *removes* an item from the Munitions List.

[21] Rupert Decl., Ex. 7 (Letter); *see supra* n.19.

[22] Rupert Decl., Ex. 8 (Stipulation of Dismissal with Prejudice).

MOTION FOR PRELIMINARY INJUNCTION
2:18-cv-01115-RSL

5

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue. Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1     **E.**       **The Court Issues a TRO and the President Denounces the Covert Settlement**

2          On July 31, 2018, after becoming aware of the Settlement Agreement, President Trump

3 tweeted that deregulating printable-gun files "doesn't seem to make much sense!"[23] The Court

4 issued the TRO on July 31. Dkt. # 23. At a press briefing the following day, White House

5 Press Secretary Sarah Sanders commented as follows: "The Department of Justice made a deal

6 without the President's approval. On those regards, the President is glad this effort was delayed

7 to give more time to review the issue."[24]

8                           **III.**      **ARGUMENT**

9     **A.**       **Standard for Granting Temporary Relief**

10          The same standard applies to a request for a TRO and a request for a preliminary

11 injunction. The States must establish that "(1) they are likely to succeed on the merits; (2) they

12 are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of the

13 equities tips in their favor; and (4) an injunction is in the public interest." *Short v. Brown*,

14 893 F.3d 671, 675 (9th Cir. 2018). These factors are analyzed on a "sliding scale," *id.*; "the more

15 net harm an injunction can prevent, the weaker the plaintiff's claim on the merits can be while

16 still supporting some preliminary relief." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127,

17 1133 (9th Cir. 2011) (quotation marks and citation omitted). Thus, while the merits of the States'

18 claims are extremely strong, even if they were less clearly meritorious, relief would be warranted

19 because the balance of harms so heavily favors the States. *See Short*, 893 F.3d at 675.

20     **B.**       **The States Have Standing**

21          The Court has already found, for purposes of the TRO, that the States have standing to

22 pursue their claims based on their "clear and reasonable fear that the proliferation of untraceable,

23

---

24              [23] Dkt. # 15-2.
             [24] Rupert Decl., Ex. 1 (White House Press Briefing 8/1/2018) at 14 of 19.

MOTION FOR PRELIMINARY
INJUNCTION
2:18-cv-01115-RSL
       6        ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue. Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1   undetectable weapons will enable convicted felons, domestic abusers, the mentally ill, and others

2   who should not have access to firearms to acquire and use them" as a result of the Government's

3   sudden deregulation of downloadable gun files. Dkt. # 23 at p.6 n.2.

4        "At bottom, 'the gist of the question of standing' is whether" the States "have 'such a

5   personal stake in the outcome of the controversy as to assure that concrete adverseness which

6   sharpens the presentation of issues upon which the court so largely depends for illumination.'"

7   *Massachusetts v. EPA*, 549 U.S. 497, 517 (2007) (quoting *Baker v. Carr*, 369 U.S. 186, 204

8   (1962)); *see also Washington v. Trump*, 847 F.3d 1151, 1158–59 (9th Cir. 2017). States are

9   "entitled to special solicitude in [the] standing analysis." *Massachusetts*, 549 U.S. at 520.

10       **1.    The States have Article III standing**

11       This Court is familiar with the injury-in-fact, traceability, and redressability requirements

12  of Article III standing. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). In an APA case

13  such as this, these requirements are relaxed: a litigant vested with a procedural right "has

14  standing if there is some possibility that the requested relief will prompt the injury-causing party

15  to reconsider the decision that allegedly harmed the litigant." *Massachusetts*, 549 U.S. at 518;

16  *see also Texas v. United States*, 787 F.3d 733, 748, 751–52 (5th Cir. 2015). A state has standing

17  "if it possesses a sovereign, quasi-sovereign, or a proprietary interest" in the litigation. *Dep't of

18  Fair Emp't & Hous. v. Lucent Techs.*, 642 F.3d 728, 753 n.5 (9th Cir. 2011)

19  (citing *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez* (*Snapp*), 458 U.S. 592, 600–02

20  (1982)). Here, the States satisfy standing on all three grounds.

21       Fundamentally, the Government's actions harm the States' bedrock sovereign interests.

22  "Two sovereign interests are easily identified: . . . the power to create and enforce a legal code"

23  and "the maintenance and recognition of borders." *Snapp*, 458 U.S. at 601. The police power is

24  likewise "an exercise of the sovereign right of the government to protect the general welfare of

MOTION FOR PRELIMINARY
INJUNCTION
2:18-cv-01115-RSL

7

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue. Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

the people." *East N.Y. Sav. Bank v. Hahn*, 326 U.S. 230, 232 (1945) (quotation marks, citation, alteration omitted).[25] By authorizing the unrestricted spread on the internet of downloadable guns, so that any State resident or visitor could manufacture and possess weapons without the States' knowledge or detection, the Government undercuts the States' abilities to enforce their statutory codes.[26] The Government's deregulation violates the States' border integrity by impeding their ability to prevent weapons from entering through airports.[27] It violates the States' police power by seriously impeding their ability to protect their residents from injury and death.[28]

The deregulation also harms the States' proprietary interests.[29] They make state, county, and municipal jails and prisons more dangerous for guards and inmates.[30] "The existence of 3-D printed plastic firearms, weapons that are undetectable using metal detectors, would fundamentally undermine [States'] ability to maintain safe and secure correctional facilities."[31] The jobs of state, county, and municipal detectives, protective service agents, and other law enforcement personnel would become more dangerous and more difficult.[32]

The deregulation harms the States' quasi-sovereign interests, too.[33] The Government's

---

[25] *See also California ex rel. Becerra v. Sessions*, 284 F. Supp. 3d 1015, 1029 (N.D. Cal. 2018) (finding state injury-in-fact based on invasion of State's "broad police powers").

[26] *See* Dkt. # 29, ¶¶ 68–217; Coyne Decl., ¶¶ 4–8; Rupert Decl. Ex., 20 (Lanier Decl.), ¶¶ 17–30; Graham Decl., ¶¶ 20, 26–37; Camper Decl., ¶¶ 3–6, 9; Herzog Decl., ¶ 7; McCord Decl., ¶¶ 39–40; Dkt. # 29-1, Ex. 2 (Johanknecht Decl.), ¶ 9; Dkt. # 29-1, Ex. 3 (Best Decl.), ¶ 8; Graham Decl., ¶ 36–37.

[27] *See* Coyne Decl., ¶ 4; Rupert Decl. Ex., 20 (Lanier Decl.), ¶¶ 29–30; McCord Decl., ¶¶ 7–20.

[28] Herzog Decl., ¶¶ 3–8; Kyes Decl., ¶¶ 7–20; Rupert Decl. Ex., 20 (Lanier Decl.), ¶¶ 17–28; Graham Decl., ¶¶ 25–28, 33, 38; Camper Decl., ¶¶ 3, 7; Coyne Decl., ¶¶ 4, 8; Hosko Decl., ¶¶ 12–16; McCord Decl., ¶¶ 17–18, 21, 34-38; Bisbee Decl., ¶¶ 16-17.

