# EXHIBIT O

_____

```
                                )
STATE OF WASHINGTON, et al.,     ) C18-1115-RSL
                                 )
             Plaintiffs,         ) SEATTLE, WASHINGTON
                                 )
v.                               ) August 21, 2018
                                 )
UNITED STATES DEPARTMENT OF      ) MOTION HEARING
STATE, et al.,                   )
                                 )
             Defendants.         )
```

_____

VERBATIM REPORT OF PROCEEDINGS
BEFORE THE HONORABLE ROBERT S. LASNIK
UNITED STATES DISTRICT JUDGE

_____

APPEARANCES:

For the Plaintiffs:      Jeffrey G. Rupert
                         Attorney General's Office
                         PO Box 40110
                         Olympia, WA  98504

                         Jeffrey T. Sprung
                         Kristin Beneski
                         Zachary P. Jones
                         Attorney General's Office
                         800 5th Avenue
                         Suite 2000
                         Seattle, WA  98104

                         Scott J. Kaplan
                         Oregon Department of Justice
                         100 SW Market Street
                         Portland, OR  97201

```
1   For the Defendant        Steven A. Myers
    United States            US Department of Justice
2   Defendants:              20 Massachusetts Avenue NW
                             Washington, DC  20530
3
    For the Defendant        Charles R. Flores
4   Defense Distributed:     Daniel Hammond
                             Beck Redden LLP
5                            1221 McKinney Street
                             Suite 4500
6                            Houston, Texas  77010

7   For the Defendants       Matthew Goldstein
    Defense Distributed;     Farhang & Medcoff
8   Second Amendment         4901 East Broadway Blvd.
    Foundation, Inc.;        Suite 311
9   and Conn Williamson:     Tucson, AZ  85711

10                           Joel B. Ard
                             Immix Law Group PC
11                           701 5th Avenue
                             Suite 4710
12                           Seattle, WA  98104

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          THE CLERK:  Case C18-1115-L, State of Washington,

2     et al, versus United States Department of State, et al.

3     Counsel, would you please make your appearances.

4          MR. RUPERT:  Jeff Rupert, Assistant Attorney General

5     for plaintiff, states.

6          MR. SPRUNG:  And Jeff Sprung, Assistant Attorney

7     General.

8          MS. BENESKI:  Kristin Beneski, Assistant Attorney

9     General for the State of Washington.

10          MR. JONES:  Zach Jones, Assistant Attorney for the

11     State of Washington.

12          MR. KAPLAN:  Scott Kaplan, Assistant Attorney General

13     for the State of Oregon.

14          THE COURT:  Who is also a member of the bar of the

15     State of Washington.

16          MR. KAPLAN:  Yes, Your Honor.

17          THE COURT:  Great.

18          MR. MYERS:  Good morning, Your Honor, Steven Myers on

19     behalf of the federal defendants.

20          THE COURT:  Mr. Myers, are you all alone representing

21     the entire United States of America?

22          MR. MYERS:  I am, Your Honor, yes.

23          THE COURT:  We appreciate that.

24          MR. ARD:  Good morning, Your Honor, Joel Ard for the

25     defendants Second Amendment Foundation, Defense Distributed,

1    and Conn Williamson.

2          MR. GOLDSTEIN:  Your Honor, Matthew Goldstein for the

3    private parties Conn Williamson, Defense Distributed and

4    Second Amendment Foundation.

5          THE COURT:  Sure.

6          MR. HAMMOND:  Dan Hammond for Defense Distributed.

7          MR. FLORES:  Your Honor, my name is Chad Flores.  I'm

8    representing Defense Distributed.  And I will be giving the

9    argument for all of the private defendants.

10         THE COURT:  Welcome, Mr. Flores.  Thank you.

11       All right.  Well, we are here for the follow-up of the

12    temporary restraining order, and arguing today whether the

13    Court should issue a preliminary injunction in this case.

14    And I believe we will start with Mr. Rupert.

15         And there was an indication that, Mr. Sprung, you would

16    address a Second Amendment issue if it came up; is that

17    right?

18         MR. SPRUNG:  Yes, Your Honor.

19         THE COURT:  Okay.  I think I might save that for

20    rebuttal.  So thanks for letting me know.

21       So, Mr. Rupert, you have the floor.

22         MR. RUPERT:  Thank you, Your Honor.

23       Your Honor, the State Department voluntarily entered into

24    a settlement agreement with an organization run by a crypto

25    anarchist.  The State Department has chosen to give access to

1   potentially untraceable and undetectable firearms to any

2   terrorist, felon, or domestic abuser, with a laptop and 3D

3   printer.  This Court granted a temporary restraining order,

4   and we're now asking the Court to convert that to a

5   preliminary injunction.

6       We have procedural claims, the 30-day notice to Congress

7   and the Department of Defense concurrence, as well as an

8   arbitrary and capricious claim.  The order I was going to

9   address it in, unless Your Honor wanted me to go in a

10  different order, is I was going to address irreparable harm

11  first, since that seems to be the main challenge by the

12  government; then likelihood of success on the merits;

13  standing; and --

14          THE COURT:  That's fine.

15          MR. RUPERT:  -- then First Amendment.

16          THE COURT:  Um-hum.

17          MR. RUPERT:  As far as irreparable harm, the

18  government's chief contention is that the harms that the

19  states have identified in their many declarations cannot be

20  traced to the government's actions.  I think that's

21  thoroughly rebutted by the evidence in the record; in fact,

22  by the government's own prior filings in the Texas

23  litigation.

24      Notably, in the April 2018 brief, the government argued

25  that the Internet does not have separate parts, domestic and

1  foreign, it's all one Internet.  So once this information

2  goes online, it's going to be available.  And as the Court

3  noted in its prior temporary restraining order decision, the

4  proliferation of these firearms will have many of the

5  negative impacts on the state level that the federal

6  government once feared on an international stage.

7      The Court then quoted a number of the government's own

8  words against them -- or not against them, excuse me, just as

9  illustrative from the briefing.  But I'd also highlight the

10  declaration of Lisa Aguirre, or Aguirre, I'm not sure how you

11  pronounce her name.  But she talked about the potential for

12  terrorist groups using such weapons against the United

13  states.

14      Well, the states are a part of the United States.  So we

15  believe that the government's own evidence demonstrates that

16  the government is well aware that significant harm could

17  occur to the states if its rulings are permitted to stand

18  here.

19      One of the central issues that is the cause for the harm

20  is the widespread use of metal detectors.  Now, we've

21  submitted numerous declarations about metal detectors, and

22  how they are used, and how they do not pick up these plastic

23  guns.  But I'd highlight the declaration from Mary McCord.

24  She was the Acting Assistant Attorney General for National

25  Security, retiring in May 2017.  But she oversaw all federal

1    counterterrorism, espionage, and export control prosecutions,

2    including prosecutions of terrorists.

3        And she details the difficulties that would occur if these

4    guns become prevalent.  Because they're just not picked up by

5    metal detectors.  And it's well known by the government, it's

6    in Lisa Aguirre's declaration as well.  Then there's numerous

7    other declarations that make the same point.