[29] "As a proprietor, [a state] is likely to have the same interests as other similarly situated proprietors . . ., [a]nd like other such proprietors it may at times need to pursue those interests in court." *Snapp*, 458 U.S. at 601–02; *see also Washington*, 847 F.3d at 1161; *Texas*, 787 F.3d at 748.

[30] Herzog Decl., ¶¶ 4–8.

[31] *Id.*, ¶ 7.

[32] Herzog Decl., ¶ 8; Coyne Decl., ¶ 6; Rupert Decl. Ex., 20 (Lanier Decl.), ¶¶ 15–16, 26–28; Camper Decl., ¶¶ 8–9, 12.

[33] "[A] state has a quasi-sovereign interest in the health and well-being—both physical and economic—of its residents in general." *Snapp*, 458 U.S. at 607. A federal action that "impos[es] substantial pressure on [states] to change their laws" harms "the states' 'quasi-sovereign interests." *Texas v. United States*, 809 F.3d 134, 153 (5th Cir. 2015). *See also Nebraska v. Wyoming*, 515 U.S. 1, 20 (1995) (affirming that states have standing to vindicate "quasi-sovereign" interests); *Snapp*, 458 U.S. at 602–07 (states have a quasi-sovereign interest in

---

MOTION FOR PRELIMINARY
INJUNCTION
2:18-cv-01115-RSL

8

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue. Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1    actions threaten the safety and physical well-being of the States' residents by making dangerous

2    weapons far more accessible within the States' borders,[34] including in places such as schools

3    where children increasingly have access to 3D printers.[35] Indeed, plastic weapons pose

4    heightened dangers to children.[36]

5    ## 2.    The States have prudential standing

6    A plaintiff suing under the APA also must show that "the interest[s] sought to be

7    protected . . . [are] arguably within the zone of interests to be protected or regulated by the

8    statute . . . in question." *Ass'n of Data Processing Serv. Orgs. v. Camp*, 397 U.S. 150, 153 (1970)

9    (citing 5 U.S.C. § 702). This test is "not meant to be especially demanding" and requires no

10   showing of "congressional purpose to benefit" the plaintiff. *Clarke v. Sec. Indus. Ass'n*, 479 U.S.

11   388, 399–400 & n.16 (1987). Agency action is "presumptively reviewable" and "the benefit of

12   any doubt goes to the plaintiff." *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v.*

13   *Patchak*, 567 U.S. 209, 225 (2012). The States would fail the test only if their "interests are so

14   marginally related to or inconsistent with the purposes implicit in the statute that it cannot

15   reasonably be assumed that Congress intended to permit the suit." *Id.*; *see Graham v. FEMA*,

16   149 F.3d 997, 1004 (9th Cir. 1998).

17   The States easily meet the zone of interests test. AECA is intended to protect *domestic*

18   security by restricting the flow of military information abroad. 22 U.S.C. § 2778(a)(1);

19   *United States v. Posey*, 864 F.2d 1487, 1495 (9th Cir. 1989). Here, the States have well-grounded

20

21   preventing                                  a                                  nuisance);
     *Missouri v. Illinois*, 180 U.S. 208, 241 (1901) ("it must surely be conceded that, if the health and comfort of the

22   inhabitants of a State are threatened, the State is a proper party to represent and defend them"); *Am. Rivers v. FERC*,
     201 F.3d 1186, 1205 (9th Cir. 1999) (affirming that state entities have *parens patriae* standing to sue federal
     entities).

23   [34] *See supra* nn.26–28, 30–32.
     [35] *See* Patel Decl., ¶ 5; Scott Decl., ¶¶ 48; Rivara Decl., ¶¶ 5-8; Racine Decl., ¶¶ 3–6.
     [36] Rivara Decl., ¶¶ 5-8; Wintemute Decl., ¶¶ 12-13, 16; Hemenway Decl., ¶¶ 9-24.

24

concerns that foreign terrorists will enter their borders with undetectable guns, and their residents will face street crime perpetrated with untraceable smuggled guns.[37] Such threats to domestic security—to the safety of the States' own employees and residents—are caused by the Government's sudden decision to deregulate the posting of 3D-printed gun files on the internet. As the Government itself argued as recently as April 2018, "the Internet has no dividing lines"; once the files are released, they are available globally.[38] The States' interests fall squarely within the domestic security concerns that Congress passed AECA to address.

## C.      The States are Likely to Prevail on the Merits

The States are likely to succeed on the merits of their claims. As the Court observed, "[t]here is no indication that the federal government followed the prescribed procedures" to remove the CAD files at issue from the Munitions List. Dkt. # 23 at p.6. As discussed below, the evidence affirmatively shows that the State Department failed to follow the rules.

### 1.      The State Department's actions are judicially reviewable under the APA

A person who suffers a legal wrong or is adversely affected or aggrieved by final agency action is entitled to judicial review. 5 U.S.C. §§ 702, 704. A reviewing court shall "hold unlawful and set aside" agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"; "in excess of statutory jurisdiction, authority, or limitations"; or "without observance of procedure required by law". *Id*. § 706(2). There is no dispute that the State Department's enactment of the Temporary Modification and issuance of the Letter are final agency actions for purposes of APA review, and are judicially reviewable.[39]

### 2.      The State Department's actions are in excess of its statutory jurisdiction, not in accordance with law, and in violation of required procedures

---

[37] McCord Decl., ¶¶ 8–10, 14–20, 34–40; Kyes Decl., ¶ 17; Lanier Decl., ¶¶ 29-30; Bisbee Decl., ¶ 17.
[38] Rupert Decl., Ex. 4 (Government's Motion to Dismiss) at 8, 18.
[39] *Compare* Dkt. # 2 at pp. 13, 15 *with* Dkt. # 16 (no dispute that the actions at issue are final); *compare* Dkt. # 2 at pp. 14–15 *with* Dkt. # 16 (no dispute that the actions at issue are judicially reviewable).

MOTION FOR PRELIMINARY
INJUNCTION
2:18-cv-01115-RSL

10

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue. Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1      The State Department exceeded its delegated authority in at least five distinct ways.

2      (i) *Failure to provide 30 days' notice to Congress.* The State Department violated the

3   Act's prohibition on "remov[ing] any item from the Munitions List" without giving 30 days'

4   notice to the appropriate Congressional foreign relations committees. 22 U.S.C. § 2778(f). The

5   Department flat-out failed to provide the required notice, instead enacting the Temporary

6   Modification and Letter covertly pursuant to the Settlement Agreement.

7      The 30-day notice provision is a crucial procedural requirement.[40] According to

8   U.S. Senator Bob Menendez and U.S. Representative Eliot Engel, when the House and Senate

9   foreign relations committees receive a Munitions List removal notice—a relatively rare

10  occurrence—committee members and their staff actively participate in reviewing and assessing

11  the proposed removal.[41] In fact, the common practice in the past has been for the State

12  Department to give significantly *more* than 30 days' notice, and to work intensively with

13  Congress in an active back-and-forth process, discussing the proposed removal with staff and

14  detailing the reasons the removal will not endanger national security or U.S. interests.[42] Congress

15  does not simply rubber-stamp removals from the Munitions List.[43] Thus, when members of

16  Congress learned of the covert Settlement Agreement in this case, they did not take it lightly.[44]

17

18      [40] Congress enacted subsection (f) in 1981 to further its "particularly rigorous oversight of the Munitions List[.]" *United States v. Zheng*, 590 F. Supp. 274, 278–79 (D.N.J. 1984), *vacated on other grounds*, 768 F.2d 518 (3d Cir. 1985); *see also* Rupert Decl., Ex. 9 (Sen. Menendez letter 8/8/2018). In fact, Congress amended subsection

19  (f) in 2002 to strengthen the notice requirements in response to perceived attempts to evade its oversight. *See* H.R. REP. NO. 107-57, at 86–87 (2001).
      [41] Engel Decl., ¶¶ 9–11; Rupert Decl., Ex. 9 (Sen. Menendez letter 8/8/2018).