8        But metal detectors, as are in the declarations, are used

9    throughout the United States, in airports, the courthouse --

10   in fact, the courthouse downstairs -- government buildings,

11   prisons, stadiums, even schools.  One of the interesting

12   things one of the experts pointed out that I hadn't even

13   thought about, that with 3D printers in schools, if the

14   school has a metal detector, the gun could be printed in the

15   school, even evading it further.

16       Now, this all demonstrates the public-safety concern that

17   the states have raised here, by the government's sweeping

18   change of its position that it had for five years.  Now, the

19   states have numerous laws about who is prohibited from owning

20   a gun, such as felons, domestic abusers, those with mental

21   health issues, or for age.  And we have background checks

22   that are used to identify those folks.

23       Some states even have limits on the manufacturing of a

24   gun.  Massachusetts does, for instance.  New Jersey does as

25   well.  Well, all of those could easily be evaded, again, with

1   a 3D printer and these files.  And then the issue becomes,

2   that I just identified, the metal detectors are not going to

3   be useful at all.

4        Just a few other points I'll highlight on irreparable

5   harm, and then I'll move on.  I want to just focus on, for a

6   moment, the deposition of Professor Patel from the University

7   of Washington, who is a MacArthur Genius Fellow.  He talks

8   about how 3D printing works now, and that this Liberator gun

9   could easily be printed.  But then also discusses the

10  advances that he believes, in his opinion, will occur rapidly

11  in this area, that the technology will proceed far -- be far

12  better than we currently have, as new gun designs come out,

13  and, frankly, the 3D printing advances.

14       I also want to highlight that the 3D guns will spread.

15  And by that I'm referring to the declaration from Ron Hosko.

16  He's a 30-year career FBI agent.  He was the Assistant

17  Director of the FBI's Criminal Investigative Division and led

18  the Bureau's largest program worldwide.  But his declaration

19  discusses his experiences and his belief that the 3D printers

20  will be embraced by criminal enterprises, if it becomes

21  available.

22       One other thing to highlight, and then I'll kind of go on

23  to a few other points here, is that we do know, from the

24  declaration from Blake Graham, the special agent for the

25  California Department of Justice, that ghost guns, these are

1    the metal guns that don't have any identifier on them, they

2    are emerging more and more in California.  They've been used

3    in a number of mass shootings.

4        There's heightened risk of terrorist attacks.  And the

5    Aguirre and McCord declarations detail those.  Then the

6    ability of law enforcement to use serial numbers to solve

7    crimes would be greatly compromised if these became

8    widespread.  And there, I point to the declaration of John

9    Camper from the Colorado Bureau of Investigation, who they

10   did some testing on these guns, and they concluded that

11   standard forensic techniques cannot be applied to link a

12   projectile or bullet to a particular 3D-printed firearm.

13   That's because the barrel is not rifled, and the firing

14   conditions can't be replicated.  And, frankly, it was unsafe

15   to fire some of the guns.

16       One of the things we hear in response is, well, the

17   Undetectable Firearms Act, you know, that covers this, so why

18   are you complaining, states?  Well, as Mary McCord in her

19   declaration notes that the Undetectable Firearms Act does

20   nothing to deter terrorists or bad actors from making a 3D

21   weapon.  In fact, the current system has firearms dealers

22   whose livelihood depends on compliance with federal and state

23   law.  But those will be removed if these become widespread.

24       I think Chief Best from the Seattle Police Department

25   summed it up best with if we have 3D guns, you know, such a

1    world will be more dangerous for the public and for the

2    police officers whose job it is to protect the public.

3        So we believe the irreparable harm element has been shown

4    to grant a preliminary injunction.  And we note that there is

5    no evidence to the contrary submitted by the government or

6    the other private defendants.

7        Turning now to likelihood of success on the merits.  As we

8    discussed last time, I think it's pretty clear the items are

9    on the Munitions List.  The government has taken that

10   position for five years starting in 2013, all the way up to

11   April 2018 in court filings.

12        They then took two actions to remove the items from the

13   Munitions List, the temporary modification and the letter.

14   Both require notice, 30 days' notice to Congress.  And that's

15   -- the statute that requires that is 22 -- excuse me --

16   2778(f)(1).

17        There's no dispute that the notice to Congress was not

18   given.  And that's in the record with the declarations from

19   Representative Engel, as well as the letter from Senator

20   Menendez.  The position of the government is, though, that it

21   wasn't required because they believe that the statute, when

22   it refers to items, is actually referring to a category or

23   subcategories of items.  We've discussed this in the brief,

24   but we don't believe that finds support in the actual text of

25   the statute or the case law.

1    And they also talk about a *Skidmore* defense.  But *Skidmore*

2    doesn't apply if the statute is unambiguous.  In support we

3    would highlight the CFR section that we highlighted, as well

4    as the case law, which distinguishes between categories and

5    items.  And even the executive order that we have at issue,

6    refers to items or categories of items.  And if an item was a

7    category it wouldn't make any sense.

8    So we believe that when these were removed, that notice

9    was required.  And there's no dispute it was not given.

10    THE COURT:  Mr. Rupert, when we first met, the

11    absence of 30-days notice was particularly acute, because we

12    were acting on virtually no notice whatsoever.  Now Congress

13    obviously has, even if they haven't received the official

14    notice, they're on notice.  And they will have had about

15    30 days to act.  And I think it's fairly obvious they're not

16    going to act.  So what is the irreparable harm of not giving

17    the notice?

18    MR. RUPERT:  Actually the notice, if you look at the

19    statute provision, it requires the notice shall describe the

20    nature of any controls to be imposed, and that item under any

21    other provision of law.  It's just not clear what position

22    the government is taking, if it is going to do anything to

23    protect these weapons, under another mechanism or not.  And

24    it is a formal mechanism to Congress that is required to be

25    done.  And, again, it's a procedural claim, but it was not

1    done.

2        The other procedural claim that we identify was the

3    concurrence of the Secretary of Defense.  And there's a bit

4    of a dispute whether that's reviewable.  We believe it is

5    based on the *City of Carmel* case from the Ninth Circuit.  The

6    government had cited a district court decision out of the

7    D.C. -- D.C., the *Defender of Wildlife* case, which had some

8    similar language.  But I would say the *Defender of Wildlife*

9    case noticeably has a section labeled, "Application and

10   judicial review."  That's not in the executive order that we

11   have here.  And we believe, therefore, that the *City of*

12   *Carmel* case controls.

13       So as far as the Department of Defense, the declarations

14   submitted by the government trying to explain what did occur,

15   there's no mention in that declaration whatsoever that the

16   Department of Defense concurred in the temporary

17   modification.

18       I will say, though, that that declaration does say that

19   the Department of Defense concurred in the letter.  Now,

20   there's no details about the date, time, or person that gave

21   it.  But it does say that.  And I would note that there's a

22   distinction between the letter and the modification, too.