20      [42] Engel Decl., ¶ 11.
      [43] *Id.*, ¶ 12.

21      [44] Representative Engel and Senator Menendez, the Ranking Members of the House and Senate foreign relations committees entitled to 30 days' notice, each wrote to Secretary Pompeo expressing profound concern and

22  disapproval of the removal of downloadable guns from the Munitions List and pointing out the violation of the statutory notice provision. *Id.* ¶ 7 & Ex. 1; Rupert Decl., Ex. 9 (Sen. Menendez letter 8/8/2018); *Id.*, Ex. 10 (Sen. Menendez letter 7/25/2018). Separately, nine Senators wrote to Secretary Pompeo "with great alarm" urging the

23  State Department not to permit the files' dissemination and asking pointed questions about State's "reasoning behind the decision to settle this litigation in the manner it did." *Id.*, Ex. 11 (Senators' letter 7/26/2018). House Committee Chairman Ed Royce weighed in as well, urging the President to re-regulate 3D-printed guns and decrying the change

24  to "export restrictions that have long been in place." *Id.*, Ex. 12 (Rep. Royce letter 7/31/2018).

1    The Government agrees (as it must) that Congress must receive 30 days' notice before

2    any "item" can be removed from the Munitions List, but in its response to the States' motion for

3    a TRO, it quibbled about what an "item" is—despite offering no support for its interpretation of

4    the term. According to the Government, "item" means one of the Munitions List's broader

5    "categories or subcategories," whereas the term does not encompass "specific articles" such as

6    Defense Distributed's files. Dkt. # 16 at p.15. The Government's own authority refutes its theory

7    that an "item" is a "category"; both cases on which it relies *distinguish* "specific controlled

8    items" from the Munitions List's broader "categories." *Def. Distributed*, 121 F. Supp. 3d 680 at

9    687 (the Munitions List is "a series of categories describing the ***kinds of items***" regulated)

10   (emphasis added); *United States v. Zhen Zhou Wu*, 711 F.3d 1, 12 (1st Cir. 2013) (same).[45] The

11   Government's theory is further undermined by the CJ regulation providing for determinations as

12   to individual articles, which reiterates the Act's requirement that the Directorate "must provide

13   notice to Congress at least 30 days before any item is removed from the U.S. Munitions List."

14   22 C.F.R. § 120.4(a). Even the Government itself has previously referred to Defense

15   Distributed's files as "items."[46]

16   The Government's argument also ignores the breadth of the files that it removed from

17   the Munitions List. The Temporary Modification removed all "technical data that is the subject

18   of the Action"—a phrase defined by reference to Defense Distributed's Texas complaint[47] to

19   include both Defense Distributed's files *and* "Other Files," i.e., "similar 3D printing files related

20

21   ───────────────

22       [45] *See also United States v. Pulungan*, 569 F.3d 326, 328 (7th Cir. 2009) (Easterbrook, J.) ("[A]n effort to
     enumerate each ***item*** [on the Munitions List] would be futile . . .") (emphasis added).
         [46] *See, e.g.*, Dkt. # 29-1, Ex. 4 (Aguirre Decl.), ¶¶ 28, 29(a).
23       [47] The Temporary Modification provides that it applies to the "technical data identified in the Settlement
     Agreement for the matter of *Defense Distributed, et al., v. U.S. Department of State, et al.*, Case No. 15-cv-372-RP
     (W.D. Tex.)" (the Action). Dkt. # 29-1, Ex. 7. The Settlement Agreement defines the files at issue by reference to
24   specific paragraphs of Defense Distributed's Second Amended Complaint in that case. Dkt. # 29-1, Ex. 6.

MOTION FOR PRELIMINARY
INJUNCTION
2:18-cv-01115-RSL                                12          ATTORNEY GENERAL OF WASHINGTON
                                                              800 Fifth Avenue. Suite 2000
                                                               Seattle, WA 98104-3188
                                                                  (206) 464-7744

1  to firearms that they or others have created."[48] "Other Files" also includes inchoate technical

2  information that Defense Distributed "will continue to create and possess" in the future. *Id.*, ¶ 45.

3  In short, the Temporary Modification applies broadly to all "3D printing files related to

4  firearms." Moreover, if only a few "specific articles" were at issue, it would be overkill for the

5  Government to agree to "draft and fully pursue" a formal APA rulemaking in order to settle with

6  Defense Distributed—but it did.[49] In fact, the proposed rule would amend the Regulations to

7  "revise" entire Munitions List *categories*. Dkt. # 16 at p.6 n.6; *supra* at 5.

8       For all the above reasons, the Government cannot escape the 30-day notice requirement,

9  which it concededly did not follow. This alone is fatal.

10      (ii) *Failure to obtain the Secretary of Defense's concurrence*. As noted above, the

11 President delegated his export-control authority to the State Department subject to the limitation

12 that "changes in designations" (including removing items from the Munitions List) "shall have

13 the concurrence of the Secretary of Defense." Executive Order 13637, §1(n). Evidently, there

14 was no such concurrence here,[50] as the States pointed out and as the Government did not dispute.

15 *See* Dkt. # 2 at pp. 5, 14, 15–16; Dkt. # 16. In acting without the required concurrence, the

16 Directorate exceeded its delegated authority. "Agency actions beyond delegated authority are

17 'ultra vires,' and courts must invalidate them." *Transohio Sav. Bank v. Dir., Office of Thrift*

18 *Supervision*, 967 F.2d 598, 621 (D.C. Cir. 1992).[51]

19      (iii) *Misuse of the regulation allowing for "temporary modification" of ITAR*. In an

20

21

[48] Rupert Decl., Ex. 13 (Defense Distributed's Second Amended Complaint), ¶ 44.
[49] Dkt. # 29-1, Ex. 6, ¶ 1(a).
[50] *See* Rupert Decl., Ex. 9 (Sen. Menendez letter 8/8/2018) (in a departure from typical practice, the Senate Committee on Foreign Relations was not informed as to whether the Department of Defense concurred with the removal in this case).
[51] Courts should invalidate *ultra vires* agency action whether the delegation of authority is made by statute or by executive order. *See City of Carmel-By-The-Sea v. U.S. Dep't of Transp.*, 123 F.3d 1142, 1166 (9th Cir. 1997).