23   The letter addresses just the specific articles that were at

24   issue.  That's the Liberator gun and a few other items.  The

25   modification, on the other hand, was much broader, because

1    that covered not only the guns that -- the designs that had

2    been submitted, but as well as any future 3D guns that might

3    be submitted by private defendants or anyone else.  So that's

4    the much broader one that there's no concurrence from the

5    Department of Defense.

6        Just to give background here.  Removals from the Munitions

7    List rarely occur.  And I'm referring to the declaration from

8    Representative Engel's letter as well as Senator Menendez's

9    letter.  And they explained the usual process that occurs

10   where, well, 30 days is what is required statutorily.  Often

11   it's far greater than that.  And the Department of Defense is

12   involved in this whole process.  And that just wasn't done

13   here.

14       I want to move to the arbitrary and capricious claim.  We

15   don't have the record here, and we will need that when we

16   reach the final merits of this, but we believe there is

17   sufficient information before you right now to demonstrate a

18   likelihood of success on the merits.  That's because of the

19   following:  First, there's a prior CJ determination in 2015,

20   as well as the Aguirre declarations that have findings that

21   these items need to be on the Munitions List for national

22   security reasons.  And they also detail the harm that would

23   occur if they were removed.

24       Second, the government in past litigation filings for over

25   three years, said essentially the same thing, discussing the

harms and need for national security for these items to
remain on the Munitions List.  And the third, I would cite
the Heidema declaration that the government has submitted in
opposition.  Now, this declaration details the government's
rationale for making its decision.

Now, it does, as I mentioned, address the concurrence to
the letter by the Department of Defense.  But it's notable
about what is not in this declaration.  This declaration
doesn't say there's any justification, rationale or findings
for the government's change in position from 2015 in the CJ
or the Aguirre declaration until now.

The government's declaration does not say there's any
national security or public safety, it doesn't even mention
at all about putting these guns out there.  And there's --
the government doesn't say that a new CJ was done.  What the
government does rely on is proposed rulemaking that it has
done to move some items from Category I of the Munitions
List, over to the Commerce Department.

But this can't be a basis for this decision, at least if
it is -- it's an arbitrary and capricious one, because it
would be an attempt to make an end run around the rulemaking
process.  Because these rules are not final.  We don't know
what will come out of it, in fact.  And if they're trying to
short-circuit the rulemaking process by using this
modification, I think it fails right there as arbitrary and

1  capricious.

2      Then more telling, I would look at the actual rationale

3  that they identify for moving items from the Munitions List

4  over to Commerce.  And I'm referring to paragraph 19 of

5  Ms. Heidema's declaration.  She refers to the transfer of

6  certain items was informed by the Defense Department's

7  assessment that the items proposed for transfer are already

8  commonly available.

9      We know plastic guns are not commonly available.  So if

10  that's the rationale for the government's decision now to

11  make plastic guns available, not even the declaration

12  supports that.  And we believe that it's arbitrary and

13  capricious.

14      One of the other items in paragraph 19 that's highlighted

15  is that little national security concern is highlighted by

16  the fact that the Department of Defense does not generally

17  review export license applications for the physical items

18  described in Category I, as the Department does for license

19  applications in other categories.  Well, we know that they

20  actually did review this one here, that's the 2015 CJ

21  determination.  So, again, this declaration by Ms. Heidema of

22  trying to justify the government's decisions in this case,

23  actually does not justify it at all, and shows the arbitrary

24  nature of it.

25      The final thing -- two other things to highlight.  There

1   has been suggestions by the private defendants that the First

2   Amendment was a factor in this analysis.  But Ms. Heidema's

3   declaration makes clear that the Department denies and

4   continues to deny that it violated the First or Second

5   Amendment or acted in ultra vires.  So that was not the

6   rationale either.

7       And, finally, I'm not quite sure how best to categorize

8   it, because it's so unusual it's hard to find any case law.

9   But we have the President himself tweeting, that this doesn't

10  seem to make much sense.  And that's not quite the legal

11  standard, but ultimately that's what is an arbitrary and

12  capricious decision.  Does this make sense or not?  And we

13  believe that based on Ms. Heidema's declaration, as well as

14  the prior declarations in the 2015 CJ determination that it

15  does not.

16      I was going to move on to standing, unless the Court had

17  any questions about the likelihood of success on the merits.

18          THE COURT:  Well, on the Heidema declaration, she's

19  not somebody who was brought in in a new administration or

20  anything like that.  It seems like she's been part of the

21  government agencies that have been looking at this for

22  several years.  The federal defendants have made the argument

23  that this was a kind of boring bureaucratic look at

24  something, and just happened to cover the 3D guns, but it

25  wasn't set out to change things, in particular to that, it

1    was this 50-caliber or below.

2       What evidence do the states have that this really was a

3    setup to change the 3D guns, rather than a bureaucratic

4    process that could put anyone to sleep?

5           MR. RUPERT:  I think the timing is one of the big

6    questions that we have throughout this whole thing, the way

7    it was revealed at certain times, the settlement.

8       Overall, though, regardless of why it was done, what's in

9    that declaration versus what is not, the case law is clear on

10   arbitrary and capriciousness.  If you're going to make a

11   significant change, you need to have a rationale for it.  It

12   doesn't need to be a better rationale.  But you do need to

13   have a rationale.  And none is identified in this

14   declaration.  Because as I pointed out, this doesn't apply to

15   plastic guns, the rationale that they have, that it's readily

16   available, the guns, because that's just not so for plastic

17   guns.

18          THE COURT:  So the action may not be arbitrary and

19   capricious to the larger categories, but its impact on the

20   plastic gun issue is?

21          MR. RUPERT:  Correct.  That's why we do wonder what

22   will come out in the final rulemaking, which we don't know.

23   But you do wonder, do plastic guns get excepted from the

24   final rulemaking.  And then we'll just have to see what they

25   do, and then we'll have to see if there's any challenges to

1  that.

2         THE COURT:  Okay.  You can move on now, to standing.

3         MR. RUPERT:  Sure.

4     As we discussed last time, standing is injury in fact,

5  traceability and redressability.  But these requirements are

6  relaxed in the APA case.  And the state has standing, if it's

7  either sovereign, quasi-sovereign, or proprietary interest.

8  I want to highlight the *Massachusetts v. EPA* case that talks

9  about the special solicitude in the standing analysis,

10 because that does change it somewhat when the states are

11 involved.  And that was applied for the *EPA* case, and also

12 recently applied in the *Texas v. United States* case, that was

13 affirmed by an equally divided court in 2016.

14    This is, I think, pretty well laid out in the briefs, so I

15 was going to move through it somewhat quickly.  The states

16 have a sovereign interest to create and enforce the legal

17 code.  And we believe that the government's actions under

18 forces our ability to enforce the statutory codes.  And we

19 have multiple declarations that support that.

20    It also undermines the maintenance and recognition of

21 borders, because this will allow guns, based on the McCord

22 declaration, to come across the borders by air, sea, and

23 water.  Also affects the police power, because it seriously

24 impedes the ability to protect the residents from injury and

25 death.  And there's numerous declarations that go into that.

1    On the proprietary standing, the state has submitted

2    declarations related to its jails.  Metal detectors are

3    widely used there.  And if this technology, that technology

4    being 3D guns, is widely implemented, the metal detectors are

5    going to have a significant hole.  And we'll have to buy a

6    whole new wave of technology to scan folks when they come

7    back in, or guests that come in.  And we're going to have to

8    do hand searches.  So there's going to be significant expense

9    involved.