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue. Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

attempt to end-run around the procedural requirements discussed above, the Directorate enacted a "Temporary Modification" of the Munitions List pursuant to 22 C.F.R. § 126.2.[52] But it had no authority to do so, as this regulation does not—and could not—permit the Directorate to bypass the Act's procedural requirements, whether for "security" or any other reason. "It is beyond dispute that a federal regulation cannot empower the Government to do what a federal statute prohibits it from doing." *Tuan Thai v. Ashcroft*, 366 F.3d 790, 798 (9th Cir. 2004).

Furthermore, the Directorate's purported determination that removing the files from the Munitions List is "consistent with" national security (Dkt. # 16, p.16) is not the sort of emergency stopgap measure contemplated by 22 C.F.R. § 126.2. And as discussed below, such a determination would be arbitrary and capricious in any event. *Infra* at 15–17.

(iv) <u>*Unlawful attempt to abrogate state and federal law*</u>. The Directorate lacks statutory authority to permit "any United States person" to "access, discuss, use, reproduce, or otherwise benefit" from downloadable-gun files, as this would allow "any United States person" to manufacture, possess, and sell firearms made from the files. As such, this provision conflicts with many of the States' respective laws regulating firearms,[53] and is also inconsistent with numerous provisions of the federal Gun Control Act, including 18 U.S.C. § 922(x)(2) (possession by minors) and § 922(g) (possession by felons and domestic abusers).

The Government seeks to disclaim any preemptive effect or statutory conflict. Dkt. # 16 at p.16. Even assuming the Government is correct that the Temporary Modification and Letter cannot overturn state or federal statutes, their facial contradiction of state and federal law is all the more reason to invalidate them as *ultra vires*. Moreover, the absence of preemptive effect

---

[52] 22 C.F.R. § 126.2 provides that the Directorate "may order the temporary suspension or modification of any or all of the regulations of this subchapter in the interest of the security and foreign policy of the United States."
[53] Dkt. # 29, ¶¶ 67–217; Dkt. # 29-1, Ex. 2 (Johanknecht Decl.), ¶ 9; Dkt. # 29-1, Ex. 3 (Best Decl.), ¶ 8; Coyne Decl., ¶¶ 5–9; Camper Decl., ¶¶ 3–6; Kyes Decl., ¶ 20.

14

1  appears to be up for debate; the Private Defendants, at least, have adamantly asserted that the

2  Temporary Modification and Letter are as broad as they appear, permitting "*any* United States

3  person" to use the technical data. "*Any* means *all*," they say. Dkt. # 8 at p.1 (emphasis in original).

4       (v) *The President disagrees with the State Department's actions*. The Act endows the

5  *President* with authority to control imports and exports of defense articles. 22 U.S.C. § 2778(a).

6  Thus, the State Department cannot lawfully exercise such control against the President's

7  wishes—and the President has made his disagreement clear. [54]

8       **3.       The State Department's actions were arbitrary and capricious**

9       Courts must set aside agency action that is "arbitrary, capricious, an abuse of discretion,

10  or otherwise not in accordance with the law," 5 U.S.C. § 706(2)(A). Agency action is arbitrary

11  and capricious "if the agency has relied on factors which Congress has not intended it to consider,

12  entirely failed to consider an important aspect of the problem, . . . or is so implausible that it

13  could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle*

14  *Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). An agency

15  cannot simply ignore its previous determinations—especially if the agency offers no "reasoned

16  explanation" for ignoring or countermanding its earlier factual findings. *FCC v. Fox Television*

17  *Stations, Inc.*, 556 U.S. 502, 516 (2009).

18       In 2015, the Directorate determined via a CJ process that the files at issue were subject

19  to export regulation because they are "technical data" whose "central function" is to "enable the

20  manufacture" of ITAR-controlled items, including to "automatically find, align, and mill"

21  firearms.[55] As of April 2018, the Government's position was that it had a "very strong public

22  interest" in preventing the dissemination of such data for reasons of "national defense and

23

24       [54] Dkt. # 15-2; Rupert Decl., Ex. 1 (White House Press Briefing 8/1/2018).
         [55] Dkt. # 29-1, Ex. 4 (Aguirre Decl.), ¶¶ 29, 30.

MOTION FOR PRELIMINARY          15

national security," and that "it is not possible to meaningfully curtail the overseas dissemination of arms if unfettered access to technical data essential to the production of those arms is permitted."[56] The Government then abruptly reversed its position. It now claims to have made a "determination" that "the temporary modification is consistent with the United States' national security and foreign policy" and that "ITAR control of [the downloadable-gun files] is not warranted"—offering no reason for the about-face. Dkt. # 16 at pp. 16, 17.

In fact, the State Department apparently *still* believes that permitting downloadable guns to be posted online threatens the national security.[57] On July 31, 2018, spokesperson Heather Nauert stated at a press briefing addressing this case that the State Department still "wants to prevent the wrong people from acquiring weapons overseas. That is the State Department's equity in this."[58] This is consistent with the State Department's position on 3D-printed gun files since 2013. Nevertheless, Ms. Nauert stated, the State Department settled the case and enacted the Temporary Modification solely because the Department of Justice advised it to do so, "and so that is what was done. . . . We took the advice of the Department of Justice, and here we are right now."[59] In light of these revelations, which undermine any notion that the Temporary Modification and Letter somehow further the national security, it is unsurprising that the Government released no reports, studies, or analyses to explain the supposed reversal of its position, and has failed to comply with the States' repeated requests that it produce the administrative record related to this matter.[60] All signs point to the conclusion that no such record exists—or that it is extremely limited.[61]

---

[56] Rupert Decl., Ex. 4 (Government's Motion to Dismiss) at 6, 7.
[57] Dkt. # 35-1, Ex. A at 4 of 19; Rep. Engel Decl. ¶ 6.
[58] Dkt. # 35-1, Ex. A at p. 4 of 19.
[59] *Id.*
[60] *See* Dkt. # 35, ¶¶ 4–10; Dkt. # 35-1, Exs. B–H.
[61] *See* Dkt. # 35-1, Ex. A at 4 of 19; Engel Decl. ¶ 6. The dubious merits of that advice, which appears to have been based on Defense Distributed's First Amendment claim, is discussed below.

16

1    Under these circumstances, the Government's 180-degree reversal is the epitome of

2    arbitrary and capricious agency action. Not only did the Government "ignore" the dire national-

3    security threats that "underlay . . . the prior policy," *Fox*, 556 U.S. at 516—it completely reversed

4    its position despite *continued* awareness and acknowledgement that the national-security threat

5    posed by downloadable guns has not changed. And it did so without "articulat[ing]" *any*

6    explanation for doing so. *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43.

### 4.    A preliminary injunction would not offend the First Amendment

8    The Private Defendants' First Amendment arguments, which were rejected by both the

9    Texas district court and the Fifth Circuit, have no bearing on the States' APA challenge, which

10   is focused on the Government's failure to follow mandatory procedures. The Private Defendants

11   acknowledge that the files at issue are "technical data" for purposes of inclusion on the Munitions

12   List. The removal of such items from the Munitions List requires 30 days' notice to Congress

13   and the concurrence of the Secretary of Defense—procedures designed to ensure that the

14   removal will not imperil the national security. *Supra* at 11. Those procedures were not followed,

15   and the States stand to suffer grievous harm as a result. That is the end of the inquiry.