10    The same with law enforcement, anybody who is relying on

11   metal detectors is going to have to upgrade their technology,

12   if such technology exists, or they're going to have to go to

13   more hand searches, which is going to be more intensive and

14   require more manpower.  So we believe that's the proprietary

15   interest right there.

16    As far as quasi-sovereign, we believe there's, again, a

17   threat, similar to the sovereign and proprietary, a threat to

18   safety and physical well-being, to the states' residents by

19   making these weapons more available, which sort of dovetails

20   with what I've discussed about irreparable harm.

21    The next part of a standing analysis is zone of interest

22   and prudential standing.  This is not meant to be an

23   especially demanding test.  And it's presumptive -- agency

24   actions are presumptively reviewable.  When you look at the

25   AECA itself, it's intended to protect domestic security by

1  restricting the flow of military information abroad.  But it

2  does so in furtherance of world peace and the security and

3  foreign policy of the United States.

4      As I said before, the states are the United States.  If

5  this is going to -- if we're doing it to protect national

6  security, we should be doing it to protect the states.  And

7  we have declarations in the record that talk about these guns

8  flowing across our borders, or the potential that somebody in

9  a foreign country could seize an airplane by getting onto the

10  airplane in a foreign country and flying it towards the

11  States.

12      I'm going to move on to the First Amendment issues, unless

13  Your Honor had any questions about standing.

14      We believe the First Amendment is irrelevant to the merits

15  of the case.  And we do that because the government, in the

16  Heidema declaration, states that they didn't rely on the

17  First Amendment in deciding these decisions.  Now, I do

18  believe the Court should consider the First Amendment when it

19  balances the equities, and that element of the temporary

20  restraining order.  We believe it's an easy decision there,

21  though, because Judge Pitman has already done that review,

22  being on a somewhat different standard, but on a preliminary

23  injunction standard, and determined that plaintiffs have not

24  shown a substantial likelihood of success on the merits of

25  their claim under the First Amendment.

1    We have a number of arguments in here, and I'm going to

2    focus on Judge Pitman's analysis.  But I do want to highlight

3    some of those arguments before I get to Judge Pitman.

4        First is that 3D guns themselves are not an expressive

5    act.  And for that, I'm relying on the *Vartuli* case cited in

6    the briefs.  Because the nature of these guns is that you

7    just press a button and it prints.  So we don't believe that

8    itself is an expressive act.

9        One of our other arguments that we raise in our briefs is

10   that these load files are integral to criminal conduct and

11   are, therefore, exempt from the First Amendment.  And there's

12   some cases that we cite for that.  But the gist of that is

13   that with the Undetectable Firearms Act, as well as the state

14   law restrictions, it's illegal to possess a weapon such as a

15   plastic gun.  So, therefore, these guns -- excuse me, the

16   files are so tied to those plastic guns, that they themselves

17   have no First Amendment protection.

18       But what I want to focus most on is intermediate scrutiny

19   or whether this is content neutral, as Judge Pitman had

20   determined.  Before we get there, though, we need to look at

21   this issue of a prior restraint.  Because the private

22   defendants have claimed that if there's a prior restraint,

23   that strict scrutiny automatically applies.  Well, that's

24   just not so in the case law.

25       As Judge Pitman cited, the standard review for analyzing

1   prior restraints, there's different standards of review

2   depending on the restraint at issue.  While there's a heavy

3   presumption against validity, that's not a standard review in

4   itself.  And he cites, for instance, the *Seattle Times* case,

5   where there was a prior restraint, but strict scrutiny was

6   not applied.

7       Following Judge Pitman's analysis, he determined that the

8   law is content neutral.  And he did so because the ITAR does

9   not regulate disclosure of technical data, based on the

10  message it's communicating.  And that's exactly our position

11  as well.  Because the fact that some of these private

12  defendants are in favor of global access to firearms or have

13  some other agenda, is not the basis for regulating the export

14  of the computer files at issue.

15      The motivation of the government, as the government said

16  itself in its brief, is not the product of hostility towards

17  their ideas or the spread of 3D printing technology, but it's

18  the very means to easily do so.  So I believe that

19  intermediate scrutiny applies here because it's content

20  neutral.

21      If there is intermediate scrutiny, again, I'm going to

22  follow Judge Pitman's reasoning here.  There's a substantial

23  government interest in regulating the dissemination of

24  military information and combatting terrorism.  And there's

25  numerous cases on that point.  We believe that the

1    regulations here are narrowly tailored, and there's a

2    procedure to challenge it with a CJ.  And the declaration

3    from Ms. Aguirre indicated that most CJs are granted.  By

4    that, I mean you're allowed to export the item.

5         Finally, there are alternative avenues to produce this

6    information.  But here, notably, it only applies to Internet

7    posting.  They can hand them around domestically.  And also

8    there's a wide exception in the statute for general

9    scientific, mathematical or engineering papers.

10        I would note that Judge Pitman's decision relied on a

11   Ninth Circuit case, which we again believe controls, is the

12   *Chi Mak* case, from the Ninth Circuit in 2012, where the Ninth

13   Circuit quoted -- quote says, it repeatedly rejected First

14   Amendment challenges to the AECA, its implementation of

15   regulations in its predecessor statute.

16        So, again, we believe that decides the issue with the

17   First Amendment.  But Your Honor only has to reach these

18   issues on the balancing of the equities test for an

19   injunction.

20        Moving on to the balancing of the equities.  We believe

21   there's a real and present danger to the public safety.  The

22   President seems to agree.  And the preliminary injunction, if

23   it were issued, as with temporary restraining orders, will

24   not harm the government.  It would put us back to where we

25   were before this all happened.  As to the First Amendment

1   issues that have been raised by the private defendants, I'll

2   just address them there.  And they didn't have this ability

3   to publish for five years here.  And just continuing it on

4   while this litigation proceeds, we don't believe will cause

5   much harm, when compared with the irreparable harm that the

6   states would suffer, as demonstrated by our declarations.

7       I don't have anything further, unless Your Honor has any

8   questions.

9           THE COURT:  I'll catch you in rebuttal.

10          MR. RUPERT:  Okay.  Thank you.

11          THE COURT:  Um-hum.  Mr. Myers.

12          MR. MYERS:  Thank you, Your Honor.  The federal

13  government agrees that undetectable plastic firearms pose a

14  significant risk to domestic public safety.  The Department

15  of Justice is fully committed to vigorously enforcing the

16  Undetectable Firearms Act.

17          THE COURT:  How do you vigorously enforce an act to

18  find undetectable guns, until that gun ends up being used?

19  How do you proactively stop and find those things?

20          MR. MYERS:  Your Honor, federal law enforcement is

21  involved in finding all kinds of illicit contraband;

22  undetectable firearms, unlawful drugs, any number of things.

23  The federal government has a lot of experience doing that.

24          THE COURT:  Right.  But we don't just wait for the

25  heroin to be produced, and then try to find it.  We say it's

 1    against the law to produce the heroin.