16   Even if the Private Defendants' First Amendment claim were directly implicated here

17   (which it is not), that claim has been rejected at every level. *Def. Distributed*, 121 F. Supp. 3d at

18   691–96 (finding Defense Distributed unlikely to succeed on the merits of its First Amendment

19   claim); *Def. Distributed*, 838 F.3d 451 (5th Cir. 2016), *cert. denied*, 138 S. Ct. 638 (2018)

20   (affirming denial of preliminary injunction). Moreover, the Federal Government has never

21   reversed its position that inclusion of 3D-printed gun files on the Munitions List is consistent

22   with the First Amendment. *See* Dkt. # 29-1, Ex. 6, ¶ 4 ("[Government] Defendants deny . . . that

23   they violated the First Amendment").

24   It is highly questionable whether files that instruct a 3D printer to produce a gun at the

MOTION FOR PRELIMINARY
INJUNCTION
2:18-cv-01115-RSL                              17                  ATTORNEY GENERAL OF WASHINGTON
                                                                          800 Fifth Avenue. Suite 2000
                                                                          Seattle, WA 98104-3188
                                                                              (206) 464-7744

1   push of a button are protected "speech" at all. As the Fifth Circuit observed, this is a "novel"

2   question best resolved at the merits stage on a full factual record. *Def. Distributed*, 838 F.3d at

3   461. Even at this preliminary stage, it is clear that the files at issue "induce action without the

4   intercession of the mind or the will" of any human participant. *CFTC v. Vartuli*, 228 F.3d 94,

5   111 (2d Cir. 2000). All one has to do is "open the file and click 'Print'" and the file

6   "communicate[s] directly" with the 3D printer to produce a weapon.[62] Furthermore, Defense

7   Distributed's intent in disseminating the files is *not* to communicate an idea or message, but

8   specifically to evade lawful gun-safety regulation.[63]

9          Even assuming that the printable files are protectable "speech," the Ninth Circuit has

10  "repeatedly rejected First Amendment challenges to the AECA, its implementing regulations,

11  and its predecessor, the MSA[.]" *United States v. Chi Mak*, 683 F.3d 1126, 1136 (9th Cir. 2012).

12  The inclusion of the files at issue on the Munitions List is a content-neutral regulation that "will

13  be sustained under the First Amendment if it advances important governmental interests

14  unrelated to the suppression of free speech and does not burden substantially more speech than

15  necessary to further those interests." *Id.* at 1134. Here, the files' inclusion on the Munitions List

16  furthers the national security,[64] which easily qualifies as a compelling government interest even

17  under strict scrutiny. *In re Nat'l Sec. Letter*, 863 F.3d 1110, 1123 (9th Cir. 2017);

18  *see Def. Distributed*, 121 F. Supp. 3d at 694 (inclusion of the files on the Munitions List is not

19  based on Defense Distributed's message, but "is intended to satisfy a number of foreign policy

20  and national defense goals"). And the CJ procedure determined that only those files whose

21

22          [62] Patel Decl., ¶¶ 11, 13; *see also* Kyes Decl., ¶ 7.
            [63] *See* Dkt. # 29, ¶¶ 6, 38, 59, 70, 98; Rupert Decl., Ex. 14; *id.*, Ex. 15; *id.*, Ex. 16 (Wilson: "The message

23  is in what we're doing—the message is: download this gun.").
            [64] The State Department admittedly still "wants to prevent the wrong people from acquiring weapons

24  overseas." Dkt. # 35-1, Ex. A at 4 of 19; *supra* at 16.

MOTION FOR PRELIMINARY
INJUNCTION
2:18-cv-01115-RSL                                           18                     ATTORNEY GENERAL OF WASHINGTON
                                                                                        800 Fifth Avenue. Suite 2000
                                                                                          Seattle, WA 98104-3188
                                                                                              (206) 464-7744

"central function" was to "automatically find, align, and mill" defense articles were subject to ITAR; Defense Distributed was not restricted from "discussing information and ideas about 3D printing . . . as long as such discussions do not include the export of technical data."[65]

If the First Amendment is implicated at all, it does not tip the scales against a preliminary injunction, particularly in light of the grave threat of irreparable harm discussed below.

**D.      The States Will Suffer Irreparable Harm in the Absence of Preliminary Relief**

A threat to public safety undoubtedly establishes irreparable harm. *See, e.g.*, *Maryland v. King*, 567 U.S. 1301 (2012) (Roberts, C.J., as Circuit Justice) ("ongoing and concrete harm to [state]'s law enforcement and public safety interests . . . constitutes irreparable harm"). Here, the evidence shows that removing 3D-printed gun files from the Munitions List will make it significantly easier to produce undetectable, untraceable weapons, posing unique threats to the health and safety of the States' residents and employees, and compromising the States' ability to enforce their laws and keep their residents and visitors safe.

**1.      3D-printed guns are real, dangerous weapons that would be widely accessible if the files were removed from the Munitions List**

If the files are removed from the Munitions List, anyone with access to a commercially available 3D printer—regardless of their age, mental health status, or criminal history—will be able to download and instantly use them to make functional weapons at home or anywhere a 3D printer can be accessed. Indeed, the proliferation of downloadable guns outside the strictures of state and federal law—a "Cambrian explosion" of unregulated weapons—is precisely Defense Distributed's goal.[66] The company's "Liberator" pistol can be printed using a commonly available, low-end 3D printer that can be purchased for as little as $300, using materials that cost

---

[65] Dkt. # 29-1, Ex. 4 (Aguirre Decl.), ¶¶ 29, 30.
[66] *See* Dkt. # 29, ¶¶ 6, 38, 59, 70, 98; Rupert Decl., Ex. 14; *id.*, Ex. 15; *id.*, Ex. 16.

MOTION FOR PRELIMINARY INJUNCTION
2:18-cv-01115-RSL

19

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue. Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

around $20.[67] A functional Liberator can be made almost entirely of plastic; though its design

calls for the addition of a non-functional metal insert, the gun can fire deadly bullets without it.[68]

Videos of successful firings of 3D-printed Liberator guns are available online, including one

posted by Cody Wilson in 2013,[69] and working 3D-printed weapons have been seized by

authorities across the globe.[70] 3D-printed weapons will only become deadlier as the technology

continues to evolve.[71]

## 2.    3D-printed guns pose numerous unique threats of irreparable harm

The testimony of numerous distinguished former government officials and other

experts—among them former Acting Assistant Attorney General for National Security at the

Department of Justice Mary B. McCord and former Assistant Director of the FBI's Criminal

Investigative Division Ron Hosko—establishes the unique threats of irreparable harm to the

States posed by permitting 3D-printed weapons files to be posted on the internet.

(i) <u>Threats to public safety</u>. Metal detectors are one of the most significant forms of

protection for public facilities operated by the States and local governments such as airports,

stadiums, courthouses and other government buildings, and—increasingly—schools.[72] Firearms

made almost entirely of plastic would not be detected by this equipment,[73] thus seriously

undermining its utility;[74] even a metal bullet might be undetectable depending on the sensitivity

---

[67] Patel Decl., ¶¶ 9, 17–18, 26. These printers are also available at the University of Washington in Seattle, where they can be accessed and used by any UW student. *Id.* ¶ 17. 3D printers are also widely available and readily accessible to students in public schools across Massachusetts. Scott Decl., ¶¶ 4–5; Racine Decl., ¶¶ 3–6.