 2          MR. MYERS:  Correct, Your Honor.

 3          THE COURT:  If we have something that, by definition,

 4    is undetectable and untraceable, wouldn't it make sense that

 5    it should not be manufacturable?

 6          MR. MYERS:  And to be clear, Your Honor, it is

 7    unlawful to produce an undetectable firearm.

 8          THE COURT:  Right.

 9          MR. MYERS:  As in other contexts it's unlawful to

10    produce illegal drugs.  So that is our point.  It is unlawful

11    to produce an undetectable firearm.  And it's the

12    Undetectable Firearms Act that is the basis for that

13    illegality.  And the government is fully committed to

14    enforcing that statute.

15       It's also fully committed to enforcing other prohibitions

16    on firearms ownership, by people who are ineligible to own

17    firearms:  Felons, and those who were judged mentally ill,

18    and others.  But the fact that a weapon is dangerous

19    domestically, and there's a basis to regulate it

20    domestically, doesn't mean that it provides a critical

21    military or intelligence advantage, which is the standard

22    that applies when the State Department exercises its

23    authority under the Arms Export Control Act.

24          THE COURT:  So are you saying it never should have

25    been there in the first place?

1          MR. MYERS:  Your Honor, the key event, from the

2    government's perspective, is the May notices of proposed

3    rulemaking from state and commerce, that reflect the

4    government's judgment that nonautomatic firearms, sub

5    50-caliber, do not present a critical military or

6    intelligence advantage.  So, no, I'm not saying it never

7    should have been.

8          THE COURT:  But we now have a new proposed

9    modification that will take all those weapons off the table,

10   as far as the Export Control Act goes.

11         MR. MYERS:  Correct.

12         THE COURT:  And I didn't require production of the

13   record under this tight time schedule, because I didn't want

14   you worrying about that.  But at some point the question of

15   whether this was the bureaucracy at work, but not noticing

16   that it affected 3D printed weapons; or, my goodness, let's

17   get these 3D weapons unregulated and this is the way to do

18   it, does become important, doesn't it?

19         MR. MYERS:  Your Honor, if this case -- assuming this

20   case proceeds and we're directed to produce the

21   administrative record, everything that is part of the record

22   will be before the Court.

23         THE COURT:  Well, do you know the answer to the

24   question?  Was it -- did somebody notice that this

25   modification is going to change the 3D gun thing, and it was

1   part of the process; or, we just wanted to change the

2   50-caliber or less, nonautomatic, and we didn't even think

3   about the 3D printing?

4           MR. MYERS:  Your Honor, I think the face of the

5   documents that we've relied on and put before the Court

6   suggests that there's been a year's long effort to revise the

7   United States Munitions List.  And as part of that, the

8   judgment has been made that sub-50-caliber nonautomatic

9   firearms ought not be regulated under the AECA and ITAR.  And

10  that extends to professional firearms or plastic firearms,

11  provided that they are nonautomatic and sub-50-caliber.

12          To be clear, even if the Court were to grant plaintiffs

13  every ounce of relief that they seek in this case, Defense

14  Distributed could still mail every American citizen in the

15  country the files that are at issue here.  And what that gets

16  at, and what I really want to underscore, is the fundamental

17  disconnect between the claims that plaintiffs are asserting

18  here, and the statutory regime at issue.

19          Again, there are domestic prohibitions on undetectable

20  firearms, on firearm possession.  Some of those are federal.

21  Some of those are state.  And all remain on the books and

22  capable of being enforced.  But plaintiffs are trying to rely

23  on the wrong statutes.

24          So let me start by talking about plaintiffs' theory of

25  injury, which is relevant to their claims of both standing

1    and irreparable harm.  Their main argument is that as a

2    result of these files being available, that's going to lead

3    to the proliferation of undetectable guns.  Again, that harm,

4    that potential harm is not properly traceable to the

5    regulatory action that's at issue here.  If those harms

6    occur, it will be because of separate violations of separate

7    statutory prohibitions.

8         Plaintiffs similarly try to question defendants' national

9    security judgment.  But the federal government's judgment is

10   that the risk of small-caliber weapons of this kind does not

11   justify their regulation under the Arms Export Control Act.

12        And that judgment, the federal government's national

13   security judgment, to the extent it's reviewable at all, is

14   entitled to significant deference from the Court.

15        Plaintiffs make the observation that the states are the

16   United States.  And I suppose that's true in some sense, of

17   course.  But the federal government has principal

18   responsibility for ensuring the national security of the

19   country.  And the Arms Export Control Act is part of that.

20   That's the function of that statute.

21        With respect to abrogation of state laws, plaintiffs say

22   that somehow the federal government is interfering with their

23   ability to enforce their state laws.  But that's just not so.

24   We are not suggesting that the actions at issue here

25   undermine or preempt state law in any respect.  Plaintiffs

1  are just as able to enforce those laws today as they were a

2  year ago.

3      As I've tried to indicate, this fundamental mismatch

4  between what plaintiffs are concerned about and the statute

5  on which they're relying, also really undermines their

6  prudential standing.  As a matter of prudential standing,

7  they need to show that their claims are in the zone of

8  interests of the statutory provision upon which they rely.

9  But as the Ninth Circuit has made clear, the Arms Export

10  Control Act is designed to, and I'm quoting, "Protect against

11  the national security threat caused by the unrestricted flow

12  of military information abroad."  That's the *United States v.*

13  *Posey* case from the Ninth Circuit.

14      The vast majority of the harms that they're talking about

15  are purely domestic harms that are properly the subject of

16  domestic regulation.  But they're not relevant to the foreign

17  affairs concerns of the Arms Export Control Act.  And, again,

18  plaintiffs are not able and should not be able to

19  second-guess the executive national security determinations.

20  That is the essential function of the federal government, not

21  state governments.

22      Unless Your Honor has questions on what I've said so far,

23  I'll turn to the likelihood of success on the merits of their

24  APA claims.

25          THE COURT:  Go ahead.

1        MR. MYERS:  Their primary argument is this 30-day

2   notice provision that arises from 22 U.S.C. Section 2278(f).

3   And what that statute says is that before items are removed

4   from the Munitions List, there needs to be 30 days' notice to

5   Congress.

6        Your Honor can simply look at the United States Munitions

7   List to see that nothing, no items have been removed from the

8   Munitions List.  The Munitions List consists of 21

9   categories.  And then there are items within those

10  categories.  And the items, for example in Category I, are

11  things like nonautomatic and semiautomatic firearms, to

12  caliber 50, or combat shotguns, or silencers, mufflers and

13  flash suppressors.  Again, all of those items are still

14  there.  The USML has not changed at all as a result of the

15  actions challenged here.

16       What the July 27th notice did was temporarily exclude very

17  specific technical data from the scope of the USML, and

18  essentially meant that the USML would not be applied as to

19  those specific files pertaining to those specific articles.

20  But, again, the items on the USML remain exactly the same.

21       The Heidema declaration, which we have submitted, makes

22  clear that the government has consistently, since at least

23  2011, understood the statute's use of the term "items" in

24  exactly that way.  And it further makes clear that Congress

25  has been put on notice that that's how the State Department

1    understands the statute.  So that understanding is entitled

2    to some degree of deference from this Court.