[68] *Id.* ¶¶ 15–16; McCord Decl., ¶ 10; Graham Decl., ¶ 34.

[69] Rupert Decl., ¶ 17.

[70] Rupert Decl., Ex. 17; *id.*, Ex. 18; *id.*, Ex. 19.

[71] *See* Patel Decl., ¶¶ 21–26 (discussing emerging materials and technology that could be used to make deadlier weapons).

[72] McCord Decl., ¶¶ 7–8, 13, 18–21; Camper Decl., ¶ 7; Rivara Decl., ¶ 7; Hemenway Decl., ¶ 21; Wintemute Decl., ¶ 14.

[73] McCord Decl., ¶ 11; Bisbee Decl., ¶ 18; Dkt. # 29-1, Ex. 2 (Johanknecht Decl.), ¶ 7; Dkt. # 29-1, Ex. 3 (Best Decl.), ¶ 7.

[74] McCord Decl., ¶ 13; Hosko Decl., ¶ 14; Coyne Decl., ¶ 4; Camper Decl., ¶ 7; Kyes Decl., ¶ 17.

MOTION FOR PRELIMINARY
INJUNCTION
2:18-cv-01115-RSL

20

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue. Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1   and calibration of the equipment.[75] Because of the potential for catastrophic harm posed by

2   undetectable weapons, and our country's heavy reliance on metal detectors to prevent such harm,

3   the prospect of non-metal weapons becoming available has long caused concern at the highest

4   levels of the U.S. law enforcement and national security community.[76]

5       Prisons also rely heavily on metal detectors and x-ray scanners for security.[77] The

6   availability of undetectable weapons would "fundamentally undermine" the Washington

7   Department of Corrections' efforts to prevent serious contraband from being introduced into

8   prison facilities—nonmetal weapons and disassembled 3D-printed weapons could evade both

9   metal detectors and x-ray machines.[78] Successfully smuggled weapons could be used to harm or

10  kill staff, visitors, and incarcerated individuals, and aid in the escape of incarcerated persons.[79]

11  It is also "difficult to overstate the danger" posed by violent felons ineligible to possess a firearm

12  being able to easily download one from the internet, which would jeopardize the safety of parole

13  officers and undermine their supervisory and enforcement work.[80]

14      (ii) <u>Compromising law enforcement efforts</u>. Undetectable 3D-printed weapons present

15  unique challenges to law enforcement, disrupting their ability to investigate, solve, and prevent

16  violent crimes.[81] Serial numbers imprinted on weapons play an essential role in helping law

17  enforcement officials "trace" a gun to its original seller, and then to subsequent purchasers,

18  which can be used to solve crimes and combat gun trafficking.[82] But 3D-printed weapons could

19

20

---

21  [75] McCord Decl., ¶ 13. The Liberator's design file also calls for an ordinary metal nail, which may likewise
    be undetectable. *See* 18 U.S.C. § 922(p) (requiring firearms to include 3.7 ounces of steel to ensure detection).

    [76] *See* McCord Decl., ¶¶ 12–13.

22  [77] *See* Herzog Decl., ¶¶ 4, 7.

    [78] Herzog Decl., ¶ 7.

23  [79] Herzog Decl., ¶ 9.

    [80] Herzog Decl., ¶ 8.

    [81] Dkt. # 29-1, Ex. 2 (Johanknecht Decl.), ¶ 8.

24  [82] Hosko Decl., ¶ 11; McCord Decl., ¶¶ 30–32; Camper Decl., ¶ 8; Kyes Decl., ¶¶ 8, 13.

MOTION FOR PRELIMINARY
INJUNCTION
2:18-cv-01115-RSL

21

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

be privately manufactured with no serial numbers, in contravention of federal law.[83] Such untraceable "ghost guns" would make tracking ownership and possession far more difficult, reducing state law enforcement agencies' ability to solve crimes in their jurisdictions.[84] Further, because 3D-printed weapons never enter the stream of commerce through a Federal Firearms Licensee, no background check is ever performed, making it impossible for States with background-check laws to verify whether an individual is entitled to possess the firearm.[85] Ghost guns of the non-3D-printed variety are already increasingly popular[86]—and increasingly being used to commit horrific crimes, including multiple mass shootings in California.[87]

3D-printed weapons would also undermine law enforcement efforts to forensically match bullets used to commit crimes with the gun from which they are shot. For instance, plastic weapons do not have "rifled" barrels, meaning that they do not leave "ballistic fingerprints" on a bullet or casing that can be linked to the gun.[88] Even if a plastic gun did leave unique markings, the firing conditions cannot be reliably replicated—and even attempting to do so is dangerous, because the gun is unstable and dangerous even to the shooter.[89]

For many of the reasons above, 3D-printed weapons may be particularly attractive to criminal enterprises, which would likely embrace the technology for use in engaging in the violence, proceeds-collection, and retaliation that commonly attends the work of those organizations.[90] The vast majority of U.S. homicides involve illegally possessed and used

---

[83] McCord Decl., ¶¶ 29–30, 33; Kyes Decl., ¶ 8; Graham Decl., ¶ 35.
[84] McCord Decl., ¶ 34; Hosko Decl., ¶ 13; Bisbee Decl., ¶¶ 17–18; Kyes Decl., ¶¶ 11, 15–16; Graham Decl., ¶¶ 16, 32.
[85] McCord Decl., ¶ 40; Camper Decl., ¶ 6.
[86] Graham Decl., ¶¶ 17–18; *id.* ¶ 30 (noting increase in prohibited persons who possess ghost guns).
[87] *Id.*, ¶¶ 25(a)–(t), 33.
[88] Camper Decl., ¶ 12; *see also* McCord Decl., ¶ 35 ("law enforcement agencies and prosecutors will not be able to rely on forensic experts to match bullets used to commit crimes with [3D-printed] firearms").
[89] Camper Decl., ¶¶ 12–13; *see* Dkt. # 29, ¶¶ 74, 95, 109–10, 126, 131, 142, 150, 154, 157–58, 165, 170–71, 180–82, 207 (States' background-check requirements).
[90] Hosko Decl., ¶ 15.