3        Indeed, 22 CFR Section 126.2 specifically contemplates

4    temporary suspensions of the regulations as to particular

5    articles.  And so what I think plaintiffs are really

6    suggesting is that that regulation is an impermissible

7    interpretation of the statute.  And that regulation is

8    likewise entitled to some degree of deference, as a

9    reasonable construction of what the statute means.

10       Plaintiffs further say that defendants have violated the

11   executive order which requires the concurrence of the

12   Secretary of Defense.  First of all, that claim only can go

13   forward if there has, in fact, been a change to items or

14   categories of items.  So in a certain sense, it's duplicative

15   of the notice to Congress claim that I was just discussing.

16   In addition, Section 6(c) of the executive order is explicit

17   that it does not create rights that are enforceable at law

18   against the United States; which is not the case in the

19   authority upon which plaintiffs have relied to try to say

20   that they can litigate under the executive order.

21       And, finally, the Heidema declaration makes perfectly

22   clear that the Defense Department has been consulted

23   throughout this process, both with respect to the notices of

24   proposed rulemaking, which would exclude all -- which would

25   remove all nonautomatic small-caliber firearms from

1   Category I, and specifically with respect to the subject

2   files that are at issue here.

3       Finally, with respect to plaintiffs' arbitrary and

4   capricious claim, we submit that the notices of proposed

5   rulemaking directly answer that claim.  Those notices of

6   proposed rulemaking make clear that the federal government

7   has been involved in a year's long process to determine what

8   kinds of weapons present a critical military or intelligence

9   advantage.  And they further reflect the government's

10  judgment that small-caliber, nonautomatic firearms, of a kind

11  that you can buy in essentially any gun store in the United

12  States, do not present such a critical military or

13  intelligence advantage.

14      And so we think that answers their arbitrary and

15  capricious claim.

16          THE COURT:  Of course you cannot buy a 3D-printed gun

17  in any firearms store in the United States that's

18  undetectable and untraceable, can you?

19          MR. MYERS:  No, Your Honor, if it were undetectable

20  and untraceable, that would be a violation of the

21  Undetectable Firearms Act.

22          THE COURT:  So what I keep coming back to, Mr. Myers,

23  is saying we're just doing this gross category of "under

24  50-caliber nonautomatic" because that has no defense or

25  international implications, may apply to every other weapon,

1   but does it apply to a 3D gun that is undetectable and

2   unprintable?  And if you look at the government's positions

3   in the case in front of Judge Pitman in Texas, they kept

4   saying:  This is different.  This is serious.  This could be

5   utilized in ways that have a direct impact on our country,

6   because of the proliferation in foreign lands, the fact that

7   people who don't have our best interests in mind can get the

8   guns and then come in with them, or use them to get on

9   airplanes.  And we could end up with other kinds of 9/11

10  situations or shoe-bomber situations.  That this was a very

11  serious issue, in and apart from the 50-caliber issue.

12      You keep wanting to say:  That's just not part of the

13  process.  It's not what we were talking about.  If it happens

14  to implicate that, we'll deal with it in the way we deal with

15  law enforcement in general.  And that doesn't comfort people,

16  because we already see mentally ill people get their hands on

17  guns and have mass shootings.  We already see people who are

18  felons get their hands on guns.  We see people, who are not

19  entitled to have guns, get their hands on guns.  We see

20  children shoot other children with what they think are toy

21  guns.  And, my goodness, these plastic guns look even more

22  like toy guns.

23      Where is the recognition, seems to be coming somewhat from

24  the President that:  Wait a minute, this is a different

25  matter, and Sarah Sanders, we're glad that the judge put a

 1   little stop in this so we can take a better look at it.

 2   Where is the better look at it?

 3        MR. MYERS:  Your Honor, since Your Honor entered the

 4   TRO, the government has been further studying and further

 5   looking into this issue, as the press secretary I think

 6   indicated she was -- or the President was welcoming that

 7   opportunity.  That further look has concluded.  And the

 8   government's position on this issue has not changed.  And the

 9   position of the United States is the position that we've set

10   out in the brief filed with this Court.

11        THE COURT:  Okay.  So that review internally in the

12   Executive Branch did occur, and the decision was made not to

13   change the position?

14        MR. MYERS:  There has been no change in position

15   since we filed our TRO brief and since we filed the PI brief

16   and this morning's hearing.

17        THE COURT:  Right.  But my question was a little bit

18   different, though.  I understand there's been no change.  But

19   was that decision not to make a change at the highest levels

20   of the Executive Branch, or we just don't know why it wasn't

21   changed.

22        MR. MYERS:  Your Honor, I can't really speak as to

23   who or where in the Executive Branch considerations, you

24   know, have or haven't taken place.  I can say that the

25   position I'm articulating today is the vetted, authorized

1    position of the United States Government.

2            THE COURT:  Great.  Thanks, Mr. Myers.  I don't want

3    to stop you.  Are you moving on to anything else?

4            MR. MYERS:  Your Honor, I think all I would add or

5    all I would just underscore is that the government

6    understands all of the harms and issues that Your Honor has

7    just identified.  Again, we understand that undetectable

8    plastic firearms are a serious security threat.  The

9    Department of Justice takes the issue seriously, is committed

10   to vigorously enforcing statutes that deal with those topics,

11   we just don't think that the Arms Export Control Act is the

12   relevant statute here.

13           THE COURT:  As far as the First Amendment issues go,

14   the federal government has never taken a position that

15   anything that had to do with the Arms Export Control Act

16   implicated First Amendment issues, correct?

17           MR. MYERS:  We've denied liability on the First

18   Amendment claim.

19           THE COURT:  And even the settlement with Defense

20   Distributed didn't admit to any First Amendment violations?

21           MR. MYERS:  It continues to deny liability, right.

22           THE COURT:  Okay.  And you understand that you and

23   the private defendants do separate on this last issue that

24   you talked about.  They want everyone to have an

25   undetectable, untraceable gun, because they -- at least

1  according to Mr. Wilson -- that's the way they will protect

2  themselves from an overbearing, overcontrolling government.

3  And so you're not on the same page on that.

4       MR. MYERS:  Again, the Department of Justice is fully

5  committed to enforcing all federal criminal laws that

6  regulate these topics.

7       THE COURT:  Thanks, Mr. Myers.

8       MR. MYERS:  Thank you, Your Honor.

9       THE COURT:  Mr. Flores.

10      MR. FLORES:  Thank you, Your Honor.  We appreciate

11  the Court's indulgence in letting us brief and argue this

12  case as something of a bystander.  We should probably start

13  by recognizing that as the Court correctly saw at the TRO

14  stage, and as we see in footnote 1 of the motion, the

15  plaintiffs don't seek any relief against us in this case.

16  And so we have views we'd like to express, but our role is a

17  unique one.

18    I think it's also critical to acknowledge that what we

19  heard both from counsel for the plaintiffs and the government

20  is that my clients could mail the files at issue to anyone in

21  the country and violate no law.  And so really what we're

22  talking about isn't the question of whether, but how much.