MOTION FOR PRELIMINARY
INJUNCTION
2:18-cv-01115-RSL

22

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue. Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

firearms[91]—a problem that would be exacerbated by the ready availability of 3D-printed firearms, which would add to the existing risk of homicide, armed robbery, and other crimes by way of criminally inclined offenders who believe a "plastic gun" would help them avoid detection or accountability.[92] Bad actors who seek to make 3D-printed firearms for criminal purposes—unlike legitimate gun manufacturers and dealers—would have no motivation to comply with state gun-registration and background-check laws, and would face less risk of 3D-printed weapons ultimately being traced to them.[93]

(iii) <u>Heightened risk of terrorist attacks</u>. As the State Department apparently still agrees, exporting downloadable gun files by posting them on the internet seriously threatens public safety[94]—chiefly due to the risk that undetectable and untraceable firearms could be used by foreign terrorist organizations for attacks within the United States, including against persons residing in or visiting the Plaintiff States.[95] While metal detectors appear to have been effective thus far in hindering the "numerous foreign adversaries intent on causing chaos and confusion in the United States," making undetectable weapons widely available means, for example, "the 72,000 fans who pack CenturyLink for a Seahawks game suddenly become much more vulnerable to terrorists who seek to cause as much bloodshed as possible."[96]

Importantly, removing downloadable gun files from the Munitions List makes them importable as well as exportable. *See* 22 U.S.C. § 2778(a). Thus, even if a state were able to enforce a law banning 3D printing of guns within its borders, such guns could be printed outside

---

[91] Hosko Decl., ¶¶ 15–16; Kyes Decl., ¶ 12.
[92] Hosko Decl., ¶¶ 15–16.
[93] McCord Decl., ¶¶ 39–41; Graham Decl., ¶ 37.
[94] Dkt. # 35-1, Ex. A at 4 of 19.
[95] McCord Decl., ¶¶ 14–22; *see also* Rupert Decl., Ex. 9 (Sen. Menendez letter 8/8/2018). These concerns are perhaps particularly salient for the District of Columbia, which is entirely urban, densely populated, hosts hundreds of heavily attended events each year, including numerous political marches and protests, and is filled with thousands of high-ranking federal officials and diplomats from around the world. *Id.*, Ex. 20 (Lanier Decl.), ¶¶ 13–15; *see also id.*, Ex. 21 (Op-ed by former Chief of U.S. Capitol Police and Senate Sergeant at Arms).
[96] McCord Decl., ¶¶ 17–18, 22.

1  the U.S. and, being undetectable, smuggled in with relative ease. This scenario calls to mind the

2  case of the "Millennium Bomber," an al-Qaeda linked terrorist who attempted to smuggle

3  explosives into the United States through Port Angeles, Washington. *See United States v.*

4  *Ressam*, 679 F.3d 1069, 1072–73 (9th Cir. 2012).

5      (iv) <u>Impact on public health</u>. Finally, "there is no doubt that plastic firearms pose a grave

6  threat to public health and safety"[97]—particularly as to children. 3D-printed weapons such as

7  the Liberator do not always look like conventional firearms, and children may mistake them for

8  toys and play with them—a common reason for accidental gun deaths among children.[98] 3D-

9  printed weapons will also make it possible for students to manufacture their own weapons that

10  could be used in a school shooting (and could evade metal detectors that some schools are

11  installing to prevent such shootings).[99] And as noted above, currently-available 3D-printed

12  weapons can even be dangerous to the shooter because they are unstable and prone to

13  misfiring.[100]

14  **E.     The Balance of Equities and Public Interest Sharply Favor Preliminary Relief**

15      For the numerous and weighty reasons above, the balance of equities tips sharply in the

16  States' favor. Meanwhile, the only cost to Defendants of converting the TRO into a preliminary

17  injunction is the continuation of regulatory restrictions that have been in place for over five years.

18                      **IV.     CONCLUSION**

19      For the foregoing reasons, the State asks this Court to convert the TRO to a preliminary

20  injunction, so as to preserve the status quo until the merits can be fully adjudicated.

21

22

---

23  [97] Wintemute Decl., ¶ 17.
[98] Rivara Decl., ¶ 6; Hemenway Decl., ¶ 20; Wintemute Decl., ¶ 13.
[99] Rivara Decl., ¶ 7; *see also* Hemenway Decl., ¶ 21; Wintemute Decl., ¶ 14.
24  [100] Camper Decl., ¶ 13; Kyes Decl., ¶ 18.

MOTION FOR PRELIMINARY
INJUNCTION
2:18-cv-01115-RSL

24

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue. Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1

2          DATED this 9th day of August, 2018.

3                                          ROBERT W. FERGUSON
                                           Attorney General
4
                                           */s/ Jeffrey Rupert*
5                                          JEFFREY RUPERT, WSBA #45037
                                           Division Chief
6                                          KRISTIN BENESKI, WSBA #45478
                                           Assistant Attorney General
7                                          TODD BOWERS, WSBA #25274
                                           Deputy Attorney General
8                                          JEFF SPRUNG, WSBA #23607
                                           Assistant Attorney General
9                                          ZACHARY P. JONES, WSBA #44557
                                           Assistant Attorney General
10                                         JeffreyR2@atg.wa.gov
                                           KristinB1@atg.wa.gov
11                                         ToddB@atg.wa.gov
                                           JeffS2@atg.wa.gov
12                                         ZachJ@atg.wa.gov
                                           *Attorneys for Plaintiff State of Washington*
13
                                           GEORGE JEPSEN
14                                         Attorney General of Connecticut

15                                         */s/ Kimberly Massicotte*
                                           KIMBERLY MASSICOTTE, CT-04111
16                                         Associate Attorney General
                                           JOSEPH RUBIN, CT-00068
17                                         Associate Attorney General
                                           MAURA MURPHY OSBORNE, CT-19987
18                                         Assistant Attorney General
                                           Connecticut Office of Attorney General
19                                         55 Elm St.
                                           P.O. Box 120
20                                         Hartford, CT 06141-0120
                                           *Attorneys for Plaintiff State of Connecticut*
21
                                           BRIAN E. FROSH
22                                         Attorney General of Maryland

23                                         */s/ Julia Doyle Bernhardt*
                                           JULIA DOYLE BERNHARDT
24                                         JENNIFER KATZ

MOTION FOR PRELIMINARY                          25          ATTORNEY GENERAL OF WASHINGTON
INJUNCTION                                                           800 Fifth Avenue. Suite 2000
2:18-cv-01115-RSL                                                      Seattle, WA 98104-3188
                                                                          (206) 464-7744

1

Assistant Attorneys General
Office of the Attorney General

2

200 Saint Paul Place, 20th Floor
Baltimore, MA 21202

3

(410) 576-7291
jbernhardt@oag.state.md.us

4

jkatz@oag.state.md.us
*Attorneys for Plaintiff State of Maryland*

5

6

GURBIR GREWAL
Attorney General of New Jersey

7

*/s/ Jeremy M. Feigenbaum*
JEREMY M. FEIGENBAUM

8

Assistant Attorney General
Office of the Attorney General

9

Richard J. Hughes Justice Complex
25 Market Street, 8th Floor, West Wing

10

Trenton, NJ 08625-0080
(609) 376-2690

11

Jeremy.Feigenbaum@njoag.gov
*Attorneys for Plaintiff State of New Jersey*

12

BARABARA D. UNDERWOOD
Attorney General of New York

13

*/s/ Barbara D. Underwood*

14

BARBARA D. UNDERWOOD
Attorney General of New York

15

28 Liberty Street
New York, NY 10005

16

17

MAURA HEALEY
Attorney General of Commonwealth of
Massachusetts

18

*/s/ Jonathan B. Miller*

19

JONATHAN B. MILLER
Assistant Attorney General

20

Office of the Massachusetts Attorney General
One Ashburton Place

21

Boston, MA 02108
617-963-2073

22

Jonathan.Miller@state.ma.us
*Attorneys for Plaintiff Commonwealth of*

23

*Massachusetts*

24

JOSH SHAPIRO

MOTION FOR PRELIMINARY
INJUNCTION
2:18-cv-01115-RSL

26

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue. Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