23  How much of this activity can occur, due to the use of the

24  Internet?  And I think that's a critical thing to realize

25  when we're looking at things like irreparable harm and the

1    evidence that you look at from the plaintiffs.

2        When you decide whether or not to enter an injunction, you

3    can't look at evidence of all of the activity that's going

4    on, you have to look at the marginal increase that would be

5    at issue in this case, because of this particular set of

6    parties.

7        I don't really want to get into the merits of a lot of the

8    discussion here.  I actually want to focus on a procedural

9    point.  And that is that this isn't an up-or-down question of

10   whether or not to continue the TRO and whether or not the

11   temporary modification should stay in place.  I think that in

12   order to sign the order that they've drafted for you, you

13   would need to conduct the analysis, the full analysis of

14   standing, and the merits, and irreparable harm, and the

15   constitutional claims, at least four times.

16       Because, remember, the temporary modification doesn't just

17   apply to 3D guns generally.  We're talking about very

18   particular files that are defined consistently throughout the

19   actions.  You have four categories.  Category I is the

20   published files, which is a defined set of expression.

21   Category II is the ghost gunner files.  Category III is the

22   CAD files.  And Category IV is the other files.

23       And the procedural point I have to make is that we have

24   very strong arguments that apply to many of these.  And the

25   plaintiffs have some okay counterarguments.  I acknowledge

1  they are close arguments.  But I think that at worst, you're

2  going to have to split the baby here.

3      For example, I think our best argument is that the cat is

4  out of the bag as to the files that are already online.

5  There is an enumerated list of ten files at issue.  These

6  belong in the category of the published files and the CAD

7  files that are already available online, no matter what

8  happens in this case.

9      And so we think that takes out their case, both at a

10  standing level and at a traceability level.  And they have an

11  answer.  And their answer is, yes, but the order also

12  concerns other files that don't exist yet.  That may be the

13  case.  I have other answers as to other files.  But that

14  means you can't issue an injunction as to the matters that

15  are already out in the public domain.

16      And so throughout the analysis, they have to thread the

17  needle all the way through as to all four pieces that we're

18  talking about here.

19      Now, on that last piece, the other files that don't exist

20  yet, we do have a solution to that, and that's a standing

21  problem.  This is precisely the kind of speculative harm that

22  isn't justiciable.  Because remember, we don't know what

23  files we're talking about.  We're just imagining what could

24  be created in the future by, not us, but the people who we

25  send expressive files to.  And so that, we think, there

1    doesn't have standing to assert.

2        The standing analysis also needs to be divided, we think.

3    We see three standing arguments.  And I think only one of

4    them is debatable.  And that one really narrows the case.

5    The first standing argument that we don't think they succeed

6    on is this pure sovereign interest in the states' ability to

7    enact their laws and to have their Executive Branch enforce

8    those laws.  They can still do that for the reasons that my

9    friend for the government explained.  But that's not at risk

10   here.

11       The second kind of standing argument they have is this

12   quasi-sovereign interest in protecting the safety of the

13   citizens and making sure that there's a peaceable place to

14   live.  This is a parens patriae argument.  The argument that

15   the government can assert the general interest in the safety

16   of its citizens.  And as a matter of law, if that ever works,

17   it only works between a state and another state or a state

18   and a private party.  It does not run in actions against the

19   government.  Because when there are two governments, only one

20   of them can assert the interests of the people, and in this

21   case it's the federal government.

22       So the best argument they have is actually not one that

23   they can deploy against the government here.

24       Then we come to the third standing piece.  And I think the

25   most arguable point is about the jails, and the notion that

1   this may make jails more expensive.  I don't think that gets

2   them there.  I think that's a speculative kind of claim.  But

3   if it does, remember when you're balancing the equities,

4   you're not balancing the harm of every citizen in the state.

5   What you're balancing is the increased expense of new weapon

6   detectors versus the balances on the other side.  So these

7   are two critical examples of how we can't just paint with a

8   broad brush and say:  3D guns, okay or not okay.  We're

9   talking about a very specific set of files.

10      I have two more points that I want to make, Your Honor.

11  One of them is a little bit in the weeds and another is sort

12  of a separate issue.  The first point is in the weeds of the

13  merits of the case, about whether a removal occurred.  You

14  heard an argument from the government that said the reason

15  there haven't been procedural violations is because an item

16  isn't at issue here.  We have a slightly different argument.

17  Even if you think that an item is at issue, removal didn't

18  occur.  Because there is a difference between removing things

19  from the list and supplying an exemption.

20      And I'll start with an analogy and then I'll take you to

21  the text.  The analogy is:  I am arguing before the Court

22  today.  I haven't been admitted to the bar.  There are rules

23  that say I have to take and be a member of the Washington

24  bar, and I'm not.  And yet I'm here.  And the fact that I'm

25  here, the Court admitted me pro hoc, it doesn't mean the

1    Court removed the requirement of bar admission from the usual

2    way of getting into court.  There's a separate system.

3         And you can see this in the statute.  It's at 2278(g)(6).

4    And that's where the statute says that the President can

5    require a license or other form of authorization.  So you see

6    this throughout the regulatory provisions as we go pretty

7    deep into it in the briefs, is that there isn't just one way

8    to turn the switch on and off.  The President has

9    flexibility.  This isn't removing anything.  We're talking

10   about an exemption.

11        The last issue I want to talk about today is the matter

12   that we filed with the Court on Sunday night.  And it's a

13   question of subject matter jurisdiction.  We are in the case

14   because the plaintiffs say we're a necessary party.  And I'm

15   not sure that that is so.  If the case continues, we'll have

16   to litigate that.  We'll have to litigate a lot of things.

17        But according to the complaint in paragraph 24, the reason

18   we're in the case is because the relief that they ask for may

19   affect the settlement agreement.  And recall that the

20   settlement agreement is a contract that involves the United

21   States as a party and my client, Defense Distributed.  So

22   they say we're here because something in this case is going

23   to affect the contract.

24        If that's so, we may have a Tucker Act problem.  And the

25   Tucker Act problem is that suits on contract belong only in

1    the court of federal claims.  And even when they can be

2    brought in district court, no injunctive relief is available.

3        Now, I'm not sure exactly what the plaintiffs mean when

4    they say this case could affect our rights under the

5    settlement agreement, so maybe we can hear that in rebuttal.

6    But if part of this case entails changing the obligations of

7    the settlement agreement, the Court has to take a hard look.

8    We've given the Court, I think, a starting point for that

9    analysis textually, so it would be a question of 1491 on

10   whether the case is founded upon the contract.  And maybe

11   it's not.  In which case, we would acknowledge if it's not

12   founded on that, we're out.  But it's a matter of subject

13   matter jurisdiction.  And I wanted to bring it to the Court's

14   attention, because of our somewhat attenuated role in the

15   case.

16       Unless the Court has further questions, we'll yield the

17   remainder of our time.

18            THE COURT:  Thanks very much, Mr. Flores.  It's nice

19   to have you here, even if it's under an exemption.

20       All right.  Mr. Rupert.  I don't think I'll need to hear

21   from Mr. Sprung.