Attorney General of Commonwealth of
Pennsylvania

*/s/ Josh Shapiro*
JOSH SHAPIRO
Attorney General
Office of the Attorney General
Strawberry Square, 16th Floor
Harrisburg, PA 17120
(717) 787-3391
*Attorneys for Plaintiff Commonwealth of*
*Pennsylvania*

KARL A. RACINE
Attorney General for the District of Columbia

*/s/ Robyn Bender*
ROBYN BENDER
Deputy Attorney General
Public Advocacy Division
JIMMY ROCK
Assistant Deputy Attorney General
Public Advocacy Division
*Attorneys for Plaintiff District of Columbia*

ELLEN F. ROSENBLUM
Attorney General of Oregon

*/s/ Scott J. Kaplan*
SCOTT J. KAPLAN, WSBA #49377
Senior Assistant Attorney General
Oregon Department of Justice
100 SW Market Street
Portland, OR  97201
(971) 673-1880
scott.kaplan@doj.state.or.us
*Attorneys for Plaintiff State of Oregon*

XAVIER BECERRA
Attorney General of California

*/s/ Nelson R. Richards*
NELSON R. RICHARDS
Deputy Attorney General
*/s/ Mark Beckington*
MARK BECKINGTON
Supervising Deputy Attorney General
*/s/ Thomas Patterson*

MOTION FOR PRELIMINARY
INJUNCTION
2:18-cv-01115-RSL

27

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

THOMAS PATTERSON
Senior Assistant Attorney General
*Attorneys for the State of California*

CYNTHIA H. COFFMAN
Attorney General of Colorado

*/s/ Matthew D. Grove*
MATTHEW D. GROVE
Assistant Solicitor General
Colorado Department of Law
1300 Broadway, 6th Floor
Denver, Colorado  80203
Telephone:  (720) 508-6157
FAX:  (720) 508-6041
E-Mail: matt.grove@coag.gov
*Attorneys for Plaintiff State of Colorado*

MATTHEW P. DENN
Attorney General of Delaware

*/s/ Ilona M. Kirshon*
ILONA M. KIRSHON (# 3705)
Deputy State Solicitor
State of Delaware Department of Justice
Carvel State Office Building, 6th Floor
Wilmington, DE 19801
(302) 577-8400
Ilona.kirshon@state.de.us

*/s/ Patricia A. Davis*
PATRICIA A. DAVIS (# 3857)
Deputy Attorney General
State of Delaware Department of Justice
Dover, DE  19904
(302) 257-3233
patriciaA.davis@state.de.us
*Attorneys for the Plaintiff State of Delaware*

RUSSELL A. SUZUKI
Attorney General of Hawaii

*/s/ Robert T. Nakatsuji*
ROBERT T. NAKATSUJI
Deputy Attorney General
Department of the Attorney General

MOTION FOR PRELIMINARY
INJUNCTION
2:18-cv-01115-RSL

28

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue. Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

425 Queen Street
Honolulu, Hawaii  96813
(808) 586-1360
Robert.T.Nakatsuji@hawaii.gov
*Attorneys for Plaintiff State of Hawaii*

LISA MADIGAN
Attorney General of Illinois

*/s/ Brett E. Legner*
BRETT E. LEGNER
Deputy Solicitor General
*/s/ Katelin B. Buell*
KATELIN B. BUELL
*/s/ Sarah A. Hunger*
SARAH A. HUNGER
Assistant Attorneys General
Office of the Attorney General
100 W. Randolph, 12th Floor
Chicago, IL 60601
blegner@atg.state.il.us
*Attorneys for Plaintiff State of Illinois*

THOMAS J. MILLER
Attorney General of Iowa

*/s/ Nathan Blake*
NATHAN BLAKE
Deputy Attorney General
Office of the Attorney General of Iowa
1305 E. Walnut St.
Des Moines, IA  50319
(515) 281-4325
nathan.blake@ag.iowa.gov
*Attorneys for the Plaintiff State of Iowa*

LORI SWANSON
Attorney General of Minnesota

*/s/ Jacob Campion*
JACOB CAMPION, MN Reg. #0391274
Assistant Attorney General
Office of the Minnesota Attorney General
445 Minnesota Street, Suite 1100
St. Paul, Minnesota 55101-2128
(651) 757-1459
jacob.campion@ag.state.mn.us

MOTION FOR PRELIMINARY
INJUNCTION
2:18-cv-01115-RSL

29

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue. Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1

*Attorneys for the Plaintiff State of Minnesota*

2

3

JOSHUA H. STEIN
Attorney General of North Carolina

4

*/s/ Sripriya Narasimhan*

5

SRIPRIYA NARASIMHAN
Deputy General Counsel
North Carolina Department of Justice

6

114 W. Edenton St.
Raleigh, NC 27603

7

*Attorneys for Plaintiff State of North Carolina*

8

PETER F. KILMARTIN
Attorney General of Rhode Island

9

*/s/ Michael W. Field*

10

MICHAEL W. FIELD
*/s/ Susan Urso*

11

SUSAN URSO
Assistant Attorneys General

12

150 South Main Street
Providence, Rhode Island 02903

13

(401) 274-4400
mfield@riag.ri.gov

14

surso@riag.ri.gov
*Attorneys for Plaintiff State of Rhode Island*

15

16

THOMAS J. DONOVAN, JR.
Attorney General of Vermont

17

*/s/ Benjamin D. Battles*

18

BENJAMIN D. BATTLES
Solicitor General

19

Office of the Attorney General
109 State Street

20

Montpelier, Vermont 05609-1001
802-828-5500

21

benjamin.battles@vermont.gov
*Attorneys for Plaintiff State of Vermont*

22

MARK R. HERRING
Attorney General of the

23

Commonwealth of Virginia

24

*/s/ Samuel T. Towell*

MOTION FOR PRELIMINARY
INJUNCTION
2:18-cv-01115-RSL

30

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue. Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

SAMUEL T. TOWELL
Deputy Attorney General, Civil Litigation
Office of the Attorney General of Virginia
Barbara Johns Building
202 N. Ninth Street
Richmond, VA 23219
(804) 786-6731
STowell@oag.state.va.us
*Attorney for Plaintiff Commonwealth of Virginia*

***Pro Hac Vice* motions forthcoming for all counsel of record not barred in the Western District of Washington**

MOTION FOR PRELIMINARY
INJUNCTION
2:18-cv-01115-RSL

31

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue. Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

**<u>DECLARATION OF SERVICE</u>**

I hereby certify that on August 9, 2018, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will serve a copy of this document upon all counsel of record.

DATED this 9th day of August, 2018, at Seattle, Washington.

*/s/ Jeffrey Rupert*
JEFFREY RUPERT

MOTION FOR PRELIMINARY
INJUNCTION
2:18-cv-01115-RSL

32

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue. Suite 2000
Seattle, WA 98104-3188
(206) 464-7744