22            MR. RUPERT:  Thank you.  Your Honor, we've had a

23   discussion of statutory schemes and going through all the

24   elements.  But I do want to highlight what's at issue here.

25   For instance, we have Moms Demand Action in the courtroom

1    here.  The public is very concerned about these 3D weapons

2    and the potential harm that they could cause.  So I want to

3    focus on the irreparable harm.  And I will certainly address

4    the points that were made.  But I think that's what drove our

5    action and is one of the defining features of this case, is

6    all of the undisputed evidence in the record demonstrating

7    irreparable harm, both from the states as well as the federal

8    government, before it made this change.

9        We heard a number of things from the federal government

10   which I think we have addressed many of them on my initial

11   presentation, but I'll just highlight a few.  We heard again

12   this idea that items, removal of items is, in fact, a

13   category.  And, again, I think we would point to largely what

14   we did before.  If you look at, particularly the executive

15   order that refers to items or categories of items, that

16   interpretation just doesn't find support.  I would also

17   highlight the declarations from the congressmen, who

18   certainly believe that they were required to give notice for

19   this.

20       There was also this idea that there was not a removal of

21   items.  Well, I submit that when you exclude items, that is,

22   in fact, a removal.  And I don't think that bears a lot of

23   discussion, unless Your Honor has questions about that.

24       I do want to highlight the arbitrary and capricious claim.

25   We had some discussion, I thought Your Honor had some very

1    good questions.  Because it's the exact points that we're

2    making here that if they're going to justify this, or attempt

3    to justify this decision about 3D guns, they can't do it by

4    referring to a rule that's not yet final.  And then even in

5    that rule, as Your Honor identified, it seems to have been a

6    broad category.  And we don't know what the reasoning was, if

7    it was administrative oversight, or if it was an intentional

8    decision.

9        But either way, when you look at the justifications in the

10   Heidema declaration for making that rulemaking proposed

11   change, again not final, it's that the items are readily

12   available.  And it's obvious that 3D guns are not readily

13   available.  And as the government then notes that, in fact,

14   it would be illegal to possess it.  So we have a disconnect

15   there.  And we believe that demonstrates, very vividly, the

16   arbitrary and capricious nature of the government's action

17   here.

18       Now, we have the private defendants kind of pointing out

19   there were a number of files at issue here and wanting a

20   separate analysis for those.  I would just point to Judge

21   Pitman's analysis, that's the one that we have followed.  And

22   I believe Judge Pitman readily addressed this issue there.

23   So I think the Court can look to Judge Pitman for that.

24       And then there's also this, I'll call it the

25   cat-out-of-the-box argument, that the idea that, well, some

of these files are out there on the Web, so that means that

whatever we're here doing today is for no good.  I

fundamentally disagree with that.  I mean, it's one thing to

have them out there on the far reaches of the Internet, but

it is a far different thing to have them readily available

for anyone to find.  So I do think that this temporary

restraining order that Your Honor has issued, as well as

potentially a preliminary injunction, has a real effect in

preventing the harm that we've identified.  And, again, we

have declarations supporting our position.  And we have

speculation on the other side.

    We also have this question that, well, this idea that, you

know, one of the things we focused on is we that have certain

files right now, but then what the government has done with

the temporary modification is opened up all kinds of 3D gun

files that will come.  And they say, well, it's too

speculative.

    Again, let's look at the record.  We have Professor Patel

talking about the advances that are going to come in 3D

printing.  So it's not speculative at all.

    Then, finally, there was a question about standing.  But

the standing analysis or argument overlooks the case law, the

special solicitude case law, in *Massachusetts v. EPA* and

*Texas v. United States of America*, which recognized that.  I

would point Your Honor to that, which is in our briefs as

1    well.  And even the private defendants recognize that the

2    proprietary standard is a much closer call, we would say it's

3    an easy call.

4         But if our metal detectors, like the one downstairs, are

5    no longer effective, we're going to have to get something

6    new.  And that doesn't come for free.  Or the other

7    alternative is start going back to hand searches, which are

8    going to present some issues of their own, about trying to

9    get everybody through, and all kinds of other situations that

10   are going to arise; if you have to search everyone by hand

11   and pat them down, it's going to take a lot more manpower.

12   So we have proprietary standing right there.

13        Then, finally, I'll address this subject matter issue

14   that's been raised in this last-minute filing with just this

15   case.  This is not a contract case.  We said that last time

16   we were here.  This is an APA case.  The reason we included

17   them in the case is that when we balanced the equities, they

18   may have an interest in that.  And so we wanted them to be

19   heard.  And they are here making their arguments.

20        But at the end of the day, this is not a contract case at

21   all.  We are attacking the government's decision to allow

22   these 3D guns to be readily available, and the administrative

23   process there.  We're not attacking the settlement agreement

24   itself.

25             THE COURT:  There may be contractual issues between

1    Defense Distributed and the federal government, based on the

2    settlement agreement.  But it's not in front of me and it's

3    not part of this lawsuit is what you're saying?

4            MR. RUPERT:  That's correct, Your Honor.

5            THE COURT:  I agree with that.  But I'm glad to have

6    Mr. Flores and his client here to express a point of view

7    that obviously the federal government isn't willing to go

8    that far.  So it's very useful to have him here.  But I agree

9    with you, I'm not touching any contract issue in the case.

10       You know, it's a little bit frustrating to be sitting in

11   this chair as a United States District Court Judge and seeing

12   this is an issue that should be solved by the political

13   branches of government.  Like I say, when the issue came

14   before me on July 30th and I had to make a decision on

15   July 31st, on probably the most significant case that I've

16   handled as a United States District Court Judge, and having

17   the shortest amount of time possible to rule on the case,

18   that was one thing.

19       But where are the political branches to step up and deal

20   with an important issue like this?  And it's very

21   frustrating, because there are justifiable criticisms:  Who

22   is this federal judge out in Seattle that's going to make

23   such an important decision?  And I'm not going to make an

24   important decision about these issues that you've raised.

25   It's not for me to do.  But it is for me to determine:  Did

1    the federal government follow their rules in making the

2    modification and sending the letter?  And I will deal with

3    those in that technical arena.

4        But a solution to the greater problem is so much better

5    suited to the other two branches of government.  And I really

6    hope and wish that the Executive Branch and Congress would

7    face up to this and say, it's a tough issue, but that's why

8    you got into public service to begin with.

9        But thanks very much.  Did you have anything else,

10   Mr. Rupert?

11           MR. RUPERT:  I do not, Your Honor.

12           THE COURT:  I'm going to take the matter under

13   advisement.  There is some excellent briefing and issues that

14   I want to take a closer look at.  I will definitely get a

15   written decision out by Monday, August 27th.  So you'll have

16   it for sure before the expiration of the TRO on the 28th.

17       Okay.  Thanks very much, counsel.  We are adjourned.

18                    (Adjourned.)

19                C E R T I F I C A T E

20

21       I certify that the foregoing is a correct transcript from

22   the record of proceedings in the above-entitled matter.

23

24   */s/ Debbie Zurn*

25   DEBBIE ZURN
     COURT REPORTER